# FLEISCHMAN BONNER & ROCCO LLP

### ATTORNEYS AT LAW

81 MAIN STREET • SUITE 515 • WHITE PLAINS • NEW YORK • 10601
TEL: 908-516-2066 • FAX: 908-516-2049 • WEB: WWW.FBRLLP.COM

**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ NOV 0 5 2021 ★

BROOKLYN OFFICE
EMAIL: sDavies@fbrllp.com

**BY HAND**

November 1, 2021

Donald C. Palmer
Clerk of Court
United States District Court, Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York  11201

**Re:  *Przewozman, et al. v. Qatar Charity, Qatar National Bank and Masraf al Rayan*, 1:20-cv-06088
    Request for Service under Fed. R. Civ. P. 4(f)(2)(C)(ii)**

Dear Mr. Palmer:

We are counsel for the plaintiffs in the above-captioned action.  We write to request service
pursuant to Federal Rule of Civil Procedure 4(f)(2)(C)(ii) of one set of the enclosed documents on
each of the three defendants at the following addresses:

> Qatar Charity
> 1224 Ahmed Ban Hanbal Street
> Doha, Qatar
>
> Qatar National Bank
> Qatar National Bank Building
> Al Corniche Street
> Doha, Qatar
>
> Masraf Al Rayan
> Grand Hamad Street, Street #119
> Building #78, Room 5
> Doha, Qatar

I am enclosing three copy sets for service, and one copy set for your files, of each of the following
documents filed in the above-captioned action:

(1)    Complaint filed on December 15, 2020 (ECF 1) in English with certified Arabic translation;

(2)    Summon issued to the addressee defendant on December 15, 2020 (ECF 4) in English with
    certified Arabic translation.

Each of the copy sets for service is enclosed in an unsealed FEDEX envelope with an
appropriately addressed, pre-paid International Priority shipping label.

Thank you for your assistance in this matter.

Respectfully submitted,

Susan M. Davies

Enclosures

AO 440 (Rev. 06/12) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Eastern District of New York

| | |
|---|---|
| Chaim Dov Przewozman, et al., ) ) ) ) *Plaintiff(s)* ) v. ) Qatar Charity, Qatar National Bank, and Masraf Al ) Rayan, ) ) ) ) *Defendant(s)* ) | Civil Action No. 20-6088    NGG-RLM |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)* Qatar Charity
1224 Ahmed Ban Hanbal Street
Doha, Qatar

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

James P. Bonner (jbonner@fbrllp.com)
Fleischman Bonner & Rocco LLP
81 Main Street, Suite 515
White Plains, New York 10601

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.



DOUGLAS C. PALMER
*CLERK OF COURT*

Date: 12/15/2020

s/Kimberly Davis

*Signature of Clerk or Deputy Clerk*

Civil Action No.  20-6088

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❑ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

❑ I left the summons at the individual's residence or usual place of abode with *(name)* _____

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❑ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

❑ I returned the summons unexecuted because _____ ; or

❑ Other *(specify):*



My fees are $ _____ for travel and $ _____ for services, for a total of $ ____0.00____ .

I declare under penalty of perjury that this information is true.


Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:



**TRANSPERFECT**

# CERTIFICATION

TransPerfect is globally certified under the standards ISO 9001:2015 and ISO 17100:2015. This Translation Certificate confirms the included documents have been completed in conformance with the Quality Management System documented in its ISO process maps and are, to the best knowledge and belief of all TransPerfect employees engaged on the project, full and accurate translations of the source material.

File Name(s): **2020-12-15 [4-2] Issued Summons – QC**

Source Language(s) **English**
Target Language(s) **Arabic**

*Appeared before me remotely*

*Authorized Signature:*

Name: **Jacqueline Yorke**

Title: **Senior Projects Manager**

Date: **22/12/2020**

*(Currently situated in the County of New York)*

*Signature, Notary Public:*

*(Currently situated in the County of New York)*

WENDY POON
NOTARY
NO. 01PO6356754
QUALIFIED IN
QUEENS COUNTY
COMM. EXP.
04-03-2021
PUBLIC
STATE OF NEW YORK

Stamp: Notary Public

LANGUAGE AND TECHNOLOGY SOLUTIONS FOR GLOBAL BUSINESS

القضية رقم RLM-NGG-06088-cv1:20 المستند 2-4 أودع بتاريخ 2020/12/15 صفحة 1 من 2 رقم تعريف الصفحة: 87

AO 440 (النسخة المنقحة 06/12) إعلان بدعوى مدنية

# محكمة الولايات المتحدة الإقليمية

المنطقة

الشرقية في نيويورك

| | | |
|---|---|---|
| حاييم دوف برزيوزمان وآخرون، | ) | |
| | ) | |
| | ) | |
| | ) | |
| _____ | ) | |
| المدعي (المدعون) | ) | دعوى مدنية رقم 20-6088    NGG-RLM |
| ضد | ) | |
| قطر الخيرية وبنك قطر الوطني ومصرف الريان، | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| _____ | ) | |
| المدعى عليه (المدعى عليهم) | ) | |

إعلان بدعوى مدنية

إلى: (اسم المدعى عليه وعنوانه)    قطر الخيرية
1224 شارع احمد بن حنبل
الدوحة، قطر

لقد رُفعت دعوى قضائية ضدكم.

خلال 21 يومًا بعد إعلانكم بهذا الاستدعاء (لا تحسب اليوم الذي تسلمته فيه) – أو 60 يومًا إذا كنت دولة الولايات المتحدة أو وكالة في الولايات المتحدة، أو مسؤول أو موظف في الولايات المتحدة الموصوفة في قواعد الإجراءات المدنية الفيدرالية ص 12 (أ)(2) أو (3) — يجب أن تعلن المدعي برد على الشكوى المرفقة أو بطلب بموجب القاعدة رقم 12 من قواعد الإجراءات المدنية الفيدرالية. ويجب إعلان الرد أو الطلب إلى المدّعي أو محامي المُدّعي، الوارد اسمه وعنوانه أدناه:

جيمس بي بونر
(jbonner@fbrllp.com)
فلیشمان بونر آند روكو إل إل بي
81 Main Street, Suite 515
White Plains, New York 10601

وفي حالة عدم الرد، فسوف يتم إصدار حكم غيابي ضدكم والقضاء بسبل الانتصاف المطلوبة في الشكوى. كما يجب عليكم أيضاً إيداع ردكم أو طلبكم لدى المحكمة.

دوجلاس سي بالمر
كاتب المحكمة

[ختم:] محكمة الولايات المتحدة الإقليمية * المنطقة الشرقية في نيويورك

توقيع/ كيمبرلي دافيس
_____
توقيع كاتب المحكمة أو نائبه

التاريخ:    2020/12/15

AO 440 (النسخة المنقحة 06/12) إعلان بدعوى مدنية (صفحة 2)

دعوى مدنية رقم 6088-20

<div align="center">

إثبات الإعلان

(يجب عدم إيداع هذا الجزء لدى المحكمة ما لم يُشترط خلاف ذلك بموجب القواعد الفيدرالية للإجراءات المدنية الصفحة (1) 4)

</div>

استلمت هذا الإعلان الموجه إلى (اسم الشخص ومسماه الوظيفي، إن وجد)

_____ في (التاريخ) _____ .

• سلمت إعلان الدعوى شخصيًا إلى المذكور في (المكان) _____

بتاريخ (التاريخ) _____

_____ ، أو

• تركت الإعلان في محل إقامة المذكور أو مكان سكنه المعتاد مع (الاسم) _____ ،

_____ وهو شخص في عمر مناسب وحسن التقدير ويقيم في المحل

المذكور، وذلك بتاريخ (التاريخ) _____ ، وأرسلت نسخة بالبريد إلى آخر عنوان معروف للمذكور، أو

• سلمت الإعلان إلى (اسم الشخص) _____ ، والمحدد قانونًا لاستلام

الإعلان نيابةً عن(اسم المنظمة) _____

_____ بتاريخ (التاريخ) _____

_____ ، أو

• أعدت إعلان الدعوى من دون تنفيذ بسبب _____ ، أو

• غير ذلك (يرجى التحديد):

| تبلغ رسومي | دولار أمريكي للسفر | دولار أمريكي للخدمات، | 0.00 دولار |
|---|---|---|---|
| _____ و _____ | | بإجمالي | أمريكي. |

أقر تحت طائلة عقوبة الحنث باليمين، أن هذه المعلومات صحيحة.

التاريخ: _____

_____
توقيع المُعلن

_____
الاسم والوظيفة طباعةً

_____
عنوان المُعلن

معلومات إضافية تتعلق بمحاولة الإعلان وما إلى ذلك:

AO 440 (Rev. 06/12) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Eastern District of New York

| | | |
|---|---|---|
| Chaim Dov Przewozman, et al., | ) | |
| | ) | |
| | ) | |
| | ) | |
| *Plaintiff(s)* | ) | |
| v. | ) | Civil Action No. 20-6088 NGG-RLM |
| Qatar Charity, Qatar National Bank, and Masraf Al Rayan, | ) | |
| | ) | |
| | ) | |
| | ) | |
| *Defendant(s)* | ) | |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*  Qatar National Bank
Qatar National Bank Building
Al Corniche Street
Doha, Qatar

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

James P. Bonner (jbonner@fbrllp.com)
Fleischman Bonner & Rocco LLP
81 Main Street, Suite 515
White Plains, New York   10601

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.



DOUGLAS C. PALMER
*CLERK OF COURT*

Date:   12/15/2020

s/Kimberly Davis

*Signature of Clerk or Deputy Clerk*

Civil Action No.  20-6088

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❏ I personally served the summons on the individual at *(place)* _____
_____ on *(date)* _____ ; or

❏ I left the summons at the individual's residence or usual place of abode with *(name)* _____
_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❏ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____
_____ on *(date)* _____ ; or

❏ I returned the summons unexecuted because _____ ; or

❏ Other *(specify):*


My fees are $ _____ for travel and $ _____ for services, for a total of $ ____0.00____ .

I declare under penalty of perjury that this information is true.


Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:



**TRANSPERFECT**

# CERTIFICATION

TransPerfect is globally certified under the standards ISO 9001:2015 and ISO 17100:2015. This Translation Certificate confirms the included documents have been completed in conformance with the Quality Management System documented in its ISO process maps and are, to the best knowledge and belief of all TransPerfect employees engaged on the project, full and accurate translations of the source material.

File Name(s): **2020-12-15 [4-1] Issued Summons - QNB**

Source Language(s) **English**
Target Language(s) **Arabic**

*Appeared before me remotely*

*Authorized Signature:*

*Name:* **Jacqueline Yorke**

*Title:* **Senior Projects Manager**

*Date:* **22/12/2020**

*(Currently situated in the County of New York)*

*Signature, Notary Public:*

*(Currently situated in the County of New York)*

NO. 01PO6356754
QUALIFIED IN
QUEENS COUNTY
COMM. EXP.
04-03-2021
WENDY POON
NOTARY
PUBLIC
OF NEW YORK

*Stamp: Notary Public*

LANGUAGE AND TECHNOLOGY SOLUTIONS FOR GLOBAL BUSINESS

القضية رقم 1:20-cv-06088-NGG-RLM المستند 1-4 أودع بتاريخ 2020/12/15 صفحة 1 من 2 رقم تعريف الصفحة: 85 ·

AO 440 (النسخة المنقحة 06/12) إعلان بدعوى مدنية

## محكمة الولايات المتحدة الإقليمية

المنطقة

الشرقية في نيويورك

| | | |
|---|---|---|
| حاييم دوف برزيوزمان وآخرون، | ) | |
| | ) | |
| | ) | |
| | ) | |
| _____ | ) | |
| المدعي (المدعون) | ) | دعوى مدنية رقم 20-6088      NGG-RLM |
| ضد | ) | |
| قطر الخيرية وبنك قطر الوطني ومصرف الريان، | ) | |
| | ) | |
| | ) | |
| | ) | |
| _____ | ) | |
| المدعى عليه (المدعى عليهم) | ) | |

### إعلان بدعوى مدنية

إلى: (اسم المدعى عليه وعنوانه)      بنك قطر الوطني
مبنى بنك قطر الوطني
شارع الكورنيش
الدوحة، قطر

لقد رُفعت دعوى قضائية ضدكم.

خلال 21 يومًا بعد إعلانكم بهذا الاستدعاء (لا تحسب اليوم الذي تسلمته فيه) - أو 60 يومًا إذا كنت دولة الولايات المتحدة وكالة في الولايات المتحدة، أو مسؤول أو موظف في الولايات المتحدة الموصوفة في قواعد الإجراءات المدنية الفيدرالية ص 12 (أ)(2) أو (3) — يجب أن تعلن المدعي بردِ على الشكوى المرفقة أو بطلبٍ بموجب القاعدة رقم 12 من قواعد الإجراءات المدنية الفيدرالية.  ويجب إعلان الرد أو الطلب إلى المدّعي أو محامي المدّعي، الوارد اسمه وعنوانه أدناه:

جيمس بي بونر (jbonner@fbrllp.com)
فليشمان بونر آند روكو إل إل بي
81 Main Street, Suite 515
White Plains, New York 10601

وفي حالة عدم الرد، فسوف يتم إصدار حكم غيابي ضدكم والقضاء بسبل الانتصاف المطلوبة في الشكوى. كما يجب عليكم أيضاً إيداع ردكم أو طلبكم لدى المحكمة.

دوجلاس سي بالمر
كاتب المحكمة

[ختم: محكمة الولايات المتحدة الإقليمية * المنطقة الشرقية في نيويورك]

التاريخ:      2020/12/15

توقيع/ كيمبرلي دافيس
_____
توقيع كاتب المحكمة أو نائبه

Case 1:20-cv-06088-NGG-RLM Document 1 Filed 11/05/21 Page 11 of 147 PageID #: 297

دعوى مدنية رقم 20-6088

AO 440 (النسخة المنقحة 06/12) إعلان بدعوى مدنية (صفحة 2)

دعوى مدنية رقم 20-6088

### إثبات الإعلان
**(يجب عدم إيداع هذا الجزء لدى المحكمة ما لم يُشترط خلاف ذلك بموجب القواعد الفيدرالية للإجراءات المدنية الصفحة (4) (1)**

استلمت هذا الإعلان الموجه إلى *(اسم الشخص ومسمّاه الوظيفي، إن وجد)*

_____ في *(التاريخ)* _____ .

• سلّمت إعلان الدعوى شخصيًا إلى المذكور في *(المكان)* _____

_____ بتاريخ *(التاريخ)* _____ ؛ أو

• تركت الإعلان في محل إقامة المذكور أو مكان سكنه المعتاد مع *(الاسم)* _____ ،

_____ وهو شخص في عمر مناسب وحسن التقدير ويقيم في المحل

المذكور، وذلك بتاريخ *(التاريخ)* _____ ، وأرسلت نسخة بالبريد إلى آخر عنوان معروف للمذكور، أو

• سلّمت الإعلان إلى *(اسم الشخص)* _____ ، والمحدد قانونًا لاستلام

الإعلان نيابة عن *(اسم المنظمة)* _____

_____ بتاريخ *(التاريخ)* _____ ؛ أو

• أعدتُ إعلان الدعوى من دون تنفيذ بسبب _____ ؛ أو

• غير ذلك *(يرجى التحديد)*:

تبلغ رسومي _____ دولار أمريكي للسفر و _____ دولار أمريكي للخدمات، بإجمالي 0.00 دولار أمريكي.

أقر تحت طائلة عقوبة الحنث باليمين، أن هذه المعلومات صحيحة.

التاريخ: _____

_____
*توقيع المُعلن*

_____
*الاسم والوظيفة طباعةً*

_____
*عنوان المُعلن*

معلومات إضافية تتعلق بمحاولة الإعلان وما إلى ذلك:

AO 440 (Rev. 06/12) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Eastern District of New York

| | |
|---|---|
| Chaim Dov Przewozman, et al., | ) |
| | ) |
| | ) |
| | ) |
| *Plaintiff(s)* | ) |
| v. | ) Civil Action No. 20-6088    NGG-RLM |
| Qatar Charity, Qatar National Bank, and Masraf Al Rayan, | ) |
| | ) |
| | ) |
| | ) |
| *Defendant(s)* | ) |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)* Masraf Al Rayan
Grand Hamad Street, Street #119
Building #78, Room 5
Doha, Qatar

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

James P. Bonner (jbonner@fbrllp.com)
Fleischman Bonner & Rocco LLP
81 Main Street, Suite 515
White Plains, New York 10601

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

DOUGLAS C. PALMER
*CLERK OF COURT*

Date: 12/15/2020

s/Kimberly Davis

*Signature of Clerk or Deputy Clerk*

Civil Action No. 20-6088

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❑ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

❑ I left the summons at the individual's residence or usual place of abode with *(name)* _____

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❑ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

❑ I returned the summons unexecuted because _____ ; or

❑ Other *(specify)*:

My fees are $ _____ for travel and $ _____ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:



**TRANSPERFECT**

# CERTIFICATION

TransPerfect is globally certified under the standards ISO 9001:2015 and ISO 17100:2015. This Translation Certificate confirms the included documents have been completed in conformance with the Quality Management System documented in its ISO process maps and are, to the best knowledge and belief of all TransPerfect employees engaged on the project, full and accurate translations of the source material.

File Name(s):        **2020-12-15 [4] Issued Summons - MAR**

Source Language(s)   **English**
Target Language(s)   **Arabic**

*Appeared before me remotely*

*Authorized Signature:*

*Signature, Notary Public:*

Name:    **Jacqueline Yorke**

Title:    **Senior Projects Manager**

Date:    **22/12/2020**

*(Currently situated in the County of New York)*

*(Currently situated in the County of New York)*

WENDY POON
NOTARY
NO. 01PO6356754
QUALIFIED IN
QUEENS COUNTY
COMM. EXP.
04-03-2021
PUBLIC
STATE OF NEW YORK

*Stamp: Notary Public*

LANGUAGE AND TECHNOLOGY SOLUTIONS FOR GLOBAL BUSINESS

القضية رقم NGG-RLM 20-cv-06088:1 المستند 4 أودع بتاريخ 2020/12/15 صفحة 1 من 2 رقم تعريف الصفحة: 83

AO 440 (النسخة المنقحة 06/12) إعلان بدعوى مدنية

## محكمة الولايات المتحدة الإقليمية

المنطقة

الشرقية في نيويورك

| | |
|---|---|
| حاييم دوف برزيوزمان وآخرون، | ) |
| | ) |
| | ) |
| _____ | ) |
| المدعي (المدعون) | ) |
| ضد | ) دعوى مدنية رقم 6088-20    NGG-RLM |
| قطر الخيرية وبنك قطر الوطني ومصرف الريان، | ) |
| | ) |
| | ) |
| | ) |
| _____ | ) |
| المدعى عليه (المدعى عليهم) | ) |

إعلان بدعوى مدنية

**إلى:** (اسم المدعى عليه وعنوانه)    مصرف الريان
شارع حمد الكبير، شارع رقم 119
مبنى رقم 78، غرفة 5
الدوحة، قطر

لقد رُفعت دعوى قضائية ضدكم.

خلال 21 يومًا بعد إعلانكم بهذا الاستدعاء (لا تحسب اليوم الذي سلمته فيه) ـ أو 60 يومًا إذا كنت دولة الولايات المتحدة أو وكالة في الولايات المتحدة، أو مسؤول أو موظف في الولايات المتحدة الموصوفة في قواعد الإجراءات المدنية الفيدرالية ص 12 (أ)(2) أو (3) ـ يجب أن تعلن المدعي برد على الشكوى المرفقة أو بطلب بموجب القاعدة رقم 12 من قواعد الإجراءات المدنية الفيدرالية. ويجب إعلان الرد أو الطلب إلى المدّعي أو محامي المدّعي، الوارد اسمه وعنوانه أدناه:

جيمس بي بونر (jbonner@fbrllp.com)
فليشمان بونر آند روكو إل إل بي
81 Main Street, Suite 515
White Plains, New York 10601

وفي حالة عدم الرد، فسوف يتم إصدار حكم غيابي ضدكم والقضاء بسبل الانتصاف المطلوبة في الشكوى. كما يجب عليكم أيضًا إيداع ردكم أو طلبكم لدى المحكمة.

[ختم:] محكمة الولايات المتحدة
الإقليمية * المنطقة الشرقية في
نيويورك

دوجلاس سي بالمر
كاتب المحكمة

التاريخ: _____2020/12/15_____

توقيع/ كيمبرلي دافيس
_____
توقيع كاتب المحكمة أو نائبه

القضية رقم 1:20-cv-06088-NGG-RLM   المستند 4 أودع بتاريخ 2020/12/15 صفحة 2 من 2 رقم تعريف الصفحة: 84 ٪

AO 440 (النسخة المنقحة 06/12) إعلان بدعوى مدنية (صفحة 2)

دعوى مدنية رقم 20-6088

## إثبات الإعلان
**(يجب عدم إيداع هذا الجزء لدى المحكمة ما لم يُشترط خلاف ذلك بموجب القواعد الفيدرالية للإجراءات المدنية الصفحة (1) 4)**

استلمت هذا الإعلان الموجه إلى *(اسم الشخص ومسماه الوظيفي، إن وجد)* _____

_____ في *(التاريخ)*.

• سلّمت إعلان الدعوى شخصيًا إلى المذكور في *(المكان)* _____

بتاريخ *(التاريخ)* _____

_____ ، أو

• تركت الإعلان في محل إقامة المذكور أو مكان سكنه المعتاد مع *(الاسم)* _____،

_____ وهو شخص في عمر مناسب وحسن التقدير ويقيم في المحل

المذكور، وذلك بتاريخ *(التاريخ)* _____ ، وأرسلت نسخة بالبريد إلى آخر عنوان معروف للمذكور، أو

• سلّمت الإعلان إلى *(اسم الشخص)* _____ ، والمحدد قانونًا لاستلام

الإعلان نيابةً عن *(اسم المنظمة)* _____

بتاريخ *(التاريخ)* _____

_____ ، أو

• أعدتُ إعلان الدعوى من دون تنفيذ بسبب _____ ، أو

• غير ذلك *(يرجى التحديد)*:

تبلغ رسومي _____   دولار أمريكي للسفر   دولار أمريكي للخدمات،   0.00 دولار

و _____   بإجمالي _____   أمريكي. _____

أقر تحت طائلة عقوبة الحنث باليمين، أن هذه المعلومات صحيحة.

التاريخ: _____

_____
*توقيع المُعلن*

_____
*الاسم والوظيفة طباعةً*

_____
*عنوان المُعلن*

معلومات إضافية تتعلق بمحاولة الإعلان وما إلى ذلك:

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------- X

CHAIM DOV PRZEWOZMAN, HADASSAH
PRZEWOZMAN, individually, as the personal
representative of the Estate of Pinches Menachem
Przewozman, and as parent and natural guardian of Y.P.,      Case No. 20-6088
a minor, and P.P., a minor, CHAYA RACHEL
PRZEWOZMAN, individually, and as parent and natural
guardian of A.M.P., a minor, and F.P., a minor,
SARA PRZEWOZMAN-ROZENBAUM, YAFA
PRZEWOZMAN, and TZVI YOSEF PRZEWOZMAN,

                                                            **COMPLAINT**

                    Plaintiffs,

                    -against-                               **Jury trial demanded**

QATAR CHARITY, QATAR NATIONAL BANK and
MASRAF AL RAYAN,

                    Defendants.

-------------------------------------------------------------------- X

        Plaintiffs, by their undersigned counsel, hereby allege the following upon information and

belief, except as to those allegations concerning Plaintiffs, which they allege based upon their

personal knowledge.

## INTRODUCTION

        1.      Plaintiffs assert claims for wrongful death, personal injury and related torts

pursuant to the Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2331 *et seq.*, against the members of a

terrorism-financing conspiracy spearheaded by the government and Royal Family of Qatar.

        2.      The members of that conspiracy sponsored and carried out a series of heinous

terrorist attacks in Israel, including the bombing that killed Pinches Menachem Przewozman and

injured his family members, the Plaintiffs in this action.

3.      For more than a decade, Qatar has openly financed and supported two organizations that the U.S. government long-ago identified as Specially Designated Terrorists ("SDTs") – the infamous Palestinian terrorist organizations Hamas and Palestinian Islamic Jihad ("PIJ"). Hamas and PIJ earned their designations as SDTs by repeatedly committing violent terrorist attacks targeting innocent victims in Israel and the Palestinian Territories.

4.      In October 2012, Qatar publicly pledged $400 million to Hamas. That lawless act evoked widespread condemnation in the U.S. Congress. In addition to substantial financial support, Qatar has provided safe haven to Hamas's senior leadership since at least 2012.

5.      To accomplish its goal of spreading acts of terrorism and violence in Israel while evading international sanctions, Qatar coopted several institutions that it dominates and controls to funnel coveted U.S. dollars (the primary currency of Middle East terrorist networks) to Hamas and PIJ under the false guise of charitable donations.

6.      Three of those institutions are Defendants in this case – Qatar Charity, Masraf Al Rayan Bank and Qatar National Bank ("QNB" and, collectively with Qatar Charity and Masraf Al Rayan, "Defendants").

7.      Qatar Charity is a Qatari organization well-known for funding terrorism throughout the Middle East and North Africa. It is a member of the Union of Good, a notorious funder of Hamas and international terrorism that the U.S. government has named as a Specially Designated Global Terrorist ("SDGT"). The chairman of Qatar Charity's board is Hamad bin Nasser al-Thani, a member of the Qatari Royal Family.

8.      Pursuant to their unlawful conspiracy, the Defendants and their co-conspirators provided material support and resources to Hamas and PIJ that allowed those terrorist

2

organizations to carry out the attacks that killed Pinches Menachem Przewozman and countless other civilians in Israel and the Palestinian Territories and injured an even larger number of non-combatants.

9.     In furtherance of that conspiracy, Qatar Charity collected and funneled millions of dollars in donations through the U.S. financial system.

10.     Qatar Charity solicited donations in Qatar and around the world and then transferred those funds to its account at Masraf Al Rayan in Doha, Qatar. Masraf Al Rayan then utilized its "correspondent" bank account located in New York to conduct transactions involving U.S. dollars ("USD") and to transfer funds from Doha, through New York, to Qatar Charity's accounts in the Palestinian Territories at either the Bank of Palestine or the Islamic Bank in Ramallah.

11.     Once Qatar Charity's branches in the Palestinian Territories secured those funds, the branches distributed the U.S. dollars or funds denominated in other currencies to Hamas and PIJ, as well as supposed charities affiliated with those terrorist organizations.

12.     Hamas and PIJ then utilized those funds to finance terrorist activities in Israel and the Palestinian Territories, including the attack that killed Pinches Menachem Przewozman and injured his family members.

13.     Masraf Al Rayan is currently under investigation in the United Kingdom for, among other things, knowingly providing financial services to Hamas and PIJ by utilizing Qatar Charity to pass funds to those terrorist organizations.

14.     Like Masraf Al Rayan, QNB took numerous overt acts in support of the conspiracy that resulted in the death of Pinches Menachem Przewozman. In coordination with the other

3

Defendants and their co-conspirators, QNB maintained at least six accounts for Qatar Charity and provided a host of banking services for the leaders of terrorist organizations. Indeed, Qatar Charity specifically requested that donors send funds to its accounts at QNB.

15.     QNB maintained dozens of accounts for Hamas terrorists, including: (a) one of the FBI's most wanted female terrorists, who is currently fighting extradition to the U.S. from Jordan; (b) a spokesperson for, and the former leader of, Hamas's military wing in the West Bank, who was convicted for orchestrating murderous terrorist attacks in Israel; (c) a member of Hamas's politburo, who was convicted for his role as a Hamas terror cell operative; and (d) the Chairman of the Union of Good, a U.S.-designated terrorist organization sanctioned for funding Hamas's terrorist activities.

16.     All of those QNB accounts were used to finance the terrorist activities of Hamas and PIJ in Israel and the Palestinian Territories.

17.     The attack that killed Pinches Menachem Przewozman and injured Plaintiffs occurred on May 5, 2019, when Hamas and PIJ terrorists targeted civilians residing in Israel with over 600 rockets fired from positions within the Gaza Strip.

18.     As a result of that terrorist attack, Plaintiffs have suffered severe physical and/or psychological injuries.

19.     Accordingly, Defendants are liable to Plaintiffs under the ATA for providing material assistance to Hamas and PIJ, engaging in a conspiracy designed to support those organizations' terrorist activities, and aiding and abetting that unlawful conduct.

## JURISDICTION AND VENUE

20.      Pinches Menachem Przewozman, a citizen of the United States, was killed by acts of international terrorism that arose from the Defendants' conspiracy to support Hamas and PIJ. The Plaintiffs in this action are the representative of his estate and his survivors and heirs, all of whom were injured by the same acts of international terrorism.

21.      As a result, this Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 18 U.S.C. §§ 2333(a) and 2338.

22.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) and (d).

23.      Defendants are subject to personal jurisdiction in the United States pursuant to 18 U.S.C. § 2334(a), CPLR § 302, and Fed. R. Civ. P. 4(k)(1)-(2) because, pursuant to a conspiracy, they: transacted business and committed tortious acts within the United States (and New York) by transferring funds through the United States (and New York) for the benefit of Hamas and PIJ; and purposefully availed themselves of the benefits and protections offered by the New York banking system and New York law in the course of committing the wrongful acts Plaintiffs allege. Throughout the course of the conspiracy, all Defendants recognized that Hamas and PIJ had a long history of utilizing the funding they obtained to conduct terrorist attacks that killed Americans who resided in, or were visiting, Israel or the Palestinian Territories.

24.      Specifically, in furtherance of their conspiracy, Qatar Charity and Masraf Al Rayan, with the knowledge of their co-conspirator, QNB, knowingly effectuated U.S. dollar-denominated funds transfers on behalf of Qatar Charity through the Bank of New York Mellon in New York.

25.      Pursuant to their agreement with QNB, Qatar Charity and Masraf Al Rayan effectuated those bank transfers for the purpose of advancing the interests of Hamas and PIJ and

facilitating the ability of those terrorist organizations to conduct attacks in Israel and the Palestinian Territories.  Furthermore, all Defendants recognized that Hamas and PIJ were U.S.-designated terrorist organizations at the time Defendants orchestrated those transfers.

## THE PARTIES

### A. Plaintiffs

26.     Plaintiff Hadassah Przewozman is a citizen of Israel and the wife of the deceased, Pinches Menachem Przewozman.  At all relevant times, Pinches was a U.S. citizen.

27.     Pinches was killed as a result of the May 5, 2019 rocket attacks that Hamas and PIJ launched at civilians residing in Israel from the Gaza Strip.  The terrorist attack that killed Pinches was party of a two-day bombing spree that Hamas and PIJ commenced on May 4, 2019.

28.     Hadassah brings this action under the ATA in her personal capacity for loss of consortium and intentional infliction of emotional distress.

29.     Hadassah also asserts claims under the ATA as the personal representative of Pinches's estate for wrongful death, pain and suffering and intentional infliction of emotional distress.

30.     In addition, Hadassah asserts claims as the guardian of Y.P. and P.P., both of whom are citizens of Israel and the sons of Hadassah and Pinches.

31.     On behalf of Y.P. and P.P., Hadassah seeks damages under the ATA for loss of consortium and intentional infliction of emotional distress.

32.     Plaintiff Chaim Dov Przewozman is and was, at all relevant time, a citizen of U.S. and the father of Pinches Menachem Przewozman.  Chaim brings this action under the ATA for loss of consortium and intentional infliction of emotional distress.

33.     Plaintiff Chaya Rachel Przewozman is a citizen of Israel and the mother of Pinches Menachem Przewozman.  Chaya brings this action under the ATA for loss of consortium and intentional infliction of emotional distress.

34.     Chaya also brings this action as the guardian of A.M.P. and F.P., who are citizens of the U.S. and the brother and sister, respectively, of Pinches Menachem Przewozman.

35.     On behalf of A.M.P. and F.P., Chaya seeks damages under the ATA for loss of consortium and intentional infliction of emotional distress.

36.     Plaintiff Sara Przewozman-Rozenbaum is a citizen of the United States and the sister of Pinches Menachem Przewozman.  Sara brings this action under the ATA for loss of consortium and intentional infliction of emotional distress.

37.     Plaintiff Yafa Przewozman is a citizen of the United States and the sister of Pinches Menachem Przewozman.  Yafa brings this action under the ATA for loss of consortium and intentional infliction of emotional distress.

38.     Plaintiff Tzvi Yosef Przewozman is a citizen of the United States and the brother of Pinches Menachem Przewozman.  Tzvi brings this action under the ATA for loss of consortium and intentional infliction of emotional distress.

**B.  Defendants**

**(1).  Qatar Charity**

39.     Qatar Charity was founded in 2002 as the Qatar Charitable Society.  It soon became a key funding source for international terrorists.

40.     The Qatar Charitable Society renamed itself Qatar Charity after it became notorious under its prior name for financing international terrorism.

7

41.     In March 2008, the U.S. Interagency Intelligence Committee on Terrorism (IICT)[1] of the U.S. National Counterterrorism Center listed Qatar Charity (then known as Qatar Charitable Society) as a "priority III terrorism support entity (TSE)" because of its "intent and willingness" to support terrorist organizations that attack the U.S. and its interests.

42.     Long before then, however, Qatar Charity had engaged in a pattern of support and financing of international terrorist organizations.

43.     In testimony to the 9/11 Commission and Congress, Jamal al-Fadl, a former business aide to Osama bin Laden who defected to the United States in 1996, said that Bin Laden told him in 1993 that the Qatar Charitable Society was one of Bin Laden's major sources of funding.

44.     In 2002, in a terrorism-related criminal case in the United States District Court for the Northern District of Illinois, the U.S. government confirmed that the Qatar Charitable Society financed Osama Bin Laden, who used the funds to carry out the 1998 East Africa embassy bombings.[2]

45.     The 2003 testimony provided by Matthew Epstein and Evan Kohlmann to the U.S. House Committee on Financial Services Subcommittee on Oversight and Investigations (the

---

[1] The IICT was established in 1997 pursuant to the National Security Act of 1947 to "advise and assist the Director of Central Intelligence (DCI) in the discharge of his duties and responsibilities with respect to the coordination and publication of national intelligence on terrorism issues and … promote the effective use of Intelligence Community resources for this purpose." The DCI Terrorism Warning Group was charged with preparing "coordinated Intelligence Community threat warnings from the DCI to alert senior policy makers of possible foreign terrorist attacks against US and allied personnel, facilities and interests." https://fas.org/irp/offdocs/dcid3-22.pdf.

[2] "Government's Evidentiary Proffer Supporting the Admissibility of Co-Conspirator Statements," *United States of America v. Enaam M. Arnaout*, Case #: 02 CR 892 (N.D. Ill. Jan. 31, 2003) (the "Arnaout Proffer").

"Epstein/Kohlmann Testimony") provides additional evidence of the Qatar Charitable Society's support for terrorism.

46.     The Epstein/Kohlmann Testimony noted that the Qatar Charitable Society engaged in the "active financing of Al-Qaida and other designated international terror groups" and "served a critical role in the Arab-Afghan terrorist infrastructure by laundering money originating from bank accounts belonging to Bin Laden and his sympathetic patrons in the Arabian Gulf, providing employment and travel documents to Al-Qaida personnel worldwide, and helping 'to move funds to areas where Al-Qaida was carrying out operations.'" http://archives-financialservices.house. gov/media/pdf/ 031103me.pdf (quoting the Arnaout Proffer).

47.     The Epstein/Kohlmann Testimony also emphasized that, while Qatar Charitable Society touted its humanitarian work, its "charitable mission represented little more than an excuse to provide material support to terrorists."

48.     In addition to serving as a major financial conduit for Al-Qaida, Qatar Charity has financed and supported other terrorist organizations throughout the Middle East, Africa and elsewhere.

49.     For example, Qatar Charity actively aided radical quasi-official terrorist militias associated with the National Islamic Front (NIF) in Sudan.

50.     In the 1990s, Qatar Charity supported the Eritrean Islamic Jihad Movement, another terrorist organization in Africa.

51.     Outside of Africa, Qatar Charity was extremely active in terrorist activities in the Balkans and the turbulent republics of the Caucasus.

9

52.     Qatar Charity has also acted as a financier and agency for terrorist organizations in Chechnya and Mali and funded Syria's Ahfad al-Rasul Brigade.

53.     In addition, Qatar Charity provided funding to, and partnered with, Islamic Relief Worldwide, which Israel banned in 2014 for funding Hamas.

54.     In July 2008, Israel's Defense Minister signed an order banning Qatar Charity (then known as the Qatar Charitable Society) and all of its branches operating in the territories administered by the Palestinian Authority.  The same Israeli government order designated Qatar Charity as a member of the Union of Good, a notorious funder of Hamas terrorism.

55.     At the time of that designation, Israel also expressly warned all world banking and financial institutions to "prepare accordingly and act with caution in order to avoid criminal actions and civil lawsuits by victims of terrorism," including those brought in the United States.

56.     In November 2008, the U.S. Department of the Treasury ("Treasury") designated the Union of Good as an SDGT.

57.     That designation declared that the Union of Good was "an organization created by Hamas leaders to transfer funds to the terrorist organization."  The Treasury designation further emphasized that "the primary purpose of this activity is to strengthen Hamas's political and military position in the West Bank and Gaza, including by: (i) diverting charitable donations to support Hamas members and the families of terrorist operatives; and (ii) dispensing social welfare and other charitable services on behalf of Hamas."

58.     The Treasury designation stated that the supposed charitable services that the Union of Good provided in the West Bank and Gaza included making so-called "martyr" payments to the families of suicide bombers.  The Union of Good also promoted terrorism by making payments

directly to other perpetrators of terrorism and by making support payments to the families of convicted terrorists serving jail time in Israel.

59.     In that regard, the Treasury designation stated, "In addition to providing cover for Hamas financial transfers, some of the funds transferred by the Union of Good have compensated Hamas terrorists by providing payments to the families of suicide bombers."

60.     Treasury further found that "Union of Good acts as a broker for Hamas by facilitating financial transfers between a web of charitable organizations . . . and Hamas-controlled organizations in the West Bank and Gaza."

61.     Long before the Union of Good designation, Treasury had designated Hamas as a terrorist organization in October 1997.

62.     In 2017, to avoid suspicion from international banks after a damning report by the UK Charity Commission noting its connections to Hamas and the Muslim Brotherhood, the UK branch of Qatar Charity renamed itself Nectar Trust.

63.     Saudi Arabia, Bahrain, Egypt, and the United Arab Emirates ("UAE") cut ties with Qatar on June 5, 2017, due to Doha's connections with, and support of, terrorist organizations.

64.     In June 2019, Saudi Arabia, Bahrain, Egypt and the UAE designated Qatar Charity as a financial supporter of terrorism.

65.     At all times relevant to this Complaint, the chairman of the Qatar Charity board has been Hamad bin Nasser al-Thani, a member of the Qatari royal family.

        **(2).    <u>Masraf Al Rayan Bank</u>**

66.     Masraf Al Rayan, founded in January 2006, is a publicly held banking company headquartered in Doha, Qatar.

67.     Masraf Al Rayan purports to engage in banking, financing and investing activities in conformity with the principles of Islamic Sharia Law.  It is regulated by the Qatar Central Bank and is one of the largest Islamic banks in the world, with a market capitalization of $7.5 billion.

68.     Masraf Al Rayan is controlled by the Qatari government and members of the Qatari royal family through their substantial stock ownership in the bank and membership on the Bank's board of directors.  Several members of the Qatari royal family (the House of Thani) are or have served as members of the bank's board.

69.     According to Masraf Al Rayan's most recent Annual Report, the bank's four largest shareholders are all agents or instrumentalities of the Qatari government: Qatar's General Retirement Authority's Pensions Fund holds 2.88% of the bank's stock; the Qatar Investment Authority, a Qatari government entity responsible for developing, investing and managing the reserve funds of the State of Qatar and other assets assigned to it, holds 4.09%; the Qatar Armed Forces Investment Portfolio holds 9.31%; and the Qatar Holding Company, the main direct investment subsidiary of the Qatar Investment Authority, holds 11.65%.

70.     Notwithstanding Qatar Charity's longstanding and highly publicized support for Hamas and other international terrorist organizations, Masraf Al Rayan provided Qatar Charity with financial services throughout the time relevant to Plaintiffs' claims.  Indeed, Masraf Al Rayan continues to provide those services to Qatar Charity to this day.

71.     Masraf Al Rayan owns 70 percent of Al Rayan (UK) Limited, which owns 98.34% of its subsidiary, Al Rayan Bank PLC.  By virtue of its share ownership in Al Rayan (UK) Limited, Masraf Al Rayan controls that entity and its subsidiary, Al Rayan Bank PLC.

72.     Al Rayan Bank PLC, formerly known as Islamic Bank of Britain, is a commercial

bank in the United Kingdom. That entity was established in August 2004 to offer Sharia-compliant financial services to UK customers.

73.     Al Rayan Bank PLC notified its shareholders in late 2019 that it was under investigation by the United Kingdom's Financial Conduct Authority ("FCA").

74.     The FCA investigation arises from the financial services that Al Rayan Bank PLC provided to designated terrorist entities. The bank's clients include Interpal, which Treasury designated as a terrorist entity in 2003 due to Interpal's funding links to Hamas.

75.     Al Rayan Bank PLC also provides services to the Nectar Trust, the U.K. branch of Qatar Charity. Nectar Trust, previously known as Qatar Charity UK, has received more than £37 million (roughly $49.4 million as of the date of this pleading) from Qatar Charity.

76.     Nectar Trust is partners with the Emaan Trust, a group whose leaders have close links to the extremist Muslim Brotherhood in England's northern city of Sheffield.

(3).     **QNB**

77.     QNB, founded in 1964, was Qatar's first domestically owned commercial bank.

78.     The Qatar Investment Authority, Qatar's state-owned sovereign wealth fund, owns a 50% interest in QNB.

79.     The Qatar Investment Authority was founded in 2005 by Qatar's then-Emir, Hamad bin Khalifa Al Thani. Hamad bin Jassim bin Jaber bin Mohammed bin Thani Al Thani, the former Prime Minister and Foreign Minister of Qatar, ran the Qatar Investment Authority until 2013. From 2015 to 2018, Sheikh Abdullah bin Mohammed bin Saud Al Thani, another member of the Qatari royal family, served as the Qatar Investment Authority's CEO.

80.     QNB is controlled by the Qatari government and members of the Qatari royal

family through their substantial stock ownership in the bank and membership on the bank's board of directors.  Several members of the Qatari royal family are or have been members QNB's board, including the bank's current vice-chair.

81.   QNB markets its ability to provide "Sharia compliant current accounts in numerous currencies" and associated services throughout the Middle East and in the U.K.  According to QNB, its "Islamic products and offerings are approved by our Sharia Supervisory Board (SSB)."

82.   Yousuf Abdulla Al-Qaradawi, the Chairman of the Union of Good, sits on the QNB SSB even though the Union of Good is a U.S.-designated terrorist organization created by Hamas to collect funding through purported charitable donations.

## THE FACTUAL BASES FOR PLAINTIFFS' CLAIMS

## I.   THE CONSPIRACY AMONG QATAR AND DEFENDANTS TO FUND HAMAS AND PIJ IN CIRCUMVENTION OF U.S. AND INTERNATIONAL SANCTIONS

### A.   Hamas

83.   Hamas is an acronym for "Harakat al-Muqawama al-Islamiyya," the Islamic Resistance Movement.  Hamas was founded in December 1987 by Sheikh Ahmed Yassin, Salah Shehada, Abd al-Aziz al-Rantisi, Muhammad Sham'a, Ibrahim al-Yazuri, Issa al-Nashar and Abd al-Fatah Dukhan.

84.   Hamas is an offshoot of the Muslim Brotherhood, a radical Islamic group founded in Egypt before World War II.

85.   Hamas is a U.S. government-designated Foreign Terrorist Organization ("FTO") dedicated to radical Islamist principles and the destruction of the State of Israel.  It uses violence, including suicide bombings and missile attacks, and threats of violence in an attempt to pressure Israel to cede territory to the Palestinian people.

86.     Hamas is nominally divided into three interconnected wings: (i) a political organization; (ii) the "Da'wa," Hamas's social service or humanitarian component; and (iii) a military operational wing known as the Izz-al-Din al-Qassam Brigades.

87.     Although these components have separate responsibilities, the Hamas organization operates seamlessly, with each component working together to conduct and support the military operations and achieve the illegal objectives of the terrorist group as a whole.

88.     Hamas's social services are, in large part, administered by local "zakat" committees and charitable societies.  Hamas either established these committees or coopted them by, *inter alia*, installing Hamas members, operatives and activists as members of the zakat committees' governing bodies.  These committees and organizations collect and distribute funds on behalf of Hamas for the organizations' purposes.

89.     The zakat committees play important roles in channeling funds to pay expenses for, and assist the families of, terrorist operatives who are arrested, injured or killed.

90.     The zakats also assist with providing housing subsidies to the families of suicide bombers, whose homes are often demolished by the Israeli army after the bombers' identities are confirmed.  The zakat committees also helped to identify and recruit potential terrorists.

91.     Hamas regularly routs significant sums that it nominally collects for charitable and humanitarian purposes to terrorist and other operational uses.  Hamas used (and still uses) those funds to obtain weapons and explosives and to provide transportation services, safehouses, training and salaries for its terrorist operatives and recruiters.

92.     Even the funds the zakats utilize for charitable purposes free up other money for use in connection with terrorist acts.  And the funds Hamas uses for charitable purposes directly

support its military operations, as they bolster Hamas's image-making machine, which increases its fundraising and attracts new foot soldier recruits.

**B. PIJ**

93.     Founded in Gaza in 1981, PIJ is a radical Islamist terrorist organization committed to the globalization of Islam through violent "jihad," or holy war.

94.     PIJ is formally committed to the destruction of the State of Israel and to achieving its objectives by violent means, including acts of terrorism.

95.     Since its creation, PIJ has carried out dozens of terrorist attacks in Israel.  These attacks have killed and injured hundreds of Israelis and Americans.

96.     As with Hamas, PIJ controls dozens of purportedly charitable Non-Government Organizations and religious organizations operating in the Palestinian Territories.

97.     PIJ also routs significant sums that it nominally collects for charitable and humanitarian purposes to terrorist and other operational uses.  Even the funds that PIJ uses for charitable purposes free up other money for use in connection with PIJ's terrorist activity.

98.     PIJ used (and still uses) those funds to obtain weapons and explosives and to provide transportation services, safehouses, training and salaries for its terrorist operatives and recruiters.

99.     Even the funds that PIJ uses for actual charitable purposes directly support its military operations, as they bolster PIJ's image-making machine, which increases its fundraising and attracts new foot soldier recruits.

16

C. **The Formal Designation of Hamas and PIJ as Terrorist Organizations**

100.    In 1989, the Government of Israel declared Hamas a terrorist organization and designated it an "unlawful organization" because of its terrorist acts. Notice of the designation was placed in the Announcements and Advertisements Gazette, an official Government of Israel publication.

101.    On January 23, 1995, President Clinton issued Executive Order No. 12947, which found that "grave acts of violence committed by foreign terrorists that threaten to disrupt the Middle East peace process constitute an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States."

102.    Executive Order No. 12947 designated Hamas and PIJ as SDTs and "blocked" all of their property and interests in property.

103.    On October 8, 1997, by publication in the Federal Register, the United States Secretary of State designated Hamas and PIJ as Foreign Terrorist Organizations ("FTOs") pursuant to Section 219 of the Immigration and Nationality Act and the Antiterrorism and Effective Death Penalty Act of 1996. The designations of Hamas and PIJ as FTOs have been renewed every two years since 1997.

104.    After the September 11, 2001 terrorist attacks on the United States, President Bush issued Executive Order No. 13224, which declared a national emergency with respect to the "grave acts of terrorism ... and the continuing and immediate threat of further attacks on United States nationals or the United States."

105.    Executive Order No. 13224 designated Hamas and PIJ as SDGTs. That Executive Order also blocked all property and interests in property of SDGTs, including Hamas and PIJ.

17

### D.  Qatar's Direct and Deliberate Funding of Hamas and PIJ and Provision of Safe Haven to Hamas Leadership

106.    From at least 2011 through 2015, Hamas and PIJ knowingly, willfully, and unlawfully combined, conspired, confederated and agreed with Defendants to commit numerous acts of international terrorism, as defined by 18 U.S.C. §§ 2331 and 2332.  Those acts of international terrorism included acts of murder, attempted murder, and solicitation to commit murder, as well as providing material support to designated FTOs.

107.    Like any enterprise, terrorist organizations like Hamas and PIJ require money to operate.  But unlike legitimate companies, terrorist organizations must conduct their fundraising and other financial activities in a clandestine manner.

108.    As a result, Hamas and PIJ – like many other terrorist organizations – employ creative fundraising strategies that rely heavily upon sympathetic nation states and financial institutions to disguise the financial activities of Hamas and PIJ and thereby facilitate their efforts to evade anti-terrorism laws.

109.    In large part, Hamas and PIJ endeavored to cloak their terror-financing efforts in a veneer of "charitable" donations.

110.    The government of Qatar has long maintained an official policy of providing financial support to Hamas, often disguised as purported charitable donations.

111.    Defendants, all of which the Qatari government and royal family dominate, have played integral roles in Qatar's support of Hamas and PIJ.

112.    Qatar's support for Hamas started at least as early as 2006.  At that time, shortly after the elections that brought Hamas to power in Gaza, Qatar pledged $50 million to what was then a Hamas-dominated Palestinian Authority government.

18

113.    In 2008, Palestinian officials stated that Qatar provided Hamas with "millions of dollars a month" nominally intended for the people of Gaza.[3]

114.    In October 2012, Qatar pledged $400 million to Hamas.  In response, 24 U.S. members of Congress wrote to the Qatari ambassador, stating that Qatar's support of "Hamas, a U.S.-designated Foreign Terrorist Organization . . .  legitimizes, and bolsters an organization committed to violence and hatred."

115.    A 2013 memo marked "secret" addressed to Sheikh Hamad bin Jassem (Qatar's Prime Minister and Foreign Minister and a Qatari royal family member) from Ali Fahad Al-Hajri, the Qatari Assistant Minister of Foreign Affairs, shows the extent of the Qatari government's support for Hamas.

116.    Al-Hajri's memo noted that, at bin Jassem's instruction, $250 million had been paid from the Qatar Central Bank directly to Hamas's leader, Khaled Meshal.  The memo stated: "I would like to inform Your Excellency that the approved payment was extracted from the emergency fund at the Ministry of Finance by check no. (060622496) dated 27/01/2013 and drawn from Qatar Central Bank on behalf of Mr. Khaled Abdel Rahim Ismail Abdel Kader Misha'al, (Hamas)."

117.    Qatar is Hamas's largest single funder.  Between 2012 and 2018, Qatar officially provided Hamas with over $1.1 billion.

.

---

[3] "Qatar Seen Bankrolling Hamas," *The Washington Times,* March 5, 2008 (available at http://www.washingtontimes.com/news/2008/mar/05/qatar-seen-bankrolling-hamas/?page=all).

118.    In March 2014, Treasury Under Secretary David Cohen singled out Qatar as an especially "permissive jurisdiction" for terrorist financing.  He noted that Qatar "has for many years openly financed Hamas, a group that continues to undermine regional stability."

119.    At the same time, Cohen noted that Qatari oversight is so lax that "several major Qatar-based fundraisers act as local representatives for larger terrorist fundraising networks that are based in Kuwait."  Cohen further stated that Qatar not only supports Hamas, but also extremist groups operating in Syria. *See* https://www.treasury.gov/press-center/press-releases/Pages /jl2308.aspx.

120.    Other Middle Eastern governments have also recognized the substantial role that Qatar's government plays in supporting terrorism in the region.  Saudi Arabia, Bahrain, Egypt, and the UAE all cut ties with Qatar on June 5, 2017, due to Qatar's longstanding connections with terrorist organizations.

121.    In addition to substantial financial support, Qatar has provided safe haven to Hamas's political leadership since 2012.  Among other Hamas officials, the organization's current leader, Khaled Meshal, has resided in Qatar since 2012.

122.    Moreover, in April 2013, Qatar chartered a private flight to transport senior Hamas political leader Ismail Haniyeh, who was at that time a leader of the Palestinian National Authority, to Doha.

123.    Qatar arranged for two founders of Hamas's military wing, Yehia Sinwar and Rawhi Mushtaha, to join Haniyeh on that flight.

124.    As of February 2020, Haniyeh was still living in Qatar.

### E. Qatar's Use of the Bank Defendants to Facilitate the Illicit Funding of Hamas and PIJ

125. The U.S. government has recognized the critical role that Qatar plays in funding terrorist organizations.

126. According to the March 4, 2014 prepared statements of David Cohen, who was then serving as Treasury Under Secretary for Terrorism and Financial Intelligence:

> Private fundraising networks in Qatar . . . increasingly rely upon social media to solicit donations for terrorists and to communicate with both donors and recipient radicals on the battlefield. This method has become so lucrative, and Qatar has become such a permissive terrorist financing environment, that several major Qatar-based fundraisers act as local representatives for larger terrorist fundraising networks . . . . There should be no doubt that while we remain committed to working with countries such as . . . Qatar to confront ongoing terrorist financing, the U.S. will not hesitate to act on its own to disrupt these terrorist financing networks.[4]

127. Consistent with Under Secretary Cohen's remarks, Qatar exploited its control of Masraf Al Rayan to use the bank to funnel money to Hamas and PIJ under the guise of donations to various purported "charitable" organizations. Qatar Charity was the principal beneficiary of that illicit scheme.

128. From March 1, 2015 until September 7, 2015 alone, Defendants conspired to use Masraf Al Rayan to transfer over $28 million in supposed charitable donations from Qatar Charity in Doha to its two branches in the Palestinian Territories (one in Gaza and the other in the West Bank).

129. Qatar Charity eventually transferred a substantial portion of those funds to Hamas, PIJ, and supposed charities controlled by those terrorist organizations.

---

[4] https://www.treasury.gov/press-center/press-releases/Pages/jl2308.aspx.

130.     Among other supposed charities tied directly to Hamas, Qatar Charity transferred at least $150,000 to Hebron Islamic Charity Society between March 2011 and September 2015.

131.     Well before that time period, Israel had outlawed the Hebron Islamic Charity Society because it operated as an arm of Hamas.

132.     According to the confessions of the Director and staff of Qatar Charity's Ramallah Branch (located about 10 miles from Jerusalem), as well as that organization's financial books, the conspiracy to fund Hamas involved the following steps designed to pass U.S. dollars ("USD") through the American banking system for Hamas's benefit:

        a.     Qatar Charity would solicit donations in Qatar and around the world.

        b.     Qatar Charity would transfer those funds to its account at Masraf Al Rayan in Doha.

        c.     Between 2009 and 2015, Masraf Al Rayan arranged for currency exchange transactions that involved converting in excess of $3.5 million in USD and Euros held by Qatar Charity in Doha into Israeli shekels and moving those funds to Qatar Charity in the Palestinian Territories.

        d.     The USD used in connection with those transactions passed through Bank of New York Mellon in New York and on to the Qatar Charity accounts held at either the Bank of Palestine or the Islamic Bank in Ramallah.

        e.     Qatar Charity then distributed a portion of those funds to Hamas, PIJ, and their affiliates.

22

    f.     In addition to those funds, between 2011 and 2013, Qatar Charity moved $25 million from Doha to the banned Qatar Charity entity operating in the Gaza Strip.

    g.     Those dollars also passed through the Bank of New York.

133.    Qatar Charity annual reports for 2013, 2014, and 2015 reflect that Qatar Charity transferred funds to, and carried out joint projects with, various Hamas and PIJ fronts, including the Elehssan Society.

134.    On May 4, 2005, Treasury designated the Elehssan Society "a charitable front for the Palestinian Islamic Jihad." A Treasury press release announcing the designation stated that "in addition to its use as a financial conduit, Elehssan is used by PIJ to recruit for its operational cadre. In early 2003, Elehssan planned to open a youth center to support PIJ activity and conduct PIJ-related recruitment and training."

135.    Stuart Levey, then Treasury Under Secretary for the Office of Terrorism and Financial Intelligence, noted that "Elehssan masquerades as a charity, while actually helping to finance Palestinian Islamic Jihad's acts of terror against the Israeli people and other innocents."

136.    In a criminal proceeding involving a notorious PIJ finance ring operated by former University of South Florida professor Sami Al-Arian, Elehssan was also named as a recipient of support from the three defendants.

137.    Despite Qatar Charity's clear and substantial links to terrorist entities, Masraf Al Rayan completed USD transfers to Qatar Charity in the Palestinian Territories throughout the conspiracy. Those transfers proceeded in defiance of Israeli law, which governs banking activity in the territories.

23

138.    During the entirety of the conspiracy, Qatar Charity was operating illegally in the Palestinian Territories, as Israel had designated Qatar Charity a member of the Union of Good, and specifically as a funder of Hamas, in 2006.  Qatar Charity was therefore banned from operating within Israel.

139.    Additionally, during the entirety of the conspiracy, Qatar Charity was listed as a priority III terrorism support entity by the United States Interagency Intelligence Committee on Terrorism.

140.    In 2009, however, the Qatari government decided, in defiance of Israeli law, to re-open Qatar Charity's operations in the Palestinian Territories.

141.    Qatar Charity's operations again ceased in July 2015, however, when the Israeli government intervened to shutter the organization and arrest three of its senior executives (Fadi Mansra, Judeh Jamal and Najwan Odeh).

142.    The Qatari government demonstrated its loyalty to Qatar Charity even after the arrest of those three individuals and the closing of Qatar Charity's operations in the Palestinian Territories.

143.    In 2017, Mr. Jamal—who had served as Qatar Charity's Director—was convicted in Israel for operating an illegal organization and transferring funds to Hamas.  Eventually, he served just less than 23 months for his offenses and was fined one million Israeli shekels.  The Qatari Foreign Ministry eventually paid Mr. Jamal's fine.

144.    Ms. Odeh, who was the operations manager for Qatar Charity, received a 17-month sentence and a 100,000 shekel fine for the same offenses.  The Qatari government, directly or indirectly, also paid that criminal fine.

24

145.     Mr. Mansra, who worked in accounts at Qatar Charity, served roughly 2.5 years in jail for his offenses.  To secure Mr. Mansra's release, the Qatari Foreign Ministry paid his one million shekel fine.

146.     Even before Israel acted to shutter Qatar Charity's operations in the Palestinian Territories in 2015, other banks operating there had taken steps to eliminate their dealings with Qatar Charity.

147.     For example, Arab Bank, a large Jordanian bank, refused to process salary payments made by Qatar Charity to its employees in the Palestinian Territories.  In addition, the Banque du Caire, an Egyptian institution, refused to conduct banking activities for Qatar Charity in the Palestinian Territories.

148.     Pursuant to Defendants' conspiracy, Qatar Charity also used its accounts at Masraf Al Rayan to solicit contributions from donors, purportedly for humanitarian purposes such as assisting Syrian refugees.  In fact, however, Qatar Charity used a substantial portion of the funds that it solicited through the Masraf Al Rayan account to fund Hamas, PIJ and other terrorist causes.

149.     These facts, along with the Qatari government's open support for Hamas, demonstrate that Masraf Al Rayan was knowingly complicit in financing Hamas.

150.     The transfers that Masraf Al Rayan made to Qatar Charity through the Bank of Palestine also enabled Defendants to distribute funds directly to terrorists and their family members anonymously under the guise of "charitable" donations.

151.     Defendants accomplished that objective by funding Qatar Charity's purchase of thousands of anonymous debit cards known as "Sanabel Cards" from the Bank of Palestine.

152.     Pursuant to the Defendants' conspiracy, those anonymous debit cards were then

25

distributed in the Palestinian Territories to thousands of recipients.

153.    The Sanabel Card scheme effectively operated as a source of financing for PIJ and Hamas. The organizations' operatives utilized the debit cards to fund their personal financial needs while they planned terrorist attacks. The terrorists also used the Sanabel cards to make the limited expenditures that their crude attacks required, such as securing ammunition and purchasing gasoline and other supplies.

154.    In addition, Defendants' Sanabel Card scheme effectively operated as an insurance policy for Hamas and PIJ terrorists and their family members. When the terrorists were imprisoned for their illicit conduct, both they and their family members received priority eligibility status for the distribution of the Sanabel Cards.

155.    Likewise, when Hamas and PIJ terrorists were killed during their efforts to carry out terrorist attacks, their family members were provided with priority eligibility for Sanabel Cards.

156.    Thus, the anonymous distribution of Sanabel Cards permitted Defendants to encourage terrorism both by directly funding the low-cost attacks that Hamas and PIJ operatives committed and by assuring those terrorists that both they and their family members could rely upon a financial safety net when the attackers were arrested or killed.

### F.  Masraf Al Rayan Provided Defendants With the Access to the U.S. Financial System that Their Conspiracy Required

157.    In furtherance of Defendants' conspiracy to provide the dollars that Hamas and PIJ needed to conduct their terrorist operations, Masraf Al Rayan utilized the U.S. financial system to move Qatar Charity funds to the Palestinian Territories and into terrorist hands.

158.    Masraf Al Rayan had no U.S. branch or office.  As a result, it arranged with banking institutions that maintained offices located in New York to conduct "correspondent banking" transactions that allowed Masraf Al Rayan to move USD through the international banking system.

159.    A correspondent bank is a financial institution that creates and maintains accounts for other financial institutions.  The account holder uses the account with the correspondent bank to make deposits and payments and to engage in other financial transactions, particularly those requiring currency translation.

160.    Correspondent banks can act as intermediaries between banks in different countries or as an agent to process local transactions for clients of the account holder when they are traveling abroad.  At the local level, correspondent banks can accept deposits, process documentation, and serve as transfer agents for funds.

161.    The ability of correspondent banks to provide these services relieves foreign banks of the need to establish a physical presence in other jurisdictions, such as the U.S.

162.    Foreign banks often use correspondent banks in the U.S. to access the U.S. financial system and to conduct USD transactions.  Frequently, those transactions involve the exchange of currencies or transfers made in currencies other than the account holder's home currency.

163.    At all times relevant to Plaintiffs' claims, Masraf Al Rayan maintained a direct or indirect correspondent banking relationship with Bank of New York Mellon, and perhaps other U.S. banks.

164.    The correspondent banking relationship that Masraf Al Rayan maintained with Bank of New York Mellon allowed Masraf Al Rayan to access the U.S. financial system to

complete transactions in USD for its customers.  That correspondent banking relationship also enabled Masraf Al Rayan to benefit from the stability and reliability of New York's banking laws.

165.    By means of the transactions that Masraf Al Rayan conducted through its correspondent accounts, the bank was able to transfer USD for its clients, convert its clients' USD into other currencies (USD to Euros, for example), and convert other currencies held by its clients into USD (Euros to USD, for example).

166.    Masraf Al Rayan used its correspondent banking relationships in New York to process USD transactions for Qatar Charity.  As a result, those relationships allowed Qatar Charity, Hamas and PIJ to access USD and to distribute those dollars to terrorists and their family members in the Palestinian Territories, where USD were a coveted currency during the time period relevant to this action.

167.    Qatar Charity and Hamas could not have obtained those USD without Masraf Al Rayan's participation in Defendants' terrorist funding scheme.  Reputable international banking institutions would not have passed USD through the American banking system on behalf of an entity such as Qatar Charity, which was a known supporter of Hamas and PIJ.

168.    At the time Defendants participated in their conspiracy to pass USD to Hamas and PIJ, Defendants knew or should have known that Hamas regularly targeted U.S. nationals for assassinations, suicide bombings and other forms of terrorist attacks.

169.    Without the support that Masraf Al Rayan provided through the conspiracy Plaintiffs allege, Hamas and PIJ would have been unable to carry out the attack that killed Pinches Menachem Przewozman and injured his family members.

### G. QNB's Support of Hamas, PIJ and Defendants' Conspiracy By Providing Financial Services to Hamas Leadership, Qatar Charity, and the Union of Good

170.    Like Masraf Al Rayan, QNB violated its internal policies, U.S. law, and international banking standards by providing significant banking services that facilitated Qatar Charity's efforts to pass USD to Hamas and PIJ and to purported charities located in the Palestinian Territories that those terrorist organizations controlled.

171.    During the time period relevant to this action, QNB maintained at least seven accounts for Qatar Charity.

172.    Six of these accounts were opened on March 18, 2012, while another was opened on September 20, 2006.

173.    Qatar Charity has utilized those accounts at QNB to pass funds to purported charities that Hamas and PIJ control.

174.    Throughout the time period relevant to Plaintiffs' claims, QNB has also served as a principal banker for Hamas leadership.  Those terrorists have used their QNB accounts to fund Hamas operations, including terrorist attacks.

175.    In 2011, Israel released numerous convicted Hamas terrorists from incarceration to save the life of an Israeli soldier.

176.    Shortly after that prisoner exchange, QNB opened accounts for at least 29 Hamas terrorists freed in the prisoner exchange.

177.    Two terrorists opened their accounts on July 8, 2015 at a QNB branch in Doha. Roughly a month later, an additional 27 terrorists opened accounts at the same QNB branch on August 4, 2015.

29

178.    Notably, at least 21 of those terrorists listed their addresses on the account opening documents as the same P.O. Box.  At least two other terrorists registered their accounts to a second P.O. Box.

179.    The fact that QNB allowed known Hamas terrorists, including one on the FBI's most-wanted list, to open accounts on the same day and to register them to the same P.O Box demonstrates the bank's failure – in contravention of its own policies and international banking standards – to conduct any due diligence in connection with opening those accounts.

180.    The terrorists who opened QNB accounts in Doha on August 4, 2015 include Husam Badran, a Hamas Politburo spokesperson and former leader of Hamas's military wing in the northern West Bank.

181.    Badran was one of the most prominent leaders of the Izz al-Din al-Qassam Brigades, Hamas's military wing, in the West Bank during the Second Intifada, an uprising of Palestinian violence that took place between 2000 and 2005.  As a result, Badran was the target of a failed Israeli assassination attempt in 2002.

182.    Badran spent 14 years in Israeli jails, during which time he was a member of Hamas's "prisoner politburo."

183.    The name associated with the account in QNB's records is "Husam Badran," and the second and third digits of the Qatari national identification number associated with that individual indicate that this Husam Badran was born in 1966, the same year as the notorious terrorist of the same name.

184.     The address that Badran used to open that account is shared by at least 20 terrorists
released from Israeli prisons who opened QNB accounts in Doha on either July 8, 2015 or August
4, 2015.

185.     QNB maintained that account although Badran is one of Hamas's most notorious
terrorists.

186.     As a Hamas military leader, Badran orchestrated a series of bombings that killed
scores of innocent civilians and injured hundreds more.

187.     The attacks that Badran planned include: the 2001 Sbarro Pizza bombing in
Jerusalem that killed 15 and injured 130; the 2001 bombing of the Dolphinarium Discotheque in
Tel Aviv that killed 21 and wounded 120; the 2002 bombing of the Passover Seder at the Park
Hotel in Netanya that killed 30 and injured 140; and the 2002 bombing of the Matza restaurant in
Haifa that killed 14 and injured 33.

188.     Israeli security forces captured Badran in 2002.  In 2004, he was sentenced to 17
years in prison for his role in the above attacks.

189.     In 2011, Israel released Badran as part of the prisoner exchange designed to save
the life of an Israeli soldier.  Soon thereafter, Badran moved to Qatar, where he currently resides
with other Hamas leadership and continues to act as a Hamas spokesperson.

190.     As a spokesperson for Hamas, Badran continues to advocate for Palestinian
terrorism.

191.     Additionally, according to the Shin Bet (the Israeli General Security Service) and
the Israeli Defense Forces ("IDF"), Badran continues to give orders to Hamas terror cells and to
provide them with funds by smuggling gold and jewelry purchased in Jordan into the West Bank.

192.    QNB also opened an account for Musa Dudin, a member of the Hamas Politburo and a convicted Hamas terror cell operative, at the same Doha, Qatar branch on August 4, 2015.

193.    Like Badran, Dudin registered that account to the same P.O. Box address that 20 other terrorists released from Israeli prisons used to establish their QNB accounts in the summer of 2015.  The account number on Dudin's account indicates that the account holder was born in 1972, the year of Dudin's birth.

194.    Israel arrested Dudin in 1992 for his role in directing West Bank terror cells.  Israel convicted Dudin for that terrorist conduct.  As a result, he was serving a life sentence in Israel when he was released as part of the same 2011 prisoner exchange as Badran.

195.    Like Badran, Dudin moved to Qatar soon after his release.

196.    Dudin is currently responsible for maintaining Hamas's "prisoner portfolio."  In that role, Dudin determines what Hamas terrorists should be released from prison in Israel in exchange for the release of civilians and IDF soldiers that Hamas has kidnapped or in exchange for returning the remains of IDF soldiers killed by terrorists to the soldiers' family members.

197.    The name associated with the QNB account held by this terrorist is "Musa Dudin." The second and third digits of the Qatari national identification number associated with that individual indicate that this Musa Dudin was born in 1972, the same year as the notorious terrorist of the same name.

198.    QNB also maintains several accounts for Yousuf Abdulla Al-Qaradawi, the chair of the Union of Good, a U.S.-designated terrorist organization.

199.    Al-Qaradawi is a spiritual leader of the radical Muslim Brotherhood.

32

200.    He also has a long history of inciting terrorist attacks and violent jihad in the Middle East.  In response to international campaigns in Afghanistan against al-Qaida and the Taliban, and in Iraq against Saddam Hussein, al-Qaradawi issued religious rulings inciting Muslims to join jihadist groups and conduct attacks against U.S. and international forces.  Al-Qaradawi has also issued religious rulings that purport to justify suicide bombings.

201.    QNB has maintained accounts for Al-Qaradawi since at least 2006.    The identification numbers on the accounts indicate that the account holder shares the same birth year, 1926, as Al-Qaradawi.

202.    QNB has endeavored to capitalize upon its relationship with Al-Qaradawi by placing him on the bank's Sharia Advisory Board.  QNB maintains such close ties to Al-Qaradawi that he performed the ribbon-cutting at the opening of QNB's Islamic banking division.

203.    By providing Al-Qaradawi with those high-profile roles, QNB cemented its relationship with him and solidified the bank's reputation with the members of the Muslim religious community in Qatar, where Al-Qaradawi wields enormous social, political, and religious influence.

204.    Al-Qaradawi's influence as a leader in Qatar's religious, media, education, financial and charitable sectors is enhanced by his position as a close friend and confidante of the Qatari royal family.

205.    Indeed, the then-U.S. Ambassador to Qatar, Chase Untermeyer, wrote in a 2005 State Department cable that Al-Qaradawi is "the only Islamic thinker in Qatar who matters."

206.    Al-Qaradawi's status in Qatar is demonstrated by the fact that, at both the 2017 and 2018 Ramadan banquets hosted by Qatar's Emir, Sheikh Tamim bin Hamad Al-Thani, Qaradawi

was seated next to the Emir.  At those public holiday celebrations, Al-Qaradawi was seen chatting

cordially with the Emir, who embraced Qaradawi and kissed him on his forehead:







207. As his leadership position in a designated terrorist organization dedicated to the financial support of Hamas suggests, Al-Qaradawi espouses extreme, violent views. According to Mathew Levitt, Ph.D., a former counterterrorism official at the FBI and Treasury, "Qaradawi is one of the most public figureheads of the radical wing of the Muslim Brotherhood."

208. Al-Qaradawi has officially provided his religious imprimatur to terrorist attacks in Israel. For example, in 2017, Al-Qaradawi stated that he no longer viewed suicide attacks as religiously justified because Hamas could by then mount attacks with rockets and other more sophisticated weapons.

209. As evidenced by the photograph that appears below, Al-Qaradawi continues to maintain close ties with Hamas leadership. That photograph, which was taken in 2016 in Qatar, shows Al-Qaradawi sitting between, and chatting with, the leading Hamas terrorists Khaled Meshal (the former chair of the Hamas Politburo) and Ismail Haniyeh (the current head of the Hamas Politburo) while resting his hands on their knees. Both of those Hamas leaders have long benefited from the safe haven Qatar provides to them.



210.    The name associated with Al-Qaradawi's QNB accounts is "Yousu Abdulla A Al-Qaradawi," and the second and third digits of the Qatari national identification number associated with that individual indicate that this Al-Qaradawi was born in 1926, the same year as the Union of Good chair of the same name.

211.    The account information indicates that Al-Qaradawi opened his QNB accounts in September 2006 and lists a P.O. box address in Doha.

212.    QNB also opened an account for Ahlam Aref Ahmad Tamimi on August 4, 2015 at the same Doha branch as her fellow releasees from Israeli prisons.

213.    Tamimi is a Jordanian national and "journalist" who was involved in the 2001 Hamas suicide bombing of a Sbarro Pizzeria in Jerusalem that killed 15 people, including two Americans, and injured scores of other victims.

214.    Tamimi is one of the FBI's most-wanted women. A warrant for Tamimi's arrest and extradition from Jordan was issued in 2013 and unsealed in 2017.

215. The QNB records evidencing Tamimi's account confirm that the accountholder shares the same birth year as the terrorist.

216. The terrorists who opened accounts at the same Doha branch of QNB on August 4, 2015 also include Zaher Ali Musa Jibril (a/k/a Zahar Jabarin).

217. Like 20 other terrorists released from Israeli prisons in the 2011 prisoner exchange, Jibril listed the same Doha P.O. Box as his address on the account opening documents. The account records for Jibril's QNB account demonstrate that the accountholder has the same birth year as the terrorist Jibril.

218. Jibril has been named a Specially Designated National by Treasury. Jibril earned that designation because he serves as a senior Hamas leader who helped found the Hamas military wing in the West Bank.

219. Israel convicted Jibril of killing Israeli soldier Giti Avishar in 1993. According to Treasury, the name that appears on the QNB account, Jibril, is an alias for Zahar Jabarin. Jibril has long served in top financial positions for Hamas and currently runs Hamas's financial operations from Turkey.

220. The terrorists who opened a QNB account on August 4, 2015 at the same Doha branch also include Hisham Hijaz. Like at least 20 other terrorists released from Israeli prisons in the 2011 prisoner exchange, Hijaz used the same Doha P.O. Box to open his QNB account during the summer of 2015.

221. According to terrorism-info.org, Hijaz met with Bakr Atallah Samih Sa'ad in 2013 in Jordan. The ISA later detained Sa'ad for planning to carry out shooting attacks and abductions in Israel.

37

222.    Hijaz also met in Istanbul with a Palestinian Imam and offered $20,000 to the family of anyone who carried out a suicide bombing in Israel.

223.    The account records for Hijaz's QNB account demonstrate that the accountholder shares the same birth year as the terrorist Hijaz.

224.    QNB also maintains accounts for Moustafa Mamdouh Mesalm, a senior accountant at Qatar Charity, and an individual named Ibrahim M A Al-Kaabi, both of whom list their address as a Qatar Charity P.O. Box.

225.    Other terrorists released from Israeli prisons as part of the 2011 prisoner exchange who opened accounts at QNB in the summer of 2015 include the following:

| Accountholder Name | Date Account Opened | Accountholder Address | History of Terrorist Conduct |
|---|---|---|---|
| Abedalaziz Amro | 8/4/15 | P.O. Box 38479 Doha, Qatar | Participated in the 2003 Café Hillel bombing in Jerusalem that killed seven and injured 50 more. |
| Majdi Amr | 8/4/15 | P.O. Box Doha, Qatar | Shot and killed 28-year-old David Cohen in July 2001 in front of his wife and children. In 2002, helped to organize the attack on Bus No. 37 in Haifa, Israel that killed 17 and injured 50 more. Played an important role in developing explosive devices for Hamas. |
| Ibrahim Sulaim Mahmud Shammasina | 8/4/15 | P.O. Box 5045 Doha, Qatar | A terrorist affiliated with the Fatah organization. He was involved in the 1990 murder of 23 Israelis and was later sentenced to an additional 20 years in jail in connection with his role in planning a kidnapping. |
| Abd al-Hakim Abd al-Aziz abd Hanaini | 8/4/15 | P.O. Box Doha, Qatar | A Hamas terrorist convicted of making explosives for use by militants against Israelis. |
| Nizar Muhammad Taysir Ramadan | 8/4/15 | P.O. Box 207338 Doha, Qatar | In August 1998, ambushed and killed Harel Bin-Nun, 18, and Shlomo Liebman, 24, who were on patrol at the Yitzhar settlement in the West Bank. |
| Nasir Sami Abd al-Razzaq Ali al-Nasser-Yataima | 8/4/15 | P.O. Box 207338 Doha, Qatar | Planned the deadly Passover 2002 bombing of the Park Hotel in Netanya that helped trigger Israel's reoccupation of the West Bank. |
| Muhammad Waal Muhammad Daghales | 8/4/15 | P.O. Box 207338 Doha, Qatar | A co-conspirator in the 2001 Sbarro Pizza bombing in Jerusalem that killed 15 and injured 130. |

226. The accounts that QNB maintained for the above-mentioned terrorists were used to finance Hamas and PIJ terrorist activities in Israel. The accounts allowed the released terrorists to finance their personal expenditures, thereby freeing them to continue to conduct activities on behalf of Hamas and PIJ. In addition, the terrorists directly used those funds to further the efforts of Hamas and PIJ to carry out terrorist attacks.

227. QNB also contributed directly to Qatar Charity in order to promote Qatar Charity's ability to fund Hamas, PIJ and other terrorist organizations. For example, in November 2013, QNB contributed one million Qatari riyals, or roughly $275,000, directly to Qatar Charity.

228. In or about February 2020, QNB also contributed 2 million Qatari riyals, or roughly $550,000, directly to Qatar Charity, purportedly to assist Syrian refugees.

## H. The Bank Defendants' Purported Anti-Terrorism Policies Provided Them with Knowledge of the Unlawful Purpose of Their Financial Dealings with Qatar Charity

229. Like other international banks, particularly those involved in transactions that touch upon areas plagued by terrorism such as the Palestinian Territories, Masraf Al Rayan and QNB (collectively, the "Bank Defendants") had to implement and employ anti-money laundering ("AML"), counter-terrorism financing ("CTF"), know-your-customer ("KYC"), and other due diligence requirements designed to prevent precisely the type of illicit activity that caused the death of Pinches Menachem Przewozman and injured his family members.

230. Among other sources, those rules were provided by the banking law of Qatar and the U.S., as well as the CTF, AML, KYC, and customer due diligence procedures that the Bank Defendants purportedly maintained and that international banking standards imposed at all relevant times.

231. Qatari AML and CTF laws, like U.S., European Union, and international law, prohibit collecting funds to support terrorism and require banks to implement procedures to combat the financing of terrorism.

232. In addition, multiple internationally recognized banking organizations have published guidelines designed to guide best practices by financial institutions and to prevent them from becoming entangled with terrorist organizations or facilitating the flow of money to those illicit entities.

233. Those international standards provided the Bank Defendants with well-accepted guidance regarding the AML, CTF, KYC and due diligence procedures the banks should employ to prevent the illicit use of their services by terrorist groups, individual terrorists, and their sympathizers.

234. International AML and CTF standards are published by three broad categories of organizations: (a) those concerned primarily with financial/supervisory matters, including the Basel Committee of Banking Supervision (the "Basel Committee"); (b) those concerned with financial/supervisory and legal/criminal enforcement matters, including the Financial Action Task Force ("FATF"), the United Nations, the Council of Europe, and the European Union; and (c) those primarily concerned with legal/criminal enforcement matters, including the Egmont Group of Financial Intelligence Units.

235. In addition, the Wolfsberg Group is an association of global banks that has published guidelines based on its understanding of international standards, as well as the member banks' own policies and procedures for KYC, AML and CTF functions.

236.     The leading authorities that international banks follow to strengthen their AML and CTF policies include: FATF's International Standards on Combating Money Laundering and the Financing of Terrorism & Proliferation; the Wolfsberg Anti-Money Laundering Principles for Private Banking; and the Basel Committee's Anti-Money Laundering principles.

237.     Those internationally recognized standards obligate banks to adopt a risk-based approach to evaluate prospective customers, to monitor those customers on an ongoing basis, and to systematically monitor funds flowing into and out of their institutions.

238.     The risk-based approach that banks employ involves both customer-specific due diligence and systems-wide transaction monitoring. The level of due diligence applied to a customer is based on the customer's risk profile.

239.     In evaluating the level of risk presented by a customer, banks do not look to any single indicator.

240.     Rather, risk assessment evaluates customers, accounts and transactions against established criteria.  Because banks are unable to check every transaction offline, they develop risk-profiles, applying relatively greater scrutiny to those customers and transactions that pose the greatest risk of unlawful activity.

241.     The most commonly used risk criteria are country risk, customer risk, and service risk.

242.     Country risk is measured by the connection a customer or transaction may have to high-risk jurisdictions.  Relevant connections include any nexus between a high-risk jurisdiction and: the funds involved in a transaction; the customer or its officers and directors; or the counterparties or financial institutions involved in a transaction.

41

243.    High-risk jurisdictions include countries: (a) subject to sanctions, embargoes or similar measures; (b) identified by the FATF as non-cooperative; (c) identified by credible sources as providing funding or support for terrorist activities; (d) where terrorism or other violent conflict is prevalent; and (e) identified by credible sources as having significant levels of corruption, drug trafficking or other criminal activity.

244.    In addition, country risk includes the existence of unregulated charities and other unregulated not-for-profit organizations that do business with a bank's customers or are parties to transactions involving the bank.

245.    Customer risk involves an assessment of, among other things, the nature of the customer and the business in which it engages.    Well-established corporations, for example, present lower risks than unknown sole proprietorships, particularly where the latter are largely cash businesses.

246.    Charities warrant additional scrutiny because criminal enterprises, including terrorist organizations, frequently exploit purported charitable organizations to gather and move funds.

247.    Services risk relates to the kinds of banking services the customer anticipates or actually uses.    For example, wire transfers are considered a higher-risk service because they are a principal means used by criminal enterprises to move funds between and among persons, institutions and countries.

248.    While the occasional use of wire transfers alone may not give rise to suspicion, the number, frequency, origin and destination of wire transfers are risk factors that banks must consider as part of their ongoing evaluation of persons and entities with whom they conduct

business.  Transactions involving the transfer of funds internationally or that involve some effort to render a participant anonymous to a bank present higher levels of service risk.

249.    KYC standards are well-established risk-management rules that obligate banks to develop a clear and concise understanding of their customers and their businesses.

250.    Those standards constitute an integral element of both opening and maintaining bank accounts and customer relationships.

251.    Thus, KYC procedures are an ongoing process.  By gaining familiarity with their customers, and the kinds of services and account activity each customer might reasonably undertake, banks can uncover and prevent potential, actual or suspected unlawful activity.

252.    Standard banking industry practice calls for banks to begin applying KYC measures when they first establish a new customer relationship, typically when that new customer seeks to open an account.

253.    Standard KYC account opening procedures include: obtaining proper documentation of the customer's legal status (e.g., sole proprietorship, corporation, or charitable association); verifying the customer's name, address and other identifier information; obtaining identification documentation for the customer's officers and directors, at least with respect to those authorized to engage in banking transactions; gathering information on the customer's business, including its sources of funds, the kinds of services the customer will be using the bank for, and where the customer's funds will be going; and other information necessary to formulate a risk profile for that customer.

254.    In formulating a customer's risk profile, a bank must pay particular attention to the country risk posed by the customer or its officers and directors; i.e., the connections they may have

with high-risk jurisdictions. Contacts with high-risk jurisdictions mandate closer scrutiny of the customer during the entire course of the business relationship.

255.    A bank's risk-management function includes the adoption of sound policies and procedures for determining expected or normal activity at account opening, as well as during the course of the relationship. Evaluating reasonably expected account activity against actual transactional activity is a critical aspect of customer due diligence. Account and transaction monitoring is the backbone of any AML or CTF compliance program.

256.    Banks constantly monitor their customers' accounts and transactions. The monitoring of transactions encompasses the entire spectrum of the money flow of wire transactions, particularly those involving the international transmission of funds. That monitoring includes gathering information concerning the originators and recipients of transactions because a bank cannot effectively evaluate a transaction or transactional pattern by looking only at one side of the money flow.

257.    The purpose of this monitoring activity is to identify: (a) transactions that by their very nature are inherently suspect; (b) unusual transactions, *i.e.*, transactions that do not have an obvious financial or legitimate purpose; and (c) suspicious transactions, *i.e.*, transactions that may be considered inconsistent with the known and legitimate business of the customer or with the usual activity in the account in question.

258.    Transaction monitoring compares transactional information against identified risks. Among other things, transaction monitoring compares account/transaction activity against the customer's profile, compares that activity to peer group data, measures the activity against

established typologies, and highlights and investigates anomalous, unusual, or suspicious transactions.

259.    Customer due diligence also utilizes and references third-party information such as newspapers, internet data, and the information available in banks' internal databases to maintain an adequate understanding of banks' clients and the environment in which each client does business, including unusual political or terrorism-related factors operative in the countries connected to the client's transactions.

260.    The need for this ongoing analysis is particularly acute when customers are connected with global hot spots or conflict zones, or otherwise have high risk profiles.

261.    Like other international banks, the Bank Defendants maintain compliance departments, ostensibly to ensure that the banks comply with their AML, CTF, KYC and other due diligence obligations.

262.    To fulfill those obligations, banks—including the Bank Defendants—now use sophisticated software to monitor accounts and transactions, including products marketed by third parties expressly to fulfill banks' AML and CTF obligations.

263.    The vendors of those products constantly enhance them in response to changes in the legal environment, revisions to sanctions and embargo lists, and other relevant factors, such as increased terrorist activity in particular regions or among particular groups.

264.    Banks employ two primary types of software in connection with AML and CTF compliance: (a) programs that monitor transaction trends and patterns and thus highlight potentially anomalous or suspicious activity; and (b) filtering software that identifies potential matches to embargo and sanction lists by scanning fields such as the names of originators and

beneficiaries. The latter type of software is used to identify potentially suspicious parties and counterparties to transactions (*i.e.*, those that match to lists).

265. Banks, particularly those that operate in terrorism hot spots such as the Bank Defendants, recognize that there have been numerous lists of terrorists and terrorist organizations in force since 1990, including those promulgated by Treasury's Office of Financial Assets Control ("OFAC"), the EU, the UN, and Israel.

266. International banks input these lists to their filtering software to maintain a consolidated filtering system for monitoring accounts and transactions. As these lists are updated, the new information is loaded into the software as well.

267. Bank compliance groups are responsible for researching and evaluating the transactions identified as suspicious by these systems. The compliance groups' role is critical because software systems simply scan data that, due to transactional volumes, the complexity of account activity, and the increasingly extensive nature of embargo lists, cannot be analyzed manually.

268. The AML compliance function thus includes reviewing and researching the "hits" generated by compliance software, whether for anomalous activity or for identification of a name that matches one found on an embargo list (or both), and evaluating that information in light of the ongoing customer due diligence associated with the account in question.

269. The steps that banks' compliance departments take in response to the hits generated by compliance software are therefore integral to banks' ability to avoid providing material assistance to terrorists and other money launderers.

270.    The compliance personnel must determine which hits are "false positives" that should not prevent the consummation of transactions and which involve a material risk of facilitating illicit behavior, including terrorist attacks.  Regulations applicable in most countries, including the U.S., require banks to report the transactions they have identified as suspicious to government officials.

271.    When bank policy or government regulations appear to prohibit the consummation of particular transactions, the involved funds are typically "blocked" in a segregated account, and the involved parties must usually receive government approval to release the funds after establishing the legitimacy of the blocked transaction.

272.    FATF is an intergovernmental body created in 1989 by the G-7 countries (Canada, France, Germany, Italy, Japan, the United Kingdom, and the United States).  Currently, its membership consists of 31 countries and territories.

273.    FATF has published authoritative guidance designed to strengthen banks' AML and CTF policies, particularly the influential Forty Recommendations on Money Laundering (along with interpretive notes) that FATF issued in 1990.  The Forty Recommendations have been updated and revised since their initial publication.

274.    In response to the September 11, 2001 attacks, FATF issued eight additional Special Recommendations specifically related to Terrorist Financing.  A ninth recommendation was added in October 2004.

275.    The FATF Forty Recommendations include a recommendation that banking authorities implement customer due diligence procedures (including identify verification) and

record keeping and suspicious transactions reporting requirements for financial institutions and designated non-financial businesses and professions.

276.    Expanding on that recommendation, FATF Recommendation Number Five states that banks should undertake customer due diligence measures designed to identify and verify the identity of their customers, when: (a) establishing business relations; (b) carrying out occasional transactions; (c) there is a suspicion of money laundering or terrorist financing; or (d) the bank has doubts about the veracity or adequacy of previously obtained customer identification data.

277.    FATF's Nine Special Recommendations include recommendations that banks: (a) freeze and confiscate terrorist assets; and (b) report suspicious transactions related to terrorism and money laundering to government authorities.

278.    The Nine Special Recommendations also recognize the critical role that purported charities play in terrorist financing.

279.    FATF recommended that countries should review the adequacy of laws and regulations governing non-profit organizations because those entities are particularly vulnerable to abuse in connection with the financing of terrorism, either intentionally or through terrorist organizations' exploitation of unwitting participants.

280.    The Basel Committee was formed in 1974 by the central bank governors of the G-10 countries.

281.    The Basel Committee works by consensus to formulate broad supervisory standards and guidelines and to publish statements on a wide range of banking issues.

282.    Three of the most important Basel Committee statements of banking standards concern AML issues.

283. Basel Committee statements are directed to national bank supervisory authorities beyond the organization's core membership. By issuing those statements, the Basel Committee hopes to persuade banking supervisors to protect the integrity of the global banking system by implementing the Basel Committee standards and guidelines.

284. Because the Basel Committee guidelines are formulated as the result of a consensus building exercise by the G-10's national bank regulators, they carry substantial weight within the banking industry. Therefore, Basel Committee guidelines are generally regarded as reflecting the minimum standards for individual banks with regard to AML and CTF policies.

285. In 1988, the Basel Committee issued its Statement on Prevention of Criminal Use of the Banking System for the Purpose of Money Laundering (the "Basel Statement on Prevention").

286. The Basel Statement on Prevention outlines basic policies and procedures that bank management should ensure are in place within their institutions both domestically and internationally.

287. The Basel Statement on Prevention further recognizes that the most important safeguard against the use of financial institutions for purposes of money laundering is the integrity of banks' management and their vigilant determination to prevent their institutions from becoming associated with criminals or being used as channels for money laundering.

288. The Basel Statement on Prevention sets forth four key principles: (a) banks should make reasonable efforts to determine the true identity of all customers requesting the institution's services; (b) banks should ensure that business is conducted in conformity with high ethical standards and adheres to laws and regulations pertaining to financial transactions; (c) banks should

cooperate fully with national law enforcement authorities to the extent permitted by local regulations relating to customer confidentiality and, where a bank has reason to suspect that funds on deposit are from criminal activity or that transactions entered into are for a criminal purpose, the bank should take appropriate measures, including denial of assistance, severing of the customer relationship, and closing or freezing the account; and (d) banks should adopt formal policies consistent with the Basel Statement on Prevention.

289.   In 1997, the Basel Committee issued its Core Principles for Effective Banking Supervision (the "Core Principles").   Those principles were intended to provide a comprehensive blueprint for a safe and sound banking system.

290.   The Basel Committee emphasized that the Core Principles are "minimum requirements" and are "intended to serve as a basic reference" in formulating an effective bank compliance environment.

291.   Core Principle 15 deals with money laundering and reinforces the importance of KYC policies and procedures.   It provides that banks must have adequate policies, practices and procedures in place, including strict KYC rules that promote high ethical and professional standards in the financial sector and that prevent banks from being used, intentionally or unintentionally, by criminal elements.

292.   The Basel Committee also issued a further "Core Principles Methodology" in 1999 that set forth widely accepted benchmarks for bank supervision.

293.   The Core Principles Methodology was drafted to assist bank supervisors worldwide in self-assessments of the degree to which their banking systems, and the banks operating within them, had policies and practices consistent with the Core Principles.

294.    The Core Principles Methodology contains a Principle-by-Principle discussion of "essential" and "additional" criteria.  The section on Core Principle Methodology 15 contains eleven essential criteria and five additional criteria to help assess the adequacy of KYC policies and procedures.

295.    The first additional criterion specifically references the FATF Forty Recommendations as reflecting "international sound practices."

296.    Among the essential criteria are: (a) banks must have in place policies and procedures to prevent them from being used, intentionally or unintentionally, by criminal elements; (b) banks must have clear and effective KYC policies and procedures, including effective recordkeeping and records retention for both customer identification and individual transactions; (c) banks must have formal procedures to recognize potentially suspicious transactions; (d) banks must have clear lines of authority and communication for implementation of their AML programs; and (e) banks must report suspicious activities to their regulators where they potentially may be material to the safety, soundness or reputation of the bank.

297.    In 2001, the Basel Committee also issued standards governing minimum customer due diligence for banks (the "Customer Due Diligence Statement").

298.    The Customer Due Diligence Statement notes that customer due diligence involves developing customer risk-profiles, including consideration of factors such as a customer's background, country of origin, public or high-profile position, linked accounts, business activities, use of wire transfers (particularly for international remittance of funds) and other risk indicators.

299.    The Due Diligence Statement also clarifies that even basic KYC is not simply a function of account opening procedures.  Rather, it remains an ongoing process.

300.    The Due Diligence Statement also highlights the importance of ongoing monitoring of accounts and transactions as part of an effective AML program.

301.    Specifically, the Due Diligence Statement provides, "Ongoing monitoring is an essential aspect of effective KYC procedures.  There should be intensified monitoring for higher risk accounts."

302.    The Basel Committee's 2012 Core Principles for Effective Banking Supervision (the "2012 Core Principles") stressed the need for banks to "have adequate policies and processes that promote high ethical and professional standards and prevent the bank from being used, intentionally or unintentionally, for criminal activities."    Basel Committee on Banking Supervision, Core Principles for Effective Banking Supervision (September 2012), https://www.bis.org/publ/ bcbs230.pdf.

303.    The 2012 Core Principles explained that the essential elements of "customer due diligence" standards include a policy identifying "business relationships that the bank will not accept based on identified risks," an ongoing "customer identification, verification and due diligence" program, and policies and processes that require the bank to monitor "unusual or potentially suspicious transactions" and to apply enhanced scrutiny to high-risk accounts.

304.    The Wolfsberg Group is an association of 13 global banks.  In addition to its formal members, other significant global banks are recognized as being affiliated with Wolfsberg.

305.    The Wolfsberg Group has published its own sets of methodologies in an effort to assist banks worldwide in complying with international AML standards.  The banking community considers the guidance published by the Wolfsberg Group as representative of the views of the global banking community.

306.    On October 30, 2000, the Wolfsberg Group published the Wolfsberg AML Principles.

307.    The Wolfsberg AML Principles set forth guidelines regarding client acceptance, including the client identification and due diligence procedures banks should undertake when accepting a new client. The due diligence procedures require banks to ascertain the client's reasons for opening the account, the source of its funds, and the client's anticipated activity. Those procedures also specify steps that banks should employ to undertake risk-based customer due diligence.

308.    The Wolfsberg AML Principles also set out practices for identifying unusual or suspicious transactions and for the on-going monitoring of account activity. In addition, the principles stress the need for a reporting and control system within the bank, staff education and training, and setting record retention requirements.

309.    The Wolfsberg Group also designed a questionnaire intended to help banks develop internal policies and practices for KYC, AML and CTF policies.

310.    This questionnaire provides an overview of a financial institution's AML policies and practices and can help determine whether a financial institution is complying with industry best practices.

311.    The questions relate to the following areas: (a) general AML policies, practices and procedures; (b) risk assessment; (c) KYC, due diligence and enhanced due diligence; (d) reportable transactions and prevention and detection of transactions with illegally obtained funds; (e) transaction monitoring; and (f) AML training.

312.    The questions the Wolfsberg Group questionnaire sets forth include:

a.   Does the Bank have record retention procedures that comply with applicable law?

b.   Are the Bank's AML policies and practices being applied to all branches and subsidiaries of the Bank, both in the home country and in locations outside of that jurisdiction?

c.   Does the Bank have a risk-based assessment of its customer base and their transactions?

d.   Does the Bank determine the appropriate level of enhanced due diligence necessary for those categories of customers and transactions that the Bank has reason to believe pose a heightened risk of illicit activities at or through the Bank?

e.   Does the Bank require the collection of information regarding its customers' business activities?

f.   Does the Bank have policies or practices for the identification and reporting of suspicious transactions?

g.   Does the Bank have a monitoring program for unusual and potentially suspicious activity that covers funds transfers and monetary instruments, such as travelers' checks, money orders, etc.?

313.   The Wolfsberg Statement on the Suppression of Financing of Terrorism (the "Wolfsberg Terrorism Statement") was published in January 2002.

314.   The Wolfsberg Terrorism Statement reiterated and elaborated upon the existing international standards designed to prevent financial institutions from becoming entangled with terrorism and the financing of terrorist organizations and attacks.

315.   The most critical components of the Wolfsberg Terrorism Statement include the following: (a) Paragraph four emphasizes the importance of KYC policies and procedures; (b) Paragraph five refers to high-risk sectors and activities and focuses on a financial institution's application of enhanced and appropriate due diligence; and (c) paragraph six addresses monitoring and how financial institutions should apply existing monitoring procedures to identify unusual or suspicious transactions because, although transactions may be unclear, monitoring and then identifying and reporting unusual or suspicious transactions may assist government agencies by linking seemingly unrelated activity to the financing of terrorism.

316.   The Bank Defendants completely disregarded the international banking standards identified in paragraphs 229-315 in connection with the transactions that they conducted with Qatar Charity, Hamas terrorists and Hamas front organizations.

317.   The violations of those standards that the Bank Defendants committed include, but are not limited to the following:

  a.   The Bank Defendants provided banking services for Qatar Charity despite their knowledge that the charity was a leading contributor to Hamas and PIJ;

  b.   QNB directly provided banking services to known Hamas terrorists and opened accounts for those individuals without performing the minimum KYC and due diligence procedures required by international banking standards, including verifying the addresses of those individuals and checking them against the available databases of known terrorists;

  c.   QNB failed to monitor the transactions undertaken by these Hamas terrorists to promote Hamas's illicit activities, to report those transactions to authorities in Qatar

and abroad, and to block the terrorists' funds before they could be transferred to the intended beneficiaries;

d.   The Bank Defendants failed to develop a suitable risk profile for Qatar Charity and to subject its transactions to enhanced due diligence despite the significant money-laundering and terrorism-financing risks presented by Qatar Charity's activities as a purported charity affiliated with terrorist organizations and their sponsors, the concentration of Qatar Charity's contributions in terrorism hot spots like the Palestinian Territories and other Middle Eastern areas prone to terrorist conduct, Qatar Charity's history of donations to purported charities affiliated with Hamas, PIJ, and other terrorist organizations, and the unusual and substantial nature of the wire transfers that Qatar Charity made;

e.   The Bank Defendants subordinated their AML and CTF obligations to the desire of their largest shareholders, the members of the Qatari Royal Family and the entities they control, to fund Hamas, PIJ and other terrorist groups;

f.   The Bank Defendants failed to adopt a risk-based analysis for assessing whether (i) to provide banking services to Qatar Charity, Hamas operatives, and Hamas front organizations, (ii) to continue to process transactions for those accountholders and beneficiaries, and (iii) to maintain accounts for those accountholders;

g.   The Bank Defendants failed to consider the risks associated with providing banking services to Qatar Charity—particularly its supposed status as a charitable entity operating in Middle Eastern locations prone to terrorism—or to design appropriate

measures for counteracting those risks and thereby preventing money laundering and terrorism financing;

h.  The Bank Defendants failed to consider the risks of money laundering and terrorism financing presented by the Sanabel Card scheme, particularly whether those debit cards could be used by terrorist front organizations to distribute funds directly to terrorists and to their family members as an incentive to commit terrorist acts, to compensate them for carrying out terrorist activities, or to offset the personal costs (including loss of income resulting from injury or imprisonment) associated with terrorist activity;

i.  The Bank Defendants ignored their obligation to detect and block transactions with people and organizations included on terrorist and money laundering sanctions and embargo lists propounded by the E.U., the U.N., the U.S., Israel, and other nations;

j.  The Bank Defendants failed to undertake any research to determine the terrorist affiliations of their account holders and the beneficiaries of transfers made from the account holders' accounts despite the suspicious nature of those transactions and the availability of information corroborating the terrorist ties of the account holders and the transfer beneficiaries on the Internet, databases such as Lexis/Nexis, and specialized software widely used by international banks;

k.  The Bank Defendants either ignored the feedback provided by their AML and CTF software regarding transactions involving account holders or transferees tied to terrorism or money laundering or failed to update that software to prevent the banks from participating in those transactions; and

57

l.    The Bank Defendants ignored the well-accepted guidance for international banking provided by, among other standards, FATF's Forty Recommendations on Money Laundering, FATF's Special Recommendations specifically related to terrorist financing, the Basel Statement on Prevention, the Basel Committee's Core Principles for Effective Banking Supervision, the Basel Committee's Core Principles Methodology, the Basel Committee's Customer Due Diligence Statement, the Basel Committee's 2012 Core Principles, the Wolfsberg AML Principles, the Wolfsberg AML questionnaire, and the Wolfsberg Terrorism Statement.

318.    Despite these AML and CTF failings, Masraf Al Rayan endeavored to create the appearance that it was complying with Qatari CTF law, the bank's internal policies barring terror financing, and the foregoing international CTF and AML principles.

319.    For example, in its 2018 Annual Report, Masraf Al Rayan touted its role "in complying with the anti-money laundering and counter-terrorism financing within the local, regional and international system; in addition to its responsibility towards the society and the environment in which it operates."

320.    The Annual Report further stated that the bank maintained a risk management system to keep its Board apprised of the bank's "internal control work and results," including the bank's "Anti-Money Laundering and Counter Terrorism Financing" policies and procedures.

321.    The Annual Report also emphasized that Masraf Al Rayan employed a "bank transfers monitoring system to ensure that there are no names that appear in the banned lists or those related to anti-money laundering and counter terrorism financing; and integrate[s] this

58

system with the SWIFT system to intercept any suspicious names at the same time when the transactions are taking place."

322.     Given the notorious nature of Qatar Charity's sponsorship of Hamas, including its designation by Israel in 2008 as a member of the U.S. Treasury-designated Union of Good, the due diligence steps Masraf Al Rayan's policies and procedures required the bank to undertake would have revealed the critical role that Qatar Charity played in financing and promoting Hamas and PIJ terrorism.

323.     Thus, Masraf Al Rayan could have utilized the AML and CTF policies and procedures that it described to prevent the financing of Hamas and PIJ terrorism, had the bank actually wanted to eliminate that illicit conduct.

324.     Despite overwhelming public evidence that Qatar Charity actively raised money to support Hamas and other global terrorist organizations, Masraf Al Rayan continued to provide banking services to Qatar Charity.

325.     Indeed, Masraf Al Rayan knowingly transferred millions of dollars of Qatar Charity funds into local bank branches operating in Hamas territory despite the bank's actual knowledge that Qatar Charity (1) was a known sponsor of Hamas and (2) was operating illegally in the Palestinian Territories.

## II.     THE TERRORIST ATTACK THAT KILLED PINCHES MENACHEM PRZEWOZMAN AND INJURED HIS FAMILY MEMBERS

326.     Pursuant to the unlawful conspiracy that Plaintiffs allege above, Defendants and their co-conspirators provided material support and resources to Hamas and the PIJ that allowed those notorious terrorist organizations to carry out the attack that killed Pinches Menachem

59

Przewozman and injured his family members.  That attack, and the resulting death of Pinches Menachem Przewozman, caused Plaintiffs severe physical and psychological injuries.

327.    The missile attack that killed Pinches Menachem Przewozman was part of a two-day bombing spree that Hamas and PIJ commenced on May 4, 2019.

328.    Over the two days, Hamas and PIJ terrorists launched over 600 rockets and mortars at Israelis from the Gaza Strip.

329.    The PIJ and Hamas terrorists deliberately aimed their rockets at civilian centers and struck Israeli roads, homes, a factory, and even a kindergarten and a hospital.

330.    As a result of that violence, schools were shut throughout the southern portion of Israel as children continued to run for shelter amid explosions.

331.    During this lengthy assault, the family of Pinches Menachem Przewozman experienced a day of anxiety, fear, trepidation, disbelief and worry as rockets continually fell near the homes of the family members who lived in the vicinity of the bombings and as the other family members learned of the scope of the terrorist attack.

332.    All of the family members feared for the safety of the family members who lived in the vicinity of the bombing spree.  In particular, the family members feared for the safety of Pinches Menachem Przewozman, who lived close to the Gaza Strip in the western Israel port city of Ashdod.

333.    Unfortunately, the members of the Przewozman family had good reason to fear for Pinches's safety.

334.    As the Hamas and PIJ rocket attacks began, Pinches was walking with some friends in Ashdod when they heard the warning sirens that announced an incoming attack (the rocket bombings had become a favorite terror tactic of Hamas and PIJ).

335.    After the sirens sounded, Pinches ran inside the lobby of a nearby building to take shelter.

336.    When that building suffered a direct hit from a rocket attack, large pieces of shrapnel hit Pinches, piercing his heart and causing severe injuries.

337.    Emergency personnel treated Pinches and rushed him to the hospital for further care.

338.    At the time of transport, Pinches was unconscious, and in traumatic arrest. Tragically, Pinches succumbed to his catastrophic injuries after arriving at the hospital.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION

### AIDING AND ABETTING FOREIGN TERRORIST ORGANIZATIONS IN VIOLATION OF 18 U.S.C. § 2333(d) AGAINST ALL DEFENDANTS

339.    Plaintiffs repeat and reallege each and every allegation of the foregoing paragraphs as if fully set forth herein.

340.    Plaintiffs assert this cause of action against all Defendants under 18 U.S.C. § 2333(d) and the Justice Against Sponsors of Terrorism Act ("JASTA") § 2b.

341.    Plaintiffs are nationals of the United States or the estates, survivors or heirs of U.S. nationals.

61

342.    Hamas and PIJ were both foreign terrorist organizations ("FTOs") at the time they committed, planned, and authorized the terrorist attack that killed Pinches Menachem Przewozman and injured Plaintiffs.

343.    That terrorist attack was an act of international terrorism, as defined by 18 U.S.C. § 2331. The attack: (a) involved violence and endangered human life; (b) would have violated federal and state criminal law, had it been committed in the United States; (c) appeared to be intended to intimidate or coerce the civilian populations of Israel and the United States, to influence the policies of the Israeli and American governments, and to affect the policies of those governments through violent action; and (d) occurred primarily outside the United States and transcended national boundaries in that Hamas and PIJ raised money internationally, intended to impact the citizens and governments of Israel and the United States, operated internationally and sought asylum in multiple countries in the Middle East.

344.    Defendants knowingly provided substantial assistance to those acts of international terrorism.

345.    The substantial assistance that Defendants knowingly provided to Hamas and PIJ included: (a) transferring significant sums of money to the FTOs, their operatives and their front organizations; (b) maintaining bank accounts for the benefit of those organizations, their front organizations, and their senior operatives; (c) providing Hamas and PIJ with access to U.S. dollars and the U.S. banking system; (d) providing seeming legitimacy to the FTOs' efforts to raise funds to finance their operations and to compensate terrorists and their family members following terrorist attacks; and (e) enabling the FTOs to convert funds nominally intended to support humanitarian causes into the resources necessary to commit terrorist attacks.

346. Defendants' services and support provided encouragement to would-be terrorists and incentivized their future attacks.

347. At the time Defendants provided that substantial assistance to Hamas and PIJ, Defendants knew that: (a) the two FTOs were so designated; (b) the two FTOs and their operatives engaged in terrorism, including the attacks alleged herein; and (c) the financial assistance that Defendants were providing to those FTOs was essential to their ability to carry out terrorist attacks, including the attack that injured Plaintiffs.

348. Defendants also intended that their substantial assistance would facilitate the ability of Hamas and PIJ to carry out their terrorist attacks against Plaintiffs and other civilians. As a result, Defendants recognized that they played an integral role in the FTOs' terrorist activities.

349. The assistance that Defendants provided to Hamas and PIJ was a substantial factor in causing Plaintiffs' injuries. Moreover, Plaintiffs' injuries were a foreseeable result of that substantial assistance.

350. As a direct and proximate result of the substantial, knowing assistance that Defendants provided to Hamas and PIJ, Plaintiffs have suffered significant physical, psychological and emotional injuries.

351. Defendants knowingly aided and abetted Hamas and PIJ within the meaning of 18 U.S.C. § 2333(d), which Congress enacted to provide "civil litigants with the broadest possible basis" for relief against those "that have provided material support, directly or indirectly, to foreign organizations or persons that engage in terrorist activities against the United States." *See* JASTA, § 2b.

352.     Defendants are therefore liable to Plaintiffs for damages in an amount to be determined at trial, treble damages, and the payment of the attorneys' fees and expenses incurred by Plaintiffs in connection with this action.

## SECOND CAUSE OF ACTION

### VIOLATION OF THE ANTI-TERRORISM ACT, 18 U.S.C. § 2333(d) AGAINST ALL DEFENDANTS (CONSPIRACY LIABILITY)

353.     Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

354.     Plaintiffs assert this cause of action against all Defendants under 18 U.S.C. § 2333(d) and JASTA, § 2b.

355.     Plaintiffs are nationals of the United States or the estates, survivors or heirs of U.S. nationals.

356.     Defendants conspired with each other, Hamas, PIJ, the government of Qatar and others to bring about acts of international terrorism against Americans in Israel.

357.     Defendant Qatar Charity joined the conspiracy by agreeing, among other things, expressly or tacitly to raise funds for Hamas and PIJ although both organizations are designated as FTOs by the United States, Israel and other nations. Qatar Charity further agreed to distribute those funds on behalf of Hamas and PIJ. By engaging in that conduct, Qatar Charity furthered the goals of the conspiracy.

358.     Defendant Masraf Al Rayan joined the conspiracy by agreeing, among other things, expressly or tacitly: (a) to allow Qatar Charity to use accounts at Masraf Al Rayan to funnel money to and fund Hamas and PIJ; (b) to allow other Islamic groups linked to PIJ and Hamas, including Interpal, to maintain accounts at the bank that were used to funnel money to Hamas and PIJ; and

64

(c) to give Qatar Charity, Hamas, and PIJ access to U.S. dollars through Masraf Al Rayan's correspondent banking relationships in the U.S.  By engaging in that conduct, Masraf Al Rayan furthered the goals of Defendants' conspiracy.

359.    Defendant QNB joined the conspiracy by agreeing, among other things, expressly or tacitly: (a) to provide banking services to Hamas leadership headquartered in Doha; (b) to provide banking services to its co-conspirator, Qatar Charity; and (c) to employ and provide banking services to the chair of the Union of Good, a U.S.-designated SDGT and a fundraising front for Hamas.

360.    The close relationships among Defendants and the Qatari government, including the Qatari royal family, connected the two banks to the conspiracy.

361.    Defendant Masraf Al Rayan knew that it facilitated acts of terrorism and Defendants' conspiracy by allowing a notorious designated financer of terrorism like Qatar Charity to maintain accounts at the bank and by disregarding suspicious transactions involving those accounts.

362.    Defendant QNB knew that it facilitated acts of terrorism and Defendants' conspiracy by providing services to notorious Hamas terrorists who were released in a prisoner exchange from their terrorism-related prison sentences in Israel to the safe haven of Qatar, where they continued to run Hamas.

363.    The Bank Defendants knew that the government of Qatar and members of the Qatari royal family, who had leadership positions at both banks, openly supported Hamas by financing its operations and providing a safe haven to Hamas's leadership.

364.     The Bank Defendants knew that, by allowing Qatar Charity to use accounts at the banks to funnel money to Hamas and PIJ, the banks were joining a conspiracy intended to commit acts of international terrorism, including the murder of Americans in Israel.

365.     As a direct and proximate result of the Defendants' conspiracy and the steps they knowingly took in furtherance thereof, Plaintiffs have suffered significant physical, psychological and emotional injuries.

366.     Defendants are therefore liable to Plaintiffs for damages in an amount to be determined at trial, treble damages, and the payment of the attorneys' fees and expenses incurred by Plaintiffs in connection with this action.

### THIRD CAUSE OF ACTION

### PROVIDING MATERIAL SUPPORT TO TERRORISTS IN VIOLATION OF 18 U.S.C. §§ 2339A AND 2333(a) AGAINST ALL DEFENDANTS

367.     Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

368.     Plaintiffs assert this claim against all Defendants for violations of 18 U.S.C. §§ 2333(a) and 2339A.

369.     Plaintiffs are nationals of the United States or the estates, survivors or heirs of U.S. nationals.

370.     The financial assistance that Defendants provided to Hamas and PIJ constituted material support of those terrorist organizations and facilitated the efforts of Hamas and PIJ to engage in acts of international terrorism, including the attack that killed Pinches Menachem Przewozman and injured Plaintiffs.

66

371.    Defendants provided that material assistance to Hamas and PIJ knowing or intending that their material assistance would be utilized by the terrorist organizations to prepare for or carry out terrorist attacks, including the attack that killed Pinches Menachem Przewozman and injured Plaintiffs.

372.    Defendants provided that material assistance to Hamas and PIJ in furtherance of the conspiracy to facilitate the acts of terrorism that Hamas and PIJ perpetrated, including the attack that killed Pinches Menachem Przewozman and injured his family members.

373.    The material assistance that Defendants provided to Hamas and PIJ constituted activities dangerous to human life that violated 18 U.S.C. § 2339A and that were either unlawful under state law, including New York Penal Law §§ 490.10 and 490.15, or would have been unlawful under that state law if committed in the United States.

374.    The material assistance that Defendants provided to Hamas and PIJ was dangerous to human life because that assistance enabled the terrorist organizations to finance their violent attacks and recruit individuals to carry out those attacks.  The financial assistance that Defendants provided to Hamas and PIJ also enabled the terrorist organizations to expand their purported charitable activities, and thereby attract additional donors and recruits for their terrorist operations.

375.    The actual and apparent intention of the material assistance that Defendants provided to Hamas and PIJ was: (a) to intimidate or coerce the civilian populations of Israel and the United States; (ii) to influence the policies of Israel and the United States by means of intimidation and coercion; or (iii) to affect the conduct of the governments of Israel and the United States by mass destruction, assassination, or kidnapping.

376.    The substantial financial assistance that Defendants provided to Hamas and PIJ occurred primarily outside the United States and transcended national boundaries in that Defendants operated internationally in providing financial assistance to Hamas and PIJ.

377.    As a result, Defendants committed acts of international terrorism, as defined by 18 U.S.C. § 2331.

378.    Hamas and PIJ did rely upon the financial assistance and material support provided by Defendants in carrying out the FTOs' terrorist activities.

379.    Hamas and PIJ engaged in acts of physical violence outside of the United States with the intent to kill or to cause serious bodily injuries to Plaintiffs, nationals of the United States. The FTOs engaged in that illicit conduct pursuant to a joint plan and conspiracy with Defendants and others.

380.    The FTOs' acts of violence caused the death of Pinches Menachem Przewozman and injured his family members.

381.    The material support and substantial assistance that Defendants provided to Hamas and PIJ was a substantial factor in causing Plaintiffs' injuries.  Moreover, Plaintiffs' injuries were a foreseeable result of the material support and substantial assistance that Defendants provided to Hamas and PIJ.

382.    As a direct and proximate result of the material support and substantial assistance that Defendants knowingly provided to Hamas and PIJ, Plaintiffs have suffered significant physical, psychological and emotional injuries.

383.    Defendants are therefore liable to Plaintiffs for damages in an amount to be determined at trial, treble damages, and the payment of the attorneys' fees and expenses incurred by Plaintiffs in connection with this action.

### FOURTH CAUSE OF ACTION

### PROVIDING MATERIAL SUPPORT TO FOREIGN TERRORIST ORGANIZATIONS IN VIOLATION OF 18 U.S.C. §§ 2339B(a)(1) AND 2333(a) AGAINST ALL DEFENDANTS

384.    Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

385.    Plaintiffs assert this claim against all Defendants for violation of 18 U.S.C. §§ 2333(a) and 2339B(a)(1).

386.    Plaintiffs are nationals of the United States or the estates, survivors or heirs of U.S. nationals.

387.    At the time of the attack that injured Plaintiffs, Hamas and PIJ were FTOs.

388.    At that time, Defendants knew that Hamas and PIJ were FTOs, that those organizations engaged in terrorist activity (as defined in 8 U.S.C. § 1182(a)(3)(B)), and that they engaged in terrorism (as defined in 22 U.S.C. § 2656f(d)(2)).

389.    As Plaintiffs allege in detail above, Defendants provided material support to Hamas and PIJ.

390.    That material support was integral to the ability of Hamas and PIJ to carry out their terrorist attacks, including the attack that injured Plaintiffs.

391.    As Plaintiffs allege in detail above, the material support that Defendants provided to Hamas and PIJ constituted acts of international terrorism, as defined in 28 U.S.C. § 2331(1).

69

392.     The material support that Defendants provided to Hamas and PIJ was a substantial

and foreseeable factor in causing Plaintiffs' injuries.

393.     Moreover, Plaintiffs' injuries were a foreseeable result of the material support and

substantial assistance that Defendants provided to Hamas and PIJ.

394.     As a direct and proximate result of the material support and substantial assistance

that Defendants knowingly provided to Hamas and PIJ, Plaintiffs have suffered significant

physical, psychological and emotional injuries.

395.     Defendants are therefore liable to Plaintiffs for damages in an amount to be

determined at trial, treble damages, and the payment of the attorneys' fees and expenses incurred

by Plaintiffs in connection with this action.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court:

(a)     Accept jurisdiction over this action;

(b)     Enter judgment against Defendants and in favor of Plaintiffs for compensatory
damages in amounts to be determined at trial, and pre-judgment interest thereon;

(c)     Enter judgment against Defendants and in favor of Plaintiffs for treble damages
pursuant to 18 U.S.C. § 2333(a), and pre-judgment interest thereon;

(d)     Enter judgment against Defendants and in favor of Plaintiffs for any and all costs
sustained in connection with the prosecution of this action, including attorneys' fees,
pursuant to 18 U.S.C. § 2333(a), and pre-judgment interest thereon; and

(e)     Grant such other and further relief as justice requires.

PLAINTIFFS DEMAND A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.

Dated: December 15, 2020

FLEISCHMAN BONNER & ROCCO LLP
By:  /s/ James P. Bonner
James P. Bonner (jbonner@fbrllp.com)
Patrick L. Rocco (procco@fbrllp.com)
Susan M. Davies (sdavies@fbrllp.com)
81 Main Street, Suite 515
White Plains, New York 10601
Telephone:  908-516-2066

PERLES LAW FIRM PC
Steven R. Perles*
Joshua K. Perles*
1050 Connecticut Ave. NW, Suite 500
Washington, D.C. 20036
Telephone:  202-955-9055

ALLEN L. ROTHENBERG, P.C.
Allen L. Rothenberg
Harry Rothenberg
706 Salem Court
Yardley, PA 19067
Telephone:  866-239-3405

*  Motions for admission *pro hac vice* to be filed

71



**TRANSPERFECT**

# CERTIFICATION

TransPerfect is globally certified under the standards ISO 9001:2015, ISO 17100:2015, and ISO 18587:2017. This Translation Certificate confirms the included documents have been completed in conformance with the Quality Management System documented in its ISO process maps and are, to the best knowledge and belief of all TransPerfect employees engaged on the project, full and accurate translations of the source material.

| | |
|---|---|
| File Name(s): | 2020-12-15 Qatar II Complaint FINAL |
| Source Language(s) | English |
| Target Language(s) | Arabic |

*Authorized Signature:*

*Signature, Notary Public:*

_____

*Name:* Jacqueline Yorke

*Title:* Project Manager

*Date:* October 29, 2021



*Stamp: Notary Public*

LANGUAGE AND TECHNOLOGY SOLUTIONS FOR GLOBAL BUSINESS

محكمة الولايات المتحدة الإقليمية

للمنطقة الشرقية في نيويورك

-------------------------------------------------------------------X

حاييم دوف برزيوزمان وهداسا برزيوزمان، منفردين، كل منهما بصفته

الممثل الشخصي لتركة بينشيز مناحيم برزيوزمان، وولي الأمر والوصي

الطبيعي لكل من Y.P.، قاصر، وP.P.، قاصر، وتشايا راشيل

برزيوزمان، منفردين، وولي الأمر والوصي الطبيعي لكل من A.M.P.،       القضية رقم 6088-20

قاصر، وF.P.، قاصر، وسارة برزيوزمان- روزنباوم، ويافا برزيوزمان،

وتزفي يوسف برزيوزمان،

المُدّعون،

-ضد-                                                **شكوى**

قطر الخيرية وبنك قطر الوطني ومصرف الريان،        **محاكمة مطلوبة أمام هيئة محلّفين**

المدعى عليهم.

-------------------------------------------------------------------X

يعرب المدعون عن المزاعم التالية بموجب هذه الوثيقة، ومن خلال مستشارهم الموقع أدناه، بناءً على المعلومات

والاعتقاد، باستثناء تلك المزاعم المتعلقة بالمدعين، والتي يزعمونها بناءً على معرفتهم الشخصية.

**المقدمة**

1.    يؤكد المدعون الدعاوى المتعلقة بالقتل الخطأ والإصابة الشخصية والأضرار ذات الصلة وفقًا لقانون مكافحة

الإرهاب، القسم 2331 من الفصل 18 من مدونة القوانين الأمريكية وما يليه، ضد أعضاء مؤامرةٍ لتمويل الإرهاب بقيادة

الحكومة والأسرة الحاكمة في قطر.

2.    قام أعضاء هذه المؤامرة برعاية وتنفيذ سلسلة من الهجمات الإرهابية الشنيعة في إسرائيل، تضمنت التفجير

الذي أسفر عن قتل بينشيز مناحيم برزيوزمان وإصابة أفراد أسرته، المدعين في هذه الدعوى.

3.    منذ أكثر من عِقد، قامت قطر علانيةً بتمويل ودعم مؤسستين على الأقل صنّفتهما الولايات المتحدة الأمريكية

منذ فترة طويلة ضمن الإرهابيين العالميين المصنفين تصنيفًا خاصًا — وهما حركة حماس وحركة الجهاد الإسلامي الإرهابيتين

سيئتي السمعة في فلسطين. وقد تم وضع حركة حماس وحركة الجهاد الإسلامي الفلسطيني على لائحة الإرهابيين العالميين

المصنفين تصنيفًا خاصًا نتيجة ارتكاب هجمات إرهابية متكررة ضد ضحايا أبرياء في إسرائيل والأراضي الفلسطينية.

4.    في أكتوبر 2012، تعهدت قطر علنًا بالتبرع بمبلغ 400 مليون دولار أمريكي لحماس. وقد أدى هذا الفعل

غير القانوني إلى إدانةٍ واسعة النطاق في الكونجرس الأمريكي.  وبالإضافة إلى الدعم المالي الكبير، قدمت قطر أيضًا ملاذًا آمنًا للقيادة السياسية العليا لحركة حماس منذ عام 2012 على الأقل.

5.      من أجل تحقيق هدفها المتمثل في نشر أعمال الإرهاب والعنف في إسرائيل مع التهرب من العقوبات الدولية، تعاونت قطر مع العديد من المؤسسات التي تهيمن وتسيطر عليها لتمرير الدولارات الأمريكية المطلوبة (العملة المفضلة للشبكات الإرهابية في الشرق الأوسط) إلى حماس وحركة الجهاد الإسلامي تحت غطاء التبرعات الخيرية الزائف.

6.      وهناك ثلاث من هذه المؤسسات مدعى عليهم في هذه القضية وهم – قطر الخيرية، ومصرف الريان، وبنك قطر الوطني (يُشار إلى "بنك قطر الوطني" بمفرده، وإليه مجتمعًا مع قطر الخيرية ومصرف الريان باسم "المدعى عليهم").

7.      قطر الخيرية هي مؤسسة قطرية معروفة بتمويل الإرهاب في جميع أنحاء الشرق الأوسط وشمال أفريقيا. وهي عضو في ائتلاف الخير، منظمة معروفة بتمويل حماس والإرهاب الدولي الذي تسميه الحكومة الأمريكية الإرهابيين العالميين المصنفين تصنيفًا خاصًا ("SDGT"). ورئيس مجلس إدارة قطر الخيرية هو حمد بن ناصر آل ثاني، أحد أبناء الأسرة الحاكمة القطرية.

8.      وفقًا لمؤامرتهم غير القانونية، قدّم المدعى عليهم وشركائهم في المؤامرة الدعم المادي والموارد إلى حماس وحركة الجهاد الإسلامي الفلسطينية مما مكّن هذه المنظمات الإرهابية من شن الهجمات التي قتلت بينشيز مناحيم برزيوزمان، وعدد لا حصر له من المدنيين في إسرائيل والأراضي الفلسطينية، وأصابت عدد أكبر من غير المقاتلين.

9.      وتعزيزًا لهذه المؤامرة، قامت قطر الخيرية بجمع ملايين الدولارات من التبرعات وتوجيهها من خلال النظام المالي الأمريكي.

10.      وقد طلبت قطر الخيرية تبرعات في قطر وحول العالم، ثم حوّلت تلك الأموال إلى حسابها في مصرف الريان بالدوحة في دولة قطر. ثم استخدم مصرف الريان حسابه المصرفي "المراسل" في نيويورك لإجراء المعاملات التي تتضمن أموال مقومة بالدولار الأمريكي ("الدولار الأمريكي") ونقل الأموال من الدوحة عبر نيويورك إلى حسابات قطر الخيرية في الأراضي الفلسطينية في بنك فلسطين أو البنك الإسلامي في رام الله.

11.      بمجرد حصول فروع قطر الخيرية في الأراضي الفلسطينية على هذه الأموال، توزع الأموال المقومة بالدولار الأمريكي أو المقومة بعملات أخرى على حماس وحركة الجهاد الإسلامي الفلسطينية، علاوة على الجمعيات الخيرية

2

المزعومة التابعة لهذه المنظمات الإرهابية.

12.      ثم استخدمت حماس وحركة الجهاد الإسلامي هذه الأموال لتمويل الأنشطة الإرهابية في إسرائيل والأراضي الفلسطينية، بما في ذلك الهجوم الذي قُتل بينشيز مناحيم برزيوزمان وأصيب فيه أفراد عائلته.

13.      لا يزال مصرف الريان رهن التحقيقات في المملكة المتحدة نظرًا لاشتهاره بتقديم خدمات مالية إلى حماس وحركة الجهاد الإسلامي الفلسطينية، من بين أمور أخرى، من خلال استغلال قطر الخيرية لنقل الأموال إلى هذه المنظمات الإرهابية.

14.      على غرار مصرف الريان، ارتكب بنك قطر الوطني أفعالًا سافرة لدعم المؤامرة التي أدت إلى وفاة بينشيز مناحيم برزيوزمان. وبالتنسيق مع باقي المدعى عليهم وشركائهم في المؤامرة، احتفظ بنك قطر الوطني بستة حسابات على الأقل لصالح قطر الخيرية ووفر مضيفًا للخدمات المصرفية لقادة المنظمات الإرهابية. وفي الواقع، طلبت قطر الخيرية تحديدًا من المانحين إرسال الأموال إلى حساباتها في بنك قطر الوطني.

15.      احتفظ بنك قطر الوطني بعشرات الحسابات لصالح الإرهابيين في حماس، بما في ذلك: (أ) أحد أكثر الإرهابيات المطلوبات من قبل مكتب التحقيقات الفيدرالي، والتي تقاوم حاليًا تسليمها إلى الولايات المتحدة من الأردن، و(ب) المتحدث الرسمي، والقائد السابق، لجناح حماس العسكري في الضفة الغربية، الذي تم ادانته بتدبير هجمات إرهابية قاتلة في إسرائيل، و(ج) أحد أعضاء المكتب السياسي لحماس، الذي تم إدانته لدوره كعميل خلية إرهابية تابعة لحماس، و(د) رئيس مجلس إدارة ائتلاف الخير، وهي منظمة صنفتها الولايات المتحدة الأمريكية كمنظمة إرهابية وتم فرض عقوبات عليها لقيامها بتمويل أنشطة حماس الإرهابية.

16.      وقد استُخدمت جميع هذه الحسابات في بنك قطر الوطني لتمويل الأنشطة الإرهابية لحماس وحركة الجهاد الإسلامي في إسرائيل والأراضي الفلسطينية.

17.      الهجوم الذي أودى بحياة بينشيز مناحيم برزيوزمان وأصاب المدعين وقع في 5 مايو 2019 عندما استهدفت حماس وحركة الجهاد الإسلامي الفلسطينية مدنيين يقيمون في إسرائيل بأكثر من 600 صاروخ تم إطلاقهم من مواقع داخل قطاع غزة.

18.      ونتيجة لهذا الهجوم الإرهابي، لحق بالمدعين إصابات بدنية و/أو نفسية شديدة.

3

19.   وبناءً عليه، يتحمل المدعى عليهم المسؤولية تجاه المدعين بموجب قانون مكافحة الإرهاب لقيامهم بتوفير مساعدة مادية إلى حماس وحركة الجهاد الإسلامي الفلسطينية، وضلوعهم في مؤامرة مصممة لدعم أنشطة هذه المنظمات الإرهابية، والمساعدة والتحريض على هذا السلوك غير القانوني.

<u>الاختصاص القضائي ومحل نظر الدعوى</u>

20.   قُتِل بينشيز مناحيم برزيوزمان، وهو مواطن أمريكي، بسبب أعمال الإرهاب الدولي الذي نتج عن تآمر المدعى عليهم لدعم حماس وحركة الجهاد الإسلامي الفلسطينية. المدعون في هذه الدعوى يمثلون تركته وخلفائه وورثته، وجميعهم تعرضوا للإصابة من جراء نفس أعمال الإرهاب الدولي.

21.   ونتيجة لذلك، تتمتع هذه المحكمة بالاختصاص القضائي الموضوعي لنظر هذه الدعوى بموجب القسم 1331 من الباب 28 من مدونة القوانين الأمريكية والقسمين 2333(أ) و2338 من الباب 18 من مدونة القوانين الأمريكية.

22.   يُعد محل نظر الدعوى مناسبًا في هذه المنطقة وفقًا للقسم 1391(ب) و(د) من الباب 28 من مدونة القوانين الأمريكية.

23.   يخضع المُدعى عليهم للاختصاص الشخصي في الولايات المتحدة وفقًا للقسم 2334(أ) من الباب 18 من مدونة القوانين الأمريكية والقسم 302 من قانون وقواعد الممارسة المدنية وقاعدة   الإجراءات المدنية الفيدرالية ع. 4(ك)(2)-(1) لأنهم، وفقًا للمؤامرة، قاموا بمزاولة الأعمال وارتكاب أعمال تعذيب داخل الولايات المتحدة (ونيويورك) عن طريق تحويل الأموال عبر الولايات المتحدة (ونيويورك) لصالح حماس وحركة الجهاد الإسلامي واستفادوا عمدًا من المزايا والحماية التي يوفرها النظام المصرفي في نيويورك وقانون نيويورك في سياق ارتكاب الأفعال غير المشروعة التي يدعيها المدعون.  على مدار فترة التآمر، أقر جميع المدعى عليهم أن حماس وحركة الجهاد الإسلامي الفلسطينية لديهم تاريخ طويل من استغلال التمويل الذي حصلوا عليه في شن هجمات إرهابية قتلت مواطنين أمريكيين مقيمين في إسرائيل أو كانوا يزورون إسرائيل أو الأراضي الفلسطينية.

24.   وتحديدًا، تحقيقًا لمؤامرتهم، قامت قطر الخيرية ومصرف الريان، بمعرفة شريكهم في المؤامرة، بنك قطر الوطني، بالتنفيذ العمدي لتحويل أموال مقومة بالدولار الأمريكي نيابة عن قطر الخيرية من خلال بنك نيويورك ميلون في نيويورك.

4

25.     وبحسب اتفاقهم مع بنك قطر الوطني، قامت قطر الخيرية ومصرف الريان بتنفيذ هذه التحويلات المصرفية بغرض تعزيز مصالح حماس وحركة الجهاد الإسلامي الفلسطينية وتسهيل قدرة هذه المنظمات الإرهابية على شن هجمات داخل إسرائيل والأراضي الفلسطينية. علاوة على ذلك، أقر جميع المدعى عليهم بأن حماس وحركة الجهاد الإسلامي الفلسطينية كانتا مصنفتان كمنظمات إرهابية من قبل الولايات المتحدة في الوقت الذي دبر فيه المدعى عليهم هذه التحويلات.

<u>أطراف الدعوى</u>

<u>المدعون</u>    أ.

26.     المدعية هداسا برزيوزمان هي مواطنة إسرائيلية وزوجة المتوفى بينشيز مناحيم برزيوزمان. في جميع الأوقات المتصلة بالقضية قيد النظر، كان بينشيز مواطنًا أمريكيًا.

27.     قُتل بينشيز جراء هجمات صاروخية شنتها حماس وحركة الجهاد الإسلامي الفلسطينية في 5 مايو 2019 ضد المدنيين المقيمين في إسرائيل من قطاع غزة. وقد كان الهجوم الإرهابي الذي قتل بينشيز جزءًا من سلسلة تفجيرات استمرت لمدة يومين بدأتها حماس وحركة الجهاد الإسلامي الفلسطينية في 4 مايو 2019.

28.     أقامت هداسا هذه الدعوى بموجب قانون مكافحة الإرهاب بصفتها الشخصية بسبب فقدان عُرى الزوجية وإلحاق ضائقة عاطفية بها عن قصد.

29.     كما تؤكد هداسا أيضًا على المطالبات بموجب قانون مكافحة الإرهاب بصفتها الممثل الشخصي لتركة بينشيز بسبب القتل الخطأ والألم والمعاناة وإلحاق ضائقة عاطفية بها عن قصد.

30.     بالإضافة إلى ذلك، تؤكد هداسا على المطالبات بصفتها الوصي على Y.P. وP.P.، وكلاهما مواطنان إسرائيليان وأبناء هداسا وبينشيز .

31.     بالنيابة عن Y.P. وP.P. تطالب هداسا بتعويضات عن الأضرار بموجب قانون مكافحة الإرهاب بسبب فقدان عُرى الزوجية وإلحاق ضائقة عاطفية بها عن قصد.

32.     كان المدعي حاييم دوف برزيوزمان، في جميع الأوقات المتصلة بالقضية قيد النظر، مواطنًا أمريكيًا ووالد بينشيز مناحيم برزيوزمان. يقيم حاييم هذه الدعوى بموجب قانون مكافحة الإرهاب بسبب فقدان عُرى الأسرة وإلحاق ضائقة عاطفية به عن قصد.

5

33. المدعية تشايا راشيل برزيوزمان هي مواطنة إسرائيلية ووالدة بينشيز مناحيم برزيوزمان. وتقيم تشايا هذه الدعوى بموجب قانون مكافحة الإرهاب بسبب فقدان عُرى الأسرة وإلحاق ضائقة عاطفية بها عن قصد.

34. كما تقيم تشايا هذه الدعوى بصفتها وصية على A.M.P. و F.P.، وهم مواطنان أمريكيان وشقيق وشقيقة، على التوالي، بينشيز مناحيم برزيوزمان.

35. بالنيابة عن A.M.P. و F.P.، تطالب تشايا بتعويضات عن الأضرار بموجب قانون مكافحة الإرهاب بسبب فقدان عُرى الأسرة وإلحاق ضائقة عاطفية بها عن قصد.

36. المدعية سارة برزيوزمان – روزنباوم هي مواطنة أمريكية وشقيقة بينشيز مناحيم برزيوزمان. وتقيم سارة هذه الدعوى بموجب قانون مكافحة الإرهاب بسبب فقدان عُرى الأسرة وإلحاق ضائقة عاطفية بها عن قصد.

37. المدعية يافا برزيوزمان هي مواطنة أمريكية وشقيقة بينشيز مناحيم برزيوزمان. وتقيم يافا هذه الدعوى بموجب قانون مكافحة الإرهاب بسبب فقدان عُرى الأسرة وإلحاق ضائقة عاطفية بها عن قصد.

38. المدعي تزفي يوسف برزيوزمان هو مواطن أمريكي وشقيق بينشيز مناحيم برزيوزمان. يقيم تزفي هذه الدعوى بموجب قانون مكافحة الإرهاب بسبب فقدان عُرى الأسرة وإلحاق ضائقة عاطفية به عن قصد.

ب. **المدعى عليهم**

**(1).** **قطر الخيرية**

39. تأسست قطر الخيرية في عام 2002 تحت اسم جمعية قطر الخيرية. وسرعان ما أصبحت مصدر تمويل رئيسي للإرهابيين الدوليين.

40. وقد أعادت جمعية قطر الخيرية تسمية نفسها باسم قطر الخيرية بعد أن أصبحت معروفة باسمها السابق بتمويل الإرهاب الدولي.

41. في مارس 2008، أدرجت لجنة الاستخبارات الأمريكية المشتركة بين الوكالات المعنية بمكافحة الإرهاب [1]

---

[1] تأسست لجنة الاستخبارات الأمريكية المشتركة بين الوكالات المعنية بمكافحة الإرهاب في عام 1997 وفقًا لقانون الأمن القومي لسنة 1947 بهدف "تقديم المشورة والمساعدة لمدير الاستخبارات المركزية في الاضطلاع بواجباته ومسؤولياته فيما يتعلق بالتنسيق ونشر الاستخبارات الوطنية بشأن قضايا الإرهاب و... تعزيز الاستخدام الفعال لموارد مجتمع الاستخبارات لهذا الغرض". كانت مجموعة التحذير من الإرهاب التابعة لمدير الاستخبارات المركزية مكلفة بإعداد "تحذيرات منسقة بشأن تهديدات مجتمع الاستخبارات من مدير الاستخبارات المركزية لتنبيه صانعي السياسات العليا بالهجمات الإرهابية الأجنبية

6

التابعة للمركز الوطني لمكافحة الإرهاب بالولايات المتحدة قطر الخيرية (المعروفة حينئذ باسم جمعية قطر الخيرية) باعتبارها "كيانًا داعمًا للإرهاب ذو أولوية من المستوى الثالث" بسبب "عزمها واستعدادها" دعم المنظمات الإرهابية التي تهاجم الولايات المتحدة ومصالحها.

42.    قبل ذلك بفترة طويلة، كانت قطر الخيرية متورطة في أحد أنماط دعم وتمويل المنظمات الإرهابية الدولية.

43.    في شهادةٍ مقدمة إلى لجنة هجمات 9/11 والكونجرس، قال جمال الفضل، المعاون التجاري السابق لأسامة بن لادن الذي انشق عنه وتوجه إلى الولايات المتحدة في عام 1996، أن بن لادن أخبره في عام 1993 أن جمعية قطر الخيرية كانت واحدة من أكبر مصادر تمويل بن لادن.

44.    في عام 2002، في قضية جنائية متعلقة بالإرهاب في محكمة الولايات المتحدة الإقليمية للمنطقة الشمالية في إلينوي، أكدت الحكومة الأمريكية أن جمعية قطر الخيرية قد موّلت أسامة بن لادن، الذي استخدم الأموال لتنفيذ تفجيرات السفارات في شرق أفريقيا عام 1998. [2]

45.    الشهادة التي أدلى بها ماثيو ابستين وإيفان كولمان في عام 2003 إلى لجنة مجلس الشيوخ الأمريكية بشأن اللجنة الفرعية للخدمات المالية المعنية بالرقابة والتحقيقات ("شهادة ابستين/كولمان") تقدم دليلاً إضافيًا على دعم قطر الخيرية للإرهاب.

46.    أشارت شهادة ابستين/كولمان إلى ضلوع جمعية قطر الخيرية في "تمويل تنظيم القاعدة وجماعات أخرى مصنفة بأنها جماعات إرهاب دولي" و"قامت بدورًا حاسمًا في البنية التحتية الإرهابية العربيـة-الأفغانية عن طريق غسل الأموال المتأتية من حسابات مصرفية تخص بن لادن ورعاته المتعاطفين معه في الخليج العربي، حيث توفر وثائق توظيف وسفر لأفراد القاعدة في جميع أنحاء العالم، وتساعد على "نقل الأموال إلى مناطق عمليات تنظيم القاعدة." http://archives-financialservices.house gov/media/pdf/031103me.pdf.(مقتبس من عرض برهان أرناؤوط).

47.    أكدت شهادة إبستين/كولمان أيضًا أنه بينما كانت جمعية قطر الخيرية تروج لعملها الإنساني، "لم تمثّل

المحتملة ضد الولايات المتحدة والأفراد والمنشآت والمصالح الحليفة." https://org.fas/irp/offdocs/3dcid22.pdf.
[2] عرض الأسانيد الثبوتية الحكومية الداعمة لقبول إفادات المشتركين في المؤامرة"، *الولايات المتحدة الأمريكية ضد إنعام م. أرناؤوط*، دعوى رقم: 02  892CR (المحكمة الإقليمية الأمريكية للمنطقة الشمالية بتاريخ 31 يناير 2003) ("عرض برهان أرناؤوط").

رسالتها الخيرية أكثر من ذريعة لتقديم الدعم المادي للإرهابيين".

48.    بالإضافة إلى عملها كقناة مالية رئيسية لتنظيم القاعدة، قامت قطر الخيرية بتمويل ودعم المنظمات الإرهابية الأخرى في جميع أنحاء الشرق الأوسط وأفريقيا وغيرها.

49.    فعلى سبيل المثال، ساعدت قطر الخيرية ميلشيات إرهابية شبه رسمية متطرفة ترتبط بالجبهة الإسلامية القومية في السودان.

50.    في تسعينيات القرن الماضي، دعمت قطر الخيرية حركة الجهاد الإسلامي الإرتري، وهو تنظيم إرهابي آخر في أفريقيا.

51.    خارج أفريقيا، كانت قطر الخيرية نشطة للغاية في الأنشطة الإرهابية في البلقان والجمهوريات المضطربة في القوقاز.

52.    كما عملت قطر الخيرية أيضًا كممول ووكالة للتنظيمات الإرهابية في منطقة الشيشان ومالي ومولت لواء أحفاد الرسول في سوريا.

53.    بالإضافة إلى ذلك، قدمت قطر الخيرية التمويل إلى، وأقامت شراكات مع، منظمة الإغاثة الإسلامية، التي تم حظرها في إسرائيل عام 2014 بسبب توفير التمويل لحماس.

54.    في يوليو 2008، وقع وزير الدفاع الإسرائيلي على أمر يحظر مؤسسة قطر الخيرية بأكملها (المعروفة آنذاك باسم جمعية قطر الخيرية) وجميع فروعها العاملة في الأراضي التي تديرها السلطة الفلسطينية. وبموجب نفس الأمر الصادر من الحكومة الإسرائيلية، تم تصنيف قطر الخيرية كعضو في ائتلاف الخير المعروف بتمويل أعمال حماس الإرهابية.

55.    وفي وقت التصنيف، حذرت إسرائيل أيضًا بشكل صريح جميع المؤسسات المصرفية والمالية العالمية كي "تستعد تبعًا لذلك وتتصرف بحذر لتجنب الدعاوى الجنائية والقضايا المدنية من جانب ضحايا الإرهاب"، بما في ذلك تلك المرفوعة في الولايات المتحدة.

56.    في نوفمبر 2008، وضعت وزارة الخزانة الأمريكية ("وزارة الخزانة") ائتلاف الخير على لائحة الإرهابيين العالميين المصنفين تصنيفًا خاصًا.

57.    وبموجب هذا التصنيف تم إعلان ائتلاف الخير "كمنظمة أسستها قادة حماس لنقل الأموال إلى التنظيم

6

‏.65 [نص عربي]

‏.64 [نص عربي] 2019، [نص عربي] 2017، [نص عربي]

‏.63 [نص عربي]

‏[نص عربي]

‏.62 [نص عربي] 2017، [نص عربي] 1997.

‏.61 [نص عربي]

‏.60 [نص عربي]

‏[نص عربي]

‏.59 [نص عربي]

‏[نص عربي]

‏.58 [نص عربي]

‏[نص عربي] (2) [نص عربي]

‏[نص عربي] (1) [نص عربي]

وهو أحد أبناء الأسرة الحاكمة القطرية.

**(2).** **مصرف الريان**

66. تأسس مصرف الريان في يناير 2006 وهو شركة مصرفية عامة مقرها في الدوحة، قطر.

67. يهدف مصرف الريان إلى مزاولة الأنشطة المصرفية والتمويلية والاستثمارية بما يتفق مع مبادئ الشريعة الإسلامية. ويخضع للتنظيم من جانب مصرف قطر المركزي ويُعد واحداً من أكبر المصارف الإسلامية في العالم برأس مال سوقي يبلغ 7.5 مليار دولار أمريكي.

68. يخضع مصرف الريان للرقابة من جانب الحكومة القطرية وأفراد الأسرة الحاكمة القطرية من خلال ملكيتهم لحصص كبيرة في المصرف وعضويتهم في مجلس إدارته. ويُعد العديد من أفراد الأسرة الحاكمة القطرية (آل ثاني) أعضاء حاليين أو سابقين في مجلس إدارة المصرف.

69. وفقًا لأحدث تقرير سنوي صدر عن مصرف الريان، فإن أكبر أربعة مساهمين في المصرف هم جميع وكلاء أو أجهزة الحكومة القطرية: يمتلك صندوق المعاشات التابع للهيئة العامة للتقاعد والتأمينات الاجتماعية القطرية نسبة 2.88% من أسهم البنك، ويمتلك جهاز قطر للاستثمار، وهو كيان حكومي قطري مسؤول عن تطوير واستثمار وإدارة الأموال الاحتياطية لدولة قطر والأصول الأخرى المخصصة له، نسبة 4.09%، وتمتلك المحفظة الاستثمارية للقوات المسلحة القطرية نسبة 9.31%، وتمتلك شركة الاستثمار المباشر التابعة لجهاز قطر للاستثمار نسبة 11.65%.

70. بصرف النظر عن الدعم المقدم من جانب قطر الخيرية لحماس وغيرها من المنظمات الإرهابية الدولية منذ فترة طويلة والذي يحظى بتغطية إعلامية كبيرة، فقد كان مصرف الريان يقدم طوال الوقت المتعلق بمطالبات المدعين خدمات مالية لقطر الخيرية. وفي الواقع، ما زال مصرف الريان يقدم تلك الخدمات إلى قطر الخيرية حتى هذا اليوم.

71. يمتلك مصرف الريان 70 بالمائة من شركة الريان (المملكة المتحدة) المحدودة، التي تمتلك 98.34% من شركتها التابعة، بنك الريان بي إل سي. وبحكم الأسهم التي يمتلكها في الريان (المملكة المتحدة) المحدودة، يتحكم مصرف الريان في هذا الكيان والشركة التابعة له، بنك الريان البريطاني ش.م.ع.

72. بنك الريان ش.م.ع، المعروف سابقًا باسم البنك الإسلامي البريطاني، هو بنك تجاري في المملكة المتحدة. تأسس هذا الكيان في أغسطس 2004 لتقديم الخدمات المالية المتوافقة مع الشريعة الإسلامية لعملاء المملكة المتحدة.

73.    أخطر بنك الريان ش.م.ع مساهميه في أواخر عام 2019 بأنه خضع للتحقيق من قبل هيئة السلوك المالي في المملكة المتحدة.

74.    يستند تحقيق هيئة السلوك المالي إلى تقديم الخدمات المالية من جانب بنك الريان ش.م.ع للكيانات الإرهابية الخاضعة للإدراج.  ومن عملاء البنك مؤسسة إنتربال، التي صنفتها وزارة الخزانة كان إرهابي في عام 2003 بسبب روابط التمويل بين إنتربال وحماس.

75.    كما يقدم بنك الريان البريطاني ش.م.ع الخدمات إلى نكتار تراست، الفرع البريطاني لقطر الخيرية.  وقد حصل نكتار تراست، المعروف سابقًا باسم قطر الخيرية بالمملكة المتحدة، على أكثر من 37 مليون جنيه إسترليني (حوالي 49.4 مليون دولار أمريكي من تاريخ هذه الدعوى) من قطر الخيرية.

76.    نكتار تراست له علاقة شراكة مع إيمان تراست، وهي مجموعة يرتبط قادتها بعلاقات وثيقة مع جماعة الإخوان المسلمين المتطرفة في مدينة شيفيلد شمالي إنجلترا.

**(3).    بنك قطر الوطني**

77.    كان بنك قطر الوطني، الذي تأسس عام 1964، أول بنك تجاري مملوك محليًا لدولة قطر.

78.    يمتلك جهاز قطر للاستثمار، وهو صندوق الثروة السيادية المملوك لدولة قطر، حصة قدرها 50% في بنك قطر الوطني.

79.    تأسس جهاز قطر للاستثمار في عام 2005 من قبل أمير دولة قطر حينئذ، الأمير حمد بن خليفة آل ثاني. وقد كان جهاز قطر للاستثمار يُدار حتى عام 2013 بواسطة حمد بن جاسم بن جابر بن محمد بن ثاني آل ثاني، رئيس الوزراء السابق ووزير خارجية دولة قطر.  في الفترة من 2015 إلى 2018، شغل الشيخ عبدالله بن محمد بن سعود آل ثاني، فرد آخر في الأسرة الحاكمة القطرية، منصب الرئيس التنفيذي لجهاز قطر للاستثمار.

80.    يخضع بنك قطر الوطني للرقابة من جانب الحكومة القطرية وأفراد الأسرة الحاكمة القطرية من خلال ملكيتهم لحصص كبيرة في البنك وعضويتهم في مجلس إدارته.  ويُعد العديد من أفراد الأسرة الحاكمة القطرية أعضاء حاليين أو سابقين في مجلس إدارة بنك قطر الوطني، ومن بينهم نائب رئيس مجلس الإدارة الحالي.

81.    يقوم بنك قطر الوطني بتسويق قدرته على توفير "حسابات جارية متوافقة مع الشريعة الإسلامية بالعديد من

العملات" والخدمات ذات الصلة في جميع أنحاء منطقة الشرق الأوسط والمملكة المتحدة. ووفقًا لبنك قطر الوطني، "يتم اعتماد المنتجات والعروض الإسلامية بواسطة هيئة الرقابة الشرعية لدينا."

82.     ويُعد يوسف عبدالله القرضاوي، رئيس ائتلاف الخير، عضوًا في هيئة الرقابة الشرعية ببنك قطر الوطني، على الرغم من أن هذا الائتلاف قد أدرجته الولايات المتحدة على قائمة المنظمات الإرهابية التي أنشأتها حماس لجمع التمويل من خلال التبرعات الخيرية المزعومة.

<u>الأسس الوقائعية لمطالبات المدعين</u>

أولاً:   المؤامرة بين قطر والمدعى عليهم لتمويل حماس وحركة الجهاد الإسلامي للتحايل على العقوبات الأمريكية والدولية

<u>أ. حماس</u>

83.     يُعد اسم حماس اختصارًا لمصطلح "حركة المقاومة الإسلامية". تأسست حماس في ديسمبر 1987 بواسطة الشيخ أحمد ياسين مع صلاح شحادة وعبد العزيز الرنتيسي ومحمد شمعة وإبراهيم اليازوري وعيسى النشار وعبد الفتاح دخان.

84.     تعتبر حماس فرعًا من جماعة الإخوان المسلمين، وهي جماعة إسلامية متطرفة تأسست في مصر قبل الحرب العالمية الثانية.

85.     حماس منظمة أدرجتها الحكومة الأمريكية على قائمة المنظمات الإرهابية الأجنبية، وهي تتبنى المبادئ الإسلامية المتطرفة وتهدف إلى تدمير دولة إسرائيل.  فهي تستخدم العنف، والذي يتضمن التفجيرات الانتحارية، والهجمات الصاروخية، والتهديدات بالعنف في محاولة للضغط على إسرائيل للتنازل عن الأرض للشعب الفلسطيني.

86.     تنقسم حماس اسميًا إلى ثلاثة أجنحة مترابطة: (1) التنظيم السياسي، و(2) "الدعوة" (الخدمة الاجتماعية أو المكون الإنساني لحركة حماس)، و(3) جناح العمليات العسكرية المعروف باسم كتائب عز الدين القسام.

87.     وعلى الرغم من أن هذه المكونات لها مسؤوليات منفصلة، إلا أن تنظيم حماس يُدار بسلاسة، حيث تعمل جميع المكونات معًا لتنفيذ ودعم العمليات العسكرية وتحقيق الأهداف غير القانونية للجماعة الإرهابية بالكامل.

88.     تُدار الخدمات الاجتماعية لحركة حماس، في جزء كبير منها، من خلال لجان "الزكاة" المحلية والجمعيات الخيرية.  وقد قامت حماس إما بإنشاء هذه اللجان أو التعاون معها بعدة طرق *من بينها*، تثبيت أعضاء حماس ومشغليها

ونشطائها ليكونوا أعضاء في الهيئات الحاكمة للجان الزكاة. وتعمل هذه اللجان والمنظمات على جمع وتوزيع الأموال نيابةً عن حماس لخدمة أغراض المنظمة.

89.   لعبت لجان الزكاة أدوارًا مهمة في تحويل الأموال لدفع نفقات، ومساعدة أسر، النشطاء الإرهابيين الذين ألقي القبض عليهم أو أُصيبوا أو قُتلوا.

90.   كما تُستخدم أموال الزكاة للمساعدة في تقديم إعانات إسكان لأسر الانتحاريين الذين كان الجيش الإسرائيلي يدمر منازلهم دائمًا بعد تأكيد هويات الانتحاريين. وساعدت لجان الزكاة أيضًا في تحديد الإرهابيين المحتملين وتوظيفهم.

91.   تقوم حماس بانتظام بتوجيه مبالغ كبيرة يتم جمعها اسميًا لأغراض خيرية وإنسانية إلى الاستخدامات الإرهابية والاستخدامات التشغيلية الأخرى. وقد استخدمت حماس (وما زالت تستخدم) هذه الأموال للحصول على الأسلحة والمتفجرات وتوفير خدمات النقل والمخازن والتدريب والرواتب لعناصرها الإرهابية وللمجندين الإرهابيين.

92.   حتى أموال الزكاة المستخدمة للأغراض الخيرية تخلص أموال أخرى تُستخدَم في أعمال إرهابية. وتدعم الأموال التي تستخدمها حماس للأغراض الخيرية عملياتها العسكرية بشكل مباشر، حيث إنها تدعم آلية الترويج لصورة حماس، وهو ما يزيد من جمع التبرعات ويجذب المزيد من المجنّدين.

**ب. حركة الجهاد الإسلامي الفلسطينية**

93.   تأسست حركة الجهاد الإسلامي الفلسطينية في غزة عام 1981، وهي تنظيم إرهابي إسلامي متطرف ملتزم بعولمة الإسلام من خلال "الجهاد" العنيف أو الحرب المقدسة.

94.   تلتزم حركة الجهاد الإسلامي رسميًا بتدمير دولة إسرائيل وتحقيق أهدافها من خلال وسائل العنف، بما في ذلك أعمال الإرهاب.

95.   نفذت حركة الجهاد الإسلامي، منذ إنشائها، عشرات الهجمات الإرهابية في إسرائيل. وقد قتلت وأصابت هذه الهجمات مئات المواطنين الإسرائيليين والأمريكيين.

96.   كما هو الحال مع حماس، تتحكم حركة الجهاد الإسلامي في عشرات المنظمات الخيرية غير الحكومية المزعومة والمنظمات الدينية التي تعمل في الأراضي الفلسطينية.

97.	كما تقوم حركة الجهاد الإسلامي بتوجيه مبالغ كبيرة يتم جمعها اسميًا لأغراض خيرية وإنسانية إلى الاستخدامات الإرهابية والاستخدامات التشغيلية الأخرى. حتى الأموال التي تستخدمها حركة الجهاد الإسلامي الفلسطيني لأغراض خيرية تخلّص أموال أخرى لاستخدامها فيما يتعلق بالنشاط الإرهابي للحركة.

98.	وقد استخدمت حركة الجهاد الإسلامي (وما زالت تستخدم) هذه الأموال للحصول على الأسلحة والمتفجرات وتوفير خدمات النقل والمخازن والتدريب والرواتب لعناصرها الإرهابية وللمجندين الإرهابيين.

99.	وحتى الأموال التي تستخدمها حركة الجهاد الإسلامي للأغراض الخيرية تدعم بشكل مباشر عملياتها العسكرية، حيث إنها تدعم آلية الترويج لصورة حركة الجهاد الإسلامي، وهو ما يزيد من جمع التبرعات ويجذب المزيد من المجندين.

## ج. إدراج حماس وحركة الجهاد الإسلامي رسميًا على قائمة المنظمات الإرهابية

100.	في عام 1989، أعلنت الحكومة الإسرائيلية حركة حماس تنظيمًا إرهابيًا وقامت بإدراجها "باعتبارها تنظيمًا غير مشروع" بسبب أعمالها الإرهابية. وتم نشر إخطار الإدراج في الجريدة الرسمية للدعاية والإعلان لحكومة إسرائيل.

101.	في 23 يناير 1995، أصدر الرئيس كلينتون الأمر التنفيذي رقم 12947، الذي نصّ على أن "أعمال العنف الخطيرة التي يرتكبها الإرهابيون الأجانب والتي تهدد بعرقلة عملية السلام في الشرق الأوسط تشكل تهديدًا استثنائيًا وغير عادي للأمن القومي والسياسة الخارجية واقتصاد الولايات المتحدة."

102.	قضى الأمر التنفيذي رقم 12947 بإدراج حماس وحركة الجهاد الإسلامي على لائحة الإرهابيين العالميين المصنفين تصنيفًا خاصًا و"تجميد" جميع ممتلكاتهما ومصالحهما في الممتلكات.

103.	في 8 أكتوبر 1997، من خلال منشور في السجل الفيدرالي، قضى وزير الخارجية الأمريكي بإدراج حماس وحركة الجهاد الإسلامي كتنظيمات إرهابية أجنبية وفقًا للقسم 219 من قانون الهجرة والجنسية وقانون مكافحة الإرهاب وعقوبة الإعدام الفعلي لعام 1996. وكان يتم تجديد إدراج حماس وحركة الجهاد الإسلامي باعتبارهما تنظيمات إرهابية أجنبية كل عامين منذ عام 1997.

14

104. بعد الهجمات الإرهابية على الولايات المتحدة في 11 سبتمبر 2001، أصدر الرئيس بوش الأمر التنفيذي رقم 13224، معلنًا حالة طوارئ وطنية فيما يتعلق "بأعمال الإرهاب الجسيمة... والتهديد المستمر والفوري للهجمات الأخرى على مواطني الولايات المتحدة أو على الولايات المتحدة."

105. الأمر التنفيذي رقم 13224 وضع حماس وحركة الجهاد الإسلامي الفلسطيني على لائحة الإرهابيين العالميين المصنفين تصنيفًا خاصًا. كما قضى هذا الأمر التنفيذي بتجميد جميع الممتلكات والمصالح في الممتلكات الخاصة بالإرهابيين المدرجين على لائحة الإرهابيين العالميين المصنفين تصنيفًا خاصًا، ومن بينهم حماس وحركة الجهاد الإسلامي.

د.   التمويل المباشر والمتعمد من جانب قطر إلى حماس
وحركة الجهاد الإسلامي وتوفير الملاذ الآمن لقيادة حماس

106. في الفترة من عام 2011 حتى عام 2015 على الأقل، قامت حماس وحركة الجهاد الإسلامي، عن علم وعن قصد وبصورة غير قانونية، بالاجتماع والتآمر والتحالف والاتفاق مع المدعى عليهم لارتكاب العديد من أعمال الإرهاب الدولي، على النحو المعرّف في القسمين 2331 و2332 من الباب 18 من مدونة القوانين الأمريكية. تضمنت أعمال الإرهاب الدولي أعمال القتل والشروع في القتل والتحريض على القتل، فضلًا عن تقديم الدعم المادي للمنظمات الإرهابية الأجنبية.

107. تحتاج المنظمات الإرهابية مثل حماس وحركة الجهاد الإسلامي إلى الأموال للعمل مثلها مثل أي مؤسسة أخرى. ولكن على عكس الشركات الشرعية، يجب على المنظمات الإرهابية ممارسة أنشطة جمع التبرعات والأنشطة المالية الأخرى بطريقة سرية.

108. ونتيجة لذلك، تستخدم حماس وحركة الجهاد الإسلامي الفلسطينية ـ مثل العديد من المنظمات الإرهابية الأخرى ـ استراتيجيات لجمع التبرعات  بوسائل ابتكارية تعتمد بشكل كبير على الدول المتعاطفة والمؤسسات المالية لإخفاء الأنشطة المالية لحماس وحركة الجهاد الإسلامي الفلسطينية، وبالتالي تسهيل جهودها للتهرب من قوانين مكافحة الإرهاب.

109. في الجزء الكبير، تسعى حماس وحركة الجهاد الإسلامي الفلسطينية إلى إخفاء جهودهم لتمويل الإرهاب تحت ستار التبرعات "الخيرية".

110. وقد مارست حكومة قطر منذ فترة طويلة سياسة رسمية لتقديم الدعم المالي إلى حماس، وغالباً ما يتم إخفاء هذا الدعم تحت ستار تبرعات خيرية مزعومة.

15

111.   وقد لعب المدعى عليهم، وجميعهم خاضعين لسيطرة الحكومة القطرية والأسرة الملكية، أدوارًا مكملة لبعضها البعض في دعم قطر لحماس وحركة الجهاد الإسلامي الفلسطينية.

112.   بدأت قطر في دعم حماس في بداية عام 2006 على الأقل. وفي ذلك الوقت، بعد فترة وجيزة من الانتخابات التي جلبت حماس إلى السلطة في غزة، تعهدت قطر بمبلغ 50 مليون دولار أمريكي إلى حكومة السلطة الفلسطينية التي كانت تسيطر عليها حركة حماس حينذ.

113.   في عام 2008، صرح مسؤولون فلسطينيون أن قطر قدمت لحماس "ملايين الدولارات شهريًا" والتي كانت مخصصة اسميًا لسكان غزة.[3]

114.   في أكتوبر 2012، تعهدت قطر بالتبرع بمبلغ 400 مليون دولار أمريكي لحماس. وردًا على ذلك، كتب 24 عضوًا أمريكيًا في الكونجرس إلى السفير القطري، مصرحين بأن دعم قطر "لحماس، وهي تنظيم أدرجته الولايات المتحدة على قائمة التنظيمات الإرهابية الأجنبية... يضفي الشرعية على التنظيم الممارس للعنف والكراهية ويعززه."

115.   مذكرة بتاريخ 2013 تحمل علامة "سرية" موجهة إلى الشيخ حمد بن جاسم (رئيس الوزراء القطري ووزير الخارجية وأحد أفراد العائلة الحاكمة في قطر) من علي فهد الهاجري، مساعد وزير الشؤون الخارجية القطرية، تُظهر مدى دعم الحكومة القطرية لحماس.

116.   أشارت مذكرة الهاجري إلى أنه تم دفع 250 مليون دولار بناءً على تعليمات بن جاسم من البنك المركزي القطري مباشرة إلى خالد مشعل، قائد حماس. وتنص المذكرة على ما يلي: "أود أن أبلغ سعادتكم أن المبلغ المعتمد قد تم استخراجه من صندوق الطوارئ بوزارة المالية بشيك رقم (060622496) بتاريخ 2013/01/27 وسحبه من مصرف قطر المركزي نيابة عن السيد/ خالد عبدالرحيم اسماعيل عبدالقادر مشعل (حماس)."

117.   تعد قطر أكبر ممول فرديّ لحماس. ففي الفترة ما بين عامي 2012 و2018، أمدّت قطر حركة حماس رسميًا بما يزيد عن 1.1 مليار دولار أمريكي.

---

[3]"مشاهدة التمويل القطري لحركة حماس،" *واشنطن تايمز*، 5 مارس 2008 (متوفر على http://www.washingtontimes.com/news/2008/mar/05/qatar-seen-bankrolling-hamas/?pag e=all).

16

118.   في مارس 2014، قام وكيل وزارة الخزانة ديفيد كوهين بإدراج قطر باعتبارها "اختصاص قضائي متساهل" بشكل خاص في تمويل الإرهاب.  وأشار إلى أن قطر "كانت تقوم علنًا منذ سنوات عديدة بتمويل حماس، وهي جماعة تواصل تقويض الاستقرار الإقليمي."

119.   وفي الوقت نفسه أشار كوهين إلى أن الرقابة القطرية متساهلة للغاية لدرجة أن "العديد من جامعي الأموال الرئيسيين الموجودين في قطر يعملون ممثلين محليين لشبكات جمع الأموال الإرهابية الأكبر حجمًا الموجودة في الكويت." كما ذكر كوهين أن قطر لا تدعم حماس فحسب، بل أيضًا جماعات متطرفة تعمل في سوريا. انظر https://www.treasury.gov/press-center/press-releases/Pages/jl2308.aspx.

120.   كما أدركت حكومات أخرى في الشرق الأوسط الدور الأساسي الذي تلعبه الحكومة القطرية في دعم الإرهاب في المنطقة. قطعت دول المملكة العربية السعودية والبحرين ومصر والإمارات العربية المتحدة علاقاتها مع قطر في 5 يونيو 2017، بسبب صلات قطر طويلة الأمد بالتنظيمات الإرهابية.

121.   وبالإضافة إلى الدعم المالي الكبير، قدمت قطر ملاذًا آمنًا للقيادة السياسية لحركة حماس منذ عام 2012. من بين مسؤولي حماس الآخرين، يقيم خالد مشعل القائد الحالي للمنظمة في قطر منذ عام 2012.

122.   علاوة على ذلك، في أبريل 2013، استأجرت قطر رحلة طيران خاصة لنقل القائد السياسي البارز في حماس إسماعيل هنية، الذي كان في ذلك الوقت قائدًا للسلطة الوطنية الفلسطينية، إلى الدوحة.

123.   ورتبت قطر لانضمام اثنين من مؤسسي الجناح العسكري لحماس، وهما يحيى السنوار وروحي مشتهى، إلى هنية على تلك الرحلة.

124.   واعتبارًا من فبراير 2020، فإن هنية لا يزال يعيش في قطر.

هـ.   **استخدام قطر للبنوك المدعى عليها**
<u>**لتسهيل التمويل غير المشروع لحماس وحركة الجهاد الإسلامي الفلسطينية**</u>

125.   أقرت الحكومة الأمريكية بالدور الحيوي الذي تلعبه قطر في تمويل المنظمات الإرهابية.

126.   وفقًا للإفادات المُعدة المؤرخة 4 مارس 2014 التي أدلى بها ديفيد كوهين، الذي كان يشغل منصب وكيل وزارة الخزانة لشؤون الإرهاب والاستخبارات المالية في ذلك الوقت:

> تعتمد شبكات جمع الأموال الخاصة في قطر... بشكل متزايد على وسائل التواصل الاجتماعي لاستجداء التبرعات للإرهابيين والتواصل مع المانحين والمتطرفين المستلمين لتلك التبرعات في ساحة المعركة. وقد أصبحت هذه الطريقة مثمرة للغاية، وأصبحت قطر بيئة متساهلة للغاية في تمويل الإرهاب لدرجة أن العديد من جامعي الأموال الرئيسيين في قطر يعملون ممثلين محليين لشبكات جمع الأموال الإرهابية الأكبر حجمًا... وليس هناك من شك في أنه بينما نظل نحن ملتزمين بالعمل مع دول مثل... قطر لمواجهة تمويل الإرهاب المستمر، فلن تتردد الولايات المتحدة في التصرف بمفردها لتدمير هذه الشبكات لتمويل الإرهاب."[4]

127. وتماشيًا مع ملاحظات وكيل الوزارة كوهين، فمن خلال سيطرتها على مصرف الريان، استخدمت قطر المصرف لتحويل الأموال إلى حماس وحركة الجهاد الإسلامي تحت سِتار التبرعات إلى مختلف المنظمات "الخيرية" المزعومة. كانت قطر الخيرية المستفيد الرئيسي من هذا المخطط غير المشروع.

128. في الفترة من 1 مارس 2015 وحتى 7 سبتمبر 2015 وحدها، تآمر المدعى عليهم لاستخدام مصرف الريان لتحويل أكثر من 28 مليون دولار أمريكي على هيئة تبرعات خيرية مفترضة من قطر الخيرية في الدوحة إلى فرعيها في الأراضي الفلسطينية (فرع في غزة والآخر في الضفة الغربية).

129. وقامت قطر الخيرية في النهاية بتحويل جزء كبير من هذه الأموال إلى حماس وحركة الجهاد الإسلامي الفلسطينية والجمعيات الخيرية المزعومة التي تتحكم فيها تلك المنظمات الإرهابية.

130. ومن بين الجمعيات الخيرية المزعومة الأخرى التي ترتبط بحماس مباشرة، قامت قطر الخيرية بتحويل 150,000 دولار على الأقل إلى الجمعية الخيرية الإسلامية - الخليل خلال الفترة بين مارس 2011 وسبتمبر 2015.

131. قبل هذه الفترة الزمنية، كانت إسرائيل قد أعلنت أن الجمعية الخيرية الإسلامية - الخليل غير قانونية لأنها تعمل كذراع لحماس.

132. وفقًا لاعترافات مدير وطاقم فرع قطر الخيرية في رام الله (الذي يقع على بعد 10 أميال من القدس)، وكذلك الدفاتر المالية للمؤسسة، انطوت المؤامرة لتمويل حماس على الخطوات التالية المصممة لتمرير أموال مقومة بالدولار الأمريكي من خلال النظام المصرفي الأمريكي لصالح حماس:

أ. كانت قطر الخيرية تستجدي التبرعات في قطر وحول العالم.

ب. كانت قطر الخيرية تقوم بنقل تلك الأموال إلى حسابها في مصرف الريان بالدوحة.

ج. بين عامي 2009 و2015، رتب مصرف الريان معاملات صرف عملات تضمنت تحويل مبلغ

---

[4] https://www.treasury.gov/press-center/press-releases/Pages/jl2308.aspx.

يزيد عن 3.5 مليون مقوم بالدولار الأمريكي واليورو تحتفظ به قطر الخيرية في الدوحة إلى شيكلات إسرائيلية وتحريك تلك الأموال إلى مؤسسة قطر الخيرية في الأراضي الفلسطينية.

د.        الأموال المقومة بالدولار الأمريكي المستخدمة فيما يتعلق بتلك المعاملات تم تمريرها عبر بنك نيويورك ميلون في نيويورك وإلى حسابات قطر الخيرية المفتوحة إما في بنك فلسطين أو البنك الإسلامي في رام الله.

هـ.        ثم وزعت قطر الخيرية جزءًا من هذه الأموال على حماس وحركة الجهاد الإسلامي الفلسطينية والشركات التابعة لهما.

و.        بالإضافة إلى تلك الأموال، في الفترة ما بين عامي 2011 و2013، حولت قطر الخيرية 25 مليون دولار من الدوحة إلى كيان قطر الخيرية المحظور الذي يعمل في قطاع غزة.

ز.        كما تم تمرير هذه الدولارات عبر بنك نيويورك.

133.    تعكس التقارير السنوية لقطر الخيرية عن السنوات 2013 و2014 و2015 أن قطر الخيرية قامت بتحويل أموال إلى مختلف جبهات حماس وحركة الجهاد الإسلامي في فلسطين ونفذت مشاريع مشتركة معهما، بما في ذلك جمعية الإحسان.

134.    في 4 مايو 2005، صنفت وزارة الخزانة جمعية الإحسان على أنها "واجهة خيرية لحركة الجهاد الإسلامي في فلسطين". أعلنت وزارة الخزانة في بيانها الصحفي الذي تعلن فيه عن التصنيف أنه "يتم استخدام جمعية الإحسان من قبل حركة الجهاد الإسلامي الفلسطينية لتجنيد كادرها العملياتي، بالإضافة إلى استخدامها كقناة مالية. في أوائل عام 2003، خططت جمعية الإحسان لفتح مركز شباب لدعم نشاط حركة الجهاد الإسلامي الفلسطينية وإجراء التوظيف والتدريب المرتبط بالحركة."

135.    أشار ستيوارت ليفي، وكيل وزارة الخزانة لمكتب شؤون الإرهاب والاستخبارات المالية آنذاك، إلى أن "جمعية الإحسان تتخفى وراء ستار المؤسسة الخيرية، بينما تساعد فعليًا في تمويل أعمال الإرهاب التي تقوم بها حركة الجهاد الإسلامي الفلسطينية ضد الشعب الإسرائيلي والأبرياء الآخرين".

19

136.   تم اختيار جمعية الإحسان لتكون متلقي دعم من ثلاثة مدعى عليهم في دعوى جنائية كانت جزءًا من الحلقة المالية سيئة السمعة لحركة الجهاد الإسلامي الفلسطينية التي يديرها الأستاذ السابق في جامعة جنوب فلوريدا سامي العريان.

137.   وعلى الرغم من الروابط الواضحة والكبيرة بين قطر الخيرية والكيانات الإرهابية، فقد أكمل مصرف الريان تحويلات الأموال المقومة بالدولار الأمريكي إلى قطر الخيرية في الأراضي الفلسطينية طوال فترة التآمر. وقد استمرت هذه التحويلات في تحدي للقانون الإسرائيلي الذي يحكم النشاط المصرفي في الأراضي الفلسطينية.

138.   خلال المؤامرة بأكملها، كانت قطر الخيرية تعمل بشكل غير قانوني في الأراضي الفلسطينية، حيث أدرجت إسرائيل قطر الخيرية، وهي عضو في ائتلاف الخير، تحديدًا على أنها مموّلاً لحركة حماس في عام 2006. ومن ثم، تم حظر قطر الخيرية من العمل داخل إسرائيل.

139.   بالإضافة إلى ذلك، خلال المؤامرة بالكامل، تم إدراج قطر الخيرية بوصفها كيانًا داعمًا للإرهاب ذا أولوية من المستوى الثالث من قبل لجنة الاستخبارات الأمريكية المشتركة بين الوكالات المعنية بمكافحة الإرهاب.

140.   ومع ذلك، قررت الحكومة القطرية في عام 2009، في تحدي للقانون الإسرائيلي، إعادة فتح عمليات قطر الخيرية في الأراضي الفلسطينية.

141.   ومع ذلك، توقفت عمليات قطر الخيرية مرة أخرى في يوليو 2015 عندما تدخلت الحكومة الإسرائيلية لغلق المؤسسة واعتقلت ثلاثة من كبار التنفيذيين لديها (فادي مناصرة وجودة جمال ونجوان عودة).

142.   أظهرت الحكومة القطرية ولائها لقطر الخيرية حتى بعد اعتقال هؤلاء الأفراد الثلاثة وإغلاق عمليات قطر الخيرية في الأراضي الفلسطينية.

143.   في عام 2017، تم إدانة السيد/ جمال – الذي شغل منصب مدير قطر الخيرية – في إسرائيل لإدارة منظمة غير قانونية ونقل الأموال إلى حماس. وفي نهاية المطاف، تم حبسه لمدة أقل من 23 شهرًا لجرائمه وتم تغريمه مليون شيكل إسرائيلي. ودفعت وزارة الخارجية القطرية في نهاية المطاف الغرامة المفروضة على السيد جمال.

144.   وقد تم الحكم على السيد عودة، الذي كان يعمل مديرًا للعمليات بمؤسسة قطر الخيرية، بالحبس لمدة 17 شهرًا وغرامة قدرها 100,000 شيكل عن نفس الجرائم. أيضًا دفعت الحكومة القطرية، بشكل مباشر أو غير مباشر، تلك الغرامة الجنائية.

20

145.    وقد قضى السيد مناصرة، الذي كان يعمل في الحسابات في مؤسسة قطر الخيرية، عامين ونصف تقريبًا في السجن عن نفس الجرائم. ولتأمين إطلاق سراح السيد مناصرة، دفعت وزارة الخارجية القطرية الغرامة المفروضة عليه وقدرها مليون شيكل.

146.    حتى قبل أن تتحرك إسرائيل لإغلاق عمليات قطر الخيرية في الأراضي الفلسطينية في عام 2015، اتخذت البنوك الأخرى التي تعمل هناك خطوات لإنهاء تعاملاتها مع قطر الخيرية.

147.    على سبيل المثال، رفض البنك العربي، وهو بنك أردني كبير، معالجة مدفوعات الرواتب التي أرسلتها قطر الخيرية إلى موظفيها في الأراضي الفلسطينية. بالإضافة إلى ذلك، رفض بنك القاهرة، وهو مؤسسة مصرية، تنفيذ أنشطة مصرفية لصالح قطر الخيرية في الأراضي الفلسطينية.

148.    وبحسب المؤامرة التي قام بها المدعى عليهم، استخدمت قطر الخيرية حساباتها في مصرف الريان لطلب مساهمات من المانحين، وذلك لأغراض إنسانية مزعومة، مثل مساعدة اللاجئين السوريين. ومع ذلك، استخدمت قطر الخيرية جزءًا كبيرًا من الأموال التي طلبتها من خلال حساب مصرف الريان لتمويل حماس وحركة الجهاد الإسلامي الفلسطينية وغيرها من القضايا الإرهابية.

149.    وتُظهر هذه الحقائق، إلى جانب الدعم العلني من الحكومة القطرية لحماس، أن مصرف الريان كان متواطئًا عن علم في تمويل منظمة حماس.

150.    كما مكّنت التحويلات التي قام بها مصرف الريان إلى قطر الخيرية من خلال بنك فلسطين المدعى عليهم من توزيع الأموال على الإرهابيين وأفراد أسرهم مباشرة دون الإفصاح عن هويتهم تحت ستار التبرعات "الخيرية".

151.    وقد حقق المدعى عليهم هذا الهدف من خلال تمويل شراء قطر الخيرية للآلاف من بطاقات شراء دون اسم المعروفة باسم "بطاقات سنابل" من بنك فلسطين.

152.    وبحسب المؤامرة التي قام بها المدعى عليهم، تم توزيع بطاقات الشراء المجهولة الهوية هذه على آلاف المستفيدين في الأراضي الفلسطينية.

153.    تم تنفيذ مخطط بطاقات سنابل بفعالية كمصدر لتمويل حركة الجهاد الإسلامي الفلسطينية وحماس. استخدم عملاء المنظمتين بطاقات الشراء لتمويل احتياجاتهم المالية الشخصية أثناء قيامهم بالتخطيط لشن هجمات إرهابية. كما استخدم

21

الإرهابيون بطاقات سنابل لدفع النفقات المحدودة اللازمة لشن هجماتهم السافرة، مثل تأمين الذخيرة وشراء البنزين وغيرها من المستلزمات.

154. بالإضافة إلى ذلك، استخدم المُدعى عليهم مخطط بطاقات سنابل بفاعلية كوثيقة تأمين للإرهابيين في حماس وحركة الجهاد الإسلامي الفلسطينية وأفراد عائلاتهم. عندما يصدر الحكم بحبس الإرهابيين بسبب سلوكهم غير المشروع، يتم إعطائهم هم وأفراد أسرهم الأولوية للحصول على بطاقات سنابل.

155. وبالمثل، عندما يتم قتل الإرهابيين التابعين لحماس وحركة الجهاد الإسلامي الفلسطينية أثناء مساعيهم لتنفيذ الهجمات الإرهابية، يتم إعطاء أفراد أسرهم أولوية الحصول على بطاقات سنابل.

156. ومن ثم، مكّن توزيع بطاقات سنابل دون اسم المدعى عليهم من تشجيع الإرهاب من خلال التمويل المباشر للهجمات منخفضة التكلفة التي ارتكبها عملاء حماس وحركة الجهاد الإسلامي الفلسطينية، ومن خلال طمأنة هؤلاء الإرهابيين أن بإمكانهم هو وأفراد أسرهم الاعتماد على شبكة الأمان المالي في حالة اعتقال المهاجمين أو قتلهم.

**و. منح مصرف الريان المدعى عليهم إمكانية الوصول إلى النظام المالي الأمريكي اللازم لتنفيذ مؤامرتهم**

157. دعمًا لمؤامرة المّدعى عليهم لتوفير الدولارات التي احتاجتها حماس وحركة الجهاد الإسلامي الفلسطينية لتنفيذ العمليات الإرهابية، استغل مصرف الريان النظام المالي الأمريكي لنقل أموال قطر الخيرية إلى الأراضي الفلسطينية وإلى الإرهابيين.

158. لم يمتلك مصرف الريان فرع أو مكتب في الولايات المتحدة. ونتيجة لذلك، أجرى ترتيبات مع المؤسسات المصرفية التي تمتلك مكاتب في نيويورك لإجراء معاملات "أعمال البنوك المراسلة" التي مكّنت مصرف الريان من نقل أموال مقومة بالدولار الأمريكي من خلال النظام المصرفي الدولي.

159. البنك المراسل هو مؤسسة مالية تقوم بإنشاء حسابات لصالح مؤسسات مالية أخرى والحفاظ عليها. يستخدم صاحب الحساب حسابه لدى البنك المراسل لعمل الإيداعات والمدفوعات وتنفيذ معاملات مالية أخرى، وخاصة تلك التي تتطلب تحويل العملة.

160.   يمكن للبنوك المراسلة أن تعمل بوصفها وسيطاً بين البنوك في دول مختلفة أو وكيلاً لمعالجة المعاملات المحلية للعملاء الذين يملكون حسابات عند السفر للخارج.  على المستوى المحلي، يمكن للبنوك المراسلة قبول الودائع ووثائق العملية والعمل كوكلاء تحويل للأموال.

161.   إن قدرة البنوك المراسلة على تقديم هذه الخدمات تعفي البنوك الأجنبية من الحاجة إلى إقامة وجود فعلي في الاختصاصات القضائية الأخرى، مثل الولايات المتحدة.

162.   غالبًا ما تستخدم البنوك الأجنبية بنوك مراسلة في الولايات المتحدة للوصول إلى النظام المالي الأمريكي وإجراء المعاملات بالدولار الأمريكي.  وفي كثير من الأحيان، تتضمن هذه المعاملات صرف العملات أو التحويلات التي تتم بعملات بخلاف العملة الوطنية لصاحب الحساب.

163.   في جميع الأوقات ذات الصلة بمطالبات المدعين، حافظ مصرف الريان على علاقة مصرفية مراسلة مباشرة أو غير مباشرة مع بنك نيويورك ميلون وربما بنوك أمريكية أخرى.

164.   وبفضل العلاقة المصرفية المراسلة التي أقامها مصرف الريان مع بنك نيويورك ميلون، استخدم مصرف الريان النظام المالي الأمريكي لإتمام المعاملات بالدولار الأمريكي لعملائه.  وبفضل هذه العلاقة المصرفية المراسلة نجح مصرف الريان في الاستفادة من استقرار وموثوقية القوانين المصرفية في نيويورك.

165.   من خلال المعاملات التي أجراها مصرف الريان عبر حساباته المراسلة، تمكن من تحويل أموال مقومة بالدولار الأمريكي لعملائه وتحويل أموال عملائه المقومة بالدولار الأمريكي إلى عملات أخرى (من الدولار الأمريكي إلى اليورو، على سبيل المثال) وتحويل العملات الأخرى التي يملكها عملاؤه إلى الدولار الأمريكي (اليورو إلى الدولار الأمريكي، على سبيل المثال).

166.   استخدم مصرف الريان علاقاته المصرفية المراسلة في نيويورك لمعالجة معاملات بالدولار الأمريكي لصالح قطر الخيرية.  ونتيجة لذلك، مكّنت تلك العلاقات قطر الخيرية وحماس وحركة الجهاد الإسلامي الفلسطينية من الحصول على أموال بالدولار الأمريكي وتوزيع تلك الأموال على الإرهابيين وأفراد أسرهم في الأراضي الفلسطينية، حيث كان الدولار الأمريكي عملة مرغوبة خلال الفترة الزمنية المتصلة بهذه الدعوى.

23

167. لم يكن بإمكان قطر الخيرية وحماس الحصول على تلك الدولارات الأمريكية بدون مشاركة مصرف الريان في نظام تمويل الإرهاب الذي قام به المدعى عليهم. ما كانت المؤسسات المصرفية الدولية ذات السمعة الطيبة لتمرر أموال بالدولار الأمريكي من خلال النظام المصرفي الأمريكي نيابة عن كيان مثل قطر الخيرية، والتي كانت معروفة بدعمها لحماس وحركة الجهاد الإسلامي الفلسطينية.

168. وفي الوقت الذي شارك فيه المدعى عليهم في هذه المؤامرة لتمرير الدولارات الأمريكية لمنظمة حماس وحركة الجهاد الإسلامي، كانوا يعرفون أو كان ينبغي أن يعرفوا أن حماس استهدفت بصفة منتظمة المواطنين الأمريكيين بالاغتيالات والتفجيرات الانتحارية وأشكال أخرى من الهجمات الإرهابية.

169. ولولا الدعم المقدم من مصرف الريان خلال هذه المؤامرة التي يدعيها المدعون، لما استطاعت حماس وحركة الجهاد الإسلامي تنفيذ الهجمات التي قتلت بينشيز مناحيم برزيوزمان وأصابت أفراد عائلته.

**ز. قيام بنك قطر الوطني بدعم حماس وحركة الجهاد الإسلامي الفلسطينية، ومؤامرة المدعى عليهم من خلال تقديم الخدمات المالية إلى قيادة حماس <u>وقطر الخيرية وائتلاف الخير</u>**

170. على غرار مصرف الريان، انتهك بنك قطر الوطني سياساته الداخلية والقانون الأمريكي والمعايير المصرفية الدولية من خلال تقديم خدمات مصرفية كبيرة تسهّل جهود قطر الخيرية من أجل تمرير أموال بالدولار الأمريكي إلى حماس وحركة الجهاد الإسلامي الفلسطينية وإلى الجمعيات الخيرية المزعومة الكائنة في الأراضي الفلسطينية التي تسيطر عليها هذه المنظمات الإرهابية.

171. وخلال الفترة الزمنية المتعلقة بهذه الدعوى، حافظ بنك قطر الوطني على سبعة حسابات على الأقل لصالح قطر الخيرية.

172. تم فتح ستة من هذه الحسابات في 18 مارس 2012، بينما تم افتتاح آخر في 20 سبتمبر 2006.

173. استفادت قطر الخيرية من هذه الحسابات في بنك قطر الوطني لنقل الأموال إلى المؤسسات الخيرية المزعومة التي تسيطر عليها حماس وحركة الجهاد الإسلامي الفلسطينية.

174. وطوال الفترة الزمنية المتعلقة بمطالبات المدعين، عمل بنك قطر الوطني كمؤسسة مصرفية رئيسية لقيادة حماس. استخدم هؤلاء الإرهابيون حسابات بنك قطر الوطني لتمويل عمليات حماس، بما في ذلك الهجمات الإرهابية.

175.   في عام 2011، أطلقت إسرائيل سراح أعداد كبيرة من الإرهابيين التابعين لحركة حماس من السجن مقابل انقاذ حياة جندي إسرائيلي.

176.   وبعد فترة وجيزة من تبادل الأسرى، فتح بنك قطر الوطني حسابات لصالح ما لا يقل عن 29 إرهابيًا تابعًا لحماس تم تحريرهم في عملية تبادل الأسرى.

177.   فتح اثنان من الإرهابيين حساباتهم في 8 يوليو 2015 في فرع بنك قطر الوطني في الدوحة. وبعد شهر تقريبًا، فتح إرهابيان آخران وعددهم 27 إرهابيًا حسابات في نفس فرع بنك قطر الوطني في 4 أغسطس 2015.

178.   وعلى وجه الخصوص، أدرج 21 على الأقل من هؤلاء الإرهابيين نفس رقم صندوق البريد كعنوان لهم في وثائق فتح الحساب. سجل اثنان على الأقل من الإرهابيين الآخرين حساباتهم على رقم صندوق بريد ثانٍ.

179.   إن حقيقة أن بنك قطر الوطني سمح لإرهابيين معروفين تابعين لحماس، بما في ذلك إرهابية مدرجة على قائمة أكثر المطلوبات لمكتب التحقيقات الفيدرالي، بفتح حسابات في نفس اليوم وتسجيلها على نفس رقم صندوق البريد توضح إخفاق البنك في إجراء أي عناية واجبة فيما يتعلق بفتح تلك الحسابات، وذلك في مخالفة لسياساته والمعايير المصرفية الدولية.

180.   من بين الإرهابيون الذين فتحوا حسابات لدى بنك قطر الوطني في الدوحة في 4 أغسطس 2015 حسام بدران، المتحدث باسم المكتب السياسي لحماس وقائد سابق لجناح حماس العسكري في شمالي الضفة الغربية.

181.   كان بدران واحدًا من أبرز القادة في كتائب الشهيد عز الدين القسام، الجناح العسكري لحماس، في الضفة الغربية خلال الانتفاضة الثانية، وهي انتفاضة العنف الفلسطيني التي وقعت بين عامي 2000 و2005. ونتيجة لذلك، كان بدران هدفًا لمحاولة اغتيال فاشلة قامت بها إسرائيل في عام 2002.

182.   قضى بدران 14 عامًا في السجون الإسرائيلية، وخلال هذه الفترة كان عضوًا في "المكتب السياسي للأسرى" التابع لحماس.

183.   كان الاسم المرتبط بالحساب في سجلات بنك قطر الوطني هو "حسام بدران"، ويشير الرقمان الثاني والثالث في رقم الهوية الوطنية القطرية الخاص بهذا الشخص إلى أن "حسام بدران" وُلد في عام 1966، وهو العام نفسه الذي وُلد فيه الإرهابي سيء السمعة الذي يحمل الاسم نفسه.

25

184.    عنوان بدران المستخدم لفتح هذا الحساب استخدمه ما لا يقل عن 20 إرهابي من بين الذين تم إطلاق سراحهم من السجون الإسرائيلية لفتح حسابات لدى بنك قطر الوطني في الدوحة في 8 يوليو 2015 أو 4 أغسطس 2015.

185.    وقد حافظ بنك قطر الوطني على هذا الحساب على الرغم من أن بدران كان واحدًا من أشهر الإرهابيين.

186.    كقائد عسكري في حماس، دبر بدران سلسلة من التفجيرات التي قتلت عشرات المدنيين الأبرياء وأصابت المئات غيرهم.

187.    شملت الهجمات التي خطط لها بدران ما يلي: تفجير بيتزا سبارو عام 2001 في القدس ما أسفر عن مقتل 15 وإصابة 130؛ تفجير ملهى الدلافين في 2001 في تل أبيب ما أسفر عن مقتل 21 وإصابة 120؛ تفجير عيد الفصح في 2002 في فندق بارك في نتانيا ما أسفر عن مقتل 30 وإصابة 140؛ وتفجير مطعم متزا في حيفا عام 2002 ما أسفر عن مقتل 14 وإصابة 33.

188.    اعتقلت قوات الأمن الإسرائيلية بدران في عام 2002. حُكم عليه عام 2004 بالسجن 17 عامًا لدوره في الهجمات المذكورة أعلاه.

189.    في عام 2011، أطلقت إسرائيل سراح بدران كجزء من صفقة تبادل الأسرى المُعدة لإنقاذ حياة جندي إسرائيلي.  وبعد ذلك بفترة وجيزة، انتقل بدران إلى قطر حيث يقيم حاليًا مع قادة حماس الآخرين ويواصل العمل كمتحدثًا رسميًا باسم حماس.

190.    يواصل بدران، بصفته متحدثًا باسم حماس، الدفاع عن الإرهاب الفلسطيني.

191.    بالإضافة إلى ذلك، وفقًا لشين بيت (جهاز الأمن العام الإسرائيلي) وجيش الدفاع الإسرائيلي، يواصل بدران إصدار الأوامر إلى خلايا حماس الإرهابية وتزويدها بالأموال عن طريق تهريب الذهب والمجوهرات المشتراة من الأردن إلى الضفة الغربية.

192.    وقد فتح بنك قطر الوطني أيضًا حسابًا لموسى دودين، عضو المكتب السياسي لحماس الذي تم ادانته كعميل لخلية إرهابية تابعة لحماس، لدى نفس فرع الدوحة في قطر في 4 أغسطس 2015.

193. وكما هو الحال مع بدران، قام دودين بتسجيل هذا الحساب على نفس عنوان صندوق بريد الذي استخدمه 20 من الإرهابيين الآخرين الذين تم إطلاق سراحهم من السجون الإسرائيلية لفتح حسابات في بنك قطر الوطني في صيف 2015. يشير رقم الحساب الموجود على حساب دودين إلى أن صاحب الحساب قد وُلد في عام 1972، وهو عام ميلاد دودين.

194. اعتقلت إسرائيل دودين في عام 1992 لدوره في توجيه الخلايا الإرهابية في الضفة الغربية. أدانت إسرائيل دودين بهذا السلوك الإرهابي. ونتيجة لذلك، كان يقضي عقوبة السجن مدى الحياة في إسرائيل عندما تم إطلاقه سراحه كجزء من صفقة تبادل الأسرى المذكورة في عام 2011 مثل بدران.

195. وعلى غرار بدران، انتقل دودين إلى قطر بعد إطلاق سراحه مباشرة.

196. يضطلع دودين حاليًا بمسؤولية حفظ "ملف الأسرى" لدى حماس. بموجب هذا الدور، يحدد دودين الإرهابيين التابعين لحماس الذين يجب إطلاق سراحهم من السجون الإسرائيلية مقابل إطلاق سراح المدنيين وجنود جيش الدفاع الإسرائيلي الذي اختطفهم حماس أو مقابل إعادة رفات جنود جيش الدفاع الإسرائيلي الذين تم قتلهم على أيدي إرهابيين إلى أهالي الجنود.

197. الاسم المرتبط بحساب بنك قطر الوطني الذي يحتفظ به هذا الإرهابي هو "موسى دودين". يشير الرقمان الثاني والثالث في رقم الهوية الوطنية القطرية المرتبط بهذا الشخص إلى أن موسى دودين وُلد في عام 1972، وهو العام نفسه الذي وُلد فيه الإرهابي سيء السمعة الذي يحمل الاسم نفسه.

198. كما يحتفظ بنك قطر الوطني بالعديد من الحسابات لصالح يوسف عبدالله القرضاوي، رئيس ائتلاف الخير، وهي منظمة وضعتها الولايات المتحدة على قائمة الكيانات الإرهابية المخصصة.

199. القرضاوي هو قائد روحي لجماعة الإخوان المسلمين الأصولية.

200. وله تاريخ طويل من التحريض على الهجمات الإرهابية والجهاد العنيف في الشرق الأوسط. استجابة للحملات الدولية في أفغانستان ضد تنظيم القاعدة وطالبان، وفي العراق ضد صدام حسين، أصدر القرضاوي فتاوى دينية تحرض المسلمين على الانضمام إلى الجماعات الجهادية وشن هجمات ضد القوات الأمريكية والدولية. كما أصدر القرضاوي فتاوى دينية تبرر التفجيرات الانتحارية.

201. وقد احتفظ بنك قطر الوطني بحسابات للقرضاوي منذ عام 2006 على الأقل. تشير أرقام التعريف الموجودة على الحسابات إلى أن صاحب الحساب وُلد في نفس السنة، 1926، مثل القرضاوي.

202. وقد سعى بنك قطر الوطني إلى الاستفادة من علاقته مع القرضاوي من خلال تعيينه في هيئة الرقابة الشرعية في البنك. ويحافظ بنك قطر الوطني على هذه الروابط الوثيقة مع القرضاوي لدرجة أنه قام بقص شريط افتتاح قسم الصيرفة الإسلامية في بنك قطر الوطني.

203. ومن خلال تكليف القرضاوي بهذه الأدوار رفيعة المستوى، عزز بنك قطر الوطني علاقته معه ورسخ سمعة البنك مع أعضاء المجتمع الديني الإسلامي في قطر، حيث يتمتع القرضاوي بنفوذ اجتماعي وسياسي وديني هائل.

204. يتم تعزيز تأثير القرضاوي كرائد للقطاعات الدينية والإعلامية والتعليمية والمالية والخيرية في قطر من خلال موقعه كصديق مقرب للعائلة الحاكمة في قطر وأمين أسرارها.

205. وفي الواقع، كتب تشاس انتيرمير، سفير الولايات المتحدة في قطر حينئذ، في برقية وزارة الخارجية في عام 2005 أن القرضاوي هو "المفكر الإسلامي الوحيد المهم في قطر".

206. وتتضح مكانة القرضاوي في قطر من خلال حقيقة جلوسه بجوار الأمير في المآدب الرمضانية التي استضافها أمير قطر الشيخ تميم بن حمد آل ثاني في عامي 2017 و 2018. خلال احتفالات العطلات العامة هذه، شوهد القرضاوي وهو يدردش بشكل ودي مع الأمير، الذي احتضن القرضاوي وقبله على جبهته:

28






207. يتبنى القرضاوي، كما يشير موقعه القيادي في منظمة إرهابية مدرجة على قوائم الإرهاب المخصصة لتوفير

الدعم المالي لحماس، بعض وجهات النظر المتطرفة. ووفقًا لما ذكره ماثيو ليفيت، الحاصل على درجة الدكتوراه، وهو مسؤول

سابق لمكافحة الإرهاب في مكتب التحقيقات الفيدرالي ووزارة الخزانة، "القرضاوي هو أحد أكثر الشخصيات شعبية في الجناح

المتطرف للإخوان المسلمين".

29

208.    قدم القرضاوي رسمياً فتواه الدينية بإباحة الهجمات الإرهابية في إسرائيل. فعلى سبيل المثال ذكر القرضاوي في عام 2017 أنه لم يعد يعتبر الهجمات الانتحارية أمرًا مباحًا دينيًا لأن حماس يمكنها الآن شن هجمات بالصواريخ وأسلحة أخرى أكثر تطورًا.

209.    وكما يتضح من الصورة التي تظهر أدناه، ما زال القرضاوي يحافظ على علاقات وثيقة مع قيادة حماس. تبين هذه الصورة، التي تم التقاطها في عام 2016 في قطر، القرضاوي وهو يجلس بين، ويتحدث مع كبار الإرهابيين في حماس، ألا وهما خالد مشعل (رئيس المكتب السياسي لحماس سابقًا) وإسماعيل هنية (رئيس المكتب السياسي لحماس حاليًا) بينما يضع يديه على ركبتيهما. وقد استفاد كل من هذين القياديين لحماس منذ فترة طويلة من الملاذ الآمن الذي توفره قطر لهم.



210.    الاسم المرتبط بحسابات القرضاوي في بنك قطر الوطني هو "يوسف عبدالله القرضاوي"، ويشير الرقمان الثاني والثالث في رقم الهوية الوطنية القطرية الخاص بهذا الشخص إلى أن "القرضاوي" وُلد عام 1926، وهو العام نفسه الذي وُلد فيه رئيس ائتلاف الخير الذي يحمل الاسم نفسه.

211.    تشير معلومات الحساب إلى أن القرضاوي فتح حساباته ببنك قطر الوطني في سبتمبر 2006، وأدرج عنوان صندوق بريد في الدوحة.

212.   أيضًا فتح بنك قطر الوطني حسابًا لصالح أحلام عارف أحمد التميمي في 4 أغسطس 2015 في نفس فرع الدوحة على غرار زملائها المحررين من السجون الإسرائيلية.

213.   التميمي هي مواطنة أردنية و"صحفية" اشتركت في التفجير الانتحاري الذي نفذته حماس في عام 2001 واستهدف مطعم سبارو في القدس وأسفر عن قتل 15 شخصًا، من بينهم شخصين أمريكيين، وإصابة عشرات من الضحايا الآخرين.

214.   التميمي مدرجة على قائمة الأكثر طلبًا لمكتب التحقيقات الفيدرالي. لقد صدرت مذكرة لتوقيف تميمي وتسليمها من الأردن في عام 2013 وكُشف عنها النقاب في عام 2017.

215.   وتؤكد سجلات بنك قطر الوطني التي تثبت حساب تميمي أن سنة ميلاد صاحب الحساب مماثلة لسنة ميلاد الإرهابية.

216.   ومن بين الإرهابيين الذين فتحوا حسابات بفرع الدوحة التابع لبنك قطر الوطني في 4 أغسطس 2015 أيضًا، زاهر علي موسى جبريل (المعروف كذلك باسم زاهر جبارين).

217.   وشأن 20 إرهابيًا آخرًا أُطلق سراحهم من السجون الإسرائيلية في إطار عملية تبادل السجناء التي تمت عام 2011، دُوّن جبريل صندوق بريد الدوحة ذاته كعنوانه بوثائق فتح الحساب. توضح سجلات الحسابات المصرفية فيما يتعلق بالحساب الخاص بجبريل في بنك قطر الوطني أن سنة ميلاد صاحب الحساب مماثلة لسنة ميلاد جبريل الإرهابي.

218.   وفضلاً عن ذلك أدرجت وزارة الخزانة اسم جبريل بقائمة "الرعايا الخاضعين لإدراج خاص". وقد أُدرج اسم جبريل على هذه القائمة بصفته قياديّ بحركة حماس ساعد في تأسيس الجناح العسكري التابع للحركة في الضفة الغربية.

219.   وكانت إسرائيل قد أدانت جبريل بقتل الجندي جيتي أفيشار في عام 1993. ووفقًا لما ذكرته وزارة الخزانة، فإن الاسم الذي يظهر بحساب بنك قطر الوطني، أي جبريل، إنما هو الاسم المستعار لزاهر جبارين. وقد شغل جبريل مناصب مالية مرموقة بحركة حماس لفترة طويلة وهو يدير حاليًا العمليات المالية للحركة من تركيا.

220.   ومن بين الإرهابيين الذين فتحوا حساب بفرع الدوحة التابع لبنك قطر الوطني في 4 أغسطس 2015 أيضًا، هشام حجاز. وشأن ما لا يقل عن 20 إرهابيًا آخرًا أُطلق سراحهم من السجون الإسرائيلية في إطار عملية تبادل السجناء التي تمت عام 2011، استخدم الحجاز صندوق بريد الدوحة ذاته لفتح حسابه ببنك قطر الوطني أثناء صيف 2015.

32

| | | | |
|---|---|---|---|
| | 04/08/2015 | 207338 | |
| | 04/08/2015 | 207338 | |
| | 04/08/2015 | 207338 | |
| | 04/08/2015 | 5045 | |
| | 04/08/2015 | 38479 | |

225.

224.

223.

222. 20,000

221. terrorism-info.org 2013

| | | الدوحة، قطر | التي وقعت عام 2001 في القدس وأدت إلى مقتل 15 شخصًا وإصابة 130 شخصًا بجروح. |

226.  استُخدمت الحسابات التي احتفظ بها بنك قطر الوطني لصالح الإرهابيين المذكورين أعلاه لتمويل الأنشطة الإرهابية لحماس وحركة الجهاد الإسلامي في إسرائيل. ولقد أتاحت الحسابات المصرفية للإرهابيين المُفرج عنهم بتمويل نفقاتهم الشخصية، ليتفرغوا بذلك لمواصلة ممارسة الأنشطة نيابة عن حركتيّ حماس والجهاد الإسلامي. بالإضافة إلى ذلك، استغل الإرهابيون هذه الأموال بشكل مباشر في تعزيز جهود حركتيّ حماس والجهاد الإسلامي الرامية إلى تنفيذ الهجمات الإرهابية.

227.  كما ساهم بنك قطر الوطني بشكل مباشر في قطر الخيرية من أجل تعزيز قدرتها على تمويل حركتيّ حماس والجهاد الإسلامي وغيرها من المنظمات الإرهابية الأخرى. فعلى سبيل المثال ساهم بنك قطر الوطني، في نوفمبر 2013، بمبلغ مليون ريال قطري، أو بحوالي 275,000 دولار أمريكي، مباشرة في مؤسسة قطر الخيرية.

228.  وفي أو حوالي شهر فبراير عام 2020، ساهم بنك قطر الوطني أيضًا بمبلغ 2 مليون ريال قطري، أو ما يقرب من 550,000 دولار أمريكي، مباشرة في قطر الخيرية، التي تهدف إلى مساعدة اللاجئين السوريين.

ح.  سياسات مكافحة الإرهاب المزعومة
للبنكين المدعى عليهما زودتهما بالمعرفة اللازمة بشأن الغرض غير المشروع
لتعاملاتهما المالية مع قطر الخيرية

229.  على غرار البنوك الدولية الأخرى، لا سيما تلك التي تشارك في تعاملات لها صلة بالمناطق التي ابتليت بآفة الإرهاب مثل الأراضي الفلسطينية، كان يتعين على كل من مصرف الريان وبنك قطر الوطني (واللذان يُشار إليهما مجتمعين باسم "البنكين المدعى عليهما") تنفيذ واتباع سياسات مكافحة غسل الأموال وتمويل الإرهاب واعرف عميلك، وغيرها من متطلبات العناية الواجبة الأخرى التي أُعدت لكي تحول خصيصًا دون ممارسة ذلك النوع من النشاط غير المشروع الذي تسبب في وفاة بينشيز مناحيم برزيوزمان وإصابة أفراد أسرته بجراح.

230.  ومن بين مصادر المعلومات الأخرى، تلك القواعد المنصوص عليها في القانون المصرفي القطري والأمريكي، بالإضافة إلى سياسات مكافحة تمويل الإرهاب وغسل الأموال واعرف عميلك وإجراءات العناية الواجبة تجاه العملاء التي من المفترض أن البنكين المدّعى عليهما يحافظا على اتباعها إلى جانب المعايير المصرفية الدولية المفروضة في جميع الأوقات ذات الصلة.

231.   تحظر قوانين مكافحة غسل الأموال ومكافحة تمويل الإرهاب القطرية، على غرار الولايات المتحدة والاتحاد الأوروبي والقانون الدولي، جمع الأموال لدعم الإرهاب وتطلب من البنوك تنفيذ إجراءات لمكافحة تمويل الإرهاب.

232.   بالإضافة إلى ذلك، قامت العديد من المؤسسات المصرفية المعترف بها دوليًا بنشر المبادئ التوجيهية الرامية إلى توجيه أفضل الممارسات التي تتبعها المؤسسات المالية ومنعها من التورط مع المنظمات الإرهابية أو تسهيل تدفق الأموال إلى تلك الكيانات غير المشروعة.

233.   لقد زودت هذه المعايير الدولية البنكين المدعى عليهما بتوجيهات مقبولة تمامًا بشأن إجراءات مكافحة غسل الأموال وتمويل الإرهاب واعرف عميلك وإجراءات العناية الواجبة التي ينبغي على البنوك اتباعها للحيلولة دون الاستخدام غير المشروع لخدماتها من جانب الجماعات الإرهابية، وفرادى الإرهابيين، والمتعاطفين معهم.

234.   تنشر المعايير الدولية لمكافحة غسل الأموال ومكافحة تمويل الإرهاب ثلاث فئات عريضة من المؤسسات: (أ) المؤسسات المعنية بصفة رئيسية بالمسائل المالية/الإشرافية، بما في ذلك لجنة بازل للرقابة المصرفية ("لجنة بازل")؛ (ب) وتلك المعنية بمسائل الإنفاذ المالي/الإشرافي والقانوني/الجنائي، بما في ذلك توصيات مجموعة العمل المالي (فاتف) والأمم المتحدة، ومجلس أوروبا، والاتحاد الأوروبي؛ و(ج) المؤسسات المعنية بشكل أساسي بمسائل الإنفاذ القانوني/ الجنائي، بما في ذلك مجموعة إيغمونت لوحدات الاستخبارات المالية.

235.   بالإضافة إلى ذلك، قامت مجموعة فولفسبورج وهي عبارة عن رابطة تضم البنوك العالمية، بنشر المبادئ التوجيهية استنادًا إلى فهمها للمعايير الدولية وللسياسات والإجراءات الخاصة بالبنوك الأعضاء فيما يتعلق بمهام سياسات اعرف عميلك ومكافحة غسل الأموال ومكافحة تمويل الإرهاب.

236.   وتشمل المصادر البارزة التي تتبعها البنوك الدولية بغية تعزيز سياسات مكافحة غسل الأموال ومكافحة تمويل الإرهاب الخاصة بها ما يلي: المعايير الدولية لمجموعة "فاتف" بشأن مكافحة غسل الأموال ومكافحة تمويل الإرهاب وانتشار الأسلحة؛ مبادئ مجموعة "فولفسبورج" بشأن مكافحة غسل الأموال في نطاق المعاملات المصرفية الخاصة؛ ومبادئ لجنة بازل بشأن مكافحة غسل الأموال.

237.   تُلزم هذه المعايير المعترف بها دوليًا البنوك بتبني نهج قائم على المخاطر لتقييم العملاء المحتملين، ومراقبتهم بصفة مستمرة، وكذلك مراقبة الأموال التي تتدفق من وإلى مؤسساتهم بصورة ممنهجة.

34

238.    ويتضمن النهج القائم على المخاطر الذي تستخدمه البنوك بذل العناية الواجبة تجاه العملاء ومراقبة المعاملات على مستوى الأنظمة. يتوقف مستوى العناية الواجبة المطبقة على العميل، على ملف المخاطر الخاص به.

239.    عند تقييم مستوى المخاطر التي يمثلها العميل، لا تنظر البنوك إلى مؤشر واحد فحسب.

240.    بل تقوم عملية تقييم المخاطر بتقييم العملاء والحسابات والمعاملات وفقٌ معايير محددة. ونظرًا لعدم قدرة البنوك على التحقق من كل معاملة دون اتصال بالإنترنت، فإنها تُعد ملفات للمخاطر، وتجري تدقيقًا أكبر نسبيًا فيما يخص العملاء والمعاملات التي تشكل مخاطر أكبر فيما يتعلق بالنشاط غير المشروع.

241.    ومن أكثر معايير المخاطر استخدامًا ما يلي: المخاطر القُطرية ومخاطر العملاء ومخاطر الخدمة.

242.    يتم قياس المخاطر القُطرية استنادًا إلى الصلة التي قد تكون للعميل أو المعاملة باختصاصات قضائية عالية المخاطر. تشمل الصلات المُشار إليها أي علاقة بين الاختصاص القضائي عالي المخاطر والأموال التي تشملها المعاملة؛ أو العميل أو مسؤوليه ومديريه؛ أو الأطراف المقابلة الأخرى أو المؤسسات المالية المشاركة في المعاملة.

243.    تشمل الاختصاصات القضائية عالية المخاطر البلدان: (أ) التي تخضع للعقوبات أو للحظر أو لتدابير مماثلة؛ و(ب) البلدان التي صنفتها مجموعة "فاتف" بأنها غير متعاونة؛ و(ج) البلدان التي تم تحديدها حسب المصادر الموثوقة بأنها توفر التمويل أو الدعم للأنشطة الإرهابية؛ و(د) البلدان التي يسود فيها الإرهاب أو تدور بها صراعات عنيفة؛ و(هـ) البلدان التي حددت المصادر الموثوقة أنها تعاني من تفشي الفساد أو المخدرات أو غيرها من الأنشطة الإجرامية بربوعها.

244.    بالإضافة إلى ذلك، تشمل المخاطر القُطرية وجود مؤسسات خيرية وغيرها من المنظمات الأخرى غير الهادفة للربح غير مقننة الأوضاع، تتعامل مع عملاء البنك أو تكون طرفًا في معاملات يشارك فيها البنك.

245.    تنطوي مخاطر العملاء، من بين جملة أمور أخرى، على إجراء تقييم لطبيعة العميل والأعمال التي يشارك فيها. إذ تمثل الشركات العريقة، على سبيل المثال، مخاطر أقل مقارنة بالمنشآت الفردية غير المعروفة، وخاصة عندما تكون الأخيرة شركات تمارس نشاطها في الأموال النقدية إلى حد كبير.

246.    تتطلب المؤسسات الخيرية إجراء المزيد من التدقيق بشأنها نظرا لأن المنظمات الإجرامية، بما في ذلك المنظمات الإرهابية، كثيرًا ما تستغل المؤسسات الخيرية المزعومة لجمع الأموال ونقلها.

35

247.    تتعلق مخاطر الخدمات بأنواع الخدمات المصرفية التي يتوقعها العميل أو يستخدمها فعليًا. على سبيل المثال، تعتبر التحويلات البرقية خدمة ذات مخاطر أعلى لأنها تمثل إحدى الوسائل الرئيسية التي تستخدمها المنظمات الإجرامية لنقل الأموال بين الأشخاص والمؤسسات والدول.

248.    بالرغم من أن الاستخدام العرضي للتحويلات البرقية وحده لا يثير الشك، إلا أنه عدد التحويلات البرقية ووتيرتها ومنشأها ووجهتها تمثل عوامل مخاطر يجب أن تنظر إليها البنوك باعتبارها جزءًا من تقييمهم المستمر للأشخاص والكيانات التي تتعامل معها. بيد أن المعاملات التي تنطوي على نقل الأموال دوليًا أو على بعض الجهد لإخفاء هوية أحد المشاركين فيها عن البنك تمثل مستويات أعلى من مخاطر الخدمة.

249.    معايير اعرف عميلك هي قواعد واضحة لإدارة المخاطر تُلزم البنوك بتطوير فهم واضح ودقيق لعملائهم وشركاتهم.

250.    وتمثل تلك المعايير عنصرًا أساسيًا في فتح الحسابات المصرفية والحفاظ عليها وعلى العلاقات مع العملاء.

251.    ومن ثم تعد إجراءات اعرف عميلك عملية مستمرة. فمن خلال تعرف البنوك على عملائهم وأنواع الخدمات وأنشطة الحساب التي قد يقوم بها كل عميل بشكل معقول، يمكنهم كشف النقاب عن النشاط غير المشروع الفعلي أو المحتمل أو المشتبه به والحيلولة دون ممارسته.

252.    تستلزم الممارسة القياسية للصناعة المصرفية من البنوك أن تبدأ في تطبيق تدابير اعرف عميلك عندما تقوم بإنشاء علاقة جديدة مع العميل لأول مرة، وعادة عندما يسعى العميل الجديد لفتح حساب.

253.    تشمل الإجراءات القياسية لفتح حساب وفق معيار "اعرف عميلك": الحصول على المستندات المطلوبة الخاصة بالوضع القانوني للعميل (على سبيل المثال، منشأة فردية أو شركة أو جمعية خيرية)؛ التحقق من اسم العميل، وعنوانه والمعلومات الأخرى التي تحدد الهوية؛ الحصول على وثائق تحديد الهوية الخاصة بمسؤوليّ العميل ومديريه، على الأقل فيما يتعلق بالأشخاص المصرح لهم بالمشاركة في المعاملات المصرفية؛ جمع المعلومات عن أنشطة العميل، بما في ذلك مصادر أمواله، وأنواع الخدمات التي سوف يستعين العميل بالبنك في أدائها، والجهة التي ستذهب إليها أموال العميل؛ وغيرها من المعلومات اللازمة لإعداد ملف مخاطر لهذا العميل.

254.    عند إعداد ملف المخاطر الخاص بالعميل، يجب أن يولي البنك اهتمامًا خاصًا بالمخاطر القُطرية التي يشكلها العميل أو مسؤوليه ومديريه؛ *أي،* الصلات التي قد تكون لديهم بالاختصاصات القضائية عالية المخاطر. ويستلزم وجود اتصالات بالاختصاصات القضائية عالية المخاطر إخضاع العميل لعملية تدقيق صارمة طوال مدة علاقة العمل بالكامل.

255.    تشمل وظيفة إدارة المخاطر بالبنك، تبني سياسات وإجراءات سليمة لتحديد النشاط المتوقع أو المعتاد عند فتح الحساب، وكذلك أثناء سير علاقة العمل. ويُعد تقييم النشاط المتوقع للحساب بشكل معقول مقارنة بالنشاط الفعلي للمعاملات جانبًا بالغ الأهمية في بذل العناية الواجبة تجاه العملاء. كما تُعد مراقبة الحسابات والمعاملات بمثابة حجر الزاوية لأي برنامج امتثال لمكافحة غسل الأموال أو مكافحة تمويل الإرهاب.

256.    لذا تراقب البنوك حسابات العملاء ومعاملاتهم باستمرار. وتشمل مراقبة المعاملات النطاق الكامل لتدفق أموال المعاملات البرقية، لاسيما تلك التي تشمل النقل الدولي للأموال. كما تتضمن المراقبة المُشار إليها، جمع المعلومات المتعلقة بمنشئ المعاملات ومتلقيها نظرًا لأن البنك لا يمكنه تقييم معاملة أو نمط معاملات بشكل فعال من خلال النظر إلى جانب واحد فحسب من عملية تدفق الأموال.

257.    يتمثل الغرض من نشاط المراقبة في تحديد: (أ) المعاملات المشبوهة بطبيعتها؛ (ب) المعاملات غير المعتادة، *أي،* المعاملات التي ليس لها غرض مالي أو مشروع واضح؛ و(ج) المعاملات المشبوهة، *أي،* المعاملات التي قد تُعد غير متسقة مع الأعمال المعروفة والمشروعة للعميل أو مع النشاط المعتاد في الحساب ذي الصلة.

258.    تقارن مراقبة المعاملات بين معلومات المعاملات والمخاطر المحددة. كما تقوم مراقبة المعاملات، من بين جملة أمور أخرى، بمقارنة نشاط الحساب/المعاملة مع ملف العميل، وكذلك مقارنة ذلك النشاط مع بيانات مجموعة النظراء، وقياسه مقارنة بالأنماط المحددة، وتسليط الضوء على المعاملات الشاذة أو غير المعتادة أو المشبوهة والتحقيق فيها.

259.    تستعين العناية الواجبة تجاه العملاء وتراجع أيضًا معلومات الغير مثل الصحف وبيانات الإنترنت والمعلومات المتاحة في قواعد البيانات الداخلية للبنوك للحفاظ على فهم كافٍ لعملاء البنوك والبيئة التي يمارس فيها كل عميل نشاطه، بما في ذلك العوامل غير المعتادة المتعلقة بالسياسة أو الإرهاب التي لها تأثيرها في البلدان ذات الصلة بمعاملات العميل.

37

260.   وتكون ثمة حاجة ماسة إلى إجراء مثل هذا التحليل المستمر لا سيما عندما يكون للعملاء صلة بالنقاط الساخنة العالمية أو مناطق الصراع، أو لهم ملفات عالية المخاطر.

261.   وعلى غرار البنوك الدولية الأخرى، يوجد لدى البنكين المدعى عليهما إدارات للامتثال، وذلك حتى تضمن ظاهريًا امتثال البنوك لالتزامات مكافحة غسل الأموال ومكافحة تمويل الإرهاب واعرف عميلك وغيرها من التزامات العناية الواجبة الأخرى.

262.   وللوفاء بتلك الالتزامات، تستخدم البنوك - بما في ذلك البنكين المدعى عليهما - في الوقت الراهن برامج متطورة لمراقبة الحسابات والمعاملات، بما في ذلك المنتجات التي تسوقها أطراف ثالثة بشكل صريح للوفاء بالتزامات مكافحة غسل الأموال ومكافحة تمويل الإرهاب الخاصة بالبنوك.

263.   لذا يقوم بائعو تلك المنتجات بتحسينها باستمرار استجابةً للتغيرات التي تطرأ على البيئة القانونية، والمراجعات التي تتم لقوائم العقوبات والحظر، وغيرها من العوامل الأخرى ذات الصلة، مثل زيادة النشاط الإرهابي في مناطق معينة أو بين مجموعات معينة.

264.   تستخدم البنوك نوعين أساسيين من البرامج فيما يتعلق بالامتثال لمكافحة غسل الأموال وتمويل الإرهاب: (أ) البرامج التي ترصد اتجاهات وأنماط المعاملات ومن ثم تُسلط الضوء على الأنشطة الشاذة أو المشبوهة المحتملة؛ (ب) وبرامج التصفية التي تحدد المطابقات المحتملة مع قوائم الحظر والعقوبات عن طريق مسح حقول مثل أسماء المنشئين والمستفيدين. ويُستخدم النوع الأخير من البرامج لتحديد الأطراف والأطراف المقابلة المشبوهة المحتملة للمعاملات (أي، الأطراف المطابقة للقوائم).

265.   تدرك البنوك، لاسيما تلك التي تعمل في المناطق الساخنة للإرهاب مثل البنكين المدّعى عليهما، أن هناك العديد من قوائم الإرهابيين والمنظمات الإرهابية السارية منذ عام 1990، بما في ذلك تلك الصادرة من مكتب مراقبة الأصول المالية التابع لوزارة الخزانة الأمريكية (OFAC) والاتحاد الأوروبي والأمم المتحدة وإسرائيل.

266.   تقوم البنوك الدولية بإدخال هذه القوائم ببرامج التصفية الخاصة بها بغية الحفاظ على وجود نظام تصفية موحد لمراقبة الحسابات والمعاملات. ولدى تحديث هذه القوائم، يتم تحميل المعلومات الجديدة في البرنامج أيضًا.

267.   وتضطلع المجموعات المعنية بالامتثال في البنك بمسؤولية البحث وتقييم المعاملات التي حددتها هذه الأنظمة على أنها مشبوهة. ويُعد الدور الذي تؤديه المجموعات المعنية بالامتثال، مهم للغاية لأن أنظمة البرامج تقوم ببساطة بمسح البيانات التي لا يمكن تحليلها يدويًا، نظرًا لحجم المعاملات، وتعقيد نشاط الحساب، والطبيعة المطردة بصورة متزايدة لقوائم الحظر.

268.   ومن ثم تشمل وظيفة الامتثال لمكافحة غسل الأموال، مراجعة وبحث "النتائج" التي يُنْشِئُهَا برنامج الامتثال، سواء أكان ذلك بسبب النشاط الشاذ أو لتحديد اسم يطابق أحد الأسماء الموجودة على قائمة الحظر (أو كليهما)، وتقييم تلك المعلومات على ضوء العناية الواجبة المستمرة تجاه العميل والمرتبطة بالحساب ذي الصلة.

269.   لذلك فإن الخطوات التي تتخذها الإدارات المعنية بالامتثال داخل البنوك استجابةً للنتائج التي تتوصل إليها برامج الامتثال، تعتبر جزءًا لا يتجزأ من قدرة البنوك على تجنب تقديم المساعدة المادية للإرهابيين وغيرهم من الجهات التي تمارس عمليات غسل الأموال.

270.   ويجب على موظفيّ الامتثال تحديد النتائج التي تُعد "إيجابية زائفة" ومن ثم لا يجب أن تمنع إتمام المعاملات وأيها ينطوي على مخاطرة جوهرية بتسهيل السلوك غير المشروع، بما في ذلك الهجمات الإرهابية. تتطلب اللوائح المعمول بها في معظم البلدان، بما في ذلك الولايات المتحدة، من البنوك الإبلاغ عن المعاملات التي حددتها على أنها مشبوهة للمسؤولين الحكوميين.

271.   عندما يبدو أن سياسة البنك أو اللوائح الحكومية تحظر إتمام معاملات معينة، يتم عادة "تجميد" الأموال ذات الصلة في حساب منفصل، ومن ثم يجب على الأطراف المعنية عادةً الحصول على موافقة الحكومة لصرف الأموال بعد إثبات مشروعية المعاملة المحظورة.

272.   مجموعة "فاتف" هي منظمة حكومية دولية تم إنشاؤها في عام 1989 بمبادرة من الدول الأعضاء بمجموعة الدول الصناعية السبع (كندا وفرنسا وألمانيا وإيطاليا واليابان والمملكة المتحدة والولايات المتحدة). وتتكون عضويتها حاليًا من 31 دولة وإقليم.

273.    نشرت مجموعة "فاتف" توجيهًا مرجعيًا يهدف إلى تعزيز سياسات مكافحة غسل الأموال وتمويل الإرهاب الخاصة بالبنوك، لا سيما التوصيات الأربعين المؤثرة بشأن غسل الأموال (إلى جانب الملاحظات التفسيرية) التي أصدرتها المجموعة في عام 1990. تم تحديث التوصيات الأربعين وتنقيحها منذ نشرها بصورة أولية.

274.    استجابة لهجمات 11 سبتمبر 2001، أصدرت مجموعة "فاتف" ثماني توصيات خاصة إضافية تتعلق بتمويل الإرهاب على وجه التحديد. ثم أُضيفت توصية تاسعة في أكتوبر 2004.

275.    تتضمن التوصيات الأربعون التي أصدرتها مجموعة "فاتف" توصية بأن تقوم السلطات البنكية بتنفيذ إجراءات العناية الواجبة تجاه العملاء (بما في ذلك التحقق من الهوية) والوفاء بمتطلبات الاحتفاظ بالسجلات والإبلاغ عن المعاملات المشبوهة الخاصة بالمؤسسات المالية والأعمال التجارية والمهن غير المالية المحددة.

276.    وشرحًا لهذه التوصية، تنص التوصية رقم خمسة التي أصدرتها مجموعة "فاتف" على أنه يتعين على البنوك أن تتخذ تدابير العناية الواجبة تجاه العملاء والتي أعدت لتحديد هوية عملائهم والتحقق منها، لدى: (أ) إنشاء علاقات عمل؛ أو (ب) تنفيذ معاملات عرضية؛ أو (ج) عند الاشتباه في ارتكاب جريمة غسل الأموال أو تمويل الإرهاب، أو (د) عندما تساور الشكوك البنك بشأن صحة بيانات تعريف العميل التي سبق الحصول عليها من قبل أو كفايتها.

277.    تتضمن التوصيات التسع الخاصة التي أصدرتها مجموعة "فاتف" توصيات مفادها قيام البنوك: (أ) بتجميد ومصادرة الأصول الإرهابية؛ و(ب) الإبلاغ عن المعاملات المشبوهة المتعلقة بالإرهاب وغسل الأموال إلى السلطات الحكومية.

278.    كما تقر التوصيات التسع الخاصة بالدور الحيوي الذي تؤديه المؤسسات الخيرية المزعومة في تمويل الإرهاب.

279.    لذا أوصت مجموعة "فاتف" بضرورة مراجعة البلدان لمدى كفاية القوانين واللوائح التي تحكم المنظمات غير الربحية نظرًا لأن تلك الكيانات عرضة بشكل خاص للإساءة فيما يتعلق بتمويل الإرهاب، سواء أكان ذلك عن عمد أو من خلال استغلال المنظمات الإرهابية للمشاركين دون علمهم بذلك.

280.    أسس محافظو البنوك المركزية لمجموعة الدول العشر لجنة بازل في عام 1974.

40

281.   تمارس لجنة بازل عملها من خلال إجماع الآراء وذلك لصياغة معايير وإرشادات إشرافية شاملة ونشر بيانات حول مجموعة كبيرة من القضايا المصرفية.

282.   وتتعلق ثلاثة من أهم بيانات لجنة بازل بشأن المعايير البنكية بقضايا مكافحة غسل الأموال.

283.   وتُوجه بيانات لجنة بازل إلى السلطات الرقابية البنكية الوطنية وذلك بخلاف العضوية الأساسية بالمؤسسة. وتأمل لجنة بازل، بإصدارها لهذه البيانات، في إقناع المشرفين المصرفيين بحماية سلامة النظام المصرفي العالمي من خلال تطبيق معايير اللجنة ومبادئها التوجيهية.

284.   ونظرًا لأن المبادئ التوجيهية للجنة بازل قد تمت صياغتها نتيجة لممارسة عملية تحقيق إجماع الآراء من جانب الجهات التنظيمية للمصرف الوطني لمجموعة الدول العشر، فإنها تتمتع بثقل كبير داخل القطاع المصرفي.  ولذلك، يُنظر إلى المبادئ التوجيهية للجنة بازل عمومًا على أنها تعكس الحد الأدنى من المعايير الخاصة بالبنوك الفردية فيما يتعلق بالسياسات الخاصة بمكافحة غسل الأموال ومكافحة تمويل الإرهاب.

285.   أصدرت لجنة بازل، في عام 1988، بيانها بشأن منع الاستخدام الإجرامي للنظام المصرفي لأغراض غسل الأموال ("بيان بازل بشأن الوقاية").

286.   يوضح بيان بازل بشأن الوقاية السياسات والإجراءات الأساسية التي ينبغي أن تطبقها إدارات البنوك داخل مؤسساتها المحلية والدولية.

287.   كما يقر بيان بازل بشأن الوقاية بأن أهم إجراء وقائي يُتخذ ضد استخدام المؤسسات المالية لأغراض غسل الأموال هو نزاهة إدارة البنوك واتخاذها قرار حذر بمنع مؤسساتها من أن تصبح مرتبطةً بالمجرمين أو أن تُستخدم كقنوات لغسل الأموال.

288.   ينص بيان اتفاقية بازل على أربعة مبادئ رئيسية وهي: (أ) بذل البنوك جهود معقولة لتحديد الهوية الحقيقية لجميع العملاء الذين يطلبون خدمات المؤسسة؛ و(ب) ضمان البنوك إجراء الأعمال وفقًا للمعايير الأخلاقية الرفيعة ومطابقتها للقوانين واللوائح التجارية المتعلقة بالمعاملات المالية؛ و(ج) تعاون البنوك تعاونًا كاملًا مع جهات تنفيذ القانون المحلية بالقدر المسموح به بموجب اللوائح المحلية المتعلقة بخصوصية العملاء، وإذا كان البنك لديه سبب يجعله يشتبه في أن الأموال المودعة

41

ناتجة من نشاط إجرامي أو أن المعاملات مبرمة لغرض إجرامي، حينها يتخذ البنك التدابير اللازمة بما فيها رفض المساعدة وقطع العلاقة مع العميل وإغلاق الحساب أو تجميده؛ و(د) اعتماد البنوك سياسات رسمية تتوافق مع بيان بازل بشأن الوقاية.

289. أصدرت لجنة بازل، في عام 1997، مبادئها الأساسية للرقابة المصرفية الفعالة ("المبادئ الأساسية")، التي تهدف إلى تقديم مخطط شامل لنظام مصرفي آمن وسليم.

290. أكدت لجنة بازل أن المبادئ الأساسية تمثل "الحد الأدنى من المتطلبات" و"مصممة لتكون مرجعًا أساسيًا" في تهيئة بيئة فعالة للامتثال المصرفي.

291. يتناول المبدأ الأساسي رقم 15 قضية غسل الأموال ويعزز أهمية سياسات وإجراءات اعرف عميلك، إذ ينص على ضرورة تطبيق البنوك سياسات وممارسات وإجراءات مناسبة، بما في ذلك قواعد اعرف عميلك الصارمة التي تعزز المعايير الأخلاقية والمهنية الرفيعة في القطاع المالي وتمنع استغلال البنوك من جهة عناصر إجرامية سواء عمدًا أو بدون عمد.

292. إضافةً إلى ذلك أصدرت لجنة بازل أيضًا، في عام 1999، "منهجية مبادئ أساسية" تضع معايير للرقابة المصرفية تكون مقبولةً على نطاق واسع.

293. كان الهدف من منهجية المبادئ الأساسية مساعدة المراقبين في البنوك في جميع أنحاء العالم في إجراء تقييمات ذاتية لمعرفة إلى أي مدى كانت أنظمتهم المصرفية والبنوك التي تعمل داخلها تطبق سياسات وممارسات تتفق مع المبادئ الأساسية.

294. تناقش منهجية المبادئ الأساسية المعايير "الأساسية" و"الإضافية" واحدًا يلو الآخر. يحتوي القسم الخاص بمنهجية المبدأ الأساسي رقم 15 على إحدى عشر معيارًا أساسيًا وخمسة معايير إضافية للمساعدة في تقييم مدى كفاية سياسات وإجراءات اعرف عميلك.

295. يشير المعيار الإضافي الأول تحديدًا إلى أن التوصيات الأربعين الصادرة عن مجموعة العمل المالي "فاتف" تعكس "الممارسات السليمة الدولية".

296. تتضمن المعايير الأساسية ما يلي: (أ) تطبيق البنوك سياسات وإجراءات تمنع استغلالها من عناصر إجرامية سواء عن عمد أو بدون عمد؛ و(ب) ضرورة وضع البنوك سياسات وإجراءات واضحة وفعالة لبرنامج اعرف عميلك، بما في ذلك الاحتفاظ الفعال بالسجلات واستبقاء المحفوظات الخاصة بكل من تحديد هوية العميل والمعاملات التي تُجرى مع كل عميل

على حدة؛ و(ج) تطبيق البنوك إجراءات رسمية للتعرف على المعاملات المحتمل أن تكون مشبوهةً؛ و(د) وضع البنوك خطوط واضحة للسلطة وسبل التواصل من أجل تنفيذ برامجها الخاصة بمكافحة غسل الأموال؛ و(د) إبلاغ البنوك جهات التنظيم التابعة لها بالأنشطة المشبوهة إذا كان من المحتمل أن تؤثر جوهريًا على سلامة البنك أو نزاهته أو سمعته.

297.    أصدرت لجنة بازل أيضًا، في عام 2001، معايير تحكم الحد الأدنى للعناية الواجبة تجاه العملاء في المصارف ("بيان العناية الواجبة تجاه العملاء").

298.    يشير بيان العناية الواجبة تجاه العملاء إلى أن العناية الواجبة تجاه العملاء تتضمن إنشاء ملفات لتعريف مخاطر العملاء، بما في ذلك مراعاة عوامل معينة منها خلفية العميل وموطنه الأصلي ومنصبه سواء حكومي أو رفيع المستوى والحسابات المرتبطة به وأنشطته التجارية وفيما يستخدم التحويلات البنكية (خاصة تحويل الأموال الدولية) ومؤشرات المخاطر الأخرى.

299.    يوضح بيان العناية الواجبة أيضًا أنه حتى برنامج اعرف عميلك الأساسي لا ينحصر دوره في إجراءات فتح الحساب؛  بل يظل عملية مستمرة.

300.    كما يسلط بيان العناية الواجبة الضوء على أهمية المراقبة المستمرة للحسابات والمعاملات باعتباره جزءًا من برنامج مكافحة غسل الأموال الفعّال.

301.    ينص بيان العناية الواجبة، على وجه التحديد، على أن "المراقبة المستمرة جانب أساسي من إجراءات اعرف عميلك الفعالة؛ لذا يجب وضع رقابة مكثفة على الحسابات ذات المخاطر العالية."

302.    أكدت المبادئ الأساسية للرقابة المصرفية الفعالة الصادرة عن لجنة بازل عام 2012 ("المبادئ الأساسية لعام 2012") على ضرورة "تطبيق البنوك سياسات وعمليات كافية تعزز المعايير الأخلاقية والمهنية الرفيعة وتمنع البنك من استغلاله، عمدًا أو بدون عمد، في الأنشطة الإجرامية." لجنة بازل للرقابة المصرفية، المبادئ الأساسية للرقابة المصرفية الفعالة (سبتمبر 2012)، https://www.bis.org/publ/bcbs230.pdf.

303.    أوضحت المبادئ الأساسية لعام 2012 أن العناصر الأساسية لمعايير "العناية الواجبة تجاه العملاء" تتضمن سياسة تحدد "علاقات العمل التي لن يقبلها البنك استنادًا إلى المخاطر المحددة"، وبرنامج مستمر "لتحديد هوية العملاء والتحقق

منهم والعناية الواجبة تجاههم"، وسياسات وعمليات تتطلب من البنك مراقبة "المعاملات غير العادية أو المحتمل اشتباهها" وإجراء فحص دقيق للحسابات عالية المخاطر.

304.    مجموعة ولفسبيرج هي اتحاد يضم 13 بنكاً عالميًا.  وبالإضافة إلى أعضائها الرسميين، هناك بنوك أخرى عالمية كبيرة معروفة بأنها تابعة لمجموعة ولفسبيرج.

305.    نشرت مجموعة ولفسبيرج مجموعاتها الخاصة من المنهجيات بغية مساعدة البنوك في جميع أنحاء العالم في الامتثال للمعايير الدولية لمكافحة غسل الأموال. يأخذ المجتمع المصرفي في اعتباره المبدأ التوجيهي الذي نشرته مجموعة ولفسبيرج باعتبارها الجهة التي تمثل آراء المجتمع المصرفي العالمي.

306.    نشرت مجموعة ولفسبيرج، في 30 أكتوبر عام 2000، مبادئ ولفسبيرج لمكافحة غسل الأموال.

307.    تحدد مبادئ ولفسبيرج لمكافحة غسل الأموال المبادئ التوجيهية المتعلقة بقبول العميل، بما في ذلك تحديد هوية العميل وإجراءات العناية الواجبة التي تتخذها البنوك عند قبول عميل جديد. تتطلب إجراءات العناية الواجبة من البنوك التأكد من الأسباب التي تدعو العميل لفتح الحساب ومصدر أمواله والنشاط الذي ينوي مزاولته. تحدد هذه الإجراءات أيضًا الإجراءات الواجب على البنوك اتخاذها لتحقيق مبدأ العناية الواجبة تجاه العملاء القائمة على المخاطر.

308.    تنص مبادئ ولفسبيرج لمكافحة غسل الأموال كذلك على ممارسات لتحديد المعاملات غير العادية أو المشبوهة وللمراقبة المستمرة لنشاط الحساب. إضافةً إلى ذلك، تؤكد المبادئ ضرورة وضع نظام للإبلاغ والتحكم داخل البنك، وتعليم الموظفين وتدريبهم، وتحديد شروط الاحتفاظ بالسجلات.

309.    كما وضعت مجموعة ولفسبيرج استبيانًا يهدف إلى مساعدة البنوك في وضع سياسات وممارسات داخلية لسياسات برنامج اعرف عميلك ومكافحة غسل الأموال ومكافحة تمويل الإرهاب.

310.    يعطي هذا الاستبيان نظرةً عامةً على سياسات وممارسات مكافحة غسل الأموال الخاصة بمؤسسة مالية ما، ويمكن أن يساعد في تحديد ما إذا كانت المؤسسة المالية تمتثل لأفضل الممارسات في المجال.

311.    تتعلق الأسئلة بالمجالات التالية: (أ) سياسات وممارسات وإجراءات مكافحة غسل الأموال، و(ب) تقييم المخاطر، و(ج) برنامج اعرف عميلك والعناية الواجبة والعناية الواجبة المعززة، و(د) المعاملات الواجب الإبلاغ بها، ومنع

44

المعاملات التي يمكن الحصول فيها على أموال بطرق غير مشروعة والكشف عنها، و(هـ) مراقبة المعاملات، و(و) التدريب على مكافحة غسل الأموال.

312. تشمل الأسئلة التي يطرحها استبيان مجموعة ولفسبيرج الأسئلة التالية:

أ. هل الإجراءات التي يطبقها البنك للاحتفاظ بالسجلات مطابقة للقانون المعمول به؟

ب. هل سياسات وممارسات البنك في مكافحة غسل الأموال تنطبق على جميع فروع البنك والمؤسسات التابعة له، سواءً في الموطن الأصلي أو في مواقع أخرى خارج نطاق هذا الاختصاص القضائي؟

ج. هل يجري البنك تقييمًا قائمًا على المخاطر لقاعدة عملائه ومعاملاتهم؟

د. هل يحدد البنك المستوى المناسب من العناية الواجبة المعززة اللازمة لفئات العملاء والمعاملات التي يرى أنها تنطوي على مخاطر متزايدة تحدث نتيجة الأنشطة غير المشروعة التي تُجرى في البنك أو من خلاله؟

هـ. هل يطلب البنك جمع المعلومات المتعلقة بالأنشطة التجارية التي يُجريها العملاء؟

و. هل يطبق البنك سياسات أو ممارسات لتحديد المعاملات المشبوهة والإبلاغ بها؟

ز. هل ينفذ البنك برنامج لمراقبة النشاط غير المعتاد والمحتمل أن يكون مشتبهًا الذي يغطي تحويلات الأموال والصكوك النقدية مثل الشيكات السياحية والحوالات النقدية وما إلى ذلك؟

313. نُشر بيان ولفسبيرج بشأن قمع تمويل الإرهاب ("بيان ولفسبيرج عن الإرهاب") في يناير 2002.

314. أكد بيان ولفسبيرج عن الإرهاب وأوضح بالتفصيل المعايير الدولية الحالية المصممة لمنع المؤسسات المالية من التورط مع الإرهاب وتمويل المنظمات والهجمات الإرهابية.

315. تتضمن أهم عناصر بيان ولفسبيرج عن الإرهاب ما يلي: (أ) تؤكد الفقرة الرابعة أهمية سياسات وإجراءات اعرف عميلك؛ و(ب) تشير الفقرة الخامسة إلى القطاعات والأنشطة عالية المخاطر، وتركز على تطبيق المؤسسة المالية مبدأ العناية الواجبة المعززة والمناسبة، و(ج) تتناول الفقرة السادسة مراقبة المعاملات غير العادية أو المشبوهة وكيف تطبق المؤسسات المالية إجراءات المراقبة القائمة لتحديد هذه المعاملات، وذلك لأنه، بالرغم من أن المعاملات قد تكون غير واضحة، إلا أن مراقبة المعاملات غير العادية أو المشبوهة ثم تحديدها والإبلاغ بها قد يساعد الوكالات الحكومية عن طريق ربط النشاط الذي يبدو لا صلة له بتمويل الإرهاب.

316.   لم يتقيد البنكان المدعى عليهما تمامًا بالمعايير المصرفية الدولية المحددة في الفقرات 229-315 فيما يتعلق بالمعاملات التي أبرموها مع قطر الخيرية وإرهابيي حركة حماس والمنظمات الواجهة التابعة لحماس.

317.   تشمل مخالفات تلك المعايير التي التزم بها البنكان المدعى عليهما، على سبيل المثال لا الحصر، ما يلي:

أ.   قدم البنكان المدّعى عليهما خدمات مصرفية لمؤسسة قطر الخيرية على الرغم من علمهما بأن قطر الخيرية كانت مساهمًا رئيسيًا في حركة حماس وحركة الجهاد الإسلامي في فلسطين؛

ب. قدم بنك قطر الوطني خدمات مصرفية مباشرة لإرهابيي حركة حماس وفتح حسابات لهؤلاء الأفراد دون القيام بأقل الإجراءات من إجراءات اعرف عميلك وإجراءات العناية الواجبة المطلوبة وفق المعايير المصرفية الدولية، بما في ذلك التحقق من عناوين هؤلاء الأفراد ومقارنتها بقواعد بيانات الإرهابيين المعروفين المتاحة؛

ج. لم يراقب بنك قطر الوطني المعاملات التي أجراها إرهابيو حماس لتعزيز الأنشطة غير المشروعة لحركة حماس، ولم يبلغ السلطات في قطر وخارجها بهذه المعاملات، ولم يحظر أموال الإرهابيين قبل تحويلها إلى المستفيدين المعنيين؛

د. لم ينشئ البنكان المدعى عليهما ملفا مناسبًا لتعريف المخاطر لمؤسسة قطر الخيرية، ولم يُخضع معاملاتها للعناية الواجبة المعززة على الرغم من المخاطر الكبيرة المتعلقة بغسل الأموال وتمويل الإرهاب التي نتجت عن أنشطة هذه المؤسسة باعتبارها مؤسسة خيرية مزعومة تابعة لمنظمات إرهابية ورعاتها، وعلى الرغم من أن إسهامات قطر الخيرية تتركز في بؤر نشاط الإرهاب مثل الأراضي الفلسطينية وغيرها من مناطق الشرق الأوسط المعرضة للعمل الإرهابي، ورغم سجل تبرعات قطر الخيرية الموجهة للجمعيات الخيرية المزعومة التابعة لحركة حماس وحركة الجهاد الإسلامي في فلسطين وغيرها من المنظمات الإرهابية، ورغم الطبيعة غير العادية والجوهرية لتحويلات الأموال التي أجرتها قطر الخيرية؛

هـ. نفذ البنكان المدعى عليهما التزاماتهما بشأن مكافحة غسل الأموال ومكافحة تمويل الإرهاب بما يتوافق مع رغبة أكبر المساهمين وأعضاء العائلة المالكة القطرية والكيانات التي يسيطرون عليها لتمويل حماس وحركة الجهاد الإسلامي في فلسطين والمجموعات الإرهابية الأخرى؛

46

و. لم يعتمد البنكان المدعى عليهما تحليلًا قائمًا على المخاطر لتقييم ما إذا كان حدث ما يلي: (1) تقديم خدمات مصرفية إلى قطر الخيرية ونشطاء حماس ومنظمات واجهة حماس، و(2) الاستمرار في معالجة المعاملات لأصحاب الحسابات والمستفيدين من هذه الجهات، و(3) الحفاظ على حسابات هؤلاء العملاء؛

ز. لم يضع البنكان المدعى عليهما في اعتبارهما المخاطر المرتبطة بتقديم الخدمات المصرفية إلى قطر الخيرية - وبالأخص وضعها المفترض بصفتها كيان خيري يعمل في مواقع الشرق الأوسط المعرضة للإرهاب — ولم يضعا تدابيرًا مناسبةً لمواجهة تلك المخاطر ومن ثم منع غسل الأموال وتمويل الإرهاب؛

ح. لم يضع البنكان المدعى عليهما في اعتبارهما مخاطر غسل الأموال وتمويل الإرهاب الناتجة عن نظام بطاقات سنابل، خاصةً ما إذا كان يمكن للمنظمات الواجهة الإرهابية استخدام بطاقات الخصم في توزيع الأموال مباشرة على الإرهابيين وعلى أفراد عائلتهم كحافز لارتكاب أعمال إرهابية مباشرة أو في دفع تعويض لهم مقابل تنفيذ الأنشطة الإرهابية أو في مقاصة التكاليف الشخصية المرتبطة بنشاط إرهابي (مثل فقدان الدخل بسبب التعرض لإصابة أو حبس)؛

ط. لم يوف البنكان المدعى عليهما بالتزامهما برصد وحظر المعاملات مع الأفراد والمنظمات المدرجة في قوائم عقوبات وحظر الإرهاب ومكافحة غسل الأموال التي يصدرها الاتحاد الأوروبي والأمم المتحدة والولايات المتحدة الأمريكية وإسرائيل ودول أخرى؛

ي. لم يُجر البنكان المدعى عليهما أي بحث لتحديد الانتماءات الإرهابية لأصحاب الحسابات لديهما والمستفيدين من الحوالات المالية التي تُجرى من خلال هذه الحسابات بالرغم من أن هذه المعاملات بطبيعتها مشبوهة ورغم توافر المعلومات التي ترتكز على العلاقات التي تربط الإرهاب بأصحاب الحسابات والمستفيدين من التحويلات على شبكة الإنترنت وقواعد بيانات مثل ليكسيس/نيكسيس وبرامج متخصصة تستخدمها البنوك الدولية على نطاق واسع؛

ك. إما أن البنكان المدعى عليهما لم يلتزما بالتعليقات التي أظهر ما برنامج مكافحة غسل الأموال ومكافحة تمويل الإرهاب فيما يتعلق بالمعاملات التي تشمل أصحاب الحسابات أو المستفيدين من الحوالات المرتبطين بالإرهاب أو غسل الأموال أو أنهما لم يحدثا هذا البرنامج لمنع البنوك من المشاركة في هذه المعاملات؛

47

ل. لم يلتزم البنكان المدعى عليهما بالتوجيهات المقبولة تمامًا بشأن الخدمات المصرفية الدولية التي تنص عليها،

من بين معايير أخرى، التوصيات الأربعين الصادرة عن مجموعة العمل المالي بشأن غسل الأموال،

والتوصيات الخاصة الصادرة عن مجموعة العمل المالي المرتبطة على وجه التحديد بالتمويل الإرهابي،

وبيان بازل بشأن الوقاية، والمبادئ الأساسية للرقابة المصرفية الصادرة عن لجنة بازل، ومنهجية لجنة بازل

للمبادئ الأساسية، وبيان العناية الواجبة تجاه العملاء الصادر عن لجنة بازل، والمبادئ الأساسية لعام

2012 الصادرة عن لجنة بازل، ومبادئ ولفسبيرج لمكافحة غسل الأموال، واستبيان ولفسبيرج عن مكافحة

غسل الأموال، وبيان ولفسبيرج عن الإرهاب.

318.    رغم وجود إخفاقات في مكافحة غسل الأموال وتمويل الإرهاب، إلا أن مصرف الريان كان يسعى لإبداء أنه

يمتثل للقانون القطري لمكافحة تمويل الإرهاب، والسياسات الداخلية للبنك التي تحظر التمويل الإرهابي، والمبادئ الدولية

لمكافحة تمويل الإرهاب ومكافحة غسل الأموال السابق ذكرها.

319.    فعلى سبيل المثال وصف مصرف الريان في تقريره السنوي لعام 2018 دوره "في الامتثال لنظام مكافحة

غسل الأموال ومكافحة تمويل الإرهاب محلياً وإقليمياً ودولياً، بالإضافة إلى مسؤوليته تجاه المجتمع والبيئة التي يعمل فيها".

320.    أشار التقرير السنوي أيضًا إلى أن البنك اتبع نظامًا لإدارة المخاطر ليبقى مجلس إدارته على علم "بأعمال

الرقابة الداخلية التي تُنفذ داخله ونتائجها"، بما في ذلك سياسات وإجراءات "مكافحة غسل الأموال ومكافحة تمويل الإرهاب"

المطبقة في البنك.

321.    ووفقًا للتقرير السنوي للمصرف، يستخدم مصرف الريان أيضًا "نظام مراقبة للتحويلات المصرفية للتأكد من

عدم وجود أسماء تظهر في القوائم المحظورة أو تلك المتعلقة بمكافحة غسل الأموال ومكافحة تمويل الإرهاب؛ ودمج هذا النظام

مع نظام SWIFT لاعتراض أي أسماء مشبوهة في الوقت نفسه الذي تتم فيه المعاملات."

322.    نظرًا لسوء سمعة قطر الخيرية برعايتها لحركة حماس، بما في ذلك تعيينها من جهة إسرائيل في عام

2008 عضوًا في ائتلاف الخير الذي عينته وزارة الخزانة الأمريكية، كانت ستكشف إجراءات العناية الواجبة التي يلزم على

البنك اتخاذها وفق سياسات وإجراءات مصرف الريان عن الدور الحاسم الذي تؤديه قطر الخيرية في تمويل ودعم الأعمال

الإرهابية لحركة حماس وحركة الجهاد الإسلامي في فلسطين.

323.   لذا كان بإمكان مصرف الريان الاستفادة من سياسات وإجراءات مكافحة غسل الأموال ومكافحة تمويل الإرهاب التي حددها في منع تمويل الأعمال الإرهابية لحركة حماس وحركة الجهاد الإسلامي في فلسطين، لو كان يرغب البنك فعليًا في القضاء على هذا العمل غير المشروع.

324.   رغم الأدلة العامة القاطعة على نشاط قطر الخيرية في جمع الأموال بغية دعم حماس وغيرها من المنظمات الإرهابية العالمية، إلا أن مصرف الريان استمر في تقديم الخدمات المصرفية لها.

325.   في الواقع حول مصرف الريان، مع علمه بذلك، ملايين الدولارات من أموال قطر الخيرية إلى فروع محلية له تعمل في منطقة حماس بالرغم من معرفته الفعلية بأن قطر الخيرية (1) جهة معروفة ترعى حركة حماس، و(2) كانت تعمل بشكل غير قانوني في الأراضي الفلسطينية.

ثانيًا:     **الهجمات الإرهابية التي قَتلت بينشيز مناحيم برزيوزمان وأصابت أفراد عائلته**

326.   وفقًا للتآمر غير القانوني الذي يدعيه المدعون أعلاه، قدم المدّعى عليهم ومشاركوهم لحماس وحركة الجهاد الإسلامي في فلسطين الدعم المادي والموارد التي تسمح لتلك المنظمات الإرهابية سيئة السمعة بتنفيذ الهجوم الذي أدى إلى مقتل بينشيز مناحيم برزيوزمان وإصابة أفراد عائلته.  وقد تسبب هذا الهجوم، وما نتج عنه من مقتل بينشيز مناحيم برزيوزمان، في إصابة المدعين بإصابات بدنية ونفسية شديدة.

327.   كان هجوم القذائف الذي أدى إلى مقتل بينشيز مناحيم برزيوزمان جزءًا من سلسلة تفجيرات استمرت لمدة يومين بدأتها حماس وحركة الجهاد الإسلامي الفلسطينية في 4 مايو 2019.

328.   على مدار هذين اليومين، أطلق الإرهابيون التابعون لحركة حماس وحركة الجهاد الإسلامي في فلسطين أكثر من 600 صاروخ وقذائف هاون في إسرائيل من قطاع غزة.

329.   كان يتعمد الإرهابيون التابعون لحركة حماس وحركة الجهاد الإسلامي تصويب الصواريخ نحو المراكز المدنية ودمروا طرق ومنازل إسرائيلية ومصنعًا ورياض أطفال ومستشفى إسرائيلي.

330.   ونتيجةً لهذا العنف، أغلقت المدارس في الجزء الجنوبي من إسرائيل حيث استمر الأطفال في الركض للبحث عن مخبأ يحميهم من الانفجارات.

331. واجهت عائلة بينشيز مناحيم برزيوزمان خلال هذا الاعتداء الذي طالت مدته يومًا مليء بالقلق والخوف والذعر والجمود والهلع بسبب سقوط الصواريخ المستمر بالقرب من منازل أفراد العائلة الذين كانوا يقيمون في محيط القصف، بينما كان أفراد العائلة الآخرين على علم بنطاق الهجوم الإرهابي.

332. كان جميع أفراد العائلة قلقين بشأن سلامة أفراد العائلة الذين كان يقيمون في محيط موجة الانفجارات. بالأخص سلامة بينشيز مناحيم برزيوزمان حيث كان يقيم بالقرب من قطاع غزة في مدينة ميناء أشدود الغربية الإسرائيلية.

333. ومن المؤسف أن عائلة برزيوزمان كان لديهم سبب وجيه للخوف على سلامة بينشيز.

334. وأثناء بدء حركتي حماس والجهاد الإسلامي في فلسطين في الهجمات الصاروخية، كان بينشيز يسير مع بعض الأصدقاء في مدينة أشدود حينها سمعوا صفارات الإنذار التي أعلنت عن هجوم قادم (لقد أصبحت التفجيرات الصاروخية تكتيكًا إرهابيًا مفضلًا لدى حماس وحركة الجهاد الإسلامي في فلسطين).

335. بعد إطلاق صفارات الإنذار، ركض بينشيز داخل البهو في مبنى قريب منه للاختفاء فيه.

336. عندما تعرض هذا المبنى لضربة مباشرة من هجوم أحد الصواريخ، ارتطمت قطع كبيرة من الشظايا ببينشيز واخترقت قلبه وأدت إلى حدوث إصابات خطيرة.

337. عالج موظفو الطوارئ بينشيز ونقلوه إلى المستشفى لتلقي المزيد من الرعاية.

338. كان بينشيز، أثناء نقله، فاقدًا الوعي وفي حالة صدمة. وكانت النهاية مفجعة، حيث توفى بينشيز بعد وصوله المستشفى بسبب إصاباته الكارثية.

## أسباب الدعوى

## السبب الأول للدعوى

### مساعدة التنظيمات الإرهابية الأجنبية والتواطؤ معها
### بما يخالف القسم 2333(د) من الباب 18 من مدونة القوانين الأمريكية ضد جميع المدعى عليهم

339. يكرر المدعون ويدّعون مرة أخرى كل ادعاء وارد في الفقرات السابقة حسبما هو منصوص عليه بالكامل في هذه الشكوى.

340. يؤكد المدعون سبب هذه الدعوى ضد جميع المدعى عليهم بموجب القسم 2333(د) من مدونة القوانين الأمريكية والقسم 2-ب من قانون العدالة ضد رعاة الإرهاب ("جاستا").

341.    المدعون هم مواطنون أمريكيون أو مستحقو تركة مواطنين أمريكيين أو من ورثتهم أو من أفراد أسرهم
الباقين على قيد الحياة.

342.    كانت حماس وحركة الجهاد الإسلامي من التنظيمات الإرهابية الأجنبية في وقت ارتكابهما وتخطيطهما
وتصريحهما بالهجوم الإرهابي التي قُتل فيه بينشيز مناحيم برزيوزمان وأصيب فيها المدعون.

343.    كان هذا الهجوم الإرهابي من أعمال الإرهاب الدولي، كما هو محدد في القسم 2331 من الباب 18 من
مدونة القوانين الأمريكية. كان الهجوم: (أ) ينطوي على أعمال عنف ويعرض حياة البشر للخطر؛ و(ب) ينتهك القانون الجنائي
الفيدرالي والحكومي، في حالة ارتكابه في الولايات المتحدة؛ و(ج) يبدو أنه يهدف إلى ترويع السكان المدنيين في إسرائيل
والولايات المتحدة أو الضغط عليهم، والتأثير على سياسات الحكومتين الإسرائيلية والأمريكية من خلال أعمال العنف والتأثير
على سياسات هاتين الحكومتين من خلال أعمال العنف؛ و(د) قد حدث في المقام الأول خارج الولايات المتحدة وتجاوز الحدود
الوطنية حيث جمعت حماس وحركة الجهاد الإسلامي الأموال دوليًا، بهدف التأثير على مواطني إسرائيل والولايات المتحدة،
ونفذتا عمليات على الصعيد الدولي وطلب أعضاؤها اللجوء في بلدان متعددة في الشرق الأوسط.

344.    قدم المدّعى عليهم عن علم مساعدة كبيرة لأعمال الإرهاب الدولي هذه.

345.    تضمنت المساعدة الكبيرة التي قدمها المدّعى عليهم عن علم إلى حماس وحركة الجهاد الإسلامي ما يلي: (أ)
تحويل مبالغ كبيرة من الأموال إلى التنظيمات الإرهابية الأجنبية وناشطيها والتنظيمات الصورية التابعة لها؛ و(ب) الاحتفاظ
بحسابات مصرفية لصالح تلك التنظيمات والتنظيمات الصورية التابعة لها وكبار ناشطيها؛ و(ج) تمكين حماس وحركة الجهاد
الإسلامي من الوصول إلى الدولارات الأمريكية والنظام المصرفي الأمريكي؛ و(د) إضفاء الشرعية الظاهرية على جهود
التنظيمات الإرهابية الأجنبية لجمع الأموال من أجل تمويل عملياتها وتعويض الإرهابيين وأفراد أسرهم عقب تنفيذ الهجمات
الإرهابية؛ و(هـ) تمكين التنظيمات الإرهابية الأجنبية من تحويل الأموال المخصصة صوريًا لدعم قضايا إنسانية إلى الموارد
اللازمة لارتكاب الهجمات الإرهابية.

346.    كان من شأن الخدمات والدعم المقدم للمدّعى عليهم تشجيعهم على أن يكونوا إرهابيين محتملين وتحفيزهم
على ارتكاب هجماتهم المستقبلية.

51

347.   في الوقت الذي قدم فيه المدعى عليهم تلك المساعدة الكبيرة إلى حماس وحركة الجهاد الإسلامي، كان المدعى عليهم يعرفون ما يلي: (أ) خضع التنظيمان الإرهابيان الأجنبيان للتصنيف بهذا الوصف؛ و(ب) كان التنظيمان الإرهابيان الأجنبيان ونشطاؤهما يشاركون في أعمال إرهابية، بما في ذلك الهجمات المزعومة في هذه الشكوى، و(ج) كانت المساعدة المالية التي قدمها المدعى عليهم لتلك التنظيمات الإرهابية الأجنبية ضرورية حتى يتسنى لهم تنفيذ الهجمات الإرهابية، بما في ذلك الهجوم الذي تعرض له المدعون.

348.   أراد المدعى عليهم أيضًا أن تعمل مساعدتهم الكبيرة على تيسير قدرة حماس وحركة الجهاد الإسلامي على تنفيذ هجمات إرهابية ضد المدعين وغيرهم من المدنيين. ونتيجة لذلك، اعترف المدعى عليهم بأنهم لعبوا دورًا أساسيًا في الأنشطة الإرهابية للتنظيمات الإرهابية الأجنبية.

349.   كانت المساعدة التي قدمها المدعى عليهم إلى حماس وحركة الجهاد الإسلامي عاملًا أساسيًا للتسبب في إصابات المدعين.  علاوة على ذلك، كانت إصابات المدعين نتيجة متوقعة لتلك المساعدة الكبيرة.

350.   وكنتيجة مباشرة للمساعدة الكبيرة المعروفة التي قدمها المدعى عليهم إلى حماس وحركة الجهاد الإسلامي، عانى المدعون من إصابات جسدية ونفسية وعاطفية خطيرة.

351.   ساعد المدّعى عليهم عن علم حماس وحركة الجهاد الإسلامي وتحريضهما وفقًا للمعنى الوارد في القسم 2333(د) من مدونة القوانين الأمريكية والتي خلص فيها الكونجرس إلى توفير "أوسع نطاق ممكن للمتقاضين المدنيين" للحصول على انتصاف من أولئك "الذين قدموا دعمًا ماديًا، سواء بشكل مباشر أو غير مباشر، إلى تنظيمات أجنبية أو أشخاص متورطين في أنشطة إرهابية ضد الولايات المتحدة". راجع القسم 2ب من قانون جاستا.

352.   .352   وبالتالي يتحمل المدعى عليهم مسؤولية تجاه المدعين بتقديم تعويضات بمبلغ يتم تحديده في المحاكمة، وتعويضات بواقع ثلاثة أضعاف، ودفع أتعاب المحاماة والنفقات التي يتكبدها المدعون فيما يتعلق بهذه الدعوى.

<u>السبب الثاني للدعوى</u>

**انتهاك القسم 2333(د) من الباب 18 من مدونة القوانين الأمريكية، قانون مكافحة الإرهاب ضد جميع المدعى عليهم (المساءلة عن المؤامرة)**

353.   يكرر المدعون ويدّعون مرة أخرى كل ادعاء وارد في الفقرات السابقة حسبما هو منصوص عليه بالكامل في هذه الشكوى.

52

354.   يؤكد المدعون هذا السبب لرفع دعوى ضد جميع المدعى عليهم بموجب القسم 2333(د) من الباب 18 من مدونة القوانين الأمريكية والقسم 2ب من قانون جاستا.

355.   المدعون هم مواطنون أمريكيون أو مستحقو تركة مواطنين أمريكيين أو من ورثتهم أو من أفراد أسرهم الباقين على قيد الحياة.

356.   تآمر المُدعى عليهم مع بعضهم البعض ومع حماس وحركة الجهاد الإسلامي وحكومة قطر وآخرين لارتكاب أعمال إرهابية دولية ضد الأمريكيين في إسرائيل.

357.   انضمت المدعى عليها قطر الخيرية إلى المؤامرة من خلال الموافقة، من بين أمور أخرى، صراحةً أو ضمنًا على جمع أموال لصالح حماس وحركة الجهاد الإسلامي، وكلاهما تنظيمات إرهابية أجنبية وضعتها الولايات المتحدة وإسرائيل ودول أخرى على قائمة المنظمات الإرهابية. وافقت قطر الخيرية أيضًا على توزيع تلك الأموال نيابة عن حماس وحركة الجهاد الإسلامي في فلسطين. ومن خلال التورط في هذا السلوك، دعمت قطر الخيرية أهداف المؤامرة.

358.   انضم المدعى عليه مصرف الريان إلى المؤامرة من خلال الموافقة، من بين أمور أخرى، صراحةً أو ضمنيًا على: (أ) السماح لقطر الخيرية باستخدام حسابات في مصرف الريان لتمرير أموال إلى حماس وحركة الجهاد الإسلامي وتمويلهما، و(ب) السماح لجماعات إسلامية أخرى مرتبطة بحماس وحركة الجهاد الإسلامي، بما في ذلك مؤسسة إنتربال، بالاحتفاظ بحسابات في البنك لاستخدامها في تمرير الأموال إلى حماس وحركة الجهاد الإسلامي، و(ج) تمكين قطر الخيرية وحماس وحركة الجهاد الإسلامي من الوصول إلى الدولارات الأمريكية عن طريق العلاقات المصرفية لمصرف الريان مع بنوك مراسلة في الولايات المتحدة. ومن خلال التورط في هذا السلوك، دعم مصرف الريان أهداف مؤامرة المدعى عليهم.

359.   انضم المدعى عليه بنك قطر الوطني إلى المؤامرة من خلال الموافقة، من بين أمور أخرى، صراحةً أو ضمنيًا على: (أ) تقديم خدمات مصرفية إلى قيادة حماس التي يقع مقرها الرئيسي في الدوحة، و(ب) تقديم خدمات مصرفية إلى قطر الخيرية المشاركة في المؤامرة، و(ج) من خلال توفير وتقديم خدمات مصرفية إلى رئيس ائتلاف الخير، وهو منظمة إرهابية مُدرج على لائحة الإرهابيين العالميين المصنفين تصنيفًا خاصًا من جانب الولايات المتحدة وواجهة لجمع التبرعات لصالح حماس.

53

360.   بسبب العلاقات الوثيقة بين المدّعى عليهم والحكومة القطرية، بما في ذلك العائلة الحاكمة في قطر كان للبنكين علاقة بالمؤامرة.

361.   كان المدعى عليه مصرف الريان يعرف بأنه يُسهل أعمال الإرهاب ويشارك في مؤامرة المدعى عليهم من خلال السماح لممول معروف أنه مدرج على قائمة الإرهاب مثل قطر الخيرية بالاحتفاظ بحسابات في البنك وتجاهل المعاملات المشبوهة في تلك الحسابات.

362.   كان المدعى عليه بنك قطر الوطني يعرف أنه يقوم بتسهيل أعمال الإرهاب ويشارك في مؤامرة المدعى عليهم من خلال تقديم خدمات إلى إرهابيين معروفين من حماس كان قد أُطلق سراحهم في إحدى صفقات تبادل الأسرى ونجوا من أحكام السجن التي كانت صادرة ضدهم في إسرائيل ليفروا إلى الملاذ الآمن في قطر، حيث واصلوا إدارة حماس.

363.   كان البنكان المدّعى عليهما على علم بأن حكومة قطر والأسرة الحاكمة القطرية، التي كانت تشغل مناصب قيادية في كلا البنكين، تدعم حماس صراحة من خلال تمويل عملياتها وتوفير ملاذ آمن لقيادة حماس.

364.   كان البنكان المدّعى عليهما على علم بأنه من خلال السماح لقطر الخيرية باستخدام حسابات في البنكان لتمرير أموال إلى حماس وحركة الجهاد الإسلامية، فهما يشاركان في المؤامرة التي كانت تنطوي على هدف أساسي متمثل في ارتكاب أعمال الإرهاب الدولي، بما في ذلك مقتل أمريكيين في إسرائيل.

365.   ونتيجةً لمباشرة مؤامرة المدعى عليهم والخطوات التي اتخذوها عن قصد دعمًا للمؤامرة، عانى المدعون من إصابات جسدية ونفسية وعاطفية خطيرة.

366.   وبالتالي يتحمل المدعى عليهم مسؤولية تجاه المدعين بتقديم تعويضات بمبلغ يتم تحديده في المحاكمة، وتعويضات عن الأضرار بواقع ثلاثة أضعاف، ودفع أتعاب المحاماة والنفقات التي يتكبدها المدعون فيما يتعلق بهذه الدعوى.

<u>السبب الثالث للدعوى</u>

**تقديم دعم مادي للإرهابيين
بما يخالف القسمين 2339أ و2333(أ)
من الباب 18 من مدونة القوانين الأمريكية**

367.   يكرر المدعون ويدّعون مرة أخرى كل ادعاء وارد في الفقرات السابقة حسبما هو منصوص عليه بالكامل في هذه الشكوى.

54

368.   يؤكد المدعون رفع هذه الدعوى ضد جميع المدعى عليهم بسبب مخالفة المادتين 2333(أ) و2339أ من الباب 18 من مدونة القوانين الأمريكية.

369.   المدعون هم مواطنون أمريكيون أو مستحقو تركة مواطنين أمريكيين أو من ورثتهم أو من أفراد أسرهم الباقين على قيد الحياة.

370.   شكلت المساعدة المالية التي قدمها المدعى عليهم إلى حماس وحركة الجهاد الإسلامي دعمًا ماديًا لتلك المنظمات الإرهابية وسهلت جهودها للمشاركة في أعمال الإرهاب الدولي، بما في ذلك الهجوم الذي تسبب في مقتل بينشيز مناحيم برزيوزمان وإصابة المدعين.

371.   قدم المدعى عليهم هذه المساعدة المادية لحماس وحركة الجهاد الإسلامي في فلسطين مع علمهم بأن المنظمات الإرهابية ستستفيد منها في شن أو الاستعداد لشن الهجمات الإرهابية بما في ذلك الهجوم الذي أدى إلى وفاة بينشيز مناحيم برزيوزمان وإصابة المدعيين.

372.   قدم المُدعى عليهم هذه المساعدة المادية لحركة حماس وحركة الجهاد الإسلامي في فلسطين بغرض المساعدة في تنفيذ المؤامرة لتسهيل الأعمال الإرهابية التي ارتكبتها كل من الحركتين بما في ذلك الهجوم الذي أدى إلى وفاة بينشيز مناحيم برزيوزمان وإصابة أفراد عائلته.

373.   ساعدت المساعدة المادية التي قدمها المُدعى عليهم لكل من حركة حماس وحركة الجهاد الإسلامي في فلسطين في تنفيذ أنشطة خطرة على حياة البشرية بما يخالف القسم 2339أ من الباب 18 من مدونة القوانين الأمريكية، والتي كانت غير قانونية إما بموجب قانون الولاية، بما في ذلك القسمين 490.10 و490.15 من قانون العقوبات في نيويورك، أو بموجب قانون الولاية المذكور في حال ارتكابها في الولايات المتحدة.

374.   كانت المساعدة المادية التي قدمها المُدعى عليهم لحركة حماس وحركة الجهاد الإسلامي في فلسطين تشكل خطرًا على حياة الإنسان لأن المنظمات الإرهابية تمكنت بسببها من تمويل هجماتها العنيفة وتجنيد أفرادًا لتنفيذ تلك الهجمات. كما ساعدت المساعدة المالية التي قدمها المُدعى عليهم لحركة حماس وحركة الجهاد الإسلامي في فلسطين المنظمات الإرهابية على توسيع أنشطتهم الخيرية المزعومة، وبالتالي اجتذاب المزيد من المتبرعين والمجندين لتنفيذ عملياتهم الإرهابية.

375.   كان الغرض الحقيقي والواضح من المساعدة المادية التي قدمها المُدعى عليهم لحركة حماس وحركة الجهاد
الإسلامي في فلسطين يتمثل فيما يلي: (1) إرهاب السكان المدنيين في إسرائيل والولايات المتحدة أو قهرهم؛ أو (2) السيطرة
على سياسات إسرائيل والولايات المتحدة من خلال الترهيب والإكراه؛ أو (3) التأثير على سلوك حكومات إسرائيل والولايات
المتحدة عن طريق الدمار الشامل أو الاغتيال أو الاختطاف.

376.   قدم المُدعى عليهم المساعدة المالية الجوهرية لحركة حماس وحركة الجهاد الإسلامي في فلسطين في المقام
الأول خارج الولايات المتحدة ثم تجاوزوا الحدود الوطنية التي كانوا يعملون فيها دوليًا في تقديم المساعدة المالية لحماس وحركة
الجهاد الإسلامي في فلسطين.

377.   ونتيجة لذلك، ارتكب المدعى عليهم أعمال الإرهاب الدولي، حسبما يحدده القسم 2331 من الباب 18 من
مدونة القوانين الأمريكية.

378.   اعتمدت حماس وحركة الجهاد الإسلامي على المساعدة المالية والدعم المادي المقدم من المدعى عليهم في
تنفيذ الأنشطة الإرهابية للتنظيمات الإرهابية الأجنبية.

379.   تورطت حماس وحركة الجهاد الإسلامي الفلسطينية في أعمال عنف جسدي خارج الولايات المتحدة بقصد
قتل المدعين، وهم مواطنون امريكيون، أو التسبب في إصابات جسدية خطيرة لهم.  وتورطت التنظيمات الإرهابية الأجنبية في
هذا السلوك غير المشروع وفقًا لمخطط ومؤامرة مشتركة مع المدعى عليهم وآخرين.

380.   تسببت أفعال العنف التي نفذتها المنظمة الإرهابية الأجنبية في وفاة بينشيز مناحيم برزيوزمان وإصابة أفراد
عائلته.

381.   كان الدعم المادي والمساعدة الكبيرة التي قدمها المدعون إلى حماس وحركة الجهاد الإسلامي عاملًا أساسيًا
للتسبب في إصابات المدعين.  علاوة على ذلك، كانت إصابات المدعين نتيجة متوقعة للدعم المادي والمساعدة الكبيرة التي
قدمها المدعى عليهم إلى حماس وحركة الجهاد الإسلامي.

382.   وكنتيجة مباشرة للدعم المادي والمساعدة الكبيرة التي قدمها المدعى عليهم إلى حماس وحركة الجهاد
الإسلامي، عانى المدعون من إصابات جسدية ونفسية وعاطفية خطيرة.

383. وبالتالي يتحمل المدعى عليهم مسؤولية تجاه المدعين بتقديم تعويضات بمبلغ يتم تحديده في المحاكمة، وتعويضات عن الأضرار بواقع ثلاثة أضعاف، ودفع أتعاب المحاماة والنفقات التي يتكبدها المدعون فيما يتعلق بهذه الدعوى.

**السبب الرابع للدعوى**

**تقديم دعم مادي**
**لتنظيمات إرهابية أجنبية**
**بما يخالف القسمين 2339ب(أ)(1) و2333(أ) من الباب 18 من مدونة القوانين الأمريكية ضد جميع المدعى عليهم**

384. يكرر المدعون ويدّعون مرة أخرى كل ادعاء وارد في الفقرات السابقة حسبما هو منصوص عليه بالكامل في هذه الشكوى.

385. يؤكد المدعون رفع هذه الدعوى ضد جميع المدعى عليهم بسبب مخالفة القسمين 2333(أ) و2339ب(أ)(1) من الباب 18 من مدونة القوانين الأمريكية.

386. المدعون هم مواطنون أمريكيون أو مستحقو تركة مواطنين أمريكيين أو من ورثتهم أو من أفراد أسرهم الباقين على قيد الحياة.

387. في وقت الهجوم الذي أصيب فيه المدعون، كانت حماس وحركة الجهاد الإسلامي تنظيمين إرهابيين أجنبيين.

388. في ذلك الوقت، كان المدعى عليهم يعرفون أن حماس وحركة الجهاد الإسلامي تنظيميان إرهابيان أجنبيان، وأن التنظيمين متورطان في نشاط إرهابي (كما هو محدد في القسم 1182(أ)(3)(ب) من الباب 8 من مدونة القوانين الأمريكية، وفي أعمال الإرهاب (كما هو محدد في القسم 2656و(د)(2) من الباب 22 من مدونة القوانين الأمريكية.

389. وكما يزعم المدعون بالتفصيل أعلاه، قدم المدعى عليهم دعمًا ماديًا لحماس وحركة الجهاد الإسلامي.

390. كان الدعم المادي جزءًا أساسيًا من قدرة حماس وحركة الجهاد الإسلامي على تنفيذ الهجمات الإرهابية، بما في ذلك الهجوم الذي أصيب فيه المدعون.

391. وكما يزعم المدعون بالتفصيل أعلاه، شكل الدعم المادي المقدم من المُدعى عليهم إلى حماس وحركة الجهاد الإسلامي عملًا من أعمال الإرهاب الدولي، حسبما يحدده القسم 2331(1) من الفصل 28 من مدونة القوانين الأمريكية.

392.    كان الدعم المادي الذي قدمه المدعى عليهم إلى حماس وحركة الجهاد الإسلامي عاملًا أساسيًا وقد كان من المتوقع أن يتسبب في إصابات المدعين.

393.    علاوة على ذلك، كانت إصابات المدعين نتيجة متوقعة للدعم المادي والمساعدة الكبيرة التي قدمها المدعى عليهم إلى حماس وحركة الجهاد الإسلامي.

394.    وكنتيجة مباشرة للدعم المادي والمساعدة الكبيرة التي قدمها المدعى عليهم إلى حماس وحركة الجهاد الإسلامي، عانى المدعون من إصابات جسدية ونفسية وعاطفية خطيرة.

395.    وبالتالي يتحمل المدعى عليهم مسؤولية تجاه المدعين بتقديم تعويضات بمبلغ يتم تحديده في المحاكمة، وتعويضات عن الأضرار بواقع ثلاثة أضعاف، ودفع أتعاب المحاماة والنفقات التي يتكبدها المدعون فيما يتعلق بهذه الدعوى.

## <u>طلب رفع الضرر</u>

وبناءً عليه، يطلب المدعون من هذه المحكمة:

(a)    قبول الاختصاص القضائي على هذه الدعوى.

(b)    إصدار حكم ضد المدعى عليهم ولصالح المدعين للحصول على تعويضات عن الأضرار بالمبالغ التي سيتم تحديدها في المحاكمة، وفائدة ما قبل الحكم.

(c)    إصدار حكم ضد المدعى عليهم ولصالح المدعين للحصول على تعويضات بواقع ثلاثة أضعاف بموجب القسم 2333(أ) من الباب 18 من مدونة القوانين الأمريكية، وفائدة ما قبل الحكم.

(d)    إصدار حكم ضد المدعى عليهم ولصالح المدعين بشأن أي وجميع التكاليف المتكبدة فيما يتعلق بإجراءات المقاضاة في هذه الدعوى، بما في ذلك أتعاب المحاماة، بموجب القسم 2333(أ) من الباب 18 من مدونة القوانين الأمريكية، وفائدة ما قبل الحكم؛ و

58

(e)        ومنح أي سبل انتصاف أخرى حسبما تقتضيه العدالة.

يطلب المدعون عقد محاكمة من جانب هيئة المحلفين بشأن جميع القضايا التي تستوجب المحاكمة.

<div dir="rtl">

فليشمان بونر آند روكو إل إل بي                          التاريخ:15  ديسمبر 2020
بواسطة: /توقيع/ جيمس بي بونر
جيمس بي بونر (jbonner@fbrllp.com )
باتريك إل روكو (procco@fbrllp.com )
سوزان إم ديفيز (sdavies@fbrllp.com )
81 مين ستريت، الجناح   515
وايت بلينس، نيويورك   10601
الهاتف:908-516-2066

مكتب بيرلس للمحاماة بي سي
ستيفن آر بيرلس *
جوشوا كيه بيرلس *
1050 كونيتيكت أفينيو، شمال غرب، الجناح   500
واشنطن، العاصمة،   20036
الهاتف:202-955-9055

ألين إل روثينبيرج، بي سي
ألين إل روثينبيرج
هاري روثينبيرج
706 محكمة سالم
ياردلي،   PA 19067
الهاتف:866-239-3405

</div>

*ستُقدم الطلبات *للاعتراف بالممارسة* في هذه الدعوى فقط

59