# FLEISCHMAN BONNER & ROCCO LLP
## ATTORNEYS AT LAW

81 MAIN STREET • SUITE 515 • WHITE PLAINS • NEW YORK • 10601
TEL: 908-337-1426 • FAX: 908-516-2049 • WEB: WWW.FBRLLP.COM

EMAIL: PRocco@fbrllp.com

February 2, 2022

**BY ECF**

The Honorable Nicholas G. Garaufis
U.S. District Court for the Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re:     *Przewozman, et al. v. Qatar Charity, et al.*, No. 1:20-cv-06088-NGG-RLM

Dear Judge Garaufis:

The Court has scheduled a pre-motion conference in the above-captioned matter for February 4, 2022 at 11:30 a.m. We write on behalf of Plaintiffs to respond to the Defendants' November 22 and 24, 2021, and January 20, 2022 pre-motion conference request letters. (ECF 20, 26, 42). Plaintiffs are the surviving family members of a U.S. citizen who was murdered in a terrorist attack in Israel sponsored by two notorious terrorist organizations, Hamas and the Palestinian Islamic Jihad ("PIJ"), both designated by the U.S. as Foreign Terrorist Organizations ("FTOs").

**The Relevant Facts**

Defendants principally rely on inapposite cases where financial institutions and their customers played only a remote, speculative role in terrorism. In contrast, each of the Defendants here knowingly and directly participated in a conspiracy to commit terrorism spearheaded by the Qatari government, which effectively controls each of them (¶¶ 5-7, 68, 80, 111, 127[1]). Over the last decade, Qatar has openly provided substantial funding and support to Hamas, a U.S.-designated FTO, including providing safe haven to fugitive members of Hamas's senior leadership. ¶¶ 3-7, 106-124. Indeed, from 2012 through 2018, Qatar officially provided Hamas with more than $1.1 billion, making Qatar Hamas's largest single funder. ¶ 117.

Defendant Qatar Charity, the customer of the bank Defendants Masraf al Rayan ("Masraf") and Qatar National Bank ("QNB"), is itself a long-standing and notorious funder of international terrorism. The countries that have officially recognized Qatar Charity as a terrorist organization include: the United States, which designated Qatar Charity as "a priority III terrorism support entity"; Saudi Arabia, Bahrain, Egypt and UAE, each of which identified Qatar Charity as "a financial supporter of terrorism"; and Israel which banned Qatar Charity for its support of terrorism and designated it as a member of the Union of Good, an organization that the United States declared a Specially Designated Global Terrorist ("SDGT") in 2008. ¶¶ 7, 41, 54-64, 139. Qatar Charity's terrorist beneficiaries include not only Hamas and PIJ, but a long and notorious list of terrorists hostile to the United States, including Osama Bin Laden and the Al-Qaida network. ¶¶ 39-65. As just one of many examples, 2003 testimony before the U.S. House of

---

[1] References herein to "¶ __" and "¶¶ __ - __" refer to specific paragraphs of Plaintiffs' Complaint (ECF 1).

Representatives highlighted Qatar Charity's "active financing of Al-Qaida and other designated international terror groups." ¶ 46. Given the extensive and notorious nature of Qatar Charity's longstanding support for terrorist organizations (¶¶ 70, 322, 324), no financial institution could have remained unaware of that illicit conduct.

But the Defendant banks did not merely ignore Qatar Charity's leading role in advancing the Qatari government's conspiracy to fund FTOs. To further its goal of supporting FTOs like Hamas and PIJ, Qatar coopted the Defendant banks to join the conspiracy to funnel millions of coveted U.S. dollars (the chosen currency of Middle East terrorist networks) through the U.S. financial system to those FTOs under the false guise of "charitable donations." ¶¶ 3-8, 125-133.

Each Defendant played an integral role in that conspiracy. Masraf processed the many payments ultimately bound for terrorists through its correspondent bank account in New York. ¶¶ 10, 132-133. The Defendants repeatedly used that New York correspondent account to process "donations [that Qatar Charity had] solicited in Qatar and around the world" and funnel U.S. dollars to Hamas and PIJ. ¶¶ 9-10, 24, 128-132, 164-167. The access to the U.S. financial system that Defendants provided allowed Hamas and PIJ to obtain the U.S. dollars needed to sustain their terrorist activities. ¶¶ 5, 24, 358.

QNB also furthered the goals of the conspiracy by maintaining at least six bank accounts for Qatar Charity, that Qatar Charity used to fund terrorism and to which it specifically requested its donors to transfer funds. ¶ 14. In addition, QNB maintained accounts for Hamas's senior leadership—including terrorists convicted for murdering innocent civilians—and those accounts were also used to fund Hamas's terrorism. ¶¶ 14, 106-124, 174.

**This Court has Specific Personal Jurisdiction Over Each Defendant in the Conspiracy**

This Court has personal jurisdiction over all of the Defendant Co-Conspirators based on their purposeful use of a correspondent bank account in New York to funnel substantial U.S. dollars to Hamas and PIJ, both U.S.-designated FTOs. *See Official Comm. of Unsecured Creditors of Arcapita Bank, B.S.C. v. Bahr. Islamic Bank*, 549 B.R. 56, 67-68 (S.D.N.Y. Mar. 30, 2016) ("[T]he use of a correspondent bank account, even if the defendant has no other contacts with New York, satisfies the first prong of New York's long-arm statute so long as the use was purposeful and not coincidental or adventitious."). "[A] foreign bank's repeated use of a correspondent account in New York on behalf of a client—in effect, a 'course of dealing'—show[s] purposeful availment of New York's dependable and transparent banking system, the dollar as a stable and fungible currency, and the predictable jurisdictional and commercial law of New York and the United States." *Licci v. Lebanese Can. Bank, SAL*, 20 N.Y.3d 327, 339 (2012) ("*Licci III*"); *accord Miller v. Arab Bank, PLC*, 372 F. Supp. 3d 33, 43 (E.D.N.Y. 2019) (Cogan, J.).

QNB's claim that Plaintiffs have alleged "no facts regarding the volume, frequency or deliberate nature of such funds transfers by QNB through New York" ignores myriad allegations of the Complaint demonstrating Defendant Co-Conspirators' pattern and practice of repeatedly using a New York correspondent account to "funnel[] millions of dollars of donations through the U.S. financial system" to obtain U.S. dollars for distribution to Hamas and PIJ. *See* ¶¶ 9-11, ¶ 132 (setting forth the conspiracy's operating procedures for using a New York correspondent bank to process Qatar Charity's donations), ¶¶ 165-166 (noting Masraf's use of a New York correspondent account to process "USD and to distribute those dollars to terrorists and their family members in the Palestinian Territories"). QNB's recent claim that, even assuming the truth of Plaintiffs

allegations, it would never have used a NY correspondent account to funnel USD from QC's QNB accounts to Hamas and PIJ ignores the structure of the conspiracy alleged. The flow of money went from QC's accounts at QNB to accounts at third-party banks in the Palestinian Territories—the Bank of Palestine and Islamic Bank—where it was distributed to the FTOs. ¶¶ 10, 132, 149-151. In order to make these interbank transfers of millions of U.S. dollars it is almost certain that QNB had to access the U.S. financial system. *See e.g., Banque Worms v. BankAmerica Int'l*, 77 N.Y.2d 362, 370 (1991) ("The [Clearing House Interbank Payment System ('CHIPS')] network handles 95% of the international transfers made in dollars. . . . These funds are transferred through participating banks located in New York because all of the banks belonging to the CHIPS network must maintain a regulated presence in New York.").

Importantly, "defendant's use of the correspondent bank account need not be at the 'very root' of the plaintiff's claim." *Arcapita Bank*, 549 B.R. at 68 (citing *Licci III*, 20 N.Y.3d at 339-41). "Rather, as long as the use of the correspondent bank account is not 'completely unmoored' from one of the elements of the plaintiff's cause of action," the Court may exercise personal jurisdiction." *Id.* (quoting *Licci III*, 20 N.Y.3d at 340). Here, the connection to this forum is far more substantial than required by the controlling *Licci* decisions, as use of the New York correspondent account was essential to Defendants' conspiracy because Hamas and PIJ required U.S. dollars to fund their widespread terrorism. ¶¶ 157-169.

Qatar Charity's claim that the use of a correspondent bank account in New York cannot be the basis for exerting specific jurisdiction over Qatar Charity—a non-bank defendant—ignores that a principal may be subject to jurisdiction in New York based upon the acts of its agent. *See Kreutter v. McFadden Oil Corp.*, 71 N.Y.2d 460, 467, 473 (1988). Here, Masraf's use of its New York correspondent account to acquire U.S. dollars for Qatar Charity was clearly within the scope of its agency relationship with its customer Qatar Charity. Thus, Masraf's New York actions can be attributed to its principal Qatar Charity for jurisdictional purposes. *See also CutCo Indus. v. Naughton*, 806 F.2d 361, 365-66 (2d Cir. 1986) ("Under traditional agency law, joint participation in a partnership or joint venture establishes 'control' sufficient to make each partner or joint venturer an agent of the others."); *Allianz Global Inv'rs GMBH v. Bank of Am. Corp.*, 457 F. Supp. 3d 401, 408 (S.D.N.Y. 2020) ("Specific jurisdiction may . . . exist where a defendant's connection to the forum state arises from participation in a conspiracy connected to the forum state by a co-conspirator's acts in furtherance of the conspiracy.").

In any event, because Plaintiffs have alleged a good faith basis for exerting personal jurisdiction over all three Defendants, the Court should not decide Defendants' motions to dismiss for lack of personal jurisdiction until Plaintiffs are allowed jurisdictional discovery. *See Singer v. Bank of Palestine*, 2021 U.S. Dist. LEXIS 177860, at *61 (E.D.N.Y. Apr. 30, 2021) (permitting jurisdictional discovery where plaintiff alleged that defendant "used correspondent bank accounts in New York to issue large volumes of payments in U.S. dollars to organizations affiliated with Hamas during the relevant period"); *Vasquez v. H.K. & Shanghai Banking Corp.*, 2019 U.S. Dist. LEXIS 90716, at *34 (S.D.N.Y. May 29. 2019) (allowing jurisdictional discovery where defendant bank depicted its correspondent banking as "entirely passive"). Plaintiffs have sought to engage Defendants regarding that discovery since shortly after Plaintiffs served their Complaint, but Defendants have asserted that discovery is "premature" and have refused to conduct the Rule 26(f) conference in which the parties are obligated to participate "as soon as practicable" and which, absent court order, must precede the taking of discovery. Defendants have offered no explanation

concerning why scheduling the Rule 26(f) conference has been "impracticable" because no such excuse exists.

### The Foreign Sovereign Immunities Act is Inapplicable to QNB

While Plaintiffs allege that QNB is effectively controlled by Qatar and the Qatari Royal family (¶ 80), the Complaint alleges neither that Qatar owns a majority interest in QNB, nor that QNB is "an organ" of the state of Qatar. *See* ¶ 78 (Qatar has only an indirect 50% interest in QNB). As such, QNB has no basis to assert sovereign immunity in its motion to dismiss. *See* 28 USCS § 1603(b)(2) (to qualify as the agency or instrumentality of a foreign state under the FSIA, an entity must be "an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof."); *USX Corp. v. Adriatic Ins. Co.*, 345 F.3d 190, 208 (3d Cir. 2003) ("to be an organ of a foreign state it must engage in a public activity on behalf of the foreign government.").

### Service of Process on All Defendants Was Adequate Pursuant to Rule 4(f)(2)(C)(ii)

Both Qatar Charity and Masraf misstate the standard applicable to their legal challenges to the sufficiency of the service effectuated by the Clerk of this Court under Rule 4(f)(2)(C)(ii). Such service by "any form of mail . . . that requires a signed receipt" is sufficient "unless **prohibited** by the foreign country's law." Rule 4(f)(2)(C)(ii) (emphasis added). That standard has been met. Indeed, Article 11 of the Qatari Civil and Commercial Procedures Law (Law No. 13 of 1990) explicitly authorizes delivery of a summons "by registered mail [*i.e.*, mail requiring signed receipt] or any other appropriate means."[2] Qatar Charity and QNB also purport to challenge Plaintiffs' proofs of service by asserting that Plaintiffs have not shown that the individuals who signed for receipt of the summonses and complaints (*see* ECF 24-1 (H. Hussain for QNB), ECF 34-1 (A. Abdulla for Qatar Charity)) were "authorized to accept service" on their behalf. However, in order to prove service on a corporation outside of the United States pursuant to Rule 4(f)(2)(C)(ii), Plaintiffs need only demonstrate "that the summons and complaint were delivered to the addressee." Rule 4(l)(2)(B). Defendants' appearances here are proof of that. But, if Defendants seriously intend to raise a factual dispute as to their receipt of the summonses and complaints, Plaintiffs should be permitted to conduct discovery on this issue before responding to the motions to dismiss.

In any event, Defendants' challenges to the sufficiency of service under Rule 4(f)(2)(C)(ii) will be rendered moot when the letters rogatory issued by this Court on January 5, 2021 (ECF 10) and, in the case of Qatar Charity, reissued on December 13, 2021 to reflect an intervening change of address (ECF 33), are executed by the appropriate authority in Qatar. That has not yet occurred at least in part because, as a result of the COVID-19 pandemic, the U.S. Department of State's Office of International Judicial Assistance did not transmit the letters rogatory issued by this Court on January 5, 2021 to the U.S. Embassy on Doha until December 20, 2021. Even without an 11-month delay at the outset, the U.S. Department of State's website advises that "[e]xecution of

---

[2] *See* https://almeezan.qa/LawArticles.aspx?LawTreeSectionID=8075&lawId=2492&language=en (last visited Jan. 21, 2022). As in the United States, "registered mail" in Qatar is a "postal service which allows sender proof of mailing upon request and a signed proof of delivery upon delivery." https://qatarpost.qa/FAQs (last visited Jan. 25, 2022).

letters rogatory may take a year or more."[3]  Plaintiffs are not aware of any reason why service will not ultimately be accomplished pursuant to this Court's letters rogatory.

### Plaintiffs Have Stated Valid Claims Under the ATA, as Revised By JASTA

Plaintiffs have adequately pled secondary liability claims against all Defendants under the Justice Against Sponsors of Terrorism Act ("JASTA"), Pub. L. No. 114-222, 130 Stat. 852 (2016). Congress made clear that "[t]he purpose of [JASTA] is to provide civil litigants with the **broadest possible basis**, consistent with the Constitution of the United States, to seek relief against persons, entities, and foreign countries, wherever acting and wherever they may be found, that have provided material support, **directly or indirectly**, to foreign organizations or persons that engage in terrorist activities against the United States."  JASTA § 2(b) (emphasis added); *see also Estate of Henkin v. Kuveyt Turk Katilim Bankasi, A.S.*, 495 F. Supp. 3d 144, 154 (E.D.N.Y. 2020) (Cogan, J.).  By knowingly providing financial services to further the fundraising efforts of the FTOs Hamas and PIJ, Defendants engaged in precisely the type of conduct that Congress intended JASTA to address.  They conspired to further the interests of the FTOs and aided and abetted the FTOs' pursuit of international terrorism.  *See* 18 U.S.C. § 2333(d); *Henkin,* 495 F. Supp. 3d at 151 (denying bank's motion to dismiss where the complaint alleged that the bank maintained "multiple bank accounts for a notorious Hamas operative, Hamas'[s] most prominent fundraiser in Turkey, and a key Hamas institution in Gaza," and that the bank "understood that it was providing vital financial services to the terrorist organization responsible" for the plaintiffs' deaths).

Defendants are not "relieve[d] of liability for aiding and abetting . . . simply because the terrorist organization intentionally raised funds through an intermediary, an alter ego, or a mere front to engage in violence."  *Henkin,* 495 F. Supp. 3d at 158; *see also, e.g., Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842, 855 (2d Cir. 2021) (JASTA "simply says the defendant must have given 'substantial assistance,'" to an act of international terrorism, not substantial assistance to the principal engaging in an act of international terrorism—*i.e.*, for aiding and abetting liability to attach under JASTA, a defendant's substantial assistance may be "indirect").  Defendants' arguments that their conduct is too remote ignore that they "may be liable under the ATA for aiding and abetting the organization behind the attacks, not only the 'triggerman' or suicide bomber."  *Miller*, 372 F. Supp. 3d at 48; *see also id.* at 46 ("Allegations that a defendant provided money to terrorist organizations, or transferred money that was given to terrorist organizations, strengthen[] the inference that plaintiff's injuries were proximately caused by a defendant's conduct under the ATA.").[4]

---

[3] *See* https://travel.state.gov/content/travel/en/legal/travel-legal-considerations/internl-judicial-asst/obtaining-evidence/Preparation-Letters-Rogatory.html (last visited January 21, 2022).

[4] Masraf's claim that Plaintiffs have not alleged a sufficient nexus between their injuries and Defendants' scheme is also unavailing.  Plaintiffs have alleged that Masraf's knowing support of Hamas and PIJ occurred before, during, and after the time periods of the attacks at issue.  ¶¶ 70, 137.  Moreover, given the fungibility of U.S. currency, courts have declined to require that ATA plaintiffs trace payments to specific attacks.  *See Strauss v. Crédit Lyonnais, S.A.*, 925 F. Supp. 2d 414, 433-34 (E.D.N.Y. 2013) (stating that requiring such proof "would be impossible and would make the ATA practically dead letter").  Courts have also declined to conclude at the motion to dismiss stage that a specific payment's temporal proximity to an attack could not satisfy the

February 2, 2022
Page 6

      Defendants' claims that they lacked the requisite scienter to provide substantial assistance are belied by Plaintiffs' allegations, which leave no doubt that all Defendants acted knowingly and in concert to carry out Qatar's open sponsorship of the FTOs Hamas and PIJ.  Defendants' clear knowledge that they were facilitating the funding of terrorist organizations far exceeds the "general awareness" that JASTA requires.[5]  As the Second Circuit held in *Linde v. Arab Bank, PLC*, 882 F.3d 314, 329 (2d Cir. 2018), JASTA's requirement of general awareness does not require "the specific intent demanded for criminal aiding and abetting culpability" or that defendant "knew of specific attacks at issue when it provided financial services for Hamas." Rather, a plaintiff must only show a defendant's "general[] aware[ness] of his role as part of an overall illegal or tortious activity at the time that he provides the assistance." *Id.; accord, e.g.*, *Lelchook v. Islamic Republic of Iran*, 393 F. Supp. 3d 261, 267 (E.D.N.Y. 2019) (finding Bank Saderat liable for aiding and abetting Hezbollah based on a funding scheme involving Iran, its controlled banks, and Hezbollah because Bank Saderat "was more than generally aware that it was playing a significant role" in financing terrorism and it "knowingly and substantially assisted" that illicit conduct).[6]

      Moreover, courts may only rarely adjudicate fact-intensive scienter issues as matter of law at the motion to dismiss stage.  Indeed, the Second Circuit has instructed that courts should be "'lenient in allowing scienter issues to withstand [even] summary judgment based on fairly tenuous inferences,' because such issues are 'appropriate for resolution by the trier of fact.'" *In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F. 3d 677, 693 (2d Cir. 2009) (quoting *Press v. Chem. Inv. Servs. Corp.*, 166 F.3d 529, 538 (2d Cir. 1999)); *accord, e.g., Linde*, 882 F. 3d at 330 (finding itself "obliged to vacate and remand for a jury to decide that question [of scienter]" and noting that "traditionally a jury resolves questions about a tortfeasor's state of mind.") (citations omitted).

---

causation requirement as a matter of law.  *See Weiss v. Nat'l Westminster Bank PLC*, 453 F. Supp. 2d 609, 632 (E.D.N.Y. 2006) (finding plaintiffs sufficiently alleged proximate cause of terrorist attacks "given the fungible nature of money and the fact that it is difficult to say when the particular dollar given to a terrorist is actually used").  Instead, the payment need only be a "substantial factor in the sequence of responsible causation" and the plaintiff's injury "reasonably foreseeable or anticipated as a natural consequence" of the defendants' scheme. *Miller*, 372 F. Supp. 3d at 46 (quoting *Rothstein v. UBS AG*, 708 F.3d 82, 92 (2d Cir. 2013)).

[5] The autocratic and openly terrorism-supporting Qatari government's influence over all three Defendants should dispel any doubts that the Defendant Qatari banks were knowingly complicit in financing Hamas and PIJ. *See* ¶¶ 7, 65, 68-69, 78-80, 110-24.  If, contrary to the well-pled allegations of the Complaint, the Defendant banks had not been involved in a conspiracy directed by the Qatari government, their antiterrorism policies and procedures would have precluded them from providing financial services to such an open and notorious financer of terrorism as Qatar Charity.  *See, e.g.*, ¶¶ 316-25.

[6] QNB's claim that Plaintiffs' alternative conspiracy allegations are deficient because Plaintiffs fail to allege that Defendants conspired directly with the entities that committed the acts of terrorism is directly contradicted by the Complaint, which specifically states that all Defendants conspired with Hamas and PIJ. ¶ 106.

February 2, 2022
Page 7

  Defendants also offer no valid basis for dismissing Plaintiffs' direct claims under the ATA. Rather, they rely on district court cases that conflict with binding Second Circuit precedent to argue that, to establish a direct claim under the ATA, Plaintiffs must allege that Defendants themselves engaged in "violent or dangerous acts" beyond providing financial services and financing to a terrorist organization. Contrary to Defendants' arguments, Plaintiffs can establish a primary liability claim by alleging that Defendants provided financial services to Qatar Charity, a notorious fundraiser for FTOs, with the requisite knowledge that those funds were destined for the FTOs' coffers. *See Miller*, 372 F. Supp. 3d at 44-45 (providing financial services to members and associates of terrorist organizations may constitute an act of "international terrorism" under the ATA because that illicit conduct may be "dangerous to human life").

  Defendants present the oft-rejected claim that they are entitled to dismissal because they provided "only" "routine banking services." This meritless argument "does not require extended discussion." *Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842, 858 (2d Cir. 2021) (rejecting defendant bank's "routine banking services" defense because the complaint alleged that the bank violated banking regulations, disregarded its internal policies, and subsidized suicide bombers and their families both retrospectively and prospectively). *Linde* held that while routine banking services provided to an organization affiliated with a terrorist organization do not *necessarily* establish causation under the ATA's primary liability provisions, only a jury may normally decide whether the banking services provided by a defendant were "routine." *Linde*, 882 F.3d at 327. In any event, the services the bank Defendants provided here were anything but routine. Rather, the Defendant banks provided financial services to Qatar Charity—a notorious, U.S.-designated supporter of terrorism—as well as to notorious Hamas operatives, as part of a Qatari state-sponsored conspiracy to fund FTO terrorism, as Qatar has done openly for the last decade.

## All Plaintiffs Have Statutory Standing

  Qatar Charity asserts that 3 of the 11 Plaintiffs lack standing because they are not U.S. nationals. However, in this Circuit it remains an open question whether survivors and heirs of U.S. citizens killed by acts of international terrorism must themselves by U.S. citizens. *See Henkin*, 495 F. Supp. 3d at 152-53 (Cogan, J.) ("18 U.S.C. § 2333(a) contains no [such] requirement") (internal quotation omitted).

  Accordingly, Plaintiffs will oppose Defendants' motions to dismiss in their entirety. Plaintiffs respectfully request that the Court establish a briefing schedule that provides for Plaintiffs to file their memorandum of law in opposition after the completion of expedited jurisdictional discovery.

                Respectfully submitted,

                /s/ Patrick L. Rocco

                Patrick L. Rocco

CC: All counsel of record (via ECF)