UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

CHAIM DOV PRZEWOZMAN, *et al.*,

                              Plaintiffs,

       - against -

QATAR CHARITY, *et al.*,

                            Defendants.

1:20-cv-06088 (NGG) (RLM)

 

**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANT MASRAF AL RAYAN'S MOTION TO DISMISS THE COMPLAINT**

 

PILLSBURY WINTHROP SHAW PITTMAN LLP
31 West 52nd Street
New York, NY 10019-6131
Tel.:   (212) 858-1000
Fax:   (212) 858-1500


February 18, 2022

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................................1

STATEMENT OF FACTS .....................................................................................2

    A.    MAR Is a Foreign Bank With No U.S. Branches or Offices.................................2

    B.    The Allegations of Transactions Involving MAR End in 2015 and Plaintiffs' Injuries Were Sustained Four Years Later in 2019................................2

ARGUMENT .........................................................................................................3

I.    THE COURT LACKS PERSONAL JURISDICTION OVER MAR REQUIRING DISMISSAL UNDER RULE 12(B)(2) ...........................................................3

    A.    Plaintiffs Cannot Satisfy New York's Long-Arm Statute ......................................5

        1.    Plaintiffs Fail to Allege Purposeful Availment of the New York Forum..............................................................................................5

        2.    Plaintiffs Fail to Establish an Articulable Nexus Between Their Causes of Action and the Transactions Alleged Against MAR..................8

    B.    Plaintiffs Fail to Satisfy Constitutional Requirements of Minimum Contacts and Reasonableness ............................................................................10

II.    DISMISSAL FOR IMPROPER SERVICE UNDER RULE 12(B)(5) IS PROPER FOR FAILURE TO COMPLY WITH THE FEDERAL RULES OR QATARI LAW ....12

III.    PLAINTIFFS FAIL TO STATE A CLAIM FOR PRIMARY LIABILITY UNDER THE ATA BECAUSE MAR'S BANKING SERVICES ARE NOT ACTS OF INTERNATIONAL TERRORISM PROXIMATELY CAUSING PLAINTIFFS' INJURIES, REQUIRING DISMISSAL UNDER RULE 12(B)(6) ..................................13

    A.    MAR's Alleged Commercial Banking Activity Is Not an Act of International Terrorism Involving Violence or Intending to Intimidate or Coerce ................................................................................................14

    B.    Plaintiffs Fail to Plausibly Allege Any Facts Which Support an Inference that MAR's Financial Services Were the Proximate Cause of Plaintiffs' Injuries ............................................................................................16

    C.    Plaintiffs Fail to Plausibly Allege Facts Sufficient to Assert that MAR Had the Requisite *Mens Rea* for Primary Liability under the ATA .............................18

IV.    PLAINTIFFS FAIL TO PLAUSIBLY ALLEGE SECONDARY LIABILITY UNDER JASTA, REQUIRING DISMISSAL UNDER RULE 12(B)(6) ........................19

    A.    Plaintiffs Fail to Meet the Standards for Aiding and Abetting Liability ...............20

        1.    No Allegations Establish MAR's "General Awareness" of Illegal Acts ..................................................................................................20

            a.    Pre-2008 Allegations Do Not Provide MAR with

i

Knowledge ..................................................................................23

       b.    Information Unavailable Until After the Transactions Cannot Impute Knowledge Upon MAR .......................................26

       c.    Allegations of Control by Qatar Are a Red Herring ....................26

     2.    Plaintiffs Cannot Allege that MAR "Knowingly and Substantially" Assisted in the Principal Violation ...........................................28

   B.    Plaintiffs Fail to Allege that MAR Knowingly Entered into an Agreement to Support Conspiracy Liability Under 18 U.S.C. § 2333(d) ...............................31

V.    FOUR PLAINTIFFS LACK STATUTORY STANDING FOR ATA OR JASTA .........32

VI.    JURISDICTIONAL DISCOVERY IS NOT WARRANTED ...........................................33

CONCLUSION..........................................................................................35

# TABLE OF AUTHORITIES

**Page(s)**

<u>Cases</u>

*Al Rushaid v. Pictet & Cie*,
    28 N.Y.3d 316 (2016) ..............................................................................................8

*Alexander v. Porter*,
    No. 13-cv-6834 (SLT) (JO), 2014 WL 7391683 (E.D.N.Y. Dec. 29, 2014) ..........................34

*Ansbacher, et. al. v. Qatar Charity, et.al.*,
    Jerusalem District Court, CC 21387-06-21, November 10, 2021...........................................11

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)...........................................................................................3, 16

*Averbach v. Cairo Amman Bank*,
    No. 19-cv-0004 (GHW) (KHP), 2020 WL 486860 (S.D.N.Y. Jan. 21, 2020),
    *report and recommendation adopted sub nom. Averbach ex rel. Averbach v.
    Cairo Amman Bank*, No. 19-cv-00004 (GHW), 2020 WL 1130733 (S.D.N.Y.
    Mar. 9, 2020)....................................................................................................7, 28

*Averbach ex rel. Averbach v. Cairo Amman Bank*,
    No. 19-cv-00004 (GHW), 2020 WL 1130733 (S.D.N.Y. Mar. 9, 2020)...........................7, 32

*Bartlett v. Société Générale de Banque Au Liban SAL*,
    No. 19-cv-00007 (CBA) (VMS), 2020 WL 7089448 (E.D.N.Y. Nov. 25, 2020) .........6, 14, 22

*Berdeaux v. OneCoin Ltd.*,
    19-cv-4074 (VEC), 2021 WL 4267693 (S.D.N.Y. Sept. 20, 2021)..............................7, 8, 29

*Boyer Works USA, LLC v. Rubik's Brand Ltd.*,
    No. 21-cv-7468 (AKH), 2022 WL 355398 (S.D.N.Y. Feb. 7, 2022) ......................................34

*Cabrera v. Black & Veatch Special Projects Corp.*,
    No. 19-cv-3833 (EGS) (ZMF), 2021 WL 3508091 (D.D.C. July 30, 2021) .....................9, 17

*In re Chiquita Brands Int'l, Inc.*,
    284 F. Supp. 3d 1284 (S.D. Fla. Jan. 3, 2018)...............................................................16, 18

*Clean Coal Techs., Inc. v. Leidos, Inc.*,
    377 F. Supp. 3d 303 (S.D.N.Y. 2019)..............................................................................4

*Cmty. Fin. Grp., Inc. v. Stanbic Bank Ltd.*,
    No. 14-cv-5216 (DLC), 2015 WL 4164763 (S.D.N.Y. July 10, 2015) ....................................5

*Daou v. BLC Bank, S.A.L.*,
  No. 20-cv-4438 (DLC), 2021 WL 1338772 (S.D.N.Y. Apr. 9, 2021)...............................6, 10

*EM Ltd. v. Banco Central De La República Argentina*,
  800 F.3d 78 (2d Cir. 2015)...........................................................................................27

*Freeman v. HSBC Holdings PLC ("Freeman I")*,
  413 F. Supp. 3d 67 (E.D.N.Y. 2019) .............................................................10, 13, 14, 15

*Gill v. Arab Bank, PLC*,
  893 F. Supp. 2d 474 (E.D.N.Y. 2012) .............................................................................16

*Gill v. Arab Bank, PLC*,
  893 F. Supp. 2d 542 (E.D.N.Y. 2012) ...............................................................................9

*Halberstam v. Welch*,
  705 F.2d 472 (D.C. Cir. 1983) ...............................................................................20, 28

*Harris v. Mills*,
  572 F.3d 66 (2d Cir. 2009)...............................................................................................2

*Estate of Henkin v. Kuveyt Turk Katilim Bankasi, A.S.*,
  495 F. Supp. 3d 144 (E.D.N.Y. 2020) .....................................................................23, 26, 32

*Honickman v. BLOM Bank SAL*,
  6 F.4th 487 (2d Cir. 2021) ................................................................................... *passim*

*Int'l Shoe Co. v. Wash*,
  326 U.S. 310 (1945)...........................................................................................................11

*Jazini v. Nissan Motor Co., Ltd.*,
  148 F.3d 181 (2d Cir. 1998)...............................................................................................4

*Jerusalem NY Enters. LLC v. Huber Erectors & Hoisting, LLC*,
  No. 21-cv-376 (MKB), 2021 WL 5827934 (E.D.N.Y. Dec. 8, 2021) ....................................33

*Kaplan v. Jazeera*,
  No. 10-cv-5298, 2011 WL 2314783 (S.D.N.Y. June 7, 2011) ..............................................16

*Kaplan v. Lebanese Canadian Bank, SAL*,
  405 F. Supp. 3d 525 (S.D.N.Y. 2019), *vacated and remanded on other* grounds,
  999 F.3d 842 (2d Cir. 2021)...............................................................................................31

*Kaplan v. Lebanese Canadian Bank, SAL*,
  999 F.3d 842 (2d Cir. 2021)................................................................................... *passim*

*Khan v. Khan*,
  360 F. App'x 202 (2d Cir. 2010) ........................................................................................12

iv

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL ("Licci II")*,
    673 F.3d 50 (2d Cir. 2012)......................................................................14

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL ("Licci IV")*,
    732 F.3d 161 (2d Cir. 2013).............................................................5, 8, 11

*Linde v. Arab Bank, PLC ("Linde I")*,
    882 F.3d 314 ...........................................................................15, 18, 28

*Mednik v. Specialized Loan Serving, LLC*,
    No. 20-cv-427 (MKB), 2021 WL 707285 (E.D.N.Y. Feb. 23, 2021) ..............33, 34

*Miller v. Arab Bank, PLC*,
    372 F. Supp. 3d 33 (E.D.N.Y. 2019) .................................................15, 22, 29

*Milton v. Wazed*,
    No. 16-cv-4542 (MKB) (JO), 2018 WL 2074179 (E.D.N.Y. Mar. 30, 2018).........34, 35

*Nabulsi v. Nahyan*,
    No. H-06-2683, 2008 WL 1924235 (S.D. Tex. Apr. 29, 2008)........................12

*In re NYSE Specialists Secs. Litig.*,
    503 F.3d 89 (2d Cir. 2007).................................................................2

*O'Sullivan v. Deutsche Bank AG*,
    No. 17-cv-8709 (LTS) (GWG), 2019 WL 1409446 (S.D.N.Y. Mar.
    28, 2019) ............................................................................25, 31

*Ofisi v. BNP Paribas, S.A.*,
    278 F. Supp. 3d 84 (D.D.C. 2017), *order vacated in part on other grounds*,
    285 F. Supp. 3d 240 (D.D.C. 2018) ...................................................18, 19

*Rosenberg v. Lashkar-e-Taiba*,
    No. 10-cv-5381 (DLI) (CLP), 2016 WL 11756917 (E.D.N.Y. July 5, 2016),
    *report and recommendation adopted as modified*, No. 10-cv-5381 (DLI) (CLP),
    2017 WL 11647006 (E.D.N.Y. Mar. 31, 2017).........................................32

*Rosenberg v. Lashkar-e-Taiba*,
    No. 10-cv-5381 (DLI) (CLP), 2017 WL 11647006 (E.D.N.Y. Mar. 31, 2017) ..............13, 32

*Rothstein v. UBS AG*,
    708 F.3d 82 (2d Cir. 2013), *superseded by statute on other grounds,* JASTA,
    Pub. L. No. 114-222, 130 Stat. 852, 854 (2016)....................................16, 17, 18

*S. Cherry St., LLC v. Hennessee Grp. LLC*,
    573 F.3d 98 (2d Cir. 2009)..............................................................35

*Schansman v. Sberbank of Russia PJSC*,
No. 19-cv-2985 (ALC), 2021 WL 4482172 (S.D.N.Y. Sept. 30, 2021)................................15

*Siegel v. HSBC N. Am. Holdings, Inc.*,
933 F.3d 217 (2d Cir. 2019).........................................................................28, 30, 31

*Spetner v. Palestine Inv. Bank*,
495 F. Supp. 3d 96 (E.D.N.Y. 2020) ....................................................................4

*Strauss v. Crédit Lyonnais, S.A.*,
175 F. Supp. 3d 3 (E.D.N.Y. 2016) ..............................................................8, 9, 10

*Tamam v. Fransabank Sal*,
677 F. Supp. 2d 720 (S.D.N.Y. 2010)..................................................................8, 33

*In re Terrorist Attacks on Sept. 11, 2001*,
714 F.3d 118 (2d Cir. 2013)..................................................................................18

*In re Terrorist Attacks on Sept. 11, 2001*,
298 F. Supp. 3d 631 (S.D.N.Y. 2018)......................................................................27

*Vasquez v. Hong Kong and Shanghai Banking Corp., Ltd.*,
477 F. Supp. 3d 241 (S.D.N.Y. 2020)....................................................................6, 7

*Waldman v. Palestine Liberation Org.*,
835 F.3d 317 (2d Cir. 2016)................................................................................5, 11

*Weiss v. Nat'l Westminster Bank PLC*,
453 F. Supp. 2d 609 (E.D.N.Y. 2006) ......................................................................9

*Weiss v. Nat'l Westminster Bank PLC*,
768 F.3d 202 (2d Cir. 2014)....................................................................................15

*Weiss v. Nat'l Westminster Bank PLC*,
381 F. Supp. 3d 223 (E.D.N.Y. 2019) ......................................................................15

*Zapata v. HSBC Holdings PLC*,
414 F. Supp. 3d 342 (E.D.N.Y. 2019) ...........................................................15, 16, 17

<u>Constitution</u>

United States Constitution
Fourteenth Amendment ...........................................................................................11

<u>Statutes and Codes</u>

United States Code
    18 U.S.C. § 2331(1) ...............................................................................14, 15
    18 U.S.C. § 2333(a) ......................................................................1, 13, 14, 32
    18 U.S.C. § 2333(d) ..................................................................................31
    18 U.S.C. § 2333(d)(2) ......................................................................1, 19, 20
    18 U.S.C. § 2334(a) ...................................................................................4
    18 U.S.C. § 2339A .....................................................................13, 14, 18, 19
    18 U.S.C. § 2339B ....................................................................................18
    18 U.S.C. § 2339B(a)(1) ............................................................................13

New York Civil Practice Law and Rules
    Section 302(a)(1) ...........................................................................4, 5, 8, 10
    Section 302(a)(2) .......................................................................................4

Qatari Civil & Commercial Procedures Law (Law No. 13 of 1990)
    Article 10 ...............................................................................................13
    Article 11 ...........................................................................................12, 13

<u>Rules and Regulations</u>

Federal Rules of Civil Procedure
    Rule 4(f) ...............................................................................................12
    Rule 4(f)(1) ............................................................................................12
    Rule 4(f)(2)(C)(ii) ....................................................................................12
    Rule 4(h)(2) ...........................................................................................12
    Rule 4(k)(2) .............................................................................................4
    Rule 8 ...................................................................................................34
    Rule 11 ...................................................................................................4
    Rule 12(b)(2) ......................................................................................3, 34
    Rule 12(b)(5) ..........................................................................................12
    Rule 12(b)(6) ......................................................................................13, 19

<u>Other Authorities</u>

*Antiterrorism Act of 1990:  Hearing on S. 2465 Before the Subcomm. on Courts*
    *& Admin. Practice of the Comm. on the Judiciary of the United States*
    *Senate*, 101st Cong. 46 (1990) (statements of Sen. Strom Thurmond and
    Lloyd Green, counselor, U.S. Department of Justice) .............................................32

Antiterrorism Act of 1990, S. 2465, 101st Cong. § 2(a) (1990) ...................................32

U.S. Department of Defense, *'Major Non-NATO Ally' Designation Will Enhance*
    *U.S., Qatar Relationship*, Jan. 31, 2022,
    https://www.defense.gov/News/News-Stories/Article/Article/2917336/major-
    non-nato-ally-designation-will-enhance-us-qatar-relationship/.............................. 34

## PRELIMINARY STATEMENT

In May 2019, Plaintiffs were tragically injured in Israel following a two-day bombing spree by the terrorist groups known as Hamas and the Palestinian Islamic Jihad ("PIJ").  Now, Plaintiffs assert this action under the Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2333(a), *et seq.*, and, as amended, under the Justice Against Sponsors of Terrorism Act ("JASTA"), 18 U.S.C. § 2333(d)(2), *et seq.,* not against the terrorists who caused the attack, but rather against Masraf Al Rayan ("MAR") – a foreign financial institution based in Doha, Qatar with no presence in the United States.  The crux of Plaintiffs' theory is that *four years before the attack*, no later than 2015, MAR materially supported terrorism by providing correspondent banking services to one customer, Qatar Charity, to obtain U.S. dollars and transmit those funds to Qatar Charity's local branches in Palestine, and those local branches thereafter allegedly transferred an unspecified "substantial portion" of funds to Hamas and unidentified "supposed charities," which allegedly funded the rocket attacks that injured Plaintiffs four years later in 2019.

The devastation for which Hamas and PIJ are responsible is indisputably tragic.  However, Plaintiffs have no claims against MAR.  Simply put, ordinary banking transfers in 2015 for one charitable organization are not acts of international terrorism nor are they the proximate cause of rocket attacks being fired by terrorist organizations four years later in 2019 such that Plaintiffs can plausibly allege a claim for primary liability under the ATA.  Equally flawed are Plaintiffs' claims for secondary liability under JASTA using aiding and abetting and conspiracy theories because the Complaint does not allege any set of publicly available facts from which MAR could be imputed to be "generally aware" that transacting with Qatar Charity – which has never been designated a Specially Designated Global Terrorist ("SDGT"), a Foreign Terrorist Organization ("FTO"), or otherwise sanctioned by the United States – was akin to transacting with Hamas and PIJ.  Nor do

1

Plaintiffs allege any agreement with Hamas or PIJ.  The sheer implausibility of Plaintiffs' allegations warrant dismissal with prejudice, as does Plaintiffs' failure to set forth a *prima facie* case of personal jurisdiction and proper service.

## STATEMENT OF FACTS[1]

### A.      MAR Is a Foreign Bank With No U.S. Branches or Offices

Plaintiffs direct their claims for injuries caused by rocket attacks not at those who fired the rockets, but at MAR, a foreign bank publicly held and headquartered in Doha, Qatar and regulated by the Qatar Central Bank.  (Compl. ¶¶ 66-67).  MAR has no U.S. branch or office.  (*Id.* ¶ 158).  As a financial institution, MAR engages in banking, financing, and investing activities for all of its customers.  (*Id.* ¶ 67).  Having no nexus to the United States, Plaintiffs focus on a single, ordinary financial activity – allegedly engaging in U.S. dollar transactions with correspondent banks in New York for one customer.  (*Id.* ¶¶ 132(c)-(d), 163-69).

That customer, Qatar Charity, is not alleged to be an SDGT or an FTO.  (*See, e.g., id.* ¶¶ 3, 7, 85).  Plaintiffs themselves recognize that Qatar Charity is a well-known charity providing humanitarian services in the Middle East, (*id.* ¶ 47), and that Qatar Charity was using "its accounts at Masraf Al Rayan to solicit contributions from donors, purportedly for humanitarian purposes such as assisting Syrian refugees."  (Compl. ¶ 148).[2]

### B.      The Allegations of Transactions Involving MAR End in 2015 and Plaintiffs' Injuries Were Sustained Four Years Later in 2019

While the year during which MAR's alleged misconduct is alleged to have begun changes

---

[1]  For purposes of this motion, the facts as alleged in the Complaint are assumed true.  *See In re NYSE Specialists Secs. Litig.*, 503 F.3d 89, 91 (2d Cir. 2007).  However, "that tenet is inapplicable to legal conclusions, and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (internal quotation marks and citation omitted).

[2]  MAR incorporates by reference Defendant Qatar Charity's Memorandum of Law in Support of Its Motion to Dismiss the Complaint, which demonstrates that Qatar Charity is and was a legitimate charitable organization, well known for its humanitarian efforts.

throughout the almost 400 paragraphs of the Complaint, Plaintiffs' allegations repeatedly identify 2015 as the end date. (*See, e.g., id.* ¶ 106 ("From at least 2011 through 2015 . . ."); *id.* ¶ 128 ("From March 1, 2015 until September 7, 2015 alone . . ."); *id.* ¶ 132(c) ("Between 2009 and 2015 . . .")). In addition, Qatar Charity's operations allegedly "ceased in July 2015," necessarily ceasing transfers to Hamas and PIJ as well, and Plaintiffs make no non-conclusory allegations that MAR committed any alleged misconduct if and when Qatar Charity's operations resumed. (*Id.* ¶ 141).[3]

While the allegations against MAR end in 2015, the injuries sustained by Plaintiffs occurred almost four years later. Tragically, Pinches Menachem Przewozman was killed during "a two-day bombing spree that Hamas and PIJ commenced on May 4, 2019." (*Id.* ¶ 27). Crucially, Plaintiffs do not allege that MAR was aware of the attack, provided funding to Hamas and PIJ for the attack, or that it was involved in the attack. Nor does the Complaint allege any agreement between MAR and Hamas or PIJ to engage in this attack. Similarly, Plaintiffs do not allege *Qatar Charity* was aware of the attack, conspired to commit the attack, or was otherwise involved in the attack. Instead, Plaintiffs leap to the conclusory allegation that Plaintiffs' injuries are "a direct and proximate result of the material support and substantial assistance that Defendants knowingly provided" four years earlier. (*Id.* ¶ 382). But the Complaint is bereft of any facts tying MAR's alleged actions ending in 2015 to injuries in 2019 and thus, dismissal of the action is warranted.

## ARGUMENT

## I.   THE COURT LACKS PERSONAL JURISDICTION OVER MAR REQUIRING DISMISSAL UNDER RULE 12(b)(2)

Although the Complaint conclusorily alleges that MAR is subject to jurisdiction under New

---

[3] Plaintiffs plead that "Masraf Al Rayan continues to provide [financial] services to Qatar Charity to this day," but they allege no facts from which this conclusory statement can be inferred. (*Id.* ¶ 70). Nor is there any allegation that such services have any nexus either to New York or to the attacks at issue. Such "threadbare recitals" are insufficient to impute personal jurisdiction or ATA/JASTA liability. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). All of Plaintiffs' allegations of misconduct against MAR are plagued by the same legal defect.

York's long-arm statute[4] due to its correspondent banking activity (Compl. ¶ 23), Plaintiffs have not alleged facts upon which it would be appropriate for this Court to exercise jurisdiction over MAR, a foreign bank with no presence in the United States, whom Plaintiffs do not allege (in a conclusory manner or otherwise) availed itself of the New York forum *at all* after 2015.[5]   And with respect to alleged conduct prior to 2015, the conduct is far too attenuated and generalized to plead any connection between MAR and New York, and insufficient to plead that MAR's correspondent banking activity in 2015 gave rise to the attack in 2019 that injured Plaintiffs.

Plaintiffs must present a *prima facie* case that (1) the New York long-arm statute and (2) U.S. constitutional requirements have been satisfied.  *See Spetner v. Palestine Inv. Bank*, 495 F. Supp. 3d 96, 108 (E.D.N.Y. 2020).  *Prima facie* jurisdiction has not been established unless a plaintiff pleads "in good faith, *see* Fed. R. Civ. P. 11, legally sufficient allegations of jurisdiction." *Jazini v. Nissan Motor Co., Ltd.*, 148 F.3d 181, 184 (2d Cir. 1998) (citations omitted).  Courts accept jurisdictional allegations as true for purposes of a motion to dismiss, but not conclusory allegations.  *See Spetner*, 495 F. Supp. 3d at 112 (rejecting "Plaintiffs' key contentions" that were "styled as factual allegations but mostly amount to legal conclusions," including allegations that defendant "purposefully and knowingly directed its agents to use correspondent bank accounts in New York") (internal quotation marks and citations omitted).  Plaintiffs have failed to establish either "a statutory basis for personal jurisdiction" or that "the exercise of personal jurisdiction"

---

[4] Under New York's Long-Arm statute, a court may exercise personal jurisdiction over "any non-domiciliary . . . who in person or through an agent . . . *transacts any business within the state* . . . ." N.Y. C.P.L.R. § 302(a)(1) (emphasis added).  Plaintiffs contend that correspondent banking is transacting business in New York under Section 302(a)(1). (*See* Compl. ¶ 23).  Plaintiffs do not allege jurisdiction under Section 302(a)(2), nor could they, because they do not allege the "physical commission of the tortious act in New York." *Clean Coal Techs., Inc. v. Leidos, Inc.*, 377 F. Supp. 3d 303, 314 (S.D.N.Y. 2019) (citation omitted).

[5] The Complaint alleges two other bases for personal jurisdiction: (i) 18 U.S.C. § 2334(a), requiring proper service in the United States of the Complaint, as provided in the ATA, and (ii) minimum contacts with the United States under Fed. R. Civ. P. 4(k)(2).  However, Plaintiffs have not attempted to serve MAR in the United States, and Plaintiffs do not allege any contacts, sufficient or not, with any state besides New York, rendering Rule 4(k)(2) inapplicable.

comports "with constitutional due process principles." *Waldman v. Palestine Liberation Org.*, 835 F.3d 317, 327 (2d Cir. 2016) (internal quotation marks and citations omitted).

### A.    Plaintiffs Cannot Satisfy New York's Long-Arm Statute

Under Section 302(a)(1), New York courts employ a two-pronged test to determine whether correspondent banking amounts to "transacting business": Plaintiffs must demonstrate that the foreign bank's maintenance and use of the correspondent account is "purposeful" and also that a "nexus" exists between the plaintiff's claims and the foreign banks' alleged use of the account. *See Licci ex rel. Licci v. Lebanese Canadian Bank, SAL, ("Licci IV")*, 732 F.3d 161, 168-69 (2d Cir. 2013). Here, Plaintiffs do not sufficiently allege either.

### 1.    Plaintiffs Fail to Allege Purposeful Availment of the New York Forum

Plaintiffs' allegations of purposeful availment – all of which end in 2015 – are legally deficient because they lack specificity and are conclusory. Plaintiffs' allegations fail to plead MAR's "frequen[t] and deliberate . . . use of its correspondent account." *Id.* at 168 (citations omitted). Nor do Plaintiffs allege "an established course of dealing." *Cmty. Fin. Grp., Inc. v. Stanbic Bank Ltd.*, No. 14-cv-5216 (DLC), 2015 WL 4164763, at *4-5 (S.D.N.Y. July 10, 2015) (dismissing complaint for lack of personal jurisdiction and finding that plaintiffs alleged "only one connection between this case and New York," which was not purposeful).

There are only two references in the Complaint that attempt specificity as to MAR's alleged misconduct. First, Plaintiffs allege that "from March 1, 2015 until September 7, 2015 alone, Defendants conspired to use Masraf Al Rayan to transfer over $28 million" in donations from Qatar Charity. (Compl. ¶ 128). But significantly, Plaintiffs do not allege *that these transfers touched correspondent accounts in New York*. Nor do Plaintiffs allege any other details to support purposeful availment, such as when MAR allegedly made these transfers to New York, to whom the transfers were made, how often these transfers were made, the amounts of such transfers. (*Id.*)

Second, Plaintiffs allege that "[b]etween 2009 and 2015, Masraf Al Rayan arranged for currency exchange transactions that involved converting in excess of $3.5 million in USD *and* Euros held by Qatar Charity in Doha into Israeli shekels and moving those funds to Qatar Charity in the Palestinian Territories." (Compl. ¶ 132(c) (emphasis added)). They further allege that the "USD used in connection with those transactions passed through Bank of New York Mellon in New York and on to the Qatar Charity accounts held at either the Bank of Palestine or the Islamic Bank in Ramallah." (*Id.* ¶ 132(d)). Plaintiffs fail to identify what *amount* or *frequency* of those funds were actually U.S. dollars versus Euros, meaning their allegation may amount to only a *de minimis* amount of dollars passing through New York. *See Daou v. BLC Bank, S.A.L.*, No. 20-cv-4438 (DLC), 2021 WL 1338772, at *8-9 (S.D.N.Y. Apr. 9, 2021) (dismissing complaint where "[p]laintiffs point to only four instances in which [defendant] used its New York correspondent account in connection with the plaintiffs"); *cf. Bartlett v. Société Générale de Banque Au Liban SAL*, No. 19-cv-00007 (CBA) (VMS), 2020 WL 7089448, at *5 (E.D.N.Y. Nov. 25, 2020) (finding personal jurisdiction where "specific transactions . . . number in the dozens and total millions of dollars"). In addition, Plaintiffs plead that the funds were converted "in Doha into Israeli shekels." (Compl. ¶ 132(c)). The sheer implausibility of using correspondent banking in New York to obtain U.S. dollars only to transfer those funds to local branches of Qatar Charity to obtain Israeli shekels further underscores the conclusory nature of the allegations for personal jurisdiction, directly undermining Plaintiffs' allegation that Hamas and PIJ needed "coveted" dollars – and not shekels – "to conduct their terrorist operations." (*Id.* ¶¶ 5, 157).

Moreover, the Complaint is careful to avoid pleading that MAR, who was not the recipient of the alleged funds, *chose* New York as a forum; instead, it alleges just that the transactions "passed through" New York. *See Vasquez v. Hong Kong and Shanghai Banking Corp., Ltd.*, 477

F. Supp. 3d 241, 259 (S.D.N.Y. 2020) (dismissing complaint because "there is no evidence that [defendant] directed the funds to be deposited or controlled the route of the plaintiffs' funds through the correspondent account."); *cf. Averbach v. Cairo Amman Bank*, No. 19-cv-0004 (GHW) (KHP), 2020 WL 486860, at *7 (S.D.N.Y. Jan. 21, 2020) (internal quotation marks and citations omitted) (finding purposeful availment where complaint alleged the bank used money transferred into its correspondent accounts to then credit money to its customers at least twenty-three times, which was volitional activity constituting purposeful use, and explaining that "affirmatively act[ing] on" a customer's deposit constitutes purposeful availment), *report and recommendation adopted sub nom. Averbach ex rel. Averbach v. Cairo Amman Bank*, No. 19-cv-00004 (GHW), 2020 WL 1130733 (S.D.N.Y. Mar. 9, 2020). [6]

The remaining allegations as to MAR's alleged connections with New York are conclusory and vague, *e.g.*, (Compl. ¶ 163) ("At all times relevant to Plaintiffs' claims, Masraf Al Rayan maintained a direct or indirect correspondent banking relationship with Bank of New York Mellon, and perhaps other U.S. banks."), or simply state legal conclusions, *e.g.*, (Compl. ¶ 24) ("Specifically, in furtherance of their conspiracy, Qatar Charity and Masraf Al Rayan . . . knowingly effectuated U.S. dollar-denominated funds transfers on behalf of Qatar Charity through the Bank of New York Mellon in New York.").  As a result, these allegations cannot be credited. *See Berdeaux v. OneCoin Ltd.*, 19-cv-4074 (VEC), 2021 WL 4267693, at *10 (S.D.N.Y. Sept. 20, 2021) ("Although Plaintiffs allege that [defendants] 'directed their money laundering efforts' at BNYM, which is headquartered in New York and does business here, that wholly conclusory allegation is patently inadequate . . . .").

---

[6] Plaintiffs also allege that "[i]n addition to those funds, between 2011 and 2013, Qatar Charity moved $25 million from Doha to the banned Qatar Charity entity operating in the Gaza Strip (*Id.* ¶ 132(f)).  This allegation, however, contains no factual allegations as to MAR or any references of *purposefully* choosing New York.  (*Id.* ¶ 132(g)).

If deemed sufficient, the Complaint's jurisdictional allegations as to MAR could be used to assert jurisdiction against virtually any foreign financial institution given the ubiquity of correspondent banking today; instead, the "use of the correspondent account" must be "repeated" and used "as an instrument to achieve the wrong complained of in this suit." *Licci IV*, 732 F.3d at 173; *see also Berdeaux*, 2021 WL 4267693, at *12 ("[T]he mere use of a correspondent account does not subject [the defendant] to jurisdiction under Section 302(a)(1)."). Plaintiffs' allegations thus fail to meet a *prima facie* case of purposeful availment of New York.

## 2.    Plaintiffs Fail to Establish an Articulable Nexus Between Their Causes of Action and the Transactions Alleged Against MAR

Even if Plaintiffs sufficiently alleged that MAR purposefully availed itself of the New York forum in connection with its correspondent banking activity (they do not), Plaintiffs fail to allege that MAR's correspondent banking activity gave rise to Plaintiffs' injuries. A *prima facie* pleading of personal jurisdiction requires "an articulable nexus or a substantial relationship between transactions occurring within the state and the cause of action sued upon." *Tamam v. Fransabank Sal*, 677 F. Supp. 2d 720, 726 (S.D.N.Y. 2010) (dismissing claim) (internal quotation marks and citations omitted); *see also Al Rushaid v. Pictet & Cie*, 28 N.Y.3d 316, 323 & n.4 (2016) (citation omitted) (explaining that determination that frequency of business transactions is "sufficient" for purposeful availment is limited by the "'requirement that the cause of action arise from the very transaction or transactions which are relied upon to provide the contact with the forum.'").

Courts tend to find a nexus where plaintiffs allege both that the dates of the transfers and injuries overlapped *and* that defendants had contemporaneous knowledge of the tie between its clients and terrorist activity. *Strauss v. Crédit Lyonnais, S.A.*, 175 F. Supp. 3d 3, 20-23 & n.9 (E.D.N.Y. 2016) (finding a nexus established when most transfers overlapped with the attacks and plaintiffs alleged defendant knew that the funds it transferred were being used to support a terrorist

organization).  At the pleading stage, a nexus is "too attenuated if" MAR executed the transfers "at a time far removed from the attacks that caused Plaintiffs' injuries" or fail to "show that [MAR] knew or was deliberately indifferent to the fact that [the bank customer] was financially supporting terrorist organizations."  *Id*. at 3, 20-21 (internal quotation marks and citation omitted).  Here, Plaintiffs allege neither temporal overlap nor contemporaneous knowledge.

First, Plaintiffs do not allege any transfers involving New York occurred after 2015, almost four years before the attacks.  *See*, *e.g.*, *Compl*. ¶¶ 106, 128, 132(c), 141.  Plaintiffs rely on *Weiss v. Nat'l Westminster Bank PLC*, 453 F. Supp. 2d 609, 632 (E.D.N.Y. 2006), for the assertion that "[c]ourts have [] declined to conclude at the motion to dismiss stage that a specific payment's temporal proximity to an attack could not satisfy the causation requirement as a matter of law." (ECF No. 44 at 5-6 n.4).  However, the court in *Weiss* specifically limited that finding to "an attack that occurred *less than two years*" after the transactions in question, a gap half the size of the gap at issue here.  *Weiss*, 453 F. Supp. 2d at 632 (emphasis added).  Moreover, in the ATA context, courts since *Weiss have* found as a matter of law that a lack of temporal proximity to an attack can negate the allegation that banking activity caused the attack at issue.  *See*, *e.g.*, *Cabrera v. Black & Veatch Special Projects Corp.*, No. 19-cv-3833 (EGS) (ZMF), 2021 WL 3508091, at *24 (D.D.C. July 30, 2021) (granting motion to dismiss ATA claims that "do not draw a sufficient temporal nexus between the alleged wrongdoing and Plaintiffs' injuries").[7]

Courts have also dismissed non-ATA complaints claiming jurisdiction on the basis of

---

[7] Other cases are consistent with this understanding of the "temporal proximity" requirement.  In *Gill*, the court granted summary judgment for a bank-defendant because "there is no evidence [the transfers] were in close temporal proximity to the shooting that injured plaintiff," and "no additional evidence has been presented from which a reasonable juror could infer that the Bank's support—whether intentional or not—in 2004 reflected on the Bank's state of mind with respect to actions that might affect an American adversely in 2008."  *Gill v. Arab Bank, PLC*, 893 F. Supp. 2d 542, 563 (E.D.N.Y. 2012).  Here, it is implausible that a rocket attack in 2019 by Hamas and PIJ was a foreseeable consequence to MAR of its provision of banking services to Qatar Charity in 2015 or earlier.

Section 302(a)(1) for lack of a temporal nexus. *See, e.g.*, *Daou*, 2021 WL 1338772, at *8 (citation omitted) (finding no "articulable nexus" or "substantial relationship" where "[t]he gravamen of the plaintiffs' complaint is CL Bank's breach of its contract with the plaintiffs . . . in 2019. But CL Bank's use of the New York correspondent accounts in conjunction with the plaintiffs occurred between 2016 and 2018, in advance of the events that prompted the plaintiffs' complaint."). Thus, Plaintiffs incorrectly submit that "a specific payment's temporal proximity to an attack could not satisfy the causation requirement as a matter of law." (ECF No. 44 at 5-6 n.4). Here, it is implausible that, in 2015, MAR could "foresee being haled into court" in New York for rocket attacks in Israel in 2019 when it allegedly executed ordinary banking transactions for a charitable organization. *Id*. at 170 (citation omitted).

Second, Plaintiffs fail to allege that MAR "knew or was deliberately indifferent to the fact that" Qatar Charity "was financially supporting terrorist organizations." *Strauss*, 175 F. Supp. 3d at 21 (internal quotation marks and citation omitted). As discussed *infra* § IV.A.1, Plaintiffs have failed to allege that MAR could have inferred that providing banking services to Qatar Charity was essentially the same as funding Hamas or PIJ. Qatar Charity was not an FTO or a SDGT, and, to the contrary, it "used its accounts at Masraf Al Rayan to solicit contributions from donors, purportedly for humanitarian purposes such as assisting Syrian refugees." (Compl. ¶ 148). There is no plausible explanation for the inference that Qatar Charity revealed its alleged illicit intentions to its bank. As a result, and in conjunction with the temporal limitations of their allegations, Plaintiffs only plead "a remote, purely contingent, or overly indirect causal connection." *Freeman v. HSBC Holdings PLC ("Freeman I")*, 413 F. Supp. 3d 67, 84 (E.D.N.Y. 2019).

### B.   Plaintiffs Fail to Satisfy Constitutional Requirements of Minimum Contacts and Reasonableness

Plaintiffs also fail to show that MAR has "certain minimum contacts with [the forum] such

that the maintenance of the suit does not offend traditional notions of fair play and substantial justice" under the Due Process Clause of the Fourteenth Amendment. *Int'l Shoe Co. v. Wash*, 326 U.S. 310, 316 (1945) (internal quotation marks and citations omitted).  This inquiry is analyzed under two prongs: (1) minimum contacts, "where the defendant purposefully availed itself of the privilege of doing business in the forum," and (2) reasonableness. *Licci IV*, 732 F.3d at 170, 173-74 (internal quotation marks and citations omitted).  Plaintiffs cannot meet this standard.

*First*, Plaintiffs have not established that MAR has minimum contacts with the forum because, as discussed *supra* § I.A.1., they have not alleged that MAR selected and repeatedly used New York's banking system for accomplishing the alleged wrongs. *See Licci IV*, 732 F.3d at 171 ("[W]e by no means suggest that a foreign defendant's 'mere maintenance' of a correspondent account in the United States is sufficient to support . . . personal jurisdiction over the account-holder in connection with any controversy.").

*Second*, exercising jurisdiction over MAR would be unreasonable. The "reasonableness" inquiry considers the burden of exercising jurisdiction on the defendant, "the interests of the forum state in adjudicating the case," and "the plaintiff's interest in obtaining convenient and effective relief." *Id.* at 170 (internal quotation marks and citations omitted). MAR is headquartered in Qatar (Compl. ¶ 66) and several Plaintiffs reside in Israel (*id.* ¶¶ 26-38); *see also Licci IV*, 732 F.3d at 174.  "[A]s heinous as" the rocket attacks were, they "were not sufficiently connected to the United States to provide specific personal jurisdiction in the United States." *Waldman*, 835 F.3d at 337.

Indeed, exercising jurisdiction here would offend traditional notions of fair play and substantial justice; 132 other alleged victims have brought a lawsuit arising out of the same alleged events against MAR and nine other defendants in Israel. *Ansbacher, et. al. v. Qatar Charity, et.al.*, Jerusalem District Court, CC 21387-06-21, November 10, 2021.  Plaintiffs, many of whom are

11

either Israeli citizens or Israeli residents, would not be denied an opportunity to obtain relief, as they can bring suit in a forum outside the United States – further demonstrating that an American court is not the appropriate forum to hear these issues.

## II.   DISMISSAL FOR IMPROPER SERVICE UNDER RULE 12(b)(5) IS PROPER FOR FAILURE TO COMPLY WITH THE FEDERAL RULES OR QATARI LAW

Not only did Plaintiffs fail to plead a *prima facie* case of personal jurisdiction, they failed to properly serve MAR.  Plaintiffs bear "the burden of establishing that service was sufficient." *Khan v. Khan*, 360 F. App'x 202, 203 (2d Cir. 2010) (citation omitted).  Here, Plaintiffs' alleged service upon MAR – a foreign defendant with no branch or office in the U.S. (Compl. ¶ 158) – via Federal Express to a Qatari address and by delivery to a person whom Plaintiffs have not demonstrated is authorized to accept service on behalf of MAR is not proper service.

Service of MAR, a foreign corporation, is permitted "in any manner prescribed by Rule 4(f) for serving an individual, except personal delivery under (f)(2)(C)(i)." Fed. R. Civ. P. 4(h)(2). With respect to subsection 4(f)(1), Plaintiffs acknowledge that Qatar "is not a signatory to the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents, or any other service treaty" and recognize that "for a judgment entered against Defendants in this action to be enforceable in Qatar against Defendants' assets located there, service *must* be effected in Qatar pursuant to letters rogatory."  (*See* ECF No. 8 at 3) (emphasis added).

However, Plaintiffs now attempt service via Federal Express, purportedly in compliance with Rule 4(f)(2)(C)(ii).  (*See* ECF No. 11).  Here, Plaintiffs have not established that service by private courier (*i.e.*, Federal Express) is not "prohibited by [Qatar's] law." *See Nabulsi v. Nahyan*, No. H-06-2683, 2008 WL 1924235, at *4 (S.D. Tex. Apr. 29, 2008) ("Plaintiffs' silence on the issue does not allow the court to assume that service by mail is not prohibited by U.A.E. law.").

Plaintiffs cite to Article 11 of the Qatari Civil & Commercial Procedures Law (Law No.

13 of 1990), in stating that Qatari law explicitly authorizes delivery of a summons "by registered mail . . . or any other appropriate means." (ECF No. 44 at 4) (citation omitted). However, Article 11 governs the service of an individual person. Article 10 governs service upon a corporation and only permits personal service upon "the chairperson or manager or one of the joint partners or their legal representatives or whoever acts on their behalf." Article 10 of the Qatari Civil & Commercial Procedures Law (Law No. 13 of 1990, as amended by Law No. 7 of 1995).[8] Plaintiffs fail to demonstrate their attempt at service is not prohibited by this provision of Qatari law. *See Rosenberg v. Lashkar-e-Taiba*, No. 10-cv-5381 (DLI) (CLP), 2017 WL 11647006, at *4 (E.D.N.Y. Mar. 31, 2017) (dismissing with prejudice plaintiffs' ATA claims, and adopting Report & Recommendation in part, including a finding of improper service where plaintiffs failed to explain what position the person signing the Federal Express delivery "held in the organization or why he was 'authorized to accept service on behalf of'" defendants) (citation omitted).

## III.   PLAINTIFFS FAIL TO STATE A CLAIM FOR PRIMARY LIABILITY UNDER THE ATA BECAUSE MAR'S BANKING SERVICES ARE NOT ACTS OF INTERNATIONAL TERRORISM PROXIMATELY CAUSING PLAINTIFFS' INJURIES, REQUIRING DISMISSAL UNDER RULE 12(b)(6)

Under the ATA as codified at 18 U.S.C. § 2333(a), "principal perpetrators of acts of international terrorism" are not liable unless plaintiffs plausibly allege (1) an injury to a U.S. national, (2) an act of international terrorism, and (3) causation. *Freeman I*, 413 F. Supp. 3d at 82 (internal quotation marks and citations omitted). Plaintiffs allege that MAR has primary liability under the ATA for allegedly providing material support to terrorists (in violation of 18 U.S.C. § 2339A) (Third Cause of Action) and to an FTO (in violation of 18 U.S.C. § 2339B(a)(1)) (Fourth Cause of Action). MAR's conduct, however, does not equate to engaging in acts of international

---

[8] *See* https://almeezan.qa/LawArticles.aspx?LawTreeSectionID=8075&lawId=2492&language=en); *see also* (ECF No. 44 at 4 (citing same)).

terrorism that proximately caused Plaintiffs' injuries. Section 2339A additionally requires Plaintiffs to plead that MAR acted with a heightened *mens rea*, which Plaintiffs have failed to do. Thus, Plaintiffs' Third and Fourth Causes of Action should be dismissed.

> **A.    MAR's Alleged Commercial Banking Activity Is Not an Act of International Terrorism Involving Violence or Intending to Intimidate or Coerce**

To constitute an act of international terrorism under the ATA, the act at issue must: (1) involve violence or endanger human life; (2) violate federal or state criminal law if committed in the United States; (3) appear to be intended "to intimidate or coerce a civilian population" or to "influence the policy [or the conduct] of a government by intimidation[,]" "coercion[,]" "mass destruction, assassination, or kidnapping"; and (4) occur primarily outside the United States or transcend national boundaries. *See* 18 U.S.C. § 2331(1) (defining an act of international terrorism); *see also Licci ex rel. Licci v. Lebanese Canadian Bank, SAL ("Licci II")*, 673 F.3d 50, 68 (2d Cir. 2012) (citation omitted). Here, Plaintiffs have based their claims of primary liability on the assertion that MAR provided banking services to Qatar Charity, but these allegations fail to satisfy the preliminary threshold for primary liability: that MAR *itself* committed an "act of international terrorism" as defined by statute. *See Freeman I*, 413 F. Supp. 3d at 82 ("Plaintiffs must plausibly allege that Defendants' actions were, *themselves*, acts of international terrorism in order to give rise to primary liability under § 2333(a).") (emphasis added).

Plaintiffs cannot allege MAR committed an act of international terrorism, as they only allege MAR "used its correspondent banking relationships in New York to process USD transactions for Qatar Charity." (Compl. ¶ 166). Providing financial services – even to FTO affiliates – is not an act inherently "violent or dangerous to human life." *See Bartlett*, 2020 WL 7089448, at *7-8 (dismissing ATA claim). Unlike in *Miller*, where the bank had committed acts of international terrorism by administering an insurance scheme for terrorist martyrs through

automated services, and the bank was advertised as the site of the scheme, there are no allegations here that MAR did anything other than process transactions for one customer.  *See Miller v. Arab Bank, PLC*, 372 F. Supp. 3d 33, 45-46 (E.D.N.Y. 2019).[9]  Moreover, not only does MAR stand accused of providing mere banking services, but those services were "purportedly for humanitarian purposes such as assisting Syrian refugees."  (Compl. ¶ 148).  Such services are not acts of international terrorism.

In addition, Plaintiffs fail to allege that MAR's activities objectively appear to have the requisite intent to coerce or intimidate.  Plaintiffs have not alleged that actions undertaken by MAR meet this standard, especially because MAR dealt with only Qatar Charity, an alleged intermediary with no clear ties to terror.  *See Zapata v. HSBC Holdings PLC*, 414 F. Supp. 3d 342, 358-59 (E.D.N.Y. 2019) (dismissing ATA claim); *Weiss v. Nat'l Westminster Bank PLC*, 768 F.3d 202, 207 n.6 (2d Cir. 2014) (ellipsis in original) (citation omitted) ("The requirement to 'appear to be intended . . .' does not depend on the actor's beliefs, but imposes on the actor an objective standard."); *Freeman I*, 413 F. Supp. 3d at 92 & n.31 (holding that Plaintiffs did not allege intent to intimidate where "defendants are [not] alleged to have conspired directly with an FTO or front organization," but instead, "[c]rucially," there were "intervening actors" between the bank and the terrorist activity).[10]  Nor can Plaintiffs satisfy the requisite intent requirement by imputing Qatar's alleged support of Hamas to MAR by conclusorily alleging close ties between MAR and the Qatari

---

[9] Other decisions in the Second Circuit likewise indicate that providing financial services does not constitute an act of terrorism unless the plaintiff can sufficiently allege that the funds the bank processed were identified as destined for the terrorist group and the bank knew of such designation.  *See Schansman v. Sberbank of Russia PJSC*, No. 19-cv-2985 (ALC), 2021 WL 4482172, at *6 (S.D.N.Y. Sept. 30, 2021).  In *Schansman*, the funds at issue "were confirmed by . . . the leader of the [terrorist group], and additional funds were raised by [an individual] who publicly boasted about raising millions for the [terrorist group]."  *Id.*  Here, Plaintiffs have made no such allegations.

[10] Even the provision of financial services to a known terrorist organization – which Plaintiffs do not allege here – would require plaintiffs to allege that a defendant's conduct "manifest[s] the apparent intent required" under Section 2331(1).  *Weiss v. Nat'l Westminster Bank PLC*, 381 F. Supp. 3d 223, 235 (E.D.N.Y. 2019) (quoting *Linde v. Arab Bank, PLC ("Linde I")*, 882 F.3d 314, 326) (2d Cir. 2018) (internal quotation marks omitted).

government.   (Compl. ¶¶ 110-11); *see, e.g.*, *Kaplan v. Jazeera*, No. 10-cv-5298, 2011 WL 2314783, at *5-6 (S.D.N.Y. June 7, 2011) (dismissing plaintiffs' ATA claims where plaintiffs merely asserted, in conclusory fashion, that defendant-news network had an official "anti-American and anti-Israel organizational policy") (citation omitted).   Such a recitation of legal elements and conclusory allegations without support "will not do," and turns the objective standard for intent to intimidate into a subjective one. *See Iqbal*, 556 U.S. at 678 (citation omitted). Accordingly, Plaintiffs have failed to meet the threshold requirements for ATA primary liability.

### B.   Plaintiffs Fail to Plausibly Allege Any Facts Which Support an Inference that MAR's Financial Services Were the Proximate Cause of Plaintiffs' Injuries

Plaintiffs further fail to allege that MAR's correspondent banking transactions proximately caused Plaintiffs' injuries, as required for primary liability under the ATA. *See Rothstein v. UBS AG*, 708 F.3d 82, 95 (2d Cir. 2013), *superseded by statute on other grounds*, JASTA, Pub. L. No. 114-222, 130 Stat. 852, 854 (2016).   Specifically, Plaintiffs must allege "a sufficiently direct relationship between the conduct in question and the injuries for which recovery is sought." *Zapata*, 414 F. Supp. 3d at 356 (citations omitted).

Plaintiffs fail to allege a temporal connection between MAR's alleged conduct ending in 2015 and Plaintiffs' injuries in 2019. *See In re Chiquita Brands Int'l, Inc.*, 284 F. Supp. 3d 1284, 1313 (S.D. Fla. Jan. 3, 2018) ("[T]he greater the time between the payments and the attack, the more attenuated the foreseeability of the attack, and the weaker the likelihood that the support played a significant role in facilitating the attack[].").   Conceptually, "proximate cause is central in imposing a balance," and transfers "made long before the event—even if recklessly made— would not" incur liability, depending on their size and frequency. *Gill v. Arab Bank, PLC*, 893 F. Supp. 2d 474, 507 (E.D.N.Y. 2012).   Here, almost four years passed between the last alleged transactions and rocket attacks at issue; "if the defendants' conduct was distant in time from the

attacks causing the plaintiffs' injuries, that fact weighs against foreseeability." *Cabrera*, 2021 WL 3508091, at *23-24 (granting motion to dismiss ATA claims).

Moreover, MAR did not participate in the attack, and MAR did not provide money to the perpetrators of the attack either directly or indirectly. Plaintiffs acknowledge repeatedly that Hamas is well-funded without MAR. (*See, e.g.*, Compl. ¶ 117 ("Between 2012 and 2018, Qatar officially provided Hamas with over $1.1 billion.")). Decisions in which courts have denied "motions to dismiss in these cases have rested on the theory that giving money to terrorist organizations definitionally enables them to commit additional acts of terrorism"; however, transferring money that Qatar Charity "independently accumulate[s] is an act of a fundamentally different sort from giving terrorist organizations money that they do not already have." *Zapata*, 414 F. Supp. 3d at 358 (dismissing ATA claim); *see also Rothstein*, 708 F.3d at 97 (finding no proximate causation where "[t]he Complaint does not allege that [bank] was a participant in the terrorist attacks that injured plaintiffs. It does not allege that [bank] provided money to [the terrorist organizations]. It does not allege that U.S. currency [the bank] transferred to [its customer] was given to [the terrorist organizations]. And it does not allege that if [the bank] had not transferred U.S. currency to [its customer], [that its customer,] with its billions of dollars in reserve, would not have funded the attacks in which plaintiffs were injured.").

Plaintiffs allege that MAR was "knowingly complicit in financing Hamas" because Qatar Charity was allegedly a member of the Union of Good and that "Qatar Charity and Hamas could not have obtained those U.S. dollars without" MAR. (Compl. ¶¶ 149, 167, 322). But aside from conclusory statements, Plaintiffs do not allege the requisite nexus. Indeed, these allegations "do not meet *Twombly*'s plausibility standard with respect to the need for a proximate causal relationship between the cash transferred by [the bank defendant] to [its customer] and the terrorist

17

attacks . . . that injured plaintiffs." *Rothstein*, 708 F.3d at 97; *accord In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 118, 124 (2d Cir. 2013) (holding that the allegation that "[t]he September 11th Attack was a direct, intended and foreseeable product of [defendant's] participation in al Qaida's jihadist campaign" must be rejected for failure to meet *Twombly*'s plausibility standard with respect to the need for a proximate causal relationship) (citation omitted).

### C.   Plaintiffs Fail to Plausibly Allege Facts Sufficient to Assert that MAR Had the Requisite *Mens Rea* for Primary Liability under the ATA

Plaintiffs' Third Cause of Action – alleging material support to terrorists (in violation of 18 U.S.C. § 2339A) – should be dismissed for failure to plausibly allege the knowledge and intent required. This failure is especially stark where Plaintiffs have failed to prove even the lesser knowledge requirement for secondary liability, as discussed *infra* § IV.A.1.

Section 2339A makes it illegal to "provide[] material support or resources or conceal[] or disguise[] the nature, location, source or ownership of material support or resources, *knowing and intending* that they are to be used in preparation for, or in carrying out, a violation of" federal laws, including terrorism. 18 U.S.C. § 2339A (emphasis added). Accordingly, under Section 2339A, "an ATA plaintiff must prove that the defendant acted with the specific knowledge or intent that its support would be used in preparation for, or in carrying out, one of the enumerated terrorism-related crimes." *In re Chiquita*, 284 F. Supp. 3d at 1309. "Section 2339A [thus] requires proof of a heightened *mens rea*" in comparison to Section 2339B. *Id.* (internal quotation marks and citations omitted) (noting that "the mental state required under § 2339A extends both to the support itself, *and* to the underlying purposes for which the support is given"))[11]; *see also Ofisi v. BNP Paribas, S.A.*, 278 F. Supp. 3d 84, 101 (D.D.C. 2017) (dismissing ATA claims where "the

---

[11] In contrast, Section 2339B "requires only knowledge of the organization's connection to terrorism, not intent to further its terrorist activities or awareness that one is playing a role in those activities." *Linde I*, 882 F.3d at 330 (citation omitted). Plaintiffs cannot plausibly assert knowledge under either § 2339A or § 2339B.

complaint does not contain any detailed factual allegations that [bank] knew about [its customer's] supposed connections to [terrorist organization]," and the complaint contains "no facts showing that [bank] knew what [another customer] was doing with the funds [bank] processed"), *order vacated in part on other grounds*, 285 F. Supp. 3d 240 (D.D.C. 2018).

Plaintiffs only allege that MAR processed funds for Qatar Charity, not a terrorist group. *See Ofsi*, 278 F. Supp. 3d at 102 (internal quotation marks and citation omitted) (holding that allegations did not satisfy § 2339A where allegations asserted that defendant "[p]rocess[ed] funds for Sudan [or Sudanese commercial banks], [which] is not the same as processing funds for a terrorist organization or a terrorist front"). Nor do Plaintiffs allege the temporal connection required for *mens rea*, because Plaintiffs have not alleged sufficient, non-conclusory facts to establish that MAR knew, before the rocket attacks, that Qatar Charity was so connected to Hamas, PIJ, or their affiliates such that providing financial services to it was essentially the same thing as providing those services to Hamas, PIJ, or their affiliates. *See id.* at 101 (dismissing ATA claims because plaintiffs failed to allege *mens rea* where plaintiffs failed to allege bank knew its customer was acting as an agent of terrorist group prior to attack). Thus, Plaintiffs' ATA claims fail.

## IV.   PLAINTIFFS FAIL TO PLAUSIBLY ALLEGE SECONDARY LIABILITY UNDER JASTA, REQUIRING DISMISSAL UNDER RULE 12(b)(6)

Under JASTA, secondary liability attaches in only a limited set of circumstances:

> In an action under subsection (a) for an injury arising from an act of international terrorism *committed, planned, or authorized* by an organization that *had been designated as a foreign terrorist organization* under section 219 of the Immigration and Nationality Act (8 U.S.C. 1189), as of the date on which such act of international terrorism was committed, planned, or authorized, liability may be asserted as to any person *who aids and abets, by knowingly providing substantial assistance*, or *who conspires with the person who committed such an act of international terrorism*.

18 U.S.C. § 2333(d)(2) (emphasis added). Here, Plaintiffs' allegations are insufficient for either aiding and abetting or conspiracy liability.

19

### A.  Plaintiffs Fail to Meet the Standards for Aiding and Abetting Liability

Secondary liability pursuant to Section 2333(d)(2) under an aiding and abetting theory (First Cause of Action) requires Plaintiffs to allege that (1) "the party whom the defendant aids must perform a wrongful act that causes an injury;" (2) "the defendant must be *generally aware* of his role as part of an overall illegal or tortious activity at the time that he provides the assistance;" and (3) "the defendant must *knowingly and substantially* assist the principal violation." *See Honickman v. BLOM Bank SAL*, 6 F.4th 487, 494 (2d Cir. 2021) (quoting *Halberstam v. Welch*, 705 F.2d 472, 477 (D.C. Cir. 1983)).  Plaintiffs have not met this legal standard.  The Complaint only describes MAR as a bank performing ordinary banking activity for a single customer who, as Plaintiffs acknowledge, was using "its accounts at Masraf Al Rayan to solicit contributions from donors, purportedly for humanitarian purposes such as assisting Syrian refugees." (Compl. ¶ 148).

### 1.  No Allegations Establish MAR's "General Awareness" of Illegal Acts

MAR is a distant link in the chain providing services to Qatar Charity, which thereafter used local branches to allegedly fund Hamas and PIJ.  As there are no allegations MAR directly funded the SDGT or FTO, the only basis for secondary liability against MAR is via *indirect* assistance for providing financial services to Qatar Charity.

Plaintiffs, however, have not alleged facts to support the inference of MAR's "general awareness" of a role in the overall illegal activity to fund Hamas and PIJ via Qatar Charity and its local branches.  To do so, Plaintiffs "must plausibly allege that [MAR] was aware that, by assisting the principal, it is itself assuming a role in terrorist activities." *Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842, 851 (2d Cir. 2021) (internal quotation marks and citations omitted).  This element "does not require proof that the defendant had a specific intent," but it does require that MAR "knowingly—and not innocently or inadvertently—gave assistance, directly or indirectly" to the FTO. *Id.* at 863-64.  Put simply, "the relevant inquiry for the general awareness element is:

did Plaintiffs plausibly allege" that Qatar Charity was "so closely intertwined with [Hamas's and PIJ's] violent terrorist activities that one can reasonably infer that [MAR] was generally aware while it was providing banking services to [Qatar Charity] that it was playing a role in unlawful activities from which [Hamas's and PIJ's] attacks were foreseeable[?]" *Honickman*, 6 F.4th at 499 (internal quotation marks and citations omitted).  The answer is no.

Here, the allegations as to general awareness pale in comparison to those in prior cases in which JASTA liability was found.  In *Kaplan*, for example, the Second Circuit provided guidance on the type of publicly available information that rises to the level of general awareness.  The defendant bank at issue was alleged to have aided and abetted the terrorist group Hizbollah (an SDGT and FTO); plaintiffs alleged that their customers were not only "integral parts of Hizbollah" but that the defendant bank "knew this was so because Hizbollah *repeatedly publicized those relationships on Hizbollah websites and in news media that included Hizbollah's own radio and television stations*."  999 F.3d at 862 (emphasis added).  These statements were made by "senior Hizbollah officials" at "press conferences and news media interviews" and on Hizbollah's own "official websites," "official television station," and its "official radio station" during a "particular time period (*i.e.*, repeatedly in the several years leading to [the earliest date of the attacks at issue])." *Id*. at 864 (internal quotation marks omitted) (quoting plaintiffs' complaint).  The *Kaplan* complaint also averred that the relationships between Hizbollah and the defendant's customers were reported in "a *dozen* published English-language articles" in addition to "the repeated multimedia statements by Hizbollah." *Id*. at 850, 864-65 (emphasis added).  While *Kaplan* holds that, in cases brought under JASTA, Plaintiffs are not required to "plead a defendant's actual state of mind," JASTA contains a "requirement" of "actual knowledge" that the defendant "know that it is providing assistance" to an FTO, so as to "avoid imposing liability on innocent, incidental

participants." *Id.* at 863-64 (internal quotation marks, brackets, and citations omitted).  The exhaustive recitation of the alleged publication of facts necessary to find that the defendant was generally aware it was aiding and abetting an FTO in *Kaplan* is far from present in this case.

Other cases in which courts have found that general awareness was pleaded include cases where the customers themselves were FTOs or SDGTs.  *See, e.g.*, *Bartlett*, 2020 WL 7089448, at *9.  Because of *Bartlett*'s explicit "reliance on" all but one of the banks at issue "having had SDGT-designated customers during the relevant period" in its finding of general awareness, *Bartlett*'s statement that "Defendants' anti-money laundering and counter-financing of terrorism procedures" would have given "the banks reason to know when a customer had been designated an SDGT" is inapposite to the Complaint's lengthy allegations about MAR's own anti-terrorism policies.  *Id.* at *9, 11 & n.10; *see also* (Compl. ¶¶ 229-315).  Moreover, the one bank which did *not* have an SDGT customer, "a closer case," purportedly "provided services to members of and companies controlled by" a "prominent" family "'synonymous with Hezbollah,' with family members and businesses *designated as SDGTs*."  *Bartlett*, 2020 WL 7089448, at *11 (emphasis added) (quoting plaintiffs' complaint).  Plaintiffs cannot make those allegations here.

Complaints meeting the JASTA threshold have also contained allegations that indicate the defendant bank was not only generally aware of terrorist activity, but willfully assisted it.  In *Miller*, for example, the defendant received lists identifying causes of death of payment beneficiaries.  *Miller*, 372 F. Supp. 3d at 39, 47.  Similarly, *Kaplan* found that the defendant bank provided "special treatment" to the customers at issue, such as dispensing with filing requirements to allow the customers to deposit hundreds of thousands of dollars a *day* without having to identify the source of funds.  *Kaplan*, 999 F.3d at 850.

Here, Plaintiffs are unable to make any of these kinds of allegations.  Qatar Charity is not

an SDGT or an FTO.  And there are no "red flags" so ubiquitous so as to impute knowledge.  *Estate of Henkin v. Kuveyt Turk Katilim Bankasi, A.S.*, 495 F. Supp. 3d 144, 160 (E.D.N.Y. 2020) ("A single online search at any time between 2008 and October 2015 would have confirmed IHH's status as a [] Hamas conduit . . . ."); *see also Kaplan*, 999 F.3d at 862 ("Hizbollah repeatedly publicized those relationships [between bank customers and Hizbollah] on Hizbollah websites and in news media").  This case more closely resembles *Honickman*, in which one account holder was Union of Good (the organization of which Plaintiffs claim "Qatar Charitable Society" was a member), and, like Qatar Charity, all three customers at issue were involved in charitable giving. *Honickman*, 6 F.4th at 493.[12]  There, the Complaint contained "limited public sources" that the Court held to be insufficient to plead general awareness.  *Id.* at 501-02.  Faced with similarly limited public sources but determined to reverse engineer a complaint against MAR, Plaintiffs resort to a kitchen-sink approach of stray facts to infer MAR's knowledge, but all are implausible.

### a.      Pre-2008 Allegations Do Not Provide MAR with Knowledge

To try to impute knowledge of wrongdoing by Qatar Charity onto MAR, Plaintiffs cobble together irrelevant and isolated information that predates the transactions by many years.  Plaintiffs allege that "Qatar Charitable Society," a "prior name" for Qatar Charity, (*id.* ¶ 40), was named in congressional and trial testimony in the United States in 2002 and 2003, years before MAR's founding in 2006 and a dozen years before they allege MAR transacted with Qatar Charity.  (*Id.* ¶¶ 43-47, 66).  According to the Complaint, this testimony relates entirely to a relationship between

---

[12] In *Estate of Henkin*, decided before *Honickman*, the court credited the allegation that a customer was designated as a member of the Union of Good.  *See* 495 F. Supp. 3d at 155.  However, that allegation was coupled with allegations that the bank customer *itself* was "a substantiated Hamas conduit and terrorist organization," that such status could be easily confirmed with a "single online search," and that the customer had participated in an internationally-publicized deadly incident before the attacks at issue – allegations that Plaintiffs do not plead against MAR.  *See id.* at 160.

Qatar Charitable Society and a terrorist group not at issue in this case.[13]  Plaintiffs make no attempt to demonstrate how MAR should have been aware of this testimony, or even to demonstrate how testimony in the United States about Qatar Charitable Society supporting Al-Qaeda through a 9/11-related action rendered it foreseeable to MAR that Qatar Charity purportedly supported Hamas and PIJ years later.  *See Honickman,* 6 F.4th at 501-02 ("The complaint lacks any allegations that at the time of the interviews in which al-Qaradawi—who chaired Union of Good—praised martyrdom and criticized the United States' designation of Hamas, it was public knowledge that al-Qaradawi chaired Union of Good.").

The Complaint also attempts to imply knowledge should be presumed because the IICT listed Qatar Charity as a "priority III terrorism support entity" in 2008, yet this information was directed to "advise and assist the Director of Central Intelligence" ("DCI") and provide "threat warnings from the DCI to alert senior policy makers of possible foreign terrorist attacks."  (Compl. ¶ 41 & n.1).  There is no basis to conclude that MAR, which does not even operate in the United States, would have knowledge of the information closely held by American intelligence agencies. *See Honickman*, 6 F.4th at 502 n.18 (citation omitted) (explaining that allegations of general awareness based on "'publicly available'" but unreported information "require[] the implausible inference that the defendant was aware of those facts even before the news media.").[14]

Nor can Plaintiffs equate an SDGT or FTO designation to *Israel's* designation of "Qatar Charitable Society" in 2008 as a "a member of the Union of Good," and Israel's banning of Qatar Charitable Society, because Plaintiffs fail to allege whether such designation and its meaning were

---

[13] Plaintiffs also allege terrorist "support" by Qatar Charity unrelated to the attacks (or even countries) at issue in this case without providing any detail or corroboration; moreover, Plaintiffs do not plead that this alleged information was publicly available (in a conclusory fashion or otherwise).  (*Id.* ¶¶ 48-52).

[14] There are no allegations that this information was publicly available to MAR prior to the transactions at issue. Indeed, the hyperlink provided by Plaintiffs in the Complaint contradicts that this information would have been public, as it was declassified on December 2, 2016.  (Compl. ¶ 68 & n.1).

plausibly known to MAR.  (*See* Compl. ¶ 54).  But even if known to MAR, one designation by a foreign country (using a different name than Qatar Charity) years before the misconduct at issue is not enough to render banking activity for that customer tantamount to terrorist activity; Plaintiffs' approach to designations from other nations other than SDGTs and FTOs would stretch the contours of anti-money laundering requirements.  *Honickman,* 6 F.4th at 490, 493, 502 n.20 (noting "allegation that Israel designated Al-Aqsa as a terrorist organization in 1998, without specifying whether and where this was made public, is also unavailing" while affirming dismissal of complaint for allegations of banking activity between 1999 and 2003).  Relatedly, the U.S. Department of the Treasury's designation of the Union of Good as an SDGT is unavailing without evidence that MAR had reason to believe such a designation applied to Qatar Charity – not Union of Good.  *O'Sullivan v. Deutsche Bank AG*, No. 17-cv-8709 (LTS) (GWG), 2019 WL 1409446, at *10 (S.D.N.Y. Mar. 28, 2019) (finding that allegations regarding Iran's status as a state sponsor of terrorism and the purpose of U.S. sanctions against Iran were insufficient to plausibly allege aiding and abetting liability claim); *Honickman*, 6 F.4th at 501-02.[15]

In sum, Plaintiffs have not alleged facts from which general awareness can be inferred; MAR could not foresee terrorist activity at the time it processed the alleged transactions at issue. *Id.* at 496-97 ("Foreseeability is thus central . . . to JASTA aiding-and-abetting liability.").  Unlike in *Estate of Henkin*, where media in the home country of the defendant bank reported that "the head of [the customer's] supervisory board had been designated as a senior Hamas fundraiser by the U.S. Treasury Department" the very month before the attacks at issue and *while* the customer

---

[15] The allegation that Arab Bank and Banque du Caire declined to provide Qatar Charity financial services in the Palestinian Territories is undated.  (*Id*. ¶ 147).  It is also bereft of facts that indicate why they did so.  (*Id*. ¶ 147). Moreover, the Complaint is clear that other peer financial institutions, such as the Bank of Palestine and the Islamic Bank in Ramallah, did transact with Qatar Charity during this time period.  (*Id*. ¶ 10).

was transacting with the defendant bank, 495 F. Supp. 3d at 151, here, Plaintiffs do not allege facts that are meant to support an inference of general awareness prior to the attack at issue.

> **b.**     **Information Unavailable Until After the Transactions Cannot Impute Knowledge Upon MAR**

Lacking allegations of general knowledge before the transactions at issue, Plaintiffs instead recite alleged red flags that postdate their own allegations of transactions, such as a UK Charity Commission report in 2017, the Israeli criminal convictions of Qatar Charity staffers in 2017, an alleged investigation of an affiliate's affiliate in late 2019, or the allegation that certain Middle Eastern countries designated Qatar Charity as a financial supporter of terrorism in June 2019. (Compl. ¶¶ 62-64, 73-74, 143-46).   However, it is impossible for after-the-fact revelations to support a finding of knowledge years before the transactions.   *See Honickman*, 6 F.4th at 501 (noting that "[o]ne of the news articles on Sanabil referenced in the complaint was dated . . . more than a year after the last relevant attack," and that another allegation of press coverage "is undated").   Unlike in *Kaplan,* Plaintiffs here cannot point to contemporaneous "press conferences and news media interviews" or content from Hamas or PIJ's own "official websites," "official television station," or "official radio station."   999 F.3d at 864 (internal quotation marks and citation omitted).[16]   Notably, many of these alleged "flags" postdate not just the transactions, but the May 2019 attack as well.

> **c.**     **Allegations of Control by Qatar Are a Red Herring**

As a last resort, Plaintiffs try to meet their burden of "general awareness" by pleading that the Government of Qatar's alleged support for Hamas was well known and thus, MAR "was knowingly complicit in financing Hamas."   (*See* Compl. ¶ 149).   Plaintiffs appear to base this

---

[16] For the same reason, any attempt to draw inferences from the contents of "Qatar Charity annual reports" is futile; Plaintiffs fail to plead those reports were publicly available.  (Compl. ¶ 133).

conclusion on the allegation that Qatar "dominates" MAR, an allegation predicated on the allegation that agents or instrumentalities of the Qatari government" have a minority ownership interest of, collectively, less than 28 percent in MAR, and the vague, general allegation that an unspecified number of those in Qatar's royal family "are or have served as members of" MAR's board of directors. (*Id*. ¶¶ 3-5, 68-69.)  These vague and conclusory allegations, unsupported by any facts, do not meet the standard for aiding and abetting liability; allegations about an entity's home country cannot be imputed to the entity based on the conclusory claim that one "dominates" the other.  To follow Plaintiffs' argument to its natural conclusion, any entity based in Qatar with a member of Qatar's royal family on its board is subject to liability for aiding and abetting terrorism.  However, there is nothing nefarious about a bank being affiliated with its home country, or a member of its royal family serving on its board.  *In re Terrorist Attacks on Sept. 11, 2001*, 298 F. Supp. 3d 631, 656-57 (S.D.N.Y. 2018) (holding that "[p]laintiffs' allegations fail to show that the charity organizations were alter-egos of Saudi Arabia" because such allegations were "conclusory" and "largely boilerplate.") (internal quotation marks and citation omitted).[17]

Finally, Plaintiffs undermine their own allegations because they admit Qatar Charity "used its accounts at Masraf Al Rayan to solicit contributions from donors, purportedly for humanitarian purposes such as assisting refugees."  (Compl. ¶ 148); *Honickman*, 6 F.4th at 502 ("That organizations like the Three Customers maintained a 'cover' in public undermines the plausibility of Plaintiffs' theory that BLOM bank understood these organizations' true nature and activities from the public record at the time.").  As a result, "there is a meaningful difference between the

---

[17] Plaintiffs do not allege that MAR is an organ or alter ego of Qatar because MAR would be entitled to foreign sovereign immunity.  *See EM Ltd. v. Banco Central De La República Argentina*, 800 F.3d 78, 93 (2d Cir. 2015) (holding allegations did not support alter ego finding and noting that "[m]issing from plaintiffs' allegations are any claims that Argentina's appointment of board members then caused it to interfere in and dictate BCRA's daily business decisions").  Unable to allege facts to support an alter ego theory, Plaintiffs instead use the terms "dominates" "coopted" and "controlled" yet also offer no facts to support such alleged domination, coopting, or control.

alleged functions" of Qatar Charity "and those of the customers in *Kaplan*," who "provided subsidies to the families of Hizbollah suicide bombers." *Id.* at 503 n.21; *see also Averbach*, 2020 WL 486860, at *13 ("Merely provid[ing] banking services to a Hamas-affiliated charity, does not satisfy JASTA's mens rea requirement.").[18]

### 2. Plaintiffs Cannot Allege that MAR "Knowingly and Substantially" Assisted in the Principal Violation

With respect to the "aiding and abetting" requirement that the defendant "knowingly and substantially assist in the principal violation," Plaintiffs must allege that MAR "knowingly—and not innocently or inadvertently—gave assistance" to Hamas and PIJ. *Honickman*, 6 F.4th at 499-500 (quoting *Halberstam*, 705 F.2d at 477; *Kaplan*, 999 F.3d 863-64) (internal quotation marks omitted). Courts evaluate six factors that relate to "substantial assistance," all of which weigh against Plaintiffs. *See Linde I*, 882 F.3d at 329.

**(1) Nature of act encouraged.** Plaintiffs vaguely allege that MAR used its correspondent banking relationships to benefit Qatar Charity. (Compl. ¶¶ 128, 166). But no allegations demonstrate MAR's knowledge that specific funds would be received by Hamas and PIJ or used to fund the rocket attacks, let alone that MAR sought to encourage Hamas and PIJ to engage in terrorist attacks. *See Siegel v. HSBC N. Am. Holdings, Inc.*, 933 F.3d 217, 225 (2d Cir. 2019) ("The plaintiffs here have not plausibly alleged that HSBC encouraged the heinous November 9 Attacks or provided any funds to [the terrorist organization]."). While Plaintiffs allege that MAR's transfers to Qatar Charity led to the purchase of "anonymous debit cards known as 'Sanabel Cards,'" Plaintiffs' allegations improperly "lump" all defendants together. (Compl. ¶ 151).[19]

---

[18] To establish general awareness, Plaintiffs must show not that Qatar Charity was intertwined with Hamas and PIJ, but that it was "closely intertwined with [their] *violent terrorist activities*." *Honickman*, 6 F.4th at 501 (emphasis added). Here, given Qatar Charity's reputation as a charitable organization, there is no basis for such a finding.

[19] As with other allegations in the Complaint, Plaintiffs' improper allegations about the purported "Sanabel Card

Plaintiffs do not attempt to plead that MAR had any specific knowledge as to what Qatar Charity was doing with its own money; as a result, the allegation that "distribution of Sanabel Cards permitted Defendants to encourage terrorism" is a legal conclusion bereft of facts to support application to MAR.  (*Id*. ¶ 156).  Any attempt to draw a parallel between Plaintiffs' Sanabel Card allegations and the allegation in *Miller* that "Hamas-affiliated organizations provided Arab Bank with detailed lists containing the names of the martyrs, their personal information, and the date and manner of their death, which often included bullets, bombs and assassinations" is futile.  372 F. Supp. 3d at 39.  According to the Complaint, the Sanabel Cards were purchased from the Bank of Palestine, and Plaintiffs decline to allege who distributed them.  (Compl. ¶ 154).

**(2) Amount of assistance given by MAR.**  While Plaintiffs do "not need to allege the funds actually went to Hamas" or PIJ, they do need to plead facts "that permit a reasonable inference that the defendant recognized the money it transferred to its customers would be received by the FTO." *Honickman*, 6 F.4th at 500 (internal quotation marks and citation omitted).  The Complaint contains no such facts.  The alleged assistance here is providing ordinary banking services to one customer, Qatar Charity, a legitimate organization, and the "amount and type of aid" pled is limited to otherwise legal transactions.  *Id*. (citation omitted).  In contrast, the defendant in *Kaplan* "gave the Customers special treatment, exempting them from submitting cash transaction slips" and gave them "exemptions with respect to deposits in Lebanese Currency" for "more than $2.5 million a week." *Kaplan*, 999 F.3d at 850.  Plaintiffs fail to allege that MAR provided any special treatment to Qatar Charity.

**(3) MAR's presence or absence at the time of the tort.**  Plaintiffs do not allege that

---

scheme" fails to distinguish in any way between any of the Defendants, which is an independent basis for dismissal. (Compl. ¶¶ 151-56); *see also Berdeaux*, 2021 WL 4267693, at *7 ("Plaintiffs' complaint is riddled with instances of improper group pleading, in which they refer to actions taken by the 'Scott Group Defendants,' without distinguishing in the least among the four Defendants whom Plaintiffs[] have lashed together in their complaint."); *see also* § V.

MAR or any of its representatives were present during Hamas and PIJ's rocket attacks.

(4) **MAR's relation to the principal.** Plaintiffs' conclusory allegations that MAR conspired with "Defendants," "Hamas," "PIJ," and the "government of Qatar" aside (*see* Compl. ¶ 356), Plaintiffs fail to allege MAR had a relationship with Hamas or PIJ. *See Siegel*, 933 F.3d at 225 ("On the fourth factor – defendant's relation to the principal – the plaintiffs do not plead any non-conclusory allegations that HSBC had any relationship with [the terrorist organization]."). Plaintiffs ask this Court to impose liability on MAR for allegedly conducting ordinary banking services for a customer who allegedly "solicit[ed] contributions from donors, purportedly for humanitarian purposes," transferring those funds to Qatar Charity's own branches, and that those funds were then distributed to "supposed charities" who were "affiliated" with Hamas and PIJ. (Compl. ¶¶11, 148).  This link is too "attenuated" to allege that MAR had a relationship with Hamas or PIJ. *Honickman*, 6 F.4th at 501.

(5) **MAR's "state of mind."**  Plaintiffs have not alleged, in non-conclusory fashion, that MAR "knowingly or intentionally supported [Hamas or PIJ]" in any manner, or that "[MAR] knowingly assumed a role" in the FTOs' terrorist activities. *See Siegel*, 933 F.3d at 225.  Focusing on acts done in MAR's ordinary course of business, Plaintiffs' allegations fail to support any inference of MAR's actual knowledge in the attack. *See infra* § IV.A.1; *see also infra* § III.C.

(6) **The period of assistance.**  As discussed above, the Complaint does not allege any facts to plead that MAR continued providing services to Qatar Charity after 2015, and even alleges that Qatar Charity's relevant operations "ceased" in 2015.  (*Id*. ¶¶ 128, 141); *see also Siegel*, 933 at 224-250 (holding that JASTA claim is "foreclose[d]" where "HSBC ceased doing business with" the customer at issue "ten months before the" attacks at issue).

Thus, all six *Halberstam* factors support that Plaintiffs have failed to plead that MAR

knowingly provided "substantial assistance" to Hamas or PIJ.  *See Siegel*, 933 F.3d at 225.

**B.      Plaintiffs Fail to Allege that MAR Knowingly Entered into an Agreement to Support Conspiracy Liability Under 18 U.S.C. § 2333(d)**

For conspiracy liability under JASTA (the Second Cause of Action), Plaintiffs must allege: (1) an agreement between two or more persons; (2) to participate in an unlawful act; (3) an injury caused by an unlawful overt act performed by a party to the agreement; (4) which overt act was in furtherance of the common scheme.  *See O'Sullivan*, 2019 WL 1409446, at *9.  Unlike for aiding and abetting liability, for which JASTA "does not say that for . . . liability to be imposed a defendant must have given substantial assistance to the principal," for conspiracy liability, MAR must "be shown to have conspired *with* the principal."  *Kaplan*, 999 F.3d at 855 (internal quotation marks and brackets omitted) (emphasis added).

Accordingly, "fatal to Plaintiffs' claim for conspiracy liability is their failure to sufficiently allege any unlawful agreement between" MAR and Hamas or PIJ (or any of the individual terrorists).  *Kaplan v. Lebanese Canadian Bank, SAL*, 405 F. Supp. 3d 525, 534 (S.D.N.Y. 2019), *vacated and remanded on other grounds*, 999 F.3d 842 (2d Cir. 2021).  Nowhere do Plaintiffs allege in a non-conclusory fashion that MAR entered into any agreement with PIJ or Hamas.  *See O'Sullivan*, 2019 WL 1409446, at *9 ("[E]ven accepting that Defendants knew generally about the purpose of U.S. sanctions, Plaintiffs' allegations do not demonstrate that Defendants entered into any agreements with the FTOs that committed the attacks at issue.").  Moreover, MAR's "alleged provision of material support to [Qatar Charity] is so far removed from the acts of terrorism that injured Plaintiffs that the Court cannot infer that Defendants shared the common goal of committing an act of international terrorism."  *Id.*  Accordingly, Plaintiffs' conspiracy claims also fail.

## V.       FOUR PLAINTIFFS LACK STATUTORY STANDING FOR ATA OR JASTA

Four of the ten Plaintiffs lack statutory standing.  "Any national of the United States injured in his or her person, property, or business by reason of an act of international terrorism, or his or her estate, survivors, or heirs, may sue therefor in any appropriate district court of the United States."  18 U.S.C. § 2333(a).  In other words, any U.S. national "injured in *his or her* person, property, or business" may bring a claim under the ATA, *or*, in the event that the U.S. national has died, "his or her estate, survivors, or heirs" may bring a claim for that U.S. national.[20]

Thus, while foreign nationals may bring claims on behalf of U.S. nationals, under the ATA, *only* claims for injuries suffered by a U.S. national are actionable.  *See Averbach*, 2020 WL 1130733, at *2 (adopting Report and Recommendation in which the magistrate held that the ATA precludes claims by foreign nationals, who are survivors or heirs of U.S. nationals killed in terrorist attacks, for their personal injuries).  The ATA "is clear that only claims brought on behalf of individuals who are United States nationals may proceed."  *Rosenberg v. Lashkar-e-Taiba*, No. 10-cv-5381 (DLI) (CLP), 2016 WL 11756917, at *19 (E.D.N.Y. July 5, 2016), *report and recommendation adopted as modified*, No. 10-cv-5381 (DLI) (CLP), 2017 WL 11647006 (E.D.N.Y. Mar. 31, 2017); *but see Estate of Henkin*, 495 F. Supp. 3d at 152-53.  Plaintiffs Hadassah Przewozman, Y.P., P.P., and Chaya Rachel Przewozman assert personal claims, but each is a citizen of Israel.  (*See* Compl. ¶¶ 26, 28, 30-31, 33).  Their individual claims should be dismissed.

---

[20] As initially drafted, the ATA only allowed claims "by a national of the United States injured in his person, property, or business," and did not include "his or her estate, survivors, or heirs."  *See* Antiterrorism Act of 1990, S. 2465, 101st Cong. § 2(a) (1990).  Congress added the additional language due to a suggestion by the Department of Justice, who clarified that the revision only made "certain the ability of family members to file a lawsuit on behalf of a slain or injured relative" so as to "make clear that which is already implied."  *Antiterrorism Act of 1990:  Hearing on S. 2465 Before the Subcomm. on Courts & Admin. Practice of the Comm. on the Judiciary of the United States Senate*, 101st Cong. 46 (1990) (statements of Sen. Strom Thurmond and Lloyd Green, counselor, U.S. Department of Justice).  In other words, the ATA includes the language "his or her estate, survivors, or heirs" so that no reader would make the mistake of believing that if a U.S. national dies in a terrorist attack, their claim dies with them.  There is no basis to suggest that Congress intended the ATA to provide a cause of action for injuries incurred by foreign nationals.

## VI.    JURISDICTIONAL DISCOVERY IS NOT WARRANTED

Plaintiffs' failure to meet basic threshold pleading requirements for every claim, compounded by personal jurisdiction and service deficiencies, warrants dismissal with prejudice. Plaintiffs should not be permitted to attempt to rehabilitate their defective claims through jurisdictional discovery because Plaintiffs have failed to make a *prima facie* showing of jurisdiction. *Tamam*, 677 F. Supp. 2d at 733 (citation omitted). Because Plaintiffs' allegations are so deficient, jurisdictional discovery would essentially amount to a fishing expedition. "[A] court is not obligated to subject a foreign corporation to discovery where the allegations of jurisdictional facts fail to state a basis for the exercise of jurisdiction or where a plaintiff's proposed discovery, if granted, would not uncover facts sufficient to sustain jurisdiction." *Jerusalem NY Enters. LLC v. Huber Erectors & Hoisting, LLC*, No. 21-cv-376 (MKB), 2021 WL 5827934, at *7 (E.D.N.Y. Dec. 8, 2021) (dismissing claim for lack of personal jurisdiction and denying request for jurisdictional discovery) (internal quotation marks, ellipsis, and citations omitted).

In *Tamam*, for example, the Court held that jurisdictional discovery "would be futile" because the plaintiffs had "already set forth the role New York correspondent accounts played in this case – they exchanged foreign currency for U.S. dollars on behalf of Lebanese banks," which, "[c]onsidering the very nature of correspondent accounts," was "the only role they could play." *Tamam*, 677 F. Supp. 2d at 733. Here, discovery cannot cure the Complaint's deficiencies because the Complaint is clear that MAR is not accused of misconduct after 2015, and the allegations' lack of temporal proximity with the rocket attacks in 2019 is not dependent on discovery. *Mednik v. Specialized Loan Serving, LLC*, No. 20-cv-427 (MKB), 2021 WL 707285, at *8-9 (E.D.N.Y. Feb. 23, 2021) (finding jurisdictional discovery improper where a plaintiff "needs new jurisdictional theories, not more evidence substantiating the theories she has already advanced"). In short, Plaintiffs have not made a "sufficient start toward establishing jurisdiction"; the Complaint instead

33

"contain[s] the kind of conclusory non-fact-specific jurisdictional allegations that the Second Circuit found did not require jurisdictional discovery." *Alexander v. Porter*, No. 13-cv-6834 (SLT) (JO), 2014 WL 7391683, at *5-6 (E.D.N.Y. Dec. 29, 2014) (internal quotations omitted) (dismissing case for lack of personal jurisdiction and denying request for jurisdictional discovery).

Moreover, Plaintiffs have asserted that their allegations depend upon a finding that the Qatari government "spearheaded" a conspiracy "to commit terrorism" and that the "Qatari government . . . controls each" Defendant. (ECF No. 44 at 1) (explaining that cases cited by Defendants involving "financial institutions and their customers" are "inapposite" because of Plaintiffs' allegations about the Qatari government). These allegations are not only conclusory and implausible, but unsupported by any alleged facts. *See infra* § IV.A.1. Plaintiffs' theory of conspiracy would require the court to allow Plaintiffs to serve discovery on a foreign entity about its relationship with a foreign sovereign without first meeting their threshold burden to state a claim for relief. Moreover, despite Plaintiffs' allegations, Qatar is not designated by the U.S. as an SDGT or an FTO; instead, the United States designated Qatar a "major non-NATO ally," which is a "powerful symbol of the close relationship the United States shares" with Qatar.[21] Jurisdictional discovery "need not be granted to permit a fishing expedition for jurisdictional facts." *Mednik*, 2021 WL 707285, at *8 (internal quotation marks and citations omitted).

Finally, "[t]he pleading standard set forth in Rule 8 of the Federal Rules of Civil Procedure is not satisfied by lumping all the defendants together in each claim and providing no factual basis to distinguish their conduct." *Milton v. Wazed*, No. 16-cv-4542 (MKB) (JO), 2018 WL 2074179,

---

[21] *See* U.S. Department of Defense, *'Major Non-NATO Ally' Designation Will Enhance U.S., Qatar Relationship*, Jan. 31, 2022, https://www.defense.gov/News/News-Stories/Article/Article/2917336/major-non-nato-ally-designation-will-enhance-us-qatar-relationship/. The designation was announced on January 31, 2022, when the two nations' leaders discussed shared interests including "countering terrorism." *Id.*; *see also Boyer Works USA, LLC v. Rubik's Brand Ltd.*, No. 21-cv-7468 (AKH), 2022 WL 355398, at *6 (S.D.N.Y. Feb. 7, 2022) ("On a Rule 12(b)(2) motion, the court may look beyond the four corners of the complaint and consider materials outside of the pleadings . . . .").

at *7 n.16 (E.D.N.Y. Mar. 30, 2018) (internal quotation marks and citations omitted) (dismissing complaint).  Yet Plaintiffs "lump" all three Defendants together, sometimes with non-parties, without "specification of any particular activities by any particular defendant."  *Id.* (internal quotation marks and citations omitted); *see, e.g.*, (Compl. ¶¶ 8, 106, 111, 151-56, 326).  Plaintiffs cannot argue that "because such facts would be peculiarly within the knowledge of the defendants" it should be entitled to jurisdictional or merits discovery; their "inability to offer more than speculation" as to Defendants' conduct "underscores, rather than cures, the deficiency in the Complaint."  *S. Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 114 (2d Cir. 2009).

Due to the Complaint's paltry allegations as to the merits of their claims, personal jurisdiction, and service, subjecting MAR to jurisdictional discovery is improper.

## CONCLUSION

For the foregoing reasons, Defendant MAR respectfully requests that the Court dismiss Plaintiffs' Complaint in its entirety, with prejudice.

Dated: February 18, 2022
        New York, New York                    PILLSBURY WINTHROP SHAW PITTMAN LLP

                                    By:  */s/ Carolina A. Fornos*
                                         Carolina A. Fornos
                                         Pillsbury Winthrop Shaw Pittman LLP
                                         31 West 52nd Street
                                         New York, NY 10019-6131
                                         Tel.:   (212) 858-1000
                                         Fax:    (212) 858-1500

                                         Aryeh L. Kaplan (*pro hac vice*)
                                         Markenzy Lapointe (*pro hac vice*)
                                         Pillsbury Winthrop Shaw Pittman LLP
                                         600 Brickell Avenue, Suite 3100
                                         Miami, FL 33131
                                         Tel.:   (786) 913-4900
                                         Fax:    (786) 913-4901
                                         *Counsel for Defendant Masraf Al Rayan*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 18, 2022, a true and correct copy of the Notice of Motion to Dismiss the Complaint Pursuant to Fed. R. Civ. P. 12(b)(2), 12(b)(5), and 12(b)(6) by Defendant Masraf Al Rayan and the Memorandum of Law in Support of Defendant Masraf Al Rayan's Motion to Dismiss the Complaint were served on the following counsel of record via email, pursuant to Plaintiffs' consent, at the email addresses noted below:

James P. Bonner
Patrick L. Rocco
Susan M. Davies
Fleischman Bonner & Rocco LLP
81 Main Street, Suite 515
White Plains, New York 10601
jbonner@fbrllp.com
procco@fbrllp.com
sdavies@fbrllp.com

Steven R. Perles
Perles Law Firm PC
1050 Connecticut Ave. NW, Suite 500
Washington, D.C. 20036
sperles@perleslaw.com


*/s/ Carolina A. Fornos*
Carolina A. Fornos