UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
STUART FORCE individually and as personal
representative of the ESTATE OF TAYLOR FORCE,
*et al*.,

        Plaintiffs,

-against-

QATAR CHARITY; QATAR NATIONAL BANK and
MASRAF AL RAYAN,

        Defendants.
------------------------------------------------------------X
CHAIM DOV PRZEWOZMAN, *et al*.,

        Plaintiffs,

-against-

QATAR CHARITY; QATAR NATIONAL BANK and
MASRAF AL RAYAN,

        Defendants.
------------------------------------------------------------X
ANNE CHANA HENKIN, individually and as personal
representative of the ESTATE OF JUDAH HERZEL
HENKIN, *et al*.,

        Plaintiffs,

-against-

QATAR CHARITY; QATAR NATIONAL BANK and
MASRAF AL RAYAN,

        Defendants.
------------------------------------------------------------X

Case No. 1:20-cv-2578-BMC

Case No. 1:20-cv-6088-NGG-RLM

Case No. 1:20-cv-5716-AMD-VMS

Served on April 1, 2022

## **DECLARATION OF PATRICK J. McARDLE**

    I, Patrick J McArdle, declare pursuant to 28 U.S.C. § 1746 subject to penalties of perjury, as follows:

    1.    I have read the Complaints in the above-captioned actions and respectfully offer the Court the following information based on my professional experience.

    2.    My professional experience spans 25 years in regulatory compliance, consulting, and law enforcement. As a Partner at Guidehouse Consulting's Global Investigations and

1

Compliance practice, I specialize in Bank Secrecy Act/Anti-Money Laundering ("BSA/AML") and sanctions compliance, fraud prevention and detection, and forensic accounting investigations. Prior to this, I served as a Senior Special Investigator for Enforcement at the Federal Reserve Bank of New York (FRBNY) for more than a decade.

3. A large part of my career involved assessing banking compliance programs, performing forensic audits, and leading investigations involving U.S. Dollar transactions and remittances from and to foreign countries. At Guidehouse, I served for several years as co-lead of a Monitorship team chosen by federal and local prosecutors and state regulators to oversee a large international financial institution with significant OFAC sanctions violations. I was specifically tasked with the validation of the institution's global AML transaction monitoring and sanctions programs in accordance with a deferred prosecution agreement. Throughout my time in consulting, I have also performed risk assessments and compliance program gap analyses for several major financial institutions and large money service businesses, all of which required a fundamental understanding of how international U.S Dollar transfers are monitored and resolved.

4. While serving at the FRBNY, I conducted numerous complex investigations and official inquiries pursuant to the Federal Reserve's supervisory obligations of domestic and foreign financial institutions. My findings were often the basis for various enforcement actions involving violations of bank regulations, illegal activities, and suspicious transactions. As a Senior Special Investigator, my work constantly involved deep dives into the global movements of U.S. dollar transactions between financial institutions, requiring me to possess a thorough understanding of correspondent banking, domestic and foreign financial regulations, and financial crime risk. In addition, I was tasked the collating responses to subpoenas from Federal, State and Local prosecutors regarding wires processed by the Fedwire Transfer system. The subpoena

responses frequently required me to provide a brief lesson in how the U.S. payment system works.

5.  My C.V. is attached hereto as Exhibit 1.

### I. Nearly all U.S. dollar-denominated payments are effectuated through U.S. banks

6.  Electronic Funds Transfers ("EFTs"), or wire transfers, of funds denominated in U.S. dollars, wherever they originate and wherever their ultimate destination, are generally processed with settlement finality[1] in the U.S., through a U.S. bank. *See Banque Worms v. BankAmerica Int'l*, 77 N.Y.2d 362, 370 (1991). In practice, nearly all such transfers are processed in New York:

> Wholesale wire transfers are generally made over the two principal wire payment systems: the Federal Reserve Wire Transfer Network (Fedwire) and the [Clearing House Interbank Payment System ("CHIPS")]…These funds are transferred through participating banks located in New York because all of the banks belonging to the CHIPS network must maintain a regulated presence in New York.[2] As a result, this State is considered the national and international center for wholesale wire transfers.

*Id.* (citation omitted).

7.  CHIPS, a private payment clearing system located in the U.S. (New York), is the predominant wire payment system utilized to this day for international wires/payments in U.S. dollars. *See* The Clearing House, "CHIPS Public Disclosure of Legal Governance, Risk Management, and Operating Framework" (June 2020) *available at*

---

[1] According to the Bank for International Settlements ("BIS"), settlement finality is defined as "the irrevocable and unconditional transfer of an asset or financial instrument, or the discharge of an obligation by the [payment system] or its participants in accordance with the terms of the underlying contract." BIS, "Principles for Financial Market Infrastructures" (2012), at 64, *available at* https://www.bis.org/cpmi/publ/d101a.pdf. "[P]ayment finality is critical to the process of decentralized exchange." Federal Reserve Bank of Atlanta, "The Economics of Payment Finality" (2002), at 11, *available at* https://www.frbatlanta.org/-/media/documents/research/publications/economic-review/2002/vol87no2_kahn-roberds.pdf.

[2] In 1998, after this ruling, CHIPS dropped the requirement that a participating bank must maintain a presence in New York. Now banks need only to maintain a presence somewhere within the U.S. to become a participate in CHIPS. *See* Federal Financial Institutions Examination Council, "BSA/AML Manual, Funds Transfers" *available at* https://bsaaml.ffiec.gov/manual/RisksAssociatedWithMoneyLaunderingAndTerroristFinancing/08 ("CHIPS is owned by banks, and any banking organization with a regulated U.S. presence may become a participant in the system.").

https://www.theclearinghouse.org/-/media/new/tch/documents/payment-systems/chips_public_disclosure_june_2020.pdf (last accessed Mar. 24, 2022) ("It has been estimated that CHIPS carries a very high percentage of all international interbank funds transfers that are denominated in U.S. dollars…CHIPS is primarily used to clear and settle the U.S. dollar leg of international wire payments. Based on data from the fourth quarter of 2019, approximately 70% of payments that clear and settle through CHIPS originate outside the U.S."); Fed. Reserve Bank of N.Y., "About the New York Fed: CHIPS" (April 2002), *available at* https://www.newyorkfed.org/aboutthefed/fedpoint/fed36.html#:~:text=The%20Clearing%20House%20Interbank%20Payments%20System%20(CHIPS)%20is%20an%20electronic,checks%20with%20electronic%20bookkeeping%20entries (last accessed Mar. 17, 2022) ("CHIPS estimates that it handles 95 percent of all U.S. dollar payments moving between countries."); The Clearing House, "PNC Bank Joins CHIPS, the Largest Private Sector US Dollar Clearing System" (March 02, 2021), available at "https://www.theclearinghouse.org/payment-systems/articles/2021/03/03-02-2021_pnc_bank_joins_chips (last accessed Mar. 25, 2022) ("CHIPS is the largest private sector USD clearing and settlement system in the world, settling an average of $1.7 trillion in payments per day on a comparatively small funding base...CHIPS is the premier USD clearing platform for international payment activity, with approximately 95% of CHIPS payments having a cross-border leg.").

8. "Processing" of U.S. dollar-denominated EFTs or wire transfers involves "clearing" and "settling" transactions, which in effect transfers credit from transaction originator to beneficiary without having to physically move assets such as banknotes, securities, or gold bullion. For banking institutions, wire transfers involve a series of steps where debts are extinguished and created by the mutually indebted banks involved in the respective payment chain

4

in a process called correspondent banking. *See* BIS, "Correspondent Banking" (July 2016), at 9, *available at* https://www.bis.org/cpmi/publ/d147.pdf (last access Mar. 17, 2022).

9. During the clearing step of processing a dollar-denominated EFT, participating banks primarily send and receive payments through CHIPS, which matches and sets off these transfers to reduce the number of ultimate transfers of debt that must be processed between the banks. *See* CHIPS, "About Chips," *available at* https://www.theclearinghouse.org/payment-systems/chips (select "How It Works") (last accessed on Mar. 17, 2022).

*10.* CHIPS settlements are ultimately resolved between U.S. banks using the Fedwire, a real-time gross payment settlement system administered by the U.S. Federal Reserve. *See* The Federal Reserve, "Fedwire Funds Service," *available at* https://www.frbservices.org/financial-services/wires (last accessed on Mar. 24, 2022). Accordingly, these balances are paid across the balance sheet of the Federal Reserve Bank of New York (acting in its Central Bank role as the lender of last resort for all cross-border electronic funds transfers denominated in U.S. dollars).

11. Foreign banks with no physical U.S. presence, like defendants Qatar National Bank and Masraf Al Rayan Bank, cannot directly participate in CHIPS or Fedwire. Only a few dozen banks currently have met the requirements to directly participate in CHIPS, and all of them must, by CHIPS's rules, have a U.S. presence. *See* U.S. Dep't of the Treasury, Financial Crimes Enforcement Network, *Feasibility of a Cross-Border Electronic Funds Transfer Reporting System Under the Bank Secrecy Act* (Oct. 2006), App. D, at 62, *available at* https://www.fincen.gov/sites/default/files/shared/CBFTFS_Complete.pdf ("Access to the CHIPS payment system is conditional upon a financial institution's U.S. presence. In other words, the financial institutions using CHIPS must operate a U.S. branch or office for the use of the system.").

12. These banks are among the "relatively small number of major money center

5

banks"—largely based in New York for U.S. dollar transfers—that "specialize in facilitating international funds transfers through their network of correspondent relationships, and thus form a key link in the vast majority of all international funds transfers." *Id.* at 57. *See also Sigmoil Res., N.V. v. Pan Ocean Oil Corp. (Nigeria)*, 234 A.D.2d 103, 104 (1st Dep't 1996) ("New York banks play an important role" in the "entire system of correspondent banking").

13. Non-U.S. banks access CHIPS or Fedwire through correspondent bank accounts, which are "accounts in domestic [U.S.] banks held in the name of the foreign financial institutions." *Sigmoil Res.,* 234 A.D.2d at 104 (1st Dep't 1996). In this scenario, the non-U.S. banks, known as the respondent banks, do not have direct access to the U.S. dollar-based financial markets, and instead rely on U.S. banks to maintain correspondent accounts to transact in U.S. Dollars on their behalf. *See* BIS, "Correspondent Banking" (July 2016), at 9, *available at* https://www.bis.org/cpmi/publ/d147.pdf (last access Mar. 17, 2022).

14. So when a customer with an account at a non-U.S. bank wishes to transfer U.S. dollars to another person with an account at another non-U.S. bank, the originating customer's bank will instruct its U.S. correspondent bank to transfer funds (via Fedwire or CHIPS) to the U.S. bank where the beneficiary's non-U.S. bank has a correspondent account. Even if these two non-U.S. banks are located a few feet from each other in a foreign country, this U.S. dollar payment ordinarily must clear through the U.S. and ultimately settle across the balance sheet of the Federal Reserve Bank of New York.

## II. The U.S. dollar-denominated transfers conducted on behalf of Qatar Charity through Masraf Al Rayan Bank discussed in the Complaints were almost certainly settled in the U.S.

15. As noted above, I have reviewed the Complaints in these actions, each of which describes transactions involving the transfer of funds from a Qatar Charity account at Masraf Al Rayan in Doha, Qatar to Qatar Charity accounts at the Bank of Palestine or the Islamic Bank in

6

Ramallah.

16. The Complaints' description of these interbank transactions is consistent with the manner in which a transaction involving U.S. dollars would typically operate. Generally, when a customer (the originator) of a non-US bank (the originating or respondent bank) initiates an EFT in US dollars to be transferred to an account held by the same or another individual (the beneficiary) at another non-US bank (the beneficiary bank), the originating bank must first always engage with a U.S. banking institution, either directly or through intermediary banks, where it or an intermediary bank maintains its US correspondent banking account. The US correspondent bank will then transact on behalf of the originating bank in U.S. dollars with the beneficiary bank's (or intermediaries') US correspondent bank to transfer credit from the originator to beneficiary through Fedwire or CHIPS. Finally, the beneficiary bank receives that credit directly or through intermediary banks from the US correspondent bank for deposit into the beneficiary account. Even if the originating and beneficiary banks were branches of the same bank in different foreign jurisdictions, as long as the transaction is in U.S. dollars it would still have to first clear and settle through in the U.S. as a matter of normal process before reaching its ultimate destination with the beneficiary.

17. The U.S. Dollar is the predominant currency for foreign exchange ("FX") transactions, accounting for approximately 88% of global FX transactions in April 2019 and has consistently remained at this share level of global FX transactions for the past 20 years. *See* Federal Reserve System, "The International Role of the U.S. Dollar" (last updated Oct. 06, 2021) available at https://www.federalreserve.gov/econres/notes/feds-notes/the-international-role-of-the-u-s-dollar-20211006.htm (last accessed on Mar, 21, 2022). Accordingly, if the transactions in question were FX transactions for U.S. Dollars rather than EFTs conducted via correspondent

banking, the settlement of these transactions would still involve a large financial institution domiciled in the United States or with a country's central bank who then would ultimately settle with the U.S. Federal Reserve. Essentially, the central inclusion of U.S. based institutions for settlement in these transactions would not change.

18. With Masraf Al Rayan Bank initiating the U.S. dollar-denominated transfers for Qatar Charity as discussed in the Complaints, these funds were almost certainly settled and cleared in the U.S. (New York) by U.S. banks on behalf of Masraf Al Rayan Bank for the funds to reach Qatar Charity's accounts at the Bank of Palestine or the Islamic Bank in Ramallah. Thus, despite the defendants' location outside of the U.S., their actual transfers involved settlement within the borders of the U.S.

19. Multinational commercial banks, like Masraf Al Rayan and Qatar National Bank also certainly understood the fundamental banking concept that international transfers in U.S. dollars must first clear and settle through U.S. based correspondent financial institutions. In fact, Qatar National Bank advertises on its website that it holds U.S. correspondent bank accounts at The Bank of New York Melon, JP Morgan Chase Bank NA, Wells Fargo Bank NA, Standard Chartered Bank (New York), and Citibank NA. *See* QNB Finansbank "Nostro Account" *available at* https://www.qnbfinansbank.com/en/popup-en/nostro-account (last accessed on Mar. 24, 2022). The purpose of these accounts is certainly for access to the U.S. financial markets for U.S. dollar clearing. It then follows that Qatar National understood that U.S. dollar transfers conducted on behalf of Qatar Charity would pass through the U.S. as a matter of process. Masraf Al Rayan offers its clients services and products that allow them to transact in other currencies, including the U.S. Dollar. *See* Masraf Al Rayan, "Tariffs and Charges Retail" at 4, *available at* https://www.alrayan.com/Library/Assets/Gallery/Files/Masraf-Fees-and-Charges-Retail.pdf

(last accessed on Mar. 25, 2022). Masraf Al Rayan uses Citibank, NA as its correspondent or agent to complete international payments using CHIPS. *See* The Clearing House, "UID Lookup" *available at* https://www.theclearinghouse.org/uid-lookup (search UID 442777 and click into the Masraf Al Rayan search result) (last accessed on Mar. 25, 2022). Therefore it is logical that Masraf Al Rayan also understood that the U.S. dollar transfers conducted on behalf of its clients would pass through the U.S. as a matter of process.

20. I declare under penalty of perjury that the foregoing is true and correct. Executed in New York, New York on March 25, 2022.

_____
Patrick J. McArdle

# Exhibit 1

# PATRICK J. MCARDLE, CAMS CFE

685 Third Avenue, 14th FL , New York, NY 10017 (W) 646-227-4841 (M) 718-673-1213
Email:  patrick.mcardle@guidehouse.com

---

## Professional Experience:

**Guidehouse, New York, NY**                                                                                          **2012-Present**
**Partner – Global Investigations and Compliance Group**

Responsible for providing strategic advice to clients on regulatory matters such as Bank Secrecy Act compliance, anti-money laundering and counter terrorist financing techniques as well as risk mitigation, sanctions compliance and fraud investigations.  Assist institutions in the development of remediation programs that are risk-responsive and in accordance with the regulatory expectations and requirements.

- Co-lead of the Monitor teams chosen by regulatory, Federal and Local law enforcement agencies to oversee a financial institution, specifically tasked with the validation of the institution's BSA/AML regional transaction monitoring program and systems as well as the sanctions program on a regional and global level. Direct management of teams of 20 or more individuals.
- Performed risk assessments of major financial institutions and large money service businesses.  Assisted in the development and implementation of a corporate wide compliance program at a large money service business designed to effectively identify and mitigate legal, regulatory and compliance risks.
- Acted as the regulatory liaison for an institution dealing with various enforcement actions which included meeting with regulatory authorities to gauge their expectations and provide the regulators updates on the institutions' responses to the actions.
- Meet with and cultivated relationships with regulatory agencies in the US, UK, Hong Kong, Singapore, UAE and India.

**Federal Reserve Bank, New York, NY**                                                                                          **2001 - 2012**
**Senior Special Investigator – Legal Group**

Primarily responsible for conducting highly sensitive and complex specialized investigations involving violations of bank regulations, illegal activities, suspicious transactions, certain application matters and other matters of significant concern pertinent to the Federal Reserve's supervisory functions relating to domestic and foreign financial institutions. Provide investigative services and analysis concerning internal FRBNY matters including charges of discrimination filed by employees with the FRBNY's Equal Employment Opportunity Office.

- Reviewed numerous BSA/AML monitoring programs for financial institutions during the examination process. Presented evaluations of these programs to senior management along with recommendations for corrective action of any deficient areas within the programs.  These findings and recommendations became the basis for various enforcement actions against financial institutions, as well as civil money penalties against severely deficient institutions.
- Assisted in the training of the BSA/AML bank examiners and law enforcement groups.  Trainings focused on the recognition of red flags in a financial institution's BSA/AML program or transactions they processed. Assisted in the development of a transaction testing program used by examiners during the examination process.
- Responded to requests from various law enforcement agencies for assistance on cases involving bank fraud, wire fraud and money laundering. Subpoena response fulfillment and US payment system training, as needed.

- Assisted in the design and implementation of a transaction monitoring program for accounts held by the FRBNY as well as a fraud assessment of the FRBNY with regard to its employees and programs.
- Collaborated with the FRBNY Compliance Group on the design and implementation of controls to address, among others, fraud and reputational risk to the FRBNY, for the TALF program, which was one of the most successful programs operated during the financial crisis.

**Kroll Associates, New York, NY**      **1995 - 2001**
**Director – Financial Services Group**
Responsible for the execution of various investigative auditing, forensic accounting, ABC investigations, litigation dispute and analysis engagements for Kroll's Financial Services Group. Duties also included cultivating relationships with current clients by identifying their future needs as well as marketing full range of FSG services to potential clients. Supervised staff members as warranted by assignment. Case experience included preparation of reports and presentations of findings, accompanying schedules of analyses, as well as interviewing individuals as they related to projects. Field work included investigative auditing, fraud investigations and reviewing accounting controls of management information systems of various entities noting deficiencies that were the source of fraud and recommending corrective actions.

**Office of the Kings County District Attorney**      **1993 - 1995**
**Financial Investigator – Financial Investigations Unit**
Worked with various investigation bureaus including, Organized Crime, Narcotics, Racketeering, and trial bureaus. Analyzed financial records for discrepancies and/or the discovery of leads related to criminal activity. Developed financial profiles, identified assets, liabilities, net worth and cash flow for business and individuals. Interviewed complainants, suspects, witnesses and informants. Drafted and served subpoenas for Assistant District Attorneys.

## EDUCATION:

**State University of New York Oneonta, NY**      **May 1993**
Bachelor of Science in Business Economics
Concentration in Account and Minor in Finance

**Association of Certified Anti-Money Laundering Specialist**      **March 2018**
Certified Anti-Money Laundering Specialist

**Association of Certified Fraud Examiners**      **January 2004**
Certified Fraud Examiner

**Cornell University, School of Industrial and Labor Relations**      **November 2005**
Certificate in EEO Complaint Handling

**Federal Law Enforcement Training Center, Glynco, GA**      **September 1994**
Fraud and Financial Investigations Training Program

**Organized Crime Task Force, State of New York**      **November 1993**
Analytical Techniques Training Program

REFERENCES AVAILABLE UPON REQUEST

# CERTIFICATE OF SERVICE

I hereby certify that, on April 1, 2022, pursuant to Fed. R. Civ. P. 5(b)(2)(E), I caused the foregoing *Declaration of Patrick J. McArdle executed on March 25, 2022 with Exhibit 1* to be served on each of the following counsel of record by electronic means, in accordance with such counsels' prior written consent:

Brittany Grace Norfleet at Brittany.Norfleet@ropesgray.com
Douglas H. Hallward-Driemeier at Douglas.Hallward-Driemeier@ropesgray.com
Mary Brust at Mary.Brust@ropesgray.com
Michael G. McGovern at Michael.McGovern@ropesgray.com

*Counsel for Defendant Qatar National Bank*


Jessica A. Masella at Jessica.Masella@dlapiper.com
John M. Hillebrecht at John.Hillebrecht@dlapiper.com
Kevin Walsh at Kevin.Walsh@dlapiper.com
Michael George Lewis at Michael.Lewis@dlapiper.com

*Counsel for Defendant Qatar Charity*


Aryeh Kaplan at Aryeh.Kaplan@pillsburylaw.com
Carolina A. Fornos at Carolina.Fornos@pillsburylaw.com
Markenzy Lapointe at Markenzy.Lapointe@pillsburylaw.com

*Counsel for Defendant Masraf Al Rayan*

Dated: April 1, 2022

By: _____
Thomas Caroccia