UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

CHAIM DOV PRZEWOZMAN, *et al.*,

                              Plaintiffs,                    1:20-cv-06088 (NGG) (RLM)

        - against -

QATAR CHARITY, *et al*.,

                              Defendants.

**REPLY BRIEF IN FURTHER SUPPORT OF
DEFENDANT MASRAF AL RAYAN'S MOTION TO DISMISS THE COMPLAINT**

PILLSBURY WINTHROP SHAW PITTMAN LLP
31 West 52nd Street
New York, NY 10019-6131
Tel.:   (212) 858-1000
Fax:    (212) 858-1500

April 20, 2022

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ........................................................................................ 1

ARGUMENT ................................................................................................................... 2

I.  PLAINTIFFS HAVE NO SECONDARY LIABILITY CLAIMS UNDER JASTA
    BECAUSE THEY FAIL TO PROPERLY PLEAD A CONSPIRACY AND
    GENERAL AWARENESS FOR AIDING AND ABETTING ..................................... 2

    A.  Plaintiffs Have No Conspiracy Claim ............................................................ 2

        1.  Plaintiffs Fail to Properly Plead Conspiracy with Anyone ........................ 2

            a.  The Time Gap Between the Alleged Transfers and the Injury Renders
                Plaintiffs' Allegations of a Conspiracy Implausible ............................ 2

            b.  Plaintiffs Have Failed to Allege a Plausible Conspiracy with the State of
                Qatar ................................................................................................ 3

            c.  Plaintiffs Have Failed to Properly Plead an Agreement with Qatar Charity
                and Qatar National Bank ..................................................................... 5

            d.  Plaintiffs Fail to Allege that MAR Conspired with an FTO .................. 6

            e.  Plaintiffs Impermissibly Engage in Group Pleading ........................... 7

        2.  Plaintiffs Misstate the Law on Conspiracy ............................................ 7

    B.  Plaintiffs Do Not State a Claim for Aiding and Abetting Liability Under JASTA .......... 10

        1.  Plaintiffs Ignore the Second Circuit's Ruling in *Kaplan* on General Awareness ...... 10

        2.  The Complaint Fails to Plead Substantial Assistance ............................. 14

II.  PLAINTIFFS DO NOT STATE A CLAIM FOR PRIMARY LIABILITY UNDER
     THE ATA ........................................................................................................... 16

    A.  Plaintiffs Fail to Establish that MAR's Alleged Activity Was the Proximate Cause of
        Plaintiffs' Injuries ........................................................................................ 16

    B.  Plaintiffs Mischaracterize *Miller* and Ignore this Court's Holding in *Zapata* .......... 18

III.  PLAINTIFFS FAIL TO ESTABLISH A *PRIMA FACIE* CASE OF PERSONAL
      JURISDICTION ............................................................................................... 20

    A.  Plaintiffs Fail to Demonstrate Basic Jurisdictional Requirements of Due Process and
        Minimum Contacts ........................................................................................ 20

    B.  Conspiracy Jurisdiction Is Not Applicable to Plaintiffs' Claims ..................... 22

    C.  Personal Jurisdiction over MAR Would Be Inconsistent with Due Process ......... 24

    D.  No Jurisdictional Discovery Is Warranted ...................................................... 24

IV.  PLAINTIFFS' DECLARATIONS AND EXHIBITS FAIL TO CURE THEIR
     LEGALLY DEFICIENT CLAIMS ...................................................................... 26

V.  PLAINTIFFS DO NOT ESTABLISH STANDING AS TO FOUR PLAINTIFFS ......... 27

i

VI. PLAINTIFFS DID NOT PROPERLY EFFECTUATE SERVICE..........................................27

CONCLUSION..................................................................................................................29

TABLE OF AUTHORITIES

Page(s)

Cases

*Ansbacher, et al. v. Qatar Charity, et al.*,
Jerusalem District Court, CC 21387-06-21, November 10, 2021 ........................................... 24

*Aqua Shield, Inc. v. Inter Pool Cover Team*,
No. 05-cv-4880 (CBA), 2007 WL 4326793 (E.D.N.Y. Dec. 7, 2007) ................................... 23

*Asahi Metal Indus. Co. v. Super. Ct. of Cal.*,
480 U.S. 102 (1987) .................................................................................................................... 24

*Astor Chocolate Corp. v. Elite Gold Ltd.*,
510 F. Supp. 3d 108 (S.D.N.Y. 2020) ...................................................................................... 23

*Atuahene v. City of Hartford*,
10 F. App'x 33 (2d Cir. 2001) ..................................................................................................... 7

*Averbach ex rel. Averbach v. Cairo Amman Bank*,
No. 19-cv-00004 (GHW), 2020 WL 1130733 (S.D.N.Y. Mar. 9, 2020) .......................... 14, 27

*Averbach v. Cairo Amman Bank*,
No. 19-cv-0004 (GHW) (KHP), 2020 WL 486860 (S.D.N.Y. Jan. 21, 2020),
*report and recommendation adopted sub nom. Averbach ex rel. Averbach
v. Cairo Amman Bank*, No. 19-cv-00004 (GHW), 2020 WL 1130733 (S.D.N.Y.
Mar. 9, 2020) ........................................................................................................................ 14, 15

*Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*,
171 F.3d 779 (2d Cir. 1999) ..................................................................................................... 22

*Bartlett v. Société Générale de Banque Au Liban SAL*,
No. 19-cv-00007 (CBA) (VMS), 2020 WL 7089448 (E.D.N.Y. Nov. 25, 2020) ............ 18, 19

*Berdeaux v. OneCoin Ltd.*,
No. 19-cv-4074 (VEC), 2021 WL 4267693 (S.D.N.Y. Sept. 20, 2021) ...................... 7, 15, 21

*Bernhardt v. Islamic Republic of Iran*,
No. 18-cv-2739 (TJK), 2020 WL 6743066 (D.D.C. Nov. 16, 2020) ........................................ 8

*Cabrera v. Black & Veatch Special Projects Corps.*,
No. 19-cv-3833 (EGS) (ZMF), 2021 WL 3508091 (D.D.C. July 30, 2021) ..................... 16, 17

*Charles Schwab Corp. v. Bank of Am. Corp.*,
883 F.3d 68 (2d Cir. 2018) ......................................................................................................... 24

4877-8098-9212

*In re Chiquita Brands Int'l, Inc.*,
   284 F. Supp. 3d 1284 (S.D. Fla. 2018) ...................................................................17

*Cmty. Fin. Grp. v. Stanbic Bank Ltd.*,
   No. 14-cv-5216 (DLC), 2015 WL 4164763 (S.D.N.Y. July 10, 2015) ...................21

*In re Dental Supplies Antitrust Litig.*,
   No. 16-cv-696 (BMC) (GRB), 2017 WL 4217115 (E.D.N.Y. Sept. 20, 2017).....................22

*Essex Universal Corp. v. Yates*,
   305 F.2d 572 (2d Cir. 1962).......................................................................................4

*Force v. Qatar Charity*,
   No. 20-cv-2578 (BMC) (E.D.N.Y.) ...........................................................................7

*Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*,
   141 S. Ct. 1017 (2021)..............................................................................................20

*Freeman v. HSBC Holdings PLC*,
   413 F. Supp. 3d 67 (E.D.N.Y. 2019) .................................................................8, 19

*Gater Assets Ltd. v. AO Moldovagez*,
   2 F.4th 42 (2d Cir. 2021) ...........................................................................................4

*Gen. Dynamics Land Sys., Inc. v. Cline*,
   540 U.S. 581 (2004)....................................................................................................9

*Gill v. Arab Bank, PLC*
   893 F. Supp. 2d 542, 547 (E.D.N.Y. 2012) ............................................................17

*GSS Grp. Ltd. v. Nat'l Port Auth. of Liberia*,
   822 F.3d 598 (D.C. Cir. 2016)....................................................................................4

*Halberstam v. Welch*,
   705 F.2d 472 (D.C. Cir. 1983) ......................................................................... *passim*

*Estate of Henkin v. Kuveyt Turk Katilim Bankasi, A.S.*,
   495 F. Supp. 3d 144 (E.D.N.Y. 2020), *appeal filed*, No. 21-513
   (2d Cir. Sept. 8, 2021)........................................................................................13, 27

*Holmes v. Air Line Pilots Ass'n, Int'l*,
   745 F. Supp. 2d 176 .....................................................................................................6

*Honickman v. BLOM Bank SAL*,
   6 F.4th 487 (2d Cir. 2021) ................................................................................ *passim*

*Jingrong v. Chinese Anti-Cult World All. Inc.*,
   16 F.4th 47 (2d Cir. 2021) ..........................................................................................8

4877-8098-9212

*Kaplan v. Al Jazeera*,
  No. 10-cv-5298, 2011 WL 2314783, at *5 (S.D.N.Y. June 7, 2011) ....................................19

*Kaplan v. Lebanese Canadian Bank, SAL*,
  999 F.3d 842 (2d Cir. 2021)..............................................................................8, 11, 15

*Kirschenbaum v. Assa Corp.*,
  934 F.3d 191 (2d Cir. 2019)...........................................................................................4

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL ("Licci II")*,
  673 F.3d 50 (2d Cir. 2012)...........................................................................................25

*Licci v. Lebanese Canadian Bank, SAL ("Licci III")*,
  20 N.Y.3d 327 (2012).................................................................................................25

*Licci v. Lebanese Canadian Bank, SAL ("Licci IV")*,
  732 F.3d 161 (2d Cir. 2013).........................................................................................25

*Linde v. Arab Bank, PLC*,
  882 F.3d 314 (2d Cir. 2018)...........................................................................................5

*Miller v. Arab Bank, PLC*,
  372 F. Supp. 3d 33 (E.D.N.Y. 2019) ...........................................................................15, 18

*Miranda v. S. Country Cent. Sch. Dist.*,
  461 F. Supp. 3d 17 (E.D.N.Y. 2020) ...............................................................................7

*Motus, LLC v. CarData Consultants, Inc.*,
  23 F.4th 115 (1st Cir. 2022).........................................................................................23

*O'Sullivan v. Deutsche Bank AG*,
  No. 17-cv-8709 (LTS) (GWG), 2019 WL 1409446 (S.D.N.Y. Mar. 28, 2019),
  *appeal filed*, No. 21-7018 (D.C. Cir. Feb. 26, 2021)..................................................9, 16, 19

*Rosenberg v. Lashkar-e-Taiba*,
  No. 10-cv-5381 (DLI) (CLP) 2016 WL 11756917 (E.D.N.Y. July 5, 2016),
  *report and recommendation adopted as modified*, No. 10-cv-5381 (DLI) (CLP),
  2017 WL 11647006 (E.D.N.Y. Mar. 31, 2017)...................................................................27

*Rosenberg v. Lashkar-E-Taiba*,
  No. 10-cv-5381 (DLI) (CLP), 2017 WL 11647006 (E.D.N.Y. Mar. 31, 2017) ..............27, 28

*Rudersdal v. Harris*,
  No. 18-cv-11072 (GHW), 2022 WL 263568 (S.D.N.Y. Jan. 28, 2022)...........................10, 23

*Shi v. Le*,
  No. 21-cv-1361 (ARR) (CLP), 2022 WL 896963 (E.D.N.Y. Mar. 28, 2022)........................22

v

*Singer v. Bank of Palestine*
No., 19-cv-006 (ENV) (RML), 2021 WL 4205176 (E.D.N.Y. Apr. 30, 2021)................24, 25

*Estates of Ungar ex rel Strachman v. Palestinian Auth.*,
304 F. Supp. 2d 232 (D.R.I. 2004).........................................................................27

*Suber v. VVP Servs., LLC*,
No. 20-cv-08177 (AJN), 2021 WL 4429237 (S.D.N.Y. Sept. 27, 2021) ............................22

*Tamam v. Fransabank Sal*,
677 F. Supp. 2d 720 (S.D.N.Y. 2010)......................................................................25

*Trueposition, Inc. v. Sunon, Inc.*,
No. 05-cv-3023, 2006 WL 1686635 (E.D. Pa. June 14, 2006)........................................28

*U.S. Bank Nat'l Ass'n v. Bank of Am., N.A.*,
916 F.3d 143 (2d Cir. 2019)................................................................................24

*Vasquez v. Hong Kong & Shanghai Banking Corp.*,
477 F. Supp. 3d 241 (S.D.N.Y. 2020)....................................................................21

*Webb v. Goord*,
340 F.3d 105 (2d Cir. 2003).................................................................................5

*Weiss v. Nat'l Westminster Bank PLC*,
453 F. Supp. 2d 609 (E.D.N.Y. 2006) ....................................................................17

*Zapata v. HSBC Holdings PLC*,
414 F. Supp. 3d 342 (E.D.N.Y. 2019) ..............................................................17, 19

## Constitutions

U.S. Constitution.............................................................................................22
Fourteenth Amendment ..................................................................................17

## Statutes and Codes

United States Code
Justice Against Sponsors of Terrorism Act, § 2(b), 130 Stat. 852..............................9
18 U.S.C. § 2333(a) ....................................................................................1, 27
18 U.S.C. § 2333(d)(2) ................................................................................1, 8
28 U.S.C. § 1604............................................................................................4

Qatari Civil & Commercial Procedures Law
Article 11 (Law No. 13 of 1990) ..................................................................27, 28
Article 10 (Law No. 13 of 1990, as amended by Law No. 7 of 1995) ...............................28

<u>Rules and Regulations</u>

Civil Practice Law and Rules
    Section 302(a)(1) ...........................................................................................................21, 22
    Section 302(a)(2) ...................................................................................................................22
    Section 302(a)(3)(ii) ..............................................................................................................21

Federal Rules of Civil Procedure
    Rule 4(f)(2)(C)(ii) ..................................................................................................................28
    Rule 4(k) ................................................................................................................................23
    Rule 4(k)(2) ...............................................................................................................10, 22, 23
    Rule 12(b)(6) .................................................................................................................17, 26

4877-8098-9212

## PRELIMINARY STATEMENT

Plaintiffs fail to overcome the numerous legal deficiencies in their Complaint that Masraf Al Rayan ("MAR") identified in its Memorandum in Support of Its Motion to Dismiss ("Motion" or "Mot."). The Complaint's most glaring deficiency is the four-year gap between Plaintiffs' injuries and MAR's alleged activity. Recognizing that this four-year gap is wholly insufficient to support their claims against MAR for primary liability under the Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2333(a), *et seq.*, for secondary liability under the Justice Against Sponsors of Terrorism Act ("JASTA"), 18 U.S.C. § 2333(d)(2), *et seq.*, and to confer jurisdiction, Plaintiffs instead spin a baseless conspiracy theory reaching the highest levels of a foreign government. However, Plaintiffs' theory falls flat. The assertion that a conspiracy can be inferred, despite four years passing between MAR's alleged conduct and Plaintiffs' injuries, is implausible.

Time gap aside, Plaintiffs do not even attempt to plead facts implicating MAR in a conspiracy with Hamas and PIJ, the terrorist groups at issue, as required under JASTA. Similarly, irrelevant allegations about Middle Eastern politics cannot hide Plaintiffs' failure to plead publicly available facts that provide any grounds to plausibly allege general awareness, a requirement for aiding and abetting liability under JASTA. In addition, Plaintiffs' primary liability claims under the ATA fail because (as courts have repeatedly explained, and as Plaintiffs ignore) ordinary banking transactions—the most that Plaintiffs allege of MAR—are not acts of violence.

Plaintiffs' claims warrant complete dismissal for failure to state a claim; separately, Plaintiffs also fail to establish that MAR purposefully availed itself of the New York forum and that exercising personal jurisdiction would be consistent with due process. Moreover, Plaintiffs implicitly concede that several Plaintiffs lack standing, and they have yet to properly serve MAR. For these reasons, Plaintiffs' claims must be dismissed.

4877-8098-9212

## ARGUMENT

I.   **PLAINTIFFS HAVE NO SECONDARY LIABILITY CLAIMS UNDER JASTA BECAUSE THEY FAIL TO PROPERLY PLEAD A CONSPIRACY AND GENERAL AWARENESS FOR AIDING AND ABETTING**

Under theories of conspiracy and aiding and abetting, Plaintiffs seek to attach secondary liability to MAR for actions that occurred four years earlier.  Plaintiffs' attempt to infer a conspiracy from these tenuous allegations is wholly implausible.  Recognizing the deficiency of these claims, Plaintiffs attempt to plead a conspiracy simply by labeling Defendants "co-conspirators" without facts to support their conclusory allegations.  In vain, they devote twenty pages of their Omnibus Memorandum of Law in Opposition to Motions to Dismiss of Defendants Qatar Charity, Qatar National Bank and Masraf Al Rayan ("Opposition" or "Opp.") to describing a conspiracy that they have not properly pled (nor could they).

### A.   Plaintiffs Have No Conspiracy Claim

#### 1.   Plaintiffs Fail to Properly Plead Conspiracy with Anyone

Plaintiffs' conspiracy allegations are implausible considering the four-year time gap between the date of the alleged transfers and the attack that injured Plaintiffs.  Moreover, Plaintiffs have failed to properly plead a plausible claim of conspiracy with anyone.  Plaintiffs' claim requires that they plausibly plead "an agreement to do an unlawful act or a lawful act in an unlawful manner."  (Opp. at 34-35).  They have not met this burden.

##### a.   The Time Gap Between the Alleged Transfers and the Injury Renders Plaintiffs' Allegations of a Conspiracy Implausible

Four years separate even the most recently dated alleged transaction and the attack that injured Plaintiffs.  (Compl. ¶ 17 (attack occurred on May 5, 2019); *id.* ¶ 106 (alleged conspiracy occurred "[f]rom at least 2011 through 2015"); *id.* ¶ 128 (alleged transfer occurred "[f]rom March 1, 2015 until September 7, 2015 alone"); *id.* ¶ 132(c) (alleged currency exchange transactions

2

occurred "[b]etween 2009 and 2015")).   Plaintiffs even admit that Qatar Charity's relevant operations "ceased in July 2015," (*id.* ¶ 141), necessarily ceasing transfers to Hamas and PIJ.

Nevertheless, Plaintiffs spin an implausible theory that a conspiracy can be inferred from alleged conduct occurring years before the terrorist acts that gave rise to Plaintiffs' injuries.  *See Halberstam v. Welch*, 705 F.2d 472, 481 (D.C. Cir. 1983) ("In sum, we expect that the relationships between the actors and between the actions (*e.g.*, the proximity in time and place of the acts, and the duration of the actors' joint activity) are relevant to inferring an agreement in a civil conspiracy action.").   It is undisputed that MAR was nowhere near the attacks at issue.  (Opp. at 29 n.16). Without any pled "proximity in time," and as a result, no "duration" of "joint activity" by MAR and its purported co-conspirators, Plaintiffs' theory of conspiracy is implausible on its face. *Halberstam*, 705 F.3d at 481.

### b.  Plaintiffs Have Failed to Allege a Plausible Conspiracy with the State of Qatar

Even if the Court looks past the substantial gap in Plaintiffs' alleged timeline, Plaintiffs have failed to plead a conspiracy with anyone.  Without basis, Plaintiffs aver that they have alleged "an agreement among the government of Qatar, the Qatari Royal Family, the [Foreign Terrorist Organizations ("FTO" or "FTOs")], and Defendants."  (Opp. at 35).  Plaintiffs continue to insist that Defendants' illegal conspiracy was orchestrated by the Qatari government, and that MAR's "dominat[ion] by Qatar and its Royal Family" and "control" by Qatar (*Id.* at 12, 17, 23-24, 46 n.28) demonstrates the plausibility of this theory.  However, no facts have been pled to support this legal conclusion.

First, Plaintiffs insist their allegations that the government owns 28% of MAR and has some unspecified number of board seats is sufficient, *per se*, to establish control.  In support of

3

this assertion, they cite *Essex Universal Corp. v. Yates*, 305 F.2d 572 (2d Cir. 1962).[1]  (Opp. at 25-26 n.14).  *Essex* grappled with "the question whether a contract for the sale of 28.3 per cent of the stock of a corporation is, under New York law, invalid as against public policy solely because it includes a clause giving the purchaser an option to require a majority of the existing directors to replace themselves," 305 F.2d at 573, a question completely irrelevant to Plaintiffs' arguments. Plaintiffs cite shareholder control cases to mask that their allegations do not allege that Qatar had "stock voting power" in two banks, *id*. at 579, but instead conclusorily plead that Qatar "coopted several institutions that it dominates and controls to funnel coveted U.S. dollars" to terrorist organizations in secret.  (Compl. ¶ 5).  Shareholder control, even majority shareholder control (which Plaintiffs do not plead Qatar has over MAR), and board seats are insufficient resources to coopt a corporation in service of an illegal terrorist conspiracy.  *See Gater Assets Ltd. v. AO Moldovagez*, 2 F.4th 42, 58 (2d Cir. 2021) (Even if the "Republic [of Moldova] effectively wields the power of a majority shareholder over Moldovagez . . . such authority does not in itself establish extensive control.").[2]

Second, as pled, Plaintiffs' conspiracy theory is nonsensical.  According to Plaintiffs, the government of Qatar's "integral role in the conspiracy" was "encouraging [Defendants'] behavior."  (Opp. at 36).  It is not clear what encouragement Defendants needed, especially if they were completely dominated and "controlled" by Qatar.  Plaintiffs also fail to explain why it is

---

[1] Plaintiffs also cite shareholder control cases interpreting Delaware law in similarly irrelevant contexts, (Opp. at 26 n.14), and a D.C. Circuit case (*id*. at 26) where the government "ordered" an instrumentality to cancel a contract—a specific allegation of government action missing from this case.  *GSS Grp. Ltd. v. Nat'l Port Auth. of Liberia*, 822 F.3d 598, 606-07 (D.C. Cir. 2016).  There, plaintiff's complaint was dismissed because it lacked a plausible allegation of agency control, despite the order.  *Id*. at 608.

[2] Were Plaintiffs' allegations somehow plausible, they would render MAR an organ or alter ego of Qatar.  (*See* Mot. at 27 n.17); *see also Kirschenbaum v. Assa Corp.*, 934 F.3d 191, 198 (2d Cir. 2019) ("Both Assa entities are owned and controlled by Iran.  They are Iran's alter egos as a matter of law and are therefore foreign states under the [Foreign Sovereign Immunities Act].").  If the Government of Qatar "controlled" the acts of MAR, then the Court would lack subject matter jurisdiction over this action pursuant to the Foreign Sovereign Immunities Act.  *See* 28 U.S.C. § 1604.

plausible that Qatar would go to the trouble of orchestrating a vast conspiracy involving a myriad of co-conspirators to provide "a substantial portion" of "over $28 million" to "Hamas, PIJ, and supposed charities controlled by those terrorist organizations," (Compl. ¶¶ 127-29), when Qatar was allegedly comfortable pledging publicly that it would provide Hamas with $400 million directly.  (*Id*. ¶ 114).

### c.      Plaintiffs Have Failed to Properly Plead an Agreement with Qatar Charity and Qatar National Bank

To properly allege MAR conspired with Qatar Charity and Qatar National Bank ("QNB"), Plaintiffs "must provide some factual basis supporting a meeting of the minds, such that defendants entered into an agreement."  *Webb v. Goord*, 340 F.3d 105, 110-11 (2d Cir. 2003) (internal quotation marks and citation omitted).  There are no non-conclusory allegations that MAR ever conspired with either or both of its co-defendants; Plaintiffs do not allege any conduct that evinces an agreement.

Plaintiffs allege only that MAR transferred funds for Qatar Charity.  (*See, e.g.*, Compl. ¶ 132).  The allegation that MAR "maintained a direct or indirect correspondent banking relationship with Bank of New York Mellon, and perhaps other U.S. banks" is not only vague, (*id.* ¶ 163), but also wholly unremarkable:  the allegation that a foreign bank engaged in banking transactions with one of its customers is not a factual basis to support the existence of an illegal conspiracy.  *See Linde v. Arab Bank, PLC*, 882 F.3d 314, 327 (2d Cir. 2018) (concluding that "providing routine financial services to members and associates of terrorist organizations is not so akin to providing a loaded gun to a child as to excuse the charging error here").  Indeed, every foreign bank would fall in this category.

In recognition of their lack of sufficient allegations against MAR, Plaintiffs repeatedly invoke the purported undated "criminal confessions by the Director and Staff of Qatar Charity's

5

West Bank Branch, which detail how Qatar Charity and Masraf laundered USD through the U.S. to Qatar Charity's accounts in the West Bank." (Opp. at 36). However, Plaintiffs do not plead any plausible allegations as to who confessed what, when, and under what circumstances. (Compl. ¶ 132).[3]

While the allegations as to an agreement between MAR and Qatar Charity hinge on routine transactions, there are no non-conclusory allegations that MAR and QNB interacted at all. The entirely disparate allegations against MAR and QNB only demonstrate that there was *not* a meeting of the minds between the Defendants. While the only concrete allegation as to a time period against MAR is from 2015 (*e.g.*, Compl. ¶ 132(c)), Plaintiffs point out that the allegations against QNB include allegations from 2006 and 2012. (Opp. at 33). And nowhere do Plaintiffs allege that MAR and QNB were ever in contact with one another. *See Halberstam*, 705 F.2d at 481 ("In sum, we expect that the relationship between the actors and between the actions (*e.g.*, the proximity in time and place of the acts, and the duration of the actors' joint activity) are relevant in inferring an agreement in a civil conspiracy action.").[4]

### d.    Plaintiffs Fail to Allege that MAR Conspired with an FTO

Plaintiffs also plead no facts to allege that Plaintiffs conspired with either Hamas or PIJ. As the Motion explains, "*nowhere* do Plaintiffs allege in a non-conclusory fashion that MAR entered into any agreement with PIJ or Hamas." (Mot. at 31) (emphasis added). Plaintiffs concede as much, stating that "Qatar Charity maintain[ed] the direct link to the FTOs," not either MAR or

---

[3] *See* Reply Brief in Support of Qatar Charity's Motion to Dismiss. A review of the exhibits filed by Qatar Charity demonstrates that there are contradictions that undermine Plaintiffs' allegations; as a result, the Court need not credit them. If documents "contradict the allegations of the [] complaint, the documents control and this Court need not accept as true the allegations in the [] complaint." *Holmes v. Air Line Pilots Ass'n, Int'l*, 745 F. Supp. 2d 176 at 193-94 (internal quotation marks and citations omitted).

[4] Plaintiffs incorrectly assert that MAR has "waived arguments" as to "overt act" and "causation." (Opp. at 35 n.20). The "overt act" requirement is coextensive with the "substantial assistance" and "international act of terrorism" prongs of JASTA and ATA liability, respectively, and MAR argues that Plaintiffs fail to plead causation as part of its arguments as to ATA liability and personal jurisdiction. (*See* Mot. §§ IV.A.2, III.A.-B.).

QNB.  (Opp. at 36).  As a result, Plaintiffs instead argue, incorrectly, that no such allegation is required.  *See infra* § I.A.2.

### e.    Plaintiffs Impermissibly Engage in Group Pleading

Plaintiffs also make no attempt to adhere to *Berdeaux*'s admonition against "impermissible group pleading"; Plaintiffs' Complaint is "riddled" with allegations that lump Defendants together. *See Berdeaux v. OneCoin Ltd.*, No. 19-cv-4074 (VEC), 2021 WL 4267693, at *7, *11 (S.D.N.Y. Sept. 20, 2021); (*see* Mot. at 28 n.19).  "Where a complaint lumps defendants together in each claim and provides no factual basis to distinguish their conduct, it fails to satisfy the minimum pleading standard." *Miranda v. S. Country Cent. Sch. Dist.*, 461 F. Supp. 3d 17, 31 (E.D.N.Y. 2020) (citing *Atuahene v. City of Hartford*, 10 F. App'x 33, 34 (2d Cir. 2001)).  Here, Plaintiffs repeatedly lump the Defendants together. (*See, e.g.*, Compl. ¶¶ 8, 106, 111, 151-56, 326).  Because Plaintiffs repeatedly fail to plead "factual allegations to distinguish" MAR's purportedly unlawful conduct, the Complaint should be dismissed as to MAR.  *Miranda*, 461 F. Supp. 3d at 31.[5]

### 2.    Plaintiffs Misstate the Law on Conspiracy

Setting aside Plaintiffs' failure to properly plead a conspiracy with anyone, Plaintiffs misstate the law.  Plaintiffs argue that because JASTA was enacted to permit litigants "to sue entities 'that have provided material support, *directly or indirectly*' to [Foreign Terrorist Organizations]," MAR's interpretation of JASTA is unduly restrictive.  (Opp. at 37).  However, JASTA's text is clear:

> In an action under subsection (a) for an injury arising from an act of international terrorism committed, planned, or authorized by an organization that had been designated as a foreign terrorist organization under section 219 of the Immigration and Nationality Act (8 U.S.C. 1189), as of the date on which such act of international terrorism was committed, planned,

---

[5] Plaintiffs have a similar issue in another ATA action currently pending before Judge Cogan.  *See* Transcript of Hearing at 24:12-15, *Force v. Qatar Charity*, No. 20-cv-2578 (BMC) (E.D.N.Y. Jan. 28, 2022) ("[L]ooking at this complaint, it does seem to me that there's a lot of lumping together of defendants who might have behaved very differently.").

4877-8098-9212

or authorized, liability may be asserted as to *any person who aids and abets*, by knowingly providing substantial assistance, *or who conspires with the person* who committed such an act of international terrorism.

18 U.S.C. § 2333(d)(2) (emphasis added).

"When interpreting a statute, we begin with the text.  We must give effect to the text's plain meaning." *Jingrong v. Chinese Anti-Cult World All. Inc.*, 16 F.4th 47, 57 (2d Cir. 2021).  Here, as the Second Circuit has explained, the plain meaning is clear.  "[A]iding-and-abetting claim[s]" are permissible under JASTA "where the defendant's acts aided and abetted the principal even where his relevant substantial assistance was given to an intermediary." *Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842, 856 (2d Cir. 2021).  However, conspiracy liability attaches under JASTA only where "a defendant" is "shown to have 'conspire[d] *with*' the principal" Foreign Terrorist Organization ("FTO").  *Id*. at 855 (emphasis added).[6]  The statute specifically provides that the conspiracy must be with "the person" who in fact committed the acts of terrorism.

The Second Circuit's interpretation of JASTA's liability provision is far from "myopic," as Plaintiffs put it (Opp. at 37), and every court that has evaluated Plaintiffs' argument has rejected it. *See Freeman v. HSBC Holdings PLC*, 413 F. Supp. 3d 67, 98 n.41 (E.D.N.Y. 2019) ("[T]he plain text of JASTA's *conspiracy* liability provisions requires that a defendant conspire directly with the person or entity that committed the act of international terrorism that injured the plaintiff."); *Bernhardt v. Islamic Republic of Iran*, No. 18-cv-2739 (TJK), 2020 WL 6743066, at *7 (D.D.C. Nov. 16, 2020) ("JASTA liability exists only where 'the secondary tortfeasor conspired with the principal tortfeasor in committing such an act of international terrorism.'") (emphasis and

---

[6] Plaintiffs characterize this statement as "dicta" (Opp. at 37 n.22); however, the Second Circuit's invocation of conspiracy liability under JASTA as a point of comparison to aiding and abetting liability under JASTA was central to its analysis. *Kaplan*, 999 F.3d at 855-56.  Moreover, even if the *Kaplan* panel's language at issue *were* dicta, Plaintiffs themselves cite an out-of-district case for dicta when it suits them.  (Opp. at 69.)  Second Circuit dicta has precedential value too.

8

internal quotation marks omitted) (quoting *O'Sullivan v. Deutsche Bank AG*, No. 17-cv-8709 (LTS) (GWG), 2019 WL 1409446, at \*9 (S.D.N.Y. Mar. 28, 2019)), *appeal filed*, No. 21-7018 (D.C. Cir. Feb. 26, 2021).   Plaintiffs do not cite a single authority that disagrees with these decisions, and none exists.

Plaintiffs argue that because JASTA was enacted to permit litigants "to sue entities 'that have provided material support, *directly or indirectly*' to FTOs," MAR's interpretation "limits the law to far less than its stated purpose."  (Opp. at 37).   However, Plaintiffs seek to obviate any practical distinction between aiding and abetting and conspiracy liability, leading to a result where two causes of action under the same statute would be largely redundant of one another.  (*Id*. at 35) (recognizing that "[t]he same facts that support Plaintiffs' aiding-and-abetting claim likewise evidence the existence of Defendants' conspiracy").[7]

Moreover, the "Findings and Purpose" section of JASTA cited by Plaintiffs also states that *Halberstam*, 705 F.2d 472, "provides the proper legal framework" for how conspiracy liability "should function."  JASTA § 2(b), 130 Stat. 852.  As Plaintiffs acknowledge, "the two parties in *Halberstam* necessarily conspired directly."  (Opp. at 38).   The court also held that courts in most cases "must initially look to see if" the co-conspirators "are in contact with one another," and that "[m]utually supportive activity by parties *in contact with one another over a long period* suggests a common plan."  *Halberstam*, 705 F.2d at 481 (emphasis added).   Nothing in *Halberstam*

---

[7] Plaintiffs cite a Supreme Court case interpreting the Age Discrimination in Employment Act for the proposition that courts should look to a statute's "findings and statements of objectives" to interpret a provision's plain meaning, (Opp. at 38); however, in that case, "[t]he very strength" of the lower courts' "consensus" in interpretation of the statute "was enough to rule out any serious claim of ambiguity" as to the statute's plain meaning. *Gen. Dynamics Land Sys., Inc. v. Cline*, 540 U.S. 581, 593-94 (2004).  Here, not only is the statute unambiguous, but every court that has opined on the issue disagrees with Plaintiffs' interpretation; Plaintiffs cite irrelevant *criminal* conspiracy cases instead.  (Opp. at 38).

9

contemplates liability for a co-conspirator who *never* conspired with the principal.  Thus, based on the text and purpose of JASTA, Plaintiffs' conspiracy claim fails as a matter of law.[8]

**B.**     **Plaintiffs Do Not State a Claim for Aiding and Abetting Liability Under JASTA**

Plaintiffs fail to plausibly state a claim for aiding and abetting liability under JASTA; the Complaint fails to plead facts as to both general awareness and substantial assistance.

**1.**     **Plaintiffs Ignore the Second Circuit's Ruling in *Kaplan* on General Awareness**

Plaintiffs relist their allegations of purported general awareness, (Opp. at 22-24), but those allegations remain deficient.  For example, MAR's Motion detailed why allegations of public knowledge *after* the transactions at issue cannot be used to support a finding of general awareness, which Plaintiffs do not address (Mot. at 26); even so, Plaintiffs include such allegations on their list.  (Opp. at 22-23).  Nor do Plaintiffs explain why allegations as to *Qatar's* support of terrorism can be imputed to Defendants for purposes of general awareness.  (Mot. at 26-28).  Plaintiffs argue that "these factors leave no doubt" as to general awareness "[i]n combination," (Opp. at 28), citing *Honickman*, but simply combining their disparate insufficient allegations does not transform them into a single sufficient allegation.  Plaintiffs assert that they plead "far more compelling support than *Kaplan*" for an inference of general awareness.  (*Id.* at 22).  Plaintiffs are incorrect.

Unlike Plaintiffs' allegations, the defendant in *Kaplan* "gave the customers special treatment, exempting them from submitting cash transaction slips" and gave them "exemptions

---

[8] Plaintiffs' conspiracy theory is central to their claims because Plaintiffs recognize that they must first properly plead a plausible claim of conspiracy under JASTA *before* this Court can properly exercise personal jurisdiction over Qatar Charity and QNB; without conspiracy, there is no jurisdiction over them.  However, "[i]f a federal statute contains a specific limitation on the exercise of jurisdiction that would preclude" Plaintiffs' conspiracy theory, then jurisdiction as to all of Plaintiffs' claims is unavailable because under Rule 4(k)(2), the "exercise of jurisdiction must be consistent with U.S. law."  *Rudersdal v. Harris*, No. 18-cv-11072 (GHW), 2022 WL 263568, at *11 (S.D.N.Y. Jan. 28, 2022); *see infra* § III.B.  Here, JASTA contains a limitation on the availability of conspiracy liability—it requires the defendant to have conspired *with* an FTO; Plaintiffs may not use Rule 4(k)(2) to evade that limitation.  And without the ability to assert conspiracy jurisdiction over all Defendants, Plaintiffs have no case.

with respect to deposits" for "more than $2.5 million a week." 999 F.3d at 850. Plaintiffs completely ignore these allegations, which were integral to the *Kaplan* decision. Moreover, as Plaintiffs highlight, the FTO at issue in *Kaplan* was famously headquartered in the same country as the defendant. (Opp. at 21). Plaintiffs' allegations as to general awareness in *Kaplan* included numerous *public statements* that identified the customers as "integral parts of Hizbollah" prior to the attacks at issue, "the circumstances in which the statements were made," and "the other specific media in which they were made." 999 F.3d at 864.

Worse, Plaintiffs mischaracterize the customers at issue in *Kaplan* as "a putative charity[,] . . . two corporations, and two of their officers." (Opp. at 25). No customer in *Kaplan* is described as a charity; one customer provided funding to terrorists and their families and was described in passing (in a news article cited in the complaint) as providing "charitable funds" to *suicide bombers*, an allegation that supported a finding of general awareness. *Kaplan*, 999 F.3d at 849-51. The Second Circuit drew a contrast between "the plaintiffs' theory" in *Kaplan* that the "customers provided subsidies to the families of Hizbollah suicide bombers" and "permitted the laundering of money in violation of regulatory restrictions meant to hinder the ability of FTOs to carry out terrorist attacks" with the plaintiffs' theory in *Honickman* that the customers supported "Hamas's social welfare program" and "supported orphans in Palestinian refugee camps." *Honickman v. BLOM Bank SAL*, 6 F.4th 487, 503 n.21 (2d Cir. 2021) (citation omitted). It is disingenuous at best to claim Plaintiffs' allegations against MAR more closely resemble the former than the latter.

11

Plaintiffs similarly mischaracterize *Honickman*.[9]  There, as here, "[t]he limited public sources Plaintiffs cite pale in comparison to the detailed, numerous sources that sufficed in *Kaplan*." *Id.* at 502.  Critically, the court held that the allegation that the customers at issue in *Honickman* "maintained a 'cover' in public undermines the plausibility of Plaintiffs' theory that BLOM Bank understood those organizations' true nature and activities from the public record at the time." *Id.*  That holding flies in the face of Plaintiffs' assertion that "the court should reject the Bank Defendants' claims that Qatar Charity's humanitarian work undermines Plaintiffs' allegations" of general awareness.  (Opp. at 34 n.19).  Plaintiffs characterize MAR as "pretend[ing] that Qatar Charity is not the same organization as Qatar Charitable Society," (*id.* at 26-27), but it is Plaintiffs who explain the name change was to maintain a "cover" (as in *Honickman*), specifically in response to the notoriety received "under its prior name."[10]  (Compl. ¶ 40).

Plaintiffs' allegations as to general awareness amount to two alleged facts:  Israel's ban of members of Union of Good in 2008, (*see id.* ¶ 54), and purported confessions by employees of Qatar Charity at unspecified times, (*id.* ¶ 132).  Neither demonstrates with any plausibility that MAR was generally aware of any alleged relationship between Qatar Charity and Hamas or PIJ. As to the confessions, as pled, they do not sufficiently allege general awareness as to MAR. Purportedly, MAR "arranged for currency exchange transactions" of Qatar Charity funds "through

---

[9] Plaintiffs misstate the pleading requirement articulated in *Honickman* by conflating the concepts of close intertwinement with terrorist activities and the terrorist activities themselves.  (Opp. at 25).  *Honickman* established that the general awareness standard is whether plaintiffs have plausibly alleged that the bank's customers "were so closely intertwined" with the FTOs' "violent terrorist activities that one can reasonably infer that" the bank "was generally aware while it was providing banking services to those entities that it was playing a role in unlawful activities from which [the FTOs'] attacks were foreseeable." *Honickman*, 6 F.4th at 499.  The standard is exactly that: whether the bank customer is "intertwined" with the terrorist activities of the FTOs to infer the bank's general awareness.

[10] In further recognition of the Complaint's deficiencies, Plaintiffs assert for the first time that "Defendants all possess non-public information that shows the charity's funding of the FTOs." (Opp. at 11; *see also id.* at 22 n.11).  This conclusory allegation, whether in the Complaint or in the Opposition, is irrelevant; Plaintiffs must allege proper plausible facts to proceed beyond the pleading stage.  Similarly, the allegation that non-defendant banks "refused to provide services to Qatar Charity" is unsupported by any alleged facts from which it can be inferred that such refusal was "because of its terror funding" as Plaintiffs now claim for the first time.  (*Id.* at 23).

Bank of New York Mellon in New York." (*Id.* ¶ 132(c)-(d)).  There is nothing pled to indicate that the Qatar Charity employees confessed MAR had any awareness as to the *purpose* of these transfers, or knowledge of any purported Qatar Charity affiliation with a terrorist group.  And no other aspect of this so-called confession implicates MAR, rendering the confession allegation probative of nothing.  Further, given that Plaintiffs do not plead any information as to the date, declarant, substance, or context of these purported "confessions," they are not plausible as information available to MAR that would render it generally aware of Qatar Charity's alleged relationship with FTOs.

Finally, Plaintiffs cite Israel's order banning members of Union of Good with remarkable frequency, (*see, e.g.*, Opp. at 1, 10, 16, 23, 31, 32, 35, 41, 42); however, that order did not prevent Israel from allowing Qatar Charity to operate in the Palestinian Territories for seven more years— until 2015.  (Compl. ¶ 141).  Plaintiffs seek to equate the provision of routine financial services, to an entity listed under an alias on a press release seven years prior in another country, with material support of terrorism.  To hold it is plausible that MAR was generally aware that it was participating in unlawful activities from which terrorist attacks were foreseeable on the basis of such flimsy allegations would erase any threshold for aiding and abetting liability.  A finding of general awareness cannot depend on a single foreign country's policy changes; Plaintiffs must demonstrate that information as to Qatar Charity's alleged affiliation with Hamas and PIJ was "ubiquitous."  *Estate of Henkin v. Kuveyt Turk Katilim Bankasi, A.S.*, 495 F. Supp. 3d 144, 160 (E.D.N.Y. 2020), *appeal filed*, No. 21-513 (2d Cir. Sept. 8, 2021); *see Honickman*, 6 F.4th at 502 n.18 ("Plaintiffs argue that 'the publicly available evidence [in the complaint] was largely available before or during the relevant period or discussed facts that were previously knowable.' . . . However, 'publicly available' evidence is not the same as public sources such as media articles.

The latter, depending on their substance, plausibly suggest a defendant's knowledge which can be confirmed during discovery, whereas the former requires the implausible inference that the defendant was aware of those facts even before the news media."). Union of Good itself was a customer in *Honickman*, and even though Israel "designated" it in 2002 as "part of the Hamas organization," the Second Circuit held JASTA liability still did not attach because "Plaintiffs failed to plausibly allege BLOM Bank was aware [its] [c]ustomers were related to Hamas." *Honickman*, 6 F.4th at 493 n.6, 503. As a result, JASTA liability should not attach to MAR either.[11]

## 2.    The Complaint Fails to Plead Substantial Assistance

Not only do Plaintiffs fail to allege facts from which general awareness can be inferred, they also fail to plead that MAR substantially assisted FTOs. The Complaint contains no non-conclusory allegations that MAR did anything other than execute ordinary financial transactions.

Emblematic of Plaintiffs' Opposition is its contention that "the services Defendants provided here were anything but routine." (Opp. at 30). As to MAR, Plaintiffs, however, do not assert any allegations beyond routine banking services. (*Id.*); *see Averbach v. Cairo Amman Bank*, No. 19-cv-0004 (GHW) (KHP), 2020 WL 486860, at *16 (S.D.N.Y. Jan. 21, 2020) (dismissing claim where "Plaintiffs have not pleaded that CAB had any type of relationship other than an arms-length business relationship with the Account Holders and have pleaded no relationship at all to Hamas except through the Account Holders."), *report and recommendation adopted sub nom. Averbach ex rel. Averbach v. Cairo Amman Bank*, No. 19-cv-00004 (GHW), 2020 WL 1130733 (S.D.N.Y. Mar. 9, 2020). Each of the cases cited by Plaintiffs requires the defendant to have allegedly done more. In *Kaplan*, where, for example, the bank granted "special exceptions" to its

---

[11] Plaintiffs' allegations as to MAR's state of mind are insufficient as to all of its causes of action for the same reasons as the general awareness inquiry: Plaintiffs fail to make non-conclusory allegations that MAR knew of any alleged connection between Qatar Charity and terrorist organizations. (*See* Opp. at 32).

customers, "Plaintiffs plainly did not allege that LCB's provision of banking services to the Customers was 'routine.'"  999 F.3d at 858.  In *Halberstam*, the defendant "performed [her] services in an unusual way under unusual circumstances for a long period of time." *Halberstam*, 705 F.2d at 487; *see also Miller v. Arab Bank, PLC*, 372 F. Supp. 3d 33, 48 (E.D.N.Y. 2019) (denying motion to dismiss because Plaintiffs pled Arab Bank's services were "unusual," consistent with *Halberstam*).[12]

Plaintiffs attempt the same ploy with regard to the "duration of assistance" prong of the "substantial assistance test."  The Opposition attempts to demonstrate that "the Defendants' scheme to fund the FTOs extended over several years," but makes no effort to cite concrete facts as to MAR in support of that allegation.  (Opp. at 32).  *Cf. Averbach*, 2020 WL 486860, at *17 (noting allegation that defendant maintained "accounts for Hamas-affiliated organizations from 1999-2004," but that "the fund transfers through the correspondent bank accounts took place over a much shorter period of time," as "[t]he longest duration of assistance for any one of the Account Holders was a year").[13]  Moreover, Plaintiffs plead no alleged misconduct as to MAR *after* 2015 (Compl. ¶¶ 106, 132(c), 141), but the attack at issue occurred in 2019.  (*Id.* ¶ 17).  According to the Complaint, MAR provided no assistance whatsoever, substantial or not, for the four years preceding the attack.  For that reason, the "duration of the assistance" prong fails.

---

[12] Plaintiffs attempt to bolster their conclusory theory with allegations about "Sanabel Cards" that "Qatar Charity obtained from the Bank of Palestine."  (Opp. at 8).  But Qatar Charity's alleged use of its own funds to purchase debit cards from a non-defendant unimplicated in the alleged conspiracy and distribute them to unnamed individuals does not implicate MAR at all, and Plaintiffs' labeling of it as "Defendants' Sanabel Card scheme" is improper and conclusory group pleading.  (*See, e.g.*, Compl. ¶ 154); *see Berdeaux*, 2021 WL 4267693, at *2, *7 (dismissing complaint that was "riddled with instances of improper group pleading"); *supra* § I.A.1.e.

[13] With regard to the other prongs of the "substantial assistance test," Plaintiffs continue to reassert only their conclusory allegations, (Opp. at 30-34), which fail for the reasons already identified by MAR, (Mot. at 28-31).

15

## II.     PLAINTIFFS DO NOT STATE A CLAIM FOR PRIMARY LIABILITY UNDER THE ATA

Plaintiffs' primary liability claims are similarly defective.  Premised on the tenuous

allegations that MAR's alleged activity ending in 2015 caused the attack that injured Plaintiffs,

Plaintiffs' claims fail to establish proximate cause or an intent to intimidate or coerce as required

by the ATA.

### A.     Plaintiffs Fail to Establish that MAR's Alleged Activity Was the Proximate Cause of Plaintiffs' Injuries

Plaintiffs' causation arguments are particularly unavailing because of the gap in time

between the alleged transactions and the attack.  Plaintiffs attempt to downplay this gap by

asserting that MAR "ignore[s]" Plaintiffs' allegations that "Defendants' knowing support of

Hamas and PIJ occurred before, during, and after the May 2019 rocket attack."  (Opp. at 48).  In

support, Plaintiffs cite only one, wholly conclusory, allegation against MAR, (Compl. ¶ 70), which

fails to meet *Twombly*'s plausibility standard.  (*See* Mot. at 17-18).  In addition, in *Miller*, the

defendant bank employees actually handed money to terrorists, unlike MAR, for whom "the

factual allegations delineating relationships between those services and the terrorist attacks at issue

are so attenuated." *O'Sullivan*, 2019 WL 1409446, at *8.

Plaintiffs also struggle to distinguish *Cabrera* by asserting that the gap there was greater

than the gap here.  (Opp. at 49).[14]  But Plaintiffs acknowledge that *Cabrera* establishes temporal

distance as "an element of foreseeability," even at the pleading stage.  (*Id.*).[15]  Contrary to

---

[14] Plaintiffs attempt to raise a question of fact by pointing to allegations in the Complaint that the MAR transferred funds for Qatar Charity into an account in the Palestinian Territories, where Qatar Charity had been banned.  (Opp. at 50).  As discussed *supra* § I.B.1. and in the Motion (Mot. § IV.A.1.), Plaintiffs have failed to plead sufficient allegations from which the Court could infer that MAR should have foreseen that transferring funds for Qatar Charity would have resulted in the attack that injured Plaintiffs.

[15] Plaintiffs also take issue with MAR's use of *Cabrera* to argue that it could not "foresee being haled into court" in New York, claiming that "foreseeability relates to a plaintiff's injury, not to a defendant's ability to predict litigation." (Opp. at 49).  However, Plaintiffs must plead both.  *See generally Cabrera v. Black & Veatch Special Projects Corps.*,

Plaintiffs' misreading of *Weiss v. Nat'l Westminster Bank PLC*, 453 F. Supp. 2d 609, 632 (E.D.N.Y. 2006), no court has held that Plaintiffs need not demonstrate temporal proximity at the motion to dismiss stage, and Plaintiffs cite none.[16]  Nor do Plaintiffs cite any cases in which a claim under the ATA for an injury *four years* after any alleged misconduct was found to plausibly plead causation.[17]

Even if the Court were to look past the Complaint's lack of temporal proximity, Plaintiffs fail to allege the "sufficiently direct relationship between the conduct in question and the injuries for which recovery is sought."  *Zapata v. HSBC Holdings PLC*, 414 F. Supp. 3d 342, 356 (E.D.N.Y. 2019) (Garaufis, J.); (*see* Mot. at 16).  Plaintiffs focus largely on whether their injuries were "foreseeable" as a result of MAR's alleged actions.  (Opp. at 48), but Plaintiffs make no attempt to demonstrate how their claims—which situate MAR in a long chain of alleged links and do not allege MAR participated or funded the attack either directly or indirectly—are unlike the claims in *Rothstein*, which were too attenuated.  (*See* Mot. at 17, 20).

---

No. 19-cv-3833 (EGS) (ZMF), 2021 WL 3508091 (D.D.C. July 30, 2021).  First, as a matter of proximate causation under the ATA, they must plead that Plaintiffs' injuries were foreseeable, *id*. at *20 ("To survive a motion to dismiss on this issue, plaintiffs must plausibly allege . . . that [their] injuries were reasonably foreseeable or anticipated as a natural consequence of the defendant's conduct."), and second, as a matter of personal jurisdiction under the Due Process Clause of the U.S. Constitution, "that a defendant should reasonably anticipate being haled into court there," *id*. at *13 (internal quotation marks and citation omitted).

[16] Likewise, Plaintiffs attempt to distinguish *Gill v. Arab Bank, PLC* by asserting that the foreseeability issue is "fact-intensive" and should be "explored after discovery," (Opp. at 50), but Plaintiffs have alleged no relevant facts to establish foreseeability.  Moreover, the decision under 12(b)(6) in *Gill* was published less than a month before the summary judgment decision dismissing Plaintiffs' claims for lack of foreseeability, and the decisions were "designed to be read with, and as part of," one another.  893 F. Supp. 2d 542, 547 (E.D.N.Y. 2012).  The *Gill* plaintiffs' inability to offer "evidence [the transfers] were in close temporal proximity to the" terrorist attacks at issue only underscores that Plaintiffs here have pled claims for which discovery would be futile with regard to temporal proximity.  (*See* Mot. at 9 n.7).  Plaintiffs have yet to argue otherwise, even though their claims, like *Gill*'s, involve a four-year temporal gap.  (*Id*.).

[17] Plaintiffs' attempt to rely on *In re Chiquita Brands Int'l, Inc.*, 284 F. Supp. 3d 1284 (S.D. Fla. 2018) is misplaced.  (Opp. at 50).  As Plaintiffs rightly note, the court in *In re Chiquita* explained that "foreseeability" is "more attenuated" for ATA claims "[t]he greater the time between the payments and the attack."  *In re Chiquita*, 284 F. Supp. at 1313.  The fact that some of the payments at issue in that case "continu[ed] up through *and during* the time of the FARC's kidnapping and killing of Plaintiff's family members" only highlights how comparatively attenuated Plaintiffs' claims are.  *Id*. at 1317 (emphasis added).

4877-8098-9212

**B.      Plaintiffs Mischaracterize *Miller* and Ignore this Court's Holding in *Zapata***

In alleging that MAR's conduct constituted "acts of terrorism," Plaintiffs repeatedly compare their allegations to those in *Miller*, justifying its invocation of the court's opinion in that case by asserting that "the Bank Defendants provided the same types of services that Judge Cogan found sufficient in *Miller* to plead the ATA's primary liability requirements." (Opp. at 43). Plaintiffs' attempt to equate MAR's routine financial transactions with the scheme detailed in *Miller* mischaracterizes both the Complaint and *Miller*.

The allegations in *Miller* involved "a terrorist insurance scheme" in which Arab Bank was provided "with detailed lists containing the names of the martyrs, their personal information, and the date and manner of their death, which often included bullets, bombs, and assassinations." 372 F. Supp. 3d at 39. "[A]n Arab Bank employee called a terrorist to inform him that, because the terrorist was injured and hospitalized, he was eligible for $1,330" and personally met with him to give "him a check for that amount." *Id*. at 40. The plaintiffs in *Miller* pled that the scheme "incentivized terrorists to commit acts of violence to receive the benefits" and "helped Hamas gather support." *Id*. In short, "Arab Bank provided banking services 'in an unusual way under unusual circumstances.'" *Id*. at 48 (quoting *Halberstam*, 705 F.2d at 487).

In contrast, here, Plaintiffs all but concede that the allegations as to MAR concern routine financial transactions. (Opp. at 30) (lumping Defendants together to show services at issue were "anything but routine," without specifying any action taken by MAR); *see also supra* § I.A.1.e. *Miller* acknowledged that "routine financial services," even to "members and associates of terrorist organizations," do not meet the "definition of international terrorism under the ATA." 372 F. Supp. 3d at 44-45 (citation omitted). Several cases in the Second Circuit, which Plaintiffs do not even attempt to distinguish, have held that "providing wire transfer and other financial services" is "not an act which is 'violent or dangerous to human life' as contemplated by the ATA." *Bartlett*

18

*v. Société Générale de Banque Au Liban SAL*, No. 19-cv-00007 (CBA) (VMS), 2020 WL 7089448, at *8 (E.D.N.Y. Nov. 25, 2020) (citation omitted); *see also Freeman*, 413 F. Supp. 3d at 91 (explaining that, "[g]iven the many legitimate activities [the customers] engage in, the mere act of providing financial services to them cannot be violent or dangerous," even when "non-routine"); *O'Sullivan*, 2019 WL 1409446, at *8 ("The Complaint does not allege plausibly that the provision of banking services, which are not inherently violent or dangerous, can be considered as acts dangerous to human life . . . ."). Similarly, routine financial transactions do not evince an objective intent to intimidate citizens or influence a government. (Mot. at 14-16).[18]

Moreover, Plaintiffs fail to engage with this Court's decision in *Zapata*, which dismissed ATA claims for failure to plead proximate cause. (*See* Opp. at 44 n.27 (relegating the entirety of the discussion of *Zapata* to a footnote and calling its applicability here "unavailing")); *Zapata*, 414 F. Supp. 3d at 358. Plaintiffs fail to distinguish how their allegations differ at all from those in *Zapata*, in which the defendant bank's customers were cartels that had "abundant cash resources" (like Hamas (*e.g.*, Compl. ¶ 114)) and did not have to pass through defendant bank in order to allegedly fund the acts of violence (like Hamas, which obtained money on its own apart from the alleged transactions with MAR (*see id.*)). *Zapata*, 414 F. Supp. 3d at 356. Moreover, like in *Zapata*, if Plaintiffs' theory of causation "were . . . enough to sustain a claim," then courts would be required to hold banks liable for all FTO violence. *See id.* at 357.

---

[18] Contrary to Plaintiffs' assertion that the decision in *Kaplan v. Al Jazeera* "has no relevance to this matter," (Opp. at 46 n.28), the plaintiffs in that case "failed to allege any facts suggesting that Defendant broadcast news of the Hezbollah Rocket Barrage with the intention of assisting Hezbollah." No. 10-cv-5298, 2011 WL 2314783, at *5 (S.D.N.Y. June 7, 2011). Similarly, here, Plaintiffs have alleged no non-conclusory facts suggesting that MAR had an objective intent to intimidate citizens or influence a government. (*See* Mot. § III.A.).

19

## III.   PLAINTIFFS FAIL TO ESTABLISH A *PRIMA FACIE* CASE OF PERSONAL JURISDICTION

### A.   Plaintiffs Fail to Demonstrate Basic Jurisdictional Requirements of Due Process and Minimum Contacts

Plaintiffs fail to allege that MAR has sufficient minimum contacts with New York. Contrary to Plaintiffs' argument that MAR "intentionally availed itself of the protections that New York law provides to banking institutions," all but one of the allegations Plaintiffs cite in support of this assertion fail to even *mention* New York.  (*See* Opp. at 60 (citing Compl. ¶¶ 70, 128, 132)).[19] The only one that does is the barebones allegation that "[b]etween 2009 and 2015, [MAR] arranged for currency exchange transactions that involved converting in excess of $3.5 million in USD and Euros held by Qatar Charity in Doha into Israeli shekels and moving those funds to Qatar Charity in the Palestinian Territories," and that "[t]he USD used in connection with those transactions passed through Bank of New York Mellon in New York."  (Compl. ¶ 132(c)-(d)).  Plaintiffs' Opposition ignores the fact that these allegations may only amount to a *de minimis* amount of dollars passing through New York (as they fail to identify the amount or frequency of those funds that were actually U.S. dollars, not Euros), as well as the implausibility of using correspondent banking in New York to ultimately obtain Israeli shekels.  (Mot. at 6).[20]

Moreover, even if the Court credits the statements that MAR offers its clients U.S. dollar services and that it uses Citibank, NA as its correspondent or agent to complete international payments using CHIPS, (McArdle Decl. ¶ 19), Plaintiffs still make no effort to allege how MAR

---

[19] Plaintiffs offer no factual predicate for their assertion that MAR chose the New York forum, (*e.g.*, (Compl, ¶ 163), and simply state legal conclusions, (*e.g.*, *id.* ¶ 24 ("Specifically, in furtherance of their conspiracy, Qatar Charity and Masraf Al Rayan, . . . knowingly effectuated U.S. dollar-denominated funds transfers on behalf of Qatar Charity through the Bank of New York Mellon in New York.")).

[20] The temporal gap between alleged conduct relating to New York and Plaintiffs' injuries further highlights the implausibility of Plaintiffs' jurisdictional claims.  Plaintiffs fail to demonstrate how the alleged transfers in 2015 (which are routine banking transactions, even as alleged) "relate" to Plaintiffs' injuries four years later.  *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1024-25 (2021).

20

*chose* New York as a forum.  (*See* Mot. at 6-7).  *See Cmty. Fin. Grp. v. Stanbic Bank Ltd.*, No. 14-cv-5216 (DLC), 2015 WL 4164763, at *4-5 (S.D.N.Y. July 10, 2015) (dismissing complaint for lack of personal jurisdiction and finding that plaintiffs alleged "only one connection between this case and New York," which was not purposeful).  Plaintiffs make much of their argument that U.S. dollar transactions must pass through a U.S. correspondent account (*see* Opp. at 13 n.8, 59 n.37), but acknowledge the limitations of this logical leap by noting that U.S. correspondent banks "participate in *virtually* all large wire transfers of USD" and that those transactions "*generally* 'clear' in the United States, through a U.S. bank," failing to plead purposeful availment. (Opp. at 61 & n.34) (emphases added); *see also Vasquez v. Hong Kong & Shanghai Banking Corp.*, 477 F. Supp. 3d 241, 259 (S.D.N.Y. 2020) (dismissing complaint because "there is no evidence that [defendant] directed the funds to be deposited or controlled the route of the plaintiffs' funds through the correspondent account").

Plaintiffs mischaracterize *Berdeaux* as "inapposite."  (Opp. at 62).  In *Berdeaux*, the court held that the plaintiffs' allegations were insufficient under 302(a)(1) where they alleged contact with New York in the form of a wire transfer of $30 million through a correspondent account located in New York.  2021 WL 4267693, at *10.  Likewise, Plaintiffs' allegations here are insufficient when all they allege is conclusory and vague contact with the New York forum through an alleged $3.5 million's worth of "currency exchange transactions" for which MAR "arranged," which allegedly passed through a New York bank.  (Compl. ¶ 132(c)-(d)).[21]

---

[21] Moreover, Plaintiffs' assertion that *Berdeaux* is inapplicable because plaintiffs there "disclaimed" all bases for jurisdiction other than CPLR 302(a)(3)(ii), (Opp. at 62-63), is not accurate; the court explained that it was deciding the issue under CPLR 302(a)(1) as well.  *Berdeaux*, 2021 WL 4267693, at *8-9 ("[T]o avoid resting its decision on Plaintiffs' abandonment, the Court's analysis extends beyond Section 302(a)(3)(ii).").

4877-8098-9212

### B.     Conspiracy Jurisdiction Is Not Applicable to Plaintiffs' Claims

Plaintiffs allege jurisdiction under New York's long-arm statute, N.Y. C.P.L.R. § 302(a)(1), over MAR based on MAR's alleged correspondent banking activity.  (Compl. ¶¶ 23, 163-65).  As noted above, and in the Motion, (*see* Mot. § I), Plaintiffs' allegations are insufficient to allege personal jurisdiction over MAR using New York's long-arm statute.  However, even if they were not, Plaintiffs have a problem:  they must also allege jurisdiction over Qatar Charity and QNB under New York's long-arm statute, but courts have held that § 302(a)(1) is inapplicable to a conspiracy theory of jurisdiction.  *See, e.g.*, *Suber v. VVP Servs., LLC*, No. 20-cv-08177 (AJN), 2021 WL 4429237, at *6 (S.D.N.Y. Sept. 27, 2021) ("[T]he conspiracy theory of jurisdiction is not available under section 302(a)(1) . . . ."); *see also In re Dental Supplies Antitrust Litig.*, No. 16-cv-696 (BMC) (GRB), 2017 WL 4217115, at *7 (E.D.N.Y. Sept. 20, 2017) ("[T]here is no doctrinal support for 'conspiracy jurisdiction[]'" under New York's long-arm statute).[22]  As a result, Plaintiffs have shifted arguments, now prioritizing their jurisdictional argument under Rule 4(k)(2) of the Federal Rules of Civil Procedure.  (Opp. at 80 (describing the New York long-arm statute as the "alternative basis for exercising jurisdiction")).  However, Plaintiffs' Rule 4(k)(2) argument fares no better.

As a threshold matter, Rule 4(k)(2) is inapplicable because Plaintiffs fail to show that Defendants are not subject to jurisdiction in any U.S. state and that exercising jurisdiction would be consistent with the U.S. Constitution and laws.  Plaintiffs represent that they cite "more recent decisions" to argue that Plaintiffs do not need to certify that no states have jurisdiction over any of

---

[22] Despite Plaintiffs' best efforts, (Opp. at 76-77), jurisdiction under C.P.L.R. § 302(a)(2) is unavailable altogether because, as Plaintiffs acknowledge, (*id.* at 77), the Second Circuit has held that "a defendant's physical presence in New York is a prerequisite to jurisdiction under § 302(a)(2)."  *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 171 F.3d 779, 790 (2d Cir. 1999); *see also Shi v. Le*, No. 21-cv-1361 (ARR) (CLP), 2022 WL 896963, at *2 n.2 (E.D.N.Y. Mar. 28, 2022) (applying *Bank Brussels*).  Plaintiffs plead no such physical presence, and their assertion that § 302(a)(2)'s requirements are "satisfied here even though Masraf's agent did not participate in Defendants' conspiracy" is wholly unsupported and without merit.  (Opp. at 77).

4877-8098-9212

the Defendants to assert their claims, (Opp. at 58), but they cite no authority from within the Second Circuit. *Cf. Aqua Shield, Inc. v. Inter Pool Cover Team*, No. 05-cv-4880 (CBA), 2007 WL 4326793, at *8 (E.D.N.Y. Dec. 7, 2007) (internal quotation marks and citation omitted) ("[T]he plaintiff must certify that, based on the information that is readily available to the plaintiff and his counsel, the defendant is not subject to suit in the courts of general jurisdiction of any state."); *Astor Chocolate Corp. v. Elite Gold Ltd.*, 510 F. Supp. 3d 108, 125 (S.D.N.Y. 2020) (collecting cases) ("In this Circuit, to meet the second requirement of Rule 4(k)(2), plaintiffs need to certify that, to their knowledge, the foreign defendant is not subject to jurisdiction in any other state.").[23] Plaintiffs also ignore the *most* recent decision on Rule 4(k)(2), which held that "certification is a necessary component of the showing that the plaintiff must make" under Rule 4(k)(2). *Motus, LLC v. CarData Consultants, Inc.*, 23 F.4th 115, 127 (1st Cir. 2022). Instead of making this certification, Plaintiffs argue the opposite: that they "have also alleged jurisdiction under the New York long-arm statute." (Opp. at 56 n.33).

Next, even if Plaintiffs made the requisite certification, Rule 4(k) "preclude[s] the use of a conspiracy theory of jurisdiction" when such a theory would be plainly inconsistent with the "federal statute," at issue. *Rudersdal*, 2022 WL 263568, at *11. Here, JASTA "contains a specific limitation" that requires the defendant at issue to have allegedly conspired "with" the FTO at issue. *Id*; *see supra* § I. As a result, a conspiracy theory of jurisdiction under Rule 4(k) is inapplicable to Plaintiffs' Complaint altogether.

Finally, Plaintiffs' claim of personal jurisdiction under a conspiracy theory fails because their Complaint is devoid of non-conclusory allegations that (1) a conspiracy existed, (2) that MAR participated in the alleged conspiracy, or (3) that any alleged co-conspirator took overt acts in

---

[23] In addition to being out-of-Circuit, neither case cited by Plaintiffs is more recent than *Astor*. (Opp. at 58 n.30).

furtherance of the conspiracy. *See Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 87 (2d Cir. 2018); *supra* § I.A.  To the extent Plaintiffs lump Defendants together in their jurisdictional allegations, (*see, e.g.*, Compl. ¶ 23), Plaintiffs' pleadings are impermissible and should be dismissed on that basis.  *See supra* § I.A.1.e.

### C.    Personal Jurisdiction over MAR Would Be Inconsistent with Due Process

Plaintiffs ignore a lawsuit in Israel filed against MAR and nine other defendants arising out of the same alleged events, which renders Israel a suitable forum.  *See Ansbacher, et al. v. Qatar Charity, et al.*, Jerusalem District Court, CC 21387-06-21, November 10, 2021; (Mot. at 11-12).  By Plaintiffs' own argument, "other jurisdictions' interests in furthering beneficial social policies" are relevant in the reasonableness inquiry.  (Opp. at 58-59) (citing *U.S. Bank Nat'l Ass'n v. Bank of Am., N.A.*, 916 F.3d 143, 151 n.5 (2d Cir. 2019)); *see also Asahi Metal Indus. Co. v. Super. Ct. of Cal.*, 480 U.S. 102, 115 (1987) (internal quotation marks and citation omitted) (explaining that reasonableness inquiry involving foreign defendant required considering "the procedural and substantive policies of other *nations* whose interests are affected by the assertion of jurisdiction" by a U.S. state, and admonishing that "[g]reat care and reserve should be exercised when extending our notions of personal jurisdiction into the international field").

### D.    No Jurisdictional Discovery Is Warranted

Plaintiffs are not entitled to jurisdictional discovery.  Plaintiffs' reliance on *Singer v. Bank of Palestine* is misplaced because the allegations in that case were drastically different from—and far more detailed than—the ones here.  For example, the *Singer* plaintiffs alleged the defendant maintained accounts for two customers, each of whom was a Specially Designated Global Terrorist ("SDGT"), as well as five customers that were "critical part[s] of Hamas's civilian infrastructure," one of which was also an SDGT.  No. 19-cv-006 (ENV) (RML), 2021 WL 4205176, at *2-3 (E.D.N.Y. Apr. 30, 2021).  Jurisdictional discovery was warranted because the plaintiffs had

"pleaded facts which could support a colorable claim of jurisdiction." *Id.* at *7. In addition, plaintiffs came "closest to identifying a New York connection" with allegations that two of the defendant bank's customers (both SDGTs) maintained U.S. dollar-denominated accounts with the defendant bank, that one of those customers received multiple transfers from the United States through the bank's New York correspondent account, and that the other customer "appear[ed] to be under the direct control of Hamas founder Ibrahim al-Yazuri," and that it "made multiple transfers from the U.S. to [its U.S.-dollar denominated] account in Gaza." *Id.* at *6 (internal quotation marks omitted) (quoting plaintiffs' complaint).[24] In comparison, Plaintiffs have alleged nothing similar here: they have not alleged that MAR's customer was an SDGT (nor can they) that maintained a U.S. dollar-denominated account with MAR, or that it was under the control of Hamas or PIJ.

Contrary to Plaintiffs' assertions, the *Licci* decisions[25] did not overrule *Tamam*.[26] *Tamam* does not stand for the proposition that passing money through a correspondent account for a terrorist organization cannot support exercising jurisdiction in a case arising from terrorist attacks, (*see* Opp. at 79); instead, the allegations in *Tamam* were simply not sufficient to establish jurisdiction because the plaintiffs had not alleged an "actual transfer of money through New York" to link defendants' correspondent accounts to terrorist operations. *Tamam*, 677 F. Supp. 2d at 727.

---

[24] The *Singer* plaintiffs also alleged that the defendant bank had maintained its account for that customer at least seven years after that customer was designated an SDGT. *Id.* at *2. Plaintiffs come nowhere close to alleging anything similar with respect to MAR's alleged maintenance of an account for Qatar Charity.

[25] *See Licci ex rel. Licci v. Lebanese Canadian Bank, SAL ("Licci II")*, 673 F.3d 50 (2d Cir. 2012); *Licci v. Lebanese Canadian Bank, SAL ("Licci III")*, 20 N.Y.3d 327 (2012); *Licci v. Lebanese Canadian Bank, SAL ("Licci IV")*, 732 F.3d 161 (2d Cir. 2013).

[26] The only point of law in *Tamam* that *Licci III* clarified was the nexus requirement, which requires "a relatedness between the transaction and the legal claim such that the latter is not completely unmoored from the former," *Licci III*, 20 N.Y.3d at 339, as opposed to *Tamam*'s requirement that the transaction be "at the very root" of the claims, *Tamam v. Fransabank Sal*, 677 F. Supp. 2d 720, 728-29 (S.D.N.Y. 2010) (internal quotation marks and citation omitted). Regardless, Plaintiffs fail to meet the pleading standard articulated in *Licci III*; that is, they fail to allege "a relatedness between the transaction and the legal claim." 20 N.Y.3d at 339. This insufficiency is especially stark given the four-year time gap between the alleged transactions and the attacks that injured Plaintiffs.

4877-8098-9212

Finally, Plaintiffs' comparison of Qatar to Iran and Venezuela is a stretch: Qatar is a non-NATO U.S. ally; Iran and Venezuela are not.  (Far from it.)  As Plaintiffs' own comparison demonstrates, the United States could "combat rapid oil price increases" by making entreaties to Qatar without calling it an ally of the United States.  (Opp. at 12).

## IV. PLAINTIFFS' DECLARATIONS AND EXHIBITS FAIL TO CURE THEIR LEGALLY DEFICIENT CLAIMS

Plaintiffs submit two declarations and fourteen exhibits in support of their Opposition.  (*See* Bonner Decl., McArdle Decl., and accompanying exhibits).  However, at the motion to dismiss stage, it is the pleadings that are the basis for dismissal, not the Plaintiffs' briefing.  *See Honickman*, 6 F.4th at 502 n.19 (quotations omitted) (declining to take into account plaintiffs' factual assertions made in briefing and at oral argument, which were not made in the complaint itself, because a "Rule 12(b)(6) motion tests the adequacy of the complaint . . . not the briefs") (internal quotation marks and citations omitted, ellipses in original).  In sum, these submissions cannot cure the Complaint's deficiencies.  Moreover, even if the Court considers the McArdle Declaration, which Plaintiffs offer in an attempt to repair their insufficient jurisdictional allegations, it is wholly speculative because it makes inferences out of whole cloth and not based on properly pled allegations in the Complaint.  (*See*, *e.g.*, McArdle Decl. ¶ 18 ("With Masraf Al Rayan Bank initiating the U.S. dollar-denominated transfers for Qatar Charity as discussed in the Complaints, these funds were *almost certainly* settled and cleared in the U.S. (New York) . . . .") (emphasis added);[27] *id.* ¶ 19 ("[I]t is *logical* that Masraf Al Rayan also understood that the U.S. dollar transfers conducted on behalf of its clients would pass through the U.S. as a matter of process.") (emphasis added)).  Regardless, the McArdle Declaration stands for nothing more than the fact that MAR offers U.S.-dollar denominated services and has a U.S. correspondent bank.

---

[27] This statement is also not correct.  The Complaint does not allege that MAR initiated the alleged transfers.

(*See id.*).  As explained *supra* § III.A., simply alleging that MAR has a U.S. correspondent bank is insufficient to establish personal jurisdiction over MAR.  (*See also* Mot. at § IV.A.-B)

## V.       PLAINTIFFS DO NOT ESTABLISH STANDING AS TO FOUR PLAINTIFFS

The Complaint also fails to plead standing for four Plaintiffs.  Four Plaintiffs lack statutory standing as non-U.S. citizens asserting personal claims.  (Mot. at 32).  Plaintiffs assert that these Plaintiffs have standing because "courts routinely permit the deceased individual's estate, survivors, and heirs to bring separate claims under the ATA."  (Opp. at 52 (quoting *Estate of Henkin*, 495 F. Supp. 3d at 152).  However, Plaintiffs, who cite all of three cases,[28] make no effort to engage with the decisions in this Circuit that have held "that only claims brought on behalf of individuals who are United States nationals may proceed."  *See Rosenberg v. Lashkar-e-Taiba*, No. 10-cv-5381 (DLI) (CLP) 2016 WL 11756917, at * 19 (E.D.N.Y. July 5, 2016), *report and recommendation adopted as modified*, No. 10-cv-5381 (DLI) (CLP), 2017 WL 11647006 (E.D.N.Y. Mar. 31, 2017); *Averbach*, 2020 WL 1130733, at *2.  As to each non-U.S. Plaintiff, Plaintiffs do not dispute their foreign national status at all relevant times.[29]

## VI.      PLAINTIFFS DID NOT PROPERLY EFFECTUATE SERVICE

Plaintiffs have failed to establish that service by private courier is not prohibited by Qatari law, ignoring the Qatari law's plain meaning.  Plaintiffs, again, cite to Article 11 of the Qatari

---

[28] One of those cases, *Estates of Ungar ex rel Strachman v. Palestinian Auth.*, 304 F. Supp. 2d 232, 263-64 (D.R.I. 2004) is cited as having "concluded that the same history Masraf cites **supports** allowing survivors of U.S. nationals . . . to bring actions for their own injuries."  (Opp. at 52).  MAR does not and has never disputed that "the term 'survivors' as used in § 2333(a) includes the parents and siblings of a U.S. national killed by an act of international terrorism," as the *Ungar* court held.  *Ungar*, 304 F. Supp. 2d at 264.  The *Ungar* court never reviewed the legislative history as to the ability of *foreign* survivors to bring suit, as Plaintiffs seem to imply; instead, it held without analysis that the statute "contains no requirement that the survivors or heirs . . . be citizens of the United States" and did not review the legislative history as to that point.  *Id.* at 270.  Plaintiffs themselves declined to respond to MAR's arguments as to the ATA's legislative history on this point because it is clear:  foreign nationals do not have standing to as to their *own* injuries.  (*See* Mot. at 32 n.20).

[29] To the extent that foreign nationals bring claims only on behalf of American citizens or on behalf of estates of American citizens who have died (and not on their own behalf), MAR does not seek dismissal of their claims on the basis of standing.

Civil & Commercial Procedures Law (Law No. 13 of 1990), in stating that Qatari law authorizes courts to deliver process "by registered mail."  (Opp. at 54) (citing Bonner Decl. ¶ 14 & Ex. 10); (*see also* ECF No. 44 at 4) (quotations omitted).  Plaintiffs ignore that Article 11 governs the service of an individual and that Article 10 governs service upon a corporation.[30]

Instead, Plaintiffs rely on a declaration by counsel to attempt to show the absence of any prohibition of service of process by mail under Qatari law.  (Opp. at 55) (citing Bonner Decl. ¶¶ 12–14 & Ex. 9–10).  In *Trueposition, Inc. v. Sunon, Inc.*, No. 05-cv-3023, 2006 WL 1686635, at *3–6 (E.D. Pa. June 14, 2006), upon which Plaintiffs rely even though it is not binding authority, the court relied on a declaration by a foreign lawyer that service by registered mail is a method of service regularly made in the foreign country under that country's laws, State Department guidance that service of process in the foreign country can be effected by international registered mail, and other cases in which courts found that the foreign country's law did not prohibit service of process by registered mail—none of which have been submitted by Plaintiffs here.[31]

Finally, Plaintiffs provide no compelling reason for this Court to order alternative service while Defendants wait for service of process through letters rogatory.  (Opp. at 52–55).  Plaintiffs continue to concede that the proper method of service is through letters rogatory, and that has not yet occurred.  (Opp. at 52, 55); (Bonner Decl. ¶¶ 10–11).[32]

---

[30] *See* Article 10 (Law No. 13 of 1990, as amended by Law No. 7 of 1995).  Plaintiffs also decline to cite any authority to distinguish *Rosenberg*, 2017 WL 11647006.  (Opp. at 52-53).

[31] Plaintiffs argue that service under Rule 4(f)(2)(C)(ii) is "prohibited" when the foreign country's law "expressly prohibits" the method of service, and "not merely that [the law] does not recognize or provide for it."  (Opp. at 53) (internal quotation marks and citation omitted).  Again, Plaintiffs have not offered any facts showing that Qatari law does not expressly prohibit service by registered mail.  (*See* Mot. 12-13).

[32] Plaintiffs' argument that service can be "proved" because MAR has "appeared in and defended this action" and therefore MAR's service argument is "pointless" fails to engage with the relevant law and would incentivize defendants to avoid appearing in lawsuits filed against them.  (Opp. at 53, 55).  Moreover, counsel for MAR has expressly reserved its rights and filed limited notices of appearances expressly highlighting this issue.  (*See* ECF Nos. 14, 18, 19).

4877-8098-9212

## <u>CONCLUSION</u>

For the foregoing reasons, Defendant MAR respectfully renews its request that the Court

dismiss Plaintiffs' Complaint in its entirety, with prejudice.

Dated: April 20, 2022
     New York, New York            PILLSBURY WINTHROP SHAW PITTMAN LLP

                                     By: */s/ Carolina A. Fornos*
                                        Carolina A. Fornos
                                        Pillsbury Winthrop Shaw Pittman LLP
                                        31 West 52nd Street
                                        New York, NY 10019-6131
                                        Tel.:   (212) 858-1000
                                        Fax:   (212) 858-1500

                                        Aryeh L. Kaplan (*pro hac vice*)
                                        Markenzy Lapointe (*pro hac vice*)
                                        Pillsbury Winthrop Shaw Pittman LLP
                                        600 Brickell Avenue, Suite 3100
                                        Miami, FL 33131
                                        Tel.:   (786) 913-4900
                                        Fax:   (786) 913-4901
                                        *Counsel for Defendant Masraf Al Rayan*

29

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 20, 2022, a true and correct copy of the Reply Brief in Further Support of Defendant Masraf Al Rayan's Motion to Dismiss the Complaint was served on the following counsel of record via email, pursuant to Plaintiffs' consent, at the email addresses noted below:

James P. Bonner
Patrick L. Rocco
Susan M. Davies
Thomas M. Caroccia
Fleischman Bonner & Rocco LLP
81 Main Street, Suite 515
White Plains, New York 10601
jbonner@fbrllp.com
procco@fbrllp.com
sdavies@fbrllp.com
tcaroccia@fbrllp.com

*/s/ Carolina A. Fornos*
Carolina A. Fornos

4877-8098-9212