**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

CHAIM DOV PRZEWOZMAN, HADASSAH
PRZEWOZMAN, individually, as the personal
representative of the Estate of Pinches Menachem
Przewozman, and as parent and natural guardian
of Y.P., a minor, and P.P., a minor, CHAYA
RACHEL PRZEWOZMAN, individually, and as
parent and natural guardian of A.M.P., a minor,
and F.P., a minor, SARA PRZEWOZMAN-
ROZENBAUM, YAFA PRZEWOZMAN, and
TZVI YOSEF PRZEWOZMAN,

      *Plaintiffs*,

          v.

QATAR CHARITY, QATAR NATIONAL BANK
and MASRAF AL RAYAN,

      *Defendants*.

Case No. 20-cv-6088 (NGG)

Oral Argument Requested

**QATAR NATIONAL BANK'S MEMORANDUM OF LAW IN SUPPORT OF ITS**
**<u>MOTION TO DISMISS PLAINTIFFS' COMPLAINT</u>**

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ........................................................................................ 1

ARGUMENT .................................................................................................................... 4

I.   PLAINTIFFS' COMPLAINT SHOULD BE DISMISSED AS TO QNB FOR
     LACK OF PERSONAL JURISDICTION ............................................................... 4

     A.   Plaintiffs Fail to Make a *Prima Facie* Showing of Proper Service on QNB .......... 5

     B.   Plaintiffs Fail to Make a *Prima Facie* Showing that This Court Has
          Specific Personal Jurisdiction over QNB Pursuant to New York's Long-
          Arm Statute ................................................................................................... 6

          1.   Plaintiffs' Jurisdictional Allegations as to QNB ........................................ 7

          2.   Plaintiffs' "Conspiracy Theory" of Specific Personal Jurisdiction
               over QNB Is Not Cognizable Under C.P.L.R. 302(a)(1) ............................ 8

     C.   Plaintiffs' "Conspiracy Theory" of Personal Jurisdiction over QNB is Not
          Consistent with the Requirements of Due Process ............................................ 11

     D.   Plaintiffs Are Not Entitled to Jurisdictional Discovery ..................................... 13

II.  PLAINTIFFS FAIL TO STATE A CLAIM THAT QNB IS SECONDARILY
     LIABLE UNDER 18 U.S.C. § 2333(D) FOR AIDING AND ABETTING ...................... 14

     A.   Plaintiffs Fail to Plausibly Allege that QNB Was Generally Aware of Any
          Role It Allegedly Had in an Overall Illegal or Tortious Activity ......................... 16

          1.   Plaintiffs Fail to Meet the Threshold Requirement for General
               Awareness of Plausibly Alleging that QNB Was Aware of Qatar
               Charity's and the Individual Accountholder's Alleged Connections
               with Hamas and PIJ ............................................................................ 17

          2.   Plaintiffs Further Fail to Plausibly Allege that Qatar Charity and
               the Individual Accountholders Were Closely Intertwined with
               Hamas's and PIJ's Violent Terrorist Activities ...................................... 22

     B.   Plaintiffs Fail to Plausibly Allege that QNB Knowingly and Substantially
          Assisted the Principal Violation that Caused Plaintiffs' Injuries ......................... 24

III. PLAINTIFFS FAIL TO STATE A CLAIM THAT QNB IS SECONDARILY
     LIABLE UNDER 18 U.S.C. § 2333(D) FOR CONSPIRACY .................................... 29

IV.  PLAINTIFFS FAIL TO STATE A CLAIM THAT QNB IS PRIMARILY LIABLE
     UNDER 18 U.S.C. § 2333(A) ............................................................................ 31

     A.   Plaintiffs Fail to Plausibly Allege that QNB Committed an Act of
          International Terrorism ..................................................................................... 31

     B.   Plaintiffs Fail to Plausibly Allege that QNB's Acts Were the Proximate
          Cause of Their Injuries .................................................................................... 34

CONCLUSION ................................................................................................................ 35

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*AG of Can. v. R.J. Reynolds Tobacco Holdings, Inc.*,
   268 F.3d 103 (2d Cir. 2001)................................................................................6

*Allianz Global Inv'rs GMBH v. Bank of Am. Corp.*,
   457 F. Supp. 3d 401 (S.D.N.Y. 2020)............................................................10, 12

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)..........................................................................................14, 15

*Atchley v. AstraZeneca UK Ltd.*,
   22 F.4th 204 (D.C. Cir. 2022)............................................................................28

*Berdeaux v. OneCoin Ltd.*,
   No. 19-cv-4074 (VEC), 2021 WL 4267693 (S.D.N.Y. Sept. 20, 2021)................2, 10, 11

*Charles Schwab Corp. v. Bank of Am. Corp. (Schwab I)*,
   883 F.3d 68 (2d Cir. 2018)................................................................8, 10, 11, 12

*Daventree Ltd. v. Republic of Azerbaijan*,
   349 F. Supp. 2d 736 (S.D.N.Y. 2004)................................................................13

*In re Dental Supplies Antitrust Litig.*,
   No. 16-cv-696 (BMC) (GRB), 2017 WL 4217115 (E.D.N.Y. Sept. 20, 2017)
   (Cogan, J.).............................................................................................................10

*E-Z Bowz, L.L.C. v. Pro. Prod. Rsch. Co.*,
   No. 00-cv-8670 (LTS) (GWG), 2003 WL 22064259 (S.D.N.Y. Sept. 5, 2003)..............10

*Freeman v. HSBC Holdings PLC*,
   413 F. Supp. 3d 67 (E.D.N.Y. 2019)................................................................4, 29, 30

*Gallop v. Cheney*,
   642 F.3d 364 (2d Cir. 2011)................................................................................30

*Gill v. Arab Bank, PLC*,
   893 F. Supp. 2d 474 (E.D.N.Y. 2012)................................................................35

*Gucci Am., Inc. v. Weixing Li*,
   135 F. Supp. 3d 87 (S.D.N.Y. 2015)................................................................13

*Gucci Am., Inc. v. Weixing Li*,
   768 F.3d 122 (2d Cir. 2014)................................................................................7

i

*Halberstam v. Welch*,
   705 F.2d 472 (D.C. Cir. 1983) ..............................................................................15, 16, 24, 25

*Honickman v. BLOM Bank SAL*,
   432 F. Supp. 3d 253 (E.D.N.Y. 2020), *aff'd*, 6 F.4th 487 .........................................26

*Honickman v. BLOM Bank SAL*,
   6 F.4th 487 (2d Cir. 2021) ...................................................................... *passim*

*Kaplan v. Lebanese Canadian Bank, SAL*,
   405 F. Supp. 3d 525 (S.D.N.Y. 2019), *vacated on other grounds*, 999 F.3d
   842 (2d Cir. 2021)...................................................................................... *passim*

*Kaplan v. Lebanese Canadian Bank, SAL*,
   999 F.3d 842 (2d Cir. 2021)......................................................................... *passim*

*Kemper v. Deutsche Bank AG*,
   911 F.3d 383 (7th Cir. 2018) ...................................................................................32

*Levisohn, Lerner, Berger & Langsam v. Med. Taping Sys., Inc.*,
   10 F. Supp. 2d 334 (S.D.N.Y. 1998).......................................................................10

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL* (*Licci I*),
   673 F.3d 50 (2d Cir. 2012).............................................................................5, 8, 9

*Licci ex rel Licci v. Lebanese Canadian Bank SAL (Licci II)*,
   732 F.3d 161 (2d. Cir. 2013)...................................................................................11

*Linde v. Arab Bank, PLC*,
   882 F.3d 314 (2d Cir. 2018)........................................................................25, 32, 33

*Mednik v. Specialized Loan Servicing, LLC*,
   No. 20-cv-427 (MKB), 2021 WL 707285 (E.D.N.Y. Feb. 23, 2021) ...................13

*Metro. Life Ins. Co. v. Robertson-Ceco Corp.*,
   84 F.3d 560 (2d Cir. 1996).......................................................................................13

*O'Sullivan v. Deutsche Bank AG*,
   No. 17-cv-8709 (LTS) (GWG), 2019 WL 1409446 (S.D.N.Y. Mar. 28, 2019).....31

*Owens v. BNP Paribas, S.A.*,
   897 F.3d 266 (D.C. Cir. 2018) .................................................................................23

*PharmacyChecker.com, LLC v. Nat'l Ass'n of Boards of Pharmacy*,
   530 F. Supp. 3d 301 (S.D.N.Y. 2021)......................................................................11

*In re Platinum & Palladium Antitrust Litig.*,
   449 F. Supp. 3d 290, 327 (S.D.N.Y. 2020).............................................................13

*Rothstein v. UBS AG*,
    708 F.3d 82 (2d Cir. 2013).............................................................................34

*Schwab Short-Term Bond Mkt. Fund v. Lloyds Banking Grp. PLC (Schwab II)*,
    22 F.4th 103 (2d Cir. 2021) ...............................................................10, 12

*Siegel v. HSBC Bank USA, N.A.*,
    No. 17-cv-6593 (DLC), 2018 WL 3611967 (S.D.N.Y. July 27, 2018), *aff'd*
    *sub nom. Siegel v. HSBC N. Am. Holdings, Inc.*, 933 F.3d 217 (2d Cir. 2019).....................33

*Siegel v. HSBC N. Am. Holdings, Inc.*,
    933 F.3d 217 (2d Cir. 2019)......................................................................27, 28

*SPV Osus Ltd. v. UBS AG*,
    882 F.3d 333 (2d Cir. 2018)...........................................................4, 5, 9, 11

*Strauss v. Credit Lyonnais, S.A.*,
    925 F. Supp. 2d 414 (E.D.N.Y. 2013) ..........................................................19

*Suber v. VVP Servs., LLC*,
    No. 20-cv-8177 (AJN), 2021 WL 4429237 (S.D.N.Y. Sept. 27, 2021) ........................7, 9, 10

*United States v. Besneli*,
    No. 14-cv-7339 (JFK), 2018 WL 443747 (S.D.N.Y. Jan. 16, 2018)......................................10

*Walden v. Fiore*,
    571 U.S. 277 (2014).......................................................................5, 9, 11

*Waldman v. Palestine Liberation Org.*,
    835 F.3d 317 (2d Cir. 2016).............................................................................5

## Statutes

18 U.S.C. § 2331...........................................................................31, 32

18 U.S.C. § 2333.............................................................................*passim*

18 U.S.C. § 2334...............................................................................8

## Other Authorities

Fed. R. Civ. P. 4.............................................................................7, 8

Fed. R. Civ. P. 12.............................................................................1, 4, 14

N.Y. C.P.L.R. 302.............................................................................*passim*

Pursuant to Fed. R. Civ. P. 12(b)(2), (5), and (6), Defendant Qatar National Bank Q.P.S.C. ("QNB") moves to dismiss all claims brought against QNB in Plaintiffs' complaint (the "Complaint") and respectfully submits this memorandum in support of its motion to dismiss.

## PRELIMINARY STATEMENT

While QNB condemns all acts of terrorism, this litigation is a misguided effort, which courts have repeatedly rejected, to assign liability to a well-respected bank doing business in the Middle East for nothing more than providing routine banking services to its customers in the region.  The Complaint makes *not one* allegation regarding *any* specific act by QNB that is connected even remotely to the violent acts that Plaintiffs allege injured them or their relatives. Worse still, there is not a single allegation of any act by QNB in the United States, much less in New York, that would permit this Court's exercise of personal jurisdiction over QNB.  Indeed, Plaintiffs' "theory" of personal jurisdiction over QNB is one that has been repeatedly rejected by the courts.  QNB therefore respectfully moves to dismiss the claims brought against it.

Founded in 1964, QNB is a commercial bank incorporated in Qatar and headquartered in Qatar's capital city, Doha.  QNB has subsidiaries and affiliates in Asia, Europe, and Africa, but none in the Americas (let alone in the United States or in the state of New York).

As a preliminary matter, the Complaint, which has still not been effectively served, fails to make even a *prima facie* showing of personal jurisdiction over QNB and should therefore be dismissed under Rule 12(b)(2).  None of the allegations regarding Defendants' supposed contacts with New York identifies any act by QNB; the only allegations of specific transactions that even touched the United States, which are themselves wholly unconnected to any acts of terrorism, mention only Defendants Masraf Al Rayan ("MAR") and Qatar Charity.  *See* Compl. ¶¶ 24, 132. Plaintiffs' aggregated allegations against Defendants collectively, without distinguishing which Defendant allegedly did what, *see, e.g., id.* ¶ 23, must be disregarded for purposes of assessing

jurisdiction, because "[t]o allege personal jurisdiction over a defendant, group pleading is not permitted." *Berdeaux v. OneCoin Ltd.*, No. 19-cv-4074 (VEC), 2021 WL 4267693, at *7 (S.D.N.Y. Sept. 20, 2021) (citations and internal quotation marks omitted). Plaintiffs' bald assertion that QNB participated in a "conspiracy" and, as such, is vicariously responsible for the forum contacts of its alleged co-conspirators, *see* Compl. ¶¶ 23-24, ECF No. 44 at 3, relies on a legal theory of personal jurisdiction that has been squarely rejected by New York courts as incompatible with the relevant provision of New York's long-arm statute.

The Complaint also fails to make any plausible allegation of liability against QNB, based on simply "maintaining" bank accounts in Qatar. Plaintiffs advance primary and secondary liability claims against QNB under the Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2333(a), *et seq.*, and the Justice Against Sponsors of Terrorism Act ("JASTA"), 18 U.S.C. § 2333(d)(2), *et seq.* These claims are based on rocket attacks perpetrated by Hamas and Palestinian Islamic Jihad ("PIJ") on May 4-5, 2019, acts that are not tied, in even the most remote fashion, to QNB.

Even a generous reading of the Complaint reveals that the allegations against QNB boil down to no more than QNB's "maintaining" accounts for Qatar Charity and for various individuals who allegedly have (or previously had) connections to Hamas. The Complaint makes no allegation concerning any specific transfers from Qatar Charity's accounts with QNB, let alone any transfers to external entities, much less any transfer that was exceptional or might in any way have suggested that the transferred funds would be used to fund the terrorist activities giving rise to Plaintiffs' claims. The mere fact that the largest bank in Qatar maintained accounts for the largest charity in Qatar, which was working collaboratively with both the United States Government and United Nations during the period in question, is hardly grounds for suspicion, much less a basis for liability. And while some individual customers of QNB are alleged to have been connected to Hamas attacks in the 1990s and early 2000s, those individuals were released from prison in 2011,

and the Complaint makes no allegation (including no allegation of public source information) linking them to any attacks in the decade since, much less the attacks at issue here.  QNB allegedly "maintaining" accounts for the personal use of these individuals, without more, is not a basis for subjecting QNB to liability under the ATA/JASTA on any theory.  These are precisely the kind of "routine banking services" that numerous courts, including the Second Circuit, have repeatedly rejected as a basis of liability, even under JASTA's theory of secondary liability.

The secondary liability claim for aiding and abetting under JASTA falls short because, as the Second Circuit has held, Plaintiffs do not plausibly allege that QNB was "generally aware while it was providing banking services to [Qatar Charity and individual accountholders] that it was playing a role in unlawful activities from which [Hamas's] attacks were foreseeable." *Honickman v. BLOM Bank SAL*, 6 F.4th 487, 499 (2d Cir. 2021) (quoting *Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842, 860-61 (2d Cir. 2021)).  Plaintiffs cite no basis to believe that Qatar Charity was supporting terrorism, much less that QNB had reason to believe so.  The Complaint acknowledges that Qatar Charity has consistently "touted its humanitarian work." Compl. ¶ 47.  This Court can take judicial notice that Qatar Charity was actively partnered with the United States Government and United Nations during the relevant timeframe.  *See* Qatar Charity Br. at Section II.A.1.  Yet the Complaint is premised on the idea that QNB should have ceased, in 2008, doing business with Qatar Charity because Plaintiffs allege, without citation, that Qatar Charity had been identified by a U.S. intelligence committee on an *internal* list—unavailable to the public—as potentially supporting terrorism.  *See* Compl. ¶ 41.  An unsupported allegation concerning confidential U.S. government documents hardly gives rise to an inference that QNB was "generally aware" that its customer Qatar Charity allegedly had ties to Hamas and PIJ.  Nor does the Complaint plausibly allege that the rocket attacks at issue—which the Complaint fails to connect to Qatar Charity in any way—were somehow a foreseeable result of QNB's "maintaining"

3

bank accounts for Qatar Charity, as JASTA would require.

Plaintiffs further fail to plausibly allege that QNB "knowingly and substantially assisted the principal violation" of the 2019 rocket attacks, as is also required for aiding and abetting liability, *see Honickman*, 6 F.4th at 499 (internal quotation marks omitted).  The six factors relevant in that analysis *all* favor QNB.  The secondary liability claim for conspiracy should also be dismissed because Plaintiffs fail to allege that QNB "directly conspired" or formed any kind of agreement "with the person or entity that committed the act of international terrorism that injured the plaintiff," which here would be Hamas and/or PIJ.  *Freeman v. HSBC Holdings PLC*, 413 F. Supp. 3d 67, 97-98 & n.41 (E.D.N.Y. 2019); *see also Kaplan*, 999 F.3d at 855.

Finally, the assertion of primary liability against QNB is *a fortiori* also inadequate.  The Complaint does not plausibly allege that QNB itself committed an "act of international terrorism." The Complaint further fails to plausibly allege that Plaintiffs' injuries resulted "by reason of" any of QNB's actions (*i.e.*, proximate cause).  18 U.S.C. § 2333(a).  Due to these deficiencies, the Complaint should be dismissed under Fed. R. Civ. P. 12(b)(6) in its entirety as to QNB for failure to state a claim under the ATA/JASTA.[1]

## ARGUMENT

## I.   PLAINTIFFS' COMPLAINT SHOULD BE DISMISSED AS TO QNB FOR LACK OF PERSONAL JURISDICTION.

The Court should dismiss the Complaint as to QNB, given Plaintiffs' failure to make even a *prima facie* showing of personal jurisdiction over QNB.  "[T]o survive a motion to dismiss for lack of personal jurisdiction, a plaintiff must make a prima facie showing that jurisdiction exists." *SPV Osus Ltd. v. UBS AG*, 882 F.3d 333, 342 (2d Cir. 2018) (internal quotation marks omitted).

---

[1] QNB also adopts MAR's arguments that certain plaintiffs lack standing to bring their claims and that the Complaint should therefore be dismissed as to those plaintiffs, noting that these arguments are not defendant-specific.  *See* MAR Br. at Section V.

To make such a *prima facie* showing, Plaintiffs must offer this Court "an averment of facts that, if credited by the ultimate trier of fact, would suffice to establish jurisdiction over the defendant." *Id*. (internal quotation marks omitted).  Moreover, in a case such as this with multiple defendants, Plaintiffs bear the burden of establishing that personal jurisdiction exists for *each* defendant. *Walden v. Fiore*, 571 U.S. 277, 284 (2014).  The Second Circuit has consistently held that, in determining whether a plaintiff has met this burden, the court will not draw "argumentative inferences" in the plaintiff's favor nor will it "accept as true a legal conclusion couched as a factual allegation."  *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL* (*Licci I*), 673 F.3d 50, 59 (2d Cir. 2012) (internal quotation marks omitted).

To make a *prima facie* showing of personal jurisdiction over QNB, Plaintiffs must meet three requirements: "First, the plaintiff's service of process upon the defendant must have been procedurally proper. Second, there must be a statutory basis for personal jurisdiction that renders such service of process effective . . . . Third, the exercise of personal jurisdiction must comport with constitutional due process principles."  *Waldman v. Palestine Liberation Org.*, 835 F.3d 317, 327 (2d Cir. 2016) (quoting *Licci I*, 673 F.3d 50 at 59-60).

As explained further below, Plaintiffs have failed to make a *prima facie* showing that this Court has personal jurisdiction over QNB in this case.  Because Plaintiffs have not made that threshold showing, they are not entitled to jurisdictional discovery in search of one.

### A.    Plaintiffs Fail to Make a *Prima Facie* Showing of Proper Service on QNB.

Plaintiffs' own filings acknowledge doubts regarding the legality under Qatari law of a foreign court seeking to serve a civil summons via registered mail or its equivalent.  *See* ECF No. 8 at 3 (explaining that service of letters rogatory is required in order to enforce a judgement entered against defendants in Qatar).  Those doubts are well-founded.  Service of a court summons, by which act the court obtains authority over the party summoned, at least to adjudicate questions of

jurisdiction, is an exercise of governmental power, and one state government is generally prohibited from exercising sovereign power in the territory of another without its consent. *See AG of Can. v. R.J. Reynolds Tobacco Holdings, Inc.*, 268 F.3d 103, 111 n.6 (2d Cir. 2001). Thus, Plaintiffs' reference to the authority of a Qatari court to serve a summons within Qatar, *see* ECF No. 44 at 4, is irrelevant to the question of whether a U.S. court may exercise such power within Qatar.[2] Sovereign states often agree to such reciprocal exercises of authority by treaty, but Plaintiffs point to no such treaty here. That is precisely why Plaintiffs requested, and this Court issued, letters rogatory to effectuate service through diplomatic channels, by Qatari officials in Qatar. *See* ECF Nos. 7-10. Thus, they have provided absolutely no authority for the proposition that a foreign court's service of a summons by mail on a Qatari citizen located in Qatar is not an impermissible projection of sovereign authority into another jurisdiction prohibited by Qatari law. Nor, even if such service were permissible, have they established that the person who signed was authorized to receive such summons on behalf of QNB. For that reason, Plaintiffs have failed to establish the first prong of a *prima facie* showing of personal jurisdiction.

### B. Plaintiffs Fail to Make a *Prima Facie* Showing that This Court Has Specific Personal Jurisdiction over QNB Pursuant to New York's Long-Arm Statute.

In their pre-motion letter to this Court, Plaintiffs advise that their Complaint proceeds on a theory of "specific personal jurisdiction" over each defendant "based on their purposeful use of a correspondent bank in New York to funnel substantial U.S. dollars to Hamas and PIJ," allegedly through the bank accounts of defendant Qatar Charity. ECF No. 44 at 2. Invoking New York's long-arm statute, N.Y. C.P.L.R. 302(a), Plaintiffs maintain that such alleged "use of a

---

[2] Moreover, Article 2 of the same law Plaintiffs cite in their pre-motion letter clearly states that "*[e]very* summons or execution *shall* be served through the police or any other authority appointed by the President of the Supreme Judicial Council," with the only carveout being for a Qatari court to effect service by registered mail. *See* Qatar Civil and Commercial Procedure Law (Law No. 13 of 1990), https://www.almeezan.qa/LawArticles.aspx?LawTreeSectionID=8075&lawId=2492&language=en (emphases added); *see also* ECF No. 44 at 4 (citing same law). This language suggests that Plaintiffs' method of service is *prohibited* by Qatari law.

correspondent bank account, even if the defendant has no other contacts with New York, satisfies the first prong of New York's long-arm statute [302(a)(1)] so long as the use was purposeful." *Id*. (quoting *Official Comm. of Unsecured Creditors of Arcapita Bank, B.S.C. v. Bahr. Islamic Bank*, 549 B.R. 56, 67-68 (S.D.N.Y. Mar. 30, 2016)).

Plaintiffs' Complaint, however, as well as their pre-motion letter, is bereft of *any* specific allegation that QNB transferred *any* funds through *any* New York bank, much less that QNB transferred Qatar Charity funds through a New York correspondent bank in direct support of the terrorist acts alleged in the Complaint. In an effort to overcome this deficiency, Plaintiffs invoke a "conspiracy theory" of personal jurisdiction, whereby Plaintiffs seek to attribute *to QNB* the alleged transfers of Qatar Charity funds through New York *by co-defendant MAR*. *See* ECF No. 44 at 3. As shown below, Plaintiffs' conspiracy theory of specific personal jurisdiction under New York law has been squarely rejected by numerous courts and is otherwise unavailing. *Suber v. VVP Servs., LLC*, No. 20-cv-8177 (AJN), 2021 WL 4429237, at *6 (S.D.N.Y. Sept. 27, 2021) ("[T]he conspiracy theory of jurisdiction is not available under section 302(a)(1)").[3]

1.   <u>Plaintiffs' Jurisdictional Allegations as to QNB</u>

As Plaintiffs make clear in their pre-motion letter, their theory of personal jurisdiction as to QNB is premised on "Defendant Co-Conspirators' . . . purposeful use of a correspondent bank account in New York." ECF No. 44 at 2.[4] Yet, the only "Defendant Co-Conspirators" alleged to

---

[3] Plaintiffs do not assert a theory of general jurisdiction over QNB, nor could they. QNB is decidedly not "at home" in New York—it is incorporated in Qatar and has its principal place of business in Doha, Qatar. QNB does not maintain even one branch in New York. *Cf. Gucci Am., Inc. v. Weixing Li*, 768 F.3d 122, 135 (2d Cir. 2014) (declining to exercise general jurisdiction over a bank that had even "four branch offices in the United States" but that was "incorporated and headquartered elsewhere," as this "plainly [did] not approach the required level of contact" (internal quotation marks omitted)).

[4] While not addressed in Plaintiffs' pre-motion letter, the Complaint alleges two additional statutory bases for personal jurisdiction: (i) minimum contacts with the United States as a whole pursuant to Fed. R. Civ. P. 4(k)(2) and (ii) service of process as provided under the ATA. These are also insufficient bases to establish personal jurisdiction over QNB. To invoke Rule 4(k)(2), Plaintiffs must first establish that QNB is not subject to personal jurisdiction in *any* state in the United States, *see* Fed. R. Civ. P. 4(k)(2)(A), and here they are arguing the exact opposite. Moreover, under Plaintiffs' conspiracy theory of personal jurisdiction under 4(k)(2), QNB theoretically would be subject to personal

have made any such transfer through New York are Defendants MAR and Qatar Charity. *See* Compl. ¶¶ 24-25, 128, 132. In marked contrast, Plaintiffs do not advance a single specific allegation that QNB did anything whatsoever in the state of New York, much less that QNB "transacted business" in this forum directly related to Plaintiffs' claims. *Cf.* C.P.L.R. 302(a)(1) ("[A] court may exercise personal jurisdiction over any non-domiciliary . . . who in person or through its agent . . . transacts any business within the state.).[5]

> 2.   Plaintiffs' "Conspiracy Theory" of Specific Personal Jurisdiction over QNB Is Not Cognizable Under C.P.L.R. 302(a)(1).

As noted in their pre-motion letter, *see* ECF No. 44 at 3, Plaintiffs rely solely upon C.P.L.R. 302(a)(1) to assert personal jurisdiction over QNB pursuant to New York's long-arm statute.[6] To exercise personal jurisdiction under C.P.L.R. 302(a)(1), the Court must determine "(1) whether the defendant 'transacts any business' in New York and, if so, (2) whether this cause of action 'aris[es] from' such a business transaction." *Licci I*, 673 F.3d at 60 (quoting *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 246 (2d Cir. 2007)). The Second Circuit has explained that "the overriding criterion necessary to establish a transaction of business is some act by which the defendant purposefully avails itself of the privilege of conducting activities within New York." *Licci I*, 673 F.3d at 61 (internal quotation marks omitted). If a plaintiff establishes purposeful availment, the court must

---

jurisdiction in those states—unlike New York—where the applicable long-arm statute is co-extensive with the requirements of due process, again failing the prerequisite showing under Rule 4(k)(2)(A). As for the ATA, it provides that "any civil action under section 2333 of this title against any person may be instituted in the district court of the United States for any district where any plaintiff resides or where any defendant resides or is served, or has an agent." 18 U.S.C. § 2334(a). QNB does not reside or have an agent in the Eastern District of New York, and Plaintiffs do not reside, nor have they served QNB, in this district.

[5] Plaintiffs' collective pleading against "Defendants" generally, *see, e.g.*, Compl. ¶ 23, contributes nothing to the jurisdictional analysis. As the Second Circuit repeatedly has made clear, such allegations against defendants in the aggregate are not cognizable in assessing the question of personal jurisdiction over an individual defendant. *See Charles Schwab Corp. v. Bank of Am. Corp. (Schwab I)*, 883 F.3d 68, 84 (2d Cir. 2018) (allegations that "refer[] only to the grouped entities throughout [a] complaint" are "insufficiently 'individualized'").

[6] The other subsections of C.P.L.R. 302 are inapplicable. The Complaint does not allege either a tortious act occurring in New York (C.P.L.R. 302(a)(2)), injury to any person or property in New York (C.P.L.R. 302(a)(3)), or that QNB owns, uses, or possesses real property in New York (C.P.L.R. 302(a)(4)).

also determine whether "there is an articulable nexus, or a substantial relationship, between the claim asserted and the actions that occurred in New York," *id.* at 66 (internal quotation marks omitted), or that such actions were the "proximate cause" of Plaintiffs' injuries, *SPV Osus*, 882 F.3d at 344.

Here, the Complaint is devoid of a single allegation that QNB *itself* had any contact with New York, much less transacted business in New York that gave rise to Plaintiffs injuries.  As the Supreme Court has instructed, a district court must look to the "contacts that the defendant *himself* creates with the forum."  *Walden*, 571 U.S. at 284 (internal quotation marks omitted).  Here, the Complaint does not allege that QNB ever effectuated or directed even one fund transfer through New York, let alone that QNB used a correspondent bank account in New York to effect a fund transfer on behalf of Qatar Charity, much less one related to any of Plaintiffs' claims.  While jurisdiction under C.P.L.R. 302(a)(1) may also be based on the acts of a "person or agent," to qualify under this provision the alleged agent must have acted in New York "for the benefit of, and with the knowledge and consent of the non-resident principal, and the principal must have exercised some control over the agent."  *Suber*, 2021 WL 4429237, at *5 (internal quotation marks omitted).  The Complaint contains no allegation that QNB exercised any control over any other defendant or directed them to transfer funds through New York.[7]

Given the absence of any allegation that QNB had any contacts with New York either directly or through an agent, Plaintiffs resort to a "conspiracy theory" of specific personal jurisdiction under C.P.L.R. 302(a)(1), by which they seek to attribute vicariously to QNB the wire transfers allegedly directed by MAR or Qatar Charity through New York in or before 2015.  *See*

---

[7] Far from alleging an agent/principal relationship, Plaintiffs allege only that QNB and MAR were "connected" through "close relationships" with the "Qatari government, including the Qatari royal family."  Compl. ¶ 360.  That allegation, even if true (and it is not) comes nowhere close to alleging "control" by QNB of MAR's alleged contacts with New York.

Compl. ¶¶ 23-24, 128, 132. That legal theory of personal jurisdiction, however, is unavailable under C.P.L.R. 302(a)(1). District courts within the Second Circuit have consistently rejected the application of a conspiracy theory of personal jurisdiction under Section 302(a)(1). *See Suber* 2021 WL 4429237, at \*6; *Berdeaux*, 2021 WL 4267693, at \*10; *E-Z Bowz, L.L.C. v. Pro. Prod. Rsch. Co.*, No. 00-cv-8670 (LTS) (GWG), 2003 WL 22064259, at \*9 (S.D.N.Y. Sept. 5, 2003). Indeed, courts have found that, to the extent a conspiracy theory of personal jurisdiction is available at all under New York's long-arm statute, it is available only under C.P.L.R. 302(a)(2), which is not applicable here.[8] *See United States v. Besneli*, No. 14-cv-7339 (JFK), 2018 WL 443747, at \*5 (S.D.N.Y. Jan. 16, 2018); *Levisohn, Lerner, Berger & Langsam v. Med. Taping Sys., Inc.*, 10 F. Supp. 2d 334, 342 (S.D.N.Y. 1998).

Plaintiffs' reliance in their pre-motion letter on *Allianz Global Inv'rs GMBH v. Bank of Am. Corp.*, 457 F. Supp. 3d 401 (S.D.N.Y. 2020), to support their argument that conspiracy jurisdiction is applicable to C.P.L.R. 302(a)(1), *see* ECF No. 44 at 3, is misplaced. As an initial matter, the state long-arm statute was not at issue in *Allianz*. *Id.* at 407. As such, the court applied a theory of conspiracy jurisdiction only under a due process analysis. In doing so, the court in *Allianz* relied on the Second Circuit's earlier holding in *Schwab I*, which also approved a "conspiracy theory" of personal jurisdiction only under a due process analysis. 883 F.3d at 82; *accord Schwab Short-Term Bond Mkt. Fund v. Lloyds Banking Grp. PLC (Schwab II)*, 22 F.4th 103 (2d Cir. 2021). Importantly, the Second Circuit in *Schwab I* did *not* find such theory available as a matter of New York statutory jurisdiction. 883 F.3d at 82. Indeed, the Second Circuit expressly acknowledged that, were the New York long-arm statute at issue (as opposed to the

---

[8] At least one district court judge in this Circuit has previously declined to adopt a conspiracy theory of specific personal jurisdiction even with respect to C.P.L.R. 302(a)(2), rejecting that theory "out of hand[.]" *In re Dental Supplies Antitrust Litig.*, No. 16-cv-696 (BMC) (GRB), 2017 WL 4217115, at \*7 (E.D.N.Y. Sept. 20, 2017) (Cogan, J.) ("[T]here is no doctrinal support for 'conspiracy jurisdiction[]'" under New York's long-arm statute).

California long-arm statute), the analysis as to the defendant's contacts would necessarily be different because, unlike California's long-arm statute, the New York long-arm statute is not coextensive with due process and instead requires a showing of an agent/principal relationship. *See Schwab I*, 883 F.3d at 85; *PharmacyChecker.com, LLC v. Nat'l Ass'n of Boards of Pharmacy*, 530 F. Supp. 3d 301, 325, n. 9 (S.D.N.Y. 2021) ("[T]he *Charles Schwab* test may stand alone, as California's long-arm statute is more capacious than New York's."). Because Plaintiffs fail to meet the first prong of New York's long-arm statute, they have not made even a *prima facie* showing that QNB is subject to personal jurisdiction in this Court.[9]

### C.     Plaintiffs' "Conspiracy Theory" of Personal Jurisdiction over QNB is Not Consistent with the Requirements of Due Process.

Even were Plaintiffs able to satisfy New York's long-arm statute (and they are not), they could not rely on their vague and conclusory assertions of an overarching conspiracy involving the Qatari Royal Family, Hamas, PIJ, and countless others to satisfy the requirements of due process.[10] Plaintiffs must show that QNB had "certain minimum contacts . . . such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Walden*, 571 U.S. at 283 (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). The Court's inquiry must "focus[] on the relationship among the defendant, the forum, and the litigation." *SPV Osus*, 882 F.3d at 344 (quoting *Walden*, 571 U.S. at 284).

As explained *supra* Section I.B.2, Plaintiffs rest their jurisdictional allegations as to QNB

---

[9] To aid in judicial efficiency for the Court, QNB adopts MAR's and Qatar Charity's arguments that they are not subject to personal jurisdiction under New York's long-arm statute, including their arguments with respect to whether any alleged contacts have a sufficient nexus to New York under prong two of New York's long-arm statute. *See* MAR Br. at Section I.A; Qatar Charity Br. at Section I.A.

[10] Because Plaintiffs fail to show that QNB is subject to personal jurisdiction under New York's long-arm statute, the Court need not reach a due process analysis. The Second Circuit has made it clear that New York's long-arm statute must first be satisfied before reaching the constitutional analysis under the Due Process Clause, if the due process analysis is reached at all. *Licci ex rel Licci v. Lebanese Canadian Bank SAL (Licci II)*, 732 F.3d 161, 168 (2d. Cir. 2013); *Berdeaux*, 2021 WL 4267693, at *6; *see also Schwab I*, 883 F.3d at 82 ("A plaintiff must have a state-law statutory basis for jurisdiction *and* demonstrate that the exercise of personal jurisdiction comports with due process." (emphasis added)).

solely on its alleged participation in a conspiracy.  While the conspiracy theory of jurisdiction is available in the Second Circuit under the due process analysis, "the mere existence of a conspiracy is not enough."  *Schwab I*, 883 F.3d at 85.  "A plaintiff must plausibly allege that (1) a conspiracy existed; (2) the defendant participated in the conspiracy; and (3) a co-conspirator's overt acts in furtherance of the conspiracy had sufficient contacts with a state to subject that co-conspirator to jurisdiction in that state."  *Schwab II*, 22 F.4th at 122.

The Complaint fails to plausibly allege any of the requirements necessary to establish personal jurisdiction over QNB consistent with the requirements of due process.  Not only does the Complaint fail to plausibly allege that a conspiracy existed (*see infra* Section III), the allegations concerning QNB's participation in the alleged conspiracy are wholly conclusory.  The Complaint generally alleges "Qatar Charity and Masraf Al Rayan, with the knowledge of their co-conspirator, QNB, knowingly effectuated U.S. dollar-denominated funds" through New York, Compl. ¶ 24, but that is an allegation about *MAR*, not QNB.  The Complaint also alleges that QNB provided routine banking services *in Doha, Qatar* to certain individuals with alleged ties to terrorist organizations, without any reference whatsoever to how those banking services fit into the alleged conspiracy, much less had anything to do with Plaintiffs' alleged injuries or this forum.  *See e.g.*, *id.* ¶ 15.  These allegations are patently insufficient to show that QNB participated in the alleged conspiracy.  Indeed, the Complaint fails to plead even one specific, non-conclusory allegation regarding QNB's participation in the alleged conspiracy.  *See Allianz*, F. Supp. 3d at 413-14 (finding no personal jurisdiction where complaint lacked specificity as to how certain defendants' alleged participatory acts fit in with the overall conspiracy).  Moreover, and for the reasons stated in MAR's and Qatar Charity's (QNB's alleged co-conspirators) briefs, none of their

alleged actions support a conclusion that either had sufficient contacts with New York.[11]

### D.      Plaintiffs Are Not Entitled to Jurisdictional Discovery.

This Court should not grant Plaintiffs jurisdictional discovery as to QNB, given that their legal theory of personal jurisdiction over QNB is not even cognizable as a matter of New York law. *See Mednik v. Specialized Loan Servicing, LLC*, No. 20-cv-427 (MKB), 2021 WL 707285, at *8 (E.D.N.Y. Feb. 23, 2021) ("[I]f the plaintiff has failed to establish a *prima facie* case for personal jurisdiction, jurisdictional discovery is generally not granted." (internal quotation marks omitted)); *see also Daventree Ltd. v. Republic of Azerbaijan*, 349 F. Supp. 2d 736, 761 (S.D.N.Y. 2004) ("[A] court is not obligated to subject a foreign corporation to discovery where the allegations of jurisdictional facts, construed most favorably in the plaintiff's favor, fail to state a basis for the exercise of jurisdiction."). Having failed to proffer in their Complaint, or anywhere else for that matter, a genuine issue of jurisdictional fact that could give rise to personal jurisdiction as a matter of New York law, Plaintiffs are not entitled to go on a costly and oppressive fishing expedition through QNB's files in search of another legal theory they have yet to even identify. *See Mednik*, 2021 WL 707285, at *8*; Daventree Ltd.*, 349 F. Supp. 2d at 760. Certainly, "discovery need not be granted to permit a fishing expedition for jurisdictional facts." *Mednik* 2021 WL 707285, at *8 (internal quotation marks omitted).

Here, the *only* basis Plaintiffs have articulated for the assertion of personal jurisdiction over

---

[11] Even if the Complaint plausibly alleged a conspiracy theory of jurisdiction (it does not), the Court would still have to assess whether exercising personal jurisdiction over QNB would comport with traditional notions of fair play and substantial justice. This inquiry would require the Court to determine whether it would be "reasonable" to assert jurisdiction under the circumstances. And "[t]he primary concern is the burden on the defendant." *In re Platinum & Palladium Antitrust Litig.*, 449 F. Supp. 3d 290, 327 (S.D.N.Y. 2020) (internal quotation marks omitted). The burden on QNB to litigate this action in the Eastern District of New York would be immense. QNB does not have an office in the United States and is not otherwise physically present in the forum, and none of QNB's books and records, files, or witnesses with information about the litigation are located in New York. In addition, QNB does not regularly litigate in the United States. Moreover, Plaintiffs do not allege that QNB took *any* actions in New York, thereby negating any interest this forum has in adjudicating this action as against QNB. Thus, it would be unreasonable to assert personal jurisdiction over QNB in this case. *See Gucci Am., Inc. v. Weixing Li,* 135 F. Supp. 3d 87, 99 (S.D.N.Y. 2015); *Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 574 (2d Cir. 1996).

QNB is their legally deficient conclusion that attributing MAR's or Qatar Charity's alleged forum contacts to QNB under a conspiracy theory of personal jurisdiction satisfies C.P.L.R. 302(a)(1). As explained above, such a theory is unavailing under New York law, and Plaintiffs have therefore failed to put before the Court any genuine issue of jurisdictional fact as to QNB. Thus, jurisdictional discovery would be inappropriate on such deficient allegations, and this Court should not allow Plaintiffs to engage in a search for a more viable jurisdictional theory. *See id.* (jurisdictional discovery should not be permitted where a plaintiff "needs new jurisdictional theories, not more evidence substantiating the theories she has already advanced").

## II.   PLAINTIFFS FAIL TO STATE A CLAIM THAT QNB IS SECONDARILY LIABLE UNDER 18 U.S.C. § 2333(D) FOR AIDING AND ABETTING.

Plaintiffs' secondary liability claim against QNB for aiding and abetting fails for a simple reason: Plaintiffs fail to identify public sources (or *any* sources) from which one could plausibly infer that QNB was generally aware of its customers' ties, if any, to Hamas or PIJ. The limited, supposedly "public" sources Plaintiffs cite actually reveal how deficient the Complaint is; Plaintiffs invoke various non-public, pseudo-sources, none of which QNB would have had any reason to be aware of. The Complaint also fails to plausibly allege that QNB's customers were closely intertwined with any terrorist activities of Hamas and PIJ, or that the 2019 attacks at issue were somehow a foreseeable result of QNB's banking services, or that QNB somehow knowingly and substantially assisted the principal violation. In light of these multiple failings, Plaintiffs' claims should be dismissed for failure to state a claim under Fed. R. Civ. P. 12(b)(6).

To survive a motion to dismiss for failure to state a claim upon which relief can be granted under Fed. R. Civ. P. 12(b)(6), a "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible on

its face when the "plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. However, "[t]hreadbare recitals of the elements of a cause of action, supported by merely conclusory statements, do not suffice." *Id.* What also "will not do" are pleadings that offer "labels and conclusions" or "naked assertion[s] devoid of further factual enhancement." *Id.* (internal quotation marks omitted). This familiar standard is ever more critical in this case, because even a generous reading of the Complaint can only lead to the conclusion that in many of its portions, the allegations against QNB are threadbare, wholly conclusory, and not plausibly supported by factual allegations.

JASTA amended the ATA to create a cause of action against "any person who aids and abets, by knowingly providing substantial assistance, or who conspires with the person who committed . . . an act of international terrorism." 18 U.S.C. § 2333(d)(2). Congress has "specifically endorsed the reasoning of the D.C. Circuit in *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983), in conducting the aiding-and-abetting analysis." *Honickman*, 6 F.4th at 494 (citing JASTA, Pub. L. No. 114-222, 130 Stat. 852 (2016)). The *Halberstam* court identified three elements of aiding-and-abetting liability: "(1) the party whom the defendant aids must perform a wrongful act that causes an injury; (2) the defendant must be *generally aware* of his role as part of an overall illegal or tortious activity at the time that he provides the assistance; [and] (3) the defendant must *knowingly and substantially assist* the principal violation." 705 F.2d at 477 (emphases added). Recent Second Circuit cases have refined and applied the *Halberstam* framework in the context of ATA/JASTA cases, including on motions to dismiss for failure to state a claim. *See Honickman*, 6 F.4th 487; *Kaplan*, 999 F.3d 842. Under the standard adopted by the Second Circuit, Plaintiffs' Complaint fails to plausibly allege not only general awareness, but

also knowing and substantial assistance.[12]  The Complaint's failure to plead adequately either of these elements requires dismissal of Plaintiffs' claim for secondary aiding and abetting liability under the ATA/JASTA; and here, Plaintiffs fall far short on both elements.

> **A.    Plaintiffs Fail to Plausibly Allege that QNB Was Generally Aware of Any Role It Allegedly Had in an Overall Illegal or Tortious Activity.**

In order to survive a motion to dismiss, Plaintiffs must plausibly allege the following to satisfy the "general awareness" prong: (1) as a threshold requirement, that QNB was aware of Qatar Charity's and the individual accountholders' alleged connections with Hamas and PIJ before the relevant attacks; and (2) that Qatar Charity and the individual accountholders were "so closely intertwined with Hamas's [and PIJ's] violent terrorist activities that one can reasonably infer [QNB] was generally aware of its role in unlawful activities from which the attacks were foreseeable while it was providing financial services." *Honickman*, 6 F.4th at 501.

Like the complaint in *Honickman*, Plaintiffs here fail to meet even the threshold requirement for general awareness: Plaintiffs do not plausibly allege that QNB was aware of its customers' alleged connections with Hamas or PIJ during the relevant time period.  The purportedly "public" sources that the Complaint cites are extremely limited, and the Complaint gives no basis upon which to infer from these sources that QNB was aware of its customers' alleged connections with designated terrorist organizations.  Plaintiffs also fail to allege that Qatar Charity or the individual accountholders were so closely intertwined with Hamas's and PIJ's violent terrorist activities that one could reasonably infer QNB was generally aware that violent rocket attacks were a foreseeable consequence of simply maintaining accounts for its customers.

---

[12] The first prong of the *Halberstam* analysis, "the party whom the defendant aids must perform a wrongful act that causes an injury," is generally "straightforward," *see Honickman*, 6 F.4th at 495.  The party in question refers to Hamas and PIJ in connection with the 2019 rocket attacks, not to QNB's customers.

1.  Plaintiffs Fail to Meet the Threshold Requirement for General Awareness of Plausibly Alleging that QNB Was Aware of Qatar Charity's and the Individual Accountholders' Alleged Connections with Hamas and PIJ.

With respect to Plaintiffs' claim for aiding and abetting, the only allegations that Plaintiffs specifically advance regarding general awareness is:

> At the time Defendants provided that substantial assistance to Hamas and PIJ, Defendants knew that: (a) the two FTOs were so designated; (b) the two FTOs and their operatives engaged in terrorism, including the attacks alleged herein; and (c) the financial assistance that Defendants were providing to those FTOs was essential to their ability to carry out terrorist attacks, including the attack that injured Plaintiffs.

Compl. ¶ 347.  The third of these assertions is the key one with respect to QNB, and that is where the Complaint is wholly deficient.

As in *Honickman*, the "*limited public sources* Plaintiffs cite pale in comparison to the *detailed, numerous sources* that sufficed in *Kaplan*."  6 F.4th at 502 (emphases added).  The *Kaplan* decision, another recent Second Circuit decision to address the sufficiency of a secondary aiding and abetting claim under JASTA, involved rocket attacks by Hizbollah in 2006.  There, the Second Circuit upheld the adequacy of the complaint, but did so stressing the complaint's many detailed public sources that connected the bank's customers with Hizbollah during the period leading up to the attacks.  In particular, the Second Circuit highlighted that the complaint identified "press conferences and news media interviews" and "other specific media," including "Hizbollah's own 'official websites,' its 'official television station, Al-Manar,' and its 'official radio station, Al-Nour'" in which speakers identified as "senior Hizbollah officials" had "identified [three bank customers] as integral parts of Hizbollah" during a "particular time period (i.e., repeatedly in the several years leading to July 12, 2006)." *Kaplan*, 999 F.3d at 864.  The Complaint here pales by comparison.  Plaintiffs' allegations are much weaker than those found adequate in *Kaplan*; indeed, they are even weaker than those held insufficient in *Honickman*.  The "limited public sources" that

17

were *in*adequate in *Honickman* included at least: (1) a news article about one of the bank's customers at issue, Sanabil, and its support for Palestinian families; (2) the "Lebanese press's coverage of Sanabil's center in Sidon closing due to 'its links to [Hamas]'"; and (3) the United States Treasury Department's official, public designation of Sanabil as an SDGT. *See* 6 F.4th at 501-02.  Here, by contrast, there are *no news sources at all* cited in the Complaint in regard to Qatar Charity or the individual accountholders, meaning there is even less than in *Honickman*. Further, like many of the sources in *Honickman*, the purportedly "public" sources relied on by Plaintiffs are inapposite for various reasons, including timing. *See id.* at 501-02.

The Complaint makes much ado about Qatar Charity's supposed inclusion as a "priority III terrorism support entity (TSE)" on an internal "list[]" of a U.S. intelligence committee, but the Complaint fails to explain how an internal intelligence document allegedly used to "advise and assist the Director of Central Intelligence" would constitute public knowledge attributable to QNB. *See* Compl. ¶¶ 41 & n.1, 139; ECF No. 44 at 2.  Plaintiffs make no allegation that this purported listing was provided to the public or otherwise available to QNB, or even what this alleged designation even signifies.  Indeed, the allegations Plaintiffs do make conclusively *undermine* any inference of knowledge on the part of QNB.  The document Plaintiffs link to in their Complaint to identify the intelligence committee that allegedly made this determination is a document regarding that entity's creation, which appears to have been classified for some undetermined amount of time.  *See* Compl. ¶ 41 n.1.  There is *no* allegation that could start to explain how QNB can be charged with knowledge of a designation by an entity whose *existence* may not even have been known during the relevant period.  Thus, Plaintiffs' headline allegation amounts to nothing and puts this case on a far different footing from other cases where the United States Government affirmatively designated a known customer or transferee as a "foreign terrorist organization" or a "specially designated terrorist group," each of which is a public designation by the federal

government specifically designed to dissuade legitimate enterprises from doing business with the designated entity. *Cf. Honickman*, 6 F.4th at 491-92 (involving an SDGT designation of the bank's direct customer that was ultimately untimely); *Strauss v. Credit Lyonnais, S.A.*, 925 F. Supp. 2d 414, 451 (E.D.N.Y. 2013) (noting that the ATA prevents "doing business with an FTO" and OFAC regulations provide "civil penalties for parties that do business with SDGTs"). The absence from the Complaint of any genuinely public reports of Qatar Charity's purported financing of terrorism is all the more stark given the contrast with Qatar Charity's compilation of numerous *public* sources reporting on the strong collaborative relationships that Qatar Charity has maintained with international organizations and foreign governments, including the United States, throughout the period in question. *See* Qatar Charity Br. at Section II.A.1.

The Complaint's allegations regarding the Israeli Defense Minister's 2008 order designating Qatar Charity as a member of the Union of Good also fail to pass muster. *See* Compl. ¶¶ 78, 138. The Complaint fails to allege why or how this defense order would have been public knowledge available to QNB. As the Second Circuit has held, an "allegation that Israel designated [an entity] as a terrorist organization . . . without specifying whether and where this was made public, is also unavailing." *Honickman,* 6 F.4th at 502 n.20.

Significantly, throughout the Complaint, Plaintiffs' portray Qatar Charity as maintaining a charitable "cover" for allegedly nefarious activities. *See, e.g.*, *id.* ¶ 148 ("Qatar Charity also used its accounts at Masraf Al Rayan to solicit contributions from donors, *purportedly for humanitarian purposes such as assisting Syrian refugees*." (emphasis added)); *id.* ¶ 228 ("QNB also contributed 2 million Qatari riyals, or roughly $550,000, directly to Qatar Charity, *purportedly to assist Syrian refugees*." (emphasis added)). Rather than a "cover," it is clear from the activities of numerous governments around the globe, including the United States, that Qatar Charity *is* widely recognized as a leading international charity. *See* Qatar Charity Br. at Section II.A.1. But even assuming,

*arguendo*, that Qatar Charity's good works were maintained as a "cover" for more nefarious activities, the Second Circuit has held that the fact "[t]hat organizations like the [bank's customer] maintained a 'cover' in public *undermines* the plausibility of Plaintiffs' theory that [the bank] understood these organizations' true nature and activities from the public record at the time." *Honickman*, 6 F.4th at 502 (emphasis added). Therefore, Plaintiffs' own theories of the case undermine general awareness on the part of QNB.

Regarding the hodgepodge of individual accountholders, the Complaint alleges only that QNB "provide[d] banking services" to these individuals, Compl. ¶ 359, with Plaintiffs apparently proceeding on the mistaken premise that merely maintaining such personal accounts makes QNB liable for whatever bad acts these accountholders may have committed. The Second Circuit has expressly rejected such a strict liability view of JASTA making it illegal merely to maintain a bank account for an alleged wrongdoer. *See Honickman*, 6 F.4th at 501-03 (affirming dismissal notwithstanding allegation that the Union of Good was a customer of the bank). The Complaint's allegations fail to offer any basis to infer that QNB was generally aware that these individuals allegedly were involved in terrorist activities during the time they are alleged to have been QNB customers. Plaintiffs allege that most of these individuals opened bank accounts at QNB in 2015. However, the Complaint plainly fails to allege that QNB was generally aware of any ongoing connections with Hamas and PIJ allegedly involving terrorism. The Complaint associates the individuals with various older Hamas attacks dating back to the 1990s and early 2000s, but does so without any citation to relevant public sources such as news articles. Compl. ¶¶ 14-15, 171, 185, 198, 201, 224, 226. Almost of all the accountholders are alleged to have been released from prison in 2011, and the Complaint fails to tie them to any attacks in the intervening decade, much less to the 2019 rocket attacks at issue here.

The Complaint focuses on Yousef Abdulla al-Qaradawi but fails to plausibly allege that

20

QNB was generally aware of any alleged ties between him and Hamas/PIJ.  This failure is echoed in *Honickman*, where the Second Circuit explained that, like here, the "complaint lacks any allegations that . . . it was public knowledge that al-Qaradawi chaired Union of Good."  6 F.4th at 501-02.  Moreover, *Honickman* held that the complaint failed to plausibly allege general awareness of the customer's ties to Hamas even when the *Union of Good itself* was a customer of the bank. Here, QNB's general awareness would necessarily be even another step removed, as Plaintiffs' view would require that any negative designations of the Union of Good be imputed to al-Qaradawi (or Qatar Charity).  The Complaint discusses al-Qaradawi's attitudes and his status as a prominent "thinker," but provides no allegations tying him to any actual attacks or terrorist activity.  *See* Compl. ¶¶ 198-211.  The Complaint moreover presents certain photos of holiday celebrations where individuals are essentially sitting next to one another, as "public" evidence in regard to al-Qaradawi.  *See id.* ¶¶ 206, 209.  The Complaint leaves the reader to simply speculate how QNB was supposed to collate the Complaint's disjointed, unofficial, and often undated collection of sources to arrive at knowledge of its customers' alleged involvement in terrorism.  As the Second Circuit held in *Honickman*, that approach does not suffice to plead "general awareness":

> Plaintiffs argue that "the publicly available evidence [in the complaint] was largely available before or during the relevant period or discussed facts that were previously knowable." *However, "publicly available" evidence is not the same as public sources such as media articles.*  The latter, depending on their substance, plausibly suggest a defendant's knowledge which can be confirmed during discovery, whereas the former requires the implausible inference that the defendant was aware of those facts even before the news media.

6 F.4th at 502 n.18 (emphasis added).  Similarly here, the disjointed and informal "public" evidence presented by Plaintiffs falls far short of the level of public sources (involving numerous news media and articles) that were found sufficient in *Kaplan*, and is even more deficient than the sources held *insufficient* in *Honickman*.

21

The Complaint further fails to discuss any pertinent public sources regarding the majority of the individual accountholders.  *See, e.g.*, Compl. ¶ 225 (listing several individual accountholders but zero public sources).  One of the only examples of a "public" source the Complaint contains, in regard to Hisham Hijaz, is a citation to a (dead-link) website "terrorism-info.org" with no information about its public nature.  *Id.* ¶ 221.  And the only allegation in regard to that source is completely threadbare—that one of the individual accountholders, Hisham Hijaz, met with someone else who the Complaint (but not the public source) asserts was "later detained" (not convicted) for "planning to carry out shooting attacks and abductions in Israel" (which the Complaint does not even allege to have transpired).  *Id.*  The Complaint does not link Hijaz himself to any attacks.  The Complaint's attempts to conjure up active links to Hamas for the other individual accountholders are wholly conclusory and unsupported by appropriate public sources.[13]

These clearly deficient allegations are at best "limited public sources" held inadequate in *Honickman*, rather than the "detailed, numerous sources" readily and publicly available in the lead-up to the 2006 Hizbollah attacks that supported a claim in *Kaplan*.  Plaintiffs thus fail to meet their threshold requirement of plausibly alleging that QNB had a general awareness of Qatar Charity's or the individual accountholders' alleged connections with Hamas's and PIJ's terrorist activities prior to the 2019 attacks in question.

> 2.       Plaintiffs Further Fail to Plausibly Allege that Qatar Charity and the Individual Accountholders Were Closely Intertwined with Hamas's and PIJ's Violent Terrorist Activities.

---

[13] In regard to Husam Badran, the Complaint relies only on an undated and unsourced assertion that Badran "continues to act as a Hamas spokesperson" and "to advocate for Palestinian terrorism," Compl. ¶¶ 189-90, without any indication what this purported advocacy consists of or how QNB could be charged with knowledge of it.  The further allegation attributed to Israeli security forces states in conclusory fashion that Badran "continues to give orders to Hamas terror cells" and "provide them with funds by smuggling gold and jewelry purchased in Jordan into the West Bank," *id.* ¶ 191, but the Complaint does not allege that these views of the Israeli security forces were made public in a way that QNB would have known of any ongoing link to terrorism.  And in regard to Musa Dudin, Dudin is alleged only to be "responsible" for Hamas's "prisoner portfolio" (conduct not linked to any terrorist activity), and even that allegation is not supported with any public source.  *Id.* ¶ 196.

The second part of the general awareness analysis asks whether Plaintiffs plausibly allege that Qatar Charity and the individual accountholders were "so closely intertwined with Hamas's [and PIJ's] *violent terrorist activities* that one can reasonably infer [QNB] was generally aware of *its role in unlawful activities* from which the attacks were *foreseeable* while it was providing financial services." *Honickman*, 6 F.4th at 501 (emphases added).

Even if the Complaint plausibly alleged that Qatar Charity is closely intertwined with Hamas and PIJ (which it fails to do), that would not be enough. Plaintiffs must plausibly allege that Qatar Charity was closely intertwined with Hamas's and PIJ's "*violent terrorist activities*," not just the organizations themselves writ large. As Plaintiffs themselves allege, Hamas is divided into three wings, two of which are a "political organization" and a "social service or humanitarian component" (only the third is a "military operational wing"). Compl. ¶ 86. As Plaintiffs acknowledge, Qatar Charity has maintained as one of its key focuses the aid of refugees, including in Syria and other countries. *See id.* ¶¶ 148, 228. No non-conclusory allegations in the Complaint specifically link any Qatar Charity funds to Hamas's "military operational wing"; if anything, any link would appear to be to its "social service or humanitarian component." Thus, even if Plaintiffs adequately alleged that QNB provided assistance to Qatar Charity beyond routine banking services and knew that those services would aid Hamas, any such role would not foreseeably lead to the 2019 rocket attacks, given Qatar Charity's humanitarian focus and the fact that Hamas has a "social service or humanitarian" wing. Plaintiffs' conclusory allegations of assistance fall far short of *Twombly*'s requirements. *See, e.g.*, *Owens v. BNP Paribas, S.A.*, 897 F.3d 266, 276 (D.C. Cir. 2018) (allegations that banks "transmitted the funds . . . directly to al Qaeda, and that these funds . . . were necessary for al Qaeda to carry out the embassy bombings" were "conclusory allegations

that do not meet *Twombly*'s plausibility standard" (internal quotation marks omitted)).[14]

QNB's role, as alleged in the Complaint, involves merely "maintaining" accounts in another country, more than a thousand miles away and separated by other countries; any inference that QNB's role in the "overall" activity would "foreseeably" lead to rocket attacks is highly implausible and purely speculative.  Moreover, there are no non-conclusory allegations to support Plaintiffs' bald assertion that QNB was part of a larger overall conspiracy.  The allegations fall far short of those in *Halberstam*, which Congress took as its model for JASTA.[15]  Failure on either the first or second parts of the general awareness analysis would doom Plaintiffs' JASTA claim against QNB; here, the Complaint fails on both parts and therefore must be dismissed.

**B.      Plaintiffs Fail to Plausibly Allege that QNB Knowingly and Substantially Assisted the Principal Violation that Caused Plaintiffs' Injuries**

---

[14] As discussed earlier, the individual accountholders are tied only to alleged attacks in the 1990s and early 2000s. Nothing the Complaint points to would have alerted QNB that by "providing financial services" it had "its [own] role in unlawful activities from which the attacks [on Plaintiffs] were foreseeable."  *Honickman*, 6 F.4th at 501.  For example, to the extent the Complaint even attempts to link Badran and Dudin and others in any public way to present Hamas activities, it is, for example, as a "Hamas spokesperson" (Badran) or as maintaining its "prisoner portfolio" (Dudin). Compl.  ¶¶ 189, 196.  Similarly, the Complaint alleges in regard to al-Qaradawi that he is a leading "Islamic thinker" who wields influence, inter alia, in the "*education . . . and charitable* sectors," Compl. ¶ 204 (emphases added), which undermines any inference that QNB would regard providing him routine financial services as taking a role in terrorist activities.

[15] In *Halberstam* (the reasoning of which Congress explicitly endorsed in its enactment of JASTA), Linda Hamilton served Bernard Welch's burglary enterprise as a "banker, bookkeeper, recordkeeper, and secretary," and she performed these services "in an unusual way under unusual circumstances for a long period of time."  705 F.2d at 487. The D.C. Circuit explained that it "defie[d] credulity that Hamilton did not know that something illegal was afoot," namely due to "Welch's pattern of unaccompanied evening jaunts over five years, his boxes of booty, the smelting of gold and silver, the sudden influx of great wealth, the filtering of all transactions through Hamilton except payouts for goods, Hamilton's collusive and unsubstantiated treatment of income and deductions on her tax forms."  *Id.* at 486. When Welch's dangerous activities resulted in the killing of Michael Halberstam, Hamilton was found to be liable as well for aiding and abetting.  *See id.* at 474.  QNB never performed services for Qatar Charity or the alleged individual accountholders "in an unusual way under unusual circumstances, unlike in *Kaplan*, in which the Second Circuit noted that the plaintiffs had alleged that the bank "granted special exceptions to its Hizbollah-related Customers, allowing them to deposit" large amounts of cash per day/week "all without disclosing the sources of the funds," which allowed them to "circumvent existing sanctions on Hizbollah as a designated FTO."  999 F.3d at 862.  QNB had nowhere near the level of involvement that Hamilton had, nor the level of knowledge that Hamilton had, nor the level of indications of unlawful activity that Hamilton had, such that the various attacks (akin to the killing of Halberstam) were somehow foreseeable from QNB's routine banking activity.  *See Honickman*, 6 F.4th at 496-97 ("Foreseeability is thus central to the *Halberstam* framework, and as a result to JASTA aiding-and-abetting liability."); *see Halberstam*, 705 F.2d at 488 (explaining that Hamilton's knowledge of Welch's activities was enough "because violence and killing is a foreseeable risk in . . . these [burglary-related] enterprises.").  It is difficult to see how QNB, given the Complaint's allegations, could even begin to approach the requisite level of general awareness for aiding and abetting liability.

The Complaint also fails to plausibly allege that QNB "knowingly and substantially assist[ed] the principal violation." *Honickman*, 6 F.4th at 499 (quoting *Halberstam*, 705 F.2d at 477). This element from *Halberstam* involves both a "knowledge" component and a "substantial assistance" component. *See id.*[16] For "substantial assistance," the Second Circuit employs the six-factor analysis from *Halberstam* to determine whether a defendant substantially assisted the principal violation, considering:

> (1) the nature of the act encouraged, (2) the amount of assistance given by defendant, (3) defendant's presence or absence at the time of the tort, (4) defendant's relation to the principal, (5) defendant's state of mind, and (6) the period of defendant's assistance.

*Linde v. Arab Bank, PLC*, 882 F.3d 314, 329 (2d Cir. 2018) (citing *Halberstam*, 705 F.2d at 483-84). No factor in the analysis is dispositive, and the weight given to each factor is determined on a case-by-case basis. *See Honickman*, 6 F.4th at 500 (citing *Halberstam*, 705 F.2d at 483). Here, all of the factors weigh in QNB's favor and point toward dismissal of the claims against QNB.

The first factor—the nature of the act encouraged—requires "assessing whether the alleged aid . . . would be important to the nature of the injury-causing act." *Honickman*, 6 F.4th at 500. The injury-causing act was the May 4-5, 2019 rocket attacks perpetrated by Hamas and PIJ. Here, QNB's "alleged aid" merely involved "maintaining" accounts for Qatar Charity, not for Hamas or PIJ, and the Complaint alleges no transfers by QNB to their accounts. For the individual accountholders, the Complaint alleges that those "accounts allowed the released terrorists to

---

[16] The "knowledge" component generally does not require knowledge greater than that required for the general awareness element. *See Honickman*, 6 F.4th at 500. However, as discussed above, Plaintiffs fail to plausibly allege that QNB had the requisite level of knowledge to satisfy the general awareness element. Moreover, any assistance that QNB may have provided was done so "innocently or inadvertently" through QNB's provision of routine banking services, which is exactly the type of situation the knowledge component was designed to avoid, as laid out in *Halberstam*, later followed by the Second Circuit. *Kaplan*, 999 F.3d at 864; *Halberstam*, 705 F.2d at 485 n.14 (noting that the knowledge component "is designed to avoid subjecting innocent, incidental participants to harsh penalties or damages"). Because the arguments that Plaintiffs failed to plausibly allege general awareness on the part of QNB are extensively laid out above, QNB adopts and rests on those same arguments in this section. With those arguments applied here, Plaintiffs fail to plausibly allege that QNB knowingly assisted the principal violation under this element.

finance their personal expenditures" before adding on wholly conclusory assertions that this "free[d] them to continue to conduct activities on behalf of Hamas and PIJ," and also that "the terrorists directly used those funds to further the efforts of Hamas and PIJ to carry out terrorist attacks."  Compl. ¶ 226.  Even viewing the Complaint's allegations in the light most favorable to Plaintiffs, an assessment of "whether the alleged aid . . . would be important to the nature of the injury-causing act" can only be answered in the negative, as there is no explanation or narrative in the Complaint even hinting at how QNB's banking services could have facilitated the 2019 attacks.

The second factor— the amount of assistance given by the defendant—also plainly weighs in QNB's favor, as again, QNB is only specifically alleged to have "maintained" accounts for Qatar Charity, as well as for other alleged individual accountholders, none of whom the Complaint associates with any attacks other than older ones dating back to the 1990s or early 2000s.  Notably, there are no allegations that QNB gave any of these accounts (whether for Qatar Charity or for the alleged individual accountholders) any special treatment, and none of the Complaint's narratives involving specific transfers of funds even allege QNB's involvement.  *See* Compl. ¶ 24 (alleging only that QNB had "knowledge" of certain transfers); *see also id.* ¶¶ 128, 132 (specific narratives involving transfers, none of which involve QNB whatsoever).[17]

The third factor—the defendant's presence or absence at the time of the tort—plainly weighs in QNB's favor.  The district court in *Honickman* reached the conclusion (which the Second Circuit left undisturbed) that a bank's provision of banking services during the relevant period would not amount to "presence" at the time of the tort.  *See Honickman v. BLOM Bank SAL*, 432

---

[17] Contrast this with *Kaplan*, in which the Second Circuit noted that the plaintiffs had alleged that the bank "granted special exceptions to its Hizbollah-related Customers, allowing them to deposit' large amounts of cash per day/week "all without disclosing the sources of the funds," which allowed them to "circumvent existing sanctions on Hizbollah as a designated FTO."  999 F.3d at 862.  Indeed, Plaintiffs do not allege that QNB provided any such special services or treatment; when it boils down to it, only routine banking services are alleged in the Complaint, and it would strain the meaning of the word to conclude this amount of alleged assistance was anything close to "substantial."

F. Supp. 3d 253, 269 (E.D.N.Y. 2020), *aff'd*, 6 F.4th 487 ("BLOM was not 'present' during the time of the attacks, other than providing banking services to Sanabil and Subul Al-Khair during the relevant period.").  Plaintiffs fail to allege any kind of presence on the part of QNB, much less physical presence, at the rocket attacks in question.

The fourth factor—the defendant's relation to the principal—does not require Plaintiffs to plead a direct relationship between QNB and Hamas/PIJ, as the Second Circuit has clarified.  *See Honickman*, 6 F.4th at 500-01.  However, it does require Plaintiffs to allege *some* relationship to the principal (here, Hamas and PIJ) that is "not . . . so attenuated as in *Siegel*."  *Id.* at 501. The Second Circuit in *Honickman* explained, "In *Siegel*, the defendant-bank's 'relation to the principal' was several steps removed: it allegedly had a commercial relationship with *another bank* that was linked to *various terrorist organizations* including the FTO that caused the plaintiffs' injuries." *Id.* (citing *Siegel v. HSBC N. Am. Holdings, Inc.*, 933 F.3d 217, 220-21 (2d Cir. 2019)).  Here, Plaintiffs do not allege that QNB had any relationship with the principal behind the acts (Hamas and PIJ), but with Qatar Charity, an organization with numerous charitable projects.  To make matters worse for Plaintiffs, the Complaint, in its section detailing the funds allegedly moving to Hamas and PIJ, appears to add yet more intermediaries between Qatar Charity and Hamas/PIJ (and therefore between QNB and Hamas/PIJ), focusing on alleged funds transferred by Qatar Charity to the "Hebron Islamic Charity Society," *see* Compl. ¶ 130, as well as to the "Elehssan Society," *see id.* ¶ 133-36, which then allegedly went on to Hamas and PIJ.  If the Second Circuit deemed "attenuated" the relationship in *Siegel*—where the bank dealt with another bank (a single intermediary) that had links to the FTO causing the plaintiffs' injuries—here at least *two* levels of intermediaries are alleged between QNB on one end and Hamas and PIJ on the other end.[18]

---

[18] And while Plaintiffs also target individual accountholders, none of these individuals are alleged to have been the "principal" behind the attacks causing Plaintiffs' injuries; indeed, as detailed earlier, they are connected only with

For the fifth factor—the defendant's state of mind—Plaintiffs fail to even plausibly allege that QNB had, at a minimum, general awareness.  *See Atchley v. AstraZeneca UK Ltd.*, 22 F.4th 204, 223 (D.C. Cir. 2022) (noting that "[k]nowledge of one's own actions and general awareness of their foreseeable results" is at least required for this factor to weigh in a plaintiff's favor).  *See supra*, Section II.A.  Without plausible allegations supporting even this level of awareness, this factor as well cuts against Plaintiffs and in QNB's favor.

Lastly, for the sixth factor—the period of the defendant's assistance—the Complaint alleges that QNB has maintained seven accounts for Qatar Charity, one of which was opened in 2006 and the rest of which were opened in 2012.  Most of the individual accountholders are alleged to have opened accounts with QNB in 2006 and 2015.  While this period of years could conceivably be construed as lengthy, the Second Circuit explained in *Siegel*, a case in which "HSBC provided banking services to ARB for *twenty-five years*," that the duration "certainly bespeaks a lengthy relationship *but not necessarily of assistance in terrorism*."  *Siegel*, 933 F.3d at 225 (emphases added) (citing *Halberstam*, 705 F.2d at 484).  Again, the Complaint acknowledges Qatar Charity's charitable mission and refugee support projects, and fails to plausibly allege that the bank's "maintenance" of these accounts was "necessarily . . . assistance in terrorism."  *Id.*  Even Plaintiffs' much-heralded allegation that Qatar Charity was designated a "priority III terrorism support entity (TSE)" fails to give any date by which QNB would have learned of that (apparently secret) designation, much less that it was a long time prior to the attacks alleged here.[19]  Therefore, the period of QNB's assistance has not been alleged to have involved

---

older attacks dating back to the 1990s and early 2000s and were released from prison in 2011.  Any alleged active links with Hamas in the Complaint are wholly conclusory, and QNB's provision of routine banking services to these individuals could, at most, show a highly attenuated relationship between QNB and the principal behind the attacks, which is not enough to satisfy this factor.

[19] And in regard to the alleged individual accountholders, there are no non-conclusory allegations that QNB's alleged "maintenance" of accounts for these individuals aided in terrorism, as all of the alleged attacks identified in the

assistance *in terrorism* for any specified duration, and thus this factor weighs also in QNB's favor.

All of the six factors thus fall on QNB's side.  Therefore, the "substantial assistance" prong is not plausibly met by Plaintiffs' threadbare allegations, and the secondary liability aiding and abetting claim should be dismissed for failure to state a claim.

## III.    PLAINTIFFS FAIL TO STATE A CLAIM THAT QNB IS SECONDARILY LIABLE UNDER 18 U.S.C. § 2333(D) FOR CONSPIRACY.

The secondary liability claim for conspiracy should be dismissed as to QNB, because the Complaint is devoid of any non-conclusory allegations that QNB conspired directly with the person or entity that committed the acts of international terrorism injuring Plaintiffs.  *See, e.g., Freeman*, 413 F. Supp. 3d at 97-98 & n.41.  Plaintiffs advance broad allegations that "Defendants conspired with each other, Hamas, PIJ, the government of Qatar and others to bring about acts of international terrorism against Americans in Israel."  Compl. ¶ 356.  But beyond this conclusory group pleading, Plaintiffs' specific allegations regarding QNB only assert that QNB "provide[d] banking services" for Qatar Charity and certain individuals allegedly affiliated with Hamas, *see id.* ¶ 359, which does not "lead one to infer that [QNB] shared any common goal of committing an act of international terrorism," *Kaplan v. Lebanese Canadian Bank, SAL*, 405 F. Supp. 3d 525, 534 (S.D.N.Y. 2019), *vacated on other grounds*, 999 F.3d 842, 855 (2d Cir. 2021).

Under the plain text of JASTA, QNB can be liable for conspiracy only if it "conspire[d] with the person who committed such an act of international terrorism."  18 U.S.C. § 2333(d)(2); *see also Kaplan*, 405 F. Supp. 3d at 534.  Specifically, Plaintiffs must allege that QNB "entered into an agreement" with Hamas and PIJ "to commit an act of international terrorism, and that Plaintiffs were injured by an unlawful overt act performed by" QNB, Hamas, or PIJ in "furtherance

---

Complaint occurred in the 1990s and early 2000s, with none alleged to have occurred in the full decade following their release from prison in 2011.

of" such agreement.  *Kaplan*, 405 F. Supp. 3d at 534 (citing *Halberstam*, 705 F.2d at 477).

Secondary liability under this provision requires that the defendants "*directly* conspired" with the

FTO that allegedly committed the terrorist attacks at issue.  *Freeman*, 413 F. Supp. 3d at 97-98 &

n.41 (emphasis added) ("[T]he plain text of JASTA's conspiracy liability provision requires that a

defendant conspire directly with the person or entity that committed the act of international

terrorism that injured the plaintiff.").  As the Second Circuit made clear in *Kaplan*, JASTA

conspiracy claims require that the defendant "conspired with the principal" who committed the

relevant acts of international terrorism.  *Kaplan*, 999 F.3d at 855 (internal quotation marks

omitted).  Mere "conclusory, vague, or general allegations of conspiracy" will not suffice.  *Gallop*

*v. Cheney*, 642 F.3d 364, 369 (2d Cir. 2011).

Here, the Complaint's conclusory allegations fall far short of plausibly pleading conspiracy

liability against QNB. The Complaint merely attempts to connect QNB to a conspiracy by alleging:

> QNB joined the conspiracy by agreeing, among other things,
> expressly or tacitly: (a) to provide banking services to Hamas
> leadership headquartered in Doha; (b) to provide banking services
> to its co-conspirator Qatar Charity; and (c) by employing and
> providing banking services to the chair of the U.S.-designation
> SDGT Union of Good, a fundraising front for Hamas.

Compl. ¶ 359.  But the provision of banking services to individuals associated with a terrorist

organization does not, alone, support the inference of a common goal of committing an

international act of terrorism.  *See, e.g., Kaplan*, 405 F. Supp. 3d at 534 ("Plaintiffs provide no

factual basis for these allegations that would lead one to infer that Defendant shared any common

goal of committing an act of international terrorism.  Rather, the allegations in the complaint

indicate, at most, that Plaintiffs provided financial services to the Five Customers.").  Notably,

these allegations lack any assertion that QNB conspired *directly* with Hamas or PIJ *to commit the*

*alleged acts of international terrorism.  See Freeman*, 413 F. Supp. 3d at 97-98 & n.41.  There is

not a single specific allegation that the financial services QNB allegedly provided were somehow "provided . . . for the purpose of committing violent or life-endangering acts." *O'Sullivan v. Deutsche Bank AG*, No. 17-cv-8709 (LTS) (GWG), 2019 WL 1409446, at *9 (S.D.N.Y. Mar. 28, 2019). Thus, the Complaint fails to allege plausibly the existence of an unlawful agreement (or any agreement at all)—between QNB on one hand and Hamas and PIJ on the other—to perpetuate the rocket attacks that injured Plaintiffs in 2019. As such, Plaintiffs' conspiracy liability claim plainly fails and should be dismissed.

## IV. PLAINTIFFS FAIL TO STATE A CLAIM THAT QNB IS PRIMARILY LIABLE UNDER 18 U.S.C. § 2333(A).

To prove primary liability under the ATA, a plaintiff must credibly establish not only that a U.S. national suffered an injury, but also that the defendant committed an "act of international terrorism" and the U.S. national's injury occurred "by reason of" that act of international terrorism. 18 U.S.C. § 2333(a). As a threshold matter, Plaintiffs fail to plausibly allege that QNB committed an act of international terrorism. And even assuming, *arguendo*, that they allege an act of international terrorism, they further fail to plausibly allege that their injuries occurred by reason of said act (*i.e.*, proximate cause). Because the Complaint plainly fails on either ground, the Complaint should be dismissed for failing to state a claim for primary liability under the ATA.

### A. Plaintiffs Fail to Plausibly Allege that QNB Committed an Act of International Terrorism.

To meet the definition of an act of "international terrorism" under the ATA, a plaintiff must establish certain statutory requirements, among them that the allegations must "involve violent acts or acts dangerous to human life," 18 U.S.C. § 2331(1)(A), and that the act must "appear to be intended (i) to intimidate or coerce a civilian population; (ii) to influence the policy of a government by intimidation or coercion; or (iii) to affect the conduct of a government by mass destruction, assassination, or kidnapping," 18 U.S.C. § 2331(1)(B). More specifically, "to qualify

31

as international terrorism, a *defendant's* act must also involve violence or endanger human life." *Linde*, 882 F.3d at 327 (emphasis added) (citing 18 U.S.C. § 2331(1)(A)). Further, the *defendant's* act itself "must appear to be intended to intimidate or coerce a civilian population or to influence or affect a government." See *id.* (citing 18 U.S.C. § 2331(1)(B)). In other words, the ATA's primary liability provision provides "civil relief only against the principals perpetrating acts of international terrorism . . . [and] provide[s] no civil action against secondary actors who, while not committing international terrorist acts themselves, facilitated such acts by others." *Id.* at 319-20. Any other reading would render "superfluous" the ATA's secondary liability provision under 18 U.S.C. § 2333(d)(2). *See Kemper v. Deutsche Bank AG*, 911 F.3d 383, 396 (7th Cir. 2018).

While QNB condemns all terrorist attacks, QNB's own actions as alleged in the Complaint, even if they could be connected to Plaintiffs' injuries at all, simply do not rise to the level of international terrorism. Specifically, QNB's alleged banking services do not involve violence, nor are they dangerous to human life. For starters, "[t]here is no dispute that Defendant did not itself perpetrate the . . . attacks that injured Plaintiffs." *Kaplan*, 405 F. Supp. 3d at 533. Throughout the Complaint, Plaintiffs merely allege (and repeatedly so) that QNB "maintained" certain bank accounts for Qatar Charity—a well-regarded international charity—as well as for certain individuals who the Plaintiffs allege are connected to Hamas in some way, but not to the acts of terrorism at issue here. The maintenance of these accounts are the only concrete actions Plaintiffs allege; none of the narratives involving specific transfers of funds even alleges QNB's involvement. *See* Compl. ¶ 24 (alleging only that QNB had "knowledge" of certain transfers); *see also id.* ¶¶ 128, 132 (specific narratives involving transfers, none of which involves QNB whatsoever). And even assuming, *arguendo*, that Qatar Charity and the individual accountholders were actively associated with Hamas or PIJ during the relevant time period, the Second Circuit has already concluded that "providing routine financial services to members and associates of terrorist

organizations is not so akin to providing a loaded gun to a child as to . . . compel a finding that as a matter of law, the services were violent or life-endangering acts that appeared intended to intimidate or coerce civilians or to influence or affect governments." *Linde*, 882 F.3d at 327; *see also Siegel v. HSBC Bank USA, N.A.*, No. 17-cv-6593 (DLC), 2018 WL 3611967, at *3 (S.D.N.Y. July 27, 2018), *aff'd sub nom. Siegel v. HSBC N. Am. Holdings, Inc.*, 933 F.3d 217 (2d Cir. 2019). By Plaintiffs' own allegations, QNB provided only routine banking services, and Plaintiffs fail to allege otherwise; the plain insufficiency of these allegations leaves no questions of fact unresolved as to whether QNB's actions rose to the level of international terrorism—they simply did not.

Notably, the allegations against QNB in the Complaint regarding the "maintaining" of accounts are considerably tamer than those of other similar cases where courts found that certain bank defendants were not primarily liable under the ATA. For example, in *Kaplan*, the plaintiffs alleged that a bank had provided wire transfer services to Hizbollah and that, but for such assistance, Hizbollah's ability to carry out the attacks would have been "severely crippled and limited." 405 F. Supp. 3d at 529; *see also Kaplan*, 999 F.3d at 862 (further noting that plaintiffs alleged that the bank "granted special exceptions to its Hizbollah-related Customers, allowing them to deposit" large amounts of cash per day/week "all without disclosing the sources of the funds" which allowed them to "circumvent existing sanctions on Hizbollah as a designated FTO"). Moreover, the *Kaplan* complaint alleged that the bank was providing services to a customer who used its account "to subsidize the families of Hizbollah suicide bombers—and indeed to provide financial reassurance to prospective suicide bombers." *Kaplan*, 999 F.3d at 858. Even with those more detailed and extreme allegations, the district court in *Kaplan* dismissed the primary liability claim for failing to allege that the bank itself committed an act of international terrorism (as well as for failing to allege proximate cause). *See* 405 F. Supp. 3d at 531-33. Plaintiffs here allege no similar types of special treatment (or other extreme or idiosyncratic arrangements) provided by

QNB to its customers, other than merely "maintaining" their accounts.  Therefore, the Complaint plainly fails to allege that QNB committed any act of international terrorism, which alone is fatal to Plaintiffs' claim for primary liability under the ATA.

> **B.      Plaintiffs Fail to Plausibly Allege that QNB's Acts Were the Proximate Cause of Their Injuries.**

The requirement under 18 U.S.C. § 2333(a) that the injury must occur "by reason of" an act of international terrorism requires Plaintiffs to allege that QNB's conduct was the proximate cause of their injuries, and the Complaint falls well short of this standard.  More specifically, the Second Circuit has explained, that while proximate cause does not necessarily require but-for causation, Plaintiffs must nonetheless allege that QNB's conduct was a "*substantial factor* in the sequence of responsible causation and whose injury was *reasonably foreseeable or anticipated as a natural consequence*."  *Rothstein v. UBS AG*, 708 F.3d 82, 91-92 (2d Cir. 2013) (emphases added) (internal quotation marks omitted).

Plaintiffs' allegations fall well short here because the causal link between QNB's alleged banking activity and Plaintiffs' injuries in a rocket attack are far too attenuated to support a finding of proximate cause.  *See Kaplan*, 405 F. Supp. 3d at 533.  For example, the Complaint is devoid of any factual, non-conclusory allegations either (1) that QNB provided money directly to Hamas/PIJ to carry out the rocket attacks; (2) that any funds in accounts held at QNB were even sent to Hamas/PIJ to carry out the rocket attacks; or (3) that QNB's "maintaining" of accounts somehow constituted a substantial factor in causing the attacks.  *See, e.g.*, *id.*

In regard to the alleged banking services provided to Qatar Charity, maintaining accounts for a charity organization with multiple ongoing charitable and philanthropic projects could hardly be said to be a substantial factor in causing, much less in a way that is reasonably foreseeable, a series of rocket attacks perpetrated by Hamas.  As discussed above, the Complaint concedes that

Qatar Charity pursues a number of charitable projects, including its assistance of Syrian refugees in the ongoing Syrian refugee crisis.  Compl. ¶¶ 148, 228.  The Complaint lacks any narrative discussing any plausible "sequence of responsible causation" for the Court to even assess.

The same can be said of the alleged individual accountholders.  The allegation that QNB opened accounts for these individuals in 2015, which is the only concrete and non-conclusory action Plaintiffs allege in regard to those accounts, hardly lends any support to the conclusion that QNB's conduct somehow proximately caused the rocket attacks occurring four years later in 2019. There are massive holes in Plaintiffs' narrative, and moreover, the Complaint fails to link any of the alleged individual accountholders to any specific attacks following to the opening of those accounts in 2015 (or even following their release from prison in 2011), much less the rocket attacks occurring four years later in 2019 that injured Plaintiffs.  *See Gill v. Arab Bank, PLC*, 893 F. Supp. 2d 474, 508 (E.D.N.Y. 2012) ("Temporal and factual issues will often be crucial . . . in proximate cause inquiries pursuant to section 2333(a)).

Therefore, in regard to QNB's banking activity both for Qatar Charity and for the individual accountholders, the Complaint fails to allege this activity was a "substantial factor in the sequence of responsible causation," nor does it allege that their injuries, while deeply unfortunate, were "reasonably foreseeable or anticipated as a natural consequence" of QNB's banking services.  For these reasons, Plaintiffs fail to plausibly allege proximate cause and therefore fail to state a claim for primary liability under the ATA.

## **CONCLUSION**

For the foregoing reasons, Qatar National Bank respectfully submits that the Court should grant in full its Motion to Dismiss Plaintiffs' Complaint with prejudice.

Dated: February 18, 2022

Respectfully submitted,

/s/ Michael G. McGovern

Michael G. McGovern
Douglas Hallward-Driemeier (*pro hac vice*)
**ROPES & GRAY LLP**
1211 Avenue of the Americas
New York, New York 10036-8704
Telephone: (212) 596-9000
Facsimile: (212) 596-9090
michael.mcgovern@ropesgray.com
douglas.hallward-driemeier@ropesgray.com

*Counsel for Defendant Qatar National Bank (Q.P.S.C.)*

## <u>CERTIFICATE OF SERVICE</u>

I, Michael McGovern, hereby certify that true and correct copies of Defendant Qatar National Bank's Notice of Motion to Dismiss the Complaint, as well as its Memorandum of Law in Support of Its Motion to Dismiss the Complaint, were served on Plaintiffs on February 18, 2022.

*/s/ Michael G. McGovern*
Michael G. McGovern