**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CHAIM DOV PRZEWOZMAN, *et al*., | |
| Plaintiffs, | |
| v. | No. 1:20-CV-6088-NGG-RLM |
| | Served on: February 18, 2022 |
| QATAR CHARITY, QATAR NATIONAL BANK and MASRAF AL RAYAN, | |
| Defendants. | |

**DEFENDANT QATAR CHARITY'S MEMORANDUM OF LAW IN SUPPORT OF ITS**
<u>**MOTION TO DISMISS THE COMPLAINT**</u>

**DLA PIPER LLP (US)**
John M. Hillebrecht
Kevin Walsh
Jessica Masella

1251 Avenue of the Americas
New York, New York 10020
Phone: (212) 335-4500
Email:     John.Hillebrecht@us.dlapiper.com
                Kevin.Walsh@us.dlapiper.com
                Jessica.Masella@us.dlapiper.com

*Counsel for Defendant Qatar Charity*

# TABLE OF CONTENTS

Page

FACTUAL BACKGROUND ...................................................................................2

    A.    Defendant Qatar Charity ...............................................................2

    B.    Plaintiffs' Allegations ...................................................................6

ARGUMENT ..........................................................................................................8

I.    Qatar Charity is Not Subject to Personal Jurisdiction in New York ...................8

    A.    Personal Jurisdiction Under Rule 4(k)(1)(A) – New York's Long-Arm
        Statute Does Not Reach Qatar Charity ..............................................10

        1.    Subsection (a)(2) Does Not Apply ..........................................11

        2.    Subsection (a)(1) Does Not Apply ..........................................11

                a.    Qatar Charity Did Not Purposefully Avail Itself of a New
                      York Forum ...............................................................12

                b.    There is No Nexus / Substantial Relationship to the Claims
                      Asserted ...................................................................15

    B.    Constitutional Due Process – Plaintiffs Do Not Allege the Requisite
        "Minimum Contacts" ...................................................................16

II.    Plaintiffs Fail to State Any Claim ...................................................................19

    A.    Counts III and IV Must Be Dismissed for Failure to Plausibly Plead a
        Primary Liability Claim Under Section 2333(a) ..................................19

        1.    Plaintiffs Fail to Plausibly Allege that Qatar Charity Committed an
                Act of International Terrorism ..................................................20

        2.    Plaintiffs Fail to Plausibly Allege That Qatar Charity Proximately
                Caused the Attack ...................................................................26

    B.    Counts I and II Must Be Dismissed for Failure to Plausibly Plead a
        Secondary Liability Claim Under Section 2333(d) ..............................28

        1.    The Complaint Does Not State a JASTA Conspiracy Claim ..................29

        2.    The Complaint Does Not State a JASTA Aiding-and-Abetting
                Claim .....................................................................30

a.      The Complaint Fails to Allege Facts Permitting a Plausible
        Inference that Qatar Charity Knowingly Played a Role in
        Terrorist Activities ......................................................................30

b.      Plaintiffs Fail to Plausibly Allege That Qatar Charity's
        Alleged Assistance Was "Substantial" for Purposes of
        Secondary Liability Under § 2333(d) (JASTA)............................34

III.    Plaintiffs Failed to Properly Effect Service of Process.......................................35

IV.     The Foreign Plaintiffs Lack Standing to Bring Personal Injury Claims Under the
        ATA ............................................................................................................35

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abelesz v. OTP Bank*,
  692 F.3d 638 (7th Cir. 2012) .............................................................................11

*Ackerman et al. v. State of Israel*
  (2022) (Isr.) ........................................................................................................4

*Amigo Foods Corp. v. Marine Midland Bank-New York*,
  39 N.Y.2d 391 (1976) ........................................................................................11

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) .....................................................................................19, 25

*Averbach v. Cairo Amman Bank*,
  2020 WL 486860 (S.D.N.Y. 2020) ...............................................................31, 34

*Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*,
  171 F.3d 779 (2d Cir. 1999) ..............................................................................11

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) .....................................................................................19, 29

*Berdeaux v. OneCoin Ltd.*,
  2021 WL 4267693 (S.D.N.Y. Sept. 20, 2021) (Caproni, J.) .......................... *passim*

*Best Van Lines v. Walker*,
  490 F.3d 239 (2d Cir. 2007) ..............................................................................16

*Burger King Corp. v. Rudzewicz*,
  471 U.S. 462 (1985) .....................................................................................12, 16

*Chambers v. Time Warner Inc.*,
  282 F.3d 147 (2d Cir. 2002) ................................................................................3

*Chirag v. MT Marida Marguerite Schiffahrts*,
  604 F. App'x 16 (2d Cir. 2015) ...........................................................................8

*Christa McAuliffe Intermediate School v. De Blasio*,
  364 F. Supp. 3d 253 (S.D.N.Y. 2019) ..................................................................3

*Clean Coal Techs., Inc. v. Leidos, Inc.*,
  377 F. Supp. 3d 303 (S.D.N.Y. 2019) ................................................................11

*Cmty. Fin. Grp. v. Stanbic Bank Ltd.*,
    2015 WL 4164763 (S.D.N.Y. 2015)...................................................................16

*Copeland v. Twitter, Inc.*,
    352 F. Supp. 3d 965 (N.D. Cal. 2018) .............................................................34

*In re Dental Supplies Antitrust Litigation.*,
    2017 WL 4217115 (E.D.N.Y. 2017)..................................................................15

*DirectTV Latin Am. v. Park 610, LLC*,
    691 F. Supp. 2d 405 (S.D.N.Y. 2012)...............................................................14

*DISH Network, LLC. v. Kaczmarek*,
    2021 WL 4483470 (E.D.N.Y. June 24, 2021) ..................................................18

*E-Z Bowz, L.L.C. v. Pro. Prod. Rsch. Co.*,
    2003 WL 22064259 (S.D.N.Y. 2003)...............................................................15

*Fields v. Twitter, Inc.*,
    881 F.3d 739 (9th Cir. 2018) ...........................................................................27

*First Cap. Asset Mgmt., Inc. v. Brickellbush, Inc.*,
    218 F. Supp. 2d 369 (S.D.N.Y. 2002)...............................................................14

*Freeman v. HSBC Holdings PLC*,
    413 F. Supp. 3d 67 (E.D.N.Y. 2019) ................................................................26

*Fuld v. Palestine Liberation Org.*,
    2022 WL 62088 (S.D.N.Y. Jan. 6, 2022) (appeal filed) ....................................8, 9

*Gill v. Arab Bank, PLC*,
    893 F. Supp. 2d 474 (E.D.N.Y. 2012) ..............................................................27

*Gonzalez v. Google, Inc.*,
    335 F. Supp. 3d 1156 (N.D. Cal. 2018) ............................................................26

*Halberstam v. Welch*,
    705 F.2d 472 (D.C. Cir. 1983) ...........................................................28, 30, 31, 34

*Honickman for Est. of Goldstein v. BLOM Bank SAL*,
    432 F. Supp. 3d 253 (E.D.N.Y. 2020) ....................................................31, 33, 34

*Honickman v. BLOM Bank SAL*,
    6 F.4th 487 (2d Cir. 2021) ..............................................................31, 32, 33, 34

*Int'l Shoe Co. v. State of Wash., Office of Unemployment Comp. & Placement*,
    326 U.S. 310 (1945)........................................................................................16

*Jazini v. Nissan Motor Co.*,
    148 F.3d 181 (2d Cir. 1998)................................................................................8

*Kaplan v. Lebanese Canadian Bank*,
    405 F. Supp. 3d 525, 532 (S.D.N.Y. 2019).......................................................20

*Kaplan v. Lebanese Canadian Bank*,
    999 F.3d 842 (2d Cir. 2021).................................................................. *passim*

*Kemper v. Deutsche Bank AG*,
    911 F.3d 383 (7th Cir. 2018) .........................................................................1, 9

*Levisohn, Lerner, Berger & Langsam v. Med. Taping Sys.*,
    10 F. Supp. 2d 334 (S.D.N.Y. 1998)................................................................15

*Licci v. Lebanese Can. Bank, SAL*,
    673 F.3d 50 (2d Cir. 2012).........................................................................12, 15

*Licci v. Lebanese Canadian Bank, SAL*,
    20 N.Y.3d 327 (2012) ....................................................................12, 15, 16, 17

*Licci ex. rel. Licci v. Lebanese Canadian Bank*, SAL,
    732 F.3d 161 (2d Cir. 2013)...................................................................9, 12, 17

*Linde v. Arab Bank*,
    882 F.3d 314 (2d Cir. 2018).................................................................. *passim*

*Mastafa v. Chevron Corp.*,
    770 F.3d 170 (2d Cir. 2014)..............................................................................19

*Morrison v. Nat'l Austl. Bank Ltd.*,
    547 F.3d 167 (2d Cir. 2008)................................................................................9

*In re North Sea Brent Crude Oil Futures Litig.*,
    2017 WL 2535731 (S.D.N.Y. 2017)..................................................................15

*O'Sullivan v. Deutsche Bank AG*,
    2019 WL 1409446 (S.D.N.Y. 2019)....................................................20, 29, 30

*O'Sullivan v. Deutsche Bank AG*,
    2020 WL 906153 (S.D.N.Y. 2020)...................................................................31

*Owens v. BNP Paribas, S.A.*,
    897 F.3d 266 ....................................................................................................28

*Penguin Grp. (USA) v. Am. Buddha*,
    609 F.3d 30 (2d Cir. 2010)..................................................................................8

*Pension Benefit Guar. Corp. v. Morgan Stanley Inv.*,
    712 F.3d 705 (2d Cir. 2013)........................................................................19, 25

*Rothstein v. UBS AG*,
    708 F.3d 82 (2d Cir. 2013)......................................................................19, 26, 28

*Shipping Fin. Servs. Corp. v. Drakos*,
    140 F.3d 129 (2d Cir. 1998).................................................................................8

*Siegel v. HSBC North America Holdings, Inc.*,
    933 F.3d 217 (2d Cir. 2019)........................................................................28, 34

*Sinochem Int'l Co. v. Malay. Int'l Shipping Corp.*,
    549 U.S. 422 (2007)................................................................................... 8, 10

*Spetner v. Palestine Inv. Bank*,
    495 F. Supp. 3d 96 (E.D.N.Y. 2020) ................................................................14

*SPV OSUS LTD. v. UBS AG*,
    882 F.3d 333 (2d Cir. 2018)..............................................................................17

*Stansell v. BGP, Inc.*,
    2011 WL 1296881 (M.D. Fla. 2011) ..............................................................26

*Strauss v. Credit Lyonnais*,
    379 F. Supp. 3d 148 (E.D.N.Y. 2019) ..............................................................33

*Suber v. VVP Servs.*,
    2021 WL 4429237 (S.D.N.Y. Sept. 27, 2021)..................................................15

*Tamam v. Fransabank SAL*,
    677 F. Supp. 2d 720 (S.D.N.Y. 2010)..............................................................12

*In re Terrorist Attacks on September 11, 2001*,
    714 F.3d 109 (2d Cir. 2013)....................................................................17, 26, 33

*U.S. Bank Nat'l Ass'n v. Bank of Am.*,
    916 F.3d 143 (2d Cir. 2019)..............................................................................16

*United States v. Davidson*,
    175 F. App'x 399 (2d Cir. 2006) ......................................................................11

*Universal Trading & Inv. v. Tymoshenko*,
    2012 WL 6186471 (S.D.N.Y. 2012)..................................................................14

*Vasquez v. Hong Kong & Shanghai Banking Corp.*,
    477 F. Supp. 3d 241 (S.D.N.Y. 2020)..............................................................13

*Walden v. Fiore*,
   571 U.S. 277 (2014) .................................................................................................. 12, 16

*Waldman v. Palestine Liberation Org.*,
   835 F.3d 317 (2d Cir. 2016) .............................................................................. 2, 8, 9, 18

*Weiss v. Nat'l Westminster Bank PLC*,
   278 F. Supp. 3d 636 (E.D.N.Y. 2017) ................................................................................ 29

*Weiss v. Nat'l Westminster Bank PLC*,
   381 F. Supp. 3d 223 (E.D.N.Y. 2019) .......................................................................... 31, 33

*Zapata v. HSBC Holdings PLC*,
   414 F. Supp. 3d 342 (E.D.N.Y. 2019) .......................................................................... 26, 28

**Statutes & Rules**

18 U.S.C. § 2331 ........................................................................................................ 19

18 U.S.C. § 2333 ............................................................................................... *passim*

22 U.S.C. 2321k .......................................................................................................... 5

Fed. R. Civ. P. 4 ............................................................................................... *passim*

Fed. R. Evid. 201 .......................................................................................................... 3

N.Y.C.P.L.R. § 302 ........................................................................................... *passim*

This case arises from a "two-day bombing spree" alleged to have been launched from the Palestinian Territories by Hamas and Palestinian Islamic Jihad ("PIJ") into Israel and to have resulted in the death of Pinches Przewozman (the "Attack").  Plaintiffs are the relatives of Mr. Przewozman, who assert causes of action pursuant to the Anti-Terrorism Act ("ATA") against Defendant Qatar Charity and two banks purportedly used by Qatar Charity—Qatar National Bank and Masraf Al Rayan.  Plaintiffs allege these defendants are liable under the ATA as financiers of terrorism for the Attack that injured their relative.  This action represents Plaintiffs' second attempt to seek recompense for the deaths of their family member.[1]  However, Qatar Charity is not subject to personal jurisdiction, and Plaintiffs' allegations fail to state any claim for which relief may be granted.

While the "desire to hold someone responsible for this grievous loss is eminently understandable," the fact that "[t]hose directly responsible may be beyond the reach of the court" does not justify imposing liability on Qatar Charity for a terrorist attack of which it had no knowledge and in which it took no part.  *Kemper v. Deutsche Bank AG*, 911 F.3d 383, 386, 396 (7th Cir. 2018).  At no point in the Complaint do Plaintiffs allege facts sufficient to plausibly suggest that Qatar Charity is in any way responsible for the Attack, or that Qatar Charity directed any action at New York (or the United States generally) that would suffice to subject it to jurisdiction in this Court.

And while the Attack detailed in the Complaint is horrific, "the federal courts cannot exercise jurisdiction in a civil case beyond the limits prescribed by the due process clause of the Constitution, no matter how horrendous the underlying attacks or morally compelling the

---

[1] A nearly identical set of Plaintiffs previously brought suit in the District of Columbia asserting claims against the Islamic Republic of Iran and others for the death of Pinchez Przewozman as a result of the same rocket attack.  *See* Am. Compl., *Przewozman et al., v. Islamic Republic of Iran, et al.*, No. 1:19-cv-02601 (D.D.C. Filed Oct. 9, 2019).

plaintiffs' claims." *See Waldman v. Palestine Liberation Org.*, 835 F.3d 317, 344 (2d Cir. 2016) (alleged tortious actions by the PLO, "as heinous as they were, were not sufficiently connected to the United States to provide specific personal jurisdiction in the United States"). To do so here— where the Complaint fails to plausibly allege any act undertaken by Qatar Charity in the United States—much less one directed at New York, would violate the constitutional limitations of the due process clause.

As set forth below, the Complaint's many deficiencies are fatal to Plaintiffs' claims.

## FACTUAL BACKGROUND

### A.      Defendant Qatar Charity

Qatar Charity is a charitable organization established under the laws of Qatar. It was initially founded in 1984 as a small community-led initiative to provide urgent assistance to children in vulnerable communities affected by crises or disasters. Over time, Qatar Charity's work grew to include assisting needy communities with developmental support and humanitarian relief. Today, Qatar Charity operates in over 70 countries, where it provides charitable relief to millions of desperate recipients, either through its 33 field offices or through implementing partners that include agencies of the United Nations and international organizations like the Bill and Melinda Gates Foundation. As detailed below, Qatar Charity regularly partners with various arms of the United Nations such as the U.N. Refugee Agency, United Nations Children's Fund ("UNICEF"), and the U.N. Relief and Works Agency ("UNRWA"), as well as other prominent international aid organizations. It has also worked with the U.N. World Food Program ("WFP"), the U.N. Food and Agriculture Organization, the World Health Organization, and the International

Organization for Migration.  Qatar Charity also partners with governments—including, crucially, that of the United States—to provide aid to nations in crisis.[2]

Since its inception, Qatar Charity has maintained amicable ties with the U.S. government, principally through the U.S. embassy in Qatar.  In recent years, for instance, Qatar Charity has welcomed in Doha four U.S. Chargés d'Affaires (during this period the most senior diplomatic representatives of the United States in Qatar) to discuss a variety of humanitarian issues and the best means of addressing these issues together.  Qatar Charity officials also regularly meet with representatives of the U.S. Treasury Department at its headquarters in Doha to discuss the provision of humanitarian aid in jurisdictions subject to sanctions, such as Yemen and Afghanistan, and to ensure effective coordination with the U.S. government.

In August 2021, because of Qatar Charity's recognized expertise in providing aid to refugee communities, the U.S. State Department and the Qatari Ministry of Foreign Affairs jointly agreed to select it as the sole organization responsible for the care of unaccompanied children evacuated from Afghanistan pending their relocation to the United States.  During the course of this mission, Qatar Charity has met regularly with representatives of the U.S. government.[3]

---

[2]  *See* USAID, *What We Do*, *Working in Crises and Conflict, Disaster Assistance, Malaysia* (referencing partnership between U.S. Agency for International Development ("USAID") and Qatar Charity) and USAID-PAKISTAN, *Monthly Progress Report No. 46* (June 2014) (same), annexed hereto as Exhibits 1 and 2, respectively, to the Declaration of Michael G. Lewis in Support of Qatar Charity's Motion to Dismiss ("Lewis Declaration").  Hereafter, references to exhibits to the Lewis Declaration are denoted simply "Ex. __."  In considering a motion to dismiss, "a court may consider documents attached to the complaint as an exhibit or incorporated in it by reference, . . . matters of which judicial notice may be taken, or . . . documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit."  *Chambers v. Time Warner Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (citation and internal quotation marks omitted).  The Court may take judicial notice of a fact "not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined."  Fed. R. Evid. 201(b).  *See, e.g.*, *Christa McAuliffe Intermediate School v. De Blasio*, 364 F. Supp. 3d 253 (S.D.N.Y. 2019) (taking judicial notice of information from government website, press releases, government officials' "tweets," and press interviews).

[3]  *See* Ex. 3, AFP, *Unaccompanied Afghan Evacuee Children in Qatar Limbo,* New Straits Times (Sep. 11, 2021) (discussing Qatar Charity's pivotal role in the refugee crisis); *see also* Ex. 4, Aya Batrawy, *Qatar Emerges as Key Player in Afghanistan After US Pullout*, AP News (Aug. 30, 2021).

As alleged in the Complaint, Qatar Charity conducted charitable activities in the Palestinian Territories.  As the U.N. has consistently recognized, the millions of inhabitants of Gaza—an enclave plagued by poverty and food insecurity—have long been in acute need of the type of humanitarian services and basic infrastructure support provided by Qatar Charity.[4]  Indeed, the Israeli government itself has regularly authorized the distribution of Qatari government food assistance and funds for reconstruction in Gaza, as well as salary payments, in recognition of the importance of international aid in staving off desperation and violence there.[5]

As detailed below, despite claims that Qatar Charity was designated as a supporter of terrorism in the United States, the U.S. government not only partners with the Charity, but senior U.S. diplomats have also regularly praised Qatar Charity—including as recently as this January—for its positive impact in providing vital assistance to millions around the world, characterizing Qatar Charity as "one of the best organizations in the world."  (*See infra* at 25).  That the U.S. government would offer this unqualified praise at the very same time that Plaintiffs would have the Court believe that Qatar Charity is identified by the U.S. as a supporter of terrorism represents a preposterous contradiction and underscores the wild implausibility of Plaintiffs' claims.

---

[4]  *See* Ex. 5, Press Release, *On World Food Day UNRWA and Qatar Charity Promote Nutrition and Healthy Eating Habits*, UNRWA (Oct. 21, 2019) ("Qatar Charity distributed 37,000 meals to Palestine refugee students in 35 UNRWA schools in the Gaza Strip.  Approximately 80 percent of Gaza's population depends on humanitarian assistance."); Ex. 6, Press Release, *Qatar Charity Sends 18 Trucks of Aid to Gaza*, U.N. (Dec. 10, 2009) (Qatar Charity's in-kind donation of $2.7 million worth of books and stationery "will help address the severe shortage of school materials in the Gaza Strip, which until recently have been prevented from entering by the Israeli authorities").

[5]  Ex. 7, Yaniv Kubovich, *With Israel's Consent, Qatar Gave Gaza $1 Billion Since 2012*, Haaretz (Feb. 10, 2019) (discussing aid provided by Qatar to Gaza since 2012 with "the approval of the Israeli government"); Ex. 8, Rami Ayyub, *Israel Approves Qatari Aid to Gaza after May Conflict, Defence Minister Says*, Reuters (Aug. 19, 2021) (Israeli Defense Minister stating that aid from Qatar "will be transferred to hundreds of thousands of Gazan people by the U.N. directly to their bank accounts, with Israel overseeing the recipients"); *see also* Ex. 9, Noga Tarnopolsky, *Amid Hamas-Israel Standoff, Qatar Sends Cash to Gaza Strip Charity*, L.A. Times (Jan. 26, 2019) ("the Israeli Cabinet voted to authorize the transfer [of USD 20 million from Qatar to Gaza] that Israeli military advisors said was vital to keep the volatile, blockaded enclave's 2 million inhabitants from economic desperation and violence").  On January 24, 2022, the Israeli High Court of Justice denied an effort to enjoin such payments—"the transfer of money originating in Qatar to the Gaza Strip through" Israel for the purpose of paying the salaries of officials in Gaza—based in part on the Israeli government's arguments that the provision of this Qatari money to Hamas-controlled Gaza was being made "for humanitarian reasons and as part of the effort to prevent a deterioration of security."  Ex. 10, HCJ 8542/18, *Ackerman et al. v. State of Israel* (2022) (Isr.) (internal quotation marks omitted).

Equally implausible is the conclusory allegation against the (non-party) Qatari government, which Plaintiffs invite the Court to believe is a terrorist mastermind. To the contrary, as President Biden very recently emphasized, Qatar is a key ally of the United States—"a good friend, and a reliable and capable partner." Indeed, in the words of the President, the U.S.'s "partnership with Qatar . . . has been central to many of our most vital interests: relocating tens of thousands of Afghans [and] maintaining stability in Gaza and providing lifesaving assistance to the Palestinians," among other things.[6] In recognition of that fact, President Biden designated Qatar as a "major non-NATO ally" in recognition of our "strong partnership" over 50 years.[7]

Plaintiffs baldly claim, without citation to source or authority, that Qatar Charity was listed as a "priority III terrorism support entity" in 2008 by the U.S. Interagency Intelligence Committee on Terrorism (the "IICT"). (Complaint ¶ 41). The only "support" provided by Plaintiffs for that assertion is a hyperlink to a document, apparently discussing the IICT, that makes no mention whatsoever of the Charity; in fact, this document was declassified only on December 2, 2016 (after the end of the conspiracy alleged in the Complaint). (*See* Ex. 15, IICT, *Director of Central Intelligence Directive 3/22P* (Apr. 1, 1997)). No support is provided for the claim that Qatar Charity is a "priority III terrorism support entity," nor is any explanation provided as to what such a designation even means. To our knowledge, the only putative source for the claim is a webpage found at wikileaks.org. (Ex. 16, WikiLeaks Cable 09DOHA314_a, *Qatar Commits USD 40 Million for UN Operations in Gaza* (May 12, 2009)). But the WikiLeaks document identifies as

---

[6] Ex. 11, President Biden, Remarks before Bilateral Meeting, Oval Office (Jan. 31, 2022); *cf.* Ex. 12, Sec'y of St. Antony Blinken, Signing Ceremony and Joint Press Availability for the U.S.-Qatar Strategic Dialogue, Franklin Room (Nov. 12, 2021) (quoting Secretary of State Antony Blinken as stating: "Qatar is a crucial partner in promoting regional stability [and] providing significant economic and humanitarian assistance to people in dire situations.").

[7] Ex. 13, Alex Gangitano, *Biden Says He Will Designate Qatar as a non-NATO ally*, The Hill (Jan. 31, 2022); Ex. 11, Biden Remarks; Ex. 14, Statements and Releases, Letter to the Speaker of the House and the President of the Senate on Designating Qatar as a Major Non-NATO Ally, Briefing Room, (Jan. 31, 2022); *cf.* 22 U.S.C. 2321K.

its sender only "Doha Qatar," and WikiLeaks, hardly an unimpeachable resource, identifies neither its source nor its context.  Plainly, there is no reason to conclude that this information has any credible basis, or that any member of the public would have been able to access it.

The available public record of which this Court may take judicial notice, does, however, plainly reflect that Qatar Charity has *never* been designated as a Foreign Terrorist Organization ("FTO") or Specially Designated Global Terrorist ("SDGT") by the United States.  To the contrary, as discussed further below, Qatar Charity has been widely recognized by U.S. authorities for its longstanding humanitarian works.  Plaintiffs' flimsily-sourced claim is utterly inconsistent with the Charity's ongoing and close working relationship with the U.S. government, as evidenced by the high praise publicly lavished on the Charity by U.S. government officials.  (*E.g.*, Ex. 17, January 24, 2022, Tweet of Ambassador Natalie Baker).[8]

## B.    Plaintiffs' Allegations

The injuries at issue in the Complaint arise from a rocket attack that was part of a two-day bombing spree that Hamas and PIJ commenced on May 4, 2019.  (Complaint ¶ 327).  Aside from wholly conclusory allegations, there is no information in the Complaint as to what role Hamas or the PIJ played in the particular attack that killed Mr. Przewozman, nor any references to what role,

---

[8]  Plaintiffs also point to the fact that in June 2017, various regional neighbors of Qatar (led by Saudi Arabia and including Bahrain, Egypt, and the UAE) labeled Qatar Charity as a "financial supporter of terrorism."  (Complaint ¶ 64).  Here too, Plaintiffs fail to complete the story.  As is well known, those designations were part of a wider geopolitical struggle between Qatar and its regional adversaries and were viewed by many informed observers as pretextual.  Among others who refused to recognize its accuracy were the United Nations and the United States.  Neither followed suit.  Indeed, in response to Saudi Arabia's statement alleging links between Qatar Charity and terrorism and ensuing questions to the United Nations noting the Charity's work with UNICEF, UNRWA, and WFP, the United Nations went out of its way to observe that "[a]s a matter of principle" it was not bound to follow suit, while referencing the "strong partnership" it had built with Qatar Charity over the years, singling out the Charity's important involvement in the "UN-coordinated" humanitarian projects by Qatar Charity in the region.  (Ex. 18, Press Release, Daily Press Briefing by the Office of the Spokesperson for the Secretary-General, U.N. (Jun. 9, 2017)).  Plaintiffs also do not mention that Saudi Arabia opted not to take any steps requesting that the United Nations add Qatar Charity to its own sanctions list.  (Ex. 19, Michelle Nichols, *No Apparent Arab Plans to Push for Qatar-Linked U.N. Sanctions - Diplomats*, Reuters (Jun. 14, 2017)).  Similarly, as discussed herein, the U.S. government continued after the fact to work regularly with the Charity and obviously never designated it as an FTO.  The Court should give no weight to these "designations."

if any, was played by other groups operating in Gaza that, regrettably, have regularly attacked Israel with rockets in the past.  More to the point, accepting the allegations in the Complaint—including the claim that the Charity ceased operations in the Palestinian Territories in 2015 (Complaint ¶ 141), four years before the "two-day bombing spree"—the Complaint is devoid of any factual support that would suggest that Qatar Charity acted in any way to support this Attack.

While the Complaint asserts the conclusory allegation that Qatar Charity funds cleared through New York accounts, it lacks any specificity as to how much money was purportedly transferred through New York accounts and then transferred by Qatar Charity to Hamas and Hamas-affiliated organizations, as well as to PIJ and PIJ-affiliated charities, in how many separate transactions, and when.  The only transfers alleged by Plaintiffs with any factual detail whatsoever purportedly took place prior to 2015 (a transfer of over $150,000 to a "Hebron Islamic Society" and a transfer of "over $28 million" to Qatar Charity's two branches in the Palestinian Territories).  Notably, however, Plaintiffs fail to explicitly allege that these funds flowed through New York accounts.  (*See* Complaint ¶ 128, 130).

As to the Attack itself, the Complaint includes only wholly conclusory allegations in the first instance that Hamas and PIJ directed or perpetrated the attack that killed Mr. Przewozman.  Furthermore, there are no allegations that would suggest any connection between funds distributed by Qatar Charity in support of its charitable endeavors in the Palestinian Territories and the Attack.  The allegations, while couched as fact, are instead conclusory assertions of law devoid of factual content.  The same is true for the woefully insufficient allegations as to jurisdiction.

In fact, the only detailed allegations in the Complaint—those that describe the Attack giving rise to Plaintiffs' claims—undermine any plausible inference that funds transferred by Qatar

Charity to its branches in the Palestinian Territories were in any way used or intended to support the rocket attack at issue.

## ARGUMENT

### I.   QATAR CHARITY IS NOT SUBJECT TO PERSONAL JURISDICTION IN NEW YORK

The Complaint must be dismissed as to Qatar Charity for lack of specific personal jurisdiction.[9]  To "survive a motion to dismiss for lack of personal jurisdiction, a plaintiff must make a *prima facie* showing that jurisdiction exists."  *Penguin Grp. (USA) v. Am. Buddha*, 609 F.3d 30, 34–35 (2d Cir. 2010).  A plaintiff must "demonstrate: (1) procedurally proper service of process, (2) a statutory basis for personal jurisdiction that renders such service of process effective and (3) that the exercise of personal jurisdiction comports with constitutional due process principles."  *Fuld v. Palestine Liberation Org.*, 2022 WL 62088, at *2 (S.D.N.Y. Jan. 6, 2022) (internal quotations and citation omitted) (appeal filed).  Because the "[C]ourt can readily determine that it lacks jurisdiction over" Qatar Charity, "the proper course [is] to dismiss on that ground."  *Sinochem Int'l Co. v. Malay. Int'l Shipping Corp*., 549 U.S. 422, 436 (2007).

Establishing personal jurisdiction "requires non-conclusory fact-specific allegations or evidence showing that activity that constitutes the basis of jurisdiction has taken place."  *Chirag v. MT Marida Marguerite Schiffahrts*, 604 F. App'x 16, 19 (2d Cir. 2015); *see also Jazini v. Nissan Motor Co.*, 148 F.3d 181, 184–85 (2d Cir. 1998).  Courts must "accept as true all material factual allegations in the complaint . . . [but] jurisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it."  *Shipping*

---

[9]  New York is not Qatar Charity's principal place of business or place of incorporation.  Thus, the Court cannot exercise general jurisdiction over the Charity.  *See Waldman*, 835 F.3d at 331.

*Fin. Servs. Corp. v. Drakos*, 140 F.3d 129,131 (2d Cir. 1998); *accord Morrison v. Nat'l Austl. Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008), *aff'd*, 561 U.S. 247 (2010).

Due process "conditions a tribunal's authority . . . on the defendant's having such contacts with the forum State that the maintenance of the suit is reasonable . . . and does not offend traditional notions of fair play and substantial justice." *Fuld*, 2022 WL 62088, at *2. A district court's exercise of personal jurisdiction over a foreign defendant where the terrorist attack at issue is "not sufficiently connected to the United States," violates due process. *Waldman*, 835 F.3d at 324.

Plaintiffs base their entire theory of personal jurisdiction over Qatar Charity—an entity that has absolutely no presence in New York and has never transacted business in New York—on the wholly conclusory allegation that the Charity initiated fund transfers from its bank accounts in Qatar to bank accounts that it maintained in the Palestinian Territories, for the use of its branches there, and that Masraf Al Rayan allegedly used a correspondent bank account in New York to effectuate these transfers.[10] (Complaint ¶¶ 10-11, 158, 163-167).

Plaintiffs no doubt intend to rely on caselaw holding that, in some limited circumstances, the use of a correspondent account for purposes of transferring dollars suffices to establish jurisdiction. But as Judge Caproni recently cogently observed, those cases involve *bank* defendants—not "an individual [customer's] wiring of funds that incidentally pass through a New York-based correspondent account." Judge Caproni was "[un]aware of any" authority—and we submit that there is none—standing for the principle that a non-domiciliary bank *customer* may be subject to jurisdiction in New York "because the non-domiciliary moved money between

---

[10] "A correspondent bank account is a domestic bank account held by a foreign bank, 'similar to a personal checking account used for deposits, payments and transfers of funds.' Correspondent accounts 'facilitate the flow of money worldwide, often for transactions that otherwise have no other connection to New York, or indeed the United States.'" *Licci ex. rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 165 n.3 (2d Cir. 2013) ("*Licci IV*").

foreign bank accounts, with the transfer passing through New York via a correspondent account." *Berdeaux v. OneCoin Ltd.*, 2021 WL 4267693, at *12 (S.D.N.Y. Sept. 20, 2021) (Caproni, J.) (collecting cases).

Plaintiffs' theory, resting as it does on the role banks play in routing international fund transfers, thus fails—because Qatar Charity is obviously not a bank.  Indeed, as Judge Caproni concluded, applying such a theory of jurisdiction to a banking *customer* would be "nonsensical." *Berdeaux*, 2021 WL 4267693, at *12 n.25 ("Absent unusual circumstances, an individual bank customer would have no reason to direct its foreign bank to use a New York-based correspondent account for a transaction that, such as those at issue here, has no other connection to New York."). For this reason alone, the Complaint must be dismissed as to Qatar Charity.  *Sinochem*, 549 U.S. at 436.

> ### A.   Personal Jurisdiction Under Rule 4(k)(1)(A) – New York's Long-Arm Statute Does Not Reach Qatar Charity

Under Rule 4(k)(1)(A), a federal court may exercise personal jurisdiction to the extent allowed by the law of the state in which it sits.  Only two subsections of New York's long-arm statute have even theoretical application here.  Ultimately, both fall short.  Those subsections provide that a court may exercise personal jurisdiction over "any non-domiciliary . . . who in person or through an agent":

> (1) transacts any business within the state or contracts anywhere to supply goods or services in the state; or
>
> (2) commits a tortious act within the state, except as to a cause of action for defamation of character arising from the act.

C.P.L.R. § 302(a)(1)–(2).  Neither provision confers jurisdiction over Qatar Charity.

### 1.   *Subsection (a)(2) Does Not Apply*

Subsection (a)(2) of Section 302, which permits jurisdiction for tortious acts "within the state," plainly does not apply here because "this prong of the statute is read narrowly and requires physical commission of the tortious act in New York." *Clean Coal Techs., Inc. v. Leidos, Inc.*, 377 F. Supp. 3d 303, 314 (S.D.N.Y. 2019); *see also Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 171 F.3d 779, 790 (2d Cir. 1999).

Even if transferring funds through a correspondent account (assuming, *arguendo*, that transfers connected to Plaintiffs' harms actually occurred) could constitute a tortious act within New York (and it cannot), ***physical presence*** of the defendant in New York is required to satisfy Subsection (a)(2). *See, e.g.*, *Clean Coal Techs.*, 377 F. Supp. 3d at 312 (collecting cases). Here, the only allegation is that Masraf Al Rayan—not Qatar Charity—maintained a correspondent account in New York. The maintenance of a correspondent account does not constitute physical presence. *See, e.g.*, *United States v. Davidson*, 175 F. App'x 399, 402 (2d Cir. 2006); *Abelesz v. OTP Bank,* 692 F.3d 638, 657–58 (7th Cir. 2012). It is therefore axiomatic that a foreign bank's foreign customer would not be "physically present" either.

Subsection (a)(2) "plainly" does not confer personal jurisdiction. *See Berdeaux*, 2021 WL 4267693, at *9 n.19 (it "would be plainly improper" to rely on 302(a)(2) where "Plaintiffs have not alleged that [the defendants] ever stepped foot in New York").

### 2.   *Subsection (a)(1) Does Not Apply*

Qatar Charity is also not subject to personal jurisdiction under Subsection (a)(1). For this provision to apply, the defendant that the Court is considering must have "purposely availed itself of the privilege of conducting activities in New York thereby invoking the benefits and protections of its laws." *Amigo Foods Corp. v. Marine Midland Bank-New York*, 39 N.Y.2d 391, 396 (1976). Plaintiffs must allege a "substantial relationship" between the claim asserted and a given

defendant's conduct in New York.  *E.g.*, *Licci v. Lebanese Can. Bank, SAL*, 673 F.3d 50, 66 (2d Cir. 2012) ("*Licci II*").  Plaintiffs do not come close to meeting these requirements.  Qatar Charity conducted no business in New York.

### a. *Qatar Charity Did Not Purposefully Avail Itself of a New York Forum*

The focus of the "purposeful availment" inquiry is on the "contacts that the 'defendant *himself*' creates with the forum State," as opposed to the contacts of third parties or co-defendants. *Walden v. Fiore*, 571 U.S. 277, 284 (2014) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985)) (emphasis in original).  The Complaint does not allege that Qatar Charity had **any** contacts in New York.  To the contrary, it alleges only that Masraf Al Rayan used a correspondent bank located in New York.  (Complaint ¶¶ 10, 163-166).

Courts have routinely recognized the plain reality that dollar transfers between a foreign source and a foreign destination need not transit through the United States.  *See Licci v. Lebanese Canadian Bank, SAL,* ("*Licci III*"), 20 N.Y.3d 327, 340 (2012) (bank could have routed U.S. dollar transaction anywhere in the world); *Tamam v. Fransabank SAL*, 677 F. Supp. 2d 720, 729 (S.D.N.Y. 2010) (same).

Unlike the defendants in *Licci*, Qatar Charity is not a bank; it is a bank **customer**—in this case, a customer seeking to send funds from one foreign location (Qatar) to another (the Palestinian Territories), without particular concern for the institutional routing by which these transfers were accomplished.  The "nature of correspondent banking renders largely nonsensical any attempt to base jurisdiction against . . . individual Defendants on wire transfers of funds moving through a New York correspondent account" because "[a]bsent unusual circumstances, an individual bank customer would have no reason to direct its foreign bank to use a New York-based correspondent

account for a transaction that, such as those at issue here, has no other connection to New York." *Berdeaux*, 2021 WL 4267693, at *12 n.25.

Indeed, the conclusory allegations here are especially implausible given the nature of the putative end game.  Accepting for the sake of argument Plaintiffs' allegations—that Qatar Charity's aim was to fund a terrorist attack committed by U.S.-designated FTOs—why on earth would it invite U.S. scrutiny of these transactions by purposefully using the U.S. banking system, especially when other alternatives, as courts have regularly noted, were available to it?

But without even reaching that question, the conclusory allegations on this score are quite insufficient as a matter of law as to Qatar Charity.  Again, the *Berdeaux* case is instructive.  That case also involved a bank ***customer***, not a bank.  The allegations included assertions regarding "hundreds of transactions" that purportedly flowed through New York accounts, including one $30 million transaction as to which the defendant e-mailed himself a copy of the wire instructions—thus making explicit his knowledge that the funds would be processed through New York.  That knowledge was deemed insufficient.  "None of that is anywhere close to sufficient to show that [the defendant] transacted business in New York."  *Berdeaux*, 2021 WL 4267693, at *11; *cf. id.* at *12 (these allegations are "insufficient as a matter of law").

> As Judge Caproni observed in words that resonate loudly here:
>
> Plaintiffs have not alleged that [the defendant] ***directed*** the use of a New York correspondent account, nor that the transfer of funds was otherwise ***purposeful***. Instead, Plaintiffs allege only that [the defendant] was ***aware*** that a New York account would be used.  That is patently insufficient under New York law to constitute the transaction of business. . . . Absent allegations that [the defendant] ***directed*** the funds to be deposited or ***controlled*** the route of the plaintiffs' funds through the correspondent account, the mere use of a correspondent account does not subject [the defendant] to jurisdiction under Section 302 (a)(1).

*Berdeaux*, 2021 WL 4267693, at *12 (emphases added) (citation and internal quotations omitted);

*accord Vasquez v. Hong Kong & Shanghai Banking Corp.*, 477 F. Supp. 3d 241, 253, 259

(S.D.N.Y. 2020); *Universal Trading & Inv. v. Tymoshenko*, 2012 WL 6186471, at *3 (S.D.N.Y. 2012) ("the Court's research [has not] revealed any cases" that support argument that passage of money through New York correspondent accounts can create jurisdiction over foreign customer); *cf. DirectTV Latin Am. v. Park 610, LLC*, 691 F. Supp. 2d 405, 423–24 (S.D.N.Y. 2012).[11]

Here, there is no plausible factual allegation that Qatar Charity *even knew* that Masraf Al Rayan maintained a correspondent relationship with BNY Mellon (if in fact it did) or *directed* the Bank Defendants to use these New York correspondent accounts (why would it?). And even if Qatar Charity knew that New York correspondent banking relationship would be used (assuming it was), this would not confer jurisdiction. *Berdeaux*, 2021 WL 4267693, at *12 & n.25; *see also Spetner v. Palestine Inv. Bank*, 495 F. Supp. 3d 96, 114 (E.D.N.Y. 2020) (defendant "may have expected, or even known for a fact, that [the bank] would need to settle the wire transfers in New York; but knowing and expecting are not the same as directing and controlling").

Plaintiffs also apparently allege jurisdiction over Qatar Charity under Section 302 based on the acts not of the Charity itself but the acts of alleged co-conspirator Masraf Al Rayan. (Complaint ¶¶ 23-25). That allegation fails as a matter of law. *See Berdeaux*, 2021 WL 4267693,

---

[11] Plaintiffs' counsel has attempted to distinguish *Berdeaux* by asserting that (1) "there was a single transaction" alleged and that (2) the defendant at issue "was not the customer." (Transcript of February 4, 2022, Pre-Motion Conference at 19:7-16). In fact, the *Berdeaux* plaintiffs alleged that the defendants participated in "hundreds of transactions" through a New York bank, although they focused on one transaction with specificity. *See* 2021 WL 4267693, at *4. The *Berdeaux* defendant most pertinent here, Scott, "directed banks, including some that transact significant business in the Southern District of New York, to transfer money that was the proceeds of the OneCoin fraud." *Berdeaux*, 2021 WL 4267693, at *3. While only one transaction was detailed with specificity, the Court also clearly held that the fact that there may have been "hundreds of transfers" through New York "does not change the Court's conclusion" that unless the defendant-customer *directed* the transfers through New York, the "use of the New York correspondent account cannot be described as purposeful" and the allegations are "patently insufficient under New York law." 2021 WL 4267693, at *12 & n.22. Even if "Scott oversaw the transfer of fraud proceeds through banks that 'do business' in New York, that is plainly insufficient to conclude that Scott himself transacted business in New York as that term is used in Section 302(a)(1)." 2021 WL 4267693, at *11 n.21. For the same reasons, Plaintiffs' conclusory allegations and impermissible group pleading fail to establish jurisdiction over Qatar Charity. 2021 WL 4267693, at *11 n.21; *see also First Cap. Asset Mgmt., Inc. v. Brickellbush, Inc.*, 218 F. Supp. 2d 369, 393 n.121 (S.D.N.Y. 2002) (stating that "the vague and conclusory allegation that [defendant] engaged in 'numerous New York-connected transaction[s]' through various agents ... does not contribute anything to [plaintiffs'] *prima facie* showing of jurisdiction").

at *10 (court could not "exercise jurisdiction over [defendant] under Section 302(a)(1) on a conspiracy theory based on the conduct of an alleged co-conspirator"); *Suber v. VVP Servs.*, 2021 WL 4429237, at *6 (S.D.N.Y. Sept. 27, 2021) ("the conspiracy theory of jurisdiction is not available under section 302(a)(1)"); *E-Z Bowz, L.L.C. v. Pro. Prod. Rsch. Co.*, 2003 WL 22064259, at *9 (S.D.N.Y. 2003) (same); *Levisohn, Lerner, Berger & Langsam v. Med. Taping Sys.*, 10 F. Supp. 2d 334, 342 (S.D.N.Y. 1998) (same); *see generally In re North Sea Brent Crude Oil Futures Litig.*, 2017 WL 2535731, at *9, (S.D.N.Y. 2017) (questioning "the propriety of the conspiracy theory of personal jurisdiction more broadly," which has been "widely criticized by courts and scholars") (citations omitted).[12]  Joining that litany of cases (and others) is Judge Cogan's opinion in *In re Dental Supplies Antitrust Litigation*.  There, when confronted with similar plaintiffs' arguments, the Court "reject[ed] conspiracy jurisdiction out of hand," holding that the assertion failed "for a host of reasons" and that there "[wa]s no doctrinal support" for it.  2017 WL 4217115, at *7 (E.D.N.Y. 2017) (collecting cases).  So too here.

b.  *There is No Nexus / Substantial Relationship to the Claims Asserted*

The Complaint also fails to establish "an articulable nexus, or a substantial relationship, between **the claim[s] asserted** and the [defendant's] actions that occurred in New York." *Licci II*, 673 F.3d at 66 (emphasis added).  "Where this necessary relatedness is lacking . . . the claim [is] 'too attenuated' from the transaction." *Licci III*, 20 N.Y.3d at 340.

The implausibility of the Complaint's conclusory allegations in this regard is underscored by the timeline.  The only dates of any financial transactions specified in the Complaint are alleged to have occurred before September 2015.  (*See* Complaint ¶ 128, 130).  Yet the rocket that killed

---

[12]  While it is unclear whether Plaintiffs will attempt to argue a conspiracy theory as to Section 302(a)(2), that too would be unavailing, because, as discussed above, none of the alleged co-conspirators were "physically present" in New York.  *Suber*, 2021 WL 4429237, at *8; *Levisohn*, 10 F. Supp. 2d at 342.

Mr. Przewozman—one of more than 600 fired during a "two day bombing spree" in May 2019—landed four years later. There is plainly no "articulable nexus" between transfers of charitable donations alleged to have been made prior to September 2015 and a "bombing spree" four years later that is described as a massive military operation by multiple actors (Complaint ¶ 327); "the latter is . . . completely unmoored from the former." *Licci III*, 20 N.Y.3d at 339.

### B.   Constitutional Due Process – Plaintiffs Do Not Allege the Requisite "Minimum Contacts"

Even if Plaintiffs could meet the requirements of New York's long-arm statute—which they cannot—exercising personal jurisdiction over Qatar Charity would violate due process. A non-domiciliary must have "certain minimum contacts with [the forum] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v. State of Wash., Office of Unemployment Comp. & Placement*, 326 U.S. 310, 316 (1945) (internal citations omitted). Qatar Charity lacks the requisite contacts.

To exercise specific jurisdiction consistent with due process, the "defendant's *suit-related conduct* must create a *substantial connection* with the forum." *U.S. Bank Nat'l Ass'n v. Bank of Am.*, 916 F.3d 143, 150 (2d Cir. 2019) (emphasis added); *see also Walden*, 571 U.S. at 277. Again, the relationship with the forum "must arise out of contacts that the 'defendant *himself*' creates with the forum." *Walden*, 571 U.S. at 284 (emphasis in original) (quoting *Burger King Co.*, 471 U.S. at 475); *Cmty. Fin. Grp. v. Stanbic Bank Ltd.*, 2015 WL 4164763 (S.D.N.Y. 2015) (transfer through New York account was not "purposeful" where use of the account "was initiated by a party other than" the defendant). Personal jurisdiction may be exercised *only* if the defendant either "continuously and deliberately exploited the [forum's] market" or committed "intentional, and allegedly tortious, actions . . . expressly aimed at [the forum]." *Best Van Lines v. Walker*, 490 F.3d 239, 243 (2d Cir. 2007).

Here, the Complaint fails this test for the same reasons it fails to pass muster under New York's long-arm statute. Qatar Charity itself took no action in the United States, where it has no presence whatsoever. Instead, Qatar Charity's alleged conduct was limited to transferring funds "from Qatar Charity [in Qatar] to its two branches in the Palestinian territories." (Complaint ¶ 128). As noted above, there is nothing about these alleged transactions that would necessitate funds transiting through a U.S. bank, nor is Qatar Charity alleged to have directed the use of U.S. correspondent bank accounts; a bank customer's ***direction*** of payment routing is a critical consideration in the personal jurisdiction analysis. *See Berdeaux*, 2021 WL 4267693, at *12; *Licci III*, 20 N.Y.3d at 340. Here, the Complaint is utterly devoid of ***any*** allegations—much less "non-conclusory fact-specific allegations"—regarding that necessary element.

Furthermore, the Complaint is also fatally flawed because it does not allege that any particular fund transfers for the benefit of Qatar Charity had any connection to the May 2019 Attack at issue here. *See Licci IV*, 732 F.3d at 171. This is hardly surprising given that the Attack in question occurred approximately four years after the last fund transfer in 2015.

Where a defendant has had only limited contact with the forum—and here, of course, Qatar Charity had none—a Court must find that defendant's in-forum conduct was a substantial factor in the sequence of events that caused the harms alleged. *See SPV OSUS LTD. v. UBS AG*, 882 F.3d 333, 344 (2d Cir. 2018). The use of a forum's banking system may expose that use to suits in that forum only "when that use is ***an integral part*** of the wrongful conduct." *Licci IV*, 732 F.3d at 171–72 n.7 (emphasis added); *accord In re Terrorist Attacks on September 11, 2001*, 714 F.3d 109, 123–25 (2d Cir. 2013). The Complaint contains no non-conclusory fact-specific allegations permitting any such inference.

The Complaint conspicuously lacks *any* specificity as to what Qatar Charity is alleged to have *done* once it received the funds it transferred to its accounts in the Palestinian Territories before 2015.  Indeed, the Complaint fails to provide any factual specificity whatsoever as to any transfer—aside from the vague allegation that millions of dollars were transferred prior to 2015.  Critically, however, it also fails to identify the purported *recipient* of this alleged transfer.

The resulting chasm that exists within Plaintiffs' pleading renders it deficient as a matter of law and warrants dismissal here.  Plaintiffs fail to set forth *any* non-conclusory factual allegations which might plausibly suggest that funds transferred by Qatar Charity to its branches in the Palestinian Territories were in any way related to the Attack which gave rise to Plaintiffs' injuries.  Absent more, the only *reasonable* inference is that such funds were distributed in furtherance of Qatar Charity's world-renowned charitable endeavors.  In effect, Plaintiffs allege nothing other than a single relationship between a foreign bank and a New York bank, attribute this singular relationship to Qatar Charity by asserting that all the Defendants entered into a purported conspiracy, and hope that the Court will forgive the failure to connect any conspiratorial act with their resulting injuries.

For all the foregoing reasons, the Court should dismiss the Complaint for lack of personal jurisdiction over Qatar Charity.  *See Waldman*, 835 F.3d at 335, 341.[13]

---

[13]  Plaintiffs fail to satisfy either conjunctive prong for establishing personal jurisdiction under Federal Rule of Civil Procedure 4(k)(2).  Far from pleading that Qatar Charity "is not subject to jurisdiction in any state's courts of general jurisdiction," Fed. R. Civ. P. 4(k)(2)(A), Plaintiffs plead the opposite—alleging Qatar Charity is subject to personal jurisdiction in New York.  (Complaint ¶ 23).  Plaintiffs also fail to satisfy Rule 4(k)(2)(B) because they "have not demonstrated that [Qatar Charity] has meaningful contacts with New York, and Plaintiffs make no specific allegations of contacts with other states or the United States generally."  *DISH Network, LLC. v. Kaczmarek*, 2021 WL 4483470, at *8 (E.D.N.Y. June 24, 2021), *report and recommendation adopted in relevant part*, 2021 WL 4485870 (E.D.N.Y. Sept. 30, 2021).

## II.     PLAINTIFFS FAIL TO STATE ANY CLAIM

A complaint must include "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The Court may consider only well-pled factual allegations, *Mastafa v. Chevron Corp.*, 770 F.3d 170, 177 (2d Cir. 2014), and must ignore "legal conclusions" and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Iqbal*, 556 U.S. at 678. "'[N]aked assertion[s]' devoid of 'further factual enhancement'" will not do. *Pension Benefit Guar. Corp. v. Morgan Stanley Inv.*, 712 F.3d 705, 717 (2d Cir. 2013) (quoting *Iqbal*, 556 U.S. at 678).

### A.     Counts III and IV Must Be Dismissed for Failure to Plausibly Plead a Primary Liability Claim Under Section 2333(a)

The ATA's primary liability provision provides a cause of action for any U.S. national, or any estate, survivors, or heir of a U.S. national "injured . . . ***by reason of*** an act of international terrorism." 18 U.S.C. § 2333(a) (emphasis added). The statute defines an "act of international terrorism" as requiring, among other things, that a given defendant's activities "involve[d] violent acts or acts dangerous to human life" that "appear[ed] to be intended" to "coerce a civilian population" or to "influence the policy of a government by intimidation." 18 U.S.C. § 2331(1). The ATA's primary liability provision "afford[s] civil relief only against the principals perpetrating acts of international terrorism. It provide[s] no civil action against secondary actors who . . . facilitated such acts by others." *Linde v. Arab Bank*, 882 F.3d 314, 319–20 (2d Cir. 2018) (quoting *Rothstein v. UBS AG*, 708 F.3d 82, 97 (2d Cir. 2013)).

19

1.      ***Plaintiffs Fail to Plausibly Allege that Qatar Charity Committed an***
***Act of International Terrorism***

The primary liability claims must be dismissed because Plaintiffs have failed to plausibly

allege, and obviously cannot allege, that Qatar Charity itself committed an act of "international

terrorism"— in this case, the bombing spree in May 2019 involving the launch of 600 rockets from

Gaza.  Primary liability claims impose liability only on ***direct*** perpetrators of acts of international

terrorism and require a showing that a given defendant's ***own*** actions "involve[d] violence or

endanger[ed] human life" and were intended to intimidate or coerce.  *Linde*, 882 F.3d at 326, 332.

Plainly, there has been no allegation that Qatar Charity itself or any of its employees were

involved in the Attack.  Any such allegations involving an internationally respected humanitarian

agency that regularly partners with the U.N. and the U.S. government to alleviate human suffering

would, of course, be preposterous.  (*See e.g.*, Ex. 20, Press Release, *70 Partnership Agreements*

*between Qatar Charity and UN Organizations*, Qatar Charity (Jun. 21, 2017); Ex. 21, UNHCR

Partner Profile, Qatar Charity; Exs. 1–2).  On this point, Judge Daniel's decision in *Kaplan v.*

*Lebanese Canadian Bank* is instructive:

> There is no dispute that Defendant did not itself perpetrate the rocket attacks that
> injured Plaintiffs . . . . [E]ven assuming, *arguendo*, that Defendant was aware that
> it was providing such services to Hizbollah affiliates . . . [that] does not, in itself,
> equate to international terrorism.  Plaintiffs must plausibly allege that Defendant's
> *own* actions "*also* involve[d] violence or endanger[ed] human life" and that these
> actions "appear[ed] to be intended to intimidate or coerce a civilian population or
> to influence or affect a government."

405 F. Supp. 3d 525, 532 (S.D.N.Y. 2019) (quoting *Linde*, 882 F.3d at 326) (emphasis in original),

*vacated on other grounds,* 999 F.3d 842 (2d Cir. 2021); *accord O'Sullivan v. Deutsche Bank AG*,

2019 WL 1409446, at *8 (S.D.N.Y. 2019).

Plaintiffs have cited the "Qatar Charity annual reports for 2013, 2014, and 2015,"

ostensibly in support of the allegation that they "reflect that Qatar Charity transferred funds to, and

carried out joint projects with, various Hamas and PIJ fronts, including the Elehssan Society."
(Complaint ¶ 133). We submit as Exhibits 22 through 24 the Annual Reports for those years issued
by Qatar Charity's headquarters; we also submit as Exhibit 25 a local report prepared by the
Ramallah branch office for 2013 (the only such report the Charity has been able to locate). None
of those reports say anything about Hamas or PIJ. Nor is there any reference in any of these reports
to violence or terrorism. What there is, albeit ignored by Plaintiffs, is abundant reference to the
fact that Qatar Charity regularly works with and receives funding from many United Nations
entities—including the U.N. Food and Agriculture Organization, the office of the U.N. High
Commissioner for Refugees ("UNHCR"), the WFP, the U.N. Development Program, and others.
(*See, e.g.*, Ex. 23 at 25; Ex. 24 at 40; Ex. 25 at 6).

The cited Annual Reports also reflect support from major Western organizations and
companies, including the Bill and Melinda Gates Foundation (Ex. 22 at 16), Nestle, and Ikea (Ex.
24 at 23; *see also* Ex. 26, *UNHCR and Qatar Charity Formalize Cooperation Agreement to
Support of Global Refugee Programmes*, UNHCR (Oct. 13, 2007) (noting "long standing"
"strategic partnership")). Among other joint projects, Qatar Charity partners with the Gates
Foundation in the Global Polio Eradication Initiative, pursuant to a partnership agreement signed
by Mr. Gates in Doha in 2013. (*See* Ex. 27, *Qatar Charity Joins Bill Gates in Fight Against Polio*,
Doha News (Apr. 24, 2013); Ex. 28, *QC, Gates Foundation Join Hands to Fight Polio*, The
Peninsula (Apr. 2013)). It has long worked with Orbis International, a well-known international
non-profit focused on preventable blindness, on a long-term project that has provided eye surgery
and other care to more than a million people. (*See* Ex. 29, Orbis, *Qatar Charity*). Qatar Charity
has also been a leading member of the U.K.-based Start Network, a coalition of prominent, well-
regarded international aid groups—including Catholic Relief Services, World Jewish Relief,

21

World Vision, and the International Rescue Committee—which is funded by the governments of the United Kingdom and Germany (among others); in 2019, Qatar Charity hosted the assembly meeting, which representatives of the member organizations attended in Doha.  (*See* Ex. 30, *Start Network Holds First AGM and First Assembly Meeting as an Independent Charity*, Start Network (October 1, 2019); Ex. 31, Start Network, *The Network: Our Members*).  Furthermore, the Charity also works with Doctors Without Borders, Save the Children U.K., Oxfam, and CARE.  (*See* Ex. 32, Ezzoubeir Jabrane, *United Nations Rejects Saudi Arabia's List of Qatari "Terrorists*,*"* Morocco World News (Jun. 10, 2017); Ex. 33, QNA, *Qatar Charity, Save the Children UK sign MoU*, Qatar Tribune (May 29, 2018)).

As noted, in their Complaint, Plaintiffs claim that the Annual Reports of Qatar Charity for 2013, 2014, and 2015 reflect that Qatar Charity "transferred funds, and carried out joint projects with, various Hamas and PIJ fronts, including the Elehssan Society."  The Annual Reports for these years make no mention, however, of an "Elehssan Society," as Plaintiffs claim.  The 2013 local report for Qatar Charity's Ramallah branch (Ex. 25) does include a single reference to an "Al Ihsan Charitable Association," listing it as one of many organizations and entities involved in a specific program, the "Iftar Project for fasting persons."[14]  Through that program, in 2013, Qatar Charity distributed hot Iftar meals (the evening meal with which observant Muslims end their daily Ramadan fast) to roughly 25,000 individuals.  (Ex. 25 at 9, 13).

The Annual Reports also establish that the Charity was focused, in the Palestinian Territories as elsewhere, on its broad goals of sustainable development, reducing poverty,

---

[14]  The name of this entity contains a very common Arabic term.  The term—variously Romanized as "Ihsan," "Ehssan," or "Ehsan" (as a simple Google search reveals)—refers to the "doing of good deeds or inner purification" which is one of three primary tenets of Islam, along with acts of submission and belief.  (*See* Ex. 35, Nevad Kahteran, *The Qur'an: An Encyclopedia*, 289 (Oliver Leaman, ed., 1st ed. 2005)).  Given its centrality in the Muslim faith, the term is unsurprisingly included in the name of countless NGOs, charitable organizations, and mosques in the Middle East and around the globe—including, to take but one example of many, the Al-Ihsan mosque on Fulton Street in Downtown Brooklyn.  (*See* Ex. 36, Google Maps listing for Masjid Al-Ihsan).

providing safe drinking water and sanitation services, and disaster relief; that it conformed to the priorities specified by the international aid community acting alongside competent U.N. bodies; and that its activities were transparent and scrutinized by an international accounting firm, Grant Thornton (and later KPMG).  (*See, e.g.*, Ex. 22 at 20; Ex. 25; Ex. 34, Qatar Charity, *Governance: External Regulation*).

In 2014, for example, Qatar Charity operated 133 separate relief projects "for a total sum of QAR 119 million [@ USD $32 million], benefitting about 2.25 million people in 16 countries, with the participation of 31 humanitarian organizations." (Ex. 23 at 13).  Counting other programs and activities, the Charity was active in 72 countries. (Ex. 23 at 13).  In Gaza alone, it implemented reconstruction projects, as overseen by the Islamic Development Bank, at a cost of 43 million Qatari riyals [@ USD $11.8 million].  (*See* Ex. 22 at 16; Ex. 24 at 38).  Worldwide, it implemented projects in the health field worth 11 million Qatari riyals under the direction of the Gates Foundation (which co-funded the projects).  (*See* Ex. 23 at 11).  It also distributed many millions of Qatari riyals to feed Syrian nationals displaced by armed conflict.  (*See, e.g.*, Ex. 24 at 37, 39). In the Palestinian Territories specifically, the Charity has worked with a wide variety of agencies and organizations—including the U.N. Development Program, the European Union, the Islamic Development Bank, and the YMCA—to provide services and humanitarian assistance to the impoverished population.  (Ex. 25 at 6, 7).  In addition to providing Iftar meals to 25,000 people in 2013, as discussed above, the Charity provided food through another program to an additional 17,000 poor families, while also providing cash assistance to thousands of orphans and disabled persons, as well as providing wheelchairs, hearing aids, and eyeglasses to those in need.  (Ex. 25 at 5, 14, 15).  At times, it has also purchased goats and cows for poor families, enabling them to generate an income.  (Ex. 25 at 8–9).  It is self-evident that these activities do not involve violence

or acts dangerous to human life.  Indeed, these are the types of activities that President Biden has praised for "maintaining stability in Gaza and providing life-saving assistance to the Palestinians," which he recognized were among "our most vital interests."  (Ex. 11).

Other officials of the United States government have also praised Qatar Charity for its humanitarian work, as have USAID and other U.S. agencies and non-governmental organizations that regularly partner with Qatar Charity.[15]  Comments in 2020 by then U.S. Chargé d'Affaires in Doha, Greta Holz, are typical of this praise:

> Whether partnering with UN agencies, or a wide range of U.S. NGOs, the work Qatar Charity does throughout the region is saving lives and providing assistance to those who need it most.  Qatar Charity's positive impact . . . will reverberate for generations to come.  The U.S. Embassy in Doha looks forward to exploring opportunities to collaborate with Qatar Charity on achieving our common goals.

(Ex. 37, Qatar Charity, *Chargé d'Affaires of the United States in Qatar Visits Qatar Charity* (Dec. 9, 2020); *see also* Ex. 38 (2020 tweet by British Ambassador to Qatar expressing similar enthusiasm regarding "future cooperation" with Qatar Charity)).  Indeed, as recently as January 24, 2022, Chargé d'Affaires Natalie Baker (CdA Holz's successor) tweeted the following from the official "@USAmbQatar" Twitter account:

---

[15]  *See* Exs. 1–2 (referencing cooperation between USAID and Qatar Charity for projects in Malaysia and Pakistan).







(Ex. 17 (certified translation of original Arabic tweet)).  The core of the Complaint—the allegation that Qatar Charity is a notorious supporter of terrorism and has been designated as such by the United States (Complaint ¶¶ 39–65)—is demonstrably false and flatly belied by the public record available to the Court: the U.S. government frequently works with the Charity and its diplomats praise it as "one of the best organizations in the world."  (Ex. 17).  The conclusory allegations of the Complaint are thus wholly implausible and cannot stand.

In addition to its spurious allegations regarding Qatar Charity's contributions to ***unnamed*** charities "affiliated with" Hamas and PIJ, the Complaint also contains similarly implausible, and conclusory, allegations that Qatar Charity distributed funds to Hamas and PIJ which then "utilized those funds to finance terrorist activities."  (Complaint ¶ 11-12).  That "'naked assertion[]' devoid of 'further factual enhancement'" must be rejected.  *Pension Benefit Guar. Corp.*, 712 F.3d at 717 (quoting *Iqbal*, 556 U.S. at 678).  And in any event, even if one were to accept those baseless allegations as true, such conduct would not change the analysis as to primary liability.  The

25

allegations in the Complaint are plainly insufficient, even on their face, to establish that Qatar Charity *itself* committed an act of "international terrorism." *See, e.g.*, *Stansell v. BGP, Inc.*, 2011 WL 1296881 (M.D. Fla. 2011) (corporate defendant's payment of funds directly to a U.S.-designated FTO in connection with its oil exploration business "would not lead an objective observer to conclude Defendants intended to achieve any one of the results listed in § 2331(1)(B)").

## 2. *Plaintiffs Fail to Plausibly Allege That Qatar Charity Proximately Caused the Attack*

The primary liability claims also fail because Plaintiffs have not plausibly alleged that Qatar Charity proximately caused their injuries. The ATA confines liability to injuries sustained "***by reason of*** an act of international terrorism." 18 U.S.C. § 2333(a) (emphasis added). As set forth above, the Complaint fails to adequately allege that Qatar Charity itself committed an "act of international terrorism," and hence this claim must be dismissed on that ground alone. But it also must be dismissed because the statutory language "requires a plaintiff to allege and prove that the violation proximately caused her injuries." *Zapata v. HSBC Holdings PLC*, 414 F. Supp. 3d 342, 355 (E.D.N.Y. 2019) (NGG), *aff'd,* 825 F. App'x 55 (2d Cir. 2020) (citing *Rothstein v. UBS AG*, 708 F.3d 82, 95 (2d Cir. 2013)). Establishing proximate cause requires the plaintiff to "plausibly allege that the defendant's actions were a 'substantial factor in the sequence of responsible causation' leading to the plaintiff's injury and that the plaintiff's injuries were 'reasonably foreseeable' or 'anticipated as a natural consequence' of those actions." *Freeman v. HSBC Holdings PLC*, 413 F. Supp. 3d 67, 84 (E.D.N.Y. 2019) (citing *Rothstein*, 708 F.3d at 95).

Where, as here, alleged "terror funding" is the predicate, Plaintiffs must "meet *Twombly*'s plausibility standard with respect to the need for a proximate causal relationship between the cash transferred by" the defendant and "the terrorist attacks . . . that injured plaintiffs." *In re Terrorist Attacks*, 714 F.3d at 124–25; *accord Gonzalez v. Google, Inc.*, 335 F. Supp. 3d 1156, 1178–79

26

(N.D. Cal. 2018).   Alleging, as Plaintiffs do, that a defendant enhanced an FTO's abilities, is

insufficient to state a claim.  *See Fields v. Twitter, Inc.*, 881 F.3d 739, 749–50 (9th Cir. 2018); *Gill*

*v. Arab Bank, PLC*, 893 F. Supp. 2d 474, 522 (E.D.N.Y. 2012).

Here, Plaintiffs plead threadbare, conclusory—and wholly implausible—allegations that

purport to connect Qatar Charity's fund transfers to its own branches in the Palestinian Territories

with the Attack that injured Plaintiffs four years later.  Although these allegations are repackaged

on multiple occasions throughout the Complaint, there are fundamentally four of them:

1.    Paragraphs 9-12 allege that Qatar Charity transferred funds from its bank
      account in Doha to its own accounts in the Palestinian Territories. (*cf*. Complaint
      ¶ 132).  It further alleges in wholly conclusory fashion, without any specificity,
      that the Charity's local branches "distributed [funds] to Hamas and PIJ, as well
      as supposed charities affiliated with those terrorist organizations."

2.    Purportedly relying on the Charity's Annual Reports, Plaintiffs also allege that
      from 2013 through 2015 Qatar Charity "carried out joint projects" with "various
      Hamas and PIJ fronts."  (Complaint ¶ 133).[16]

3.    It is further alleged that the Charity during some unspecified time period (ending
      at the latest in 2015) purchased "thousands of anonymous debit cards known as
      'Sanabel Cards' [which] were then distributed in the Palestinian territories to
      thousands of recipients."  (Complaint ¶ 151-52).  Some unknown portion of those
      recipients allegedly included members of Hamas or PIJ, while it is also alleged in
      entirely conclusory fashion that those members or their families would get
      "priority eligibility" for cards if imprisoned or killed.  (Complaint ¶¶ 154-55).

4.    Paragraphs 143 through 145 allege in conclusory and vague fashion that certain
      employees of Qatar Charity were "convicted in Israel for operating an illegal
      organization and transferring funds to Hamas."

It cannot be enough for Plaintiffs to assert nothing more than that Qatar Charity gave

money to ***unnamed*** charities "affiliated with" Hamas and PIJ (Complaint ¶ 11-12) and that

"Hamas and PIJ" in some unspecified way purportedly used those unidentified funds in connection

---

[16] As explained above, the reports say nothing of the sort.  Instead, they describe extensive award-winning
humanitarian work in scores of countries, benefitting millions of desperate people—work often performed in
conjunction with various U.N. agencies, the Bill and Melinda Gates Foundation, and U.S. government agencies like
USAID.

with the Attack at issue. *See, e.g.*, *Owens v. BNP Paribas, S.A.*, 897 F.3d 266 at 276 (allegations that the funds were transmitted "directly to al Qaeda [and used] to carry out the embassy bombings" were "'conclusory allegations that do not meet *Twombly*'s plausibility standard'") (quoting *Rothstein*, 708 F.3d at 97); *see also Siegel v. HSBC North America Holdings, Inc.*, 933 F.3d 217, 225 (2d Cir. 2019).

Plaintiffs have failed to "establish[] any direct causal link between" Qatar Charity's alleged fund transfers and the incident that injured Plaintiffs. *Zapata v. HSBC Holdings PLC*, 414 F. Supp. 3d 342, 356–57 (E.D.N.Y. 2019) (NGG), *aff'd*, 825 F. App'x 55 (2d Cir. 2020); *see also Rothstein*, 708 F.3d at 91–92. For all these reasons, the primary liability claims must be dismissed.

### B.   Counts I and II Must Be Dismissed for Failure to Plausibly Plead a Secondary Liability Claim Under Section 2333(d)

The Court should dismiss Counts I and II for failure to state an aiding-and-abetting or conspiracy claim under Section 2333(d). That provision provides that:

> in an action "arising from an act of international terrorism committed, planned, or authorized by" a designated FTO, liability may be asserted as to any person who aids and abets, by knowingly providing substantial assistance, or who conspires with the person who committed such an act of international terrorism.

For liability to attach, the defendant must assist the principal violation—that is, an "act of international terrorism"—and must be "integral" to, or play a "major part in prompting," the act of international terrorism that caused Plaintiffs' injuries ("the injury at issue"). *Linde I*, 882 F.3d at 331; *Halberstam v. Welch*, 705 F.2d 472, 484 (D.C. Cir. 1983). Here, the "act of international terrorism" at issue is the May 2019 rocket attack. Qatar Charity was neither integral to the Attack nor did it play any role in prompting it, and the conclusory assertions to the contrary are nonsensical.

1. ***The Complaint Does Not State a JASTA Conspiracy Claim***

Under JASTA, a defendant is liable if it "conspire[d] with the person who committed such an act of international terrorism." 18 U.S.C. § 2333(d)(2). That text imposes four requirements on any conspiracy claim: "(1) an agreement between two or more persons; (2) to participate in an [act of international terrorism]; (3) an injury caused by an unlawful overt act performed by one of the parties to the agreement; (4) which overt act was done pursuant to and in furtherance of the common scheme." *O'Sullivan*, 2019 WL 1409446 at \*9. The Complaint does not clear any of these hurdles. Instead, the Complaint stumbles at the very first step by not plausibly alleging the most basic requirement of a conspiracy: an agreement. "Because the Complaint fails to allege plausibly the existence of an unlawful agreement to commit an act of international terrorism, Plaintiffs' conspiracy liability claims must be dismissed." *O'Sullivan*, 2019 WL 1409446, at \*9; *Twombly*, 550 U.S. at 557 ("naked assertion of conspiracy . . . stops short of the line between possibility and plausibility of entitle[ment] to relief").

In fact, the Complaint does not allege that any of the Defendants even knew who committed the Attack or had any direct contact with those who did. That fact alone is fatal to Plaintiffs' conspiracy claim. *Kaplan v. Lebanese Canadian Bank*, 999 F.3d 842, 855 (2d Cir. 2021). At most, the Complaint generically asserts that Qatar Charity funded its branches in the Palestinian Territories and that some of those funds were eventually transferred to Hamas and PIJ, as well as charitable enterprises coopted by those entities and that the Charity purchased Sanabel Cards distributed to "thousands" of recipients in the Territories—some of which were putatively used by individuals, and their families, allegedly affiliated with Hamas and PIJ. (Complaint ¶¶ 128-33, 151-56). But "[b]y the plain language of the statute, § 2333(d) does not create liability against a person who aids and abets or conspires with the person who merely authorized (rather than committed) the terrorist act." *Weiss v. Nat'l Westminster Bank PLC*, 278 F. Supp. 3d 636, 650

(E.D.N.Y. 2017); *accord O'Sullivan*, 2019 WL 1409446 at *9.  Of course, here, there are no non-conclusory allegations of "authorization" in any event.

> 2.  ***The Complaint Does Not State a JASTA Aiding-and-Abetting Claim***

Civil aiding and abetting under Section 2333(d) is comprised of three elements: (1) "[T]he party whom the defendant aids must perform a wrongful act that causes an injury," (2) "the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance," and (3) "the defendant must knowingly and substantially assist the principal violation."  *Linde*, 882 F.3d at 329 (quoting *Halberstam*, 705 F.2d at 487).  In the ATA context,

> aiding and abetting an *act* of international terrorism requires more than the provision of material support to a designated terrorist *organization*.  Aiding and abetting requires the secondary actor to be 'aware' that, by assisting the principal, it is itself assuming a 'role' in terrorist activities.

*Linde*, 882 F.3d at 329 (quoting *Halberstam*, 705 F.2d at 477).

The "general awareness" prong requires Plaintiffs to plead that a defendant was generally aware of its role in an act of international terrorism.  The "substantial assistance" prong requires Plaintiffs to plead specific facts giving rise to an inference that the defendant had **"*actual knowledge*"** that it was providing **substantial** assistance to an act of international terrorism.  *Kaplan*, 999 F.3d at 863–64 (emphasis added).  The Complaint falls short as to both prongs.

> a.  ***The Complaint Fails to Allege Facts Permitting a Plausible Inference that Qatar Charity Knowingly Played a Role in Terrorist Activities***

To survive dismissal, the Complaint must contain plausible allegations that Qatar Charity was generally aware that it was playing a role in an FTO's "violent or life-endangering activities"—which requires more than the provision of "material support" to an FTO, but less than specific intent or knowledge of the particular attack at issue.  *Linde I*, 882 F.3d at 329.  Plaintiffs

must show that the defendant not only ***knew*** of the principal's involvement in committing acts of "international terrorism," but also that the defendant and the principal were "one in spirit." *Halberstam*, 705 F.2d at 484; *Linde I*, 882 F.3d at 329 & n.10.

Here, the Complaint does not plausibly allege that Qatar Charity was generally aware that it played a role in the "violent or life-endangering" activities of Hamas or PIJ.  The Complaint, instead, repeatedly makes conclusory statements about knowledge and intent.  (*See, e.g.*, Complaint ¶ 348).  While, as a general proposition, a Complaint may contain "general allegations as to a defendant's knowledge," the Second Circuit made clear in *Kaplan* that "plaintiffs are ***required*** to include allegations of the facts or events they claim give rise to an inference of knowledge" in order to plead knowing-substantial assistance.  999 F.3d at 864 (emphasis added).

More to the point, Courts have held that allegations like those here are insufficient to establish general awareness.  *See, e.g.*, *Honickman v. BLOM Bank SAL*, 6 F.4th 487, 496–503 (2d Cir. 2021); *Averbach v. Cairo Amman Bank*, 2020 WL 486860, at *13–15 (S.D.N.Y. 2020); *O'Sullivan v. Deutsche Bank AG* ("*O'Sullivan II*"), 2020 WL 906153, at *6 (S.D.N.Y. 2020); *Weiss v. Nat'l Westminster Bank PLC*, 381 F. Supp. 3d 223, 232–33, 239 (E.D.N.Y. 2019).

The *Honickman* court had this to say on the subject:

> Plaintiffs quote a passage from *Halberstam* stating that the district court's conclusions that Hamilton "*knew about* and acted to support *Welch's illicit enterprise*," if not the murder, establish that she "had a general awareness of her *role in a continuing criminal enterprise*." … Plaintiffs argue that this standard simply requires Plaintiffs to show that BLOM knew that it was playing a role, in a sense, in Hamas' terrorist *enterprise*, by providing funds to organizations which supported Hamas.  Again, the standard Plaintiffs seek to impose is simply that of knowingly providing material support to a terrorist organization, which differs from the scienter required to support aiding-and-abetting liability for supporting terrorist acts.

*Honickman for Est. of Goldstein v. BLOM Bank SAL*, 432 F. Supp. 3d 253, 265 n.8 (E.D.N.Y. 2020) (emphasis in original), *aff'd sub nom. Honickman v. BLOM Bank SAL*, 6 F.4th 487 (2d Cir.

Case 1:20-cv-06088-NGG-RLM   Document 52-1   Filed 04/20/22   Page 40 of 43 PageID #: 1357


2021).   As the Second Circuit clarified in affirming *Honickman*, "the relevant inquiry for the general awareness element" is whether the intermediate or affiliated entities which received funds from the defendant (here, presumably, the unnamed front organizations) "were ***so closely intertwined*** with [the FTO's] violent terrorist activities that one can reasonably infer that [the defendant] was generally aware . . . that it was playing a role in unlawful activities from which [the FTO's] attacks were foreseeable."   *Honickman*, 6 F.4th at 499 (emphasis added).   The allegations here plainly do not come close to supporting any such inference.

As an initial matter, the "front organizations" are largely unnamed, and Qatar Charity's ostensible involvement with them is never described or explained other than in completely conclusory allegations that the Complaint repeats as rote many times.   (*See, e.g*., Complaint ¶ 129 ("Qatar Charity eventually transferred a substantial portion of those funds to Hamas, PIJ, and supposed charities controlled by those terrorist organizations.").   In fact, the Complaint makes just one sketchy allegation that the Charity's "annual reports for 2013, 2014, and 2015 reflect that Qatar Charity transferred funds to, and carried out joint projects with, various Hamas and PIJ fronts, including the Elehssan Society."   (Complaint ¶ 133).   As discussed above, the Annual Reports simply do not support these allegations.   The Complaint references, for instance, an entity named "the Elehssan Society" as a "charitable front for the Palestinian Islamic Jihad."   (Complaint ¶¶ 134–35).   But as Exhibit 24 (cited in the Complaint) indicates, the Charity worked in 2013 with an entity with a different, if somewhat similar name (the Al Ihsan Charitable Association)— providing hot Iftar meals to the needy—hardly an admission of terrorist financing.

The alleged "front groups" mentioned in the Complaint are almost entirely unidentified by name.   And the nature of a "front," in any event, is that it is distinct from the entity for which it "fronts": a group which is the "front" for an FTO is not, of course, itself an FTO, and thus does

not conform to the requirement of Section 2333(d)(2).  More to the point, Plaintiffs acknowledge, as they must, that these charitable organizations do, in fact, perform actual charitable works.  (*E.g.*, Complaint ¶¶ 86, 88).   Both the District Court and the Second Circuit in *Honickman* have recognized that when "front organizations" perform legitimate charitable work, this has a significant bearing on whether it is plausible that a defendant was "generally aware" of the putative activities of these organizations and whether those organizations were sufficiently "closely intertwined" not with charitable or political activities, but with "violent terrorist activities." *Honickman*, 6 F.4th at 502.  The *Honickman* court found it noteworthy that three customers (the "Three Customers") allegedly linked to Hamas pursued charitable activities, "including giving money to orphans."  The District Court's analysis found this fact fatal to the aiding and abetting allegations against the defendant:

> Even accepting as true that the Three Customers [engaged in charitable activities] to procure political support for Hamas in the refugee camps, this does not cure the absence of any plausible allegation that BLOM was aware it was assuming a role in Hamas' violent or life-endangering activities.

*Honickman*, 432 F. Supp. 3d at 266 (citing *Weiss*, 381 F. Supp. 3d at 232); *accord Strauss v. Credit Lyonnais*, 379 F. Supp. 3d 148, 157–59 (E.D.N.Y. 2019) (donations to 13 charities "controlled by Hamas Founders . . . is insufficient to prove that Defendant's activities were violent or engendered human life"), *aff'd in part*, 842 F. App'x 701 (2d Cir. 2021); *accord In re Terrorist Attacks*, 714 F.3d at 124.

Focusing on the important point that the Three Customers were actually engaged in charitable activity, the Second Circuit in *Honickman* went out of its way to opine: "However, we note that there is a meaningful difference between the alleged functions of the Three Customers," including their charitable activities in the refugee camps as part of "the *da'wa*, Hamas's social

welfare program," and entities directly involved in a terrorist attack.  6 F.4th at 502, n.21; *cf.* Complaint ¶ 86 *et. seq.* (discussing the Da'Wa).

*Honickman* makes another point of relevance here.  There, the Court held that the Complaint did not plausibly allege that the defendant was generally aware of any connection between its customers and Hamas, as it relied on "press articles, government actions, and allegedly 'public knowledge.'"  432 F. Supp. 3d at 265.  The Second Circuit found that "[t]he limited public sources Plaintiffs cite pale in comparison to the detailed, numerous sources that sufficed in *Kaplan*," in which the Complaint quoted Hezbollah statements "which were 'specific as to the status of the speaker,' 'the circumstances in which the statements were made,' and 'the other specific media in which they were made.'"  *Honickman*, 6 F.4th at 502.  All of that is lacking here.

### b. *Plaintiffs Fail to Plausibly Allege That Qatar Charity's Alleged Assistance Was "Substantial" for Purposes of Secondary Liability Under § 2333(d) (JASTA)*

Only conduct that "play[ed] a 'major part in prompting the tort' or [was] 'integral' to the tort [should] be considered substantial assistance."  *Copeland v. Twitter, Inc.*, 352 F. Supp. 3d 965, 976 (N.D. Cal. 2018) (appeal filed) (quoting *Halberstam*, 705 F.2d at 484).  Failure to adequately plead the "substantial assistance" element is grounds for dismissal.  *Siegel*, 933 F.3d at 225; *Honickman*, 432 F. Supp. 3d at 267–70; *Averbach*, 2020 WL 486860, at *16–17.

The *Halberstam* framework provides six factors for determining "how much encouragement or assistance is substantial enough."  These include "(1) the nature of the act encouraged, (2) the amount of assistance given by defendant, (3) defendant's presence or absence at the time of the tort, (4) defendant's relation to the principal, (5) defendant's state of mind, and (6) the period of defendant's assistance."  *Linde*, 882 F.3d at 329 (quoting *Halberstam*, 705 F.2d 483–84).  Here, for the reasons discussed above, the *Halberstam* factors weigh heavily in favor of dismissal.

**III.    PLAINTIFFS FAILED TO PROPERLY EFFECT SERVICE OF PROCESS**

As argued at the pre-motion conference, the attempted service by mail here was improper for the reasons articulated in Section II of Masraf Al Rayan's Memorandum of Law in Support of Its Motion to Dismiss ("Masraf Al Rayan's Motion to Dismiss") and the Preliminary Statement of Qatar National Bank's Memorandum of Law in Support of its Motion to Dismiss, served on Plaintiffs this day of February 18, 2022.  We adopt those arguments.

**IV.    THE FOREIGN PLAINTIFFS LACK STANDING TO BRING PERSONAL INJURY CLAIMS UNDER THE ATA**

Qatar Charity adopts the argument set forth in Section V of Masraf Al Rayan's Motion to Dismiss regarding Plaintiffs' lack of statutory standing under the ATA and JASTA.

**CONCLUSION**

For the foregoing reasons, the Court should dismiss the Complaint in its entirety.

Dated: February 18, 2022
     New York, New York

Respectfully submitted,

**DLA PIPER LLP (US)**

By:    */s/ John Hillebrecht*
       John M. Hillebrecht
       Kevin Walsh
       Jessica Masella

1251 Avenue of the Americas
New York, New York 10020

Phone: (212) 335-4500
Email: John.Hillebrecht@us.dlapiper.com
       Kevin.Walsh@us.dlapiper.com
       Jessica.Masella@us.dlapiper.com

*Counsel for Defendant Qatar Charity*