# EXHIBIT 10

[Emblem of the State of Israel]

**At the Supreme Court sitting as the High Court of Justice**

**HCJ 8542/18**

| | |
|---|---|
| Before: | M. Mazuz, J. |
| | O. Grosskopf, J. |
| | A. Stein, J. |
| Petitioner: | Mia Ackerman and 52 other petitioners |
| | *versus* |
| Respondent: | Government of Israel |
| | Petition for a conditional order and an interim injunction |
| Representing Petitioner: | Nitsana Darshan-Leitner |

**JUDGMENT**

A. STEIN, J.:

1.  In this petition, a conditional order is sought against the Government of Israel, which would require it to come before us and provide a reason why it will not prevent the transfer of money originating in Qatar to the Gaza Strip through the territory of the State of Israel. Petitioners also seek that we issue an interim order that would prevent the aforesaid financial transfer until a hearing on the petition takes place. Petitioners in this petition include 52 residents of the Gaza Envelope and the Shurat HaDin organization that assists victims of terrorism in legal proceedings. Petitions believe that the Government has a legal duty to prevent said financial transfer as long as the terrorist organization Hamas continues to control the Gaza Strip and as long as terrorist activities from the Strip area continue against residents of the Gaza Envelope Area and all residents of Israel.

2.  Respondent was requested to submit a response to the petition, and this was submitted on 12/05/2018. In this response, Respondent gave noticed that it "intends to permit—within a short period of time—the transfer of money intended for the payment of the salaries of officials in the Gaza Strip … similarly to the way

a previous financial transfer was carried out—i.e., after coordinating among the relevant parties and subject to the performance of security checks, with an emphasis on the identity of those receiving payment, as long no judicial order prohibits it from doing so." Respondent also submitted to us that it believes that it is acting lawfully and that there is no legal impediment to permitting the financial transfer after this matter had been discussed and authorized by the Security Cabinet "for humanitarian reasons and as part of the effort to prevent a deterioration of security in the Gaza Strip." According to Respondent, this matter is dealing with a matter of clear political–security discretion in which this Court is not accustomed to intervening.

3. Our heart goes out to Petitioners. May Petitioners and all residents of Israel no longer know days of terrorism and live in peace and security.

4. As for the legal aspect of the petition, I believe that we must summarily dismiss it. The policy of combatting terrorism and "give and take" agreements that our government must, at times, make with our enemies are clear operational and political matters. As Respondent contends, these matters are at the core of the Israeli government's political and operational discretion in which we do not intervene. See sections 32, 35, and 40 of the Basic Law: The Government and *G.P.S. Agro Exports Ltd. v. Minister of Agriculture*, HCJ 4746/92, *Piskei Din* XLVIII(5) 243, 256–257 (1993) and *Ben Haim v. Minister of Agriculture*, HCJ 2926/90, *Piskei Din* XLVI(4) 622, 625–626 (1992).

5. The rule we have adopted in these matters has been summarized by M. ELON, D.P., as follows:

> "A long line of jurisprudence issued by this Court has held that the issue of the manner of foreign-policy management by the competent authorities is non-justiciable, it cannot be examined by legal criteria, and this Court will not intervene in such cases."

See *Temple Mount and Eretz Yisrael Faithful Movement v. Prime Minister*, HCJ 4354/92, *Piskei Din* XLVII(1) 37, 44 (1993).

It also bears recalling Y. ZAMIR, J.'s opinion in *Weiss v. Prime Minister*, HCJ 5167/00, *Piskei Din* LV(2) 455, 479–480 (2001):

> "There are cases where the alternative remedy is a claim in another court or an appeal to a particular court, and there are cases where the alternate remedy is that the matter be handled by the government or

> the Knesset, depending on the nature of the matter. In such matters, another body is seen as more suitable and appropriate than the court to handle the matter. The State's foreign relations have always been a clear example of such a matter. This is the case, as far as I know, in every court and in every country."

6. In matters such as that which is before us, our government reports to the Knesset and to the voters, not to us. See sections 3, 4, and 28 of the Basic Law: The Government and Amnon Rubinstein and Barak Medina, *The Constitutional Law of the State of Israel* I, 347–359 (fifth expanded edition, 1996). So it is with us, and so it is with American constitutional law. The Supreme Court of the United States has long ruled that government political decisions on foreign affairs should not be brought before a court:

> "[T]he very nature of executive decisions as to foreign policy is political, not judicial. Such decisions … are delicate, complex, and involve large elements of prophesy. … They are decisions of a kind for which the Judiciary has neither aptitude, facilities nor responsibility." *Chicago & S. Airlines v. Waterman S.S. Corp.*, 333 U.S. 103, 111 (1948).

7. Petitioners claim that by permitting said financial transfer, the government is violating a number of provisions of the law, and, for this reason, we must intervene and prohibit this. In this context, Petitioners have referred us to sections 23 and 32(d) of the Counterterrorism Act 5776-2016 (hereinafter "Counterterrorism Act") and section 2(a)(2) of the Fight Against Criminal Organizations Act 5763-2003. These statutory provisions contain criminal prohibitions on financing terrorist organizations or actions on their property, as well as providing services or means to terrorist or criminal organizations.

8. This claim has no basis. A similar claim was discussed and ruled on in *The Legal Forum for the Land of Israel v. Prime Minister*, HCJ 1169/09 (15/06/2009), which dealt with the Prohibition on Financing Terrorism Act 5765-2005, which has been replaced by the Counterterrorism Act. A. PROCACCIA, J., with D. BEINISCH, P., and E. RIVLIN, D.P., concurring, commented the following on it:

> "The Prohibition on Financing Terrorism Act primarily applies to individuals and organizations that knowingly perform actions on property to promote the commission of acts of terrorism, to reward their commission, or to finance the operations of terrorist organizations while seriously harming the interest of the Israeli public, both individually and collectively. The same is true of knowingly committing acts

on 'terrorist property,' which have a connection to terrorism, and for a terrorist organization. Following the rationale of the Prohibition on Financing Terrorism Act and its wording of the offenses in sections 8 and 9 indicates that it seeks to catch within its net acts in property carried out with an aim to supporting and strengthening terrorism and terrorist organizations, and to enhancing the means at the disposition of enforcement authorities in their efforts to eradicate domestic and global terrorism. The prohibitions on acts in property for terrorist purposes (section 8 of the Act) and the prohibition on acts of 'terrorist property' (section 9 of the Act) require the existence of a mental element of awareness that the acts on property are intended to achieve an aim of advancing an act of terrorism or financing activities of a terrorist organization. **A consequence of that is that the Act is not intended, in essence, to apply to acts of the government or any of its executive arms in the exercise of their lawful powers, which are intended to realize a policy that promotes the public interest in Israel in a broad sense, and compliance with Israel's duty to the residents of the region on a humanitarian level as part of international law. A government act to advance the Israeli interest stands as an anthesis to knowingly supporting a terrorist organization or an act of terrorism, and it does not meet the mental element required in sections 8 and 9 of the Act. The same is true when the government act is intended to meet its duty toward residents of the region on the humanitarian level.** Transfers of money or other property made as part of said policy will not be deemed, on their face, as prohibited by the Act for the aforesaid reasons.

"The case discussed in this petition illustrates the incompatibility of the offenses sections of the Prohibition on Financing Terrorism Act with the factual foundation as laid out and the circumstances of the incident described. This is a matter of permitting the prime minister to transfer money belonging to the Palestinian Authority, which has been deposited in banks in Judea and Samaria, through Israel to banks in Gaza. The money is intended to pay the salaries of Palestinian Authority employees residing in Gaza. Granting permission to such a transfer by the government or the prime minister does not fall within the prohibitions in the Act, and in any case, there is no need for a no special permit, as defined in section 9(d) of the Act, which is intended to permit a prohibited transfer of property in special circumstances.

"The purpose of the Prohibition on Financing Terrorism Act is not intended to prevent Israel from transferring property that belongs to the Palestinian Authority from Judea and Samaria to Gaza, when doing so promotes humanitarian objectives intended to ensure a reasonable and humane standard of living for residents in Judea and Samaria and the Gaza Strip. A mere suspicion that perhaps money intended for a legitimate purpose—to pay employees' salaries—may also be used indirectly for aims that the Act seeks to prevent is insufficient to categorize a financial transfer as falling within the prohibitions in the Act."

See paragraphs 16–18 in that judgment; emphasis added.

5

9. I would add to this clear excerpt that **the State of Israel, and its primary arm, the Israeli government, do not bear any criminal liability**. The late Professor S. Z. Feller correctly described this fundamental principle in these words:

> "The state is society's political organization. There is no doubt that it is a legal entity that is capable of upholding legal rights and assuming obligations as a state. **As such, might the state be 'the perpetrator of an offense,' similarly to the situation that may be applied to any corporation as a legal entity?** A simple answer to this question is found in section 52 of the Interpretation Ordinance [New Version] 1954, which states: 'No legislation seeks to derogate from any right of the state or to impose any duty thereupon, unless explicitly stated therein.' **We have not found even one piece of legislation addressing criminal offenses a provision that imposes criminal liability, as a duty to be borne due to the commission of an offense, on the state. Thus, a negative answer to the question above is self-evident.** And if legislation is passed that prescribes otherwise, this will be an exception to said section 42, and the particular offense or offenses will be treated accordingly."
>
> S. Z. Feller, *Fundamentals of Criminal Law*, volume I, 718 (5742); emphasis added.

10. For these reasons, I would propose to my brothers that we dismiss this petition without ordering costs be paid.

Given today, Tevet 2, 5779 (12.9.2018).


JUDGE                                    JUDGE                                    JUDGE

_____
18085420_F01.doc AB
Information Center, Phone: 077-2703333, website: supreme.court.gov.il



## CERTIFICATION

TransPerfect is globally certified under the standards ISO 9001:2015, ISO 17100:2015, and ISO 18587:2017. This Translation Certificate confirms the included documents have been completed in conformance with the Quality Management System documented in its ISO process maps and are, to the best knowledge and belief of all TransPerfect employees engaged on the project, full and accurate translations of the source material.

| | |
|---|---|
| File Name(s): | HCJ 854218 Ackerman et al. v. State of Israel |
| Source Language(s): | Hebrew |
| Target Language(s): | English (United States) |

Authorized Signature:

Signature, Notary Public:

Name: Shayna Himelfarb

Title: Project Assistant

Date: February 9, 2022

Stamp: Notary Public

Reason for signature: I approve the accuracy of this document content as written

Case 1:20-cv-06088-NGG-RLM   Document 52-12   Filed 04/20/22   Page 8 of 13 PageID #: 1412



**בבית המשפט העליון בשבתו כבית משפט גבוה לצדק**

**בג"ץ 8542/18**

| | |
|---|---|
| לפני: | כבוד השופט מ' מזוז |
| | כבוד השופט ע' גרוסקופף |
| | כבוד השופט א' שטיין |
| העותר: | מיה אקרמן ו-52 עותרים נוספים |
| | נ ג ד |
| המשיבה: | ממשלת ישראל |
| | עתירה לצו על תנאי ולצו ביניים |
| בשם העותר: | עו"ד ניצנה דרשן-לייטנר |

**פסק דין**

השופט א' שטיין:

1. בעתירה זו מבוקש צו על תנאי נגד ממשלת ישראל אשר יחייבה לבוא לפנינו וליתן טעם מדוע לא תמנע העברת כספים, שמקורם בקטאר, לרצועת עזה דרך שטחה של מדינת ישראל. כמו-כן מבקשים העותרים כי ניתן צו ביניים אשר ימנע את העברת הכספים כאמור לעיל עד לקיום הדיון בעתירה. העותרים בעתירה זו כוללים חמישים ושניים תושבים של אזור עוטף עזה וכן את ארגון "שורת הדין" שדרכו לסייע לנפגעי טרור בהליכים משפטיים. העותרים סבורים כי על הממשלה מוטלת חובה על פי דין למנוע העברת כספים כאמור כל אימת שנמשכת שליטתו של ארגון הטרור חמאס על רצועת עזה, וכל עוד נמשכות פעולות הטרור משטח הרצועה נגד תושבים של אזור עוטף עזה וכלל תושבי ישראל.

2. המשיבה נתבקשה למסור תגובה לעתירה וזו הוגשה בפנינו ביום 5.12.2018. בתגובה זו, מודיעה המשיבה כי "בכוונתה לאפשר – בתוך זמן קצר – העברת כספים המיועדים לתשלום משכורותיהם של פקידים ברצועת עזה [...] בדומה לאופן בו בוצעה

העברת כספים קודמת – קרי לאחר תיאום בין הגורמים הרלוונטיים ובכפוף לקיום בדיקות ביטחוניות, בדגש על זהות מקבלי התשלום, וזאת כל עוד אין צו שיפוטי האוסר עליה לעשות כן." כמו-כן מסרה לנו המשיבה כי הינה סבורה שהיא פועלת כדין וכי לא קיימת כל מניעה משפטית לאפשר את העברת הכספים לאחר שנושא זה נדון ואושר בקבינט המדיני-ביטחוני "מטעמים הומניטאריים ובמסגרת המאמץ למנוע הידרדרות ביטחונית ברצועת עזה". לטענת המשיבה, עסקינן בשיקול דעת מדיני-ביטחוני מובהק אשר בו אין בית משפט זה נוהג להתערב.

3. לבנו עם העותרים. מי יתן והעותרים וכלל תושבי ישראל לא יידעו עוד ימי טרור ויחיו בשלום ובביטחון.

4. באשר להיבט המשפטי של העתירה, סבורני כי עלינו לדחותה על הסף. מדיניות הלוחמה בטרור והסכמי "תן וקח" שממשלתנו נאלצת, לעתים, לעשות עם אויבינו הם עניינים מבצעיים ופוליטיים מובהקים. כטענת המשיבה, עניינים אלו מצויים בליבת שיקול הדעת המדיני והמבצעי של ממשלת ישראל, ובו אין אנו מתערבים. ראו סעיפים 32, 35 ו-40 לחוק יסוד: הממשלה, וכן בג"ץ 4746/92 G.P.S. Agro Exports L.T.D נ' שר החקלאות, פ"ד מח(5) 243, 256-257 (1993) ובג"ץ 2926/90 בן חיים נ' שר החקלאות, פ"ד מו(4) 622, 625-626 (1992).

5. הכלל הנקוט בידינו בעניינים אלו סוכם על ידי המשנה לנשיא מ' אלון, כדלקמן:

> "בשורה ארוכה של פסיקה שיצאה מלפני בית-משפט זה נקבע, כי הנושא של אופן ניהול מדיניות חוץ על-ידי הגורמים המוסמכים לכך הוא בלתי שפיט, אין הוא ניתן להיבדק על-פי קנה מידה משפטי, ובית-משפט זה לא יתערב בכגון אלה."

ראו בג"ץ 4354/92 תנועת נאמני הר הבית וארץ ישראל נ' ראש הממשלה, פ"ד מז(1) 37, 44 (1993).

כמו כן נזכור את דבריו של השופט י' זמיר בבג"ץ 5167/00 וייס נ' ראש הממשלה, פ"ד נה(2) 455, 479-480 (2001):

> "יש מקרים שבהם הסעד החלופי הוא תביעה בבית-משפט אחר או ערר לבית-דין מסוים, ויש מקרים שבהם הסעד החלופי הוא טיפול בעניין הנדון בממשלה או

בכנסת, לפי מהות העניין. בעניינים כאלה גוף אחר נחשב ראוי ומתאים יותר מבית-המשפט לטיפול בעניין. יחסי החוץ של המדינה הם מאז ומתמיד דוגמה מובהקת לעניין כזה. כך, ככל הידוע, בכל בית-משפט ובכל מדינה".

6. בעניינים כגון זה שבפנינו, ממשלתנו נותנת דין וחשבון לכנסת ולבוחר, ולא לנו. ראו סעיפים 3, 4 ו-28 לחוק יסוד: הממשלה, וכן אמנון רובינשטיין וברק מדינה המשפט הקונסטיטוציוני של מדינת ישראל א 347-359 (מהדורה חמישית מורחבת, 1996). כך הוא אצלנו, וכך הוא גם בגדרי המשפט החוקתי האמריקני. בית המשפט העליון של ארצות הברית קבע זה מכבר שהחלטות פוליטיות של הממשלה בענייני מדיניות חוץ, אין להביא לפתחו:

> "[T]he very nature of executive decisions as to foreign policy is political, not judicial. Such decisions […] are delicate, complex, and involve large elements of prophesy. […] They are decisions of a kind for which the Judiciary has neither aptitude, facilities nor responsibility." Chicago & S. Airlines v. Waterman S.S. Corp., 333 U.S. 103, 111 (1948).

7. העותרים טוענים כי בהתירה את העברת הכספים כאמור מפרה הממשלה שורה של הוראות חוק ובשל כך עלינו להתערב ולאסור זאת. בהקשר זה, מפנים אותנו העותרים לאמור בסעיפים 23 ו-32(ד) לחוק המאבק בטרור, התשע"ו-2016 (להלן: חוק המאבק בטרור), ובסעיף 2(א)(2) לחוק מאבק בארגוני פשיעה, התשס"ג-2003. הוראות חוק אלה מכילות איסורים פליליים האוסרים על מימון ארגוני טרור ופעולות ברכושו, וכן על מתן שירות והעמדת אמצעים לארגוני טרור ופשיעה.

8. טענה זו תלויה על בלימה. טענה דומה נדונה והוכרעה בבג"ץ 1169/09 פורום משפטי למען ארץ ישראל נ' ראש הממשלה (15.6.2009), שעסק בחוק איסור מימון טרור, התשס"ה-2005, אשר הוחלף על ידי חוק המאבק בטרור. השופטת א' פרוקצ'יה, עמה הסכימו הנשיאה ד' ביניש והמשנה לנשיא א' ריבלין, אמרה בנוגע אליה את הדברים הבאים:

> "חוק איסור מימון טרור חל ביסודו על פרטים וארגונים הפועלים ביודעין ברכוש כדי לקדם ביצוע מעשי טרור, לתגמל בעבור ביצועם, או למן פעילות ארגוני טרור תוך פגיעה קשה באינטרסים של הציבור בישראל, בהיבט הפרט והכלל גם יחד. הוא הדין בפעולות ביודעין

ב"רכוש טרור", שיש להן זיקה לטרור, ולארגון טרור. התחקות אחר הרציונל של חוק איסור מימון טרור ודרך ניסוחן של העבירות בסעיפים 8 ו-9 שבו מלמדת כי הוא ביקש לתפוס ברשתו פעולות רכושיות המתבצעות במטרה לתמוך ולחזק את הטרור ואת ארגוני הטרור, ולשכלל את האמצעים הנתונים לרשויות האכיפה במאמציהן להדביר את הטרור הפנימי והעולמי. האיסורים על פעולות ברכוש למטרות טרור (בסעיף 8 לחוק) והאיסור על פעולה ב"רכוש טרור" (סעיף 9 לחוק) מחייבים קיום יסוד נפשי של מודעות כי הפעולות ברכוש נועדו להשיג מטרה של קידום מעשה טרור או מימון פעילות של ארגון טרור. פועל יוצא מכך הוא, כי החוק אינו מכוון, במהותו, לחול על פעולות הממשלה או זרוע מזרועותיה המתבצעות בגדר סמכויותיהן כדין, אשר נועדו לממש מדיניות שעניינה קידום אינטרס הציבור בישראל במובן הרחב, ועמידה בחובתה של ישראל כלפי תושבי האזור במישור ההומניטרי במסגרת המשפט הבינלאומי. פעולה של הממשלה לקידום האינטרס הישראלי עומדת כאנטיתזה לתמיכה ביודעין בארגון טרור או בפעולת טרור, ולא מתקיים בה מרכיב היסוד הנפשי הנדרש בסעיפים 8 ו-9 לחוק. הוא הדין כאשר פעולת הממשלה נועדה לקיים את חובתה כלפי תושבי האזור במישור ההומניטרי. העברות כספים או רכוש אחר המתבצעות במסגרת המדיניות האמורה לא תיחשבנה, על פניהן, אסורות על פי החוק מהטעמים האמורים.

המקרה הנדון בעתירה זו ממחיש את אי התאמתם של סעיפי העבירות בחוק איסור מימון טרור לתשתית העובדתית שנפרשה, ולנסיבות הארוע המתוארות. המדובר בענייננו במתן היתר של ראש הממשלה להעברת כספים השייכים לרשות הפלשתינית, המופקדים בבנקים באיו"ש, דרך ישראל לבנקים בעזה. הכספים מיועדים לתשלום משכורות לעובדי הרשות הפלשתינית המתגוררים בעזה. מתן היתר להעברה מסוג זה על ידי הממשלה או ראש הממשלה אינו נכנס לגדר האיסורים שבחוק, וממילא לא נדרש היתר מיוחד כמשמעותו בסעיף 9(ד) לחוק, אשר נועד להכשיר העברה אסורה של רכוש בנסיבות מיוחדות.

תכליתו של חוק איסור מימון טרור לא נועדה למנוע מישראל העברת רכוש השייך לרשות הפלסטינית מאיו"ש לעזה, כאשר יש בכך כדי לקדם מטרות הומניטאריות שנועדו להבטיח חיים ברמה סבירה ואנושית לתושבים בתחומי איו"ש ורצועת עזה. חשש בעלמא שמא כספים המיועדים למטרה לגיטימית – כתשלום משכורות לעובדים – ישמשו בעקיפין גם למטרות שהחוק ביקש למנוע, אינו מספיק על מנת לשבץ העברת כספים למסגרת האיסורים שבחוק."

ראו שם, פסקאות 16-18 לפסק הדין; ההדגשה הוספה – א.ש.

9. לדברים ברורים אלו, אוסיף כי מדינת ישראל וזרועה העיקרית, ממשלת ישראל, כלל אינן נושאות באחריות פלילית. הפרופסור המנוח ש"ז פלר הטיב להסביר את העיקרון היסודי הזה במלים אלו:

"המדינה היא האירגון הפוליטי של החברה. אין ספק כי היא גוף משפטי ומסוגלת לקיים זכויות משפטיות ולקבל על עצמה חבויות, באשר היא מדינה. בתור שכזאת, האם עשויה המדינה להיות "עושה עבירה", בדומה למצב בו עלול להימצא כל תאגיד כגוף משפטי? תשובה פשוטה לשאלה זו מצויה בהוראת סעיף 42 לפקודת הפרשנות [נוסח חדש], 1954, שזו לשונה: "אין חיקוק בא לגרוע מכל זכות של המדינה, או להטיל עליה חובה, אלא אם נאמר בו במפורש". לא מצינו באף לא דבר חקיקה אחד, הדן בעבירות פליליות, הוראה לפיה ניתן להטיל אחריות פלילית, כחובה לשאת בה עקב ביצוע העבירה, על המדינה. כך שתשובה שלילית לשאלה דלעיל מתחייבת מעצמה. ואם יבוא חיקוק לקבוע אחרת, יהיה הדבר בבחינת חריג להוראת סעיף 42 האמור, וינהגו לגבי העבירה או העבירות המסוימות בהתאם."

ש"ז פלר יסודות בדיני העונשין כרך א 718 (תשמ"ד); ההדגשות הוספו – א' ש'.

10. מטעמים אלו אציע לחבריי כי נדחה עתירה זו ללא צו להוצאות.

ניתן היום, ב' בטבת התשע"ט (9.12.2018).

ש ו פ ט                    ש ו פ ט                    ש ו פ ט