# No. 19-865 (L)
## No. 19-1285 (XAP)

# United States Court of Appeals
### *for the*
# Second Circuit

MOSES STRAUSS, PHILIP STRAUSS, BLUMY STRAUSS, AARON STRAUSS, ROISIE ENGELMAN, JOSEPH STRAUSS, TZVI WEISS, LEIB WEISS, MALKA WEISS, YITZCHK WEISS, YERUCHAIM WEISS, ESTHER DEUTSCH, YEHUDIT NATHANSEN, SHOSHANA NATHANSEN, MATANYA NATHANSEN, FOR THE ESTATE OF THEILLA NATHANSEN,

(*Caption continued on inside cover*)

ON APPEAL AND CROSS-APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF NEW YORK

**BRIEF OF THE INSTITUTE OF INTERNATIONAL BANKERS, EUROPEAN BANKING FEDERATION, AND FRENCH BANKING FEDERATION AS *AMICI CURIAE* IN SUPPORT OF DEFENDANT-APPELLEE-CROSS-APPELLANT**

Andrew J. Pincus
Alex C. Lakatos
Marc R. Cohen
MAYER BROWN LLP
1999 K Street, NW
Washington, DC 20006
(202) 263-3000

*Attorneys for* Amici Curiae

CHANA NATHANSEN, FOR THE ESTATE OF THEILLA NATHANSEN, HEZEKIAL
TOPOROWITCH, PEARL B. TOPOROWITCH, YEHUDA TOPOROWITCH, DAVID
TOPOROWITCH, SHAINA CHAVA NADEL, BLUMY ROM, RIVKA TOPOROWITCH,
EUGENE GOLDSTEIN, LORRAINE GOLDSTEIN, BARBARA GOLDSTEIN INGARDIA,
RICHARD GOLDSTEIN, MICHAEL GOLDSTEIN, CHANA FREEDMAN, HARRY LEONARD
BEER, AS EXECUTOR OF THE ESTATE OF ALAN BEER, ANNA BEER, PHYLLIS MAISEL,
ESTELLE CARROLL, SARRI ANNE SINGER, JUDITH SINGER, ERIC M. SINGER, STEVEN
AVERBACH, JULIE AVERBACH, TAMIR AVERBACH, DEVIR AVERBACH, SEAN
AVERBACH, ADAM AVERBACH, DAVID AVERBACH, MAIDA AVERBACH, MICHAEL
AVERBACH, EILEEN SAPADIN, DANIEL ROZENSTEIN, JULIA ROZENSTEIN SCHON,
JACOB STEINMETZ, DEBORAH STEINMETZ, AMICHAI STEINMETZ, NAVA STEINMETZ,
ORIT STEINMETZ, NATANEL STEINMETZ, ROBERT L. COULTER, SR., FOR THE ESTATE
OF JANIS RUTH COULTER, DIANNE COULTER MILLER, ROBERT L COULTER, JR.,
LARRY CARTER, AS THE ADMINISTRATOR OF THE ESTATE OF DIANE LESLIE CARTER,
SHAUN COFFEL, RICHARD BLUTSTEIN, KATHERINE BAKER, FOR THE ESTATE OF
BENJAMIN BLUTSTEIN, REBEKAH BLUTSTEIN, NEVENKA GRITZ, FOR THE ESTATE OF
DAVID GRITZ, JACQUELINE CHAMBERS, AS THE ADMINISTRATOR OF THE ESTATE OF
ESTHER BABLAR, LEVANA COHEN HAROOCH, GRETA GELER, AS THE ADMINISTRATOR
OF THE ESTATE OF HANNAH ROGEN, TEMIMA SPETNER GOULD, JASON
KIRSCHENBAUM, ISABELLE KIRSCHENBAUM, MARTIN KIRSCHENBAUM, JOSHUA
KIRSCHENBAUM, SHOSHANA BURGETT, DAVID KIRSHENBAUM, DANIELLE
TEITELBAUM, CHAYA MILLER, ARIE MILLER, ALTEA STEINHERZ, JONATHAN
STEINHERZ, BENNETT FINER, AS LEGAL GUARDIAN FOR CHANA NACHENBERG, PAULA
FINER, AS LEGAL GUARDIAN FOR CHANA NACHENBERG, DAVID NACHENBERG, SARA
NACHENBERG, BENNETT FINER, PAULA FINER, ZEV FINER, SHOSHANA FINER OHANA,
MINA DORA GREEN, HOWARD M. GREEN, STEVEN GREENBAUM, FOR THE ESTATE OF
JUDITH GREENBAUM, ALAN HAYMAN, SHIRLEE HAYMAN, DAVID DANZIG, REBECCA
DANZIG, NEIL DANZIG, HAYYIM DANZIG, SARAH DANZIG, CLARA BEN-ZAKEN
LASER, NETANEL HERSKOVITZ, MARTIN HERSKOVITZ, PEARL HERSKOVITZ, YAAKOV
HERSKOVITZ, JOSHUA FAUDEM, ZOHAR FATER, BRUCE MAZER, ORLY ROM, RICHARD
COFFEY, GAL GANZMAN, JUDITH BUCHMAN-ZIV, ORA COHEN, DANIEL COHEN,
MERAV COHEN, SHIRA COHEN, ORLY COHEN, EYAL NOKED, A.N., A MINOR,
BINYAMIN ELKANA NOKED, ESTHER ROZENSTEIN, JULIE AVERBACH, FOR THE ESTATE
OF STEVEN AVERBACH, EINAT NOKED, FOR THE ESTATE OF EYAL NOKED, MICHAL
HONICKMAN, NEIL DANZIG, FOR THE ESTATE OF REBECCA DANZIG, BARUCH YEHUDA
ZIV BRILL, ELI COHEN, YEHUDA AGABABA, JACOB STEINMETZ, FOR THE ESTATE OF
AMIC STEINMETZ, DEBORAH STEINMETZ, FOR THE ESTATE OF AMIC STEINMETZ,
AKIVA ANACHOVICH, MENACHE AGABABA, FAIGA ZVIA LIEBERMAN, ELIEZER
GOLDBERG, ISABELLE KIRSCHENBAUM, FOR THE ESTATE OF MARTIN
KIRSCHENBAUM, AVISHAG NOKED, ESTHER GOLDBERG, CHAYA BEILI, KAREN

GOLDBERG, ROBERT SINGER, EINAT NOKED, E.N.C., A MINOR, NETA NECHAMA COHEN, GILA ALUF, DAVID GOLDSTEIN, BARUCH ZURI NOKED, T.Y.G., A MINOR, GRETA GELER, ILANA EROPA DORFMAN, REFAEL KITSIS AN ROGEN, SARAH ELYAKIM, NEVENKA GRITZ, FOR THE ESTATE OF NORMAN GRITZ, YITZHAK GOLDBERG, MINA DORA GREEN, FOR THE ESTATE OF HOWARD GREEN, T.N., A MINOR, NILLY CHOMAN, SHOSHANA GOLDBERG, Y.M.G., A MINOR, YEHEZKEL AGABABA, MAIDA AVERBACH, FOR THE ESTATE OF DAVID AVERBACH, MICHAL HONICKMAN, FOR THE ESTATE OF HOWARD GOLDSTEIN, ALEXANDER ROZENSTEIN, CHANA WEISS, BERNICE WOLF, FOR THE ESTATE OF DEBRA RUTH HOROVITZ AND THE ESTATE OF ELI NATAN HOROVITZ, ARI HOROVITZ, BATSHEVA HOROVITZ, DAVID HOROVITZ, LEAH HOROVITZ, MOSHE HOROVITZ, NECHAMA HOROVITZ, SHULAMITE HOROVITZ, TOVI HOROVITZ, TVI HOROVITZ, URI HOROVITZ, BRYAN WOLF, STANLEY WOLF, AVERHAM GROSSMAN, DEVORAH CHECHANOW LEIFER, JOSEPH LEIFER, BRACHA MILSTEIN, SHIFRA MILLER, CHAYA ROSENBERG, ABRAHAM WAXLER, ARTHUR WAXLER, BARUCH WAXLER, CHANA WAXLER, DINA WAXLER, EZEKIAL WAXLER, GEDALIA WAXLER, HAGGI WAXLER, NACHUM WAXLER, OBADIAH WAXLER, YAAKOV WAXLER, YOEL WAXLER, ZACHARIA WAXLER, NETHANIEL BLUTH, ESTATE OF FORUK NAIMI, MOSHE NAIMI, FAYE CHANA BENJAMINSON, THE ESTATE OF MOSHE GOTTLIEB, SEYMOUR GOTTLIEB, SHEILA GOTTLIEB, PHILIP LITLE, FOR THE ESTATE OF ABIGAIL LITLE, ELISHUA LITLE, HANNAH LITLE, HEIDI LITLE, JOSIAH LITLE, NOAH LITLE, FRAN STRAUSS BAXTER, WILLIAM J. BAXTER, ARIELA FREIRMARK, MENACHEM FREIRMACK, HADASSAH FREIMARK, PHYLLIS PAM, RIVKA REENA PAM, SHOSHANA TITA, EZRA TITA, EPHRAIM TITA, FOR THE ESTATE OF BERTIN TITA, RACHEL POTOLSKI, OVADIA TOPPOROWITCH, YISRAEL TOPPOROWITCH, YITZCHAK TOPPOROWITCH, MIRIAM EHRENFELD, MENDY REINITZ, MIRIAM REINITZ, RIVKA REINITZ, SAMUEL REINITZ, SHMUEL REINITZ, YAKOV REINITZ, ESTATE OF YISSOCHER DOV REINITZ, YITZCHOK REINITZ, RAIZEL SHIMON LEAH TAUBER, HELEN WEIDER, AVROHOM D. RICHTER, BREINA RICHTER, MIRIAM LEAH RICHTER, MOSHE RICHTER, NECHAMA RICHTER, SARA MALKA RICHTER, SHLOMO CHAIM RICHTER, TRANNE RICHTER, YAKOV YOSEF RICHTER, THE ESTATE OF MORDECHAI REINITZ, YECHIEL RICHTER, YEHUDIS RICHTER, YISROEL RICHTER, YITZCHOK RICHTER, PERL BRAILOFSKY, MALKY BREUER, ESTER BUXBAUM, GITTLE COHEN, CHAYA FREISEL, RACHEL ROSNER, ELIZABETH SCHWARTZ, JACOB SCHWARTZ, MAX SCHWARTZ, MICHAEL SCHWARTZ, PHILLIP SCHWARTZ, ABRAHAM ZARKOWSKY, ARON ZARKOWSKY, BSHAVA ZARKOWSKY, MENDEL ZARKOWSKY, FOR THE ESTATE OF ELI ZARKOWSKY, EZRIEL ZARKOWSKY, GITTEL ZARKOWSKY, MENDEL ZARKOWSKY, FOR THE ESTATE OF GOLDIE ZARKOWSKY, JOSEPH ZARKOWKSY, MENDEL ZARKOWSKY, MIRIAM ZARKOWSKY, SHRAGE ZARKOWSKY, TRANY ZARKOWSKY, YEHUDA ZARKOWSKY, NATAN APPLEBAUM, FOR THE ESTATE OF DAVID APPLEBAUM, DEBRA APPLEBAUM, THE ESTATE OF JACQUELINE

APPLEBAUM, NATAN APPLEBAUM, FOR THE ESTATE OF NAAVA APPLEBAUM, SHIRA APPLEBAUM, YITZCHAK APPLEBAUM, SHAYNA APPLEBAUM, TOVI BELLE APPLEBAUM, GEELA APPLEBAUM GORDON, CHAYA TZIPORAH COHEN, ERIK SCHECTER, SHLOMO TRATNER, ESTATE OF TIFERET TRATNER,

*Plaintiffs-Appellants-Cross-Appellees,*

GLORIA KUSHHER, NETANEL MILLER, TEHILA TOPPOROWITCH,

*Plaintiffs,*

– v. –

CRÉDIT LYONNAIS, S.A.,

*Defendant-Appellee-Cross-Appellant.*

## CORPORATE DISCLOSURE STATEMENT

None of the *amici curiae* has a parent corporation. No publicly held corporation owns 10 percent or more of the stock of any of the *amici*.

# TABLE OF CONTENTS

**Page**

STATEMENT OF INTEREST ................................................................. 1

SUMMARY OF ARGUMENT ................................................................ 3

ARGUMENT ........................................................................................ 6

I.     THE NUMBER OF UNJUSTIFIED ATA CLAIMS HAS INCREASED DRAMATICALLY IN RECENT YEARS ............................. 6

II.    THE DISTRICT COURT LACKED PERSONAL JURISDICTION OVER CRÉDIT LYONNAIS. ................................................. 9

    A.    Correspondent Banking ........................................................ 12

    B.    Isolated Correspondent Transfers Are Not Sufficiently Related To Plaintiffs' Claims To Support Specific Jurisdiction ...................... 15

    C.    Specific Personal Jurisdiction Based On Isolated Correspondent Transfers Would Be Unreasonable. .................................... 19

III.   PLAINTIFFS' ATA CLAIMS FAIL AS A MATTER OF LAW. ............... 21

    A.    Primary Liability. ................................................................ 21

    B.    Secondary Liability. ............................................................. 25

IV.   PLAINTIFFS' EXPANSIVE INTERPRETATION OF THE ATA WILL UNDERMINE INTERNATIONAL FINANCE AND TRADE. ....... 28

CONCLUSION ..................................................................................... 31

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Asahi Metal Indus. Co. v. Super. Ct. of Cal.*,
   480 U.S. 102 (1987)...........................................................................10

*Banque Worms v. BankAmerica Int'l*,
   77 N.Y.2d 362 (1991) ......................................................................12

*Bristol-Myers Squibb Co. v. Super. Ct. of Cal.*,
   137 S. Ct. 1773 (2017)......................................................9, 11, 18, 19

*Brown v. Lockheed Martin Corp.*,
   814 F.3d 619 (2d Cir. 2016) ............................................................11

*Daimler AG v. Bauman*,
   571 U.S. 117 (2014)...................................................................*passim*

*Fields v. Twitter, Inc.*,
   881 F.3d 739 (9th Cir. 2018) .......................................................7, 25

*Freeman v. HSBC Holdings PLC*,
   2019 WL 4452364 (E.D.N.Y. Sept. 16, 2019) ..................................6

*Gucci Am., Inc. v. Weixing Li*,
   768 F.3d 122 (2d Cir. 2014) ............................................................10

*Halberstam v. Welch*,
   705 F.2d 472 (D.C. Cir. 1983)...........................................26, 27, 28

*Harrison v. Republic of Sudan*,
   838 F.3d 86 (2d Cir. 2016) ..............................................................22

*Holder v. Humanitarian Law Project*,
   561 U.S. 1 (2010)..............................................................................26

*Jesner v. Arab Bank*,
   138 S. Ct. 1386 (2018).................................................................8, 21

## TABLE OF AUTHORITIES
### (continued)

Page(s)

*Kaplan v. Al Jazeera*,
    2011 WL 2314783 (S.D.N.Y. June 7, 2011) ........................................................7

*Kemper v. Deutsche Bank AG*,
    911 F.3d 383 (7th Cir. 2018) .................................................................6, 23

*Kiobel v. Royal Dutch Petroleum Co.*,
    569 U.S. 108 (2013)..............................................................................8

*Leibovitch v. Islamic Republic of Iran*,
    188 F. Supp. 3d 734 (N.D. Ill. 2016)..............................................................11

*In re Libor-Based Fin. Instruments Antitrust Litig.*,
    2015 WL 4634541 (S.D.N.Y. Aug. 4, 2015).....................................................16

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*,
    732 F.3d 161 (2d Cir. 2013) ..............................................................16, 17, 18

*Linde v. Arab Bank, PLC*,
    882 F.3d 314 (2d Cir. 2018) ...........................................................*passim*

*Mashreqbank PSC v. Ahmed Hamad Al Gosaibi & Bros. Co.*,
    23 N.Y.3d 129 (2014)...........................................................................12

*In re NY Agency of Bank of Commerce & Credit Int'l*,
    90 N.Y.2d 410 (1997)...........................................................................13

*O'Sullivan v. Deutsche Bank AG*,
    2019 WL 1409446 (S.D.N.Y. Mar. 28, 2019)....................................................6

*Owens v. BNP Paribas, S.A.*,
    897 F.3d 266 (D.C. Cir. 2018)..................................................................6

*Powell v. Ocwen Fin. Corp.*,
    2019 WL 1227939 (S.D.N.Y. Mar. 15, 2019)...................................................10

*Rothstein v. UBS AG*,
    708 F.3d 82 (2d Cir. 2013) .............................................................*passim*

iv

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Sedima, S.P.R.L. v. Imrex Co., Inc.*,
   473 U.S. 479 (1985)............................................................................21

*Shipping Corp. of India, Ltd. v. Jaldhi Overseas Pte.*,
   585 F.3d 58 (2d Cir. 2009) ................................................................19

*Siegel v. HSBC Bank USA, N.A.*,
   2018 WL 3611967 (S.D.N.Y. July 27, 2018)....................................26

*Siegel v. HSBC N. Am. Holdings Inc.*,
   933 F.3d 217 (2d Cir. 2019) .......................................................*passim*

*Sigmoil Res., N.V. v. Pan Ocean Oil Corp. (Nigeria)*,
   234 A.D.2d 103 (1st Dep't 1996) ...............................................13, 14

*Sosa v. Alvarez-Machain*,
   542 U.S. 692 (2004)..............................................................................8

*SPV Osus Ltd. v. UBS AG*,
   882 F.3d 333 (2d Cir. 2018) .................................................10, 15, 16

*Strauss v. Crédit Lyonnais, SA*,
   175 F. Supp. 3d 3 (E.D.N.Y. 2016) ...........................................*passim*

*Strauss v. Crédit Lyonnais, S.A.*,
   379 F. Supp. 3d 148 (E.D.N.Y. 2019) ...............................................23

*In re Terrorist Attacks on Sept. 11, 2001*,
   714 F.3d 118 (2d Cir. 2013) .........................................................16, 24

*United States v. Davidson*,
   175 F. App'x 399 (2d Cir. 2006) ......................................................14

*Weiss v. Nat'l Westminster Bank PLC*,
   768 F.3d 202 (2d Cir. 2014) ..............................................................24

**Statutes**

18 U.S.C. § 2332f..................................................................................3

18 U.S.C. § 2333(a) .......................................................................21, 23

v

## TABLE OF AUTHORITIES
### (continued)

Page(s)

18 U.S.C. § 2333(d) ....................................................................1, 25

18 U.S.C. § 2339B ................................................................3, 22, 26

**Other Authorities**

Black's Law Dictionary (10th ed. 2014) ........................................23

Brief for the United States as Amicus Curiae, *Arab Bank, PLC v.
    Linde*, 2014 WL 2191224 (U.S. May 23, 2014)........................20

Committee on Payments and Market Infrastructures, Bank of
    International Settlements, *Consultative Report, Correspondent
    Banking* at 7 (Oct. 2015), https://tinyurl.com/y3kplhc3 ..................13

CHIPS, *Annual Statistics from 1970 to 2017*,
    https://www.theclearinghouse.org//-media/
    tch/pay%20co/chips/reports%20and
    %20guides/chips%20volume%20through%20july%
    202017.pdf?la=en (last visited Sept. 24, 2019) ......................12

David S. Cohen, Under Sec'y, U.S. Dep't of the Treasury, Remarks at
    ABA/ABA Money Laundering Enforcement Conference (Nov. 10,
    2014), https://www.treasury.gov/press-center/press-releases/
    Pages/jl2692.aspx ..................................................................24

Financial Action Task Force, *FATF takes action to tackle de-risking*
    (Oct. 23, 2015), https://tinyurl.com/yyot5v83 ......................29

*Role of U.S. Correspondent Banking in International Money
    Laundering: Hearings Before the Permanent Subcomm. on
    Investigations of the S. Comm. on Gov't Affairs,* 107th Cong.
    (2001) ..................................................................................15

Remarks by Thomas J. Curry, Comptroller of the Currency, Before
    the Institute of International Bankers (Mar. 7, 2016),
    https://www.occ.treas.gov/news-issuances/speeches/2016/pub-
    speech-2016-25.pdf ..................................................................29

**TABLE OF AUTHORITIES**
**(continued)**

Page(s)

Staff of House of Representatives Task Force to Investigate Terrorism
Financing, 114th Cong., *Stopping Terror Finance: Securing the
U.S. Financial Sector* (2016) ..............................................................................29

Stuart Gordon & Sherin El Taraboulsi-McCarthy, Humanitarian
Policy Group, *Counter-terrorism, bank de-risking and
humanitarian-response: a path forward* (Aug. 2018),
https://tinyurl.com/y5c4u9ho..............................................................................30

Tracey Durner & Liat Shetret, Global Center on Cooperative
Security/Oxfam, *Understanding Bank De-Risking and its Effects
on Financial Inclusion* (2015), https://tinyurl.com/y3r99hdn............................29

U.S. Chamber Institute for Legal Reform, Federal Cases from Foreign
Places (Oct. 2014), https://tinyurl.com/y5p7d7rh ................................................7

U.S. Dep't of the Treasury, Financial Crimes Enforcement Network,
*Feasibility of a Cross-Border Electronic Funds Transfer Reporting
System Under the Bank Secrecy Act* (Oct. 2006),
https://tinyurl.com/y3zcc93c...............................................................................14

Yaya Fanusie & Landon Heid, *What ISIS Is Banking On*, Forbes (June
17, 2016), https://tinyurl.com/y487gp9w ...........................................................30

## STATEMENT OF INTEREST[1]

The Institute of International Bankers ("IIB"), based in New York, is the only national association devoted exclusively to representing and advancing the interests of banks headquartered outside the United States that operate within the U.S. The IIB's membership consists of approximately 90 banking and financial institutions from over 35 countries; none is incorporated or headquartered in this country. In the aggregate, IIB members' U.S. operations have approximately $5 trillion in U.S. banking and non-banking assets, provide approximately 25 percent of all commercial and industrial bank loans made in this country, and have over 20,000 full-time employees in the U.S.

The IIB regularly appears before this and other federal courts as *amicus curiae* in cases raising significant legal issues relating to international banking, including the appropriate scope of the Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2333, as amended by the Justice Against Sponsors of Terrorism Act ("JASTA"), codified at 18 U.S.C. § 2333(d)—for example, *Siegel v. HSBC North America Holdings Inc.*, 933 F.3d 217 (2d Cir. 2019); *Linde v. Arab Bank, PLC,* 882 F.3d 314 (2d Cir. 2018); *Rothstein v. UBS AG,* 708 F.3d 82 (2d Cir. 2013), and (in the district court) this case.

---

[1]     No party or party's counsel authored this brief in whole or in part or contributed money that was intended to fund preparing or submitting this brief. No person other than the *amici*, their members, or their counsel contributed money to fund the brief's preparation or submission. *See* Fed. R. App. P. 29(a)(4)(E); L.R. 29.1(b).

The European Banking Federation ("EBF") is the leading professional organization of European banks. It provides a forum for European banks to discuss best practices and legislative proposals and to adopt common positions on matters affecting the European banking industry. EBF also actively promotes the positions of the European financial services industry, and the banking industry in particular, in international fora.

The Fédération Bancaire Française ("French Banking Federation" or "FBF") is the professional body that represents commercial, cooperative, and mutual banks operating in France. The FBF's 340 members include French organizations and organizations based in other foreign countries. In France an estimated 23.5 billion payment transactions were processed in 2018. The FBF's mission is to promote the banking and financial industry in France, in Europe, and around the world. It determines the profession's positions and makes proposals to public authorities and economic/financial authorities. The FBF has previously appeared before this Court and other federal courts as an *amicus curiae* in cases involving the ATA, including in this case, *Siegel*, and *Rothstein*.

*Amici* and their members have a substantial interest in the matter now before this Court. *Amici* submit this brief to provide the Court with a broader perspective on ATA litigation and to highlight reasons why the Court should affirm the judgment below that are particularly significant to the international banking community.

2

Federal Rule of Appellate Procedure 29(a) authorizes the filing of this brief because all parties to this appeal have consented.

## SUMMARY OF ARGUMENT

In recent years, banks and other corporate entities have been subjected to a surge of private Anti-Terrorism Act lawsuits seeking damages for injuries allegedly suffered in attacks around the world. *Amici* and their members deplore any terrorist violence. Those who are responsible for terrorist acts—the groups that planned and committed them—should be brought to justice. To that end, federal law criminalizes a broad swath of terrorism-related conduct, such as bombings of places of public use (18 U.S.C. § 2332f) and providing material support to designated foreign terrorist organizations (FTOs) (*id*. § 2339B).

This case does not involve criminal liability, but rather the ATA's civil liability provision, 18 U.S.C. § 2333, which permits any national of the U.S. injured by reason of an act of international terrorism to sue for treble damages in federal court. The ATA sets out detailed requirements that a private plaintiff must plead, and ultimately prove, in order to establish civil liability. These standards are precisely calibrated to ensure that the ATA serves its goals of deterring persons who commit or support acts of terrorism and compensating their victims without chilling legitimate business activity or unjustifiably tarring banks and other entities as "terrorists." The district court carefully considered these requirements and

determined that Plaintiffs had not presented sufficient evidence to meet their burden under 18 U.S.C. § 2333.

As a threshold matter, however, the district court erred by exercising personal jurisdiction over Defendant-Appellee-Cross-Appellant Crédit Lyonnais, S.A. ("Crédit Lyonnais"). It should have dismissed the case because subjecting Crédit Lyonnais to its jurisdiction violated due process. Specifically, due process does not permit the assertion of personal jurisdiction over a foreign bank based upon a handful of isolated wire transfers processed by Crédit Lyonnais outside the U.S. and cleared through a U.S. correspondent account. The district court's contrary conclusion threatens to undermine New York's position as a global financial center by exposing foreign banks—most of which clear U.S. dollar transactions through New York correspondent accounts—to jurisdiction based on contacts that lack a constitutionally-required connection to Plaintiffs' claims.

Turning to the merits, the district court properly granted summary judgment to Crédit Lyonnais. A primary liability claim under the ATA requires plaintiffs to prove (among other things) that a defendant's actions involve violent acts or acts dangerous to human life *and* appear to be intended to intimidate or coerce civilians or a government, and that those actions were the proximate cause of plaintiffs' injuries. A secondary liability claim under the ATA requires plaintiffs to prove that a defendant aided and abetted the commission of terrorist acts by substantially

assisting the primary violator, with the knowledge that, in so doing, the defendant was assuming a role in the primary violator's overall terrorist activities. Ordinary banking services, particularly ones provided to entities that are not themselves the primary terrorist actors, do not satisfy these standards. The district court properly rejected Plaintiffs' efforts to shoehorn these services into the ATA's framework.

Permitting ATA claims to proceed in cases where plaintiffs have not adduced evidence to satisfy the detailed prerequisites for liability would not only violate Congress's carefully considered statutory scheme but also discourage banks from servicing clients with legitimate needs for financial services, including in areas of the world where those services are sorely needed. The threat of treble damages and vast reputational harm may even cause some banks to withdraw from these areas or sectors, especially if non-U.S. banks can be subjected to jurisdiction in New York based on a handful of dollar clearing transactions untethered to plaintiffs' claims. Such "de-risking" forces businesses and individuals to rely on unregulated financial intermediaries, hampers economic growth, and disrupts humanitarian efforts.

It is understandably difficult to hale into U.S. courts the terrorist groups—the truly responsible parties— and force them to provide relief to the victims of terrorism and their families. But that does not justify contravening the ATA's text to mislabel international banks as "terrorists" or ignoring the due process limits on personal jurisdiction. This Court should clarify the due process limitations applicable to ATA

suits and, additionally, affirm that plaintiffs can prove their case only by adducing evidence satisfying each element of the ATA's carefully crafted structure.

**ARGUMENT**

I. **THE NUMBER OF UNJUSTIFIED ATA CLAIMS HAS INCREASED DRAMATICALLY IN RECENT YEARS.**

Private ATA lawsuits targeting legitimate companies have grown increasingly common. The statute was enacted in 1992, but recent years have seen a dramatic increase in the number and types of filings against banks and other legitimate businesses.

Numerous cases, many in this Circuit, have been filed against transnational banks and financial services companies asserting claims similar to those advanced in this case. Courts have dismissed most of these suits for, among other things, failure to plausibly allege proximate causation and the *mens rea* required for primary or secondary liability claims. *E.g.*, *Siegel v. HSBC N. Am. Holdings Inc.*, 933 F.3d 217 (2d Cir. 2019); *Kemper v. Deutsche Bank AG*, 911 F.3d 383, 390 (7th Cir. 2018); *Owens v. BNP Paribas, S.A.*, 897 F.3d 266 (D.C. Cir. 2018); *Rothstein v. UBS AG*, 708 F.3d 82, 91-92 (2nd Cir. 2013); *Freeman v. HSBC Holdings PLC*, 2019 WL 4452364 (E.D.N.Y. Sept. 16, 2019); *O'Sullivan v. Deutsche Bank AG*, 2019 WL 1409446 (S.D.N.Y. Mar. 28, 2019).

But banks are not the only target. Increasingly, ATA suits are being brought against other types of businesses, such as technology firms[2], media companies[3], and pharmaceutical companies.[4]

The increase in ATA filings parallels the decline in claims under the Alien Tort Statute, 28 U.SC. § 1350 ("ATS"), resulting from a series of Supreme Court decisions curtailing the scope of ATS claims. Beginning in the 1990s, plaintiffs' lawyers used ATS actions to assert substantial damages claims against transnational corporations based on alleged human rights abuses. One report found 150 such lawsuits filed against companies "in practically every industry sector" for business activities "in over sixty countries." U.S. Chamber Institute for Legal Reform, Federal Cases from Foreign Places 23 (Oct. 2014), https://tinyurl.com/y5p7d7rh.

---

[2]     *E.g.*, *Fields v. Twitter, Inc.*, 881 F.3d 739 (9th Cir. 2018) (dismissing claims that Twitter knowingly provided material support to ISIS in the form of Twitter accounts and direct messaging-services).

[3]     *E.g., Kaplan v. Al Jazeera*, 2011 WL 2314783, at *6 (S.D.N.Y. June 7, 2011) (holding that plaintiffs' suggestion that broadcasting news reflects an intent to see terrorist attacks succeed "strains credulity").

[4]     *E.g., Atchley v. AstraZeneca UK Ltd., Inc.*, No. 1:17-cv-02136 (D.D.C. filed Oct. 17, 2017) (alleging that five groups of pharmaceutical companies are liable for downstream acts of terrorism based on their doing business with post-war, U.S.-funded Iraqi ministry of health, including defendants' provision of life saving medicines and medical equipment to the Iraqi ministry of health that—through looting and black-market sales—yielded cash that terrorists then used to help fund attacks on U.S. forces).

ATS cases were attractive to plaintiffs' lawyers because they provided a vehicle for labeling legitimate companies as "human rights violators" or "international law violators" and—through elaborate causation arguments, secondary liability claims, or both—tying those companies to horrific events in foreign nations, such as murders of civilians by government forces or claims of forced labor or slavery. Because the claimed injuries were inflicted outside the U.S., typically in areas facing civil strife, discovery was almost always difficult and extremely expensive. The combination of vague international law standards and the reputational damage from association with human rights abuses resulted in enormous settlement pressure.

Beginning in 2004, however, a series of Supreme Court rulings limited plaintiffs' lawyers' ability to bring expansive claims under the ATS. *Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004), held that courts could only recognize ATS claims analogous to the "historical paradigms" familiar when the statute was enacted— piracy, assaults on ambassadors, and violations of safe conduct. *Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108 (2013), held that the ATS did not apply extraterritorially. Last year, the Supreme Court again limited the scope of the ATS liability, holding that the ATS does not extend to non-U.S. corporations. *Jesner v. Arab Bank*, 138 S. Ct. 1386 (2018).

ATA claims have many of the same characteristics as ATS claims: the bank or business defendant is labeled a "terrorist" or "supporter of terrorism"; and the harm occurred primarily outside the U.S., almost always in a conflict zone. Lawyers seeking to bring large damages actions against global businesses have had little difficulty finding ways to package similar types of claims as "terrorism," as the cases discussed above demonstrate. If history is any guide, *Jesner*'s further narrowing of the ATS avenue will serve only to divert more litigation traffic toward dubious theories of ATA liability.

## II. THE DISTRICT COURT LACKED PERSONAL JURISDICTION OVER CRÉDIT LYONNAIS.

Courts exercise two types of personal jurisdiction: general and specific. *Bristol-Myers Squibb Co. v. Super. Ct. of Cal.*, 137 S. Ct. 1773, 1780 (2017) ("*BMS*"). The exercise of jurisdiction must satisfy both due process and the long-arm statute of the state in which the federal court sits. *Daimler AG v. Bauman*, 571 U.S. 117, 125 (2014).

Under the Due Process clause, a corporation is subject to general jurisdiction only where it is "fairly regarded as at home," which is almost exclusively in its place of incorporation or principal place of business. *BMS*, 137 S. Ct. at 1780.

In contrast, a defendant is subject to specific jurisdiction only if there is "an 'affiliation between the forum and the underlying controversy, principally, [an] activity or an occurrence [by the defendant] that takes place in" the forum. *Id*. Where

9

a defendant has "only limited" suit-related contacts with the forum, the defendant "will be subject to suit in that state only if the plaintiff's injury was proximately caused by those contacts." *SPV Osus Ltd. v. UBS AG*, 882 F.3d 333, 344 (2d Cir. 2018). Further, the exercise of jurisdiction in a particular case, particularly over a non-U.S. defendant, must be reasonable. *Asahi Metal Indus. Co. v. Super. Ct. of Cal.*, 480 U.S. 102, 115 (1987).[5]

Prior to the Supreme Court's 2014 decision in *Daimler*, Second Circuit precedent provided for the exercise of general jurisdiction over a foreign corporation "doing business through a local branch office in the forum." *Gucci Am., Inc. v. Weixing Li*, 768 F.3d 122, 135 (2d Cir. 2014). This meant that New York courts could—and did—exercise personal jurisdiction over banks for conduct that had nothing to do with New York, inviting plaintiffs' lawyers to bring sweeping and overreaching claims, like those under the ATS and ATA.

That precedent provided the basis for personal jurisdiction over Crédit Lyonnais when this suit was filed in 2006, but—following *Daimler*—the district

---

[5] This Court has not yet decided whether the relevant contacts under the ATA are with the forum State or the United States generally. *See Powell v. Ocwen Fin. Corp.*, 2019 WL 1227939, at *7 (S.D.N.Y. Mar. 15, 2019). There is no need decide here because, as the district court observed, "essentially all of the contacts relevant to the Court's due process inquiry involve Defendant's conduct in New York." *Strauss v. Crédit Lyonnais, SA*, 175 F. Supp. 3d 3, 28 (E.D.N.Y. 2016) ("*Strauss III*").

court recognized that it could not assert general jurisdiction over Crédit Lyonnais. *Strauss III*, 175 F. Supp. 3d at 18.

The district court nonetheless erred by replacing general jurisdiction with an over-expansive theory of *specific* jurisdiction. The district court concluded that it could exercise specific jurisdiction over Crédit Lyonnais based on five wire transfers initiated by a nonparty outside the U.S., processed by Crédit Lyonnais in France, and that cleared through a correspondent account at Crédit Lyonnais's New York branch—even though the clearing of those five wire transfers in New York did not give rise to Plaintiffs' claims.

This jurisdictional theory is part of a broader pivot by plaintiffs' lawyers seeking to replace the general jurisdiction decisions overturned by *Daimler* with alternative and extremely expansive theories. *E.g.*, *Brown v. Lockheed Martin Corp.*, 814 F.3d 619 (2d Cir. 2016) (rejecting theory that foreign corporation consented to general jurisdiction under Connecticut's registration and appointment statute); *Leibovitch v. Islamic Republic of Iran*, 188 F. Supp. 3d 734, 748-50 (N.D. Ill. 2016), *aff'd*, 852 F.3d 687 (7th Cir. 2017) (rejecting plaintiffs' similar consent-based argument). The Supreme Court recently rejected another such expansive specific jurisdiction theory in *BMS*. *See* 137 S. Ct. at 1781.

This case provides the Court with an opportunity to assess wire transfer-based personal jurisdiction, and to make clear that—no matter the reach of New York's

11

long-arm statute—the isolated use of correspondent banking accounts provides a basis for specific personal jurisdiction consistent with due process only when the plaintiff's claim arises out of the correspondent banking activity.

## A. Correspondent Banking.

Dollar-denominated payments, wherever they originate and wherever their ultimate destination, generally "clear" in the United States, through a U.S. bank. *Banque Worms v. BankAmerica Int'l*, 77 N.Y.2d 362, 370 (1991). If, for example, the customer of a British bank wishes to process a dollar-denominated transfer to the customer of another British bank, even one located on the same street corner in London, the transfer ordinarily must clear through the United States.

Large-value interbank payments are typically cleared through one of two payment systems in the United States: the Fedwire Funds Service and the Clearing House Inter-Bank Payments System ("CHIPS"). Almost "all wholesale international transactions involving the use of the dollar go through CHIPS." *Mashreqbank PSC v. Ahmed Hamad Al Gosaibi & Bros. Co.*, 23 N.Y.3d 129, 137 (2014). On an average day, CHIPS processes over 440,000 "payment messages" worth an aggregate of $1.5 trillion.[6] The CHIPS system is also used as an indirect conduit for "95% of all

---

[6]    CHIPS, *Annual Statistics from 1970 to 2017*, https://www.theclearinghouse.org/-/media/tch/pay%20co/chips/reports%20and %20guides/chips%20volume%20through%20july%202017.pdf?la=en (last visited Sept. 24, 2019).

international dollar transfers." *In re NY Agency of Bank of Commerce & Credit Int'l*, 90 N.Y.2d 410, 416 n.2 (1997). By design, all CHIPS (as well as Fedwire) payments are transmitted between participant institutions in the United States.

Non-U.S. banks, like *amici*'s members, access CHIPS or Fedwire through correspondent bank accounts, which are "accounts in domestic [U.S.] banks held in the name of the foreign financial institutions." *Sigmoil Res., N.V. v. Pan Ocean Oil Corp. (Nigeria)*, 234 A.D.2d 103, 104 (1st Dep't 1996). When a non-U.S. originating customer (*e.g.*, the customer of a non-U.S. bank) wishes to transfer dollars to a recipient/beneficiary with an account at a non-U.S. bank, the originating customer's non-U.S. bank will instruct its U.S. correspondent bank to transfer money (*e.g.*, via Fedwire or CHIPS) to the U.S. bank where the recipient/beneficiary's non-U.S. bank has a correspondent account. Importantly, "[n]either the originator who initiates payment nor the beneficiary who receives it holds title to the funds in the account at the correspondent bank." *Id*. Thus, monies will move between two U.S. correspondent accounts for the two non-U.S. banks (the bank of the originator and the bank of the recipient). The non-U.S. banks then adjust the book entries for their respective customers to reflect the transfer that occurred in the United States.[7]

---

[7]    Committee on Payments and Market Infrastructures, Bank of International Settlements, *Consultative Report, Correspondent Banking* at 7 (Oct. 2015), https://tinyurl.com/y3kplhc3.

"[A] relatively small number of major money center banks"—largely based in New York for U.S. dollar transfers—"specialize in facilitating international funds transfers through their network of correspondent relationships, and thus form a key link in the vast majority of all international funds transfers." U.S. Dep't of the Treasury, Financial Crimes Enforcement Network, *Feasibility of a Cross-Border Electronic Funds Transfer Reporting System Under the Bank Secrecy Act* (Oct. 2006), App. D, at p. 57, https://tinyurl.com/y3zcc93c; *see also Sigmoil*, 234 A.D.2d at 104 ("New York banks play an important role" in the "entire system of correspondent banking").

Many U.S. offices of non-U.S. banks also are significant players in U.S. dollar clearing, and clear dollar transfers for third party non-U.S. banks as well as for their non-U.S. affiliates. This clearing process functions identically to U.S. domestic bank clearers. Accordingly, non-U.S. banks, like Crédit Lyonnais during the period relevant to this case, that clear through their U.S. branches operate in the same manner as those that use other U.S. clearing banks.

Without correspondent banking, "it would often be impossible for banks to provide comprehensive nationwide and international banking services—among them, the vital capability to transfer money by wire with amazing speed and accuracy across international boundaries.'" *United States v. Davidson*, 175 F. App'x 399, 401 n. 2 (2d Cir. 2006) (summary order) (quoting *Role of U.S. Correspondent Banking*

*in International Money Laundering: Hearings Before the Permanent Subcomm. on Investigations of the S. Comm. on Gov't Affairs,* 107th Cong. 1-2 (2001) (opening remarks of Senator Susan M. Collins)). Correspondent banking is particularly important to New York, because the City is the home of many of the world's leading banks that are central to the correspondent banking network.

### B. Isolated Correspondent Transfers Are Not Sufficiently Related To Plaintiffs' Claims To Support Specific Jurisdiction.

Plaintiffs' claims are based on wires initiated by Crédit Lyonnais's French customer, Le Comité de Bienfaisance et de Secours aux Palestiniens (CBSP), to charities that Plaintiffs allege were affiliated with Hamas. The vast majority of this activity occurred outside the United States. To support the exercise of personal jurisdiction, Plaintiffs rely on five dollar-denominated transactions that were initiated outside the U.S. but cleared by Crédit Lyonnais's New York branch between 1997 and 2001. *Strauss III*, 175 F. Supp. 3d at 20. Based on this slender reed, Plaintiffs seek to establish jurisdiction over Crédit Lyonnais for 19 attacks that occurred between 2001 and 2004.

In *SPV Osus*, this Court held that personal jurisdiction requires a causal link between the plaintiff's injuries and the defendant's suit-related contacts in the forum. 882 F.3d at 344. Under this sliding-scale approach, a plaintiff must show that the defendant's contacts proximately caused the plaintiff's injuries. *Id*. This rigorous standard is relaxed to "but-for" causation if the defendant's forum contacts are "more

substantial." *Id.*; *In re Libor-Based Fin. Instruments Antitrust Litig.*, 2015 WL 4634541, at *23 (S.D.N.Y. Aug. 4, 2015). Plaintiffs cannot show that the transfers processed through New York were the but-for cause of the attacks, let alone the proximate cause.

One of the five transfers occurred in 1997, years before any of the terror attacks underlying Plaintiffs' claims. There simply is no basis for concluding that Plaintiffs' injuries arose from that transaction. *Cf. Siegel*, 933 F.3d at 224-25 (no liability under JASTA where bank ceased to do business with alleged terrorist financer 10 months before any attack).

The other four transfers occurred in June and July 2001. *Strauss III*, 175 F. Supp. 3d at 20. But as this Court has held, allegations that a bank processed wires to "purported charity organizations known to support terrorism that, in turn, provided funding to al Qaeda and other terrorist organizations" are "insufficient for proximate causation purposes." *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 118, 124 (2d Cir. 2013). Nor can Plaintiffs show that the processing of a small number of dollar-denominated transfers was a but-for cause of any attacks. The connections between the New York transfers and Plaintiffs' claims are "too tenuous to support the exercise of specific jurisdiction." *SPV Osus*, 882 F.3d at 344.

This Court's decision in *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161 (2d Cir. 2013) ("*Licci III*"), is not to the contrary. In *Licci III*, the court

16

held that the Lebanese bank defendant was subject to jurisdiction in New York based on its alleged (1) "repeated, intentional execution" of "dozens" of U.S.-dollar-denominated wire transfers totaling "millions of dollars," *id.* at 165-66, 171; (2) "for an account [at the Lebanese bank] held by the Shahid (Martyrs) Foundation … which is a 'financial arm' of Hizballah," *id.* at 166; (3) "to further Hizballah's terrorist goals," with the Lebanese bank "knowing that such wire transfers would enable Hizballah 'to plan, to prepare for and to carry out terrorist attacks,'" *id.* at 166-67, 171; and (4) in the absence of any relevant non-U.S. transactions processed by the Lebanese bank, *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, No. 1:08-cv-07253-GBD, ECF No. 23, ¶¶ 53-54.

None of these factors is present here. First, Crédit Lyonnais effectuated five wire transfers through its New York branch, totaling $200,000, not dozens of transfers totaling millions of dollars. *Strauss III*, 175 F. Supp. 3d at 28. Second, Crédit Lyonnais did not send wires for the account of an "arm" of a terrorist organization. Rather, the wires Plaintiffs invoke were sent on behalf of CBSP, a lawfully registered charity in France, to charities that Plaintiffs maintain were somehow affiliated with, but not a part of, Hamas. *Id*. at 11. Third, the record on which the district court asserted jurisdiction provides no indication that at the time of the New York transfers, Crédit Lyonnais thought that any of the transactions, which were designated for charitable purposes, were connected to terrorist attacks

or that the recipients of the wires were terrorist entities or affiliated with Hamas. *See* Def. Br. 9-10, 67-68. And finally, the "vast majority" of the Crédit Lyonnais transactions occurred wholly outside the United States. *Strauss III*, 175 F. Supp. 3d at 11. Thus, even assuming there were a sufficient causal nexus to the defendant bank's activity in New York in *Licci III*, that nexus is lacking here.

The district court compounded its erroneous reliance on *Licci III* with a second, independent error: concluding that Crédit Lyonnais's use of its New York Branch for clearing activity *unrelated* to Plaintiffs' claims supported the assertion of specific jurisdiction. As the district court put it: Crédit Lyonnais "had a New York Branch and systematically utilized that branch as its exclusive clearing channel for U.S. Dollar transfers requested by its customers," showing "*a fortiori*" that jurisdiction existed here because the transfers *"were executed through Defendant's own branch in New York." Strauss III*, 175 F. Supp. 3d at 28.

But whether a non-U.S. bank's correspondent account is held by an unaffiliated U.S. dollar clearer (a U.S. bank or a U.S. branch of another non-U.S. bank) or by a branch of the non-U.S. bank, is a business decision often made years before the transfers at issue, and is irrelevant to the specific jurisdiction determination because specific jurisdiction turns on *claim-related* contacts. *BMS*, 137 S. Ct. at 1781. Plaintiffs' claims do not turn on how many "U.S. Dollar transfers" for other customers happen to be processed through the same correspondent account.

18

Indeed, the Supreme Court recently rejected a similar argument in *BMS*. There, too, the plaintiffs focused on forum contacts "unrelated to" their claims, describing such contacts as "extensive," and arguing that those contacts warranted a "relaxed" standard of specific jurisdiction under which the paucity of claims-related contacts could be forgiven. The Court squarely rejected that approach, characterizing it as a "loose and spurious form of general jurisdiction." 137 S. Ct. at 1781.

### C. Specific Personal Jurisdiction Based On Isolated Correspondent Transfers Would Be Unreasonable.

The exercise of personal jurisdiction is also impermissible because it would be unreasonable. As the district court recognized, "[w]hen the entity that may be subject to personal jurisdiction is a foreign one, courts consider the international judicial system's interest in efficiency and the shared interests of the nations in advancing substantive policies." 175 F. Supp. 3d at 31. Those interests do not support the exercise of personal jurisdiction here.

Given the vast number of dollar-denominated transactions that banks process every day, it will be rare that plaintiffs are unable to point to some *de minimis* banking activity in or through the United States. *See supra* pp. 12-15. Exposing banks to liability in the U.S. based on a handful of New York wire transfers will chill the provision of these systemically important banking services. *Cf. Shipping Corp. of India, Ltd. v. Jaldhi Overseas Pte.*, 585 F.3d 58, 62 (2d Cir. 2009) (overruling precedent that "undermined the efficiency of New York's international funds

transfer business" and could "discourage dollar-denominated transactions and damage New York's standing as an international financial center").

It is also important to keep in mind that, as the United States explained in a recent ATA case, "other important interests"—such as the "the United States' vital interest in maintaining close cooperative relationships" with non-U.S. partners "in the fight against terrorism"—are at stake in adjudicating ATA claims. Brief for the United States as Amicus Curiae at 18-19, *Arab Bank, PLC v. Linde*, 2014 WL 2191224, at *19 (U.S. May 23, 2014). A rule subjecting non-U.S. banks to jurisdiction for predominantly non-U.S. conduct—simply because a small number of wire transfers are cleared through a New York correspondent account—will multiply the opportunities for intergovernmental friction.

Just such considerations supported the Supreme Court's decision to restrict the assertion of general jurisdiction in *Daimler*, which rested in significant part on the unfairness inflicted upon non-U.S. defendants by far-reaching jurisdictional theories and dubious claims (in that case, under the ATS). The Court warned that "exorbitant exercises of all-purpose jurisdiction would scarcely permit" non-U.S. defendants "to structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit." 571 U.S. at 139. It also emphasized the "transnational context" of the dispute, including the weighty "risks to international comity" and "[c]onsiderations of international rapport" that

20

an "uninhibited approach to personal jurisdiction" over foreign defendants might raise. *Id*. at 140-42. Those same considerations preclude the assertion of personal jurisdiction here.

## III.  PLAINTIFFS' ATA CLAIMS FAIL AS A MATTER OF LAW.

The ATA is the result of Congress's "careful deliberation" regarding "when, and how, banks should be held liable for the financing of terrorism." *Jesner*, 138 S. Ct. at 1405 (plurality op.). Applying the ATA's requirements, the district court correctly granted summary judgment for Crédit Lyonnais, because Plaintiffs' claims fail as a matter of law.

### A.  Primary Liability.

To survive summary judgment, a plaintiff bringing a primary liability claim must point to facts showing that claimed injuries were incurred "by reason of an act of international terrorism." 18 U.S.C. § 2333(a). To qualify as an "act of international terrorism," an activity must

(A) involve violent acts or acts dangerous to human life … ; and

(B) appear to be intended—(i) to intimidate or coerce a civilian population [or] influence the policy of a government by intimidation or coercion ….

*Id*. § 2331(1). Congress specifically required proof that the defendant *itself* engaged in terrorism or terrorism-linked activities, in contrast to RICO, for example, which was enacted to target organized crime but did not condition liability on proof that the defendant had engaged in organized-crime activities. *See Sedima, S.P.R.L. v.*

*Imrex Co., Inc.*, 473 U.S. 479 (1985). In addition, Congress required proof that the plaintiff's injury was proximately caused by the act of international terrorism. *Rothstein v. UBS AG*, 708 F.3d 82, 95 (2d Cir. 2013).

Plaintiffs' ATA claims are predicated on Crédit Lyonnais's purported violation of 18 U.S.C. § 2339B, which criminalizes the knowing provision of material support to FTOs. A violation of § 2339B can satisfy one *part* of § 2331(1)(A)'s definition of an "act of international terrorism"—the requirement that conduct "violate federal or state law if committed within this country." *Linde v. Arab Bank, PLC,* 882 F.3d 314, 325-26 (2d Cir. 2018). But § 2339B does not speak to the *additional* elements of the § 2331(1) statutory definition. *Id*. Providing ordinary banking services to a customer that in turn is alleged to have some relationship with a terrorist group should rarely, if ever, satisfy these critical additional requirements.

*First*, processing wire transfers and providing similar routine banking services for a client are not acts that "involve violence" or "endanger human life" as those terms are ordinarily understood. *Linde*, 882 F.3d at 326. And undefined words in a statute must be given their ordinary meaning. *Harrison v. Republic of Sudan*, 838 F.3d 86, 90 (2d Cir. 2016).

The word "violent" means "of, relating to, or characterized by strong physical force; resulting from extreme or intense force; [or] vehemently or passionately

threatening." Black's Law Dictionary at 1081 (10th ed. 2014). Similarly, "dangerous" means "likely to cause seriously bodily harm." *Id*. at 477.

Ordinary banking services do not involve or relate to physical force and are not inherently likely to cause harm or injury. *Strauss v. Crédit Lyonnais, S.A.*, 379 F. Supp. 3d 148, 159 (E.D.N.Y. 2019). That is particularly true here, where the documentation provided to the bank for the transfers at issue indicated that the transfers were intended for charitable purposes only. *Kemper*, 911 F.3d at 390 ("doing business with companies and countries that have significant legitimate operations" is not necessarily "dangerous to human life").

*Linde* allowed that "conduct that violates a material support statute" can also satisfy the definitional requirements of a § 2333(a) claim "*in some circumstances*." *Id*. at 326 (emphasis added). But the conduct in *Linde* was extraordinary in several respects. For example, the plaintiffs in that case adduced evidence that the bank executed transfers for a senior Hamas spokesperson and Hamas's "prime minister" and one of its founders (known to bank employees to be Hamas affiliates), and processed payments "explicitly identified as payments for suicide bombings." *Id*. at 321. Plaintiffs here have not come close to such a showing. *See* Def. Br. 37-39.

**Second**, ordinary banking services do not "appear to be intended to intimidate or coerce a civilian population or to influence or affect a government." *Linde*, 882 F.3d at 326. This terroristic-intent prong "does not depend on the actor's beliefs" but

instead uses an objective standard based on "the apparent intentions of actions." *Weiss v. Nat'l Westminster Bank PLC*, 768 F.3d 202, 207 n.6 (2d Cir. 2014).

A reasonable observer would not conclude that a bank processing wire transfers for a client—expressly designated for charitable purposes in a region with significant humanitarian needs—is acting with the "apparent intent" to "intimidate or coerce" civilians or a foreign government. To the contrary, objective observers would recognize that "[j]ust as the government seeks to keep illicit actors out of the financial system, banks and other financial institutions have no interest in criminals and terrorist financiers abusing their services."[8] Even if the charities who received the wire transfers later provided funds to Hamas or other terrorist organizations, there is no basis for concluding that by processing those transfers Crédit Lyonnais objectively manifested an intention to *share* those terroristic goals.

***Third***, the wire transfers to the third-party charities were not a proximate or but-for cause of the Hamas attacks that injured Plaintiffs. As discussed above, allegations that banks "provided funding to purported charity organizations known to support terrorism that, in turn, provided funding to al Qaeda and other terrorist organizations" are "insufficient for proximate causation purposes." *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d at 124; *see also Rothstein*, 708 F.3d at 97

---

[8]     David S. Cohen, Under Sec'y, U.S. Dep't of the Treasury, Remarks at ABA/ABA Money Laundering Enforcement Conference (Nov. 10, 2014), https://www.treasury.gov/press-center/press-releases/Pages/jl2692.aspx.

(allegations that bank knew that money sent to Iran "would be used to cause and facilitate terrorist attacks" by Hamas and Hizbollah do not show proximate cause").

The ATA "require[s] a showing of at least some direct relationship between a defendant's acts and a plaintiff's injuries." *Fields*, 881 F.3d at 748. Even "the fungible nature of material support does not require a court to also hold that any reckless contribution to a terrorist group or affiliate, no matter its attenuation, must result in civil liability." *Id*. at 749.

### B. Secondary Liability.

When Congress enacted the ATA, it did not authorize a private action for secondary violations such as aiding and abetting. *Rothstein*, 708 F.3d at 97-98. The recent JASTA amendments to the ATA confirm this by adding an express, specifically-delineated private right of action against secondary violators.

JASTA creates secondary liability for aiding and abetting only if, among other things, a person "knowingly provid[es] substantial assistance" to "the person who committed" a particular terroristic attack. 18 U.S.C. § 2333(d). In particular, plaintiffs must satisfy a three-part inquiry: (1) "the party whom the defendant aids must perform a wrongful act that causes an injury;" (2) "the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance;" and (3) "the defendant must knowingly and

substantially assist the principal violation." *Siegel*, 933 F.3d at 223 (citing *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983)).

Strict application of these elements is important, because aiding and abetting offenses by their nature reach conduct that by itself is not unlawful, and because "the international banking system depends on cooperation among financial institutions across borders." *Siegel v. HSBC Bank USA, N.A.*, 2018 WL 3611967, at *5 (S.D.N.Y. July 27, 2018).

As with primary liability, aiding-and-abetting under the ATA "requires more than the provision of material support to a designated terrorist organization." *Linde*, 882 F.3d at 329. Here, too, the provision of ordinary banking services to a client is not enough to establish a secondary liability claim.

***First***, evidence that a bank provided ordinary financial services to a third-party does not show that the bank was aware that it was assuming a role in terrorist activities. 18 U.S.C. § 2339B only requires "knowledge about the organization's connection to terrorism" generally. *Holder v. Humanitarian Law Project*, 561 U.S. 1, 16-17 (2010). But JASTA "requires the secondary actor to be 'aware' that, by assisting the principal, it is *itself* assuming a 'role' in *terrorist activities*." *Linde*, 882 F.3d at 329-30 (emphasis added).

Evidence of such awareness by Crédit Lyonnais is wholly lacking in this case. Unlike in *Linde*, all the payments in question were designated for charitable purposes

and none of the payments was shown to be specifically related to any of the attacks. As this Court recently affirmed, mere "awareness" that an entity is "believed by some to have links" to terrorist organizations is "insufficient to state a claim for aiding-and-abetting liability under JASTA." *Siegel*, 933 F.3d at 224.

***Second***, processing wire transfers with no apparent connection to terrorist activities does not establish the required "substantial assistance" with respect to specific terrorist attacks. The Court applies the six-factor test from *Halberstam* to determine whether an activity "substantially assists" a primary tortfeasor, considering "(1) the nature of the act encouraged, (2) the amount of assistance given by defendant, (3) defendant's presence or absence at the time of the tort, (4) defendant's relation to the principal, (5) defendant's state of mind, and (6) the period of defendant's assistance." *Linde*, 882 F.3d at 329. The evidence adduced by Plaintiffs does not come close to satisfying these factors.

There is no evidence that Crédit Lyonnais's processing of wire transfers "encouraged" specific attacks or that Hamas was "heavily dependent" on Crédit Lyonnais to carry out those terrorist acts. *Halberstam*, 705 F.2d at 483, 488. Nor is there evidence that the amount of money Crédit Lyonnais wired to the charities on behalf of CBSP (let alone the amount of money that the charities then funneled to Hamas, if any) was a substantial factor in any attack. *Siegel*, 933 F.3d at 225. Crédit Lyonnais was not "present" during the attacks at issue and had no relation to Hamas

27

and only an attenuated relationship with the recipients of the wire transfers. *Id*. And it beggars belief—and Plaintiffs do not allege—that Crédit Lyonnais had any intention to commit or support terrorist attacks or "make the [terrorist] venture succeed." *Halberstam*, 705 F.2d at 488. Finally, the duration of a banking relationship is not enough to constitute substantial assistance. *Siegel*, 933 F.3d at 225 (long duration "bespeaks a lengthy relationship but not necessarily of assistance in terrorism").

In sum, the evidence here falls far short of what JASTA requires for a secondary liability claim to succeed.

## IV. PLAINTIFFS' EXPANSIVE INTERPRETATION OF THE ATA WILL UNDERMINE INTERNATIONAL FINANCE AND TRADE.

Allowing plaintiffs to skirt the ATA's requirements would have significant adverse consequences for the availability of banking services around the world— and therefore adverse effects on the global economy.

"De-risking" occurs when banks stop providing services to certain regions or clients, even those with legitimate and pressing needs, because the threat of liability and expensive, drawn-out litigation is simply too great. An expansive interpretation of the ATA produces just those consequences and therefore would dramatically increase de-risking activity as banks seek to eliminate potential exposure to extraordinarily burdensome litigation, however baseless.

According to the Financial Action Task Force, de-risking already "is having a significant impact in certain regions and sectors" and "may drive financial transactions underground which creates financial exclusion and reduces transparency, thereby increasing money laundering and terrorist financing risks."[9] As the U.S. Comptroller of the Currency observed in 2016:

> Longstanding business relationships may be disrupted. Transactions that would have taken place legally and transparently may be driven underground. Customers whose banking relationships are terminated and who cannot make alternate banking arrangements elsewhere may effectively be cut off from the regulated financial system altogether. And there have been many instances of real human hardship that results when customers find themselves unable to transmit funds to family members in troubled countries.[10]

De-risking also threatens to affirmatively undermine the fight against terrorism. The withdrawal of legitimate international financial institutions may "encourage entities to move into less regulated channels, thus reducing transparency and limiting monitoring capacities."[11] De-risking also has consequences "for the

---

[9] Financial Action Task Force, *FATF takes action to tackle de-risking* (Oct. 23, 2015), https://tinyurl.com/yyot5v83.

[10] Remarks by Thomas J. Curry, Comptroller of the Currency, Before the Institute of International Bankers (Mar. 7, 2016), https://www.occ.treas.gov/news-issuances/speeches/2016/pub-speech-2016-25.pdf.

[11] Tracey Durner & Liat Shetret, Global Center on Cooperative Security/Oxfam, *Understanding Bank De-Risking and its Effects on Financial Inclusion* 19 (2015), https://tinyurl.com/y3r99hdn. *See also* Staff of House of Representatives Task Force to Investigate Terrorism Financing, 114th Cong., *Stopping Terror Finance: Securing the U.S. Financial Sector* 26-27 (2016), https://tinyurl.com/y2saxcgy (noting that many financial institutions have ceased processing remittance transfers to certain countries, which may "eventually drive legitimate transfers into the

ability of humanitarian organisations to reach people in need, particularly in areas under the control of proscribed groups."[12]

Depriving governments and civil society of key partners in the fight against terrorism and of important tools for promoting good governance and economic growth does nothing to help the victims of terror or further the ATA's goals. That is another, important reason why this Court should reject Plaintiffs' invitation to upset the careful balance Congress struck in crafting the ATA.

---

illegitimate underground economy"); Yaya Fanusie & Landon Heid, *What ISIS Is Banking On*, Forbes (June 17, 2016), https://tinyurl.com/y487gp9w (discussing increasing use of money exchanges as "concerns about terror financing and safety have disrupted much of the formal banking activity in [ISIS] territory").

[12] Stuart Gordon & Sherin El Taraboulsi-McCarthy, Humanitarian Policy Group, *Counter-terrorism, bank de-risking and humanitarian-response: a path forward* (Aug. 2018), https://tinyurl.com/y5c4u9ho.

## CONCLUSION

The Court should vacate the district court's judgment and order the case dismissed for lack of personal jurisdiction. Alternatively, the district court's judgment should be affirmed.


Dated: September 25, 2019                    Respectfully submitted.


                                             /s/ *Andrew J. Pincus*
                                             Andrew J. Pincus
                                             Alex C. Lakatos
                                             Marc R. Cohen
                                             Mayer Brown LLP
                                             1999 K Street, NW
                                             Washington, DC 20006
                                             (202) 263-3000


                                             *Attorneys for* Amici Curiae

## CERTIFICATE OF COMPLIANCE
## WITH TYPEFACE AND WORD-COUNT LIMITATIONS

I hereby certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5); the type style requirements of Fed. R. App. P. 32(a)(6); and the type volume limitations of Fed. R. Ap. P. 29(a)(5) and 32(a)(7)(B) and L.R. 29.1(c) and 32.1(a)(4)(A) because it is proportionally faced, has a typeface of 14 point Times New Roman, and contains 6,981 words, excluding the parties of the brief exempted by Fed. R. App. P. 32(f).

## CERTIFICATE OF SERVICE

I hereby certify that on this 25th day of September, 2019, I electronically filed the foregoing with the Clerk of Court for the United States Court of Appeals for the Second Circuit by using the appellate CM/ECF system. I further certify that all participants in the case are registered CM/ECF users, who will be served by the appellate CM/ECF system.

/s/ *Andrew J. Pincus*
Andrew J. Pincus