**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

CHAIM DOV PRZEWOZMAN, *et al*.,

                    Plaintiffs,

            v.

QATAR CHARITY, QATAR NATIONAL BANK
and MASRAF AL RAYAN,

                    Defendants.

No.  1:20-CV-6088-NGG-RLM

Served on:  April 20, 2022

---

**DEFENDANT QATAR CHARITY'S REPLY MEMORANDUM**
**IN FURTHER SUPPORT OF ITS MOTION TO DISMISS THE COMPLAINT**

**DLA PIPER LLP (US)**
John M. Hillebrecht
Kevin Walsh
Jessica Masella

1251 Avenue of the Americas
New York, New York 10020
Phone: (212) 335-4500
Email:    John.Hillebrecht@us.dlapiper.com
             Kevin.Walsh@us.dlapiper.com
             Jessica.Masella@us.dlapiper.com

*Counsel for Defendant Qatar Charity*

**April 20, 2022**

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ................................................................................1

ARGUMENT .........................................................................................................3

I.      PLAINTIFFS FAIL TO MAKE THE REQUISITE PRIMA FACIE SHOWING
        FOR THIS COURT TO EXERCISE JURISDICTION OVER QATAR
        CHARITY ...................................................................................................3

        A.      Rule 4(k)(2) Does Not Suffice to Confer Jurisdiction Over Qatar Charity
                Where Plaintiffs Fail to Establish a Prima Facie Case for its Application
                and Do Not Plead Any Contacts Between Qatar Charity and the U.S.
                Generally .........................................................................................8

        B.      Qatar Charity is Not Subject to Personal Jurisdiction Under an Agency
                Theory ..............................................................................................9

        C.      Subjecting Qatar Charity to Personal Jurisdiction Pursuant to Plaintiffs'
                Proffered Conspiracy Theory Would Violate Due Process ...................12

        D.      New York's Long-Arm Statute Forecloses Exercising Personal
                Jurisdiction Over Qatar Charity .........................................................14

        E.      The Due Process Reasonableness Factors Counsel Against Imposing
                Jurisdiction .....................................................................................19

II.     PLAINTIFFS FAIL TO STATE ANY CLAIM FOR RELIEF ........................20

        A.      Counts III and IV Must Be Dismissed As Plaintiffs Fail to Plead a Primary
                Liability Claim .................................................................................20

                i.      Plaintiffs Fail to Plead that Qatar Charity Committed Any Act of
                        International Terrorism ..........................................................21

                ii.     Plaintiffs Fail to Plausibly Allege That Qatar Charity Proximately
                        Caused the Attack .................................................................23

        B.      Counts I and II Must Be Dismissed for Failure to Plausibly Plead a
                Secondary Liability Claim .................................................................24

                i.      Plaintiffs Have Not Plausibly Alleged a JASTA Conspiracy Claim .........24

                ii.     Plaintiffs Have Not Plausibly Alleged a JASTA Aiding-And-
                        Abetting Claim .....................................................................25

III.    PLAINTIFFS FAILED TO PROPERLY EFFECT SERVICE OF PROCESS & A
        REQUEST TO SERVE BY EMAIL DOES NOT CURE THE FAILURE ....................27

IV.     CLAIMS AS TO FOREIGN PLAINTIFFS CONTINUE TO DEMONSTRATE
        THE PLAINTIFFS LACK STANDING TO BRING PERSONAL INJURY
        CLAIMS UNDER THE ATA ..................................................................27

V.      PLAINTIFFS' REQUEST FOR JURISDICTIONAL DISCOVERY SHOULD
        BE REJECTED ...........................................................................................27

CONCLUSION..................................................................................................................27

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Allianz Glob. Inv'rs GMBH v. Bank of Am. Corp.*,
   457 F. Supp. 3d 401 (S.D.N.Y. 2020)......................................................................13

*Aqua Shield, Inc. v. Inter Pool Cover Team*,
   2007 WL 4326793 (E.D.N.Y. 2007).........................................................................9

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)................................................................................................20

*Astor Chocolate Corp. v. Elite Gold Ltd.*,
   510 F. Supp. 3d 108 (S.D.N.Y. 2020).......................................................................9

*Bartlett v. Societe Generale de Banque Au Liban SAL*,
   2020 WL 7089448 (E.D.N.Y. 2020).......................................................................26

*Berdeaux v. OneCoin Ltd.*,
   2021 WL 4267693 (S.D.N.Y. Sept. 20, 2021)....................................11, 15, 16, 19

*Berkshire Bank v. Lloyds Banking Grp.*,
   2022 WL 569819 (2d Cir. Feb. 25, 2022).............................................13, 16, 18, 19

*Chambers v. Time Warner Inc.*,
   282 F.3d 147 (2d Cir. 2002)....................................................................................21

*Charles Schwab Corp. v. Bank of Am. Corp.*,
   883 F.3d 68 (2d Cir. 2018) (*Schwab I*) ...........................................................10, 12

*Clean Coal Techs. v. Leidos, Inc.*,
   377 F. Supp. 3d 303 (S.D.N.Y. 2019).....................................................................18

*Contant v. Bank of Am. Corp.*,
   385 F. Supp. 3d 284 (S.D.N.Y. 2019).....................................................................19

*In re Dental Supplies Antitrust Litig.*,
   2017 WL 4217115 (E.D.N.Y. 2017).......................................................................12

*DISH Network, LLC. v. Kaczmarek*,
   2021 WL 4483470 (E.D.N.Y. June 24, 2021) ..........................................................9

*In re Eur. Gov't Bonds Antitrust Litig.*,
   2022 WL 768680 (S.D.N.Y. Mar. 14, 2022) ..........................................................14

*Exp.-Imp. Bank of U.S. v. Asia Pulp & Paper Co., Ltd.*,
    609 F.3d 111 (2d Cir. 2010) ............................................................................11

*Fields v. Twitter, Inc.*,
    881 F.3d 739 (9th Cir. 2018) ..........................................................................24

*Freeman v. HSBC Holdings PLC*,
    413 F. Supp. 3d 67 (E.D.N.Y. 2019) ..................................................17, 23, 25

*Fuld v. Palestine Liberation Org.*,
    2022 WL 62088 (S.D.N.Y. Jan. 6, 2022) (appeal filed) ..................................19

*Gallop v. Cheney*,
    642 F.3d 364 (2d Cir. 2011) ............................................................................20

*Gill v. Arab Bank, PLC*,
    893 F. Supp. 2d 474 (E.D.N.Y. 2012) ............................................................24

*Halberstam v. Welch*,
    705 F.2d 472 (D.C. Cir. 1983) ........................................................................26

*Hau Yin To v. HSBC Holdings, PLC*,
    700 F. App'x 66 (2d Cir. 2017) ......................................................................10

*Kaplan v. Lebanese Canadian Bank, SAL*,
    999 F.3d 842 (2d Cir. 2021) ............................................................................25

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*,
    732 F.3d 161 (2d Cir. 2013) ......................................................................10, 19

*Linde v. Arab Bank, PLC*,
    882 F.3d 314 (2d Cir. 2018) ......................................................................25, 26

*In re N. Sea Brent Crude Oil Futures Litig.*,
    2017 WL 2535731 (S.D.N.Y. 2017) ................................................................17

*O'Sullivan v. Deutsche Bank AG*,
    2019 WL 1409446 (S.D.N.Y. 2019) ................................................................24

*Owens v. BNP Paribas, S.A.*,
    897 F.3d 266 (D.C. Cir. 2018) ........................................................................24

*PharmacyChecker.com, LLC v. Nat'l Ass'n of Boards of Pharmacy*,
    530 F. Supp. 3d 301 (S.D.N.Y. 2021) ............................................................17

*Pincione v. D'Alfonso*,
    506 F. App'x 22 (2d Cir. 2012) ......................................................................11

iv

*In re Platinum & Palladium Antitrust Litig.*,
    449 F. Supp. 3d 290 (S.D.N.Y. 2020).....................................................12

*In re Platinum & Palladium Antitrust Litig.*,
    449 F. Supp. 3d at 325–26 ....................................................................13

*Rich v. Fox News Network LLC*,
    2020 WL 6276026 (S.D.N.Y. 2020)......................................................17

*Rothstein v. UBS AG*,
    708 F.3d 82 (2d Cir. 2013).....................................................................24

*Rudersdal v. Harris*,
    2022 WL 263568 (S.D.N.Y. Jan. 28, 2022) .........................................12

*Schwab Short-Term Bond Mkt. Fund v. Lloyds Banking Grp. PLC*,
    22 F.4th 103 (2d Cir. 2021) (*Schwab II*)................................12, 13, 14

*Siegel v. HSBC North America Holdings*,
    933 F.3d 217 (2d Cir. 2019).............................................................24, 26

*SK's Cosm. Boutique Inc. v. J.R. Silverberg Realty*,
    2020 WL 3451324 (S.D.N.Y. 2020)......................................................18

*Smartmatic USA Corp. v. Fox Corp.*,
    2022 WL 685407 (N.Y. Sup. Ct. Mar. 08, 2022) ...........................16, 18

*Spetner v. Palestine Inv. Bank*,
    495 F. Supp. 3d 96 (E.D.N.Y. 2020) ..................................4, 8, 11, 12

*In re SSA Bonds Antitrust Litig.*,
    420 F. Supp. 3d 219 (S.D.N.Y. 2019)................................................8, 9

*Strauss v. Credit Lyonnais, S.A.*,
    379 F. Supp. 3d 148 (E.D.N.Y. 2019) ..................................................22

*Suber v. VVP Servs., LLC*,
    2021 WL 4429237 (S.D.N.Y. Sept. 27, 2021)......................................16

*Tamam v. Fransabank*,
    677 F. Supp. 2d 720 (S.D.N.Y. 2010)...................................................10

*Universal Trading & Inv. Co. v. Tymoshenko*,
    2012 WL 6186471 (S.D.N.Y. 2012)......................................................15

*Vasquez v. Hong Kong and Shanghai Banking Corp., Ltd.*,
    477 F. Supp. 3d 241 (S.D.N.Y. 2020)............................................11, 14

*Weiss v. Nat'l Westminster Bank PLC*,
   768 F.3d 202 (2d Cir. 2014).............................................................................4, 25

*Weiss v. National Westminster Bank PLC*,
   381 F. Supp. 3d 223 (E.D.N.Y. 2019) ...................................................................22

*Zapata v. HSBC Holdings PLC*,
   414 F. Supp. 3d 342 (E.D.N.Y. 2019) .............................................................23, 24

**Statutes & Rules**

18 U.S.C. § 2339......................................................................................................4, 25

18 U.S.C. § 2333............................................................................................................25

Fed. R. Civ. P. 4(k)(2).........................................................................................3, 8, 9, 12

N.Y. C.P.L.R. 302.................................................................................................... passim

## PRELIMINARY STATEMENT

Plaintiffs' 80-page Omnibus Memorandum of Law does nothing to cure the deficiencies of a Complaint based entirely on wholly implausible allegations.  These deficient allegations fail to state a claim.  Nor do they constitute a *prima facie* showing that jurisdiction exists over Qatar Charity—an entity which has no contact whatsoever with this forum.  Under the law previously cited to the Court, this case must be dismissed as to Qatar Charity.

As previously demonstrated, Qatar Charity has earned high praise from the U.S. government and leading international organizations as a reliable partner in providing humanitarian assistance to some of the world's neediest communities.  (*See* Memorandum in Support of Qatar Charity's Motion to Dismiss ("MTD Mem.") at 2–4).  This renders Plaintiffs' allegations wholly implausible.  Significantly, the exhibits attached to Qatar Charity's Motion to Dismiss were either (i) explicitly incorporated by Plaintiffs themselves into the Complaint or (ii) are reliable material in the public domain subject to judicial notice.  (*See* MTD Mem. at 3 n.2). Importantly, the significance of the statements contained in the documents which Qatar Charity has submitted to the Court lie largely in the fact that they were made.  That high-ranking U.S. diplomats publicly praise Qatar Charity as "one of the best organizations in the world" (Ex. 17; MTD Mem. at 25), that the U.S. Agency for International Development and the U.N. speak with pride of their numerous partnerships with the Charity (*e.g.*, Exs. 1, 2, 5, 6), and that Bill Gates has traveled to Doha to personally announce his foundation's partnership with the Charity (Ex. 27) are significant for purposes of this motion not because they are true (as they certainly are) but because it is preposterous to imagine that those statements would have been made if the entities making them—most pertinently, the U.S. government and State Department—had

information suggesting that Qatar Charity was knowingly assisting fronts for FTOs.[1]  These statements are thus highly relevant to the assessment that this Court must undertake in evaluating the plausibility of the Complaint's allegations.

The documents submitted by Qatar Charity to the Court include the Annual Reports incorporated into the Complaint by Plaintiffs.  In their Opposition, Plaintiffs continue to mischaracterize those Reports.  (*See* MTD Mem. at 20–24).  Plaintiffs also rely heavily on the "confessions of the Director and staff of Qatar Charity's Ramallah Branch" in Israeli criminal proceedings.  (Complaint ¶ 132; Opp. Mem. at 34).  Plaintiffs allege that those confessions "detail how Qatar Charity and Masraf laundered USD through the U.S."  (Opp. Mem. at 36). But the confession and testimony we have been able to obtain, of Fadi Manassra, the Charity's staff accountant in Ramallah responsible for fund transfers, do nothing of the kind.[2]  While we have not been able to obtain the other referenced confessions, Manassra's confession and testimony completely refute Plaintiffs' allegations.  Crucially, these documents flatly contradict the central allegation upon which Plaintiffs seek to base their personal jurisdiction argument, that U.S. Dollars were transferred through a correspondent account in New York.

To the contrary, in both Manassra's confession (which appears in a signed, handwritten Arabic statement and a separate but substantially similar Hebrew statement) and trial testimony, summarized in more detail below, he describes the money flow as follows:  funds at the Masraf Al Rayan bank in Doha, in Euros, would be transferred to "Deutsche Bank in Germany" and then "transferred to the Bank of Palestine in Ramallah to Branch number 1213"; only once received

---

[1]  References to "Ex." refer to Qatar Charity's Memorandum in Support of its Motion to Dismiss.  References to "Reply Ex." refer to additional exhibits attached to this brief, the majority of which are incorporated into the Complaint.
[2]  There are several alternative translations of Mr. Manassra's name, as is the case for the other former employees of Qatar Charity apparently referenced in the Complaint, Juda Jamal and Najwan Awda.

by the Bank of Palestine would that bank "convert the bills from Euros to Dollars."  (Reply Ex. 1, Fadi Manassra Interrogation at 3:85 and 3:87).  Thus, one of the confessions that Plaintiffs repeatedly urge the Court to consider as one of the only non-conclusory allegations in support of personal jurisdiction appears to do precisely the opposite, and indeed makes explicit that there is absolutely no basis for jurisdiction here.

## ARGUMENT

## I.   PLAINTIFFS FAIL TO MAKE THE REQUISITE PRIMA FACIE SHOWING FOR THIS COURT TO EXERCISE JURISDICTION OVER QATAR CHARITY

Plaintiffs allege that jurisdiction over Qatar Charity is proper under both Rule 4(k)(2) and New York's long-arm statute.  As support for each purported basis of jurisdiction, Plaintiffs rely heavily on two allegations:  (i) that Qatar Charity has long been, and remains to this day, a member of the "Union of Good," a Specially Designated Global Terrorist ("SDGT") (*see* Opp. Mem. at 1, 10–11, 16); and (ii) that the "confessions" of Charity staffers in Israel confirm that Masraf Al Rayan and the Charity "laundered USD through the U.S." for the benefit of Hamas (Opp. Mem. at 13, 36, 42).  But just as the Plaintiffs mischaracterized the Charity's Annual Reports, these allegations—central to their theories of jurisdiction—are similarly misleading.[3]

Plaintiffs assert that Qatar Charity is a member of the Union of Good.  Hence, according to Plaintiffs, the designation of the Union of Good tarred the Charity with the same brush and placed the Bank Defendants on notice that the Charity was a bad actor.  As a result, Plaintiffs contend that Masraf Al Rayan's alleged in-forum conduct between 2011 and 2015 (putatively through a New York correspondent bank which is concededly not a co-conspirator) suffices to

---

[3]  Although Plaintiffs continue to argue that the Annual Reports "demonstrate that [the Charity] transferred funds to . . . Hamas and PIJ fronts" (Opp. Mem. at 9), those Reports—which are before the Court—say no such thing.  (*See* Exs. 22, 23, 24).

establish jurisdiction over all Defendants in New York.  But yet again, Plaintiffs' theory of
jurisdiction rests entirely on misleading factual assertions.

The Charity does not dispute that the Court can take judicial notice that the U.S. Treasury
Department designated the Union of Good as an SDGT—not, as Plaintiffs wrongly claim (*see*
Opp. Mem. at 61), an FTO.[4]  But the Court should also take judicial notice of the fact that in that
designation there is no mention of Qatar Charity, although there is reference to certain specific
entities and individuals as well as reference to "several organizations previously designated"
under an earlier Executive Order.[5]  The Court should also take notice of the fact that the U.S.
government has ***never*** designated Qatar Charity as an SDGT or FTO; to the contrary, it regularly
works with the Charity and has repeatedly praised its good work.  (*See* MTD Mem. at 4–6).

Significantly, Qatar Charity definitively terminated any association with the Union of
Good 13 years ago, within months of the U.S. designation.[6]  Thus, the Charity's minimal
association with the Union of Good ended years before the inception of the purported
conspiracy.[7]

---

[4]  Because the Union of Good is an SDGT and not an FTO, it does not qualify as a "terrorist organization" for the
purposes of § 2339B of the ATA.  *See, e.g.*, *Weiss v. Nat'l Westminster Bank PLC*, 768 F.3d 202, 209 (2d Cir. 2014).
[5]  *See* Reply Ex. 2, Treasury Designates the Union of Good, *U.S. Dep't of the Treasury* (Nov. 12, 2008),
https://home.treasury.gov/news/press-releases/hp1267 (press release announcing U.S. Department of the Treasury's
designation of the Union of Good under Executive Order 13224).
[6]  Plaintiffs' theory of jurisdiction is premised on the conclusory allegation that Qatar Charity is a member of the
Union of Good.  It serves as the primary basis for Plaintiffs' allegation that Qatar Charity was part of the purported
conspiracy and that Qatar Charity has any connection to Hamas or PIJ.  Attached as Reply Exhibit 3 is a letter dated
April 2, 2009, by which Qatar Charity terminated its membership with the Union of Good.  The letter is offered for
the Court's consideration, given the undue reliance Plaintiffs attribute to hearsay statements in an Israeli order.  (*See,
e.g.*, Opp. Mem. at 68).  The Court may consider "outside materials" such as the termination letter for the purpose of
determining whether Plaintiffs have satisfied the requisite *prima facie* showing to survive Qatar Charity's 12(b)(2)
motion, which "must include an averment of facts that, if credited by the ultimate trier of fact, would suffice to
establish jurisdiction over the defendant."  *Spetner v. Palestine Inv. Bank*, 495 F. Supp. 3d 96, 109 (E.D.N.Y. 2020)
(internal quotation marks and citations omitted).  Here, the allegation of membership in the Union of Good is wholly
unsupported and contested by Qatar Charity, such that the Court should not accept that allegation as true when
determining whether Plaintiffs have pleaded a *prima facie* case of personal jurisdiction.
[7]  In reality, Qatar Charity never provided any funds to the Union of Good, never co-sponsored any events or programs,
and never attended any Union of Good events.

Plaintiffs also allege, without citation or any detail, that "confessions" obtained from certain former employees support the conclusion that Masraf Al Rayan and the Charity laundered U.S. Dollars through New York for the benefit of the FTOs. (Complaint ¶ 132; Opp. Mem. at 13, 36). Yet again, as with the Annual Reports and the Union of Good allegations, these claims are fundamentally misleading and not supported by the confessions and testimony we have been able to obtain. For example, the confession made by Fadi Manassra utterly contradicts the Plaintiffs' claim that U.S. Dollars transited through New York. Manassra was the Charity's staff accountant in Ramallah, responsible for (among other things) interacting with banks and "monitoring money transfers" (Reply Ex. 4, Sept. 1, 2017, Trial Testimony at 5:11) and "recording the movements of incoming and outgoing funds" (Reply Ex. 1 at 2:30). When interrogated by Israeli authorities in 2015, this is what Manassra said about money transfers (based on a certified translation):

> The funds are at the Al-Riyyan Bank in Doha it is transferred [sic] to Deutsche Bank in Germany. From there it is transferred to the Bank of Palestine in Ramallah to Branch Number 1213. At the bank branch in Ramallah, we convert the bills from Euros to Dollars and this action is only done at the Bank of Palestine. This is the Qatar Organization's policy for all branches around the world.

(Reply Ex. 1 at 3:85–89). At his subsequent trial testimony—where he testified as "Prosecution Witness Number 3," called by the Israeli prosecutors as a cooperative witness—Manassra confirmed that the money flowed from Doha through Deutsche Bank "in Germany" and thence to the Bank of Palestine. The prosecutor then asked, "This money, how is it transferred? In what currency?" to which Manassra replied, "Euro[s]." (Reply Ex. 4 at 5:28–29).

Plaintiffs' representation to this Court that the referenced "confessions" "confirm that Masraf used its correspondent accounts to pass USD through New York for the benefit of Qatar Charity and the FTOs" would thus appear to be a fiction made up out of whole cloth. (Opp.

Mem. at 13).[8]  They do not represent convictions for providing financial support to Hamas or PIJ.  Furthermore, as is not unusual, Israeli authorities were well aware of, and permitted, continued operations of the Charity, even though it was a "designated" entity.[9]  (Indeed, they have also permitted Qatari government assistance.).[10]

Indeed, the transcript of the Manassra confession also rebuts Plaintiffs' allegations that Qatar Charity was nothing more than the fundraising arm of murderous terrorist organizations.  As Manassra testified, when called as a prosecution witness, the Charity "is only a social association that helps society's weaker populations, among them orphans, the poor, and people with special needs."  (Reply Ex. 4 at 5:2–3).  Its "purposes are humanitarian only.  Aid to all people regardless of religion or race."  (Reply Ex. 4 at 5:41).

As to the Plaintiffs' allegation that Sanabel cards operated as a "source of financing for PIJ and Hamas" (Complaint ¶ 153), Manassra characterized the program accurately as a wholly benign effort to help thousands of orphans, describing "the conditions for registration" as simply that "the child's father died before age 10" and that proper paperwork (such as death and birth certificates) were filed.  (Reply Ex. 1 at 3:62–63).  Similarly at trial, although the Israeli prosecutor elicited testimony regarding these cards, there was no mention of Hamas or PIJ and no suggestion that the program had any purpose other than to assist "orphans who live with the

---

[8]  Reply Ex. 5, Case (Military Court of the West Bank) 6014/15 *Military Public Prosecution v. Najwan Mohammed Iman Hassan Awda* (Feb. 8, 2017) (Isr.) at 2 ("Defendant was convicted based upon her confession, with[in] the framework of the guilty plea agreement, that she was a member of the Qatar Charity organization, an illegal organization."); Reply Ex. 6, Case (Military Court of Appeals) 3189/15, *Juda Dib Ibrahim Jamal and Fadi Bahjat Abd el-Fateh Manassra v. Military Advocate General's Office*, (Dec. 30, 2015) (Isr.) at 1 ("The Qatar Association is an illegal association . . . [Juda Jamal and Fadi Manassra] . . . were indicted for membership in an illegal association, holding office in an illegal association, performing a service for an illegal association and bringing in enemy money."); Reply Ex. 7, Case (Military Court of Appeals) 2731/15 *Najwan Mohammed Iman Hassan Awda v. Military Prosecution* (Oct. 13, 2015) (Isr.) at 1 (same).

[9]  Reply Ex. 8, Human Rights Watch, *Born Without Civil Rights*, HRW (Dec. 17, 2019) at 38 (despite the designation, Israel allowed Qatar Charity to deliver funding into Gaza in May 2019); *see also* MTD Mem. at 4 n.5 (discussing Qatar Charity's partnership with the U.N. to deliver supplies which "until recently have been prevented from entering by Israeli authorities.").

[10]  MTD Mem. at 5.

mother." (Reply Ex. 4 at 7:25).  More generally, under questioning by the prosecutor, Manassra testified—without contradiction or challenge—that "all the money we have transferred to charities helps orphans and people with special needs."  (Reply Ex. 4 at 7:41).

In assessing the plausibility of Plaintiffs' allegations, this Court should weigh the false conclusions that they seek to draw from the Israeli judicial proceedings against Qatar Charity's standing in the world community, including in the U.S., where it enjoys a strong relationship with the U.S. government.[11]  This court should similarly discount Israel's 2008 designation of Qatar Charity as an "illegal" organization, upon which Plaintiffs rely heavily, as this summary designation cannot be reconciled with Qatar Charity's worldwide charitable endeavors.  Far from corroborating the Complaint's allegations, the designation only highlights the conclusory nature of the Plaintiffs' allegations—any suggestion that Qatar Charity serves as a principal fundraiser for FTOs is fantastical and need not be accepted as true by this Court when deciding this motion.

Indeed, the very court proceedings in Israel upon which Plaintiffs rely include filings making clear that Qatar Charity operated in a completely open and above-board manner and that "the Israeli authorities [were] aware of [the Charity's] activities," including by dint of "correspondence with the Israeli Tax Authorities [and] the Israeli Ministry of the Economy." (*See* Reply Ex. 9, Notice filed in *Juda Jamal et al v. The Military Prosecution* at 1). Accordingly, the Charity's staff argued that, given the authorities' knowledge of their activities, the Charity had "returned to being legal."  (*See* Reply Ex. 9, Notice filed in *Juda Jamal et al v. The Military Prosecution* at 1).

In sum, the confession of the staff member with direct responsibility for "monitoring money transfers" says that the money flowed (in Euros ***not*** Dollars) from Doha to Germany (***not***

---

[11]  *See, e.g.*, MTD Mem. at 24–25.

New York) to the Bank of Palestine, where the bank "convert[ed] the bills from Euros to Dollars," a process which was "*only* done at the Bank of Palestine."  (Reply Ex. 1 at 3:87–88 (emphasis added)).  By relying on this confession, it would appear that Plaintiffs have been hoist on their own petard.

### A.    Rule 4(k)(2) Does Not Suffice to Confer Jurisdiction Over Qatar Charity Where Plaintiffs Fail to Establish a Prima Facie Case for its Application and Do Not Plead Any Contacts Between Qatar Charity and the U.S. Generally

Federal Rule of Civil Procedure 4(k)(2) cannot serve as a basis for establishing personal jurisdiction over Qatar Charity, as its application is limited to instances where "'the defendant is not subject to jurisdiction in any state's courts of general jurisdiction.'"  (Opp. Mem. at 56 (quoting Fed. R. Civ. P. 4(k)(2)); *see also* MTD Mem. at 18 n.13).  Plaintiffs have pleaded precisely the opposite—alleging that Qatar Charity *is* subject to personal jurisdiction in New York.  (Complaint ¶¶ 23–24).

Having reviewed the Charity's moving brief, Plaintiffs now simply recite that "the defendant[s] [are] not subject to jurisdiction in any state's court of general jurisdiction."  (Opp. Mem. at 56).  Despite their argument to the contrary (Opp. Mem. at 58), Plaintiffs have the burden of pleading each element of personal jurisdiction.  *See Spetner v. Palestine Inv. Bank*, 495 F. Supp. 3d 96, 109 (E.D.N.Y. 2020) (plaintiffs "must include an averment of facts that, if credited by the ultimate trier of fact, would suffice to establish jurisdiction over the defendant") (quoting *In re Terrorist Attacks on September 11, 2001*, 714 F.3d 659, 673 (2d Cir. 2013)).

Plaintiffs' citations to out-of-circuit case law for the proposition that Qatar Charity must "identify [another] state where Plaintiffs can bring their claims" (Opp. Mem. at 56) are plainly inapposite.  In the Second Circuit, "*plaintiffs* bear [the] burden of certifying that to their knowledge, the defendant is not subject to suit in the courts of general jurisdiction of any state." *In re SSA Bonds Antitrust Litig.*, 420 F. Supp. 3d 219, 240 (S.D.N.Y. 2019) (emphasis added)

(citation and quotation marks omitted).[12]  "Because the Plaintiffs in the instant case have not certified that the [foreign defendants] are not subject to general jurisdiction in another state, they have not met all of the elements of Rule 4(k)(2)."  *In re SSA Bonds Antitrust Litig*., 420 F. Supp. 3d at 240.  Rule 4(k)(2)'s three elements are conjunctive, so Plaintiffs' failure to satisfy the second element alone precludes jurisdiction.

In addition, however, Plaintiffs also fail to satisfy the final prong of Rule 4(k)(2) because they "make no specific allegations of contacts with other states or the [U.S.] generally" (as they cannot do because there are none).  *DISH Network, LLC. v. Kaczmarek*, 2021 WL 4483470, at *8 (E.D.N.Y. June 24, 2021); *report and recommendation adopted in relevant part*, 2021 WL 4485870 (E.D.N.Y. Sept. 30, 2021); *cf. In re SSA Bonds Antitrust Litig*., 420 F. Supp. 3d at 240 (Rule 4(k)(2) "requires (1) that the defendant have sufficient minimum contacts with the [U.S.] in general, rather than any particular state and (2) that the exercise of jurisdiction is reasonable") (quoting *Porina v. Marward Shipping Co., Ltd.*, 521 F.3d 122, 127 (2d Cir. 2008)).

### B.    Qatar Charity is Not Subject to Personal Jurisdiction Under an Agency Theory

Plaintiffs' argument that Qatar Charity is subject to personal jurisdiction under Rule 4(k)(2) and New York's CPLR Section 302(a)(1)-(2) pursuant to an agency theory (Opp. Mem. at 63–68, 73–77) fails because the Complaint lacks factual allegations that either Masraf Al Rayan or its third-party correspondent bank acted in an agency capacity for Qatar Charity.  There may be jurisdiction over a principal "based on the acts of an agent where 'the alleged agent acted in New York for the benefit of, with the knowledge and consent of, and under some control by,

---

[12] *See also Astor Chocolate Corp. v. Elite Gold Ltd*., 510 F. Supp. 3d 108, 125 (S.D.N.Y. 2020) ("In this Circuit, to meet the second requirement of Rule 4(k)(2), ***plaintiffs*** need to certify that, to their knowledge, the foreign defendant is not subject to jurisdiction in any other state.") (citation omitted) (emphasis added); *Aqua Shield, Inc. v. Inter Pool Cover Team*, 2007 WL 4326793, at *8 (E.D.N.Y. 2007) (same).

the nonresident principal,'" but that is certainly not the case here.  *See Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 85 (2d Cir. 2018) (*Schwab I*) (quoting *Grove Press, Inc. v. Angleton*, 649 F.2d 121, 122 (2d Cir. 1981)); *see also* (Opp. Mem. at 65 (citing *Kreutter v. McFadden Oil Corp.*, 71 N.Y.2d 460, 467 (1988))).

To plead agency for jurisdictional purposes, the plaintiff "must allege the actual exercise of control, based on the 'realities of the relationship.'"  *Hau Yin To v. HSBC Holdings, PLC*, 700 F. App'x 66, 68 (2d Cir. 2017) (quoting *CutCo Industries, Inc. v. Naughton*, 806 F.2d 361, 366 (2d Cir. 1986)).  Plaintiffs do not plausibly allege that Qatar Charity had any knowledge of or control over Masraf Al Rayan's alleged use of a correspondent account in New York.[13]

Again, and crucially, Plaintiffs do not, and cannot, plausibly allege that Qatar Charity even knew that its funds would pass through New York.  Instead, Plaintiffs allege that Masraf Al Rayan transferred Qatar Charity funds denominated in U.S. Dollars through a correspondent account (Complaint ¶ 132), conclusorily and inaccurately asserting in their Opposition that such transfers "must have" gone through New York.  But, the confession of Fadi Manassra, upon which Plaintiffs rely, makes explicit that funds were routinely converted into U.S. Dollars in Ramallah—"and this action is ***only*** done at the Bank of Palestine."  (Reply Ex. 1 at 3:87–88 (emphasis added)).

---

[13] Plaintiffs are also wrong that the alleged transfers "could only be effectuated through a U.S. correspondent bank." (Opp. Mem. at 65).  As in *Tamam v. Fransabank SAL*, "[u]nderlying Plaintiffs' argument is the faulty assumption that U.S. dollars can only be obtained in the [U.S.]," when, in fact, financial institutions can obtain U.S. Dollars abroad from numerous foreign banks.  677 F. Supp. 2d 720, 729 (S.D.N.Y. 2010).  Plaintiffs try to evade that fact by attaching the declaration of Patrick J. McArdle ("McArdle Decl.").  But Mr. McArdle concedes he lacks any personal knowledge of the transfers alleged here.  He relies instead on personal experience unrelated to this case and three complaints filed by Plaintiffs' counsel in this and two unrelated cases, without even specifying which of his opinions are derived from the pleadings in this case.  (*See, e.g.*, McArdle Decl. ¶¶ 1, 15).  The Court should afford no weight to Mr. McArdle's declaration, which merely recounts how foreign banks "ordinarily" handle U.S. Dollar transactions (McArdle Decl. ¶ 14) and parrots the Complaint's conclusory allegations (*see, e.g.*, McArdle Decl. ¶ 16 ("The Complaints' description of these interbank transactions is consistent with the manner in which a transaction involving U.S. dollars would typically operate.")).  Of course, the confession of the Qatar Charity accountant with responsibility for fund transfers—incorporated into the Complaint by Plaintiffs—fully contradicts McArdle's rank speculation and generalization.  *See* Reply Ex. 1 at 3:88 (conversion to U.S. Dollars "is only done at the Bank of Palestine").

As numerous cases make crystal clear, those paltry allegations fail to establish that Masraf Al Rayan was Qatar Charity's agent for jurisdictional purposes.  *See Spetner*, 495 F. Supp. 3d at 112 (defendant "may have expected, or even known for a fact, that [Arab Jordan Investment Bank] would need to settle the wire transfers in New York; but knowing and expecting are not the same as directing and controlling"); *Berdeaux v. OneCoin Ltd.*, 2021 WL 4267693, at *12 n.25 (S.D.N.Y. Sept. 20, 2021) (the "nature of correspondent banking renders largely nonsensical any attempt to base jurisdiction against the individual Defendants on wire transfers of funds moving through a New York correspondent account" because "[a]bsent unusual circumstances, an individual bank customer would have no reason to direct its foreign bank to use a New York-based correspondent account for a transaction that, such as those at issue here, has no other connection to New York"); *Vasquez v. Hong Kong and Shanghai Banking Corp., Ltd.*, 477 F. Supp. 3d 241, 259 (S.D.N.Y. 2020) ("there is no evidence that [defendant] directed the funds to be deposited or controlled the route of the plaintiffs' funds through the correspondent account").

Merely alleging that Masraf Al Rayan was Qatar Charity's agent does not make it so. *Pincione v. D'Alfonso*, 506 F. App'x 22, 24 (2d Cir. 2012) ("allegations concerning [non-party's] agency were entirely conclusory and thus inadequate").  Plaintiffs cannot and do not plausibly allege the consent, knowledge, and control required to establish an agency relationship. Furthermore, even if Masraf Al Rayan was Qatar Charity's agent—which it plainly was not— Plaintiffs' putative chain of agency breaks irreparably at the purported link between Masraf Al Rayan and its correspondent bank, because it is well-recognized, in the words of the Second Circuit, that "an intermediary bank is the legal agent of neither the originator nor the intended beneficiary."  *Exp.-Imp. Bank of U.S. v. Asia Pulp & Paper Co., Ltd.*, 609 F.3d 111, 121 (2d Cir.

11

2010) (quoting N.Y. U.C.C. § 4–A–212).[14] Plaintiffs would have the Court ignore this black letter law. That it cannot do.

### C. Subjecting Qatar Charity to Personal Jurisdiction Pursuant to Plaintiffs' Proffered Conspiracy Theory Would Violate Due Process

Plaintiffs cannot establish conspiracy jurisdiction based on the in-forum acts of Masraf Al Rayan's correspondent bank, which Plaintiffs acknowledge is not an alleged co-conspirator. (*See* Opp. Mem. at 77). Plaintiffs' conspiracy theory is distinct from the agency theory discussed above, but equally deficient. The Second Circuit has explained that, for the purposes of due process, "a defendant purposefully avails itself of the laws of a forum when it or its co-conspirator undertakes an overt act in furtherance of the conspiracy in the forum." *Schwab Short-Term Bond Mkt. Fund v. Lloyds Banking Grp. PLC*, 22 F.4th 103, 109–10 (2d Cir. 2021) (*Schwab II*); *see also Schwab I*, 883 F.3d at 87.[15]

Many courts have opined that this is a dubious theory at best, in plain tension with pertinent Supreme Court precedent. *See, e.g.*, *Rudersdal v. Harris*, 2022 WL 263568, at *10 (S.D.N.Y. Jan. 28, 2022); *In re Platinum & Palladium Antitrust Litig.*, 449 F. Supp. 3d 290, 326 (S.D.N.Y. 2020); *In re Dental Supplies Antitrust Litig.*, 2017 WL 4217115, at *7 (E.D.N.Y. 2017). But Plaintiffs would have this Court launch this suspect theory into uncharted waters, predicating the theory here not on the in-forum acts of a co-conspirator (none of which are alleged) but on the in-forum acts of an entity concededly ***not*** alleged to be a co-conspirator (the supposed correspondent bank). This is a brazen bridge too far. We know of no cases applying

---

[14] *See also Spetner*, 495 F. Supp. 3d at 110, 111 ("[a] correspondent bank relationship, standing alone, does not create an agency relationship"; "That critical element of control is not present in the garden-variety correspondent banking relationship alleged here.") (internal citation omitted).

[15] *Schwab I* concerns constitutional limitations on the conspiracy theory of jurisdiction. Those limitations are applicable to Plaintiffs' agency theories under both Rule 4(k)(2) and New York's long-arm statute. As discussed in Section I.D., *infra*, New York's long-arm statute itself further limits the application of conspiracy jurisdiction under CPLR 302(a)(1)–(2).

*Schwab I's* conspiracy standard that support such a radical expansion of personal jurisdiction, and the Court should reject Plaintiffs' request to be the first.

The absence of in-forum acts undertaken by ***any*** alleged co-conspirator places the present case in stark contrast with the cases that Plaintiffs claim, wrongly, are analogous.  (*See* Opp. Mem. at 68–71) (citing, *e.g.*, *Berkshire Bank v. Lloyds Banking Grp. plc*, 2022 WL 569819, at *3 (2d Cir. Feb. 25, 2022) ("purported conspiracy participants located in New York who took steps there to advance the conspiracy"); *Schwab II*, 22 F.4th at 125 ("co-conspirators who were based in the [U.S.]"); *In re Platinum & Palladium Antitrust Litig.*, 449 F. Supp. 3d at 325–26 ("United-States-based co-conspirators"); *Allianz Glob. Inv'rs GMBH v. Bank of Am. Corp.*, 457 F. Supp. 3d 401, 412 (S.D.N.Y. 2020) ("coconspirators were based in, and acting out of, New York").[16]

Those cases bear no relationship whatsoever even to the conclusory allegations advanced by Plaintiffs.  There are no putative "United-States-based co-conspirators" alleged here.  As to Qatar Charity, the allegations are, remarkably enough, nothing more than the following:

- Qatar Charity, a Qatar entity with no alleged contacts of any kind with the U.S., attempted to send funds from its own accounts in Doha to other of its own accounts in the Palestinian Territories, taking no action in the U.S. or directed towards the U.S.;

- The Qatari bank it used for this transfer, also with no physical presence of any kind in the U.S., allegedly effectuated that Qatar-to-Palestine transfer through the U.S., utilizing a New York correspondent bank;

- The routing decision to utilize a New York correspondent was not necessary; Qatar Charity is not alleged to have had knowledge of this decision, and hence is obviously not alleged to have exercised any control; and

- The putative correspondent bank is ***not*** alleged to be a co-conspirator and is not an agent as a matter of law (and certainly not an agent of Qatar Charity itself, which concededly is not alleged to have had any knowledge of the existence of the supposed correspondent bank and not alleged to have exercised any control or direction).

---

[16]  The summary order in *Berkshire Bank* does not bind this Court as it has "no precedential effect."  Second Circuit Local Rule 32.1.1(a).

13

To recite those factual allegations is to refute utterly the conspiracy jurisdiction allegations.[17]

Asserting personal jurisdiction over Qatar Charity would also violate *Schwab II*'s instruction that a "conspiracy theory [cannot] get off the ground if [the] defendant w[as] altogether blindsided by its co-conspirator's contacts with the forum." 22 F.4th at 125. Courts considering the relationship between foreign and domestic banks "have discounted the use of a correspondent account that is essentially adventitious—*i.e.*, that was not even defendant's doing—as not reflecting a deliberate act." *Vasquez*, 477 F. Supp. 3d at 258 (collecting cases) (quotation marks and citation omitted). Here, Qatar Charity, a banking ***customer***, is even further removed than its bank from any purposeful availment of the forum. Plaintiffs do not plausibly allege that Qatar Charity knew that Masraf Al Rayan had a correspondent account in the U.S nor that Qatar Charity knew that transfers between its accounts in Qatar and the Palestinian Territories might pass through the U.S. The alleged "conspiratorial contacts" (which involve in-forum conduct only by a bank ***not*** alleged to be a co-conspirator) are therefore not remotely the kind of "contacts" that would support the conclusion that Qatar Charity "'should reasonably [have] anticipate[d] being haled into court' in the forum as a result of them." *Schwab II*, 22 F.4th at 125 (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)).

**D.     New York's Long-Arm Statute Forecloses Exercising Personal Jurisdiction Over Qatar Charity**

Qatar Charity is not subject to personal jurisdiction under Section 302 of New York's long-arm statute, which "is more restrictive than the Fourteenth Amendment's Due Process Clause." *In re Eur. Gov't Bonds Antitrust Litig.*, 2022 WL 768680, at *8 (S.D.N.Y. Mar. 14, 2022). Section 302(a)(1) stipulates that "a court may exercise personal jurisdiction over any

---

[17]   And that conclusion holds even without referencing the confession of Fadi Manassra, expressly incorporated into the Complaint, which states clearly that transfers from Doha transited through Germany in Euros and were only converted to Dollars in Ramallah.  (Reply Ex. 1 at 3:85–88).

non-domiciliary . . . who in person or through an agent . . . transacts any business within the state." CPLR 302(a)(1).  Since Plaintiffs do not, and cannot, allege that Qatar Charity itself transacted any business in New York, to satisfy Section 302(a)(1) they must allege that Qatar Charity conducted business in New York through an agent.  As discussed above in Section I.B., *supra*, Plaintiffs fail to adequately allege an agency theory for jurisdictional purposes.

Furthermore, with respect to Section 302(a)(1) specifically, there is "no authority . . . standing for the principle that a non-domiciliary individual defendant may be subject to specific jurisdiction in New York under Section 302(a)(1) because the non-domiciliary moved money between foreign bank accounts, with the transfer passing through New York via a correspondent account."  *Berdeaux*, 2021 WL 4267693, at *12.[18]  That is because "[a]bsent unusual circumstances, an individual bank customer would have no reason to direct its foreign bank to use a New York-based correspondent account for a transaction that, such as those at issue here, has no other connection to New York."  2021 WL 4267693, at *12 n.25; *accord Universal Trading & Inv. Co. v. Tymoshenko*, 2012 WL 6186471, at *3 (S.D.N.Y. 2012).

In *Berdeaux*, the plaintiff alleged "hundreds of transactions" that purportedly flowed through New York accounts, including one $30 million transaction as to which the defendant emailed himself a copy of the wire instructions—thus making explicit his knowledge that the

---

[18]  Plaintiffs badly mischaracterize *Berdeaux* in a failed attempt to distinguish it.  Plaintiffs contend "*Berdeaux* involved only one wire transfer not initiated by any defendant."  (Opp. Mem. at 63).  In reality, while the court held that "Plaintiffs allege adequately only a single transaction," the *Berdeaux* complaint alleged "the Scott Group **Defendants** used shell companies and bank accounts all over the world to launder more than $400 million in criminal proceeds" and that defendant Bank of New York Mellon "enabled the 'Scott Group' to launder more than $300 million in fraud proceeds by serving as correspondent bank for **hundreds of transactions**."  *Berdeaux*, 2021 WL 4267693, at *3, 11 n.21, 16 (emphasis added).  Next, Plaintiffs assert *Berdeaux* is inapposite because the *Berdeaux* plaintiffs "disclaimed all bases for personal jurisdiction other than CPLR 302(a)(3)(ii), which is not at issue here."  (Opp. Mem. at 62–63).  But the *Berdeaux* court made clear that it "assess[ed] . . . Defendants' amenability to jurisdiction under multiple prongs of New York's long-arm statute," **including** Sections 302(a)(1)–(2), even though "Plaintiffs . . . abandoned all bases for personal jurisdiction other than CPLR 302(a)(3)(ii)."  *Berdeaux*, 2021 WL 4267693, at *8.

15

funds would be processed through New York.  *Berdeaux*, 2021 WL 4267693, at \*3–4.  That knowledge was deemed insufficient.  "None of that is anywhere close to sufficient to show that [the defendant] transacted business in New York."  2021 WL 4267693, at \*11; *cf. id*. at \*12 (these allegations are "insufficient as a matter of law").

Here, Plaintiffs allege that Masraf Al Rayan transferred funds from Qatar Charity's account in Qatar to its account in the Palestinian Territories, and that the funds passed through New York on the way.  (Complaint ¶¶ 10, 23–25, 132).  Again, and crucially, Plaintiffs do not plausibly allege that Qatar Charity knew its funds passed through New York on the way from Qatar to the Palestinian Territories.  But, as set forth in detail above, the confession of the Qatar Charity staff accountant responsible for bank transfers upon which Plaintiffs rely discusses not Dollar-denominated transfers that cleared in the U.S., but rather Euro-denominated transfers that cleared through a German bank and were "only" converted to Dollars at the Bank of Palestine in Ramallah.  (Reply Ex. 1 at 3:85–88).

Furthermore, as explained in Qatar Charity's Opening Brief (MTD Mem. at 14–15), Plaintiffs' argument that conspiracy jurisdiction is applicable under Section 302(a)(1) is flat wrong.  *See, e.g.*, *Suber v. VVP Servs., LLC*, 2021 WL 4429237, at \*6 (S.D.N.Y. Sept. 27, 2021) ("the conspiracy theory of jurisdiction is not available under section 302(a)(1)").

Plaintiffs wrongly argue that Qatar Charity's cited authorities "did not survive *Schwab I*, *Schwab II* and *Berkshire Bank*, all of which attributed the in-forum acts of co-conspirators to each other."  (Opp. Mem. at 76).  First, and critically, even after the Second Circuit issued those opinions, a New York state court has reaffirmed that "[t]he conspiracy theory of jurisdiction is not available under section 302(a)(1)."  *Smartmatic USA Corp. v. Fox Corp.*, 2022 WL 685407, at \*26 (N.Y. Sup. Ct. Mar. 08, 2022).  Second, neither *Schwab I*, nor *Schwab II*, nor *Berkshire Bank*

16

held—or even implied—that conspiracy jurisdiction is available ***under Section 302(a)(1)***.  In fact, not one of those cases had anything to do with that statutory basis and hence, unsurprisingly, not one stands remotely for the proposition for which Plaintiffs cite them.

Plaintiffs also cite two outlier opinions for the proposition that "Defendants err when they suggest that conspiracy principles are inapplicable to jurisdiction under § 302(a)(1)."  (Opp. Mem. at 75).  Both cases are unsupported and unpersuasive.  In *Rich v. Fox News Network LLC*, a Report and Recommendation never ultimately adopted, the Magistrate Judge held that "personal jurisdiction over [defendant] based on Plaintiffs' conspiracy . . . claim is proper under Section 302(a)(1)."  2020 WL 6276026, at *6 (S.D.N.Y. 2020).  However, *Rich* cites no authority to support that proposition and cites *Schwab I* for the applicable standard.  *Rich*, 2020 WL 6276026, at *6 (citing *Schwab I*, 883 F.3d at 87).  That is erroneous because, as noted above and as Judge Karas has explained in a subsequent case, *Schwab I* "determined the personal jurisdiction of a federal court in California" and "California's long-arm statute is more capacious than New York's."  *PharmacyChecker.com, LLC v. Nat'l Ass'n of Boards of Pharmacy*, 530 F. Supp. 3d 301, 325 n.9 (S.D.N.Y. 2021).

Plaintiffs' only other citation is similarly unavailing.  It is true that in *Freeman*, the Court held that "under this long-arm statute . . . 'activities of a co-conspirator may be imputed to an out-of-state tortfeasor for jurisdictional purposes under an agency rational[e].'"  *Freeman v. HSBC Holdings PLC*, 413 F. Supp. 3d 67, 79 (E.D.N.Y. 2019) (quoting *In re N. Sea Brent Crude Oil Futures Litig.*, 2017 WL 2535731, at *9 (S.D.N.Y. 2017)).  But *Sea Brent*, the case quoted by *Freeman*, does not support that proposition or even mention Section 302(a)(1), and in fact held that New York's long-arm statute had no application to the case.  2017 WL 2535731, at *11 n.12.  It is also true that other provisions of New York's long-arm statute (inapplicable here, as

discussed below) encompass conspiracy jurisdiction.  But the law is pellucidly clear that

conspiracy jurisdiction "is not available under section 302(a)(1)."  *Smartmatic*, 2022 WL

685407, at *26.

Hence, for the reasons discussed above, Qatar Charity is not subject to Section 302(a)(1)

jurisdiction under a primary theory, an agency theory, or a conspiracy theory.

Qatar Charity is also not subject to personal jurisdiction under Section 302(a)(2).  That

provision stipulates that "a court may exercise personal jurisdiction over any non-

domiciliary . . . who in person or through an agent . . . ***commits a tortious act within the state***."

CPLR 302(a)(2) (emphasis added).  As we pointed out previously (MTD Mem. at 11), Section

302(a)(2) "is read narrowly and requires physical commission of the tortious act in New York."

*Clean Coal Techs. v. Leidos, Inc.*, 377 F. Supp. 3d 303, 314 (S.D.N.Y. 2019).  Plaintiffs do not

allege that any tortious conduct occurred in New York and neither Qatar Charity ***nor any alleged***

***co-conspirator*** was ever physically present in the state.  Thus, this theoretical basis for

jurisdiction has nothing to do with this case.  *See SK's Cosm. Boutique Inc. v. J.R. Silverberg*

*Realty*, 2020 WL 3451324, at *4 (S.D.N.Y. 2020) (no jurisdiction under Section 302(a)(2) where

"the situs of the injury was" out of state).

Conspiracy jurisdiction under Section 302(a)(2) is similarly unavailing.  The Second

Circuit recently clarified that:

> To establish conspiracy-based personal jurisdiction pursuant to New York's long
> arm statute, a plaintiff must—after making a *prima facie* showing of a conspiracy—
> plausibly allege that: "(a) the defendant had an awareness of the effects in New
> York of its activity; (b) the activity of the co-conspirators in New York was to the
> benefit of the out-of-state conspirators; and (c) ***the co-conspirators acting in New***
> ***York acted at the direction or under the control, or at the request of or on behalf***
> ***of the out-of-state defendant***."

*Berkshire Bank*, 2022 WL 569819, at *3 (quoting *Lawati v. Montague Morgan Slade Ltd.*, 961

N.Y.S.2d 5, 7 (1st Dep't 2013)) (emphasis added).  As Plaintiffs' own favorite case makes clear,

the "third element can be established by, for example, a ***co-conspirator being 'aware of the torts being committed by . . . defendants in New York.***'"  *Berkshire Bank*, 2022 WL 569819, at \*3 (quoting *Lawati*, 961 N.Y.S.2d at 8) (emphasis added).

Plaintiffs do not contest that they fail to allege Qatar Charity's knowledge, and instead argue that "what matters is *Masraf's* knowledge that it was using its New York correspondent account when it conducted the USD transactions."  (*See* Opp. Mem. at 68) (emphasis in original).  The Complaint lacks any allegation that Qatar Charity requested Masraf Al Rayan to utilize a correspondent bank in New York.  The Complaint does not plausibly allege that Qatar Charity was even ***aware of*** Masraf Al Rayan's correspondent account, and Plaintiffs now wrongly argue that "what matters is *Masraf's* knowledge."  (Opp. Mem. at 68).  That is, under governing law, clearly insufficient to plead the third prong of conspiracy jurisdiction.[19]

### E.    The Due Process Reasonableness Factors Counsel Against Imposing Jurisdiction

Even in a case, decidedly unlike this one, where there are adequate allegations that "a defendant has purposefully directed its activities at the forum state, it may still defeat jurisdiction on due process grounds."  *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 173 (2d Cir. 2013).  Here, the reasonableness factors counsel against exercising jurisdiction because none of the Defendants (especially Qatar Charity) has ***any*** presence in the U.S. and ***all*** of their alleged activity took place abroad.  *See generally Fuld v. Palestine Liberation Org.*, 2022 WL 62088, at \*1 (S.D.N.Y. Jan. 6, 2022) (appeal filed).

---

[19]  *See, e.g.*, *Berdeaux*, 2021 WL 4267693, at \*15 n.28 (citation omitted) ("Plaintiffs' allegations fall woefully short, as they do not plead facts demonstrating that [the foreign defendants] had any knowledge of the New York acts of any alleged co-conspirators."); *Contant v. Bank of Am. Corp.*, 385 F. Supp. 3d 284, 295 (S.D.N.Y. 2019) (the Complaint "does not specifically allege that [the foreign defendants] engaged in suit-related conduct aimed at or taking place in New York" or "connect these defendants' participation in the conspiracy to New York in some other way—for example, by alleging facts to show that they were aware of their co-conspirators' in-forum overt acts").

## II.     PLAINTIFFS FAIL TO STATE ANY CLAIM FOR RELIEF

### A.     Counts III and IV Must Be Dismissed As Plaintiffs Fail to Plead a Primary Liability Claim

To survive dismissal, Plaintiffs "must provide the grounds upon which [their] claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.'" *Gallop v. Cheney*, 642 F.3d 364, 368 (2d Cir. 2011) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  This requires that Plaintiffs put forth well-pleaded allegations that state a plausible claim for relief, rather than simply "tender[ing] naked assertions devoid of further factual enhancement."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation marks and citation omitted).

At no point do Plaintiffs allege—because they cannot—that Qatar Charity itself or any of its employees were involved in the Attack.  Instead, Plaintiffs' theory of primary liability rests entirely on the Defendants' purported provision of financial aid to almost entirely unnamed charitable organizations alleged, without any specificity, to be "fronts" for Hamas and PIJ. Aside from these wholly implausible inferences about the Charity's purported connection to unnamed entities, there is nothing that plausibly connects Qatar Charity's conduct to Hamas or PIJ, much less to the Attack at issue here.

Plaintiffs, in opposing the Defendants' motions to dismiss, now assert for the first time that Qatar Charity is *itself* an FTO-affiliated front for Hamas and PIJ.  (*See* Opp. Mem. at 3–4). A theory so plainly baseless—that the U.S. would choose to partner with a "terrorist front" and praise it as "one of the best organizations in the world" strains credulity to the breaking point—is the sort of fantasy that the Second Circuit has held is insufficient to plead a plausible claim for relief.  *See, e.g.*, *Gallop v. Cheney*, 642 F.3d 364 (2d Cir. 2011) (quoting *Denton v. Hernandez*, 504 U.S. 25, 32–33 (1992)) ("A court may dismiss a claim as 'factually frivolous' if the

20

sufficiently well-pleaded facts are 'clearly baseless'—that is, if they are 'fanciful,' 'fantastic,' or 'delusional.'")).

      i.      **Plaintiffs Fail to Plead that Qatar Charity Committed Any Act of International Terrorism**

This Court has more than adequate grounds to reject the characterization of Qatar Charity as a "front organization" as a "factually frivolous" claim that is "clearly baseless."  In fact, the Plaintiffs' core allegations against Qatar Charity—that it is a notorious supporter of terrorism that has been designated as such by the U.S. (*e.g.*, Complaint ¶¶ 39–41)—are demonstrably false when the public record available to the Court, including the absence of any U.S. designation and the very public praise of the Charity by U.S. government officials, is considered.  The documents which Qatar Charity has asked this Court to take judicial notice of are plainly susceptible of such notice.  Nor are these documents hearsay, since Qatar Charity has not asked this Court to consider them for their truth, but rather for the fact that the statements were made (by, among others, the President of the United States, the Secretary of State and other senior diplomats, ranking U.N. officials, and Bill Gates.  (MTD Mem. at 2–6, 20–24).  Furthermore, the Court ***can*** consider as true Qatar Charity's Annual Reports and the "confession" of a former Qatar Charity employee in Israeli juridical proceedings, because these documents were explicitly incorporated into the Complaint by Plaintiffs.  (MTD Mem. at 20–24; Complaint ¶ 133).[20]

Here, the Court has a wealth of material properly before it from which it may evaluate the implausibility of Plaintiffs' allegations—including material cited by the Plaintiffs themselves for the false proposition that Qatar Charity financed Hamas and PIJ.  Relying on the Charity's

---

[20] *See Chambers v. Time Warner Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) ("a court may consider documents attached to the complaint as an exhibit or incorporated in it by reference . . . matters of which judicial notice may be taken, or . . . documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit.") (citation omitted).

Annual Reports, for instance, Plaintiffs allege that from 2013 through 2015, Qatar Charity

"carried out joint projects" with "various Hamas and PIJ fronts."  (Complaint ¶ 133).  But the

reports say nothing of the sort.  They make no mention of Hamas or PIJ, nor do they reference

violence or terrorism.  What the Annual Reports instead reflect, as discussed in Qatar Charity's

moving papers (*see* MTD Mem. at 20–24), is abundant reference to the Charity's good works.

At least one of the "confessions" upon which Plaintiffs rely throughout their Opposition

(that of Mr. Manassra) is similarly replete with evidence of the Charity's good works.  That

confession reflects not what Plaintiffs claim, but is instead wholly consistent with the Annual

Reports and the statements of the U.S. government in explaining that the Charity focuses on

"support[ing] needy families [and] orphans," providing "Ramadan holiday meals to needy

families," and "small projects like raising sheep."  (Reply Ex. 1 at 2:58, 2:60, and 2:59).  As the

Israeli prosecutor elicited at trial from Mr. Manassra, called as a cooperative witness, the

Charity's purposes are "humanitarian only," including aid "to all people regardless of religion or

race."  (Reply Ex. 4 at 5:41).  Those statements (incorporated into the Complaint by Plaintiffs)

make no mention of Hamas or PIJ, no mention of "front organizations," and no mention of

Dollar transfers through New York.

Nor do Plaintiffs' allegations plead any "international act of terrorism" undertaken by

Qatar Charity that might support their primary liability claim.  *See, e.g.*, *Strauss v. Credit

Lyonnais, S.A.*, 379 F. Supp. 3d 148 (E.D.N.Y. 2019) (mere provision of banking services which

were earmarked for ostensibly charitable purposes was not apparently intended to intimidate or

coerce civilian population, influence government policy, or affect government conduct by mass

destruction, assassination, or kidnapping); *Weiss v. National Westminster Bank PLC*, 381 F.

Supp. 3d 223 (E.D.N.Y. 2019) (mere provision of banking services not identified as being for

any violent or terroristic purpose was not apparently intended to intimidate or coerce civilian population, influence government policy, or affect government conduct by mass destruction, assassination, or kidnapping); *Freeman v. HSBC Holdings PLC*, 413 F. Supp. 3d 67, 83 (E.D.N.Y. 2019) (banks did not engage in any acts of international terrorism by providing financial services to various Iranian banks, airlines, shipping and oil companies, all of whom had significant legitimate operations and were not merely fundraising fronts for terrorist organizations); *Zapata v. HSBC Holdings PLC*, 414 F. Supp. 3d 342 (E.D.N.Y. 2019) (failure to plausibly allege intent to intimidate civilians or influence a government where to an objective observer, conduct appeared motivated by economics or greed).  And the Plaintiffs' contention that the Complaint satisfactorily pleads facts that might support a *prima facie* claim is belied by their own citations to cases involving detailed allegations of a given defendant's ***direct contacts*** with FTOs.  (Opp. Mem. at 41–44 (citing *Linde v. Arab Bank, PLC*, 384 F. Supp. 2d 571, 588 (E.D.N.Y. 2015) ("*Linde I*") (transmission of funds to terrorist organizations) and *Miller v. Arab Bank, PLC*, 372 F. Supp. 3d 33, 45 (E.D.N.Y. 2019) (allegations that defendant provided monetary transfers and financial services directly to Hamas)).  Absent conduct satisfying the ATA's statutorily-prescribed definitions of what amounts to terrorism, Plaintiffs' claims fail.

### ii.    Plaintiffs Fail to Plausibly Allege That Qatar Charity Proximately Caused the Attack

The primary liability claims similarly fail because Plaintiffs have not plausibly alleged that Qatar Charity proximately caused their injuries.  Establishing proximate cause requires the plaintiff to "plausibly allege that the defendant's actions were a 'substantial factor in the sequence of responsible causation' leading to the plaintiff's injury and that the plaintiff's injuries were 'reasonably foreseeable' or 'anticipated as a natural consequence' of those actions." *Freeman*, 413 F. Supp. 3d at 84 (citing *Rothstein v. UBS AG*, 708 F.3d 82, 91 (2d Cir. 2013)).

Merely alleging, as Plaintiffs repeatedly do, that a defendant enhanced an FTO's abilities is insufficient to state a claim. *See Fields v. Twitter, Inc.*, 881 F.3d 739, 749–50 (9th Cir. 2018); *Gill v. Arab Bank, PLC*, 893 F. Supp. 2d 474, 522 (E.D.N.Y. 2012). What is missing—and necessary—is the articulation of a connection between Qatar Charity and the Attack, other than threadbare and totally conclusory allegations. This absence forecloses any possible finding of proximate cause. *See, e.g.*, *Owens v. BNP Paribas, S.A.*, 897 F.3d 266, 276 (D.C. Cir. 2018) (allegations that the funds were transmitted "directly to al Qaeda" who used the funds "to carry out the embassy bombings" were "conclusory allegations that do not meet *Twombly*'s plausibility standard") (citing *Rothstein*, 708 F.3d at 97); *see also Siegel v. HSBC North America Holdings*, 933 F.3d 217, 225 (2d Cir. 2019).[21]

## B.    Counts I and II Must Be Dismissed for Failure to Plausibly Plead a Secondary Liability Claim

### i.    Plaintiffs Have Not Plausibly Alleged a JASTA Conspiracy Claim

As established in Qatar Charity's Motion to Dismiss, Plaintiffs have not plausibly alleged a conspiracy claim under JASTA, as they have failed to allege the facts required to satisfy the elements of such a claim, namely:  "(1) an agreement between two or more persons; (2) to participate in an [act of international terrorism]; (3) an injury caused by an unlawful overt act performed by one of the parties to the agreement; [and] (4) which overt act was done pursuant to and in furtherance of the common scheme."  *O'Sullivan v. Deutsche Bank AG*, 2019 WL 1409446, at *9 (S.D.N.Y. 2019) (quotations and citation omitted).[22]

---

[21]  *See also Zapata v. HSBC Holdings, PLC*, 414 F. Supp. 3d 342, 356–57 (E.D.N.Y. 2019), *aff'd*, 825 F. App'x 55 (2d Cir. 2020) (no direct relationship between subsidiaries of foreign investment bank's money laundering for cartels and the acts of violence perpetrated against them, for purposes of proximate cause where victims did not allege that the cartels required laundered money to carry out specific acts of violence); *Rothstein*, 708 F.3d at 91–92.

[22]  Plaintiffs' claim that Qatar Charity has waived any argument as to certain of these elements is silly.  (Opp. Mem. at 35 n.20).  Qatar Charity plainly stated in its Motion to Dismiss that a conspiracy requires the four elements, set out once again above, and that the "Complaint does not clear any of these hurdles."  (MTD Mem. at 29).

Plaintiffs further argue that they need not show a conspiracy between *all* parties.  (Opp. Mem. at 38–39).  However, this claim is entirely beside the point because they have failed to show a conspiracy between *any* parties—and in particular, they have failed to show a conspiracy with the alleged principals, *i.e.*, Hamas and PIJ—which is necessary to plead a conspiracy. *Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842, 855 (2d Cir. 2021) ("JASTA states that to be liable for conspiracy a defendant would have to be shown to have 'conspir[ed] with' the principal.").  In an apparent attempt to remedy this failure, Plaintiffs spend much of their Opposition discussing the Union of Good.  (Opp. Mem. at 10–11, 16, 22–23, 31–32).  However, as discussed previously, *see supra* Section I, Plaintiffs' allegation that Qatar Charity was a member of the Union of Good at the time of the Attack, and remains a member today, is demonstrably false.  Moreover, it is Hamas and PIJ—not the Union of Good—who are alleged to be responsible for the Attack.  And notably, the Union of Good is an SDGT not an FTO, and therefore does not qualify as a terrorist organization for purposes of § 2339B of the ATA.  *See, e.g.*, *Weiss*, 768 F.3d at 209 n.7;[23] *see also supra* n.4.

> ### ii.    Plaintiffs Have Not Plausibly Alleged a JASTA Aiding-And-Abetting Claim

Plaintiffs have also failed to plausibly allege that Qatar Charity was "generally aware of [its] role as part of an overall illegal or tortious activity at the time that [it] provide[d] the assistance" or that it "knowingly and substantially assist[ed] the principal violation" as required to

---

[23]  Contrary to Plaintiffs' assertions, Qatar Charity did not misread *Weiss*, which is directly and accurately quoted in its Motion to Dismiss.  MTD Mem. at 29–30.  Plaintiffs agree that "§ 2333(d) does not create liability against a person who aids and abets or conspires with the person who merely authorized (rather than committed) the terrorist act." *Weiss*, 278 F. Supp. 3d at 650.  This reading is supported by *Freeman*. *Freeman*, 413 F. Supp. 3d at 84 (lack of allegations that defendants "*directly* conspired with Hezbollah or the [Islamic Revolutionary Guard Corps]" were fatal to secondary liability claims under § 2333(d)(2)).  Plaintiffs' Complaint contains no non-conclusory allegations that Qatar Charity *directly* conspired with Hamas and PIJ.

allege a JASTA aiding-and-abetting claim.  *Linde v. Arab Bank, PLC*, 882 F.3d 314, 329 (2d Cir. 2018) ("*Linde II*") (quoting *Halberstam v. Welch*, 705 F.2d 472, 487 (D.C. Cir. 1983)).

To demonstrate general awareness, Plaintiffs must show that the defendant not only ***knew*** of the principal's involvement in committing acts of "international terrorism," but also that the defendant and the principal were "one in spirit."  *Halberstam*, 705 F.2d at 484; *Linde II*, 882 F.3d at 329 n.10.  Plaintiffs have made no plausible allegations demonstrating that Qatar Charity had knowledge of Hamas and PIJ's involvement in the Attack—much less that those organizations and Qatar Charity were "'one in spirit' with the tortfeasor, such that its conduct 'evidences a deliberate long-term intention to participate in an ongoing illicit enterprise.'"  *See Bartlett v. Societe Generale de Banque Au Liban SAL*, 2020 WL 7089448, at *14 (E.D.N.Y. 2020) (quoting *Halberstam*, 705 F.2d at 484, 488).

Plaintiffs also fail to plausibly allege that Qatar Charity "knowingly and substantially assist[ed] the principal violation."  *Linde II*, 882 F.3d at 329 (quoting *Halberstam*, 705 F.2d at 487).  Such a failure is grounds for dismissal.  *Siegel*, 933 F.3d at 225.  The *Halberstam* framework, of course, provides six factors for determining "how much encouragement or assistance is substantial enough."  705 F.2d at 478.  Although Plaintiffs walk through the six factors in their Opposition, that discussion is largely silent as to Qatar Charity.  (*See* Opp. Mem. at 28–34).  The limited claims made as to Qatar Charity are unavailing, including that "Qatar Charity knew it was a member of the Union of Good" which, somehow, shows Defendant's state of mind.  (Opp. Mem. at 32).  If anything, Qatar Charity's decisive move to sever any association with the Union of Good following its designation, *see supra* Section I, shows Qatar Charity's clear intention not to be affiliated with that entity.  Indeed, the situation here is analogous to *Honickman* where the Union of Good itself was a customer of the bank defendant, and even

though Israel "designated" it in 2002, *Honickman*, 6 F.4th at 493 n.6, the Second Circuit held

liability did not attach because "Plaintiffs failed to plausibly allege BLOM Bank was aware [its]

[c]ustomers were related to Hamas." *Honickman*, 6 F.4th at 503.

## III. PLAINTIFFS FAILED TO PROPERLY EFFECT SERVICE OF PROCESS & A REQUEST TO SERVE BY EMAIL DOES NOT CURE THE FAILURE

Qatar Charity adopts and incorporates by reference the arguments made by Masraf Al

Rayan in Section VI of its Reply Brief in Further Support of its Motion to Dismiss ("Masraf's

Reply").

## IV. CLAIMS AS TO FOREIGN PLAINTIFFS CONTINUE TO DEMONSTRATE THE PLAINTIFFS LACK STANDING TO BRING PERSONAL INJURY CLAIMS UNDER THE ATA

Qatar Charity adopts arguments set forth in Section V of Masraf Al Rayan's Reply

regarding certain Plaintiffs' lack of statutory standing under the ATA and JASTA.  Specifically,

four Plaintiffs lack statutory standing as non-U.S. citizens.

## V. PLAINTIFFS' REQUEST FOR JURISDICTIONAL DISCOVERY SHOULD BE REJECTED

Plaintiffs again request (prematurely) jurisdictional discovery.  (*See* Opp. Mem. at 78–

80).  This request should be rejected, for reasons previously articulated in Qatar Charity's

Motion to Dismiss via incorporation of Masraf Al Rayan's arguments.  (*See* MTD Mem. at 35).

For these reasons and more, Plaintiffs' renewed request for jurisdictional discovery

should be rejected.  In the event Qatar Charity's Motion to Dismiss is not granted with prejudice,

and Plaintiffs at that time file a Motion for Jurisdictional Discovery in a manner consistent with

this Court's Rules, Qatar Charity reserves the right to raise all further available objections.

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should dismiss the Complaint in its entirety.

Dated: April 20, 2022
      New York, New York

Respectfully submitted,

**DLA PIPER LLP (US)**

By:    _/s/ John Hillebrecht_
       John M. Hillebrecht
       Kevin Walsh
       Jessica Masella

1251 Avenue of the Americas
New York, New York 10020
Phone: (212) 335-4500
Email: John.Hillebrecht@us.dlapiper.com
       Kevin.Walsh@us.dlapiper.com
       Jessica.Masella@us.dlapiper.com

_Counsel for Defendant Qatar Charity_

28