# EXHIBIT 4

Israel Defense Forces
[emblem]

Date: 09/01/17                          Judea Military Court                          File no.:
6011/15

1
2    **Judea Military Court**                                              **Case No. 6011/15**
3
4    **Before the Honorable President: Lt. Col. Tzvi Heilbrun**
5    **Before the Honorable Judge: Maj. Etty Adar**
6    **Before the Honorable Judge: Maj. Chaim Balilti**
7
8    **The Military Advocate General's Office**
9    (By Counsel Capt. Almaz Ayesu)
10                              **v.**
11   **The Defendant: Juda Dib Ibrahim Jamal, 86096195 / IPS – Present**
12   (By Counsel Adv. Mahajna Raslan – Present)
13
14   **Shift Leader: Cpl. Mai Tal**
15   **Translator: Sgt. Maj. David Cohen**
16
17   Date of hearing: 01/09/2017, 11 Tevet 5777
18
19
20                              <u>**Hearing Proceedings**</u>
21
22   **The Court identifies the Defendant.**
23   **The Defendant declares he is represented by Adv. Mahajna Raslan.**
24
25
26   Defense Counsel: I believe I am missing investigation material, which is essential and pertains to the contact between the
27   Ministry of Defense Legal Advisor, or anyone on his behalf, and the association's representative in Israel, whose name is
28   known and was provided to the Ministry of Defense. The two were in correspondence and carried out meetings, and this
29   lasted for a number of years. I hereby file a Temporary Activity Permit letter from the Minister of Defense given to a different
30   association by the name of UAE – Ajman International Charity Organization Association. This association was declared
31   illegal yet was given a Temporary Activity Permit. This association's representative is the same representative of the Qatar
32   Association in this case; therefore, we wish to obtain all of the correspondence between the association's representative and
33   the Ministry of Defense. Thus, I request to receive all of the correspondence and contacts I detailed above.
34
35
36   Adv. Bulus: I wish to continue arguing this case. As long as this is a preliminary argument to which this matter is related, I
37   would like to complete the argument. The argument regarding a connection between this association and the State of Israel
38   originated the Prosecution. When arguing against our response, according to which these people, who entered in 2010–2011,
39   did not know what came before then, and that the association did not know it was illegal, the Prosecution pulled out a
40   document to support its version. We have no idea where it came from and how they obtained it, but it allegedly indicates a
41   connection between the association and the Ministry of Defense. We found the document regarding the contact between the
42   Ministry of Defense and the parallel association represented by the same individual.
43
44   Military Prosecutor: We will examine the Defense's argument and provide our position on this matter in the next hearing.

1

Israel Defense Forces
[emblem]

| | | |
|---|---|---|
| Date: 09/01/17 | Judea Military Court | File no.: 6011/15 |

1
2 **Prosecution Witness No. 2 (No. 1 in the List of Witnesses) Advanced Sgt. Maj. Aamer Saliman**
3 **The witness is hereby cautioned to tell the truth, otherwise be subject to the penalties provided by Law.**
4
5 Defense Counsel: There is no dispute that the witness's statement was taken freely and voluntarily.
6
7
8 <u>**Direct Examination**</u>
9
10
11 Q: Tell the Court, what is your role?
12 A: Detective at the Israeli Police Shai District Hostile Action Unit
13 Q: What is your level of proficiency in Arabic?
14 A: Mother tongue.
15 Q: I present before the witness a statement from 09/17/2015. Can you explain to the Court who took the statement?
16 A: I took this statement.
17 Q: From whom did you take it?
18 A: Juda Jamal.
19 Q: Can you tell the Court of the circumstances of taking the statement?
20 A: That day, I got a memo from the Team Leader that the suspect should be interrogated. I took him up to the interrogation room, I told him
21 my name and position title, the suspicions against him, and the rights he has, and afterward began interrogating him according to the memo I
22 received.
23 Q: Based on what did you write what appears in the statement?
24 A: Based on the memo I received from the Shin Bet. He was interrogated there and afterward came to me. I suspected him of the suspicions
25 detailed in the statement.
26 Q: What else did you do while taking the statement?
27 A: According to what I see in the statement itself, I presented him with documents of part of the investigation.
28 Q: I present before the witness a bundle of documents. Are these the same documents you presented during the interrogation?
29 A: According to what I see in these documents, my name is on it [sic] and also, the suspect signed it, these are the documents I presented before
30 him according to this testimony.
31 Q: Regarding the statement, whose signature appears at the bottom of the statement?
32 A: Mine and the suspect's.
33 Q: Do you recall any extraordinary circumstances?
34 A: According to what I see in the statement itself, no.
35 Q: If there were any? What would you do?
36 A: It would be written in the statement itself or in a separate memo.
37 Q: Based on what did you write the answers appearing in the statement?
38 A: According to the suspect's answers.
39 Military Prosecutor: We shall request to file the statement at the end of the cross examination.
40 Q: I present you with a statement from 09/29/2015. Who took the statement?
41 A: I did.
42 Q: In what language was it taken?
43 A: In Arabic.
44 Q: How was it taken?
45 A: According to a memo I got from the Team Leader.
46 Q: What else did you do while taking the statement?
47 A: According to the statement, I presented before the suspect a number of documents.
48 Q: I present before the witness a bundle of documents from 09/29/2015. Are these the documents?
49 A: Yes. My signature is also there, but not the witness's.
50 Q: Can you detail how you took the statement?
51 A: After I received the documents and the memo from the Team Leader, I brought the suspect up to the interrogation room again and introduced
52 myself, presented the suspicions against him, told him of his rights, and afterwards interrogated him based on the documents that were presented
53 to him. At the end, he signed the statement.
54 Q: Were there any extraordinary circumstances while taking the statement?
55 A: No. According to what I see in the statement, there were none.
56 Q: And if there were, what would you have done?
57 A: I would have written them down in the statement itself or in a separate memo.
58 Q: How did you know which suspicions were there against the suspect?

Israel Defense Forces
[emblem]

| Date: 09/01/17 | Judea Military Court | File no.: 6011/15 |

1  A: There are two things here, or according to the Shin Bet's memo, and also following the suspect's previous statements.

4  Military Prosecutor: There are no further questions. I shall request to file the 2 statements and the documents at the end of the cross examination.

6  **Cross Examination**

9  Q: How many years have you been in the position of detective?
10 A: 5 years at the Hostile Action Unit and before that, 14 years at the Jerusalem Police.
11 Q: What is your part in the investigation of this affair?
12 A: Taking the two statements.
13 Q: You only took the statements?
14 A: To the best of my recollection, yes. I might have interrogated other people as well; I do not recall.
15 Q: While warning the suspect, in clause 4 of the warning it says work in an illegal association, what work did you mean?
16 A: In the statement, it is written the Qatar Al-Khiria Association.
17 Q: Why did you not mention to him in the warning that you mean the illegal Qatar Al-Khiria Association? The warning should be clear.
18 A: The suspicion may be working in an illegal association, but the details are given afterwards, there is no need to detail everything in the
19 warning.
20 Q: Why did you not detail from the start?
21 A: I put in the heading, and during the interrogation I ask the questions and detail everything in the question itself.
22 Q: When I look at page 5, when you ask regarding clause 4 of the warning, you ask him what is the connection between the association in
23 which he works and other entities, you do not say the association is illegal?
24 A: This interrogation follows previous investigations. According to what he says in page 5 "we received money..." we had already talked about
25 this association in the previous statement.
26 Q: You suspected him in clause 3 of performing a service and activity for the Hamas organization, what were you based on?
27 A: I repeat, according to the memos I had at the time and according to previous statements.
28 Q: On which memos do you recall?
29 A: I do not recall a specific memo; I assume it is in the file.
30 Q: I looked at the memos. Overall, the suspicion is of performing a service for an illegal association. I did not find any basis for the Hamas
31 organization. And you also do not interrogate much in this regard after the suspect replies in the negative. You let the subject go. Dealing with
32 such a serious suspicion, you are satisfied by that?
33 A: It is possible he was interrogated before then about Hamas, I continue the suspicions.
34 Q: From the documents you got from the Shin Bet and presented to the suspect, you also presented him with photographs of individuals, and
35 he gave you the names of 22 individuals in detail. Out of those 22 individuals' names, did you check anything about them?
36 A: The investigation was conducted by the Shin Bet, I do not know whether they checked or not, we, personally, at the Police, did not check
37 according to what I can recall. It is possible there are findings in the file that were checked by others, perhaps the Team Leader, but it was not
38 checked by me.
39 Q: Even when the suspect explains the names to you, you can ask a question about what the connection between those individuals and this
40 association is, and you did not ask. You must have not known at that stage about which association this is?
41 A: It is written that I present before him documents obtained by the Shin Bet from the suspect's computer, and it is written that there is an
42 explanation given on those individuals and what his connection to them is. At that time, these pages were presented to him in order to find out
43 who the individuals are and what his connection to them is. We asked questions regarding those individuals and got answers. Whatever was
44 needed to be asked, we asked him, and he answered.
45 Q: In page 3, you refer him to what was obtained from Fadi Manassra's computer, you do not even mention to him that this is an illegal
46 association when you mention the association's name.
47 A: I do not mention the name of the association in this question. I asked a specific question and he answered. He knows what he is interrogated
48 about. He was interrogated before then, and we did not just tell this to him. Whatever we presented before him, we did so based on the
49 documents, and we let him see it.
50 Q: In the same page, you pull out details regarding Fadi Manassra and again fail to indicate to him that this is an illegal association. Why?
51 A: He was asked, and this association is illegal, and he knows it, he was interrogated about that before. I asked him a question about documents
52 I presented before him which I obtained, who brought them and to whom do they belong.

Israel Defense Forces
[emblem]

| Date: 09/01/17 | Judea Military Court | File no.: 6011/15 |
| --- | --- | --- |

1  Q: During the last hearing, Rani Hatib you are called [sic] detective from the investigating team, and you argue that the association was declared
2  illegal in 2008. From 2008 and until the suspect was arrested in September 2015, while the association is active daily and overtly, did you or
3  any other security entity carry out any activity against the association?
4  A: What I can attest to is only regarding the evidence I have here. Regarding anything else that may or may not have been done by me I cannot
5  testify; some things may have been done without me being there or without me being aware of them.
6  Q: The suspect says and asserts in all his interrogations that he was active in a legal association that acted in coordination with the Palestinian
7  Authority. It says so in page 5. Did you check that?
8  A: I repeat, the investigation was carried out by the Shin Bet. Whatever was done or not is recorded in the investigation file. I can testify only
9  about things that I checked and recorded.
10 Q: You warned him regarding activity against the security of the Area. What did you mean?
11 A: Any illegal activity carried out against the Area's security.
12 Q: Anything specific?
13 A: The organization itself, its offices, located in the Territories, consists of activity against the Area's security. Any money he brought in or
14 obtained is not against the Area's security? Everything they were doing within this association was activity against the Area's security.
15 Q: Do you know which activity?
16 A: Whatever I know is written and I investigated.
17 Q: Helping orphans is against the law?
18 A: Whatever he was to be accused of, I investigated.
19 Q: You said you had seen previous statements of the Defendant before you interrogated him based on previous statements, and that you
20 interrogated based on them, correct?
21 A: Yes.
22 Q: In previous statements, he said that there was activity with charity associations in Israel who were in contact with this association. Are you
23 aware of such an investigation done regarding associations registered in Israel who worked with this association?
24 A: No, I do not know.
25
26 Defense Counsel: There are no further questions.
27
28 Military Prosecutor: There is no redirect examination. I refer to the fact that as arises from the statement in Arabic, the second statement which
29 I hereby file was taken on 09/29/2015 at 09:46 AM at the Petah Tikva facilities, while the translation into Hebrew says by mistake 09/17/2015.
30
31 Defense Counsel: After reviewing the interrogation in Arabic and the interrogation in Hebrew, I am under the impression that it is the same
32 interrogation and apparently, there is a typo in the Hebrew translation, and it is the interrogation from 09/29/2015 at 09:46 AM.
33
34 The statement taken on 09/17/2015 at 10:15 AM **is hereby accepted and marked as P/2.**
35
36 **The documents attached to said statement are hereby marked as P/2/a – P/2/h.**
37
38 The statement taken on 09/29/2015 at 09:46 AM **is hereby accepted and marked as P/3.**
39
40 **The documents attached to said statement are hereby marked as P/3/a.**
41
42 **Prosecution Witness No. 3 (No. 5 in the List of Witnesses) – Fadi Bahjat Manassra**
43 **The witness is hereby cautioned to tell the truth, otherwise be subject to the penalties provided by Law.**
44
45                              **Direct Examination**
46 Q: Give details about yourself, where do you work?
47 A: I work at the Qatar Al-Khiria Association in Ramallah. I am an accountant.
48 Q: What are you detained for?
49 A: I am indicted for working in an illegal association.
50 Q: Do you know what else is attributed to you in the indictment?
51 A: Working in an illegal association and transferring money.
52 Q: Tell of your relationship with the Defendant.
53 A: A work relationship, he is my manager, and I am the clerk.
54 Q: Where is he the manager?
55 A: Director of Qatar Al-Khiria in Ramallah.

Israel Defense Forces
[emblem]

| Date: 09/01/17 | Judea Military Court | File no.: 6011/15 |
|---|---|---|

1  Q: Can you talk about the activity of the association you worked for and about the director?
2  A: The association is only a social association that helps society's weaker populations, among them orphans, the poor, and people with special
3  needs.
4  Q: When did you start working there?
5  A: In December 2009.
6  Q: When did the Defendant start working there, do you know?
7  A: I do not recall exactly. Around 2010, 2011.
8  Q: Can you give more details about the association's activity? What was your part in it?
9  A: I was an accountant at the association.
10 Q: What did you do in the framework of your position?
11 A: Recording of finances, preparation of periodic reports, follow-up with the banks, monitoring money transfers and signing them.
12 Q: What money is this? What is its origin?
13 A: The financial help to orphans that arrives from Qatar.
14 Q: Where from in Qatar?
15 A: From Doha, from the Main Center.
16 Q: What is its full name?
17 A: These are the headquarters of the Qatar Al-Khiria Association based in Doha, Qatar.
18 Q: Can you give details on the money transfer method?
19 A: We would obtain a permit from the Ministry of Welfare in Doha. We would deliver the permit to the bank. The bank's offices in Doha were
20 the ones who approved. The bank in Qatar would approve, and they would transfer the money through the bank's offices in Germany. They
21 would issue the approval for the money transfer, it would go for approval via an intermediary bank in Germany together with all the documents
22 according to the Financing of Terrorism Law, to verify the money's origin, and we would then get the approval of the Presidential Aid Offices.
23 After approval, the money would be transferred to the Bank of Palestine, and after receiving the money, we would distribute the money to
24 whoever was in need, to weakened groups only.
25 Q: Can you detail the names of the banks through which the money would go?
26 A: First of all, in Doha –Rayan Bank. Then in Germany – Deutsche Bank, after approval at the bank in Germany, the money would be transferred
27 to the Bank of Palestine, who received the approval of the central bank.
28 Q: This money, how is it transferred? In what currency?
29 A: Euro.
30 Q: When you receive it at the association, what do you do with it?
31 A: We transfer the money according to the projects at that time. The orphan project is transferred to them via a certificate called Sanabel, which
32 is a card that belongs to the Bank of Palestine. According to the project, it is transferred to contractors.
33 Q: In your statement from 09/09/2015, in lines 52-57, you detailed the matter of money transferring, but you did not mention that it needs the
34 approval of the Welfare in Doha. How do you explain that?
35 A: I did explain that. In the interrogation, I was asked, and I answered how the money is transferred.
36 Q: What was your role in the transferring of money?
37 A: Recording it as a transfer received by the association and signing it.
38 Q: What was the Defendant's role?
39 A: The Office's Director. He would deal with everything pertaining the return of money and logistics.
40 Q: Can you give details about the association's activity in Gaza?
41 A: As I mentioned before, the association's purposes are humanitarian only. Aid to all people regardless of religion or race.
42 Q: What was your role in this association?
43 A: Accountant. To the Court's question, I meant only the office in Ramallah.
44
45 Defense Counsel: I request for the question to be clarified. The witness was not based in Gaza.
46
47 Q: What was your role in the association in Gaza?
48 A: We had no role there and we did not work there.
49 Q: In your statement from 09/09/2015, in lines 76-79, you say that when you began working in Ramallah, the office was responsible also for
50 the office in Gaza and you were responsible for all the activity in Gaza (quotes).
51 A: In relation to money, I can say that according to the agreement we had with the Palestinian Authority at the time for the receipt of money
52 relating to the office in Gaza, these would go for approval through the Presidential Aid Offices.
53 Q: So you did work there. You had a role in the Gaza branch.
54 A: I did not have any role in the Gaza offices. My role was in Ramallah only.
55
56
57
58
59

Israel Defense Forces
[emblem]

Date: 09/01/17            Judea Military Court            File no.: 6011/15

1   Military plaintiff: We would like to declare the witness a hostile witness, because he contradicts the statements made by him.
2   Currently the witness reported that he had no role in Gaza, when a few lines earlier he said that all financial matters in Gaza
3   were conducted through him. In light of the court's remark, I will continue interrogating the witness.
4

5   Q: In your statement dated 09/09/15 in lines 76-79 you stated that the office in Ramallah was responsible for the office
6   in Gaza with the consent of the PA, including the transfer of funds. What do you have to say about that?
7   A: I used to work in offices in Ramallah. In the offices in Gaza there was another accountant, my duties in the office
8   in Ramallah in relation to the office in Gaza were limited to the implementation of the agreements between the Palestinian Authority
9   and the Qatar Charitable Society. I was an accountant and I was sitting in Ramallah and that was my job.
10  Q: You said in your statement that the office in Ramallah was responsible for the office in Gaza with the consent of PA and you were
11  responsible for everything that happens in Gaza including the funds.
12  A: Yes, according to the signed agreements that each transfer of funds before moving to offices in Gaza must pass the approval of the
13  Palestinian Authority,
14  Q: If so, did you handle the funds and the transfer of funds to Gaza?
15  Defense attorney: This is leading on, we are in the preliminary investigation. He explained this in his statement and in the previous
16  question.
17
18  Q: I would like to refresh your memory, you said that when you started working at the Ramallah branch,
19  Advocate: I would like to review the Arabic version before it is read to the witness. I would like it to be read to the witness in the
20  Arabic version, there is a gap between it and the text in Hebrew.
21
22  **An interpreter reads to the witness the text in Arabic on page 4, lines 9-18:**
23  **"Q: Tell me about the association in Gaza.**
24  **A: I worked in Ramallah, the office was in charge of the office in Gaza according to the agreements with the Palestinian**
25  **Authority.**
26  **Everything would come back through the office in the West Bank and that is according to the agreements with the Authority**
27  **that the association will work with the Palestinian Authority. The financial transfers were from the PA's Presidential Aid of**
28  **the National Organization so that they can be checked and there will be no problems with fundraising. Any transfer through**
29  **the association in Qatar**
30  **or in the West Bank was made after the agreement with the Presidential Association."**
31
32  A: All that you have read to me is true.
33  Q: What was the role of the Defendant in the Gaza office?
34  A: To check that everything is going through the Presidential Assistance Office.
35  Q: Can you define his role?
36  A: I do not know exactly what his role is but what I do know is that it is following up according to the Charitable Qatar Society
37  according to the clauses in the agreements signed with the Palestinian Authority. And ensuring that no violations or deviations occur.
38  Q: I will refer you to your statement dated 09/09/15, lines 81-82, where you have stated (quotes)
39
40  Defense attorney: The Hebrew version does not correspond to the Arabic version. We would like to read the text in Arabic.
41
42  **Prosecutor Anan Sarhan reads aloud the Arabic version on page 4, lines 19-28 (end of page):**
43  "Abed Al-Razak Al-Garbawi, around 49 years of age, married, a.k.a. Abu al-Majed, a resident of the Gaza Strip, was in charge of the
44  association until 2010 and his successor Judy Al-Jamal, who was the director of the association in Ramallah, also managed the
45  association in Gaza.
46  And also during this period, Ramadan Aatzi Gilo, around 40, a resident of Beit Lakya (here there is a correction of the investigator and
47  deleted parts). In 2011 he was appointed CFO in the West Bank and Gaza Strip and was responsible for all projects and he was also
48  the one who confirmed the requests and their approvals.
49  Najwan Awda, who I've mentioned, was in charge of administrative and internal affairs within the West Bank and the Gaza Strip, in
50  2013 a Qatari director named Majed Abu Halub arrived, and since then there has been a loss of contact in administrative and financial
51  matters, and they started working alone in the Gaza Strip." (Parts of the statement were not clear, and there were difficulties reading
52  them).
53
54  **The interpreter reads the written text to the witness**
55  A: Ramadan Aatzi was the successor of Abed Al-Razak Al-Garbawi  and not Judy Al-Jamal. All the rest is true.
56  Q: Actually, in your statement you stated that that Abed Al-Razak Al-Garbawi was in charge of the association until 2010, and then
57  replaced by Judy Al-Jamal as the director of the association in Ramallah and who also managed the association in Gaza.

Israel Defense Forces
[emblem]

| | | |
|---|---|---|
| Date: 09/01/17 | Judea Military Court | File no.: 6011/15 |

1  A: Abed Al-Razak Al-Garbawi was the director in Gaza, but his successor was Ramadan Aatzi and not Judy Al-Jamal.
2  Q: How do you explain the difference between your statement and what you are telling us now?

4  Defense attorney: I object and note that the Plaintiff's translation in relation to the following words:
5  "And his successor, Judy Al-Jamal, who was the director of the association in Ramallah, also ran the association in Gaza."
6  These words are unclear in the original statement and we do not agree with the Plaintiff's translation.
7  Military plaintiff: We will clarify this matter with the collector of the statement and we will decide later whether to summon the
8  witness again.

10  Defense attorney: I also refer to the fact that according to the indictment, the Defendant entered the association management position
11  in Ramallah from 2011, and not in 2010 as appears in the statement.

13  Q: Can you tell the court about other activities of the association in Ramallah?
14  A: There is the matter of assisting with meals for the end of the Ramadan fast and distributing offerings – meat during Eid al-Adha.
15  Assistance to the cattle breeding project. Another project that started during 2010 – improvement of the road from Bethlehem to
16  Ramallah, improvement of lighting. Leisure activities for orphans. Assisting people who need furniture for their homes and home
17  repairs.
18  Q: With which other associations did the association Charitable Qatar Society work?
19  A: It worked with local associations within Palestine – Palestine Red Crescent Society, Islamic Charity Society, Orphanage
20  Association, Al-Ihsan Charity Association, Zakat Committee Association, and it has a permit from the Palestinian Authority. The
21  work with these associations is performed only after receiving a permit from the Palestinian Authority.
22  Q: How exactly did you interact with these associations?
23  A: They have orphans and have matters of spending money when it comes to people with special needs orphans.
24  Q: Can you elaborate on the matter of finances? How are they transferred?
25  A: We have the orphans who live with the mother. We give the mother a "Sanabl" card issued by the Bank of Palestine and the money
26  is transferred through these cards.
27  Q: How much money is transferred to the charities you mentioned?
28  A: There is no specific amount that is transferred to each association, each association according to its needs and according to the
29  number of orphans registered in it.
30  Q: I will refresh your memory with your statement of 17/09/15 lines 93 to 95, where you said that every year, you would transfer to
31  the Al-Ihsan Charity Society in Hebron 13-15 thousand dollars. For 5 years, between 70-75 thousand dollars was transferred to them.
32  A: Correct.
33  Q: In line 103, you stated that you transferred the same amounts between 70-75 thousand dollars to the Islamic Charity Society in
34  Hebron over 5 years.
35  A: This is also correct, these are amounts that help orphans.
36  Q: Does the same apply to the Red Crescent Society?
37  A: No.
38  Q: But were any funds transferred?
39  A: Yes, we also transferred money to the Red Crescent.
40  Q: The same goes for the other associations you mentioned in the investigation?
41  A: Yes, all the money we have transferred to charities helps orphans and people with special needs who are registered under these
42  associations.
43  Q: All the activities you mentioned are within the framework of the Charitable Qatar Society, which is an illegal association. Do you
44  have anything to say about that?
45  A: I don't understand.
46  Q: All these activities were part of an illegal association.
47  A: The association was approved and registered by the Palestinian Authority.
48  Q: Allow me to refresh your memory with your statement of 17/09/15 lines 140-146. (Quotes) for knowing
49  that the activity is prohibited by the authorities in Israel and the fact that the shipment of the association was not received at the port
50  in Ashdod.
51  A: They sent boxes with cans from Qatar for its receipt and distribution in the West Bank, and the State of Israel refused to accept
52  these products, because the association is blacklisted. We respected this and returned it to the port of Aqaba and it was distributed in
53  Jordan.
54  Q: So you knew that your activity within the association was illegal?
55  A: We operated in the association, because the association was registered with the Palestinian Authority and the Palestinian Authority
56  authorized to obtain its approval from the Israeli authorities when the activity is within the West Bank.
57  Q: In your statement, you said that the project with the boxes of meat was not successful because the association where you worked

7

Israel Defense Forces
[emblem]

Date: 09/01/17                    Judea Military Court                    File no.: 6011/15

1   was on the black list of the Israeli authorities and is considered illegal by them.
2   A: Yes. We were surprised by this.
3   Q: Can you tell us about the connection and operations between the Charitable Qatar Society office in Gaza and at the Ramallah
4   branch?
5   A: I've said this before. The connection between them is the implementation of the policy of the Charitable Qatar Society in Qatar
6   and the proper implementation of the signed agreements between Charitable Qatar Society and the Palestinian Authority.
7   Q: What other actions were carried out between the office in Gaza and the Charitable Qatar Society in Ramallah?
8   A: I've said this before.
9   Q: I will refresh your memory. In your statement dated 17/09/15, lines 158-192, you stated that from 2013 to 2010, when you were
10  asked what amounts were received by the office in Gaza received from the Charitable Qatar Society, you said that from 2010 to 2013
11  they received about $ 25 million ... do you confirm this?
12  A: Yes, this is correct, and all this was under the approvals of the Presidential Aid Office. Some of it was transferred from Charitable
13  Qatar Society in Qatar for projects of hospital construction and so on. After this period our ties with the offices in Gaza were severed,
14  at the request of the main offices in Qatar.
15
16
17  Military plaintiff: Due to personal constraints I have to ask the court to stop the investigation now and continue in the next discussion.
18
19  Defense attorney: There is no objection in the circumstances of the case. I will also ask not to hear the witness on Sundays in February
20  and if required, to postpone it to March.
21
22
23                                                    **Resolution**
24
25
26  In the circumstances of the case, nothing prevents us to adjourn the hearing in light of the Plaintiff's request.
27
28  **The witness, Fadi Bahjat Manassra, will be heard on 13/02/17 starting at 09:30.**
29
30  **The Secretariat will verify his summons to this meeting. Upon this date, the Secretariat will summon the prosecution witness**
31  **no. 6 to in the amended Indictment through details to be passed by the prosecution.**
32
33  In addition, the case is set to end the prosecution case on 20/03/17 at 09:30. The plaintiff will issue a notice as to which witnesses it
34  seeks to summon to this date and thus to complete the prosecution case.
35
36  At this time we will also hear the defense case, and therefore, the prosecution will also verify, by itself, the summoning of witnesses
37  for this date.
38
39  **Given and announced today, 09/01/17, publicly and in the presence of the parties.**
40
41
42  [signature]                          [signature]                          [signature]
43  **Judge**                          **Chief of the Court**                          **Judge**
44

8

Date: 07/26/17                          Judea Military Court                          File no.: 6011/15

1   **Before the honorable Chief of the Court: Lieutenant Colonel Zvi Heilbronn**
2   **Before the honorable Judge: Major Eti Adar**
3   **Before the honorable Judge: Major Haim Balilti**
4
5   **Military Prosecution**
6   (represented by Major Tal Ziskowitz)
7           **vs.**            [Arabic text]
8   **Defendant: Juda Dib Ibrahim Jamal, 86096195 / Israel Prison Service  - present**
9   (represented by Atty. Boulos and Atty. Mahajna – present)
10
11
12                                    **Verdict**
13
14   The Defendant was convicted on the basis of a plea bargain in the offenses of membership and
15   activity in an illegal association and bringing enemy funds into the area. According to the
16   amended indictment, as of March 2011, the Defendant served as planning manager in the
17   Charitable Qatar Society in Ramallah belonging to the Charitable Qatar Society in Doha, which
18   is an illegal association. Later, as of October 2011, the Defendant served as a deputy manager of
19   the Association's branch in Ramallah.
20
21   Among others, Najwan Mohammed Iman Hassan Awda (hereinafter: "Najwan"), who was in
22   charge of the logistics in the organization, and Fadi Bahjat Abd el-Fateh Manassra (hereinafter:
23   "Fadi"), who served as an accountant of the organization, worked together with the Defendant.
24   The organization's management in Doha, Qatar, approximately NIS 12,000,0000 were
25   transferred to a branch in Ramallah for various activities of the organization.
26
27   All of the funds were transferred with the Defendant's approval and under the supervision of
28   Fadi.
29
30   The Defendant confessed to crimes of which he was convicted after the hearing of the evidence
31   in the case and as part of a plea bargain, as stated.
32
33   As part of the plea bargain before us, we were asked to impose on the Defendant an agreed
34   sentence of 22 months imprisonment and 20 days as of the actual time served as a number of
35   days of the Defendant's detention so far, which is a conditional sentence at the discretion of the
36   court in regard to any offense related to support or membership in a hostile organization and any
37   offense that has an element of engaging in transactions of enemy funds or contact with an
38   enemy. The parties also petitioned for a fine of NIS 1 million or two years imprisonment for the
39   Defendant. It was agreed that the fine would be paid in 4 equal installments, with the first
40   installment of NIS 250,000 being a condition for release from prison. It was further agreed that
41   the rest of the payments would be paid every 6 months from the date of release, and that failure
42   to pay any of them in full and on time would result in immediate payment of the entire fine and
43   lead to imprisonment of the accused if the fine is not paid.
44   The prosecution argued the uniqueness of the case before us concerning the introduction of large
45   amounts of enemy money. On the other hand, they maintained considerations for their position,
46   including the Defendant's clean past, his admission of guilt and the significant savings in judicial

Date: 07/26/17                     Judea Military Court                     File no.: 6011/15

1  time in the face of weighty allegations raised by the defense in relation to the organization's
2  illegality.

Date: 07/26/17                    Judea Military Court                    File no.: 6011/15

1   Military plaintiff: No opinion in relation to the sentence.
2   Defense attorney: No opinion in relation to the sentence.
3   Military plaintiff's summary: This is a particularly unique case that includes an offense of
4   introducing large amounts of money and under unique circumstances. After a long negotiation,
5   we have reached an agreement, and we will request the Court to impose on the Defendant an
6   agreed sentence of 22 months imprisonment and 20 days as of the actual time served as a number
7   of days of the Defendant's detention so far, which is a conditional sentence at the discretion of
8   the court in regard to any offense related to support or membership in a hostile organization and
9   any offense that has an element of engaging in transactions of enemy funds or contact with an
10  enemy. I will also seek to impose a fine of NIS 1 million or two years' imprisonment for the
11  Defendant. The fine will be paid in 4 equal installments, with the first installment of NIS
12  250,000 being a condition for release from prison. The rest will be paid every 6 months. It will
13  be clarified that failure to pay any of them in full and on time would result in immediate payment
14  of the entire fine and lead to imprisonment of the accused if the fine is not paid.
15
16  The reasons for the settlement are the Defendant's clean record, his admission of guilt and the
17  significant savings in judicial time. We also considered the waiver of protection by significant
18  defense claims in relation to the illegality of the organization of which they were members. We
19  also considered the fact that the evidence shows that the Defendant did serve in a managerial
20  position in the organization, but not at the level of decision-maker in the main organization, but
21  at the executive level only. We also considered the degree of punishment imposed on the
22  Defendant's partner and also considered the fact that this is a sentence that includes a significant
23  economic component and balances it with an actual prison sentence for a period that is not
24  negligible.
25
26  The defense attorney concluded: I agree with the words of the Plaintiff members and seek to
27  respect the arrangement. Most of our claims were recognized as circumstances for leniency
28  under the plea bargain. As we have emphasized in the preliminary arguments and later in the
29  trial, some of the claims were accepted by the prosecution and form the basis for the settlement. I
30  agree with the plea bargain with a heavy heart The imprisonment is long and the amount is not
31  disputable, while the confession was waived. I ask to respect the bargain.
32
33  Defendant in his last statement: I have nothing to add.
34
35
36
37                            **-After the recess-**

[hw:] 2

Date: 07/26/17                    Judea Military Court                    File no.: 6011/15

1    This evidence is laid before us within the frame of deliberation on preliminary claims made by the
2    defense. The prosecution has noted that it has weighed the fact that the defendant has indeed served
3    in a managerial position in the organization, but he was not at a rank of a decision maker in the
4    main organization but only at an executive rank; the punishment of another person involved in the
5    affair, Najwan and the mix of the punishment components that includes a substantial financial
6    component, as said, alongside a prolonged incarceration punishment.
7
8    The defense added and clarified the meaning of the waiver of its claims in regards to the illegality
9    of the association, which in light of their weight, the indictment has been amended and the agreed
10   upon appeal for the punishment has been formulated. The distinguished defense attorneys have
11   emphasized the actual incarceration components and the substantial financial component and
12   asked that we honor the agreement.
13
14   The felonies of which the defendant has been convicted are severe. These are felonies that allow
15   and serve as the foundation of an illegal organization and acting within its frame hurts the security
16   of the State of Israel. Thus, it has been ruled in the past -
17
18        "Systematic activity whose goal is to allow the activity of terror organizations and to
19        improve it and to strengthen it in various ways by creating a financial backing is the
20        same as a systematic and persistent nibbling of the security of the State of Israel. Such
21        nibbling weakens the security, financial and social strength of Israel and it is joined by
22        the rest of the real security dangers, some existential, that Israel faces. In examining
23        the nature of this risk, it should not be isolated but examined against the picture of
24        reality as a whole" see section 3827/06 **John Doe V. The State of Israel** (published
25        on Nevo, 27.3.2007).
26
27   Additional severity is made known of the engagement of bringing enemy funds to the region, even
28   if this is an action of a civic nature -
29        "The terror organizations invest great attention to transferring funds for their activities,
30        to the families of their operatives and for other needs that fall within "wining hearts"
31        and their goal is to aid terror organizations to strengthen their hold over the civilian
32        population (see John Doe above: appeal 2169/12 Hasin v. IDF troop commander in the
33        West Bank (published on Nevo, 18.12.2012). the different levels on which the terror
34        organizations operate are meant to allow its activity on all planes, hence the conclusion
35        that a function and "civil" targets should not be separated from function and "military"
36        targets (Supreme Court 1169/09 **Legal forum for Israel v. Prime Minister, Knesset**
37        **member Ehud Olmert** (published on Nevo, 15.6.2009)" (appeal 1793/15 **Military**
38        **prosecution v. Alian**).
39
40   In our case, the defendant served in a managerial position in the organization and filled a
41   significant role in a body who acted to receive funds for an illegal organization and from there to
42   the region. The defendant acted in the organization for a long time and his contribution to
43   transferring the funds and the activity of the organization was crucial. The sums of money that
44   went under him, with his approval and knowledge are vast. However, the activity of the defendant
45   was not done in connection to a direct or real terror activity, but the actions of the type he

[hw:] 3

| Date: 07/26/17 | Judea Military Court | File no.: 6011/15 |

1  performed, who are of a civil-financial nature, also hold great risk to the public safety. The supreme
2  court has already ruled that -
3
4      "Terrorism in the current age is characterized not only in being global but also in great
5      sophistication, often in a branch organizational structure… more and more we witness
6      terror organizations investing time, thought and resources in propaganda and media
7      activities, as well as in activities of a civic nature… this extensive activity of terror
8      organizations is conditioned first and foremost in having a strong and well established
9      financial infrastructure and use of financial systems available to the terror
10     organizations to fund their actions." (**John Doe** case above).
11
12 And also in the ruling of the Military Court of Appeals in appeal 4202/07 **Legal prosecution v.**
13 **Abu Ezev:**
14      "The sophistication and mode of operation of the terror organizations no longer allow
15     separating between terror activity and so-called civic activity, and both of these fields
16     feed each other and strengthen each other, and at the end of the day put the safety of
17     the state and its citizens in real danger… the all out war that must be waged against
18     the terror organizations must be expressed in proper punishment as well, and it seems
19     to me that the punishment that was approved in the John Doe case should be used as a
20     starting point when we seek to determine the punishment of the respondent before us…
21     "
22
23 Therefore the military courts have ruled more than once, and particularly in family appeal 3197/06
24 **Zachya Awanama v. the military prosecution:**
25     "… that not only purely military action will earn strict reference, but also all manners
26     of activity behind which stands an illegal organization, even if those are of a civic
27     nature. Furthermore, effective handling requires an extensive hit of the aid and support
28     circles that are given to the terror organizations. Inside those there is a top importance
29     of the implantation of the financial infrastructure behind the terror organizations,
30     without which they would remain without activity, without support and without any
31     vitality."
32
33 From the items collected we will then see that the defendant is deserving of a prolonged
34 incarceration alongside a deterring monetary punishment whose result would harm the financial
35 activity of the organization, which constitutes an oxygen tube for the continued activity of illegal
36 organizations.
37
38 There is no doubt that the punishment the parties pleaded for is substantially more lenient than the
39 punishment deserved as determined in the ruling of the Military Court of Appeals mentioned above
40 in both the incarceration component and the monetary component. Regarding the latter component,
41 there is a trend of increasing the threshold of punishment which made a connection between the
42 height of the fine and the scope of the money that was transferred to the illegal organization from
43 considerations of appropriateness and deterrence.
44

[hw:] 4

Date: 07/26/17            Judea Military Court            File no.: 6011/15

Except in our case, there are indeed significant aspects to its leniency. First, there are the evidential arguments relating to the legality of the organization and its goals, arguments the defense has waived within the plea, as mentioned. In addition, this is an adult defendant with no criminal background. The defendant, despite his role, was not in a position of a decision maker in the organization and it is possible that the organization's civic goal were his interest at the time of his activity in it. We even considered the punishment of another individual involved in the case and the ranking the parties have created between the various punishments within the case.

Of course, we weighed all punishment components and the fact that despite the gap between the scope of the money the defendant brought to the region and the agreed upon fine, this is a substantial monetary component. This, alongside no small incarceration punishments, in practice and provisional.

In light of the above, we found it right to adopt the plea and we sentence the defendant with the following punishments:

A. 22 months and 20 days of incarceration to be served in practice from the day of his arrest.

B. 18 months of incarceration probation and the condition is that for 5 years from the day of his release, the defendant will not commit another violation with an element of support or membership of a hostile organization or any violation with an element of handling enemy funds or contact with an enemy.

C. A financial fine in the sum of 1,000,000 ILS or two years of incarceration for it. The fine will be paid in four equal instalments, where the first instalment for the sum of 250,000 ILS will be a condition for the defendant's release from prison. The rest of the payments will be made every 6 months from the time of the release. Should one of the payments not be made on time, the entire remainder of the fine shall be paid immediately, and if it is not paid, the defendant will be incarcerated for it. Vouchers will be delivered to the defense by the secretariat. The voucher numbers for the first payment are: 0000836316, 0000835916, 0000836016, 0000836116, 0000836216. Each voucher is for the amount of 50,000 ILS.

**The right of appeal is within 30 days.**

**Given and informed today, 26/07/17, in public and in the presence of the parties.**

[signature]_____          [signature]_____          [signature]_____

Justice                    Av Beit Din                Justice

**Israel Defense Forces**
 [emblem] IDF Advocate General
**Military court in Judea**                                    Case no.: 6008.15

**Before the honorable Vice President: Lieutenant Colonel Zvi Heilbronn**
**Before the honorable justice: Major Eti Adar**
**Before the honorable justice: Major Haim Balilti**


**The military prosecution**
(By Counsel Adv. Lt. Col. Morris Hirs)

**Versus**
**The defendant: Fadi Bahjat Abd el-Fateh Manassra, ID 914129002**
(By Counsel Adv. Jawad Bulus)

**<u>DECISION</u>**

On 5.11.15, an amended indictment was filed on the case of the defendant attributing to him six articles of indictment arising from him being the accountant of the association Jamait Qatar Al-Khiria in Doha",

Prior to the defendant's response to the indictment, the defense has asked to revoke the indictment since it claims the defendant has the Abuse of Process defense. Below is a summary of the defense argument:

First, it was argued by the defense that the defendant has the claim of estoppel, meaning the authority cannot put the defendant on trial since the activity of the association, which is allegedly prohibited as per the indictment, was known to the authorities in Israel. The defense argues that the activity of the association was public and advertised in the media. Furthermore, within the frame of its activity, the association ordered a shipment from Qatar and its representatives were escorted by Israeli security parties. Since the authority knew about the activity of the association and did not act against it for a long period, it cannot put its employees on trial.

Moreover, after it is proven by the defense that the authorities in Israel knew about the activity of the association and did not act against it, they created a presentation before the defendant and his partners that the activity of the association is legal, otherwise, how could the authority not act against it.

1

Judea Military Court                                        File no.: 6008.15

Another proof that the defendants believed that the authorities know the activity of the association is the fact that during the years relevant to the indictment, large sums of money were transferred to the association which came, inter alia, from Qatar. It is no secret that the law enforcement entities of the authority and of Israel follow the transfer of money to the west bank and certainly when they are large sums of money. Since the authorities took no action whatsoever and permitted the transfer of the money, the defendant and his partners have concluded that the authorities knew about it and ignored it. Therefore the authority cannot argue against the defendants on this matter.

It was also argued by the defense that not only was the activity known to the authority, it was known for a long period since 2008, and only in 2015 the authority decides to arrest the defendant. The defense argues that this period of delay gives the defendant the Abuse of Process defense.

At the end of the verbal arguments and after receiving an extension from the court, the attorney has presented us with a collection of documents from which he seeks to show that the authorities knew the activity of the association and did nothing. Thus the attorney presented us inquiries with the tax authority in regards to the association, official correspondence of the association with a representative of the ministry of economics, and various publications of the association. Furthermore, we were presented with documents that indicate the extensive activity of the association, as well as significant connection between the association and senior officials in the Palestinian authority and other senior officials.

In summary, the attorney argues that for seven years, the association acted publicly, advertised its activity in all media and within the frame of the activity of the association, all senior officials in the Palestinian authority were integrated, after receiving permits from the Israeli authority. All of these created a presentation before the defendant that the activity of the association is legal.

The military counsel argued before us that the military commander is the only one who can declare the association as a prohibited organization and if needed, to cancel the prohibition. Under the circumstances, the association was declared a prohibited organization in 2008 and this declaration still stands today.

The prosecutor further noted that the defense's argument that the defendant did not know that the association is prohibited cannot be accepted in light of what he said on 21.9.15 where the defendant stated most clearly that: "everyone knew this is a prohibited organization".

In contrast with what the defense says, the prosecutor argued that no evidence infrastructure was brought to show that the authorities indeed manage to identify all money transfer to the west bank. The prosecutor further argued that the authorities in Israel did not know about the existence of the association and certainly did not cooperate with it. According to the prosecutor, the lead to tracking the activity of the association in which the defendant had worked was tracking a shipment that was ordered by the organization in 2014. A representative of the prosecution declared to us that after checking, he informs that the enforcement authorities did not know about the prohibited activity of the association.

Regarding the documents that were presented by the defense, the prosecution made several claims:

First, it was argued by the prosecution that the hearing of the preliminary claims within the frame of criminal deliberation is subject to the evidence laws and therefore the defense must submit all material submitted by it as per the rules, meaning, by the people editing the documents.

Secondly, it was argued that the claim that all of the association publications as brought by the defense were known to the law enforcement entities should not be accepted. According to the prosecution, security entities work hard and examine the publications made in the region and outside of it, but this examination does not encompass all, so says the prosecution, and certainly this examination does not track all of the activity being done.

Third, as the counsel stated in the hall, from an examination made by the prosecution we gather that the law enforcement entities in Israel did not know the publications of the association.

**Discussion and ruling**

The defense's request to cancel the indictment is based on the fact that the security authorities in Israel knew about the activity of the association and despite knowing that, did not act against it. The defense seeks to learn from this argument that first, the authority is prevented from arguing against the defendants regarding their activity, since it did nothing to stop the activity. Secondly, the defense seeks to learn that the defendants have concluded from the conduct of the authority towards the association that the activity of the association is permitted. It was also argued by the defense that the indictment should be canceled in light of the great delay from the start of the activity of the association and until the arrest of the defendants.

As said, the prosecution disputes the arguments of the defense on the factual level and on the legal level.

Before we address the legaal argument, we state that the documents of the defense do not establish the factual foundation at the basis of the motion, that the security entities knew about the activity of the association, and these are the reasons:

We accept the argument of the prosecution that the publications of the association do not necessarily prove that the security entities knew the publications and knew from them about the activity of the association. The scope of the activity of the association and its connection to senior officials in the authority also do not establish the argument arising from the motion that the security entities knew about the activity of the association.

Even if we accept the document of the defense, which relates to the association contacting the representatives of the ministry of economics at Beit El, with a request to extract equipment related to an energy project to which the association is connected, it was not proven to us that the document that was sent to the economics representative in the administration was indeed received by him. Even if we assume for the sake of discussion that the documents relating to the association were indeed received by the tax authorities and the economics representative in the administration, it is doubtful that these authorities have temporary interfaces with law enforcement entities in regards to association that have been declared as prohibited.

3

Judea Military Court                                     File no.: 6008.15

Furthermore, the prosecution argues that from an inquiry it made, it gathers that the relevant parties did not know about the activity of the association and that only in summer 2014 security entities learned about the extensive scope of the activity of the association. It was also argued by the prosecution that even after discovering the scope of the activity of the association, time is need to assess its managers and those operating within its frame, an investigation that took time as well.

Moreover, as was argued to us, the defendant states in our investigation that he knew and even claimed that "everyone: knew that the activity of the association is prohibited. If this is how it was, the defendant cannot escape under a claim that in light of the oversight of the authority, he believed that the activity of the association is permitted.

Beyond the required, and beyond the said above, there is substance to the arguments of the prosecution that all of the documents that were submitted to us were not submitted via those who made them, and it is doubtful that they can be admitted in the manner in which they were submitted, even in this phase of hearing.

In light of all we gathered, we state that at this point, the factual foundation of the motion has not been proven to us. In light of this determination, we are not discussing, at this phase of the deliberation, whether the lack of activity from the investigation entities against the association, as the defense argues, is enough to cancel the indictment.

This decision does not prevent the defense from proving with sufficient evidence, within the affair of the defense, that the law enforcement authorities indeed knew and avoided from acting against the association. If it is indeed proven, we will be required to address the legal discussion arising from it when the day comes.

Conclusion, we reject the motion.

**The case is set to a reading on 26.9.16 at 9:30 am.**

**The secretariat will forward a copy of the decision to the parties.**

**Given and announced on 24.8.16 at the chamber.**


  [signature]_____                  [signature]_____              [signature]_____
  **Lieutenant**                       **Major Eti Adar**               **Major Haim**
  **Colonel Zvi**                      **Justice**                      **Balilti Justice**
  **Heilbronn**
  **Av Beit Din**

[hw:] *100,000 ILS*

## Israeli Defense Force

At the military court                           Court case: /15
Judea                                           Prosecution case: 3127/15
Before the composition                          [unknown abbreviate] case: 425869/15 ([unknown abbreviate])

### In the trial between the military prosecution - the accuser

#### -vs-

**Neguan hamad Iman Hassan Awda**
ID 911606184, born 7/6/82, resident of Ramallah
Detained as of 7/9/2015

### The defendant
### Indictment

### The defendant is hereby accused of performing the following felonies:

**First accusation:**
**The nature of the offense: membership and activity in an illegal organization**, a felony as per regulations 85 (1) (A) of the defense regulations (emergency), 1945.
**Details of the offense:** the defendant, in the region, **as of 5/5/2010 and until her arrest** or during the time close to it, was a member or acted as a member of an illegal organization, meaning:

1. At the time mentioned above, in Ramallah or close to it, the defendant was a member of Jamait Qatar Al-Khiria in Doha (below: "**the main Jamait**"), which is an illegal organization.
2. During the period mentioned above, Juda Dib Ibrahim Jamal (below: "**Juda**"), served as a manager of Jamait Qatar Al-Khiria in Ramallah, and under him worked the defendant, in charge of the logistics of the organization, and Fadi Bahjat Abd el-Fateh Manassra (below: "**Fadi**"), who served as the accountant of the organization.
3. During the period mentioned above, the main Jamait transferred about 12,000,000 USD to the Jamait in Ramallah for various activities of the organization.
4. The funds were transferred from the main Jamait to "Aliran" bank in Doha and from there to "Deutsche" bank in Germany. Then, it was transferred to Palestine bank or to the Islamic bank in Ramallah and deposited in the bank account of the Jamait in Ramallah.
5. All funds were transferred with the approval of Juda Fadi, the defendant.
6. As of 2011 and until 2013, the defendant also served as the logistics supervisor of Jamait Qatar Al-Khiria in Gaza, during this period, a sum of 25,000,000 USD was transferred from the main Jamait to its branch in Gaza.

By doing the above, the defendant was a member and operative of Jamait Qatar Al-Khiria in Ramallah, which is a prohibited association.

**The nature of the offense:** holding office in an illegal organization, a felony as per regulations 85 (1) (B) of the defense regulations (emergency), 1945.
**Details of the offense: as of 5/5/2010 and until her arrest** or during the time close to it, in the region, the defendant managed or helped manage an illegal organization, or held office or any position in an illegal organization or under it, meaning:
During the period mentioned above, by doing the acts detailed in the previous accusation, the defendant held an office in Jamait Qatar Al-Khiria in Ramallah, which is a prohibited association.
t.t. 366/04

<u>**Israeli Defense Force**</u>

| | |
|---|---|
| At the military court | Court case: /15 |
| Judea | Prosecution case: 3127/15 |
| Before the composition | [unknown abbreviate] case: 425869/15 ([unknown abbreviate]) |

<u>**In the trial between the military prosecution - the accuser**</u>

**-vs-**

**Neguan hamad Iman Hassan Awda**

ID 911606184, born 7/6/82, resident of Ramallah

Detained as of 7/9/2015

**The defendant**

<u>**Amended Plea Indictment**</u>

<u>**The defendant is hereby accused of performing the following felonies:**</u>

<u>**First accusation:**</u>

<u>**The nature of the offense:**</u> **membership and activity in an illegal organization**, a felony as per regulations 85 (1) (A) of the defense regulations (emergency), 1945.

<u>**Details of the offense:**</u> the defendant, in the region, **as of 5/5/2010 and until her arrest** or during the time close to it, was a member or acted as a member of an illegal organization, meaning:

1. At the time mentioned above, in Ramallah or close to it, the defendant was a member of Jamait Qatar Al-Khiria in Doha (below: "**the main Jamait**"), which is an illegal organization.
2. During the period mentioned above, Juda Dib Ibrahim Jamal (below: "**Juda**"), served as a manager of Jamait Qatar Al-Khiria in Ramallah, <u>and under him worked</u> the defendant, in charge of the logistics of the organization, and Fadi Bahjat Abd el-Fateh Manassra (below: "**Fadi**"), who served as the accountant of the organization.
3. During the period mentioned above, the main Jamait transferred about 12,000,000 USD to the Jamait in Ramallah for various activities of the organization.
4. The funds were transferred from the main Jamait to "Aliran" bank in Doha and from there to "Deutsche" bank in Germany. Then, it was transferred to Palestine bank or to the Islamic bank in Ramallah and deposited in the bank account of the Jamait in Ramallah.
5. All funds were transferred with the approval of Juda Fadi, the defendant.
6. As of 2011 and until 2013, the defendant also served as the logistics supervisor of Jamait Qatar Al-Khiria in Gaza, during this period, a sum of 25,000,000 USD was transferred from the main Jamait to its branch in Gaza.

By doing the above, the defendant was a member and operative of Jamait Qatar Al-Khiria in Ramallah, which is a prohibited association.

<u>**Second accusation:**</u>

<u>**The nature of the offense:**</u> holding office in an illegal organization, a felony as per regulations 85 (1) (B) of the defense regulations (emergency), 1945.

<u>**Details of the offense: as of 5/5/2010 and until her arrest**</u> or during the time close to it, in the region, the defendant managed or helped manage an illegal organization, or held office or any position in an illegal organization or under it, meaning:

During the period mentioned above, by doing the acts detailed in the previous accusation, the defendant held an office in Jamait Qatar Al-Khiria in Ramallah, which is a prohibited association.

t.t. 366/04



# CERTIFICATION

TransPerfect is globally certified under the standards ISO 9001:2015, ISO 17100:2015, and ISO 18587:2017. This Translation Certificate confirms the included documents have been completed in conformance with the Quality Management System documented in its ISO process maps and are, to the best knowledge and belief of all TransPerfect employees engaged on the project, full and accurate translations of the source material.

| | |
|---|---|
| File Name(s): | doc01215420220306122023 |
| Source Language(s): | Hebrew |
| Target Language(s): | English |

*Authorized Signature:*                                    *Signature, Notary Public:*



Name:     Shayna Himelfarb

Title:      Project Assistant

Date:      April 13, 2022

*Stamp: Notary Public*

Reason for signature: I approve the accuracy of this document content as written

Case 1:20-cv-06088-NGG-RLM   Document 52-64   Filed 04/20/22   Page 23 of 41 PageID #: 2424

צבא ההגנה לישראל



תיק מס': 15/6011

בית המשפט הצבאי ביהודה

1   בפני כב' האב"ד: סא"ל צבי היילברון

2   בפני כב' השופטת: רס"ן אתי אדר

3   בפני כב' השופט: רס"ן חיים בליליטי

4

5   התביעה הצבאית

6   (באמצעות ב"כ סרן אלמז אייסו)

7

8   נגד

9   הנאשם: גודה דיב אברהים גמאל, 86096195 / שב"ס - נוכח

10  (באמצעות ב"כ עו"ד מתאג'נה רסלאן- נוכח)

11

12  רמ"שית: רב"ט מאי טל

13  מתורגמן: רס"ל דוד כהן

14

15  תאריך הדיון: 09/01/17, י"א טבת תשע"ז

16

17  **מהלך הדיון**

18

19  ביהמ"ש מזהה את הנאשם.

20  הנאשם מצהיר כי מייצג אותו עו"ד מחאג'נה רסלאן.

21

22  סנגור : לדעתי חסר לי חומר חקירה שהוא מהותי הנוגע להתקשרות בין היועץ המשפטי של
23  משרד הביטחון או מי מטעמו לבין נציג העמותה בתוך ישראל ששמו מוכר והועבר למשרד
24  הביטחון ואלו קיימו התכתביות ופגישות והדבר נמשך מספר שנים. מגיש מכתב של היתר
25  לפעילות זמנית מטעם שר הביטחון של עמותה אחרת בשם עמותת ארגון למעשה צדקה מאע"מ –
26  אגמאן. נציגה של עמותה זו הוכרזה אך ניתן לה היתר פעולה זמנית. נציגה של עמותה זו
27  הוא אותו נציג של העמותה הקטגוריה שבענייננו ולכן אנו רוצים לקבל את כל התכתובות בין נציג
28  העמותה למשרד הביטחון. ולכן אבקש לקבל את כל התכתביות וההתקשרויות הפירטתי לעיל.

29

30  עו"ד בולוס : אני מבקש להמשיך ולטעון בתיק זה. כל עוד מדובר בטענה מקדמית שהנושא הזה
31  קשור אליה אני רוצה להשלים את הטיעון. תחילת הטיעון של קשר בין העמותה הזו לבין מדינת
32  ישראל היה במקורו מטעם התביעה, התביעה טענה כי תשובה שלנו שאנשים אלו שנכנסו ב-2010
33  2011 לא ידעו מה זה היה קודם והעמותה לא ידעה שהיא אסורה, התביעה הצבאית היא שלפה
34  מסמך שאין לנו מושג מהיכן מקורו ואיך הגיע לידיהם על מנת לתמוך בגרסתם שכביכול מעיד על
35  קשר בין עמותה לבין משרד הביטחון, מצאנו את המסמך של קשר בין משרד הביטחון לעמותה
36  מקבילה שיוצגה על ידי אותו אדם.

37

38  תובי"צ: אנו נבחן את טענת ההגנה ונמסור את עמדתנו בעניין בדיון הבא.

39

40

1

תיק מס' : 6011/15          בית המשפט הצבאי ביהודה          תאריך : 09/01/17

1  
2  עד תביעה מס' 2 (מס' 1 ברשימת העדים) רס"מ עאמר סלימאן  
3  העד מוזהר לומר את האמת, אחרת יהיה צפוי לעונשים הקבועים בחוק.  
4  
5  סנגור : אין מחלוקת כי האמרה שנגבתה על ידי העד נגבתה באופן חופשי ומרצון.  
6  
7  **חקירה ראשית**  
8  
9  
10  
11  ש : ספר לביהמ"ש מה תפקידך?  
12  ת : חוקר במשטרת ישראל ביחידת פחע של מחוז ש.  
13  ש : מה השליטה שלך בשפה הערבית?  
14  ת : שפת אם.  
15  ש : מצינה בפני העד אמרה מיום 17/09/15. תוכל להסביר בפני ביהמ"ש מי גבה את האמרה?  
16  ת : אני גביתי את האמרה הזו.  
17  ש : ממי גבית אותה?  
18  ת : גי'דה גימאל.  
19  <u>ש : תוכל לספר לביהמ"ש על נסיבות גביית האמרה ?</u>  
20  ת : באותו היום קיבלתי זכד מראש צוות שצריך לחקור את החשוד, העליתי אותו לחדר החקירות,  
21  הצגתי לו שמי שם תפקידי ואת החשדות שמיוחס לו ואת הזכויות שלו ולאחר מכן התחלתי  
22  לחקור אותו על פי הזכד שקיבלתי.  
23  ש : על סמך מה כתבת את הדברים המופיעים באמרה?  
24  ת : על פי הזכד שקיבלתי מידי השבכ הוא נחקר שם ולאחר מכן הגיע אלי, החשדתי אותו בחשדות  
25  המפורטים באמרה.  
26  ש : מה עוד עשית במהלך גביית האמרה?  
27  ת : על פי מה שאני רואה באמרה הצגתי לו מסמכים מחלק מהחקירה.  
28  ש : מצינה בפני העד אסופת מסמכים. האם אלו אותם מסמכים שהצגת בחקירה?  
29  ת : על פי מה שאני רואה במסמכים אלו, יש את השם שלי עליה וגם חתום עליה החשוד שאלו  
30  המסמכים שהצגתי לו על פי עדות זו.  
31  ש : לעניין האמרה, של מי החתימה בתחתית האמרה?  
32  ת : אני והחשוד.  
33  ש : האם זכורות לך נסיבות חריגות?  
34  ת : על פי מה שאני רואה באמרה רואה באמרה עצמה לא.  
35  ש : אם היו כאלה? מה היית עושה  
36  ת : היה נרשם באמרה עצמה או בזכד בנפרד.  
37  ש : על סמך מה כתבת את התשובות המופיעות באמרה?  
38  ת : על פי תשובות החשוד.  
39  תובי"צ : נבקש להגיש את האמרה בתום החקירה הנגדית.  
40  ש : מצינו בפניך אמרה מיום 29/09/15. מי גבה את האמרה?  
41  ת : אני.  
42  ש : באיזו שפה היא נגבתה?  
43  ת : בערבית.  
44  ש : כיצד היא נגבתה?  
45  ת : על פי זכד שקיבלתי מראש הצוות.  
46  ש : מה עוד עשית במהלך גביית האמרה?  
47  ת : על פי האמרה, הצגתי לחשוד מספר מסמכים.  
48  ש : מצינה בפני העד אסופת מסמכים מיום 29/09/15. האם אלו המסמכים?  
49  ת : כן. גם שם יש חתימה שלי אך לא של החשוד.  
50  ש : תוכל לפרט כיצד כיצד גבית את האמרה?  
51  ת : לאחר שקיבלתי את המסמכים והזכד מראש צוות, העליתי את החשוד לחדר חקירה עוד פעם  
52  הצגתי לו את עצמי, את החשדות נגדו, את זכויותיו ולאחר מכן חקרתי אותו על סמך המסמכים  
53  שהוצגו לו. בסוף הוא חתם על האמרה.  
54  ש : האם היו נסיבות חריגות במהלך גביית האמרה?  
55  ת : לא. על פי מה שאני רואה באמרה לא היו.  
56  ש : ואם היו מה היית עושה?  
57  ת : הייתי רושם בגוף האמרה או בזכד בנפרד.  
58  ש : כיצד ידעת באילו חשדות להחשיד את החשוד?  

2

| תיק מס': 6011/15 | בית המשפט הצבאי ביהודה | תאריך: 09/01/17 |
|---|---|---|

1  ת: יש כאן שני דברים או שעל פי הזכד של השבכ וזה גם בהמשך לאמרותיו הקודמות של החשוד.
2
3
4  תוב"ץ: אין שאלות נוספות. אבקש להגיש בתום החקירה הנגדית את 2 האמרות והמסמכים.
5
6  **חקירה נגדית**
7
8
9  ש: כמה שנים אתה בתפקיד כחוקר?
10  ת: בפחע 5 שנים ולפני זה עוד 14 שנים במשטרת ירושלים.
11  ש: מה חלקך בחקירת פרשת הזו?
12  ת: גביית שתי האמרות.
13  ש: רק גבית את האמרות?
14  ת: למיניה זכרוני כן. יכול להיות שחקרתי גם אנשים אחרים אני לא זוכר.
15  ש: כשנזהרת את החשוד בסעיף 4 לאזהרה כתוב עבודה באגודה לא חוקית, לאיזה עבודה
16  התכוונת?
17  ת: כתוב אגודת קטאר אל חירייה באמרה.
18  ש: למה לא הזכרת לו באזהרה שמדובר באגודה לא חוקית קטאר אל חירייה? האזהרה צריכה
19  להיות ברורה.
20  ת: החשד יכול להיות עבודה באגודה לא חוקית אך הפירוט מפורט בהמשך, אין צורך בפירוט הכל
21  באזהרה.
22  ש: למה לא פירטה כבר בהתחלה?
23  ת: אני שם שם הכותרת ותוך כדי החקירה אני שואל את השאלות ומפרט הכל בתוך השאלה
24  עצמה.
25  ש: כשאני מסתכל בעמוד 5 כאשר אתה שואל על סעיף 4 באזהרה, אתה שואל אותו מה הקשר של
26  האגודה בה הוא עובד לבין גופים אחרים, אתה לא אומר שהיא אגודה בלתי חוקית?
27  ת: החקירה הזו היא המשך לחקירות הקודמות. על פי מה שהוא אומר עם 5"קיבלנו כספים.. ",
28  דיברנו על האגודה הזו כבר באמרה הקודמת.
29  ש: אתה החשדת אותו בסעיף 3 במתן שירות ופעילות בארגון חמאס, על מה התבססת?
30  ת: אני חוזר שנית, על פי הזכדים שהיו לי באותו הרגע ועל פי האמרות הקודמות.
31  ש: על איזה זכדים אתה זוכר?
32  ת: אני לא זוכר זכד ספציפי אני מניח שזה מצוי בתיק.
33  ש: עיינתי בזכדים, בסך הכל החשד של מתן שירות להתאחדות בלתי מותרת לא מצאתי ייסוד
34  לארגון החמאס. ואתה גם לא מרבה לחקור בעניין זה לאחר שהחשוד משיב בשלילה אתה מניח
35  לעניין. כשמדובר בחשד כזה כבד בכך אתה מסתפק?
36  ת: יכול להיות שחקרתי לפני כן על החמאס אני ממשיך את החקירה, את החשדות.
37  ת: המסמכים שקיבלתי מהשובב והצגגת לחשוד, הצגת לו כתמונות של אנשים ונותן לך שמות של
38  22 אנשים באופן מפורט, מתוך אותם 22 שמות האנשים, בדקתם משהוה לגביהם?
39  ת: החקירה הייתה מנוהלת על ידי השבכ אני לא יודע אם לא בדקו או לא בדקו, אנחנו אישית
40  במשטרה לא בדקנו על פי זכרוני. יכול להיות שנמצאים ממצאים בתיק שנבדקו על ידי אחרים
41  אולי ראש צוות אבל על ידי לא לא נבדק.
42  ש: אפילו כשהחשוד מסביר לך השמות,  אתה יכול לשאול שאלה מה הקשר של אותם אנשים
43  לעמותה זו ואתה לא שאלת. כראאה שלא ידעת בכלל שלב לאיזה התאחדות מדובר?
44  ת: כתוב שאני מציג בפני מסמכים שהוצאו על ידי השבכ מהמחשב של החשוד וכתוב שיש הסבר
45  של אותם אנשים ומה הקשר שלו אליהם, באותו רגע דפים אלו הוצגו לו על מנת לדעת מי האנשים
46  ומה הקשר שלו אליהם. אנחנו שאלנו שאלות בקשר לאותם אנשים וקיבלנו תשובות. מה שצריך
47  לשאול אותו שאלנו והוא ענה.
48  ש: בעמ 3 אתה מפנה אותו לדברים שהוצאו ממחשבו של פאדי מנצרה, אתה אפילו לא מזכיר לו
49  שמדובר בהתאחדות בלתי מותרת על שאתה מציין את שם האגודה.
50  ת: את שם האגודה אני לא לא מזכיר בשאלה זו, אני שאלתי שאלה ספציפית והוא ענה. הוא יודע על
51  מה הוא נחקר, הוא נחקר לפני כן ולא סתם אמרנו לו את זה, מה שהצגנו לו הצגנו על פי
52  המסמכים ונתנו לו לראות את זה.
53  ש: באותו עמוד אתה מוציא לו פרטים לגבי פאדי מנצרה ושוב לא מטיח בו שמדובר באגודה בלתי
54  חוקית למה?
55  ת: הוא נשאל ואגודה זו היא לא חוקית והוא יודע את זה, הוא נחקר לפני כן על זה, אני שאלתי
56  שאלה על מסמכים שהצגתי לו שהם הגיעו לידי מי הביא אותם ולמי הם שייכים.

3

תיק מס׳: 6011/15     בית המשפט הצבאי ביהודה     תאריך: 09/01/17

1 ש: בדיון הקודם ראני חטיב אתה נקרא חוקר מתוך צוות חקירה ואתם טוענים שאגודה זו הוצאה
2 מחוץ לחוק ב־2008. מ־2008 עד שנעצר החשוד, ספטמבר 2015 כאשר האגודה פועלת יום יום ובגלוי
3 נעשתה על ידכם או על ידי גוף ביטחוני אחר פעילות כנגד העמותה?
4 ת: מה שאני יכול להעיד זה רק לגבי העדויות שיש לי כאן, על משחו אחר שנעשה ולא נעשה על ידי
5 אני לא יכול להעיד עליו, יכול להיות שנעשו דברים שאני לא הייתי איתם ולא מודע אליהם.
6 ש: הנאשם אומר וטען בכל החקירות שהוא פעל באגודה חוקית שהייתה מתואמת עם הרשות
7 הפלסטינית, כך בעמוד 5, בדקתם זאת?
8 ת: אני אומר שנית, החקירה נוהלה ע״י השב״כ, מה נעשה ולא נעשה רשום בתיק החקירה אני
9 יכול להעיד על דברים שאני בדקתי ורשומים?
10 ש: אזהרת אותו על פעילות כנגד ביטחון האזור, למה התכוונת?
11 ת: כל פעילות לא חוקית שנעשת היא נגד ביטחון האזור.
12 ש: משהו ספציפי?
13 ת: ארגון עצמו, המשרדים שלו, שנמצאת בשטחים היא פעילות כנגד ביטחון האזור, כספים
14 שהכניס או קיבל זה לא נגד ביטחון האזור? כל מה שהם עשו במסגרת ההתאחדות הזאת זה
15 פעילות נגד ביטחון האזור.
16 ש: אתה יודע איזה פעילות?
17 ת: מה שאני יודע זה רשום ואני חקרתי.
18 ש: סיוע לטרומיזם זה עבירה על החוק?
19 ת: מה שהיה צריך לחשאים אותו אני חקרתי.
20 ש: אתה אמרת שעיינת באמרות הקודמות של הנאשם לפני שחקרת אותו על בסיס האמרות
21 הקודמות ועל בסיסיהן חקרת אותו נכון?
22 ת: כן
23 ש: באמרות הקודמות הוא אמר שהיתה פעילות ועמותות צדקה בתוך ישראל שהיו בקשר עם
24 עמותה זו. אתה מודע לבדיקה כזו שנעשתה לגבי העמותות שרשומות בישראל ועבדתו עם עמותה
25 זו?
26 ת: לא אני לא יודע.
27
28 סנגור : אין שאלות נוספות.
29
30 תוב״ץ: אין חקירה חוזרת. אני מפנה לכך שכפי שעולה מהאמרה בערבית האמרה השנייה שאני
31 מגישה נגבתה בתאריך 29/09/15 בשעה 09:46 במתקן פתח תקווה וטעות בתרגום מצוין בערבית
32 תאריך 17/09/15.
33
34 סנגור : לאחר שעיינתי בחקירה בערבית ובחקירה בעברית אני מתרשם שזו אותה חקירה וככל
35 הנראה נפלה טעות קולומוס בתרגום בעברית ומדובר בחקירה מתאריך 29/09/15 בשעה 09:46.
36
37 אמרה שנגבתה בתאריך 17/09/15 בשעה 10:15 **מתקבלת ומסומנת ת/2.**
38
39 המסמכים המצורפים לאמרה זו מסומנים ת/2/א – ת/2/ח.
40
41 אמרה שנגבתה בתאריך 29/09/15 בשעה 09:46 **מתקבלת ומסומנת ת/3.**
42
43 המסמכים המצורפים לאמרה זו מסומנים ת/3/א .
44
45 **עד תביעה מס׳ 3 (מס׳ 5 ברשימת העדים)- פאדי בהג׳את מנאצרה**
46 העד מוזהר לומר את האמת, אחרת יהיה צפוי לעונשים הקבועים בחוק.
47
48 <u>חקירה ראשית</u>
49 ש: ספר פרטים על עצמך, היכן אתה עובד?
50 ת: אני עובד באגודת קטאר אלחיריה ברמאללה. אני מנהל חשבונות.
51 ש: על מה אתה עצור?
52 ת: מואשם בגלל עבודתי באגודה אסורה.
53 ש: אתה יודע מה עוד יוחס לך בכתב האישום?
54 ת: בעבודתי באגודה לא חוקית והעברת כספים.
55 ש: ספר על הקשר שלך לנאשם.
56 ת: קשר של עבודה, הוא הממונה שלי ואני הפקיד.
57 ש: איפה הוא מנהל?
58 ת: מנהל בקטאר אלחיריה ברמאללה.

4

תאריך : 09/01/17      בית המשפט הצבאי ביהודה      תיק מס׳ : 6011/15

1   ש : תוכל לספר על הפעילות של העמותה בה עבדת והנאשם?
2   ת : האגודה היא אגודה חברתית בלבד שמסייעת לאוכלוסיות החלשות בחברה. ביניהם יתומים
3   לעניים ולבעלי צרכים מיוחדים.
4   ש : מתי התחלת לעבוד שם?
5   ת : בחודש דצמבר 2009.
6   ש : מתי הנאשם החל לעבוד שם, ידוע לך?
7   ת : לא זוכר בדיוק. בסביבות 2010,2011.
8   ש : תוכל לפרט יותר על הפעילות של העמותה? מה היה חלקך?
9   ת : אני הייתי מנהל חשבונות באגודה.
10   ש : מה עשית במסגרת התפקיד?
11   ת : רישום כספים להכין דוחות מחזוריים, מעקב עם הבנקים. לבדוק העברות כספים וחתימה
12   עליהם.
13   ש : באיזה כספים מדוברי מה מקורם?
14   ת : הסיוע הכספי שמגיע מקטאר ליתומים.
15   ש : מאיפה בקטאר?
16   ת : מדוחא מהמרכז הראשי.
17   ש : מה שמו המלא?
18   ת : הם המשרדים הראשיים של אגודת קטאר אל חירייה שיושבת בדוחא בדוחא קטאר.
19   ש : תוכל לפרט על אופן העברת הכספים?
20   ת : היינו לוקחים אישור ממשרד הרווחה את האישור לבנק.  משרדי הבנק
21   בדוחא הם אלה שהיו מאשרים. הבנק בקטאר היה מאשר, היו מעבירים את הכסף דרך משרדי
22   הבנק בגרמניה. הם היו נותנים את האישור לשליחת הכסף, זה היה עובר לאישור בנק מקטר
23   בגרמניה עם כל המסמכים בהתאם לחוק מימון טרור כדי לוודא את מקור הכספים ואז היינו
24   מקבלים אישור מהמשרד הסיוע הנשיאותי. הכסף היה עובר לאחר האישור לבנק פלסטין ואחרי
25   שמקבלים את הכסף היינו מחלקים את הכסף למי שהיה צריך אותו לקבוצות המוחלשות בלבד.
26   ש : תוכל לפרט על שמות הבנקים בהם עברו הכספים?
27   ת : קודם כל בדוחא- בנק רייאן. אחר כך בגרמניה- דויטשבנק, לאחר האישור בבנק בגרמניה,
28   הכספים עוברים לבנק פלסטין. שהוא מקבל את האישור מהבנק המרכזי.
29   ש : הכסף הזה כיצד הוא מועבר? באיזה מטבע?
30   ת : יורו.
31   ש : כשאתם מקבלים את זה לעמותה מה אתם עושים עם זה?
32   ת : מעבירים את הכסף לפי הפרוייקט באותו הזמן. פרוייקט היתומים מועבר להם דרך תעודה
33   שקוראים לה "סנאבל" זה כרטיס ששייך לבנק פלסטין. בהתאם לפרוייקט זה מועבר לקבלנים.
34   ש : באמרתך מיום 09/09/15 בשורות 57-52 אתה מפרט על עניין העברת הכספים אך לא ציינת
35   שזה כרוך באישור של הרווחה זה בדוחא איך אתה מסביר את זה?
36   ת : הסברתי את זה. בחקירה. נשאלתי ועניתי איך מעבירים את הכספים.
37   ש : מה היה תפקידך בהעברת הכספים?
38   ת : הרישום כתעברת כסף שהגיעה לעמותה וחתימה עליה.
39   ש : מה היה חלקו של הנאשם?
40   ת : מנהל המשרד. היה מתעסק בכל הנוגע להחזרת כספים ולוגיסטיקה.
41   ש : תוכל לפרט על פעילות האגודה בעזה?
42   ת : כפי שהזכרתי קודם האגודה מטרתה עניינים הומניטריים בלבד. סיוע לכלל האנשים ללא
43   הבדל של דת וגזע.
44   ש : מה היה תפקידך במסגרת העמותה הזו?
45   ת : מנהל חשבונות. לשאלת ביהמ"ש התכוונתי רק למשרד ברמאללה.
46  
47   סניגור : אבקש שהשאלה תובהר. העד לא ישב בעזה.
48  
49   ש : מה היה תפקידך במסגרת העמותה בעזה?
50   ת : לא היה לנו שום תפקיד שם ולא עבדנו שם.
51   ש : באמרתך מיום 09/09/15 בשורות 79-76 אתה מוסר שהתחלת לעבוד ברמאללה המשרד היה
52   אחראי גם על המשרד בעזה והיתה אחראית על כל הפעילות את הפעילות שהייתה בעזה. (מצטט)
53   ת : בכל הנוגע לכספים אני יכול לומר לפי ההסכם שהיה עם הרשות הפלסטינית באותו זמן לקבלת
54   כספים הנוגעים למשרד בעזה, אלו היו עוברים לאישור דרך המשרד הסיוע הנשיאותי.
55   ש : אז כן עבדת שם. היה לך תפקיד בסניף שבעזה.
56   ת : לא היה לי תפקיד במשרד בעזה. תפקידי היה רק ברמאללה ותו לא.
57  

1  תוב״ז : נבקש להכריז על העד שהוא עד כעד עוין זאת מאחר שהוא סותר דברים שהוא מסר. כרגע העד
2  מסר כי לא היה לו תפקיד בעזה כשמספר שורות קודם לכן הוא אמר שכל עניין הכספים בעזה
3  מתנהל דרכו. לאור הערת ביהמ״ש אמשיך בחקירת העד.
4
5  ש : באמרתך מיום 09/09/15 שורות 79-76 מסרת כי המשרד ברמאללה היה אחראי על המשרד
6  בעזה והסכמה של הרשות. בין היתר על העברת הכספים, מה יש לך לומר על כך?
7  ת : הייתי עובד במשרדים ברמאללה. במשרדים בעזה היה מנהל חשבונות אחר, תפקידי במשרד
8  ברמאללה שנגע למשרד בעזה היה מוגבל ליישום ההסכמים בין הרשות הפלסטינית לבין קטאר
9  אלחיריה. הייתי מנהל חשבונות וישבתי ברמאללה וזה היה התפקיד שלי.
10  ש : אתה באמרה שלך אמרת שהמשרד ברמאללה היה אחראי על המשרד בעזה בהסכמה של
11  הרשות והייתם אחראים על כל דבר שקורה בעזה כולל הכספים.
12  ת : כן, זה לפי ההסכמים החתומים שכל העברת הכספים לפני שעוברים למשרדים בעזה צריכים
13  לעבור את האישור של הרשות הפלסטינית.
14  ש : אם כך, כן טיפלת בכספים ובהעברת הכספים לעזה?
15  סנגור : זאת שאלה מדריכה מדובר בחקירה ראשית. הוא הסביר זאת באמרתו ובשאלה הקודמת.
16
17  ש : אבקש לרענן את זכרונך, מסרת שכשהתחלת לעבוד בסניף ברמאללה...
18  סנגור : אבקש לעיין בנוסח בערבית לפני שיוקרא לעד. אבקש שיוקרא לעד הנוסח בערבית, יש פער
19  בינו לבין הנוסח בערבית.
20
21  מתורגמן מקריא לעד את הנוסח בערבית בעמוד מס׳ 4 שורה 18-9 :
22  "ש: ספר לי על העמותות בעזה.
23  ת : אני עבדתי ברמאללה. המשרד היה אחראי על המשרד בעזה לפי ההסכמים עם הרשות
24  הפלסטינית. כל דבר היה חוזר דרך המשרד בגדה זה לפי ההסכמים עם הרשות שהעמותה
25  תעבוד עם הרשות הפלסטינית. התעברות הכספים מעמותות הסיוע הנשיאותית של הרשות
26  הלאומית כדי שיבדקו אותן ולא יהיו בעיות עם גיוס הכספים. כל העברה דרך העמותה בקטאר
27  או בגדה לאחר ההסכמה עם העמותה הנשיאותית. "
28
29  ת : כל מה שקראת לי זה נכון.
30  ש : מה מה תפקידו של הנאשם במשרד בעזה?
31  ת : לבדיהם שהכול עובר דרך משרד הסיוע הנשיאותי.
32  ש : תוכל להגדיר את התפקיד שלי?
33  ת : אני לא יודע בדיוק מה תפקידו אך מה שאני יודע שזה מעקב לפי עמותת קטאר אל חיריה לפי
34  הסעיפים בהסכמים החתומים עם הרשות הפלסטינית. ולדאוג שלא יבוצעו עבירות או חריגות.
35  ש : אפנה אותך לאמרה שלך מיום 09/09/15 שורות 81-82. שם מסרת (מצטטת)
36
37  סנגור : הנוסח בערבית אינו תואם לנוסח בערבית. נבקש להקריא מהנוסח בערבית.
38
39  **התובע ענאן סרחאן מקריא לעד את הנוסח בערבית בעמוד מס׳ 4 שורה 28-19 (סוף העמוד) :**
40  "יעבד אלרזק אלגרבאוי בן ערבך 49 נשוי, מכינים אותו אבו אלמגיד, תושב רצועת עזה, הוא היה
41  אחראי על האגודה עד שנת 2010 ומחלופי גיודי אל ג׳מאל אשר היה אחראי ברמאללה ניהל
42  גם את האגודה בעזה.
43  וגם בתקופה הזו היה רמדאן עאצי גילו בערבך 40 תושב בית לקיה (כאן יש תיקון חוקר ודברים
44  מחוקים) בשנת 2011 היה מינוי למנהל כספי בגדה ורצועת עזה  וכל הפרויקטים הוא אחראי
45  עליהם והוא גם שמאשר את הבקשות והאישורים עליהם.
46  נגיאן עדה שהזכרתי הייתה אחראית על העניינים האדמיניסטרטיביים והפנמיים בתוך הגדה
47  ורצועת עזה, בשנת 2013 הגיע מנהל מקשור ששמו מג׳ד אבו חלוב ומאז היה ניתוק בענייינים
48  המוניליים והכספים ורצועת עזה התחילו לעבוד לבד." (חלקים מהאמרה לא היו ברורים ולכן
49  היה קושי בקריאתם).
50
51  מתורגמן מקריא לעד את הכתוב
52
53  ת : רמדאן עאצי היה מחליפו של עבד אלרזק אלגרבאוי ולא גיודי אלג׳מאל. לגבי כל היתר זה נכון.
54  ש : למעשה באמרה שלך מסרת כי כי עבד אלרזק אלגרבאוי היה אחראי על האגודה עד שנת 2010
55  אז גיודי אלג׳מאל החליפו. כמונהל האגודה ברמאללה וכן ניהל את האגודה בעזה.
56  ת : עבד אלרזק היה המנהל בעזה אבל מי שהחליף אותו היה רמדאן עאצי ולא גיודי אלג׳מל.
57  ש : איך אתה מסביר את הפער בין האמרה שלך לבין מה שאתה מוסר עכשיו.
58

| תיק מס׳ : 6011/15 | בית המשפט הצבאי ביהודה | תאריך : 09/01/17 |

1  סנגור : אני מתנגד ומציין כי התרגום של התרגע ביחס למילים הבאות:
2  "ומחליפו גידי אל גימאל אשר היה מנהל האגודה ברמאללה ניהל גם את האגודה בעזה." אינו
3  ברורה מאמרה המקורית ואנחנו לא מסכימים לתרגום של התובע.
4  תובי"ץ : בעניין זה נברר עם גובה האמרה ונחליט בהמשך אם יזמן את העד שוב.

5

6  סנגור : אני מפנה גם לעובדה שלפי כתב האישום הנאשם נכנס לניהול העמותה ברמאללה משנת
7  2011. ולא ב2010 כפי שעולה באמרה.

8  ש : תוכל לספר לביהמ"ש על פעילויות נוספות של האגודה ברמאללה?
9  ת : יש את העניין של סיוע בארוחות להפסקת צום הרמדאן וחלוקת קורבנות- בשר בחג
10  הקורבן. הגשת סיוע לפרויקט של גידול ציצן. עוד פרויקט שהתחיל בהמשך 2010 שיפור כביש מבית
11  לחם לרמאללה שיפור התאורה. פעילות בשעות הפנאי ליתומים. סיוע לאנשים שצריכים ריהוט
12  מלא לבית ושיפוץ בתים.
13  ש : עם אילו עמותות נוספות עבדה העמותה קטאר אלחיריה?
14  ת : היא עבדה עם עמותות מקומיות שבתוך פלסטין- אגודת הסהר האדום הפלסטיני, האגודה
15  אלחיריה אלאסלאמיה, אגודת חברי היתומים, אגודת אל אחסאן אלחיריה, אגודת ליגאן אלזקה
16  שיש לה אישור מטעם הרשות הפלסטינית. העבודה מול העמותות האלה רק לאחר קבלת אישור
17  מהרשות הפלסטינית.
18  ש : מה בדיוק עשיתם מול העמותות האלה?
19  ת : יש להם יתומים ויש להם עניינים של הוצאת כספים בכל הנוגע לבעלי צרכים מיוחדים או
20  יתומים.
21  ש : תוכל לפרט יותר על עניין הכספים? איך הם מועברים?
22  ת : לנו אין היתומים שהם גרים ביחד עם האמא אנחנו נותנים לאמא כרטיס "סנאבל" מונפק
23  על ידי בנק פלסטיני והכסף מועבר דרך הכרטיסים הנ"ל.
24  ש : כמה כסף מועבר לעמותות שציינת?
25  ת :אין סכום מסוים שמועבר לכל עמותה כל עמותה לפי צרכיה ולפי מספר היתומים שרשומים
26  בה.
27  ש : ארענו אתך זכרונך באמרתך מיום 17/09/15 שורות 93 עד 95 מסרת כי לאגודת אלאחסאן אל
28  חיריה בחברון בכל שנה היתם מעבירים לה 13-15 אלף דולר. במשך 5 שנים הועברו לה בין 70-75
29  אלף דולר.
30  ת : נכון.
31  ש : בשורה 103 מסרת שלעמותת אלחיריה אלאסלאמיה בחברון העברתם אותם סכומים בין 70-75
32  אלף דולר במהלך 5 שנים.
33  ת : כך נכון זה סכומים שמסייעים ליתומים.
34  ש : כך גם לגבי עמותת הסהר האדום?
35  ת : לא.
36  ש : אבל העוברו כספים?
37  ת : כן העברנו גם לסהר האדום.
38  ש : כך גם לשאר העמותות שציינת בחקירה?
39  ת : כן. כל הכסף שהעברנו לעמותות מסייע ליתומים ובעלי צרכים מיוחדים שרשומים תחתן
40  העמותות.
41  ש : כל הפעילות שציינת היא במסגרת העמותה קטאר אלחיריה זו במסגרת עמותה אסורה. מה
42  יש לך לומר על כך?
43  ת :לא מבין.
44  ש : כלל הפעילות היתה במסגרת עמותה לא חוקית.
45  ת : העמותה היתה מאושרת ורשומה על ידי הרשות הפלסטינית.
46  ש : תרשה לי לרענן את זכרונך באמרתך מיום 17/09/15 שורות 146-140. (מצטטת) על כך שידעת
47  שהפעילות אסורה על ידי הרשויות בישראל ועובדה שמשלוח של העמותה לא התקבל בנמל
48  אשדוד.
49  ת : שלחו מקטאר קופסאות שימורים לקבלתם וחלוקתם בגדה ומדינת ישראל סירבה לקבל את
50  המוצרים הנ"ל בכך שהעמותה רשומה ברשימה שחורה. כיבדנו את הדבר הזה והחזרנו את זה
51  לנמל עקבה וזה חולק בירדן.
52  ש : אז ידעת שהפעילות שלך במסגרת העמותה היא לא חוקית?
53  ת : אנחנו פעלנו באגודה בכך שהאגודה רשומה ברשות הפלסטינית והרשות הפלסטינית מוסמכת
54  לקבל את הרשות מהרשויות הישראליות כשהפעילות היא בתוך הגדה המערבית.
55  ש : אתה באמרת שלך מסרת שהפרויקט עם הקופסאות בשר לא צלח בגלל שהעמותה שבה עבדת
56  נמצאת ברשימת השחורה של רשויות ישראל ואינם חוקית אצלם.
57

12.Feb. 2017 12:32   KASLAN MAHAJNA   No.9048   P. 15

| תיק מס׳: 6011/15 | בית המשפט הצבאי ביהודה | תאריך: 09/01/17 |
|---|---|---|

1   ת: כן. הופתענו מכך.
2   ש: תוכל לספר על הקשר והפעולות בין המשרד בעזה לקטאר לאחריה בסניף ברמאללה.
3   ת: אמרתי קודם. הקשר ביניהם הוא קשר ביצוע המדיניות של עמותת קטאר לאחריה בקטאר
4   ועל יישום ההסכמים החתומים בין קטאר לאחריה לרשות הפלסטינית באופן תקין.
5   ש: אילו פעולות נוספת היו בין המשרד בעזה לבין קטאר לאחריה ברמאללה.
6   ת:אמרתי לפני.
7   ש: ארענן את זכרונך. באמרתך מיום 17/09/15 שורות 192-158 מסרת כי משנת 2010-2013 כאשר
8   נשאלת אילו סכומים קיבל המשרד בעזה מקטאר לאחריה מסרת כי משנת 2010 עד 2013 קיבלו
9   בערך 25 מיליון דולר...מאשר זאת?
10   ת:כן זה נכון וכל זה היה תחת אישורי משרד הסיוע הנשיאותי. חלק מזה היה מועבר מקטאר
11   אלאחריה בקטאר לפרוייקטים של בניית בתי חולים וכו׳. לאחר תקופה זו הופסקו קשרינו עם
12   המשרדים בעזה, לפי בקשת המשרדים הראשיים בקטאר.
13
14
15   תוב״יצ: בשל אילוצים אישיים אני נאלצת לבקש מביהמ״ש להפסיק את החקירה כעת ולהמשיך
16   אותה בדיון הבא.
17
18   סנגור: אין התנגדות בנסיבות העניין.  כמו כן אבקש לא לשמוע את העד לימי ראשון בחודש
19   בפברואר גם אם יידרש לדחות לחודש מרץ.
20
21
22   **ה ח ל ט ה**
23
24
25   בנסיבות העניין אין מנוס מהפסקת הדיון לאור בקשתה של התובעת.
26
27   **העד, פאדי בה ג׳את מנאצרה, יישמע בתאריך 13/02/17 החל מהשעה 09:30.**
28
29   **המזכירות תודא זימונו לישיבה זו. בנוסף למועד זה תזמן המזכירות את עד תביעה מס׳ 6 לכתב**
30   **האישום המתוקן באמצעות פרטים שתעביר התביעה.**
31
32   בנוסף, התיק נקבע לסיום פרשת התביעה ליום 20/03/17 בשעה 09:30. התובעת תוציא הודעה
33   אלו עדים היא מבקשת לזמן למועד זה ובכך לסיים את פרשת התביעה.
34
35   במועד זה תשמע אף פרשת ההגנה ולפיכך התביעה אף היא תודא בעצמה זימון עדים למועד זה.
36
37   ניתן והודע היום, 09/01/17, בפומבי ובמעמד הצדדים.
38
39
40

שופט                          אב״ד                          שופט

| תיק מס': 6011/15 | בית המשפט הצבאי ביהודה | תאריך: 26/07/17 |
|---|---|---|

1  בפני כב' האב"ד: סא"ל צבי היילברון

2  בפני כב' השופט: רס"ן אתי אדר

3  בפני כב' השופט: רס"ן חיים בלילטי

4

5  התביעה הצבאית

6  (באמצעות ב"כ רס"ן טל זיסקוביץ)

7  נגד

8  הנאשם: גודה דיב אברהים גמאל, 86096195/ שב"ס - נוכח

9  (באמצעות ב"כ עו"ד בולוס ועו"ד מתאגינה - נוכח)

10  <u>ג ז ר - ד י ן</u>

11

12  הנאשם הורשע על פי הודאתו במסגרת הסדר טיעון בעבירות של חברות ופעילות בהתאחדות בלתי

13  מותרת והכנסת כספי אויב לאזור. על פי כתב האישום המתוקן, מחודש מרץ 2011, שימש הנאשם

14  כמנהל תוכניות בארגון גימעיית קטאר אלחיריייה ברמאללה השייכת לגימעיית קטאר אלחיריייה

15  בדוחא, שהינה התאחדות בלתי מותרת. בהמשך, החל מחודש אוקטובר 2011 שימש הנאשם

16  כממלא מקום מנהל סניף הארגון ברמאללה.

17  עם הנאשם עבדו בין היתר, נג'ואן מחמד איימן חטן עודה (להלן: "נג'ואן"), כאחראית על תחום

18  הלוגיסטיקה בארגון, ופאדי בהג'את פייא פתאח מנצארה (להלן: "פאדי"), ששימש כרואה חשבון

19  של הארגון. מהנהלת הארגון בדוחא שבקטאר הועברו כ-12,000,000 ש"ח לסניף שברמאללה

20  לטובת פעילויות שונות של הארגון.

21

22  כלל הכספים הועברו באישורו של הנאשם ובפיקוח של פאדי.

23

24  הודאת הנאשם בעבירות בהן הורשע באה לאחר שהחלה שמיעת הראיות בתיק ובמסגרת הסדר

25  טיעון, כאמור.

26

27  במסגרת הסדר הטיעון שהונח בפנינו נתבקשנו להשית על הנאשם עונש של עונש מוסכם של 22

28  חודשי מאסר ו- 20 יום לריצוי בפועל, כמניין ימי מעצרו של הנאשם עד כה, מאסר מותנה לשיקול

29  דעת ביהמ"ש על כל עבירה שיש בה יסוד של תמיכה או חברות בארגון עוין ועל כל עבירה שיש בה

30  יסוד של עיסוק בכספי אויב או מגע עם אויב. כמו כן, עתרו הצדדים להשית על הנאשם קנס בסך

31  מיליון ₪ או שנתיים מאסר תמורתו.  הוסכם, כי הקנס ישולם ב-4 תשלומים שווים כאשר

32  התשלום הראשון על סך 250 אלף₪ יהווה תנאי לשחרור ממאסר. עוד הוסכם, כי יתר התשלומים

33  ישולמו בכל 6 חודשים ממועד השחרור וכי אי תשלום אחד מהם באופן מלא במועדו יביא לפירעון

34  מידי של הקנס כולו ויובל למאסר הנאשם חלף קנס אם לא ישלמו.

35

36  התביעה עמדה על יחידיות המקרה שבפנינו הנוגע להכנסת כספי אויב בהיקפים גבוהים. מנגד,

37  עמדה על השיקולים לקולה ובהם עברו הנקי של הנאשם, הודאתו באשמה וחוסכן המשמעותי

38  בזמן השיפוטי לנוכח טענות כבדות משקל שהעלתה ההגנה ביחס לאי חוקיות הארגון. טענות

תיק מס׳: 6011/15     בית המשפט הצבאי ביהודה     תאריך: 26/07/17

1
2   תוב״יצ : אין ראיות לעונש.
3
4   סנגור : אין ראיות לעונש.
5   תוב״יצ מסכם : מדובר בתיק חריג באופן מיוחד שכולל עבירה של הכנסת כספים בהיקפים גבוהים
6 ובנסיבות ייחודיות לאחר משא ומתן ארוך הענני לתוצאה מוסכמת ואנחנו נבקש מביהמ״ש
7 להשית על הנאשם עונש מוסכם של 22 חודשי מאסר ו- 20 יום לריצוי בפועל, הלכה למעשה מדובר
8 בהסתפקות בימי מעצרו, מאסר מותנה לשיקול דעת ביהמ״ש על כל עבירה שיש עמה יסוד של
9 תמיכה בארגון עוין או חברות בארגון עוין וכן על כל עבירה שיש עמה יסוד של עיסוק בכספי אויב או
10 מגע עם אויב. כמו כן, אבקש להשית על הנאשם קנס בסך מיליון ₪ או שנתיים מאסר תמורתו.
11 הקנס ישולם ב-4 תשלומים שווים כאשר התשלום הראשון על סך 250 אלף ₪ יהיה תנאי
12 לשחרורו. והיתר ישולמו בכל 6 חודשים. יובהר כי אי תשלום אחד התשלומים באופן מלא במועדו
13 יביא לפירעון מידי של הקנס כולו ויוביל למעצרו של הנאשם למאסר חלף קנס.
14
15   הנימוקים להסדר הם עברו הנקי של הנאשם, הודאתו באשמה והחיסכון משמעותי בזמן שיפוטי.
16 כמו כן, שקלנו את הוויתור של ההגנה על טענות הגנה משמעותיות ביחס לאי חוקיותו של הארגון
17 בו היו חברים. כמו כן שקלנו את העובדה כי מחותו הראויות עולה שהנאשם אמנם שימש בתפקיד
18 ניהולי בארגון אך אינו בדרג של מקבל החלטות בארגון הראשי אלא בדרג ביצועי בלבד. עוד
19 שקלנו את רמת העונשיה שנגזרה על שותפה של הנאשם וכן שקלנו את העובדה שמדובר בעונש
20 כולל רכיב כלכלי משמעותי ומאזן אותו עם עונש מאסר בפועל לתקופה שאינה מבוטלת.
21
22   סנגור מסכם : אני מצטרף לדברי חברי התובע ומבקש לכבד את ההסדר. עיקר טענותינו הוכרו
23 בנסיבות לקולא במסגרת ההסדר. כפי שהדגשנו בטענות המקדמיות ובהמשך המשפט שחלק
24 מהטענות התקבלו על ידי התביעה ומהוות את הבסיס להסדר. אני מצטרף להסדר בלב כבד
25 תקופת המאסר ארוכה והסכום לא מבוטל, אך ההודאה מותרת. אבקש לכבד את ההסדר.
26
27
28   הנאשם בדברו האחרון : אין לי מה להוסיף.
29
30
31        -לאחר הפסקה-
32
33
34
35
36
37
38
39
40
41
42
43
44
45
46
47
48
49
50
51
52
53
54
55
56
57
58

| תאריך : 26/07/17 | בית המשפט הצבאי ביהודה | תיק מס׳ : 6011/15 |
|---|---|---|

1 ראיותיות אלו נפרשו בפנינו במסגרת דיון בטענות מקדמיות שהעלתה ההגנה. התביעה ציינה כי

2 שקלה את העובדה שהנאשם אמנם שימש בתפקיד ניהולי בארגון, אך לא היה בדרג של מקבל

3 החלטות בארגון הראשי אלא בדרג ביצועי בלבד; את עונשו של מעורבת נוספת בפרשה, נגזאן

4 ואת תמהיל רכיבי העניישה הכולל רכיב כללי משמעותי, כאמור, לצד עונש מאסר ממושך.

5

6 ההגנה הוסיפה וחידדה את משמעות הווייתור על טענותיה בקשר לאי חוקיות האגודה, אשר נוכח

7 כובד משקלן תוקף כתב האישום וגובשה העתירה המוסכמת לעונש. הסנגורים הנכבדים הדגישו

8 את רכיבי המאסר בפועל והרכיב הכספי המשמעותי וביקשו כי נכבד את ההסדר.

9

10 העבירות בהן הורשע הנאשם הן חמורות. מדובר בעבירות המאפשרות ומבססות קיומה של

11 התאחדות בלתי מותרת ויש בפעילות במסגרתה משום פגיעה בביטחון מדינת ישראל. כך, נפסק

12 בעבר כי -

> 13 "פעילות שיטתית שמטרתה לאפשר את פעילות ארגוני הטרור, לשפרה
> 14 ולבססה בדרכים שונות על ידי יצירת גב כללי, כמו כרסום שיטתי,
> 15 מתמיד, בביטחונה של מדינת ישראל. כרסום שכזה מחליש את חוסנה
> 16 הביטחוני, הכלכלי והחברתי של ישראל והוא מצטרף ליתר הסכנות
> 17 הביטחוניות, חלקן קיומיות, הנשקפות באופן ממשי לישראל. בבחינת
> 18 טיבו של הסיכון אין לבודדו לעצמו אלא יש לבחון על רקע תמונת
> 19 המציאות בכללותה" ע"פ 3827/06 פלוני נ' מדינת ישראל (פורסם בנבו,
> 20 .(27.3.2007

21

22 חומרה יתרה נודעת לעיסוק בהכנסת כספי אויב לאזור, אף אם מדובר בפעילות בעלת אופי אזרחי

23 מעצם טיבה -

> 24 "ארגוני הטרור משקיעים תשומות משמעותיות בהעברת כספים
> 25 לפעילותיהם, למשפחות הפעילים ולצרכים אחרים הנכנסים בגדר
> 26 "הכשרת הלבנתם" ומטרתם לסייע לארגוני הטרור לבסס את אחיזתו
> 27 באוכלוסייה האזרחית (ראו עניין פלוני לעיל; עד"יי 2169/12 חסון נ'
> 28 מפקד כוחות צה"ל באיו"ש (פורסם בנבו, (18.12.2012)). הרבדים
> 29 השונים בהם פועלים ארגוני הטרור, נועדו לאפשר את פעילותו בכל
> 30 המישורים, ומכאן גם המסקנה כי אין מקום לבודד בין פונקציה
> 31 ומטרות "אזרחיות" לבין פונקציה ומטרות "צבאיות" (בג"ץ 1169/09
> 32 פורום משפטי למען ארץ ישראל נ' ראש הממשלה, ח"כ אהוד
> 33 אלמרט (פורסם בנבו, 15.6.2009)" (עד"יי 1793/15 התביעה הצבאית נ'
> 34 עליאן).

35

36

37 במקרה דנן שימש הנאשם בתפקיד ניהולי בארגון וביצע תפקיד מהותי בגוף אשר פעל לקבלת

38 כספים להתאחדות בלתי מותרת ומשם לאזור. הנאשם פעל בהתאחדות במשך זמן רב ותרומתו

39 להעברת הכספים ופעילות האגודה הייתה היתה מכרעת. סכומי הכסף שעברו תחת ידיו, באישורו

40 ובידיעתו עצומים. אמנם, פעילות הנאשם לא נעשתה בקשר עם פעילות טרור ישירה או ממשית

41 אך גם הפעילות מן הסוג אותה ביצע, שצבעה אזרחי-כלכלי, טומנת בחובה סיכון רב לביטחון

42 הציבור. בית המשפט העליון כבר פסק כי -

> 43 "הטרור בעידן הנוכחי מתאפיין לא רק בחיוותו גלובלי, אלא גם
> 44 בתחכום רב, לעתים במבנה ארגוני מסועף... יותר ויותר אנו עדים לכך
> 45 שארגוני הטרור משקיעים זמן, מחשבה ומשאבים בפעילות הסברתית
> 46 ותקשורתית, כמו גם בפעילות בעלת אופי אזרחי... פעילות נרחבת זו

③

של ארגוני הטרור מותנית בראש ובראשונה בקיומה של תשתית   1
כלכלית איתנה המבוססת ושימוש במערכות פיננסיות שיעמדו לרשות   2
ארגוני הטרור למימון פעילותם." (עניין **פלוני** הנ"ל).   3

  4

**וכן בפסיקת בית המשפט הצבאי הצבאי לערעורים בעד"י 4202/07 התביעה הצבאית נ' אבו עצב:**   5

"...התחכום ודרך הפעילות של ארגוני הטרור, אינם מאפשרים עוד   6
להפריד בין הפעילות הטרוריסטית ובין הפעילות האזרחית כביכול,   7
ושני התחומים הללו מזינים זה את זה ומחזקים זה את זה, ובסופו של   8
דבר מסכנים באופן ממשי את ביטחון המדינה ואזרחיה... מלחמת   9
החורמה שיש לנהל בארגוני הטרור, חייבת לבוא לידי ביטוי גם בענישה   10
הולמת, ונראה לי כי העונש שאושר בעניין פלוני, ראוי שישמש כנקודת   11
מוצא, בבואנו לקבוע את עונשו של המשיב שלפנינו...".   12

  13

לפיכך, קבעו בתי המשפט הצבאיים, לא אחת, ובפרט בע"מ 3197/06 **זכיה עוואנמה נ' תתוב"ץ:**   14

"...כי לא רק פעילות צבאית גרידא זכה להתייחסות מחמירה, אלא   15
אף כל אופני הפעילות אשר מאחוריהם עומדות התאגדויות בלתי   16
מותרות, גם אם אלה נושאות אופי אזרחי. יתרה מזו, התמודדות יעילה   17
מחייבת פגיעה נרחבת במעגלי הסיוע והתמיכה המוענקים לארגוני   18
הטרור. בתוך אלה נועדה חשיבות עליונה להשרשת התשתית הכלכלית   19
העומדת מאחורי ארגוני הטרור, אשר בלעדיה אלה היו נותרים ללא   20
פעילות, ללא תמיכה, וללא חיות כלל."   21

  22

  23

מן המקובץ נראה, אפוא, כי הנאשם ראוי לעונש מאסר ממושך לצד עונש כספי מרתיע שתוצאתו   24
פגיעה בפעילות הכלכלית של הארגון, המהווה ציעור חמצן להמשך פעילותן של התאגדויות בלתי   25
חוקיות.   26

  27

אין ספק, כי העונש לו עתרו הצדדים מקל במידה ניכרת מן העונש הראוי כפי שנקבע בפסיקת בית   28
המשפט הצבאי לערעורים הנזכרת לעיל הן ברכיב המאסר והן ברכיב הכספי. לגבי רכיב אחרון זה   29
חלה מגמה של החמרה ברף הענישה אשר קבעה קשר בין גובה הקנס לבין היקף הכספים שהועברו   30
להתאחדות הבלתי מותרת, משיקולי הלימה והרתעה.   31

  32

אלא שבמקרה שבפנינו אכן היבטים משמעותיים לקולה. בראשם, ניצבים הטיעונים הראייתיים   33
הנוגעים לחוקיות האגודה ומטרותיה, טיעונים עליהם ויתרה ההגנה במסגרת ההסדר, כאמור.   34
בנוסף, עניין לנו בנאשם מבוגר נעדר עבר עבר פלילי כלשהו. הנאשם, חרף תפקידו, לא היה בעל מעמד   35
של מקבל החלטות בארגון וייתכן שמטרותיה האזרחיות של האגודה הן אלו שעמדו לנגד עיניו בעת   36
פעילותו בה. שקלנו אף את את עונשה של מעורבת נוספת בפרשה ואת המדרג אותו יצרו הצדדים בין   37
העונשים השונים במסגרת הפרשה.   38

  39

מובן, כי שקלנו את מכלול רכיבי הענישה ואת העובדה כי חרף הפער בין היקף הכספים אותם   40
הכניס הנאשם לבין לאזור לקנס המוסכם, מדובר ברכיב כספי משמעותי. זאת, לצד עונשי מאסר בלתי   41
מבוטלים, בפועל ועל תנאי.   42

  43

  44

תאריך: 26/07/17    בית המשפט הצבאי ביהודה    תיק מס': 6011/15

1 לאור האמור, מצאנו לאמץ את הסדר הטיעון ואנו גוזרים על הנאשם את העונשים הבאים:

2

3 א. 22 חודשים ו-20 ימי מאסר לריצוי בפועל מיום מעצרו.

4 ב. 18 חודשי מאסר על תנאי והתנאי הוא שבמשך 5 שנים מיום שחרורו לא יעבור הנאשם

5 עבירה שיש בה יסוד של תמיכה או חברות בארגון עוין או כל עבירה שיש בה יסוד של

6 עיסוק בכספי אויב או מגע עם אויב.

7 ג. קנס כספי בסך 1,000,000 ₪ או שנתיים מאסר תמורתו. הקנס ישולם בארבעה תשלומים

8 שווים, כאשר התשלום הראשון בסך 250,000 ₪ יהווה תנאי לשחרור הנאשם ממאסר.

9 יתר התשלומים ישולמו בכל 6 חודשים ממועד השחרור. לא ישולם אחד מן התשלומים

10 במועדו תועמד יתרת הקנס כולה לפירעון מידי ואם לא תשולם ייאסר הנאשם תמורתה.

11 שוברים יימסרו להגנה על ידי המזכירות. מספרי שוברים לתשלום הראשון: 0000836316,

12 0000835916, 0000836016, 0000836116, 0000836216. כל שובר על סך 50,000 ₪.

13

14

15 זכות ערעור תוך 30 יום.

16

17 ניתן והודע היום, 26/07/17, בפומבי ובמעמד הצדדים.

18

19

20 שופט          אב"ד          שופטת

21

צ ב א   ה ה ג נ ה   ל י ש ר א ל



תיק מס': 6008.15                     בית המשפט הצבאי ביהודה
בפני כב' ס. הנשיא : סא"ל צבי היילברון

בפני כב' השופטת: רס"ן אתי אדר

בפני כב' השופט: רס"ן חיים בליליטי

התביעה הצבאית

(באמצעות ב"כ סא"ל מוריס הירש)

נגד

הנאשם: פאדי הבגת ע"א פתאח מנצרח ת.ז 914129002

(באמצעות ב"כ עו"ד ג'והאד בולוס)

<u>החלטה</u>

בתאריך 5.11.15 הוגש בעניינו של הנאשם כתב אישום מתוקן המייחס לו ששה פרטי אישום הנובעים מהיותו רואה החשבון של עמותת " ג'מעיית קטאר אלחיריייה בדוחא".

בטרם תשובת הנאשם לכתב האישום בקשה ההגנה לבטל את כתב אישום מאחר ולטעמה עומדת לנאשם הגנה מן הצדק. להלן בתמצית טיעוני ההגנה:

ראשית נטען על ידי התגנה כי עומדת לנאשם טענת 'השתק', היינו הרשות מנועה להעמיד את הנאשם לדין מאחר ופעילות העמותה, האסורה לכאורה לפי כתב האישום, היתה ידועה לרשויות בישראל. לטעמת ההגנה פעילותה של העמותה היתה פומבית ופורסמה בכלי התקשורת. זאת ועוד, במסגרת פעילותה הזמינה העמותה משלחת קטארית ונציגיה לווו על ידי גורמי הביטחון הישראלי. משהידעה הרשות על פעילות העמותה, ולא פעלה כנגדה במשך תקופה ארוכה היא מנועה מלהעמיד את עובדיה לדין.

זאת ועוד, לאחר שיוכח על ידי ההגנה כי הרשויות בישראל ידעו על פעילות העמותה ולא פעלו כנגדו הם יצרו מצג בפני הנאשם ושותפיו שפעילות העמותה הינה כדין, שאם לא כן, הכיצד הרשות אינה פועלת נגדה.

1

בית המשפט הצבאי ביהודה                                                      תיק מס': 6008.15

חוכחה נוספת לכך שהנאשמים סברו שהרשויות מכירות בפעילות העמותה, היא העובדה שבמשך השנים הרלבנטיות לכתב האישום, הועברו לעמותה סכומי כסף גדולים שהגיעו, בין היתר, מקטאר. אין זה סוד כי גורמי אכיפת החוק הן של הרשות והן של ישראל, עוקבים אחרי העברת כספים לגדה ובוודאי כשמדובר בסכומי כסף גדולים. משלא נקטו הרשויות בכל פעולה כלשהי והתירו את העברת הכספים, הסיקו הנאשם ושותפיו, כי הרשויות ידעו מכך והעלימו עין. לפיכך מנועה הרשות מלטעון בעניין זה נגד הנאשמים.

כן נטען על ידי ההגנה כי לא רק שהפעילות הייתה ידועה לרשות, היא הייתה ידועה במשך תקופה ארוכה כבר משנת 2008, ורק בשנת 2015 החליטה הרשות לעצור את הנאשם. לטעמה של ההגנה יש בתקופת שיהוי זו, כדי להקים לנאשם "הגנה מן הצדק".

בתום הטיעונים בעל פה ולאחר קבלת ארכה מבית המשפט, הציג בפנינו הסנגור אסופת מסמכים מהם הוא מבקש ללמד שהרשויות הכירו את פעילות העמותה ולא עשו דבר. כך הציג בפנינו הסנגור פניות לרשויות המס בקשר לעמותה, התכתבות רשמית של העמותה עם נציג משרד הכלכלה במנהל, וכן פרסומים שונים של העמותה. לא זו אף זו, הוצגו בפנינו מסמכים המלמדים על פעילותה הענפה של העמותה, וכן קשרים מובהקים בין העמותה לבין בכירי הרשות הפלסטינית ובכירים נוספים.

לסיכום טוען הסנגור כי במשך שבע שנים פעלה העמותה בפומבי, פרסמה את פעילותה בכל כלי התקשורת ובמסגרת פעילות העמותה אף שולבו כל בכירי הרשות הפלסטינית, וזאת לאחר קבלת היתרים מהרשויות הישראליות. כל אלו יצרו מצג בפני הנאשם כי פעילות העמותה חוקית.

הפרקליט הצבאי טען בפנינו כי המפקד הצבא הוא היחידי אשר יכול להכריז על עמותה כארגון אסור ובמידת הצורך לבטל את האיסור. בנסיבות העניין העמותה הוכרזה כארגון אסור בשנת 2008 והכרזה זו עומדת בעינה עד היום.

עוד ציין התובע, כי לא ניתן לקבל את טענת ההגנה, שהנאשם לא ידע שהעמותה אסורה, וזאת נוכח האמור באמרתו מיום 21.9.15 בה ציין הנאשם באופן הברור ביותר כי: "כולם ידעו שמדובר בארגון אסור".

בניגוד לאמור בדברי ההגנה טען התובע כי לא הובאה כל תשתית ראייתית לכך שהרשויות אכן מצליחות לזהות כל העברת כספים לגדה. כן טען התובע כי הרשויות בישראל לא ידעו על קיומה של האנגודה, ובוודאי שלא שיתפו עימם בפעולה. לטענת התובע קצה החוט לאיתור פעילות העמותה בה עבד הנאשם, היה איתור משלוח שהוזמן על ידי הארגון בשנת 2014. נציג התביעה הצהיר בפנינו כי לאחר בדיקה הוא מודיע כי רשויות האכיפה לא ידעו על פעילותה האסורה של העמותה.

בעניין המסמכים שהוצגו על ידי ההגנה טענה התביעה מספר טענות:

בית המשפט הצבאי ביהודה     תיק מס׳: 6008.15

ראשית טענת התביעה, כי גם הדיון בטענות מקדמיות במסגרת ההליך הפלילי כפוף לדיני הראיות ומשכך, על ההגנה, להגיש את כלל החומר שהוגש על ידה בהתאם לכללים, היינו, על ידי עורכי המסמכים.

שנית נטען כי אין לקבל את הטענה שכלל פרסומי העמותה כפי שהובאו על ידי ההגנה, היו ידועים לגורמי אכיפת החוק. לטענת התביעה גורמי הביטחון שוקדים ובוחנים את הפרסומים היוצאים לאור באזור ומחוצה לו, אך בחינה זו אינה חובקת כל, כך כלשון התובעת, ובוודאי שאין בבחינה זו לאתר את כלל הפעילות המתבצעת.

שלישית, כפי שהצהיר הפרקליט באולם, מבדיקה שנערכה על ידי התביעה עולה כי גורמי אכיפת החוק בישראל לא הכירו את פרסומי העמותה.

### דיון והכרעה

בקשת ההגנה לביטול כתב האישום מתבססת על כך שרשויות הביטחון בישראל ידעו על פעילות העמותה וחרף ידיעה זו לא פעלו כנגדה. מטענה זו מבקשת ההגנה ללמוד, ראשית, כי הרשות מושתקת מלטעון כנגד הנאשמים בעניין פעילותם, מאחר והיא לא עשתה דבר למיגור הפעילות. שנית מבקשת ההגנה ללמוד כי הנאשמים הסיקו מהתנהלות הרשות, כלפי העמותה, כי פעילות העמותה מותרת. כן נטען על ידי הגנה כי יש לבטל את כתב האישום גם לנוכח השיהוי הרב מתחילת פעילות העמותה ועד למעצרם של הנאשמים.

כאמור התביעה חולקת על טיעוני ההגנה הן במישור העובדתי והן במישור המשפטי.

בטרם נדרש לטיעוני המשפטי, הרי שאנו קובעים כי אין די במסמכי החהגנה כדי לבסס את החמסד העובדתי שבבסיס הבקשה, כי גורמי הביטחון ידעו על פעילות העמותה, להלן תנימוקים:

אנו מקבלים את טענת התביעה כי אין בהכרח בפרסומי העמותה כדי להוכיח שגורמי הביטחון הכירו את הפרסומים וידעו מהם על פעילות העמותה. גם היקף פעילותה של העמותה וקשריה עם בכירי הרשות אין די בהם כדי לבסס את הטענה העולה מהבקשת שגורמי אכיפת החוק ידעו על פעילות העמותה.

אף אם נקבל את מסמך החהגנה, הנוגע לפניית העמותה אל נציגי משרד הכלכלה בבית אל, בבקשה להוצאת ציוד הקשור לפרוייקט אנרגיה אליו קשורה העמותה, הרי שלא הוכח בפנינו, כי המסמך שנשלח לנציג הכלכלי במנהל אכן התקבל על ידו. גם אם נניח לצורך הדיון כי המסמכים הנוגעים לעמותה אכן התקבלו על ידי רשויות המס והנציג הכלכלי במנהל, ספק עם רשויות אלו מקימות ממשקים עיתיים עם גורמי אכיפת החוק בקשר לעמותות שהוכרזו כאסורות.

בית המשפט הצבאי ביהודה                         תיק מס': 6008.15

יתר על כן, התביעה טוענת כי מברור שערכה עולה כי הגורמים הרלבנטיים לא ידעו על פעילות העמותה וכי רק בקיץ 2014 הוברר לגורמי הביטחון היקף פעילותה הרחב של העמותה. כן נטען על ידי התביעה כי אף לאחר גילוי היקף פעילותה של העמותה, נדרשה שהות כדי לעמוד על מנהליה והפועלים במסגרתה, חקירה שאף היא דרשה זמן.

זאת ועוד, כפי שנטען בפנינו, הנאשם בחקירתו מציין כי ידע ולטענתו אף "כולם" ידעו שפעילות העמותה אסורה. אם כך הם פני הדברים, לא יוכל הנאשם להימלט בטענה כי נוכח מחדלה של הרשות סבר שהפעילות מותרת.

למעלה מן הצורך, ומעבר לאמור לעיל, יש ממש בטיעוני התביעה כי כלל המסמכים שהוגשו בפנינו לא הוגשו באמצעות עורכם, וספק רב האם ניתן לקבלם באופן שהוגשו, אף בשלב דיוני זה.

נוכח המקובץ אנו קובעים כי בשלב זה לא הוכח בפנינו המסד העובדתי לבקשה. לאור קביעה זו איננו נדרשים, בשלב זה, לדיון המשפטי, האם בהעדר פעילות גורמי החקירה כנגד העמותה, כטענת ההגנה, יש כדי לבסס את ביטול כתב האישום.

אין בהחלטה זו כדי למנוע מן ההגנה להוכיח בראיות מספיקות, במסגרת פרשת ההגנה, כי רשויות אכיפת החוק אכן ידעו ונמנעו מלפעול כנגד העמותה. אם כך אכן יוכח, נידרש לדיון המשפטי הנובע מכך בבוא היום.

סוף דבר, אנו דוחים את הבקשה.

התיק נקבע לישיבת הקראה ליום 26.9.16 בשעה 9:30.

המזכירות תעביר העתק מן ההחלטה לצדדים.

ניתן והודע ביום, 24.8.16, בלשכה.


רס"ן חיים בלילטי                רס"ן אתי אדר                סא"ל צבי הילברון
שופט                           שופטת                     אב"ד


4

| צבא | משפט | הגנה | לישראל |
|---|---|---|---|
| בבית הצבאי | | תיק ביהמ"ש: 15/ | |
| י ה ו ד ה | | תיק תביעה: 3127/15 | |
| בפני הרכב | | תיק פ.א.: 425869/15 (פ"ת) | |

במשפט שבין התובע הצבאי – המאשים
-נגד-

נגו'אן חמד אימן חסן עודה
ת.ז. 911606184, ילידת 7/6/82, תושב רמאללה
עצורה מיום 7/9/2015

**הנאשמת**

# כתב-אישום

## הנאשמת הנ"ל מואשמת בזאת בביצוע העבירות הבאות:

### פרט אישום ראשון:

**מהות העבירה: חברות ופעילות בהתאחדות בלתי מותרת,** עבירה לפי תקנות 85(1)(א) לתקנות ההגנה (שעת חירום), 1945.

**פרטי העבירה:** הנאשמת, באזור, **החל מיום 5/5/2010 ועד ליום מעצרה** או בתקופה הסמוכה לכך, הייתה חברה או פעלה כחבר בהתאחדות בלתי מותרת, דהיינו:

1. במועד האמור לעיל, ברמאללה או במקום סמוך לכך, הנאשמת הייתה חברה בגימעיית קטאר אלחיריה בדותא (להלן: "**הגימעייה הראשיתי**"), שהינה התאחדות בלתי מותרת.

2. בתקופה האמורה לעיל, גידה דיב אבראהים גימאל (להלן: "**ג'ודה**") שימש כמנהל של גימעיית קטאר אלחיריה ברמאללה, <u>תחתיו עבדו הנאשמת,</u> האחראית על תחום הלוגיסטיקה בארגון, ופאדי בהגית ע"א פתאח מנאצרה (להלן: "**פאדי**"), אשר שימש כרואה חשבון של הארגון.

3. בתקופה האמורה לעיל, העבירה הגימעייה הראשית כ-12,000,000 דולר לגימעייה שברמאללה לטובת פעילויות שונות של הארגון.

4. הכספים הועברו מהגימעייה הראשית לבנק "אליראן" בדותא ומשם לבנק "דוויטשי" בגרמניה. לאחר מכן, הועברו לבנק פלסטין או לבנק האסלאמי ברמאללה והופקדו בחשבון הבנק של הגימעייה ברמאללה.

5. כלל הכספים הועברו באישורו של גידה פאדי של הנאשמת.

6. החל משנת 2011 ועד שנת 2013 שימשה הנאשמת גם כאחראית לוגיסטיקה של גימעיית קטאר אלחיריה בעזה, בתקופה זו הועבר סכום כסף בסך 25,000,000 דולר מהגימעייה הראשית לסניפה בעזה.

בעשותה את האמור לעיל, הייתה הנאשמת חברה ופעילה בגימעיית קטאר אלחיריה ברמאללה, שהינו התאחדות בלתי מותרת.

### פרט אישום שני:

**מהות העבירה: נשיאת משרה בהתאחדות בלתי מותרת,** עבירה לפי תקנה 85(1)(ב) לתקנות ההגנה (שעת חירום), 1945.

**פרטי העבירה: החל מיום 5/5/2015 ועד ליום מעצרו** או בתקופה הסמוכה לכך, באזור, הנאשמת ניהלה או עזרה בהנהלת התאחדות בלתי מותרת, או החזיקה במשרה או עמדה כל שהיא בהתאחדות בלתי מותרת או תחת מרותה, דהיינו:

במהלך התקופה האמורה לעיל, בעשותה את המפורט בפרט האישום הקודם הייתה הנאשמת נושאת משרה בגימעיית קטאר אלחיריה ברמאללה, שהינה התאחדות בלתי מותרת.

ת.ת. 366/04

| צבא | משפט | הגנה | לישראל |
|---|---|---|---|

בית משפט הצבאי | תיק ביהמ"ש: /15
י ה ו ד ה | תיק תביעה: 3127/15
דן יחיד | תיק פ.א.: 425869/15 (פ"ת)

**במשפט שבין התובע הצבאי – המאשים**

**-נגד-**

נג'ואן חמד אימן חסן עודה
ת.ז. 911606184, ילידת 7/6/82, תושב רמאללה
עצורה מיום 7/9/2015

**הנאשמת**

# כתב אישום מתוקן בהסדר

**הנאשמת הנ"ל מואשמת בזאת בביצוע העבירות הבאות:**

**פרט אישום ראשון:**

**מהות העבירה: חברות ופעילות בהתאחדות בלתי מותרת**, עבירה לפי תקנות 85(1)(א) לתקנות ההגנה (שעת חירום), 1945.

**פרטי העבירה:** הנאשמת, באזור, **החל מיום 5/5/2010 ועד ליום מעצרה** או בתקופה הסמוכה לכך, הייתה חברה או פעלה כחבר בהתאחדות בלתי מותרת, דהיינו :

1. במועד האמור לעיל, ברמאללה או במקום סמוך לכך, הנאשמת הייתה חברה בג'מעיית קטאר אלחיירייה בדואת (להלן:**"הג'מעייה הראשית"**), שהינה התאחדות בלתי מותרת.

2. בתקופה האמורה לעיל, גידה דיב אבראהים ג'מאל (להלן:**"ג'ודה"**) שימש כמנהל של ג'מעייה קטאר אלחיירייה ברמאללה, תחתיו עבדו הנאשמת, האחראית על חתום הלוגיסטיקה בארגון, ופאדי בהנית ע"א פתאח מנצורה (להלן:**"פאדי"**), אשר שימש כרואה חשבון של הארגון.

3. בתקופה האמורה לעיל, העבירה הג'מעייה הראשית כ-12,000,000 דולר לג'מעייה שברמאללה לטובת פעילויות שונות של הארגון.

4. הכספים הועברו מהג'מעייה הראשית לבנק "אליראאן" בדואת בחשבון של ג'מעיית קטאר אלחיירייה ברמאללה. לאחר מכן, הועברו לבנק פלסטין או לבנק האסלאמי ברמאללה והופקדו בחשבון הבנק של הג'מעייה ברמאללה.

5. כלל הכספים הועברו באישורו של גידה פאדי.

6. החל משנת 2011 ועד שנת 2013 שימשה הנאשמת גם כאחראית לוגיסטיקה של ג'מעייה קטאר אלחיירייה בעזה, בתקופה זו הועבר סכום כסף בסך 25,000,000 דולר מהג'מעייה הראשית לסניפה בעזה.
בעשותה את האמור לעיל, הייתה הנאשמת חברה ופעילה בג'מעיית קטאר אלחיירייה ברמאללה, שהינו התאחדות בלתי מותרת.

**פרט אישום שני:**

**מהות העבירה:** נשיאת משרה בהתאחדות בלתי מותרת, עבירה לפי תקנה 85(1)(ב) לתקנות ההגנה (שעת חירום), 1945.

**פרטי העבירה: החל מיום 5/5/2010 ועד ליום מעצרו** או בתקופה הסמוכה לכך, הנאשמת ניהלה או עזרה בנהלת התאחדות בלתי מותרת, או החזיקה במשרה או עמדה כל שהיא בהתאחדות בלתי מותרת או תחת מרותה, דהיינו :

במהלך התקופה האמורה לעיל, בעשותה את המפורט בפרט האישום הקודם הייתה הנאשמת נושאת משרה בג'מעיית קטאר אלחיירייה ברמאללה, שהינה התאחדות בלתי מותרת.

1

ת.ת. 366/04