# EXHIBIT 6

-Unclassified-
**Israel Defense Forces**
[emblem] IDF Advocate General

**Military Court of Appeals**                                              Appeal 3189/15
                                                                          Appeal 3190/15


**Before the Honorable Vice President: Col. Zvi Lekah**


Appellants:   **Juda Dib Ibrahim Jamal, ID *********
              Fadi Bahjat Abd el-Fateh Manassra, ID *********

(By Counsel Adv. Jawad Bulus)

v.

Respondent:   **The Military Advocate General's Office**
              (By Counsel Adv. Lt. Col. Morris Hirs)


Appeal against the decision of the Judea Military Court (the Honorable Judge Major Shiran Kenan)
Case No. 6011/15 dated November 18, 2015
(the appeals were denied)


Date of hearing: December 17, 2015, 5 Tevet 5766.


## DECISION


The Appellant, Juda Jamal, is the general director of the association Jamait Qatar Al-Khiria (Qatar Charity) (hereinafter: the Qatar Association or the Association). The Appellant Fadi Manassra is the accountant of the Association. The Qatar Association is an illegal association. In view of the activity of the two in the Association, they were indicted for membership in an illegal association, holding office in an illegal association, performing a service for an illegal association and bringing in enemy money in the amount of millions of shekels into the Area. The two were detained until the end of the legal proceedings against them, and hence the appeal before me.

It must be stated that the trial court's decision was based on my own decision in the case of Najwan Awda, another senior employee of the Qatar Association. In my decision in this matter, Appeal 2731/15, I ruled that Najwan's activity in the Qatar Association, which is an illegal association, point to dangerousness and justifies her detention until the end of the proceedings. This decision was also cited by the parties in the appeal before me.

-Unclassified-
Military Court of Appeals

Appeal 3189/15
Appeal 3190/15

**The Parties' Arguments**

The Appellants' defense counsel argued that my decision in the case of Najwan Awda referred to a much more limited dispute – whether the Qatar Association is an illegal association, and whether Najwan held a significant position in the organization. The defense counsel sought to argue that that decision was relevant only in connection with the argument presented there, while he sought to raise other arguments, which had not been raised at all in the hearing of Najwan's case.

The defense counsel noted that he did not dispute that the Qatar Association was an illegal association. However, and notwithstanding this fact, in his view, circumstances existed in this case that justify the release of the Appellants. The defense counsel's arguments can be concisely divided into two levels:

  a. Arguments concerning abuse of process.
  b. Arguments pertaining to the specific dangerousness of the Appellants.

On the first level, the defense counsel argued that the Qatar Association is recognized as a serious and respected charity worldwide. This organization is mostly funded by the State of Qatar and not by a terrorist organization. The organization is also recognized in Israel, and all the relevant government bodies are well aware of its activities. Moreover, the organization's activity is completely overt and it is conducted scrupulously, through tenders published in the media, including media published in Israel, and the funds are received through bank transfers that are probably supervised as required by Israel. The defense counsel noted that there was also a case where goods arrived for the Association through the Port of Ashdod, and at no point did anyone seek to block the goods, even though the Association was declared a terrorist organization. All these circumstances indicate that the Israeli authorities knew about the Association's activities and did not try to prevent it, thus they are now silenced from arguing against it and against anyone who worked overtly in it.

On the second level, it was argued that there is great importance to the question of the Appellants' subjective knowledge of the status of the Association. The defense counsel argued that the evidence in the investigation file indicates that these were two normative individuals, who responded to job offers that seemed legitimate to them, not having imagined that this was an illegal association. The defense counsel noted that Juda responded to an ad in the *Al-Quds* newspaper where a tender was published for the Association's position of general director, while Fadi accepted a job offer in Qatar. The manner of obtaining the jobs indicates, in his opinion, that these are normative people who were looking for a legitimate job and did not imagine that this was an illegal issue. The defense counsel acknowledged that the two knew that the Association was pronounced an illegal organization in Israel, but did not know that this pronouncement applied in the Area. Although he did not dispute that the pronouncement had been issued, the Appellants were not aware of it. Even if the issue was not knowing the law, still, the defense counsel argued, in terms of dangerousness, it cannot be said that they acted out of a desire to endanger security or while consciously disregarding the law. It was also noted that as of now, when the two Appellants know that the activity in the Association is forbidden, there is certainly no fear that they will return to work in it. Hence, it is appropriate to allow them to be released under an alternative to detention. In regard to this, the defense counsel noted that Juda resides in East Jerusalem

-Unclassified-
Military Court of Appeals

Appeal 3189/15
Appeal 3190/15

and it will not be difficult to arrest him if he chooses to flee from justice, and Fadi has no interest in fleeing having moved his domicile from Qatar to Judea and Samaria for the purpose of this work.

The prosecution replied that as far as abuse of process is concerned, no basis was laid for this claim, and it should not be inferred from a newspaper ad published in Israel, or any other sporadic fact that was noted, that the authorities were aware of the Association's activities and tacitly agreed to its work.

As for dangerousness, the prosecution stated that the Qatar Association is a terrorist organization, and as such, anyone who works within a terrorist organization, and certainly someone who holds a position in a terrorist organization, represents a risk that justifies detention until the end of proceedings. It was further argued that there is a significant concern of flight from justice, both with regard to Juda, even if he lives in Israel, and certainly with regard to Fadi, who has no connection to the area other than the Association that his source of livelihood, and he can flee back to Qatar without difficulty, as that was his domicile prior to coming to work for the Association.

**Discussion and Decision**

The Qatar Association is an illegal association both in Israel (a declaration signed on May 26, 2008 by the Minister of Defense) and in the Area (a declaration by the O/C Central Command on June 29, 2008 (see Manifests, Orders and Appointments File [KMZM] 225, p. 5283). The declaration stated expressly "including branches in the territories of the Palestinian Authority"). Therefore, even if the Association had received approval from the PA, this did not make it a legal association. As I noted in the aforesaid Appeal 2731/15, the argument that the Appellants did not know that the Association was an illegal association, namely not being aware of the law, cannot be held onto, and the defense counsel did not argue otherwise.

The defense counsel focused, as stated, on the argument of abuse of process, claiming that the Israeli authorities were well aware of the Association's activity, thus they are silenced from arguing against its activity and against anyone who acted in it; and alternatively, it is argued that none of the two is dangerous, certainly not to the degree that can be prevented by an alternative to detention.

**The Abuse of Process Argument**

First, it must be said that it is not at all clear whether the stage of detention is the correct stage for raising such an argument. HCJ 230/07 *Aton v. State of Israel* (published in Nevo, 3/1/2007) states the following:

> "The place for a claim for abuse of process – when it is raised after the indictment is filed – is in the trial court where the criminal proceedings are conducted, as ruling on it naturally requires a thorough factual examination…"

These words were restated also in Various Criminal Applications 7148/12 *Kanana v. State of Israel* (published in Nevo, 10/14/2012) where the Honorable Justice Barak-Erez noted the following:

> "It seems indisputable that the main place to argue abuse of process is in the criminal proceeding itself. This is the approach that have formed in this court even earlier, where abuse of process arguments were raised in proceedings of detention until the end of proceedings."

3

Second, even if the possibility of raising this claim in the detention hearing was not completely ruled out (see *Kanaana* above, at paragraph. 26), it appears that the arguments raised by the defense require significant factual clarification. I do not believe that one can rely on the fact that Juda responded to an ad in the most-circulated newspaper in Israel, or to the fact that he would pass a checkpoint with a vehicle with the association's logo affixed on it, to learn that the authorities were aware of the Association's activities and disregarded it, and therefore they are silenced and should not hold these proceedings. On the contrary, if there is an issue that indicates that the Israeli authorities did not accept the Association's activities, then it concerns the shipment of canned meat that the Israeli authorities refused to let in because of the Association being illegal, which led the Association to transfer the meat to Jordan (see Juda's testimony dated 9/13/2015). In other words, in a case where the authorities clearly knew, directly, about the arrival of the Association's goods to the port of Ashdod, they acted to thwart the activity, and therefore it seems that the evidence at hand, certainly at this stage, does not support the silencing argument.

Allegations raised about the ability to monitor bank transfers are also substantially factual allegations, which should be supported by appropriate evidence; and certainly at this stage, without a proper basis, it cannot be ruled that the authorities were aware of the funds transfers made by the Association and disregarded them. Moreover, it is difficult to say that those who acted within the Association itself were unaware that its activities were illegal, as the investigation file contains a request to the Ministry of Defense from the Association's counsels seeking to revoke its status as a terrorist organization. The interrogation of the Appellants by the police and the General Security Services indicate that the Appellants themselves were aware that the Association's activities were illegal, at least in Israel. I will elaborate on this below.

In my view, if the defense seeks to claim estoppel within the argument of abuse of process, it is appropriate that this claim be clarified in the trial court. In any case, at the present stage there is insufficient evidentiary basis to substantiate this claim.

**Dangerousness?**

The defense counsel for the two Appellants claimed that in their subjective knowledge, they did not know they were working for an illegal association. In this context, the defense attorney referred to words they said during their interrogation, where they stated several times that had they known that this was an illegal association, they would not have worked in it. The defense counsel also noted their overt manner of work during their activity in the Association as indicating that the two did not believe that they were acting illegally.

The defense counsel tried to minimize the risk posed by the Association's activities, while the prosecution argued that it was literally a terrorist organization. The factual and legal reality is more complex than the opposing positions presented by the parties. I would yet say at the outset that I do not accept the defense's thesis that no risk stems from the Association's activity, which was mostly in the area of social welfare and charity. Indeed, the Association is not a "classic" terrorist organization, and it does not operate directly in a military manner. However, the Association is part of a group of

-Unclassified-
Military Court of Appeals

Appeal 3189/15
Appeal 3190/15

"charity" associations that aim to win hearts in the field for the purpose of the activity of "classic" Islamic terrorist organizations. The global terrorist system is based on money, a lot of money, which is mainly intended for the proliferation of activists, and consequently also the violent terrorist activities. As stated in Criminal Appeal 1784/14 *Ashur v. State of Israel* (published in Nevo, 9/3/2015):

> "Terrorist organizations do not grow out of thin air, and do not feed on air. Terrorist organizations, and Hamas among them, like any organizational framework that unites people and harnesses them to advance a common goal – need significant budgets and a social support base for their day-to-day activities. Therefore, they must rely, on the one hand, on a "military" arm the role of which is to carry out terrorist acts, and on the other hand, on a "civic" arm, the role of which is to provide the organization with the fuel that drives its military activities – money and activists."
>
> …
>
> "However, often the "civic" activity of the terrorist organizations is intended for "winning the hearts", that is for activity of education and welfare intended at raising sympathy to the terrorist organization and its activists as good and benevolent, in order to create a basis for the organization's future activity."

According to the Appellants, they did not know that they were operating within an illegal Association, which indicates a reduced risk, although it does not absolve them of responsibility. I note that I was willing to consider this argument to some extent, but I am afraid that the existing evidence indicates that the Appellants knew about the problematic activity in the Association, and at the very least looked the other way and did not try to find out that the Association is illegal in the Area.

As stated, *at the very least*, according to what they stated in the investigation, they both knew that the Association was illegal in Israel. The two cling to the fact that they believed that the Association's activities were legal in the Palestinian Authority. It is hard for me to accept this contention. Can we accept an argument that membership in a terrorist organization such as the Popular Front or Hamas is not dangerous because these organizations have not been declared illegal organizations in the Palestinian Authority? The answer is self-evident. Note well: these are not junior employees in the Association, but its most senior management. As senior management, they were well aware that the Association was pronounced a terrorist organization in Israel. It is not clear why this fact did not cause them to ascertain the legal status of the Association in the Area, given the close connection between Israel and the Area. The argument that they chose not to check the legal status of the Association in the Area is perplexing on its face. Moreover, the incident involving the shipment of meat that did not pass through the port of Ashdod also supports that the Appellants themselves looked the other way in connection with the Association's legal status, if not indicating that they knew it was illegal. According to Juda's words in his interrogation, in view of the problems with the shipment and the refusal of the Israeli authorities to transfer the goods, he was forced to transfer it to Jordan. The contention that Juda did not know that the Association was illegal in the Area is therefore problematic; why would he have been compelled to transfer the shipment to Jordan, if the Association's activity in

5

the area was legal? Why, if the Association was legal in the Area, could he not use the meat in the Judea and Samaria territories? This point indicates precisely that the Appellants, certainly Judah, knew that the legal status of the Association in the Area was problematic, and at the very least, greatly strengthens the claim that the Appellants themselves looked the other way and chose not to ascertain the Association's status in the Area.

In my view, the aforesaid facts, which at least indicate looking the other way as to the legal status of the Association in the Area, largely negate the force of the defense claim of reduced risk, so far as it seeks to be based on their subjective knowledge. Such an argument is problematic when they themselves had to investigate and prevent their unawareness, and that is the essence of "looking the other way".

As stated, the Appellants are the top management echelon of the said Association. Hence the significant danger that stems from their activity. These are not junior agents, but the persons who operated the Association's significant financial mechanism, which brought ILS 12 million into the Area (according to Juda in his investigation). In the margin I will note that it is not clear whether the ILS 12 million is per year on average or for the entire period during which Juda was the general director, as there is a disparity between the memorandum of the investigation and the police statement. In any case, the letter of indictment attributed ILS 12 million for the entire period and not each year.

In the case of Najwan Awda, I noted the following which are even more relevant to the Appellants:

> "Administrative activity within an illegal association indicates inherent danger. The global terror system operates not only at the military level, but also at the civic level, for the purpose of "winning hearts " and obtaining funding for the military activity."

Hence the activities of the Appellants indicate danger. Even if it is not at the highest level, as this is not a "classic" terrorist organization. Danger indeed exists.

**Concern for Fleeing from the Justice**

The offenses attributed to the Appellants, if convicted, indicate activity in significant, almost unprecedented, amounts of money. The level of punishment they are expected to face if convicted is high. Only recently has the Supreme Court ruled on the very severity of such acts and the appropriate punishment for those who commit them. In the aforesaid *Ashur* case, a 30-month prison sentence was imposed on a person who was not a Hamas operative, who acted on a one-time basis to transfer funds which he believed were intended for building a school. The other defendants in the same case, who engaged in a "civic"-type activity for the Hamas organization on a regular basis, were sentenced to much more severe sentences: two of them, Abu Asseb and Sirhan, were sentenced to seven years in prison, and a third defendant, Alyan, to 54 months imprisonment.

Even if the Appellants themselves are not senior members of the Hamas organization, and are not members of a "classic" terrorist organization such as the Hamas organization, and therefore their punishment should be lower, it cannot be ignored that they are

senior members of an association that is in itself an illegal association and they acted in it systematically and during several years. Indeed, the activity was "civic" in nature, but its severity, as stated above, is

-Unclassified-
Military Court of Appeals

Appeal 3189/15
Appeal 3190/15

not low. In view of this, it can be estimated that the punishment they are expected to receive, if convicted, is significant. It goes without saying that bringing in large amounts of illicit funds into the Area even justifies, in addition to actual imprisonment, imposition of significant fines (see Appeal of Military Judgment 1704/14 *The Military Advocate v. Blaona* (published in Nevo, 12/11/ 2014). This matter magnifies the concern for flight from justice.

I seriously deliberated the arguments of the defense counsel as to an alternative to detention, but I believed that the combination of the obvious risk from the Appellants' actions, as well as the concern of fleeing from the law, preclude this option.

In the case of the Appellant Fadi, I do not believe that an alternative to detention can be considered at all. This is a man whose domicile was in Qatar, who came to the Area only for the purpose of his work in the Association, and in his interrogation even expressed a desire to return to Qatar. In these circumstances, there is also a particularly high risk alongside the danger of fleeing from justice. Therefore, the appeal in his case is denied.

In the case of the Appellant Juda, the main argument of the defense is that there is an alternative to detention, as this is a person domiciled in Jerusalem, thus his appearance can be secured for any legal proceedings with appropriate guarantees. Although I was somewhat hesitant about Juda's case, I came to the conclusion that the appeal in his case as well is denied. Juda was the general director of the Association. His activities in it have been extensive and significant, and have continued throughout the past four years.

The Supreme Court has in the past been required to answer the question of how to treat those who worked in the financial and ancillary array of illegal associations, and has ruled time and time again that detention without an alternative is the answer. Thus, for example, in Appeal of Military Judgment 6378/10 *Issawi v. State of Israel* (published in Nevo, 9/19/2010), in the case of a defendant who acted to transfer funds to Hamas prisoners, the court stated:

> "Indeed, the Appellant is a young woman with a clean past. However, the accepted approach in case law with regard to offenses against state security is that, in general, although such offenses do not preclude an examination of a possible alternative to detention, they will generally "justify the defendant's detention until the end of the proceedings. **This is in view of the fear that those accused of them may continue to endanger the security of the state, even if no concrete evidence has been presented that foresees the continuation of its harmful activities in the future**" (AMJ 2975/06 *Abu Madiem v. State of Israel* (not published, 5/7/2006). Also see: AMJ 6506/07 *Anonymous v. State of Israel* (not published, 9/4/2007) Paragraph 4 of my decision; AMJ 10823/04 *Bahlul v. State of Israel* (not published, 1/17/2007) paragraph 4 of the decision of Judge E. Hayut; AMJ 6506/07 *Anonymous v. State of Israel* (not published, 9/4/2007); AMJ 7358/03 *Agbaria v. State of Israel* (not published, 8/31/2003) paragraph 4 of the decision of President Justice D. Beinisch (emphasis added)

The foregoing is also appropriate in our case, certainly given the enormous amounts of money transferred on a regular basis.

-Unclassified-
Military Court of Appeals

Appeal 3189/15
Appeal 3190/15

**In Conclusion**

I have not found any problem with the prima facie evidence to prove what is attributed to the Appellants in this case, and at the very least it seems that the Appellants themselves looked the other way and did not ascertain the status of the Association in which they acted to transfer huge amounts of money into the Area. In addition, I have not found that at this stage there is any basis for the claim of estoppel against the authorities as part of an abuse of process defense.

The offenses attributed to the Appellants indicate dangerousness, as this is a sophisticated system that aims to transfer funds to the Area illegally, and is part of an entire system to advance the goals of illegal associations. In addition to the presumption of dangerousness, there is also in this case a significant concern of flight from justice.

It is clear that an alternative to detention is irrelevant in the case of the Appellant Fadi, in view of the fact that his domicile is not in the Area, and in view of the fact that already during the interrogation he expressed a desire to return to Qatar. In the case of the Appellant Juda, too, in view of his senior status as the Association's general director, I do not believe that an alternative to detention can be sufficient.

Therefore, the appeals are denied.

Given today, December 30, 2015, 18 Tevet 5776, at the chamber. The court secretariat will forward a copy of this decision to the parties.

_____
Vice President

# CERTIFICATION

TransPerfect is globally certified under the standards ISO 9001:2015, ISO 17100:2015, and ISO 18587:2017. This Translation Certificate confirms the included documents have been completed in conformance with the Quality Management System documented in its ISO process maps and are, to the best knowledge and belief of all TransPerfect employees engaged on the project, full and accurate translations of the source material.

| | |
|---|---|
| File Name(s): | Appeal, Juda Dib Ibrahim Jamal, Fadi Bahjat Abd el-Fateh Manassra v. The Military Advocate General's Office |
| Source Language(s): | Hebrew |
| Target Language(s): | English |

*Authorized Signature:*

*Name:* Jacqueline Yorke

*Title:* Project Manager

*Date:* April 6, 2022

*Signature, Notary Public:*



*Stamp: Notary Public*

Reason for signature: I approve the accuracy of this document content as written

-בלמ"ס-

צבא ההגנה לישראל



בית המשפט הצבאי לערעורים

ע"מ 3189/15
ע"מ 3190/15

לפני כב' המשנה לנשיא: אל"ם צבי לקח

**העוררים:** גודה דיב אברהים גמאל, ת"ז \*\*\*\*\*\*\*\*\*\*

פאדי בהג'ת עבד אלפתאח מנאצרה, ת"ז \*\*\*\*\*\*\*\*\*

(באמצעות ב"כ עו"ד ג'וואד בולוס)

נגד

**המשיבה:** התביעה הצבאית

(באמצעות ב"כ סא"ל מוריס הירס)

ערר על החלטת ביהמ"ש הצבאי ביהודה (בפני כב' השופט רס"ן שירן קינן)
בתיק מס' 6011/15 מיום 18.11.15
(העררים נדחו)

תאריך הישיבה: 17 בדצמבר 2015, ה' בטבת התשע"ו.

## החלטה

העורר ג'ודה ג'מאל הינו המנכ"ל של עמותת ג'מעית קטר אלחיריה (Qatar Charity) (להלן – אגודת קטאר או האגודה). העורר פאדי מנאצרה הינו רואה החשבון של אותה אגודה. אגודת קטאר הינה התאחדות בלתי מותרת. לנוכח פעילותם של השניים במסגרת האגודה, הוגש נגדם כתב אישום בגין חברות בהתאחדות בלתי מותרת, נשיאת משרה בהתאחדות בלתי מותרת, ביצוע שירות עבור התאחדות בלתי מותרת וכן הכנסת כספי אויב לאזור בהיקף של מיליוני שקלים. השניים נעצרו עד תום ההליכים המשפטיים נגדם, ומכאן הערר שלפניי.

יש לומר כי החלטת בית משפט קמא הסתמכה על החלטתי בעניינה של נג'ואן עודה, עובדת בכירה נוספת באגודת קטאר. בהחלטתי בעניין זה, ע"מ 2731/15, קבעתי כי פעילותה של נג'ואן עודה באגודת קטאר, שהינה התאחדות בלתי מותרת, מלמדת על מסוכנות, ומצדיקה את מעצרה עד תום ההליכים. להחלטה זו התייחסו הצדדים גם בערר שלפניי.

1

-בלמ"ס-

בית המשפט הצבאי לערעורים     ע"מ 3189/15
                                ע"מ 3190/15

## טענות הצדדים

סניגורם של העוררים טען כי החלטתי בעניינה של ג'ואן עודה התייחסה לגדר מחלוקת מצומצם הרבה יותר – האם אגודת קטאר הינה התאחדות בלתי מותרת, והאם ג'ואן נשאה משרה משמעותית בארגון. הסניגור ביקש לטעון כי ההחלטה האמורה רלוונטית רק למסגרת הטיעון שהוצגה שם, בעוד הוא מבקש להעלות טענות אחרות, שלא הועלו כלל במסגרת הדיון בעניינה של ג'ואן.

הסניגור ציין כי אין הוא חולק על כך שאגודת קטאר הינה התאחדות בלתי מותרת. יחד עם זאת, וחרף עובדה זו, לדעתו מתקיימות במקרה זה נסיבות המצדיקות את שחרורם של העוררים. ניתן לחלק בתמצית את טיעוניו של הסניגור לשני סוגים :

א. טענות הנוגעות להגנה מן הצדק.

ב. טענות הנוגעות למסוכנות הפרטנית מהעוררים.

במישור הראשון טען הסניגור כי אגודת קטאר מוכרת כארגון צדקה רציני ומכובד ברחבי כל העולם. ארגון זה ממומן ברובו על ידי מדינת קטאר, ולא על ידי ארגון טרור. ארגון זה מוכר גם בישראל, וכל גורמי הממשל הרלוונטיים יודעים ומודעים היטב לפעילותו. יתר על כן, פעילות הארגון הינה גלויה לחלוטין והוא מתנהל באופן מסודר, באמצעות מכרזים המתפרסמים בכלי התקשורת, לרבות בכלי תקשורת המתפרסמים בישראל, והכספים המתקבלים מועברים באמצעות העברות בנקאיות שמן הסתם מפוקחות כנדרש על ידי ישראל. הסניגור ציין שאף היה מקרה בו סחורה הגיעה לאגודה דרך נמל אשדוד, ובשום שלב לא ביקשו לעצור את הסחורה, הגם שמדובר באגודה המוכרזת כארגון טרור. כלל נסיבות אלה מלמדות על כך שהרשויות בישראל ידעו על פעילות האגודה, ולא ניסו למנעה, ומכאן כי הן מושתקות כיום, כשהן באות לפגוע בה ובמי בפעל במסגרתה באופן גלוי.

במישור השני נטען כי יש חשיבות רבה לשאלת הידיעה הסובייקטיבית של העוררים באשר למעמדה של האגודה. הסניגור טען כי מחומר הראיות שבתיק החקירה עולה כי המדובר בשני אנשים נורמטיביים, שנענו להצעת עבודה שנראתה בעיניהם לגיטימית, ומבלי שהעלו על דעתם כי המדובר בהתאחדות בלתי מותרת. הסניגור ציין בדבריו כי ג'ודה נענה למודעה בעיתון אלקודס בו פורסם מכרז לתפקיד מנכ"ל האגודה, ואילו פאדי נענה להצעת עבודה שקיבל בקטאר. דרך השגת העבודה מעידה לדעתו על כך שמדובר באנשים נורמטיביים שחיפשו עבודה לגיטימית, ולא העלו על דעתם כי המדובר בעניין לא חוקי. הסניגור אישר כי השניים ידעו שהאגודה הינה מוכרזת כארגון אסור בישראל, אולם לא ידעו כי הכרזה זו חלה באזור. אמנם, אין הוא חולק על כך שהכרזה באזור אכן יצאה, אולם העוררים לא היו מודעים לה. גם אם מדובר באי ידיעת הדין, עדיין, מבחינת המסוכנות, אליבא דסניגור, לא ניתן לומר כי הם פעלו מתוך רצון לסכן את הביטחון או תוך התעלמות מודעת מהדין. עוד צויין כי כיום, כשהשניים יודעים שהפעילות באגודה הינה אסורה, ודאי שלא עולה חשש כלשהו כי יחזרו לפעילות במסגרתה. מכאן כי ראוי לאפשר להם להשתחרר בחלופת מעצר. בהקשר זה ציין הסניגור כי ג'ודה מתגורר במזרח

2

-בלמ"ס-

| | |
|---:|---:|
| בית המשפט הצבאי לערעורים | ע"מ 3189/15 |
| | ע"מ 3190/15 |

ירושלים, ולא יהיה קושי לעצרו אם יבחר להימלט מאימת הדין, ולפאדי אין אינטרס לברוח לאחר שהעתיק את מרכז חייו מקטאר לאיו"ש לצורך עבודה זו.

התביעה השיבה כי בכל הנוגע לטענת הגנה מן הצדק לא הונחה תשתית כלשהי המבססת טענה זו, ואין להסיק ממודעה בעיתון שפורסמה בישראל, או מעובדה ספורדית אחרת שצויינה, כי הרשויות מודעות לפעילותה של האגודה ומסכימות בשתיקה לפעילותה.

באשר למסוכנות, ציינה התביעה כי אגודת קטאר הינה ארגון טרור, וככזה, כל מי שפועל במסגרת ארגון טרור ובודאי מי שנושא משרה בארגון טרור, מלמד על מסוכנות המצדיקה מעצר עד תום ההליכים. עוד נטען כי קיים חשש משמעותי להימלטות מאימת הדין, הן באשר לג'ודה, גם אם הוא מתגורר בישראל, ובודאי לגבי פאדי, שאינו קשור לאזור מלבד לאגודה ששימשה לו מקור פרנסה, ובכל עת יכול להימלט חזרה לקטאר ללא קושי, שם היה מרכז חייו לפני שבא לעבוד באגודה.

### דיון והכרעה

אגודת קטאר הינה התאחדות בלתי מותרת הן בישראל (הכרזה שנחתמה ביום 26.5.2008 על ידי שר הביטחון) והן באזור (הכרזה על ידי אלוף פיקוד מרכז, ביום 29.6.2008 (ראו קמצ"מ 225 עמ' 5283). בהכרזה נקבע במפורש "כולל סניפים בשטחי הרש"פ". לפיכך, גם אם האגודה קיבלה אישור מטעם הרש"פ, אין בכך כדי לשלול את היותה התאחדות בלתי מותרת. כפי שציינתי בע"מ 2731/15 הנ"ל, הטענה כי העוררים לא ידעו שהאגודה הינה התאחדות בלתי מותרת הינה בבחינת אי ידיעת הדין ואין הם יכולים להיאחז בה, וגם הסניגור לא טען אחרת.

הסניגור התמקד, כאמור, בטענה של הגנה מן הצדק, וטען כי הרשויות בישראל היו מודעות היטב לפעילות האגודה, ומכאן כי הן מושתקות כיום בפעילותן נגדה ונגד מי שפעל במסגרתה, ולחילופין נטען כי מהשניים לא נובעת מסוכנות, בודאי לא כזו שלא ניתן לאיין בחלופת מעצר.

### טענת ההגנה מן הצדק

ראשית, יש לומר כי כלל לא ברור האם שלב המעצר הוא השלב הנכון להעלאת טענה מסוג זה. בבג"ץ 230/07 **עטון נ' מדינת ישראל** (פורסם בנבו, 1.3.2007) נקבע כי:

> *"מקומה של טענה בדבר הגנה מן הצדק – כאשר מעוררים אותה לאחר הגשתו של כתב-אישום – הוא בערכאה הדיונית שבה מתנהל ההליך הפלילי גופו, שכן ההכרעה בה דורשת מטבע הדברים בדיקה עובדתית יסודית ומעמיקה..."*

על דברים אלה חזר בית המשפט העליון גם בבש"פ 7148/12 **כנאנה נ' מדינת ישראל** (פורסם בנבו, 14.10.2012) שם ציינה כב' השופטת ברק-ארז כי:

> *"דומה שלא יכול להיות חולק שמקומה העיקרי של טענת "הגנה מן הצדק" הוא בהליך הפלילי עצמו. זוהי הגישה שהתגבשה בפסיקתו של בית משפט*

3

-בלמ"ס-

בית המשפט הצבאי לערעורים ע"מ 3189/15
ע"מ 3190/15

> זה עוד קודם למקרים בהם הועלו טענות של הגנה מן הצדק בהליכי מעצר עד תום ההליכים."

שנית, גם אם האפשרות להעלאת טענה זו בדיון המעצר לא נשללה באופן מוחלט (ראו עניין **כנאנה** לעיל, בפסקה 26), דומה כי הטענות שהועלו על ידי ההגנה דורשות בירור עובדתי משמעותי. אינני סבור שניתן להיתלות בעובדה שהעורר גיורה נענה למודעה בעיתון המפורסם בישראל, או בעובדה כי היה עובר במחסום עם רכב ועליו הלוגו של האגודה, כדי ללמוד מניה וביה שהרשויות היו מודעות לפעילותה של האגודה והתעלמו ממנה, ועל כן הן מושתקות לנקוט בהליכים הנוכחיים. נהפוך הוא, אם ישנו עניין המלמד כי הרשויות בישראל לא קיבלו את פעילות האגודה, הרי הדבר נוגע למשלוח בשר בקופסאות שימורים שהרשויות בישראל סרבו להכניס בגלל שהאגודה אינה חוקית, דבר שהוביל את האגודה להעביר את הבשר לירדן (ראו עדותו של ג'ודה מיום 13.9.15). כלומר במקרה בו ידעו הרשויות בבירור, באופן בלתי אמצעי, על הגעת סחורה של האגודה לנמל אשדוד, הן פעלו לסכל את הפעילות, ועל כן נראה שהראיות הקיימות, בודאי בשלב זה, אינן תומכות בטענת ההשתק.

גם טענות שהועלו הנוגעות ליכולת לפקח על העברות בנקאיות הינן טענות עובדתיות במהותן, שראוי לתמוך אותן בעדויות מתאימות, ובודאי בשלב זה, ללא תשתית מתאימה, לא ניתן לקבוע שהרשויות היו מודעות להעברות הכספים שביצעה העמותה והתעלמו מהן. יתר על כן, קשה לבוא ולומר שהגורמים שפעלו במסגרת האגודה עצמה לא היו מודעים לכך שפעילותה אינה חוקית, מאחר שבתיק החקירה קיימת פניה למשרד הביטחון מערכי דינה של האגודה בה הם מבקשים לבטל את הכרזתה כארגון טרור. מחקירת העוררים במשטרה ובשב"כ עולה כי העוררים עצמם היו מודעים לכך שפעילות האגודה אינה חוקית, לכל הפחות בישראל, וארחיב על כך בהמשך.

לטעמי, ככל שההגנה מבקשת להעלות טענה של השתק במסגרת הגנה מן הצדק, ראוי שטענה זו תתברר בערכאה הדיונית, ובכל מקרה בשלב הנוכחי אין תשתית ראייתית מספקת על מנת לבסס טענה זו.

**האם קיימת מסוכנות?**

סניגורם של השניים טען כי מבחינת הידיעה הסובייקטיבית שלהם הם לא ידעו שהם עובדים בהתאחדות בלתי מותרת. בהקשר זה הפנה הסניגור לדברים שמסרו בחקירתם, בה ציינו מספר פעמים כי לו היו יודעים שמדובר באגודה אסורה, לא היו עובדים במסגרתה. עוד ציין הסניגור את דרך העבודה הגלויה בה נקטו במהלך פעילותם באגודה, כמלמדת על כך שהשניים לא סברו כי הם פועלים באופן בלתי חוקי.

הסניגור ניסה להמעיט מהסיכון הנשקף מפעילות האגודה, בעוד שהתובע טען כי המדובר בארגון טרור פשוטו כמשמעו. המציאות העובדתית והמשפטית הינה מורכבת יותר מהעמדות המנוגדות שהציגו הצדדים. יחד עם זאת, אקדים ואומר כי אינני מקבל את התזה של ההגנה שלא נובע סיכון מפעילות האגודה שהייתה בעיקרה בתחום הרווחה הסוציאלית והצדקה. אכן, האגודה אינה ארגון טרור "קלאסי", והיא אינה פועלת באופן צבאי ישיר. אולם האגודה הינה חלק מקבוצה של

4

-בלמ"ס-

בית המשפט הצבאי לערעורים     ע"מ 3189/15
ע"מ 3190/15

אגודות "צדקה", שמטרתן קניית לבבות בשטח לצורך פעילויות ארגוני טרור אסלאמיים "קלאסיים". מערך הטרור העולמי מבוסס על כסף, הרבה מאוד כסף, שנועד בעיקרו להצמיח את הפעילים, ובעקבות זאת גם את הפעילות הטרוריסטית האלימה. כפי שצויין בע"פ 1784/14 **עאשור נ' מדינת ישראל** (פורסם בנבו, 3.9.2015):

> *"ארגוני הטרור אינם צומחים יש מאין, ואינם ניזונים מן האוויר. ארגוני הטרור, וחמאס ביניהם, ככל מסגרת ארגונית המאגדת בני אדם ורותמת אותם לקידום מטרה משותפת – זקוקים לתקציבים משמעותיים ולבסיס תמיכה חברתי לצורך פעילותם השוטפת. על כן, עליהם להישען, מחד גיסא, על זרוע "צבאית" שתפקידה להוציא לפועל את פעולות הטרור, ומאידך גיסא, על זרוע "אזרחית" שתפקידה לספק לארגון את חומר הדלק המניע את פעילותו הצבאית – כסף ופעילים.*

....

> *"עם זאת, לא אחת הפעילות "האזרחית" של ארגוני הטרור מיועדת ל"הכשרת הלבבות", היינו לפעילות של חינוך ורווחה שנועדה לגייס אהדה לארגון הטרור ולפעיליו כטובים ומיטיבים, וזאת על מנת ליצור תשתית לפעילותו העתידית של הארגון".*

לטענת העוררים הם לא ידעו כי הם פועלים במסגרת התאחדות בלתי מותרת, והדבר מלמד על מסוכנות מופחתת, גם אם אינו פוטר אותם מאחריות. אציין כי הייתי מוכן לשקול במידה מסויימת טענה זו, אך חוששני שהראיות הקיימות מלמדות כי העוררים ידעו על הבעייתיות בפעילות במסגרת האגודה, ולכל הפחות עצמו עיניהם מלברר האם האגודה הינה בלתי חוקית באזור.

כאמור, לכל הפחות, כך על פי דברים שמסרו בחקירה, שניהם ידעו כי האגודה לא חוקית בישראל. השניים נתלים בכך שהם סברו כי פעילות האגודה הינה חוקית ברשות הפלסטינית. טענה זו אני מתקשה לקבל. האם נוכל לקבל טענה כי חברות בארגון טרור כמו החזית העממית או החמאס אינה מסוכנת כיוון שאלה לא הוכרזו כארגונים אסורים ברשות הפלסטינית? התשובה לכך ברורה מאליה. ודוק: אין המדובר בעובדים זוטרים באגודה, אלא בהנהלה הבכירה ביותר שלה. כהנהלה הבכירה, הם ידעו היטב שהאגודה מוכרזת כארגון טרור בישראל. לא ברור מדוע עובדה זו לא גרמה להם לברר את מצבה המשפטי של האגודה באזור, בהתחשב בקשר ההדוק בין ישראל לאזור. הטענה כי בחרו שלא לבדוק את מצבה המשפטי של האגודה באזור, נראית תמוהה על פניה. יתר על כן, האירוע שעניינו משלוח של בשר שלא עבר בנמל אשדוד, גם הוא תומך בכך שהעוררים עצמו עיניהם בעניין מעמדה החוקי של האגודה, אם לא מלמד על כך שידעו כי היא בלתי חוקית. על פי דברי ג'ודה בחקירתו, לנוכח הבעייתיות במשלוח וסירוב הרשויות בישראל להעביר את הסחורה, הוא נאלץ להעבירה לירדן. הטענה כי ג'ודה לא ידע שהאגודה אינה מותרת באזור הינה לפיכך בעייתית, שכן מדוע נאלץ להעביר את המשלוח לירדן, אם פעילות האגודה

5

-בלמ"ס-

| בית המשפט הצבאי לערעורים | ע"מ 3189/15 |
|---|---|
| | ע"מ 3190/15 |

באזור הינה חוקית? מדוע, אם האגודה חוקית באזור, לא יכול היה לעשות שימוש בבשר בשטחי איו"ש? נקודה זו מלמדת דווקא על כך שהעוררים, בודאי ג'ודה, ידעו כי מעמדה החוקי של האגודה באזור הינו בעייתי, ולכל הפחות, מחזקת עד מאוד את הטענה כי העוררים עצמו את עיניהם מלברר את מעמדה החוקי של האגודה באזור.

לדעתי, העובדות האמורות לעיל, המלמדות לכל הפחות על עצימת עיניים באשר למעמדה החוקי של האגודה באזור, שוללות במידה רבה את תוקפה של טענת ההגנה על מסוכנות מופחתת, ככל שזו מבקשת להתבסס על ידיעתם הסובייקטיבית. טענה כזו הינה בעייתית, כאשר הם עצמם היו צריכים לברר ולמנוע את אי ידיעתם, והרי זוהי מהותה של "עצימת העיניים".

כאמור, העוררים הינם הדרג הניהולי העליון של האגודה האמורה. מכאן נובעת המסוכנות המשמעותית מפעילותם. אין המדובר בשליחים זוטרים, אלא באנשים אשר הפעילו את המנגנון הכספי המשמעותי של האגודה, שהכניס 12 מיליון שקלים לשטח (על פי דברי ג'ודה בחקירתו). במאמר מוסגר אציין כי לא ברור האם מדובר ב-12 מיליון שקלים בממוצע לשנה או לכל התקופה בה ג'ודה הינו המנכ"ל, שכן קיים פער בין הדברים הרשומים בזכ"ד החקירה לבין הדברים הרשומים באמרה המשטרתית. בכל מקרה, בכתב האישום יוחסו 12 מיליון שקלים לכל התקופה ולא כל שנה.

בעניין **נג'ואן עודה** האמור ציינתי את הדברים הבאים הרלוונטיים ביתר שאת גם לעוררים:

> *"פעילות ניהולית במסגרת התאחדות בלתי מותרת, מלמדת על מסוכנות אינהרנטית. מערך הטרור העולמי אינו פועל רק במישור הצבאי, אלא גם במישור האזרחי, לשם "הכשרת הלבבות" והשגת מימון לשם הפעילות הצבאית"*

מכאן כי פעילותם של העוררים מלמדת על מסוכנות. גם אם זו אינה ברמה הגבוהה ביותר, שכן אין המדובר בארגון טרור "קלאסי", מסוכנות – קיימת גם קיימת.

**החשש להימלטות מאימת הדין**

העבירות המיוחסות לעוררים, במידה ויורשעו בהן, מלמדות על פעילות בהיקפי כספים משמעותיים, כמעט חסרי תקדים. רמת הענישה לה הם צפויים אם יורשעו הינה גבוהה. רק לאחרונה פסק בית המשפט העליון אודות החומרה הרבה של מעשים מסוג זה ושל העונש הראוי למי שמבצע אותם. בעניין **עאשור** לעיל, נגזר עונש מאסר בפועל בן 30 חודשים למי שלא היה פעיל חמאס, ופעל באופן חד פעמי להעברת כספים שנועדו לסברתו לבניית בית ספר. על נאשמים האחרים באותה פרשייה, שעסקו בפעילות "אזרחית" באופייה בעבור ארגון החמאס על בסיס קבוע, נגזרו עונשים חמורים הרבה יותר: שניים מהם, אבו עסב וסרחאן, נשפטו ל-7 שנות מאסר בפועל, ונאשם שלישי, עליאן, ל-54 חודשי מאסר בפועל.

גם אם העוררים עצמם אינם בכירים בארגון החמאס, ואינם חברים בארגון טרור "קלאסי" כמו ארגון החמאס, ועל כן גם עונשם צריך להיות נמוך יותר, לא ניתן להתעלם מכך שהם האנשים

6

-בלמ"ס-

| בית המשפט הצבאי לערעורים | ע"מ 3189/15 |
| --- | --- |
| | ע"מ 3190/15 |

הבכירים באגודה שהינה כשלעצמה התאחדות בלתי מותרת והם פעלו במסגרתה על בסיס שיטתי ולאורך מספר שנים. אכן, הפעילות הייתה "אזרחית" באופייה, אולם חומרתה, כאמור לעיל, אינה נמוכה. לנוכח זאת, ניתן להעריך כי העונש לו הם צפויים, אם יורשעו, הינו משמעותי. מותר לציין כי הכנסת כספים אסורים בהיקפים גדולים לאזור אף מצדיקה, בצד עונש מאסר בפועל ממשי, גם הטלת קנסות משמעותיים (ראו עד"י 1704/14 **התביעה הצבאית נ' בלאונה** (פורסם בנבו, 11.12.2014). עניין זה מעצים את החשש להימלטות מאימת הדין.

שקלתי את טענות הסניגור בכובד ראש באשר לחלופת מעצר, אולם סברתי כי השילוב של המסוכנות הברורה ממעשי העוררים, כמו גם החשש להימלטות מאימת הדין, שוללים אפשרות זו.

בענייננו של העורר פאדי, אינני סבור כי ניתן כלל לשקול חלופת מעצר. המדובר באדם שמרכז חייו היה בקטאר, שהגיע לאזור רק לצורכי עבודתו באגודה, ובחקירתו אף הביע רצון לחזור לקטאר. בנסיבות אלה, קיים בצד המסוכנות גם חשש גבוה במיוחד להימלטות מאימת הדין. על כן דין הערר בענייננו להידחות.

בענייננו של העורר ג'ודה, הטענה המרכזית של ההגנה היא כי קיימת חלופת מעצר, שכן המדובר במי שמרכז חייו הינו בירושלים, ועל כן ניתן להבטיח את התייצבותו לכל הליך משפטי בערובות מתאימות. אף שהתלבטתי במידת מה בענייננו של ג'ודה, הגעתי למסקנה כי גם בענייננו דין הערר להידחות. ג'ודה היה מנכ"ל האגודה. פעילותו במסגרתה הייתה ענפה ומשמעותית, ונמשכה לכל אורך ארבע השנים האחרונות.

בית המשפט העליון נדרש בעבר לשאלה כיצד להתייחס למי שפעל במערך הפיננסי והמסייע של התאחדויות בלתי מותרות, ופסק פעם אחר פעם כי יש מקום להורות על מעצר ללא חלופה. כך למשל נקבע בבש"פ 6378/10 **עיסאוי נ' מדינת ישראל** (פורסם בנבו, 19.9.2010), בעניינה של נאשמת שפעלה להעברת כספים לאסירים של ארגון החמאס:

> *אכן, העוררת היא אישה צעירה ועברה נקי. יחד עם זאת, הגישה המקובלת בפסיקה ביחס לעבירות נגד בטחון המדינה היא כי ככלל, אף שעבירות מסוג זה אינן שוללות בדיקה של חלופת מעצר אפשרית, הרי שבדרך כלל "מצדיקות הן את מעצרו של הנאשם עד תום ההליכים.* ***זאת, נוכח החשש שמי שמואשם בהן עשוי להמשיך לסכן את בטחון המדינה, גם אם לא הובאה ראיה קונקרטית הצופה את המשך פעילותו המזיקה בעתיד"*** *(בש"פ 2975/06 אבו מדיעם נ' מדינת ישראל (לא פורסם, 7.5.06). כן ראו: בש"פ 6506/07 פלוני נ' מדינת ישראל (לא פורסם, 4.9.07) פסקה 4 להחלטתי; בש"פ 10823/04 בהלול נ' מדינת ישראל (לא פורסם, 17.1.2007) פסקה 4 להחלטתה של השופטת א' חיות; בש"פ 6506/07 פלוני נ' מדינת ישראל (לא פורסם, 4.9.07); בש"פ 7358/03 אגבריה נ' מדינת ישראל (לא פורסם, 31.8.2003) פסקה 4 להחלטתה של הנשיאה ד' ביניש)." (ההדגשה אינה במקור – צ.ל.).*

7

-בלמ"ס-

| | |
|---|---|
| בית המשפט הצבאי לערעורים | ע"מ 3189/15 |
| | ע"מ 3190/15 |

הדברים האמורים יפים גם בענייננו, בודאי בהתחשב בהיקפי הכספים האדירים שהועברו על בסיס קבוע.

**סוף דבר**

לא מצאתי כי קיימת בעייתיות בראיות לכאורה להוכחת המיוחס לעוררים במקרה זה, ולכל הפחות נראה כי העוררים עצמו עיניהם מלברר את מצבה של האגודה במסגרתה פעלו להעברת כספים בהיקפים אדירים לאזור. בנוסף, לא מצאתי כי בשלב זה יש בסיס כלשהו לטענה של השתק כלפי הרשויות כחלק מהגנה מן הצדק.

העבירות המיוחסות לעוררים מלמדות על מסוכנות, שכן המדובר במערך מתוחכם שמטרתו העברת כספים לאזור באופן בלתי חוקי, ומהווה חלק ממערך שלם לקידום מטרותיהן של התאחדויות בלתי מותרות. בנוסף לחזקת מסוכנות, אף קיים במקרה זה חשש משמעותי להימלטות מאימת הדין.

ברור כי חלופת מעצר אינה רלוונטית בענייננו של העורר פאדי, לנוכח העובדה כי מרכז חייו אינו באזור, ולנוכח העובדה כי כבר בחקירה הביע רצון לחזור לקטאר. גם בענייננו של העורר ג'ודה, לנוכח מעמדו הבכיר כמנכ"ל האגודה, אינני סבור כי ניתן להסתפק בחלופת מעצר.

אשר על כן, הערערים נדחים.

ניתנה היום, 30 בדצמבר 2015, י"ח בטבת התשע"ו, בלשכה. מזכירות ביהמ"ש תעביר העתק החלטה זו לידי הצדדים.

_____

המשנה לנשיא

8