# EXHIBIT 8



**H U M A N**

**R I G H T S**

**W A T C H**

# BORN WITHOUT CIVIL RIGHTS

Israel's Use of Draconian Military Orders to Repress Palestinians
in the West Bank



# Born Without Civil Rights

Israel's Use of Draconian Military Orders to Repress

Palestinians in the West Bank

Copyright © 2019 Human Rights Watch
All rights reserved.
Printed in the United States of America
ISBN: 978-1-6231-37816
Cover design by Rafael Jimenez

Human Rights Watch defends the rights of people worldwide. We scrupulously investigate abuses, expose the facts widely, and pressure those with power to respect rights and secure justice. Human Rights Watch is an independent, international organization that works as part of a vibrant movement to uphold human dignity and advance the cause of human rights for all.

Human Rights Watch is an international organization with staff in more than 40 countries, and offices in Amsterdam, Beirut, Berlin, Brussels, Chicago, Geneva, Goma, Johannesburg, London, Los Angeles, Moscow, Nairobi, New York, Paris, San Francisco, Sydney, Tokyo, Toronto, Tunis, Washington DC, and Zurich.

For more information, please visit our website: http://www.hrw.org.



**NOVEMBER 2019**

**ISBN: 978-1-6231-37816**

# Born Without Civil Rights

## Israel's Use of Draconian Military Orders to Repress Palestinians in the West Bank

**Summary** ....................................................................................................... 1

**Methodology** ............................................................................................... 10

**I. Background** .............................................................................................. 12

**II. Legal Standards: Civil Rights in Prolonged Occupation**................................. 14

**III. Israeli Military Orders Violating Palestinian Civil Rights**............................. 25

**IV. Right of Peaceful Assembly** ....................................................................29
   Farid al-Atrash, Bethlehem ................................................................... 30
   Abdallah Abu Rahma, Bil'in .................................................................. 32

**V. Right to Freedom of Association** ............................................................... 37
   Hafez Omar, Ramallah............................................................................ 38
   Khalida Jarrar, Ramallah ...................................................................... 41
   Najwan Odeh, Ramallah ........................................................................ 44

**VI. Right to Freedom of Expression** ..............................................................48
   Nariman Tamimi, Nabi Saleh ................................................................. 51
   Alaa al-Rimawi, Ramallah ...................................................................... 56
   Manbar al-Huriyya Radio, Hebron ........................................................ 59

**Recommendations** ...................................................................................... 61
   To the State of Israel .............................................................................. 61
   To states and international organizations................................................ 61
   To the Israeli army.................................................................................. 61
   To Israeli military prosecutors................................................................ 62
   To the Israeli Knesset ............................................................................ 62

To social media companies and internet service providers ........................................................62

**Acknowledgements** ...............................................................................................................**64**

**Appendix I: Letter from Human Rights Watch to Israeli Police** ............................................**66**

**Appendix II: Letter from Human Rights Watch to the Israeli Army Spokesperson** ............**70**

**Appendix III: Unofficial Translation of Letter from Israeli Army Spokesperson to Human Rights Watch** ........................................................................................................................**74**

**Appendix IV: Unofficial Translation of Letter from Israel Police to Human Rights Watch** ..**78**

**Appendix V: Unofficial Translation of Letter from Israel Prime Minister's Office to Human Rights Watch** ........................................................................................................................**81**

**Appendix VI: Letter from Human Rights Watch to Facebook** ..............................................**82**

**Appendix VII: Facebook Response to HRW Letter on Israel-Palestine** .............................**85**

# Summary

The Israeli army has deprived generations of Palestinians in the West Bank of their basic civil rights, including the rights to free assembly, association and expression, regularly drawing on military orders issued in the first days of the occupation. Even if such restrictions could have been justified then to preserve public order and safety, the suspension of core rights more than half a century later with no end in sight violates Israel's core responsibilities under the law of occupation.

The responsibilities of an occupying power toward the rights of the occupied population increase with the duration of the occupation. Israel remains principally in control of the West Bank, despite limited Palestinian Authority rule over certain areas, and yet has failed to provide the people living under its control with the rights they are due, including the right to equal treatment without regard to race, religion or national identity. It is long past time for Israel to fully respect the human rights of Palestinians, using as a benchmark the rights it grants Israeli citizens, an obligation that exists regardless of the political arrangement in the Occupied Palestinian Territory now or in the future.

On June 7, 1967, the Israeli army occupied the West Bank and the Gaza Strip and issued a military proclamation that permitted the application of the Defense (Emergency) Regulations of 1945, which British Mandate authorities enacted to quell growing unrest. The regulations empower authorities, among other things, to declare as an "unlawful association" groups that advocate for "bringing into hatred or contempt, or the exciting of disaffection against" authorities, and criminalize membership in or possession of material belonging to or affiliated, even indirectly, with these groups.

In August 1967, the Israeli army issued Military Order 101, which criminalizes participation in a gathering of more than ten people without a permit on an issue "that could be construed as political," punishable by a sentence of up to ten years. It further prohibits publishing material "having a political significance" or displaying "flags or political symbols" without army approval. More than 52 years later, the Israeli army continues to prosecute and imprison Palestinians under the Defense (Emergency) Regulations of 1945 and Military Order 101 of 1967.

In 2010, the Israeli army promulgated Military Order 1651, which replaced 20 prior orders and imposes a 10-year sentence on anyone who "attempts, orally or otherwise, to influence public opinion in the Area [the West Bank] in a manner which may harm public peace or public order" or "publishes words of praise, sympathy or support for a hostile organization, its actions or objectives," which it defines as "incitement." It further outlines vaguely worded "offenses against authorities" whose penalties include potential life imprisonment for an "act or omission which entails harm, damage, disturbance to the security of the Area or the security of the IDF" or entering an area in close "proximity" to property belonging to the army or state.

The law of occupation grants occupiers wide authority to restrict rights, but also imposes key limitations, including the requirement to facilitate public life for the occupied population. The Israeli army has for over 50 years used broadly worded military orders to arrest Palestinian journalists, activists and others for their speech and activities – much of it non-violent – protesting, criticizing or opposing Israeli policies. These orders are written so broadly that they violate the obligation of states under international human rights law to clearly spell out conduct that could result in criminal sanction. In other instances, Israeli authorities abusively bring ostensibly legitimate charges, such as those related to offenses of trespass or incitement, against activists to shut down opposition to Israel's rule. Israel's indefinite suspension of Palestinian civil rights has crippled the ability of Palestinians to have a more normal public, political life.

The duration of the occupation has afforded Israeli authorities plenty of time and opportunity to develop less restrictive policies. However, Israel continues to rely on the same military orders today, denying fundamental civil rights to Palestinians living under its occupation.

Israeli authorities, in fact, take it a step further, denying that its human rights obligations extend to its treatment of Palestinians in the occupied West Bank. This position has been rejected, including by the United Nations Human Rights Committee and the International Court of Justice (ICJ), which ruled in a 2004 advisory opinion that the main treaty on civil and political rights, the International Covenant on Civil and Political Rights (ICCPR), "is applicable in respect of acts done by a State in the exercise of its jurisdiction outside its own territory," alongside the law of occupation.

This report evaluates the impact of these orders on ordinary life for Palestinians in the West Bank and their legality more than half a century into an occupation with no end in sight. Israeli Prime Minister Benjamin Netanyahu has said, "Israeli military and security forces will continue to rule the entire territory, up to the Jordan [River]."[1]

This report does not cover the full Occupied Palestinian Territory: it excludes East Jerusalem, where Israel applies its own domestic law after annexing it in 1967 in a unilateral move that does not alter its status as occupied under international law, and Gaza, where Israel in 2005 dismantled the military government that had existed there since 1967. Nor does it cover Israel's denial of economic, social and cultural rights to Palestinians in the West Bank. It highlights eight illustrative cases in the West Bank where authorities used military orders, specifically Military Orders 101 and 1651 and the Defense (Emergency) Regulations of 1945, to prosecute Palestinians in military courts for their peaceful expression or involvement in non-violent groups or demonstrations.

The report draws on 29 interviews, primarily with former detainees and lawyers representing Palestinian men and women caught up in the Israeli military justice system, as well as a review of indictments and military court decisions. Human Rights Watch wrote to the Israeli army, police and security agency (Shin Bet in Hebrew) with detailed questions soliciting their perspectives and more information on the issues covered in the report and received substantive responses from the army and the police, which are reflected in the report and reprinted as appendices.

According to data it provided to Human Rights Watch, the Israeli army between July 1, 2014 and June 30, 2019 prosecuted 4,590 Palestinians for entering a "closed military zone," a designation it frequently attaches on the spot to protest sites, 1,704 for "membership and activity in an unlawful association," and 358 for "incitement."

Israeli occupying forces rely on military orders permitting them to shut down unlicensed protests or to create closed military zones to quash peaceful Palestinian demonstrations in the West Bank and detain participants. For example, the Israeli army detained in 2016 human rights defender Farid al-Atrash, who works at the Independent Commission of

---

[1] Yotam Berger and Noa Landau, "At West Bank Event, Netanyahu Promises No More Settlers, Arabs Will be Evicted," *Haaretz*, July 10, 2019, https://www.haaretz.com/israel-news/.premium-at-west-bank-event-netanyahu-promises-no-more-settlers-arabs-will-be-evicted-1.7490113 (accessed August 4, 2019).

Human Rights, a quasi-official body of the Palestinian Authority, during a peaceful demonstration in Hebron that called for re-opening a main downtown street that the army prohibits Palestinians from accessing. Prosecutors charged him under Military Order 101 for "demonstrating without a permit" and under Military Order 1651 for "attempt[ing] to influence public opinion in the Area in a manner that may harm public order or safety" through "inciting" chants and "waving Palestinian Authority flags" and holding a sign that read "Open Shuhada Street." Prosecutors further accused him of entering "a closed military zone" and "assault[ing]" a soldier, but furnished no actual evidence to substantiate these claims outside his non-violent participation in the demonstration. Authorities released al-Atrash on bail four days after his arrest but continue to prosecute him for his participation in this event three-and-a-half years later.

Activist Abdallah Abu Rahma told Human Rights Watch that the Israeli army arrested him eight times since 2005 because of his involvement in protests against the route of Israel's separation barrier in his village of Bil'in. In May 2016, the army detained him for 11 days after a bicycle race he organized to mark Nakba Day, which commemorates the displacement of Palestinians during the establishment of the Israeli state in 1948. A military court handed him a four-month sentence under Military Order 1651 for entering "a closed military zone" and "disturbing a soldier." The army also detained him for 23 days in late 2017 after he placed a rod in the separation wall as a symbolic act of protest during a demonstration. In September 2019, he pled guilty to charges of "sabotage of an IDF facility" under Military Order 1651 to avoid a potentially longer sentence.

Since 1967, the Israeli Defense Ministry has banned more than 411 organizations, among them all major Palestinian political parties, including President Mahmoud Abbas's Fatah party. Citing Military Order 1651, the army placed Khalida Jarrar, a 56-year-old member of the Palestinian Legislative Council, in administrative detention without trial or charge from July 2017 to February 2019 based on her political activism with the Popular Front for the Liberation of Palestine (PFLP), a group that includes both a political party and an armed wing that has attacked Israeli soldiers and civilians. Authorities never claimed that she had any personal involvement in armed activities. Her PFLP affiliation also led to her spending April 2015 to June 2016 in an Israeli prison, after she agreed to plead guilty, to avoid a longer sentence, to charges of "membership in an unlawful association" under the Defense (Emergency) Regulations of 1945 and "incitement" under Military Order 1651 for a 2012 speech at a rally for Palestinian prisoners in which she allegedly called for

kidnapping soldiers. The judge said the prosecution faced "difficulties proving guilt" on these charges. Jarrar said that Israeli authorities have also barred her from traveling outside of the West Bank without judicial order for more than 30 years, apart from a medical visit to Jordan in 2010. The Israeli army rearrested Jarrar on October 31, 2019; she remains in detention as of publication.

In March 2019, the Israeli army detained 36-year-old artist Hafez Omar and charged him with several offenses under Military Order 1651, including "membership and activism in unlawful association" under the Defense (Emergency) Regulations of 1945 for alleged involvement with a group the army calls al-Hirak al-Shababi or Youth Movement, which it claims operates under the "auspices of the Hezbollah organization," the Lebanese Shi'ite Islamist group. His indictment sheet, which Human Rights Watch examined, consists almost entirely of peaceful activities, such as meetings with other activists and involvement in protests, including several against the Palestinian Authority. Some analysts have questioned whether the Youth Movement ever existed as an organization. The only charge of a non-peaceful nature was his alleged involvement in unspecified "clashes" four years earlier where the charge sheet says he "threw stones at [Israeli] security forces."

The army has banned a wide range of other civil society groups. Between September 2015 and May 2016, the Israeli security forces detained five Palestinians based on their employment with a charitable organization, Qatar Charity, that works in more than 50 countries and has partnered with, among others, the United Nations, Doctors without Borders, and the United States Agency for International Development (USAID). The UN has said it shares "humanitarian" and "strictly non-political" principles with Qatar Charity, but Israel added Qatar Charity to its list of prohibited organizations in 2008 for allegedly providing financial support to Hamas, an allegation frequently leveled against charitable organizations that operate in Gaza. Despite the designation, Israel allowed Qatar Charity to deliver funding into Gaza in May 2019. Najwan Odeh, the charity's head of administration, received an 18-month sentence for affiliation with an "unlawful association," namely with Qatar Charity, under the Defense (Emergency) Regulations of 1945, and a one-year prohibition on "commit[ing] the offense of which she was convicted," effectively a ban on returning to her job, as part of a plea agreement with authorities.

Military law sets out no formal procedures to appeal the designation of an association as unlawful or a decision to close a business. While Palestinians can appeal such

administrative decisions to the High Court of Justice, the Court has shown great deference over the years to the position of the state or army.

The Israeli army also regularly cites the broad definition of incitement in its military laws, defined to include "praise, sympathy or support for a hostile organization" and "attempts, orally or otherwise, to influence public opinion in the Area in a manner which may harm public peace or public order," to criminalize speech merely opposing its occupation. Israeli authorities have said that they in particular closely monitor online speech, especially on Palestinian social media accounts, and have used predictive algorithms to determine whom to target. They have disclosed very little information about their methods of social media monitoring, but have cited social media posts for incitement-based charges.

Military prosecutors, for example, in early 2018 claimed in an indictment against activist Nariman Tamimi that she "attempted to influence public opinion in the Area in a manner that may harm public order and safety" and "called for violence" over a livestream she posted to her Facebook account of a confrontation between her then-16-year-old daughter Ahed and Israeli soldiers in her front yard in December 2017. Her indictment notes a series of charges under Military Order 1651 based primarily on the livestream, including "incitement," noting that the video was "viewed by thousands of users, shared by dozens of users, received dozens of responses and many dozens of likes." Human Rights Watch reviewed the video and case file, and nowhere in the video or case file does Nariman call for violence. Nariman told Human Rights Watch that she pled guilty to incitement and two other charges—"aiding assault of a soldier" and "interference with a soldier"— to avoid a longer sentence if convicted by a military justice system that, as human rights organizations have shown, fail to give Palestinians fair trials. Based on the plea deal, Nariman served eight months in jail.

These restrictions have particularly limited Palestinian journalists, whom the Israeli army regularly accuses of incitement or affiliation with Hamas. In late July 2018, the Israeli army detained four journalists with Al Quds TV, a channel licensed in London that Israeli Defense Minister Avigdor Lieberman accused of being "a propaganda wing of Hamas." The authorities had banned the channel from operating in Israel earlier that month, though never announced a ban on its operations in the West Bank. Military courts approved journalist Alaa al-Rimawi's detention while prosecutors investigated him on allegations of

membership in an "unlawful association," namely Al Quds TV, under the Defense (Emergency) Regulations of 1945. Interrogators fixated, al-Rimawi said, on his use of the term "martyrs" to refer to Palestinians killed by Israel, common parlance among Palestinians, including in a news clip they played for him where he used the term to refer to a person who had been killed after shooting a settler. A military court ordered his release on bail after three weeks in custody, on grounds that al-Rimawi may not have known about the ban on the channel since the army failed to properly publish notice of its decision to ban it. However, the court also conditioned his release on a two-month ban on his "publication of content on social or other communication network," and a prohibition on leaving his home city Ramallah without court approval, which al-Rimawi said lasted a year. Palestinian Center for Development and Media Freedom (MADA) reported that in 2017 and 2018 the Israeli army arrested 74 journalists and closed 19 media institutions in the West Bank, including East Jerusalem.

Arrests for peaceful exercise of basic rights reverberate within Palestinian society, often with the effect of deterring others from speaking out or engaging more generally in political activity. One journalist in Ramallah, who asked that her name be withheld for security reasons, told Human Rights Watch that she had "no idea" what constituted incitement, which has led her to "become very afraid and cautious about what I write on my social media pages." She said that self-censorship is common among journalists and activists, who often advise one another on what to post and not to post.[2] Hamza Zbeidat, who works for a development NGO, said he used to post frequently on social media, but recently has "isolated myself and willingly chosen to stay away from taking part in any public political issue or giving my opinion about them" for fear of arrest.[3] A 25-year-old resident of Bethlehem, who also requested withholding his name, similarly said that he used to frequently participate in demonstrations and other political activities, but "recently decided to lessen my participation after weighing the risks" of arrest or other punitive measures by the Israeli army. He says that, when he does decide still to participate, he tries to "be very discreet about it" and stay "behind the scenes," describing such "serious caution" as common among youth like him.[4]

---

[2] Human Rights Watch text message correspondence with journalist (name withheld), September 11, 2019.

[3] Human Rights Watch email correspondence with Hamza Zbeidat, September 9, 2019.

[4] Human Rights Watch phone interview with Bethlehem youth (name withheld), September 17, 2019.

The army carried out some of these arrests in what the Oslo Accords of 1995 define as "Area A" of the West Bank, even though the accords grant the Palestinian Authority (PA) full civil and security control in this area. The PA itself further restricts Palestinian rights in Area A through arbitrary arrests of critics and opponents of it, particularly on social media, among independent journalists, on university campuses, and at demonstrations.

Even if the law of occupation might have allowed the army to justify such broad measures in, say, July 1967, that law provides no legal basis to do so more than 50 years later. The law of occupation permits occupiers to restrict some rights, but also requires them to restore public life for the occupied population. That obligation increases in a prolonged occupation, where the occupier has more time and opportunity to develop more narrowly tailored responses to security threats that minimize restrictions on rights. In addition, the needs of the occupied population increase over time: suspending virtually all rights to freedom of expression, peaceful assembly and association for a short period interrupts temporarily normal public life, but long-term, indefinite suspension of rights has a much more debilitating impact. Social and intellectual stagnation results from the denial of free expression and debate, access to diverse information, and the opportunity to peacefully demand change.

Despite Israel's heightened obligation to facilitate normal civil life and respect for fundamental rights, given the duration of its occupation and the sophisticated bureaucracy it has developed to rule over Palestinians, it continues to rely on the same repressive measures used at the outset of the occupation.

The longer an occupation, the more military rule should resemble an ordinary governing system that respects the standards of international human rights law that apply at all times. International human rights law robustly protects civil rights, including free expression, assembly and association, and sets a "high threshold" for restrictions, which it notes should remain "an exception." Human Rights Watch has documented cases in which there is no call to violence, as well as cases in which the army equates opposition to its occupation with incitement to violence without showing that the expressive activity was meant to cause violence or was understood by others in that way.

The Israeli army should repeal Military Orders 101 and 1651 and refrain from charging defendants under the Defense (Emergency) Regulations of 1945. After 52 years of

occupation, Israel must ensure public order and safety in a way that respects, protects and fulfills the fundamental rights of Palestinians. The fact that Israel provides much more robust rights protections under its civil law, which it applies in occupied East Jerusalem and Israel, indicates that less restrictive measures are available.

States and international organizations should highlight the importance of respecting the civil rights of Palestinians in the West Bank, since these form an integral part of the legal framework applicable in the Occupied Palestinian Territory. They should consider including calls for Israel to grant Palestinians civil rights at least equal to what it grants its own citizens in their publications, reports and policy positions and to assess Israel's conduct on this basis. Both international human rights law and international humanitarian law should be used to scrutinize Israeli policies and practices towards Palestinians in the West Bank, including East Jerusalem, and Gaza Strip.

For more than two-thirds of the period since the establishment of the state of Israel, Israeli authorities have deprived the nearly 2.5 million Palestinians they rule over in the West Bank of their basic rights—rights enjoyed by the more than 400,000 Israeli settlers living in illegal settlements in the same territory. Israeli officials openly speak of their intent to permanently rule over Palestinians in the West Bank. Whatever the political arrangements, nothing can justify the continued enforcement of these restrictions and the entrenched two-tiered discriminatory system in the West Bank today.

# Methodology

This report focuses on specific Israeli military orders that unlawfully restrict the rights of free assembly, association, expression and press for Palestinians in the occupied West Bank. It does not cover the situation inside Israel, East Jerusalem, where Israel applies its own domestic law after unilaterally annexing it in 1967, the Golan Heights, to which Israel applied its domestic laws in 1981, or Gaza, where Israel in 2005 ended its direct military rule that had been in place since 1967. Nor does it cover Israel's denial of economic, social and cultural rights to Palestinians in the West Bank.

The report focuses on restrictions and punishments imposed between 2015 and 2019, although on occasion it refers to older events. It primarily evaluates the arrests themselves and charges brought and does not explore in-depth legal proceedings against detainees, their treatment in custody, or the use of force against demonstrators, all of which Human Rights Watch has documented elsewhere. It also does not investigate rights violations by the Palestinian Authority in the West Bank or Hamas authorities in Gaza, which Human Rights Watch has covered elsewhere.[5]

This report is based primarily on a detailed review of dozens of Israeli military orders, indictments and court decisions. Human Rights Watch also conducted a total of 29 interviews -- 11 with Palestinians detained pursuant to Israeli military orders, two with their family members, three with activists and journalists who say that the risk of prosecution or sanctions by the Israeli army has led them to curb their activism, one with a Palestinian political analyst, and 12 with Israeli and Palestinian lawyers representing Palestinians detained in the Israeli military justice system. The interviews took place at different locations in the occupied West Bank between August 2017 and October 2019.

We conducted most of the interviews individually, in Arabic or English. We conducted them with the full consent of those being interviewed and told each of the interviewees how Human Rights Watch would use the information provided.

---

[5] Human Rights Watch, *Two Authorities, One Way, Zero Dissent* (New York: Human Rights Watch, 2018), https://www.hrw.org/report/2018/10/23/two-authorities-one-way-zero-dissent/arbitrary-arrest-and-torture-under.

Human Rights Watch was also able in some cases to review photographic and video evidence and, in one case, to attend a military court hearing.

Human Rights Watch wrote to the Coordination of Government Activities in the Territories (COGAT), the Israeli army body in charge of administering the occupied West Bank, the Israeli police and Israel Security Agency (Shin Bet) on August 1, 2019 and to the Israeli army's spokesperson on August 29, soliciting the perspectives of each entity. Each confirmed receipt.

The Prime Minister's Office responded on behalf of the Shin Bet, saying in a short letter dated August 8, 2019, that it "operates pursuant to its power and duties as established by law," but declined to provide further information, noting that "disclosure might reveal work methods."[6] On August 28, the police sent a letter, dated August 27, with some additional information, though declined to answer most of the questions posed, claiming that it had no legal obligation to provide information, given the format in which the request had been sent, without specifying the desired format.[7] On September 1, the COGAT Office of Public Inquiries said it could not accept our request for information, without including a form available only to organizations officially registered in Israel. On November 18, the Israeli army spokesperson substantively replied to Human Rights Watch's letter. The letter noted that further information would be sent, but, as of publication, Human Rights Watch had not received any additional information.

Human Rights Watch also wrote to Facebook, soliciting information regarding requests by Israeli authorities to regulate content on its platform, and received substantive responses. All responses are reflected in the report and reprinted in full, alongside letters sent by Human Rights Watch, as appendices.

---

[6] Letter from Prime Minister's Office, Public Inquiries Department, to Human Rights Watch, August 8, 2019.

[7] Letter from National Public Complaint Officer and Freedom of Information Officer Assistant, Israel Police, to Human Rights Watch, August 28, 2019.

# I. Background

The Israeli army occupied the West Bank on June 7, 1967. That day, the army issued a proclamation establishing that its West Bank area commander has "all legislative, executive and judicial powers" over the occupied territory and that the "laws which were in force up to 7 June 1967 shall remain in force as long as they are not contradicted by subsequent military orders."[8] The army has issued hundreds of military orders for the West Bank in the subsequent 52 years.

These continue to govern many aspects of everyday life for Palestinians in the West Bank, including regulating freedom of movement and access to water, land, and natural resources.[9] They do not apply to East Jerusalem, which Israel annexed in 1967, and where it applies its own domestic law instead of military law, in a unilateral move that no other country has recognized and that does not change East Jerusalem's status as occupied territory under international law.[10]

Since 1967, the Israeli army has used military orders, together with laws that existed in the West Bank prior to the beginning of the occupation, to incarcerate hundreds of thousands of West Bank Palestinians for various periods of time. As of October 31, 2019, according to Israeli Prison Services, Israeli authorities held 4,391 Palestinians from the West Bank in custody for "security" offenses, including 458 held in administrative detention based on secret evidence without charge or trial.[11] Israeli authorities try most Palestinians detained

---

[8] Military Proclamation No. 2 Concerning Regulation of Authority and the Judiciary (West Bank), June 7, 1967, published in Jerusalem Media & Communication Center (JMCC), *Israeli Military Orders in the Occupied Palestinian West Bank 1967-1992*, Second Edition (East Jerusalem, 1995) p. 1.

[9] "Status of Palestinian Territories and Palestinian Society under Israeli Occupation," 40 years of Israeli occupation: 1967-2007, The Applied Research Institute of Jerusalem (ARIJ), https://www.arij.org/atlas40/chapter2.2.html (accessed October 27, 2019).

[10] Israel continues to restrict the rights of Palestinians in East Jerusalem. Palestinian Non-Governmental Organizations Network (PNGO), "Attacks on Palestinian civil society organizations in occupied East Jerusalem: A Matter of Illegal Annexation and of Repression of the Right to Self-determination," June 2018, https://bit.ly/2Fligtn (accessed June 30, 2019); B'Tselem - The Israeli Information Center for Human Rights in the Occupied Territories, "Censorship of the Palestinian press in East Jerusalem," March 1990, https://bit.ly/31WrfAR (accessed June 30, 2019).

[11] Israeli Prison Services figures on file with Human Rights Watch.

in the West Bank in military courts, where they face unfair trials and a conviction rate of almost 100 percent.[12]

The Palestinian Authority (PA) has also greatly restricted the rights of Palestinians to free assembly, association and expression in the parts of the West Bank where it has limited control. The PA routinely carries out arbitrary arrests of critics and opponents, particularly on social media. Among its targets are independent journalists, students on university campuses, and protesters at demonstrations.[13] Between January 2018 and March 2019, the Palestinian Authority said its security forces detained 1,609 people for insulting "higher authorities" and creating "sectarian strife," charges that in effect criminalize peaceful dissent, and 752 for social media posts.[14] PA forces systematically torture detainees. Hamas authorities in Gaza regularly perpetrate similar abuses.[15]

 In Gaza, Israeli authorities in 2005 dismantled the military government that had existed since 1967 and ceased applying military orders when it withdrew its settler population. Israel does, though, continue to maintain effective control over Gaza and restrict the rights of its residents through other means, including sweeping restrictions on the movement of people and goods into and out of the coastal territory.[16]

---

[12] Chaim Levinson, "Nearly 100% of All Military Court Cases in West Bank End in Conviction, Haaretz Learns," *Haaretz*, November 29, 2011, https://www.haaretz.com/1.5214377 (accessed January 31, 2018).

[13] Human Rights Watch, *Two Authorities, One Way, Zero Dissent*.

[14] "Palestine: No Letup in Arbitrary Arrests, Torture," Human Rights Watch news release, May 29, 2019, https://www.hrw.org/news/2019/05/29/palestine-no-letup-arbitrary-arrests-torture.

[15] Human Rights Watch, *Two Authorities, One Way, Zero Dissent*.

[16] Human Rights Watch, *Unwilling or Unable: Israeli Restrictions on Access to and from Gaza for Human Rights Workers* (New York: Human Rights Watch, 2017) https://www.hrw.org/report/2017/04/02/unwilling-or-unable/israeli-restrictions-access-and-gaza-human-rights-workers.

# II. Legal Standards: Civil Rights in Prolonged Occupation

As the occupying power, Israel has legal obligations towards Palestinian residents of the Occupied Palestinian Territory.[17] The law of occupation can be found primarily in the Fourth Geneva Convention of 1949,[18] the Hague Regulations of 1907,[19] and customary international humanitarian law.[20]

International human rights law, including the International Covenant on Civil and Political Rights (ICCPR), applies to Israel's conduct towards Palestinians in the West Bank and Gaza Strip, alongside international humanitarian law governing occupation. While Israel maintains that its human rights obligations do not extend to the occupied territories, the United Nations Human Rights Committee, the body charged with interpreting the ICCPR, has repeatedly found that states are bound to respect the human rights treaties they have ratified outside their state borders, and specifically that "the provisions of the Covenant apply to the benefit of the population of the occupied territories."[21] The International Court of Justice endorsed this view in its Advisory Opinion regarding Israel's separation barrier,

---

[17] Israel claims that the law of occupation no longer applies to its actions in Gaza. See, for example, *Physicians for Human Rights v. Defense Minister*, Israel High Court of Justice (HCJ), Case No. 10265/05, State Submission, July 11, 2006 (on file with Human Rights Watch); *Hamdan v. Southern Military Commander and related cases*, HCJ 11120/05, State Response, January 19, 2006, paras. 26-29 (in Hebrew), http://tinyurl.com/l9ourfg (accessed June 21, 2019); Both the UN and the International Committee of the Red Cross (ICRC) however continue to consider Gaza occupied territory, given its continued effective control over the lives and welfare of the Palestinians living there; Email from Yves Sorokobi, Office of the UN Secretary General Spokesperson, to Gisha – Legal Center for Freedom of Movement, February 7, 2007 (on file with Human Rights Watch): "The UN welcomed the Israeli disengagement from Gaza in August 2005. However, there has been no change in our characterization of the Gaza Strip as occupied territory."; See "Gaza Closure Not Another Year!", ICRC press release, June 14, 2010, www.icrc.org/eng/resources/documents/update/palestine-update-140610.htm (accessed October 24, 2019).

[18] Geneva Convention relative to the Protection of Civilian Persons in Time of War (Fourth Geneva Convention), adopted August 12, 1949, 75 U.N.T.S. 287, entered into force October 21, 1950.

[19] Convention (IV) respecting the Laws and Customs of War on Land and its annex: Regulations concerning the Laws and Customs of War on Land, The Hague, adopted October 18, 1907, entered into force January 26, 1910.

[20] The ICRC has identified 161 rules of customary nature: Customary IHL Database, ICRC, https://ihl-databases.icrc.org/customary-ihl/eng/docs/home (accessed October 24, 2019).

[21] See, for example, United Nations Human Rights Committee (HRC), "Concluding Observations on the Fourth Periodic Report of Israel," CCPR/C/ISR/CO/4, November 21, 2014, https://bit.ly/2k0ggJV (accessed October 24, 2019), para. 5; See also the numerous prior HRC concluding observations on Israel, for example, CCPR/CO/ISR/3, September 3, 2010, para. 5; CCPR/CO/78/ISR, August 5, 2003, para. 11; CCPR/C/79/Add.93, August 18, 1998, para. 10; Article 2 of the ICCPR itself notes that the Covenant should apply to "all individuals within its territory and subject to its jurisdiction."

and stated that the ICCPR "is applicable in respect of acts done by a State in the exercise of its jurisdiction outside its own territory."[22]

The State of Palestine has ratified numerous UN and regional human rights treaties since 2014.

The Fourth Geneva Convention requires the occupying power to provide sufficient clarity to any rule that could foreseeably restrict the activities of protected persons, especially if the violation carries criminal consequences.[23]

Article 43 of the Hague Regulations of 1907, recognized by the International Military Tribunal at Nuremberg and the International Court of Justice as having the force of customary international law binding on all states,[24] outlines the powers and responsibilities of an occupying power:

> The authority of the legitimate power having in fact passed into the hands of the occupant, the latter shall take all the measures in his power to restore, and ensure, as far as possible, **public order and safety**, while respecting, unless absolutely prevented, the laws in force in the country.[25]

This provision authorizes an occupying power to take restrictive measures that are militarily necessary to ensure its own safety, but also requires the occupier to restore and ensure public life for the benefit of the occupied population. Measures that are militarily necessary are those likely to "accomplish a legitimate purpose and are not otherwise prohibited by international humanitarian law."[26]

---

[22] International Court of Justice (ICJ), Advisory Opinion Concerning Legal Consequences of the Construction of a Wall in the Occupied Palestinian Territory, ICJ General List, No.131, ICJ Rep 136, July 9, 2004, https://bit.ly/345310j (accessed October 25, 2019), para. 111.

[23] Fourth Geneva Convention, art. 65. p. 1; Marco Sassòli and Théo Boutruche, "Expert Opinion On International Humanitarian Law Requiring of the Occupying Power to Transfer Back Planning Authority to Protected Persons Regarding Area C of the West Bank," February 1, 2011, https://bit.ly/2N46xs4 (accessed October 24, 2019), p. 1.

[24] Sassòli, Boutruche, *op. cit.,* p. 6.

[25] Emphasis added.

[26] ICRC glossary, "Military Necessity," https://casebook.icrc.org/glossary/military-necessity (accessed July 1, 2019).

Scholars and courts alike have consistently interpreted "public order and safety" to extend beyond the mere guaranteeing of security to encompass facilitating normal civilian life, including education, economy, health care and other aspects of everyday life.[27] The original French *(l'ordre et la vie publics)* includes the words "public life," reflecting that facilitating civil life constitutes an integral part of an occupying power's duties. The Israeli Supreme Court adopted such an interpretation in the landmark 1983 Jamayat Askan case:

> The [article 43 of the Hague] Regulation does not limit itself to a certain aspect of public order and safety. It spans all aspects of public order and safety. Therefore, this authority (…) also applies to a variety of "civilian" issues such as, the economy, society, education, welfare, hygiene, health, transportation and other such matters to which human life in a modern society is connected.[28]

In calling on occupiers to "ensure, **as far as possible**, public order and safety,"[29] Article 43 requires an occupier to use all practical means at its disposal to minimize the impact of its actions on the local population. The logical corollary of this article is that the means available to an occupier increase with the duration of an occupation. A foreign army occupying a village for a month or a year may be limited in the sophistication of the security measures it adopts, for lack of time, resources, and familiarity with the location and population under occupation. A foreign army, though, occupying a territory for decades, has more time and opportunity to refine its responses to threats to the security of its forces in ways that minimize restrictions on rights and freedoms. The longer the occupation, the greater the ability and therefore the obligation to arrive at security measures that minimize impact on the local population.[30]

---

[27] The United Nations International Law Commission identified providing "the health and well-being" and "benefit of the population of the occupied territory" as among the obligations of the Occupying Power. United Nations General Assembly, International Law Commission, Seventy-first session, Protection of the Environment in Relation to Armed Conflicts, U.N. Doc. A/CN.4/L.937, June 6, 2019; Sassòli, Boutruche, *op. cit.*, pp. 8-9; Vaios Koutroulis, "The application of international humanitarian law and international human rights law in situation of prolonged occupation: only a matter of time?" *International Review of the Red Cross*, Vol. 94, No. 885 (2012), p. 178, https://doi.org/10.1017/S1816383112000616.

[28] *Jamayat Askan et al., v. IDF Commander in Judea and Samaria et al.,* HCJ 393/82, 37(4) PD, December 12, 1983, para. 18. See also: Germany, British Zone of Control, Control Commission Court of Criminal Appeal, July 26, 1947, in Annual Digest and Reports of Public International Law Cases, Vol. 14 (1947), p. 232.

[29] Emphasis added.

[30] Koutroulis, p. 183.

Legal experts have interpreted Article 43 to limit occupiers from taking actions that disproportionately harm the occupied population as compared to the military benefit derived from those same actions.[31]

The needs of the local population also look different in shorter occupations, where combat-like situations may be more frequent, from a longer-term occupation, where interactions become more routinized and life somewhat normalized.[32] The Israeli Supreme Court specified in Jamayat Askan that the content of what constitutes "public order and safety" should be assessed based on the needs of the society at the time of examination.[33] It further held that "military and security needs predominate in a short-term military occupation. Conversely, the needs of the local population gain weight in a long-term military occupation."[34] The medium and long-term health of a society requires more robust protection of rights to allow for the normal development of a society.

Denial of the rights to freedom of expression, peaceful assembly, and association blocks the protected population from accessing information, debating ideas and peacefully demanding change.[35] Suspending these rights for a week or month interrupts public life, but suspension for decades fundamentally distorts it.

The International Committee of the Red Cross (ICRC) in a commentary on the Geneva Conventions has said that "duties incumbent on an Occupying Power are commensurate with the duration of the occupation," noting that "[i]f the occupation lasts, more and more responsibilities fall on the Occupying Power."[36] The Israeli government itself has argued in court that its duties become more robust as the needs of the Palestinian population grow over the course of the occupation. In a 2010 case in front of the High Court of Justice, the

---

[31] Sassòli, Boutruche, *op. cit.*, p. 9.

[32] Sassòli, Boutruche, *op. cit,* p. 9; Noam Lubell, "Human rights obligations in military occupation," *International Review of the Red Cross*, Vol. 94, No. 885 (2012), p. 329.

[33] *Jamayat Askan et al., v. IDF Commander in Judea and Samaria et al.,* HCJ 393/82, para. 21. The case involved the construction of highways into the occupied West Bank.

[34] Ibid., para. 22.

[35] "Freedom of opinion and freedom of expression are indispensable conditions for the full development of the person. They are essential for any society," UN Human Rights Committee, General Comment No. 34, Article 19: Freedom of Opinion and Expression, CCPR/C/GC/34, September 12, 2011, https://www.refworld.org/docid/4ed34b562.html (accessed October 24, 2019), para. 2.

[36] ICRC, Convention (II) de Genève pour l'amélioration du sort des blessés, des malades et des naufragés des forces armées sur mer, 12 août 1949, Commentaire of 2017, Article 2: Application of the Convention, https://bit.ly/2Pg47ZX (accessed August 7, 2019), para. 344.

state justified continued Israeli quarrying activities in the West Bank by arguing that it contributed to economic growth and thereby helped the government to carry out the additional duties it owed the population in the context of a long-term occupation.[37]

Leading jurists who study the legal framework that applies in a situation of military occupation argue that both the laws of war and international human rights law apply at all times, and that context, in particular the duration of an occupation, determines which framework takes precedence in a particular situation.

The law of occupation, as an emergency framework by definition, is designed to regulate an exceptional, temporary situation in which a foreign military power displaces the lawful sovereign and rules by force. [38]

The longer the occupation, the more military rules should resemble an ordinary governing system and therefore the standards of international human rights laws that apply at all times should govern. Even when there are periods of intensive fighting during an occupation, the situation should revert when hostilities subside to a situation in which the regular rules of international human rights law govern. While the protection of core civil

---

[37] Yesh Din - Volunteers for Human Rights, "The Great Drain: Israeli Quarries in the West Bank, High Court Sanctioned Institutionalized Theft," September 2017, https://bit.ly/33X8P2R (accessed August 7, 2019).

[38] Article 3(b) of Protocol Additional I of the Geneva Conventions specifies that the applications of Protocol and Conventions—i.e., including the Fourth Geneva Convention—shall cease "in the case of occupied territories, on the termination of the occupation." ICRC, Protocol Additional to the Geneva Conventions of 12 August 1949, and relating to the Protection of Victims of International Armed Conflicts (Protocol I), June 8, 1977, https://bit.ly/2LxW3BW (accessed October 25, 2019). This provision has become part of customary international law. The trial chamber of the International Criminal Tribunal for the former Yugoslavia (ICTY) also referenced Article 6 of the Fourth Geneva Convention to define occupation as "a transitional period following invasion and preceding the agreement on the cessation of hostilities." This provision has become part of customary international law; Marco Sassòli, *International Humanitarian Law: Rules, Controversies, and Solutions to Problems Arising in Warfare,* (Cheltenham, United Kingdom: Edward Elgar Publishing, 2019), p. 319. "This rule [Article 6 of the Fourth Geneva Convention] has been considered to be replaced by Article of Additional Protocol I as customary law under which IHL as a whole remains applicable until the actual termination of occupation."; The trial chamber of the ICTY also referenced Article 6 of the Fourth Geneva Convention to define occupation as "a transitional period following invasion and preceding the agreement on the cessation of hostilities." ICTY, *Prosecutor v. Mladen Ntaletilic and Vinko Martinokovic*, Judgment, IT-98-34-T, Trial Chamber, March 31, 2003, https://bit.ly/2WeoTe6 (accessed October 25, 2019), art. 214, pp. 72-73; Article 6 of the Geneva Convention provides that the application of the Convention "shall cease on the general close of military operations." Fourth Geneva Convention, art. 6; In its advisory opinion, the ICJ declared that the "the military operations leading to the occupation of the West Bank in 1967 ended a long time ago." ICJ Advisory Opinion Concerning Legal Consequences of the Construction of a Wall, para. 125. An expert meeting hosted by the International Committee of the Red Cross in 2012, though, concluded that the ICJ's statement on this article "was incorrect for the purposes of IHL," noting that they wrongly focused on "general close of military operations *leading to the occupation*," not "general close of military operations." The experts further concluded that IHL "did not set any limits to the time span of an occupation." Expert Meeting: Occupation and Other Forms of Administration of Foreign Territory, June 11, 2012, https://bit.ly/2WbocSE (accessed October 25, 2019).

rights, including those of expression, association, and assembly, may at times present legitimate security concerns,[39] wide-ranging restrictions should not as a default continue indefinitely. As three Israeli legal scholars have argued, "the longer the occupation, the heavier weight is to be accorded to the human rights of the local population."[40]

However, the protections provided to the occupied population under the laws of occupation, such as the prohibition against building settlements and extracting natural resources for the benefit for the occupier, remain in place so long as the occupation persists regardless of its duration. International human rights law applies at the same time, supplementing these protections in the context of a prolonged occupation that poses more risk to the long-term health of society.[41]

For example, the ICCPR would guide interpretation of the character of civil life that an occupier should provide to the occupied population under Article 43 of the Hague Resolutions in a prolonged occupation.

Israel ratified the ICCPR in 1991, although it issued a formal declaration seeking derogation from a provision on detention (Article 9) to the extent that it prohibits measures undertaken pursuant to the state of emergency it proclaimed in May 1948, which remains in effect today. The state of Palestine ratified the ICCPR in full in 2014.

Article 15 of the ICCPR highlights the need for precision in setting out criminal offenses, proscribing convicting someone based on an act that is not criminalized.[42]

Article 19 of the ICCPR states that "everyone shall have the right to freedom of expression ... to seek, receive, and impart information and ideas of all kinds." The article notes that authorities may restrict this right, but restrictions "shall only be such as are provided by law and are necessary: (a) For respect of the rights or reputations of others; (b) For the

---

[39] Adam Roberts, "Prolonged Military Occupation: the Israeli-Occupied Territories Since 1967," *The American Journal of International Law*, Vol. 84, No. 1 (1990), p. 96.

[40] Orna Ben-Naftali, Aeyal M. Gross, Keren R. Michaeli, "Illegal Occupation: Framing the Occupied Palestinian Territory," *Berkeley Journal of International Law*, Vol. 23 No.3 (2005), p. 576. See also: Roberts, p. 96; Koutroulis, p. 179.

[41] Orna Ben-Naftali and Keren R. Michaeli, "We Must Not Make a Scarecrow of the Law: A Legal Analysis of the Israeli Policy of Targeted Killings," *Cornell International Law Journal*, Vol. 36, No. 2 (2003), p. 289. "Where the law of occupation provides no clear answer, human rights law steps in and assists the law of occupation. Human rights law reinforces the weight given to [the law of occupation's] principles and objective, that is, to protect the occupied population and provide for its well-being."

[42] ICCPR, art. 15.

protection of national security or of public order, or of public health or morals." The United Nations Human Rights Committee issued in 2011 an authoritative commentary noting that freedom of expression encompasses political discourse, human rights advocacy and journalism disseminated through various means, including electronic and internet-based modes of expression.[43] The right also encompasses the freedom to impart and receive information.[44]

The committee also specified that, under the requirement of legality, restrictions must "be formulated with sufficient precision to enable an individual to regulate his or her conduct accordingly" and to "provide sufficient guidance" as to "what sorts of expression are properly restricted and what sorts are not." It also stated that, beyond the requirements of legality and necessity set out in the article itself, restrictions "must not be overbroad" and that "[w]hen a state party invokes a legitimate ground for restriction of freedom of expression, it must demonstrate in specific and individualized fashion the precise nature of the threat … in particular by establishing a direct and immediate connection between the expression and the threat." It specifically discusses the concerns about terrorism, noting that "[s]uch offenses as 'encouragement of terrorism' and 'extremist activity' as well as offenses of 'praising', 'glorifying' or 'justifying' terrorism, should be clearly defined to ensure that they do not lead to unnecessary or disproportionate interference with freedom of expression."[45]

Article 17 of the ICCPR provides that "[n]o one shall be subjected to arbitrary or unlawful interference with his privacy, family, home or correspondence."[46] The UN Office of the High Commissioner for Human Rights (OHCHR) has stated that these requirements mean government interference with privacy must be lawful, necessary and proportionate.[47] It has further noted that "the right to privacy comes into play when a Government is monitoring a public space … thereby observing individuals," and that "[s]imilarly, when information that is publicly available about an individual on social media is collected and analysed, it also implicates the right to privacy. The public sharing of information does not render its

---

[43] HRC, General Comment No. 34, CCPR/C/GC/34, para. 25, 34, 35.
[44] ICCPR, art. 19(2).
[45] Ibid.
[46] ICCPR, art. 17(1).
[47] UN Human Rights Council (UNHRC), Twenty-seventh session, Report of the Office of the United Nations High Commissioner for Human Rights, *The right to privacy in the digital age*, A/HRC/27/37, June 30 2014, https://bit.ly/2qJKz6c (accessed October 25, 2019), para. 23.

substance unprotected."[48] This means state monitoring of information that a person has made public on social media interferes with the right to privacy so that any such interference must be lawful, necessary and proportionate. When addressing state surveillance of communications and web browsing, the OHCHR has stated that "indiscriminate mass surveillance" does not meet the necessity and proportionality requirement and therefore violates rights, even when states argue that it is "necessary to protect national security."[49] The OHCHR quotes the European Court of Human Rights' observation that "a system of secret surveillance set up to protect national security may undermine or even destroy democracy under the cloak of defending it."[50]  The OHCHR reached this conclusion because when monitoring takes place at a massive scale, "an individualized necessity and proportionality analysis" by the state is not possible.[51] Indiscriminate mass monitoring of speech by definition does not involve an individualized necessity and proportionality analysis, and therefore is very likely to violate international human rights law.

To be lawful for the purposes of the right to privacy, the monitoring, collection, storage, or searching of information must take place on the basis of clear, specific, publicly available laws that establish criteria for these activities as well as safeguards and effective remedies for abuse.[52] The measures would also need to be necessary and proportionate to achieving a legitimate aim.

Article 20 of the ICCPR proscribes "[a]ny advocacy of national, racial or religious hatred that constitutes incitement to discrimination, hostility or violence shall be prohibited by law."  The Convention on the Elimination of All Forms of Discrimination, to which Israel has acceded, also bars incitement. In January 2013, the Office of the High Commissioner for Human Rights (OHCHR) adopted a set of guidelines, the Rabat Plan of Action, that set out a three-part test—legality, proportionality, and necessity—on how to balance free expression

---

[48] UNHRC, Thirty-ninth session, Report of the Office of the United Nations High Commissioner for Human Rights, *The right to privacy in the digital age*, A/HRC/39/29, August 3, 2018, https://www.right-docs.org/doc/a-hrc-39-29/ (accessed October 25, 2019), para. 6.

[49] Ibid., para. 17.

[50] Ibid., quoting *Roman Zakharov v. Russia*, European Court of Human Rights, application No. 47143/06, Judgment, December 4, 2015, https://bit.ly/2PnoxjL (accessed October 27, 2019), para. 232.

[51] Ibid., quoting UNHRC, Thirty-third session, Report of the United Nations High Commissioner for Human Rights, *Report on best practices and lessons learned on how protecting and promoting human rights contribute to preventing and countering violent extremism*, A/HRC/33/29, July 21, 2016, https://bit.ly/369UoMs (accessed October 27, 2019), para. 58

[52] UNHRC, *The right to privacy in the digital age*, A/HRC/27/37, para. 28.

and incitement to hatred. It noted that "limitation of speech must remain an exception" and set a "high threshold" for any restriction on free expression that should evaluate the context, speaker, intent, content, and form, extent of the speech act and likelihood of harm, including how imminent the threat is. On imminence, the Rabat Plan specifies that, for speech to fall afoul of the law, there should be a "reasonable probability that the speech would succeed in inciting actual action against the target group, recognizing that such causation should be rather direct."[53]

The ICCPR further safeguards the rights to "free assembly" (Article 21) and "freedom to association with others" (Article 22), limiting restrictions to cases where it is prescribed in law and necessary to "national security or public safety, public order (*ordre public*), the protection of public health or morals or the protection of the rights and freedoms of others." States can restrict free assembly and association, as with expression and privacy, only when restrictions are (1) prescribed by law; (2) undertaken for a legitimate purpose; and (3) necessary and proportionate. The OHCHR has said that "no person should be held criminally, civilly or administratively liable for the mere act of organizing or participating in a peaceful protest."[54]

Authorities, both occupiers and national governments, may take action to restrict acts when exercise of expression and assembly may be construed as threatening security or public order.[55] But this prerogative cannot justify the prosecution of journalists, human rights defenders, or others for disseminating publicly available information and opinions of legitimate interest absent a specific and imminent security threat.[56] States can always respond to such threats, but, in a prolonged occupation, absent a period of active hostilities, an occupier should do so subject to regular international human rights law and standards.

---

[53] UNHRC, Twenty-second session, Annual report of the United Nations High Commissioner for Human Rights, Report of the UN High Commissioner for Human Rights on the expert workshops on the prohibition of incitement to national, racial or religious hatred, A/HRC/22/17/Add.4, January 11 2013, https://bit.ly/343uxT3 (accessed June 30, 2019).

[54] UN Special Rapporteur on the rights to freedom of peaceful assembly and of association, Maina Kiai and Christof Heyns, *10 Principles for the Proper Management of Assemblies: Implementation Checklist*, September 2016, https://bit.ly/31PgqyZ (accessed October 25, 2019).

[55] John Quigley, "The Relation Between Human Rights Law and the Law of Belligerent Occupation: Does an Occupied Population have a Right to Freedom of Assembly and Expression?" *Boston College International and Comparative Law Review*, Article 2, Vol. 12, Issue 1 (1989), https://bit.ly/2BIvdB3 (accessed October 25, 2019), p. 25.

[56] HRC, General Comment No. 34, CCPR/C/GC/34, para. 30.

International humanitarian law forbids an occupier from transferring protected persons outside the occupied territory, a provision that Israel violates routinely when it detains Palestinians from the West Bank and holds them inside Israel.

International human rights law provides a range of additional protections, including with regards to children. The Convention on the Rights of the Child requires authorities to arrest or detain a child only as a last resort and for the shortest appropriate period of time, and to take precautions to ensure that children are not compelled to confess guilt.[57] Israel denies Palestinian children arrested and detained in the West Bank legal protections granted to Israeli children, including settlers.

Human rights law, in particular Article 26 of the ICCPR, further prohibits discrimination on grounds of race, religion or national or social origin, and mandates equal protection under the law. The restrictive military orders apply to Palestinian residents of the West Bank, not including East Jerusalem, but to none of the over 400,000 Israeli settlers living in the same territory, who live under Israeli civil law, which safeguards the rights to free expression and assembly.

The Israeli Supreme Court has referred to freedom of expression as the "heart and soul" of democracy.[58] The Israeli Supreme Court has held, in an opinion written by then Chief Justice Aharon Barak, that freedom of expression holds "a place of honor in the palace of the fundamental rights of man."[59] Israeli law imposes restrictions on free expression, but, according to Barak , "the balancing formula seeks to curtail this basic value as little as possible," and in particular "only if the injury to state security and public order is severe, serious and grave, and only if there is proximate certainty the realization of free expression will bring about this injury."[60] Barak has also written that, "[f]reedom of expression is not

---

[57] Human Rights Watch, *Submission by Human Rights Watch to the Committee on the Rights of the Child on the State of Palestine*, 83rd pre-sessional working group, March 20, 2019, https://www.hrw.org/news/2019/03/20/submission-human-rights-watch-committee-rights-child-state-palestine.

[58] Agranat J., in Criminal Appeal, *State of Israel v. Ben Moshe*, Case No. 255/68, P.D. vol. 22(2), 427, 435.

[59] *Alan Levi And Yaheli Amit v. Southern District Police Commander*, HCJ 153/83, P.D., vol. 38(2),393, https://bit.ly/2prAR8a (accessed November 18, 2019).

[60] Aharon Barak, "Freedom of Expression And Its Limitations," *Kesher*, Tel Aviv University, No. 8 (1990), pp. 4e–11e, https://bit.ly/2XoBizR (accessed July 2, 2019).

only the freedom to express things quietly and pleasantly. It is also the freedom to raise an outcry that grates on the ears."[61]

While elements of the Defense (Emergency) Regulations remain in Israeli law today, many in Israel have criticized them. In 1951, the Knesset determined that the Defense (Emergency) Regulations "oppose the basic principles of democracy" and directed a committee to draft a bill for their repeal.[62] In a 1953 case, Kol Ha'am, the Israeli Supreme Court rejected the government's attempts to censor publication of two newspapers on the grounds that it could "jeopardize the public safety," ruling that only "a near certainty" that publication would "seriously jeopardize" vital security interests could justify such recourse.[63]

With regards to demonstrations, Israeli law requires a permit only if it involves more than 50 people, takes place outdoors, and involves "political speeches and statements."[64] Police, in turn, can deny a permit only if they can prove "near certainty" of harm to public security, public order, or the rights of others.[65] Justice Barak wrote in a 2006 Supreme Court case, "a demonstration of a political or social character is a manifestation of the autonomy of individual will, freedom of choice and freedom of negation that are included in the framework of human dignity as a constitutional right."[66] A decision a year later affirmed that the right of free expression and peaceful protest "intended to protect not only those who hold accepted and popular opinions, but also... opinions that are liable to incur anger or outrage."[67] In 2017, the Supreme Court went a step further, holding that "the demand for a permit to hold protests is nothing but a [British] Mandatory remnant [and] it seems the time has come to examine its removal from Israeli law."[68]

---

[61] Aharon Barak quoted in Abraham Ben-Zvi, "The Limits of Israel's Democracy in the Shadow of Security," *Taiwan Journal of Democracy,* Vol. 1 No.2 (2005), p. 14.

[62] B'Tselem, "Defense (Emergency) Regulations," https://www.btselem.org/legal_documents/emergency_regulations (accessed August 5, 2019).

[63] Ben-Zvi, pp. 8-9.

[64] "Pocket Guide: The Right to Demonstrate," The Association for Civil Rights in Israel (ACRI) et al., 2015, https://bit.ly/2ohIVrD (accessed July 2, 2019).

[65] B'Tselem, "The Right to Demonstrate in the Occupied Territories," July 2010, https://bit.ly/2FlztTr (accessed June 30, 2019).

[66] *Mateh Harov v Israel Police et al.,* HCJ 2557/05, para. 13.

[67] *Yehuda Meshi Zahav et al. v. Jerusalem District Police Commander,* HCJ 8988/06, para. 9.

[68] Ilan Lior, "Israeli Court: Protesters Outside Attorney General's Home Don't Need Police Permit," *Haaretz,* October 9, 2017, https://bit.ly/2FOLOWe (accessed July 2, 2019).

# III. Israeli Military Orders Violating Palestinian Civil Rights

On June 7, 1967, the Israeli army took control of the West Bank and, under a proclamation issued that day declaring that existing laws remained in force unless amended by subsequent military orders, began to enforce the Defense (Emergency) Regulations of 1945, which British Mandatory authorities had enacted to maintain order and suppress dissent. While the British formally revoked the Defense (Emergency) Regulations several days before the mandate ended, and Jordan issued its own Defense Law shortly before it took control of the West Bank, the Israeli army considers the laws to never have been properly revoked, an interpretation that the Israeli Supreme Court later upheld, and in subsequent months issued two military orders (160, 224) to affirm the applicability of the regulations.[69] The Israeli army also used the regulations as a central feature of its military rule over Palestinians living in Israel between 1948 and 1966; elements of it remain in Israeli law today.[70]

The regulations authorize home demolitions, censorship, suppression of protests, closures, curfews, administrative detention, and deportations.[71] They also empower authorities to outlaw "any body of persons" that, among other things, "advocates, incites or encourages" overthrow of or even "bringing into hatred or contempt of, or the exciting of disaffecting against," local authorities, declaring that such groups constitute an "unlawful association."[72] Authorities may detain and prosecute individuals for mere membership or attendance at meetings, having in their "possession, custody or control any book, account, periodical, handbill, poster, newspaper or other document, or any funds, insignia or property," or "by writing, words, signs, or other acts or representation, directly or

---

[69] Martha Roadstrum Moffett, "Perpetual Emergency: A Legal Analysis of Israel's Use of the British Defence (Emergency) Regulations 1945, in the Occupied Territories," Al-Haq, 1989, http://www.alhaq.org/publications/8169.html (accessed July 1, 2019); Military Order 160 - Order Concerning Interpretations (Additional Regulations 1), November 5, 1967, published in JMCC, *Israeli Military Orders* (1995), p. 23; Military Order 224 - Order Concerning Interpretations (Additional Regulations), February 20, 1968, JMCC, *Israeli Military Orders*, p. 30.

[70] B'Tselem, "Defense (Emergency) Regulations"; Michal Tzur, The (Emergency) Defense Regulations, 1945," The Israel Democracy Institute, 1989, https://en.idi.org.il/publications/7591 (accessed August 7, 2019); John Quigley, "Israel's Forty-Five Year Emergency: Are There Time Limits to Derogations from Human Rights Obligations," *Michigan Journal of International Law*, Vol. 15, Issue 2 (1994).

[71] The Defense (Emergency) Regulations, 1945, available at https://bit.ly/2XlmDic (accessed October 25, 2019).

[72] The Defense (Emergency) Regulations, 1945, art. 84 (a)(b).

indirectly, whether by inference, suggestion, implication or otherwise, acts on behalf of, or as a representative of an unlawful association."[73] The regulations also allow the army to prohibit publishing anything that in its view "would be, or be likely to be or become, prejudicial to the defence of Palestine or to the public safety or to public order," without further defining what this means.[74]

In August 1967, the Israel army promulgated Military Order No. 101: "Order Regarding Prohibition of Incitement and Hostile Propaganda Actions," which imposed sweeping prohibitions on peaceful expression. The order, subsequently amended on several occasions, criminalized many forms of peaceful assembly, including any assembly, rally, or procession of ten or more people gathered on any issue "that could be construed as political" without a military permit, with violators facing a possible ten years in prison, a significant fine or both.[75] According to the order, persons may not "hold, wave, display or affix flags or political symbols, except in accordance with a permit of the military commander" or "print or publicize in the region any publication of notice, poster, photo, pamphlet or other document containing material having a political significance" unless authorized in advance by an Israeli military commander.[76]

Military Order 101 further stipulates that anyone who "publishes praise, sympathy or support for a hostile organization, its actions or objectives," or anyone who commits "an act that reveals identification with a hostile organization," including by "singing a hymn or sounding a slogan, or any similar act that clearly reveals identification or sympathy" is subject to criminal sanction.[77] The order also authorizes a military commander to "order any owner of a café, club or other place in which the public gathers" to close the area "for the period of time he specifies," and authorizes soldiers to "exercise the extent of force required [...] to prevent the violation of this order."[78] The order permits the commander to delegate his powers to any member of the security force.[79]

---

[73] Ibid., art. 85 (f)(i).

[74] Ibid., art. 87 (1).

[75] Order No. 101 – Order Regarding Prohibition of Incitement and Hostile Propaganda Actions, August 1967, arts. 1, 3, 10, as amended by Order No. 718 (1977), Order No. 938 (1981), Order No. 1079 (1983), and Order No. 1423 (1995), available at https://bit.ly/2DfDTOA (accessed October 25, 2019).

[76] Ibid., arts. 5, 6.

[77] Ibid., art. 7A.

[78] Ibid., arts. 4, 9.

[79] Ibid., art. 2.

In May 2010, the Israeli army promulgated Military Order 1651, also known as the "Criminal Code," to replace 20 key orders issued between 1967 and 2005. It also references and builds on others, including Military Order 101 and Defense (Emergency) Regulations of 1945.[80] The order criminalizes "incitement and support for a hostile organization," such as through "attempts, orally or otherwise, to influence public opinion in the Area in a manner which may harm public peace or public order," an offense that carries a ten-year prison sentence.[81]

The order further outlines a series of "offenses against authorities of the Area."[82] Beyond such crimes as "assault of a public servant," which carries a ten-year sentence, and "threaten[ing] a soldier," which carries a seven-year sentence, the order includes the vaguely worded offenses of "disturbing a soldier" in "fulfilling his task" or "insult[ing] a soldier" or "offending his honor." [83] The order also authorizes punishment of those who "behave in an insulting manner toward one of the IDF authorities in the Area or toward one of its symbols."[84] It further empowers the Israeli army to declare a "closed [military] zone" and arrest anyone present in the area.[85] According to the order, an "act or omission which entail harm, damage, disturbance or danger to the security of the Area or the security of the IDF," or being "in the proximity of" property belonging to the Israeli army or the state of Israel, could result in life imprisonment.[86] The order does not define what constitutes an assault, threat, interference, disturbance, insult, or offense.

The Defense (Emergency) Regulations of 1945 and Military Orders 101 and 1651 do not offer sufficient clarity to allow Palestinians to know what actions may result in criminal consequences and how to conform their behavior to abide by the law, violating a basic principle under both the law of occupation and international human rights law. The overly broad wording of the orders creates vague and broadly defined criminal offenses and severely limits rights as the baseline, not only when necessary. Concepts such as

---

[80] Order regarding Security Provisions [Consolidated Version] (Judea and Samaria) (Military Order No. 1651), 5770-2009, available at https://bit.ly/2X8PCaJ (accessed October 25, 2019), adopted November 2009, entered into force May 2, 2010.

[81] Ibid., art. 251.

[82] Ibid., "Article C – Offenses against authorities of the Area," https://bit.ly/324750z.

[83] Ibid., arts. 217, 215, 218.

[84] Ibid., art. 219.

[85] Ibid., "Chapter J – Administrative powers," art. 318.

[86] Ibid., art. 222 (a)(b)(d).

"incitement" and "insult[ing] a soldier" are so vaguely defined that individuals cannot reasonably predict whether an action or inaction amounts to a crime.

These orders import some of the language from Article 43 of the Hague Regulations and international human rights law such as "public order" and "safety," but with none of the limits on curbing rights that the legal frameworks provide. The orders are not narrowly tailored, but confer excessive discretion to authorities, creating today clear violations of human rights.

Instead of interpreting the broad language narrowly, the Israeli army exploits the ambiguity, arbitrarily and discriminatorily using criminal law to justify detaining journalists, activists, and other Palestinians for exercising their basic rights.

Even if restrictions on such speech or privacy could be justified under the law of occupation in July 1967, they have lost validity over the half-century that the Israeli army has developed and routinized a sophisticated system to govern the occupied territory. The army should have found a way to ensure national security and public order without effectively stripping Palestinians of their basic rights to free expression, association, assembly, and privacy.

# IV. Right of Peaceful Assembly

More than 50 years since its occupation began, Israel continues to rely on these restrictive military orders to quash demonstrations and arrest organizers, human rights defenders, journalists, and peaceful protesters, including children.[87] Military Order 101 prohibits any gathering of more than ten people in a place "in which a speech is made on a political subject, or which may be construed as political, or to discuss such a subject" without a permit from a military commander.[88] Karin Hibler, an Israeli lawyer who represents Palestinian detainees in the military court system, told Human Rights Watch that she has not heard of a single instance in which Palestinians requested a permit for a demonstration in the West Bank, or of the Israeli army issuing one.[89]

More frequently, the Israeli army will suddenly declare the location of a protest a "closed military zone" and will prosecute Palestinians who do not immediately leave under Military Order 1651, for their involvement in the demonstration. The Israeli army told Human Rights Watch that the military commander has authority to declare an area a "closed military zone" where a "concrete security need, or a concrete need to maintain public order necessitate closing the area." It notes, though, that the commander must "balance the need for security or for maintaining public order against the harm caused to Area residents by the restrictions on freedom of movement, including the effect on the residents' daily lives and occupation."[90]

The Israeli army said that, between July 1, 2014 and June 30, 2019, it prosecuted 4,590 Palestinians for "failure to obey an order regarding a closed military zone." During this time period, military courts convicted 4,519 people of this offense, including some who were indicted prior to July 1, 2014.[91]

---

[87] The Association for Civil Rights in Israel (ACRI), "The Status of the Right to Demonstrate in the Occupied Territories," September 2014, https://bit.ly/2LvIJOz (accessed June 30, 2019).

[88] Order No. 101, art. 1.

[89] Human Rights Watch phone interview with Karin Hibler, April 17, 2019.

[90] Letter from Israeli army to Human Rights Watch, November 18, 2019.

[91] Ibid.

The following two cases illustrate how the Israeli army uses the Defense (Emergency) Regulations and Military Orders 101 and 1651 to restrict the right of Palestinians to peaceful assembly. Both involve Palestinians detained for their involvement in political protests, facing a combination of charges that on their face criminalize peaceful assembly (e.g., "demonstrating without a permit"), those so broadly worded that they open the door to abuse (e.g., "attempt[ing] to influence public opinion in the Area in a manner that may harm public order or safety") and those that relate to cognizable offenses (e.g., "sabotage of an IDF Facility") but are regularly used by the Israeli army to punish opposition to its rule.

## Farid al-Atrash, Bethlehem

On February 26, 2016, Farid al-Atrash, 42, the head of the southern West Bank division of the Independent Commission of Human Rights, a commission charged with monitoring human rights compliance by Palestinian authorities, participated in a protest in Hebron. More than 100 protestors demanded that Israeli authorities reopen al-Shuhada Street, a central artery that the Israeli military has prohibited Palestinians from using for the past 19 years, ostensibly to protect the approximately 700 Israeli settlers who reside in the vicinity.[92] Israel restricts Palestinian movement in Hebron in part through more than 100 physical obstacles, 21 of them permanently staffed checkpoints.[93] These have transformed the once-bustling al-Shuhada street into a ghostly thoroughfare of shuttered windows and anti-Palestinian graffiti.[94]

---

[92] Khulood Badawi, "Yet Another Military Trial in the Occupied Territories," commentary, Human Rights Dispatch, July 16, 2017, https://www.hrw.org/news/2017/07/16/yet-another-military-trial-occupied-territories; B'Tselem, "Hebron City Center," Updated May 26, 2019, https://www.btselem.org/hebron (accessed July 2, 2019).

[93] United Nations Office for the Coordination of Humanitarian Affairs (OCHA), "The humanitarian situation in the H2 area of the Hebron city," April 2019, https://www.ochaopt.org/sites/default/files/h2_spotlight_april_2019.pdf (accessed June 30, 2019).

[94] B'Tselem and Association for Civil Rights in Israel (ACRI), "Ghost Town: Israel's Separation Policy and Forced Eviction of Palestinians from the Center of Hebron," May 2007, https://www.btselem.org/download/200705_hebron_eng.pdf (accessed October 25, 2019); B'Tselem, "Playing the security card: Israeli Policy in Hebron as Means to Effect Forcible Transfer of Local Palestinians," September 2019, https://www.btselem.org/publications/summaries/201909_playing_the_security_card (accessed October 25, 2019).



Farid al-Atrash, a human rights defender detained for four days in 2016 and continuing to face charges in military court more than three years later over his involvement in a protest in Hebron. © 2017 AFP

Al-Atrash told Human Rights Watch that five or six Israeli soldiers arrested him around noon while he participated in the protest and held a sign that read "Open Shuhada Street."[95] A video reviewed by Human Rights Watch shows Israeli soldiers arresting al-Atrash without him physically resisting.[96] Al-Atrash also said that Israeli soldiers used sound bombs and teargas, visible and audible in the video, to disperse protestors. Soldiers handcuffed al-Atrash's hands, shackled his feet, and blindfolded him, he said.

The soldiers moved him to a detention facility in the adjacent Kiryat Arba settlement, where they interrogated him for about an hour about his participation in the protest and presence in a "closed military zone," before transferring him later that day to a detention center in the nearby Gush Etzion settlement bloc, where they held him for five days.

---

[95] Human Rights Watch interview with Farid al-Atrash, Ramallah, November 18, 2018.

[96] "Arrest of lawyer Farid al-Atrash," video clip (Arabic), YouTube, February 26, 2016, https://www.youtube.com/watch?time_continue=10&v=jzT8B37v59g (accessed June 30, 2019).

Military prosecutors charged al-Atrash, as well as Palestinian activist Issa Amro, on five counts stemming from their participation in the protest, according to the indictment reviewed by Human Rights Watch. The charges include "demonstrating without permit" under Military Order 101, and, under Military Order 1651, entering "a closed military zone," "incitement" for "attempt[ing] to influence public opinion in the Area in a manner that may harm public order or safety" through his "inciting" chants and "waving Palestinian Authority flags" and an "Open Shuhada Street" sign, "assault of a soldier" based on "push[ing]" soldiers trying to prevent "protestors from advancing," and "interference with a soldier" for "attempt[ing] to avoid, and even forcibly resist[ing] arrest."

The Ofer military court released al-Atrash, as well as Amro, on bail on March 1, 2016, but their prosecutions continue, more than three-and-a-half years later. Al-Atrash's prosecution violates his right to free assembly, both by directly charging him for participating in a demonstration and indirectly by bringing charges of entering a "closed military zone" and "assault of a soldier," apparently to justify detaining him for protesting, as well as with "incitement" based on the overly broad definition of that offense in the military order.

## Abdallah Abu Rahma, Bil'in

On November 20, 2017, about 10 armed Israeli soldiers raided the house of Abdallah Abu Rahma, 48, in Bil'in, a village west of Ramallah at around 1:30 a.m., and arrested him, with 15 to 20 other soldiers positioned around the house during the arrest, several weeks after he participated in a protest in the village, Abu Rahma told Human Rights Watch.[97] Abu Rahma, a father of four, for years organized weekly protests against Israeli rights abuses in Bil'in and the village of Khan al-Ahmar in his capacity as coordinator for the Popular Committees Against the Wall and Settlements.[98]

---

[97] Human Rights Watch interview with Abdallah Abu Rahma, Ramallah, November 6, 2018.
[98] "About Us," Stop The Wall, https://www.stopthewall.org/about-us (accessed June 30, 2019).



Palestinian activist Abdallah Abu Rahme arrives at Ofer military court near Ramallah in the occupied West Bank for a hearing in a case against him on February 23, 2015. © 2015 AFP

Abu Rahma said that soldiers blindfolded him and handcuffed his hands behind his back, threatening to "make things more difficult" for him if "he continued resisting in Bil'in."[99] They moved him at around 2:30 a.m. to a military base and then to the police station at Sha'ar Binyamin industrial zone, in a settlement southeast of Ramallah, for interrogation, periodically cursing and striking him along the way, he said. Around 1 p.m., an Israeli interrogator started questioning him about his activities with the Popular Committees and his participation in demonstrations. They also asked him about a video on Facebook appearing to show him approach and place a rod in the frame of a metal gate in the separation wall near Bil'in on November 3, 2017. Abu Rahma said he did this to signify his opposition to "Israel's policy of not allowing us to reach our lands behind the wall," but the interrogator accused him of "attacking and ruining military property by trying to open the gate inside the wall."[100] The video footage, reviewed by Human Rights Watch but subsequently removed, showed no serious effort to force open the gate or damage the wall, but rather a symbolic act of defiance against the wall. Abu Rahma said he initially

---

[99] Human Rights Watch interview with Abdallah Abu Rahma, Ramallah, November 6, 2018.
[100] Human Rights Watch phone interview with Abdallah Abu Rahma, August 6, 2019.

answered the officer's questions, but, when the officer started screaming at him, he decided to refuse to answer any questions without his lawyer present for the remainder of the three-hour interrogation.[101]

Later that night, Israeli soldiers transferred Abu Rahma to Ofer military prison southwest of Ramallah. On November 22, 2017, he appeared before a military court in Ofer, which charged him with "sabotage of an IDF facility," and "offense against public order" under Military Order 1651 for "an act or omission which entails harm, damage, disturbance or danger to the security of the Area or the security of the IDF or to the operation, use or security of" installations or equipment belonging to the state or army during the November 3 protest.[102] The judge ordered him released on 5,000 NIS (US$1,400) bail on condition of his "abstention from offenses of interference with public order,"[103] – a condition that the order did not further define – and attendance at subsequent court hearings in his case. The military prosecutor twice appealed his release on bail, but the court upheld it and released him on bail on December 13, 2017. On September 3, 2019, the Ofer military court approved a deal in which Abu Rahma pled guilty, to avoid a potentially longer sentence, to the charge of "sabotage of an IDF Facility" over the incident at the wall and received a 23-day prison sentence, applied to time served, a three-month suspended sentence and a 7,000 NIS (US$1,990) fine.[104]

More than a year prior to this protest, in May 2016, Abu Rahma co-organized a cycling event from Ramallah to Bil'in to mark Nakba Day, the commemoration of the displacement of Palestinians during the establishment of the Israeli state in 1948.[105] Abu Rahma said that, as they approached Bil'in, soldiers began to fire tear gas at the group from 50-100 meters away. A soldier told Abu Rahma that "this is a closed military zone," and Abu Rahma said they would leave, if they stopped firing and gave them the opportunity to do so. Abu Rahma said the firing stopped and they moved, but, 500 meters later, another group of border police officers fired at them. When he again approached soldiers to tell

---

[101] Human Rights Watch interview with Abdallah Abu Rahma, Ramallah, November 6, 2018.

[102] Indictment on file with Human Rights Watch.

[103] Military court of appeals decision on file with Human Rights Watch.

[104] Human Rights Watch phone interview with Abdallah Abu Rahma, September 5, 2019.

[105] Oren Ziv, "Palestinian activist sent to prison for riding a bike in his village," *+972 Magazine,* November 14, 2018, https://bit.ly/2BczH3q (accessed July 2, 2019).

them to stop and respect their rights, he said they struck him repeatedly and arrested him,[106] which video footage reviewed by Human Rights Watch appears to corroborate.[107]

Military prosecutors charged him with entering a "closed military zone" and "disturbing a soldier" under Military Order 1651,[108] and released him on bail 11 days later. In November 2018, the court convicted him on these charges, handing him a four-month jail sentence, ordering him to pay a fine of 2,000 NIS (US$560), and placing him on probation for three years.[109] Abu Rahma appealed the decision in December 2018 and a military court in April 2019 ruled that he had to either serve a five-month sentence or pay a 25,000 NIS (US$7,100) fine in addition to a four-month suspended sentence valid for five years.[110] Abu Rahma paid the fine and the court closed the case.[111]

Military prosecutors in both cases brought overly vague criminal charges — "sabotage of an IDF facility," entering a "closed military zone" and "disturbing a soldier," — apparently to justify detaining him for his activism against restrictive Israeli policies.

Previously, in August 2010, an Israeli military court had convicted Abu Rahma for organizing and participating in illegal demonstrations, inciting protesters to damage the separation barrier, throwing stones at Israeli soldiers, and participating in violent protests. All of the charges stemmed from his participation in peaceful demonstrations against the separation barrier, which Human Rights Watch documented at the time.[112] When he appealed, the appellate court upheld the conviction and increased his prison sentence to 16 months, which he served.

Abu Rahma told Human Rights Watch that the repeated arrests — eight since 2005, largely for involvement in protests — have taken a psychological toll on him and his four children and that he stopped participating in activities in Bil'in. He believes he has "a right" and

---

[106] Human Rights Watch phone interview with Abdallah Abu Rahma, August 29, 2019.

[107] "Bil'in Friday 13.5.2016 demonstration for Nakba Day," video clip, YouTube, May 14, 2016, https://www.youtube.com/watch?v=rFIrVA3jFcY (accessed October 26, 2019).

[108] Indictment and court verdict on file with Human Rights Watch.

[109] Human Rights Watch phone interview with Abdallah Abu Rahma, January 24, 2019.

[110] Court verdict on file with Human Rights Watch.

[111] Human Rights Watch phone interview with Abdallah Abu Rahma, June 23, 2019.

[112] "Israel/West Bank: Jail for Peaceful Protesters," Human Rights Watch news release, January 11, 2011, https://www.hrw.org/news/2011/01/11/israel/west-bank-jail-peaceful-protesters.

"duty" to "defend and protest violations" and continues to participate in protests in other locations.

# V. Right to Freedom of Association

Israeli authorities also rely on broad provisions of military law to ban associations as "hostile organizations," and to detain Palestinians for mere membership in or identification with such groups or entities affiliated with them. The Defense Regulations of 1945 define "unlawful associations" as "any body of persons" which "advocates, incites or encourages" the "overthrow by force or violence," "hatred or contempt of, or the exciting of disaffection," "the destruction of or injury to property" and "acts of terrorism" against the local authorities.[113] Military Order 1651 classifies as a "hostile organization" any "person or any group of persons whose aim it is to harm public security, IDF forces or the public order in Israel or in a held area."[114]

Military Order 1651 authorizes the army to close a "business" or any other "place which the public or part of it frequents" for periods if it has reason to believe that it is "necessary for the maintenance of sound government, public order and for the security of the Area and the IDF."[115] The order imposes charges on any person who violates the order, including employees.

Neither the Defense Regulations of 1945 nor Military Order 1651 set out a formal procedure to challenge the designation of an association as unlawful or a decision to close a business. Some notices to shut down organizations offer the entity the opportunity to file an objection with the military commander, but that process is not governed by law. Palestinians can appeal administrative decisions to the High Court of Justice, but the Court has shown great deference over the years to the position of the state or army.[116]

From the beginning of the occupation in June 1967 through July 2019, the Israeli Defense Ministry had classified 411 organizations as "hostile," "unlawful" or "terrorist"

---

[113] The Defense (Emergency) Regulations, 1945, art. 84.

[114] Military Order No. 1651, art. 238.

[115] Ibid., art. 319.

[116] B'Tselem, "Fake Justice: The Responsibility Israel's High Court Justices Bear for the Demolition of Palestinian Homes and the Dispossession of Palestinians," February 2019, https://bit.ly/349vjOx (accessed October 6, 2019); "The Israeli Supreme Court in the Service of the Occupation," B'Tselem press release, September 5, 2018, https://bit.ly/31LAYIP (accessed October 6, 2019). "This ruling shows once again that those under occupation cannot seek justice in the occupier's courts."

associations.[117] Members of designated organizations can be criminally charged for their membership in or affiliation with the group. Among the organizations so classified are all major Palestinian political parties, including the ruling Fatah party, as well as the Palestine Liberation Organization, a designation that remains in place today despite Israel having signed the Oslo Accords with it in 1993. Israeli authorities have also applied this designation to dozens of charitable organizations and media outlets and used it as a basis to raid their offices, issue closure orders, and carry out arrests.

The Israeli army prosecuted 1,704 people for "membership and activity in an unlawful association" between July 1, 2014 and June 30, 2019, according to data it provided Human Rights Watch. Military courts convicted 1,823 people of this offense during this five-year period, including some who were indicted prior to July 1, 2014.[118]

The following three cases illustrate how the Israeli army curtails the right of Palestinians to free association. All three involve Palestinians detained for "membership and activism in an unlawful association" under the Defense (Emergency) Regulations for association with individuals or groups engaged in political or humanitarian activity that Israel deems a security threat. The cases include an artist detained over his links to youth opposed to Palestinian Authority and Israeli army rule (Hafez Omar), a Palestinian parliamentarian over her political activism for the Popular Front for the Liberation of Palestine (Khalida Jarrar), and an administrator for an established charity that operates in Gaza over allegations of links to the Hamas authorities there (Najwan Odeh).

## Hafez Omar, Ramallah

In the early morning hours of March 13, 2019, Israeli soldiers arrested Hafez Omar, a 36-year-old artist and activist, from his home in Ramallah. His brother Mohammad told Human Rights Watch that Hafez designed posters on Palestinian rights issues, especially as they relate to prisoners, which he posted on Facebook.[119]

---

[117] "List of Declarations and Orders of Terrorist Organizations and Unlawful Associations," Ministry of Defense, http://www.mod.gov.il/Defence-and-Security/Fighting_terrorism/Pages/default.aspx (accessed October 27, 2019).
[118] Letter from Israeli army to Human Rights Watch, November 18, 2019.
[119] Hafez Omar, The Palestine Poster Project Archives, https://www.palestineposterproject.org/artist/hafez-omar (accessed July 3, 2019).

Around 2:45 a.m. that day, Mohammad said about 10 soldiers came to his home to inquire about the whereabouts of Hafez, who they said was "wanted" and a "terrorist." When he declined to tell them, they forced him to accompany them to Hafez's house, down the street, the location of which they seemed to know. Mohammad said that the soldiers spoke to his brother in private there and then took him into custody.[120]

The Palestinian prisoners' rights group Addameer, which represents Hafez Omar in court, said that authorities held him incommunicado for his first seven days of detention[121] and denied him access to a lawyer for 20 days.[122] It said that Israeli authorities have largely held Omar in a detention center in Ashkelon inside Israel, although it moved him to other locations and renewed his detention several times. Omar told Addameer that his interrogations focused "on his artworks and publications on social media, especially those in support of the rights of Palestinian prisoners."[123]

Military prosecutors charged Omar with "membership and activism in an unlawful association" under the Defense (Emergency) Regulations of 1945 and three offenses under Military Order 1651, according to an April 23 indictment reviewed by Human Rights Watch.[124] The indictment claims that Omar for eight years had been a part of al-Hirak al-Shababi, or Youth Movement, which Israel had banned in 2016 as a "terrorist organization" that "acted under the instructions and funding of [the Lebanese party and military group] Hezbollah and Iran," according to a statement from then-Defense Minister Avigdor Lieberman.[125]

The indictment, which Human Rights Watch reviewed, includes no details on al-Hirak al-Shababi, and no evidence of any connection between Omar and Hezbollah or Iran. Instead, the indictment highlights Omar's involvement in several protests in the last eight years, including 2012 and 2013 protests calling for "No to negotiations with Israel. Yes to national

---

[120] Human Rights Watch phone interview with Mohammad Omar, July 1, 2019.

[121] "Israeli Court Extends Interrogation of Hafez Omar Palestinian Organiser and Artist," Addameer press release, March 20, 2019, https://bit.ly/2BPLAvz (accessed July 2, 2019).

[122] "Addameer: The Detention of Activist and Artist Hafez Omar," Addameer press release, April 2, 2019, https://bit.ly/2JlZoDQ (accessed July 2, 2019).

[123] Ibid.

[124] Indictment on file with Human Rights Watch.

[125] Yaakov Lappin, "Liberman Bans Group 'Set Up by Hezbollah and Iran to Attack Israelis'," *Jerusalem Post*, July 11, 2016, https://www.jpost.com/Arab-Israeli-Conflict/Liberman-bans-group-set-up-by-Hezbollah-and-Iran-to-attack-Israelis-460099 (accessed October 17, 2019).

unity [between Fatah and Hamas]"; a 2015 march that involved clashes with Israeli forces; a 2016 demonstration over the killing of a Palestinian activist by Israeli security forces; May 2018 protests against the Palestinian Authority's "sanctions imposed on the Gaza Strip"; hunger strikes and a protest tent set-up in solidarity with Palestinian prisoners; and meetings with other alleged Youth Movement members, including at cafes in Ramallah.

The indictment claims Omar joined the Youth Movement on March 15, 2011. On that date, according to press reports, tens of thousands of Palestinians across the West Bank and Gaza Strip, largely youth activists inspired by political upheavals in Egypt and other Arab countries, and without any discernible central organization, took to the streets "demanding an end to political division and the Israeli occupation."[126] None of the events referenced in the indictment appear to involve violence apart from allegations that he "threw stones at security forces" during several unspecified incidents "over the course of 2015, or around the time." Mohammad, Hafez's brother, said that Hafez has no affiliation with any group.[127] Some analysts have questioned whether the Youth Movement mentioned in the indictment ever existed as an organization.[128]

Prosecutors also charged Omar under Military Order 1651 for "provision of shelter" in 2003-2004, more than 15 years ago, to a man accused of involvement in the killing of Israeli civilians, and "throwing objects toward a person or property," referring to an incident in which Omar allegedly threw stones at the Israeli army during 2015 protests. The charge sheet also includes "contact with an enemy," in reference to Omar allegedly being in contact on Facebook with a Popular Front for the Liberation of Palestine activist in Lebanon, who asked Omar to "transfer to him" ashes from the grave of a friend killed in clashes with Israeli forces. The indictment notes that Omar "came into contact" with the activist "knowing he acts for the enemy."

Charging Omar for his membership in an "illegal organization," independent of any cognizably criminal acts, violates his right to free association. Raising unsubstantiated allegations of stone throwing from more than three years ago and digging up a 15-year-old

---

[126] Harriet Sherwood and Hazem Balousha, "Gaza and West Bank Protests Demand End to Palestinian Divisions," *The Guardian*, March 15, 2011, https://www.theguardian.com/world/2011/mar/15/gaza-west-bank-unity-protests (accessed July 2, 2019).

[127] Human Rights Watch phone interview with Mohammad Omar, July 1, 2019.

[128] Human Rights Watch phone interview with Palestinian political analyst (name withheld), July 2, 2019.

event appear aimed to further punish Omar for his opposition to Israeli military rule in the West Bank.

Omar remains in detention, as of publication. Mohammad said he only managed to visit Omar for the first time on October 7 and that no other family member, as of November 17, had been able to do so.[129]



Following her release in February 2019 from 20 months in administrative detention without trial or charge, parliamentarian Khalida Jarrar speaks to journalists from the Catholic Church in the West Bank city of Ramallah. © 2019 Anadolu Agency/Getty Images

## Khalida Jarrar, Ramallah

Israeli authorities held Khalida Jarrar, a 56-year-old Palestinian parliamentarian, between July 2017 and February 2019 in administrative detention without trial or charge, referencing Military Order 1651 and noting that she is a political activist who "is a threat to security of the area," without further detail.[130] This order came a year after she had spent 14 months in prison after she pled guilty to charges related to her political activism with the Popular

---

[129] Human Rights Watch text message correspondence with Mohammad Omar, October 26, 2019.
[130] Administrative detention orders on file with Human Rights Watch.

Front for the Liberation of Palestine (PFLP), a political group that includes a leftist political party and an armed wing that has attacked Israeli soldiers and civilians. Israel has outlawed the group, including the political party, though it continues to conduct political activities, including standing in Palestinian elections. Israeli authorities have not charged Jarrar with involvement in or any links to any armed attack. In 2006, Jarrar won a seat in the Palestinian Legislative Council on a PFLP list.[131] Her PFLP activism includes attending demonstrations, visiting released prisoners, as well as speeches and interviews calling for the release of prisoners.[132]

Jarrar said that Israeli authorities have since 1988 banned her from travel, with the exception of a three-week trip to Amman for medical reasons in 2010.[133]

In August 2014, the Israeli army handed Jarrar a military "supervision order" instructing her to move to Jericho for a period of six months on the grounds that she constituted a "security threat," based on "intelligence information."[134] Jarrar refused to relocate, remaining in Ramallah where she lived, and held a sit-in protest at the Palestinian Legislative Council headquarters.

On April 2, 2015, Israeli soldiers raided her home in Ramallah before dawn and arrested her. She told Human Rights Watch that the officer who arrested her told her, "You refused to follow the deportation order to Jericho, so I'm coming to arrest you today."[135]

Thirteen days after placing her in administrative detention in HaSharon prison in central Israel, the military prosecution simultaneously brought 12 charges against her,[136] none of which involve any direct call to or involvement in violence.[137] In December, prosecutors amended the indictment to focus on only two charges: "membership in an unlawful

---

[131] "The Second PLC Elections - 2006," Central Elections Commission - Palestine, February 15, 2006, https://bit.ly/2MIdyQT (accessed August 6, 2019).

[132] "Ofer military court reverses judge's decision to release Khalida Jarrar on bail," Addameer press release, May 28, 2016, http://www.addameer.org/news/ofer-military-court-reverses-judge%E2%80%99s-order-release-khalida-jarrar-bail (accessed June 30, 2019).

[133] Human Rights Watch email correspondence with Khalida Jarrar, August 5, 2019.

[134] Supervision order on file with Human Rights Watch.

[135] Human Rights Watch interview with Khalida Jarrar, Ramallah, May 20, 2019.

[136] "Ofer military court reverses judge's decision to release Khalida Jarrar on bail," Addameer press release, May 28, 2016.

[137] Original charge sheet on file with Human Rights Watch.

association" under the Defense (Emergency) Regulations of 1945 and "incitement" under Military Order 1651.[138]

Military prosecutors based the incitement charge on a 2012 speech at a PLFP rally. The indictment accuses Jarrar of speaking "against the 'Israeli occupation' and preaching for the PFLP to 'raise its head' by kidnapping Israeli soldiers for the purpose of negotiation and release of Palestinian prisoners," while standing in front of a banner that called for kidnapping soldiers.[139] The sentencing decision, however, notes that the prosecution faced "difficulties proving guilt" on the charges against her.[140]

Early in the proceedings, the judge ordered Jarrar's release on bail, finding that she did not pose a "security threat" and that the charges related to years-old activities. An appellate military court, though, reversed the decision[141] after military prosecutors appealed the release order and warned that they intended to seek an administrative detention order against Jarrar—that is, an order for her detention without trial or criminal charge—in the event the court released her.[142]

Jarrar told Human Rights Watch that the court proceedings lasted eight months, involving more than 30 sessions. Each session would involve her being away from her cell for 20 hours, much of the time "in the *bosta* [military transport vehicle], with my arms and legs shackled," with sessions sometimes cancelled after the lengthy trip, she said.

Jarrar ultimately pled guilty to two charges, "membership in an unlawful association" and "incitement," as part of a plea deal in return for a 15-month sentence and a 10,000 NIS (US$2,800) fine.[143] Her lawyers said she agreed because of her exhaustion from the protracted proceedings, her lack of faith in the military courts, and the risk of a seven-year

---

[138] Amended indictment on file with Human Rights Watch.

[139] Ibid.

[140] Sentencing decision on file with Human Rights Watch.

[141] "Ofer military court reverses judge's decision to release Khalida Jarrar on bail," Addameer press release, May 28, 2016.

[142] Amira Hass, "Jailed Palestinian MP's Trial Demonstrates How Much the Game Is Fixed," *Haaretz*, December 8, 2015, https://www.haaretz.com/israel-news/.premium-palestinian-mp-trail-shows-game-is-fixed-1.5434256 (accessed June 30, 2019); Interview with Sahar Francis, Director of Addameer, Ramallah, May 30, 2019.

[143] Sentencing decision on file with Human Rights Watch.

sentence if she went to trial.[144] Jarrar maintains her innocence of the incitement charge.[145] The Israeli army released her in June 2016 after she had spent more than 14 months in custody.

Detaining Jarrar solely over her political activism with the PFLP, without charging or convicting her for any act of violence, violates her freedom of association. Reliance on the overly vague definition of incitement in the military order makes Jarrar's prosecution on this charge arbitrary.

Just over a year later, in July 2017, 50 Israeli soldiers rearrested Jarrar at her Ramallah home. This time, they placed her in administration detention without trial or charge. Jarrar said that interrogators again focused on her political activism.

The Israeli army subsequently renewed her administration detention four times, referencing Military Order 1651. It kept the evidence against her secret, following its custom in administrative detention cases, alleging only that Jarrar is a "PFLP activist who is a threat to the security of the area."[146] Jarrar said that she and her legal team boycotted most hearings on her case. She said the military prosecution in several hearings said her electronic devices were being reviewed.

The army released her on February 28, 2019, after a total of 20 months between HaSharon and Damon prisons, but rearrested her on October 31, 2019. She was still in detention as of publication.

## Najwan Odeh, Ramallah

On September 7, 2015 at around 2:30 a.m., more than 50 Israeli soldiers raided the home of Najwan Odeh, 36, in al-Bireh, a town adjacent to Ramallah.[147] Odeh told Human Rights Watch that soldiers searched the house room by room, leaving the house in disarray, and,

---

[144] "LPHR, Addameer and National Lawyers Guild joint statement on the appalling sentencing of leading Palestinian human rights defender, Ms Khalida Jarrar," Addameer, Lawyers for Palestinian Human Rights (LPHR), National Lawyers Guild (NLG) press release, January 4, 2016, https://bit.ly/32M2xDi (accessed August 3, 2019); Human Rights Watch email correspondence with Sahar Francis, June 20, 2019.

[145] Human Rights Watch phone interview with Khalida Jarrar, August 6, 2019.

[146] Administrative detention orders on file with Human Rights Watch.

[147] Human Rights Watch interview with Najwan Odeh, Ramallah, January 29, 2019.

after she confirmed that she worked with Qatar Charity, they arrested her. Israeli forces arrested two other Qatar Charity employees the same day and two in May 2016.[148]

Qatar Charity is a Doha-based nongovernmental organization that supports projects ranging from health and water to education and culture in more than 50 countries worldwide.[149] It has partnerships with Doctors Without Borders, the World Food Program, the Norwegian Refugee Council, the United Nations Children's Fund (UNICEF), the International Organization for Migration (IOM) and the United States Agency for International Development (USAID), among others.[150] Speaking about several organizations including Qatar Charity in January 2017, the spokesman for UN Secretary General Antonio Guterres, Stephane Dujarric, said "the Office for the Coordination of Humanitarian Affairs has over the years built strong partnerships with these organizations based on shared humanitarian principles, which are strictly non-political."[151]

The Israeli army added Qatar Charity to its list of "unlawful associations" in May 2008.[152] In July 2008, the Israeli Defense Ministry declared Qatar Charity and 35 other charities "banned associations in Israel," without specifying whether the prohibition applied to the Occupied Palestinian Territory, on the basis of allegedly providing support to Hamas.[153] In 2011, Israel's Money Laundering and Terror Financing Prohibition Authority identified Qatar Charity as one of 163 organizations whose funds they claimed had links to terrorism and prohibited local organizations from receiving money from them.[154]

---

[148] Ibid.

[149] "Countries We Reach Out To," Qatar Charity, https://www.qcharity.org/en/qa/qatar-charity-offices (accessed October 26, 2019).

[150] "Ghiras," Qatar Charity periodical magazine, Issue No. 16, November 2017, https://bit.ly/2qgw9L2 (accessed September 9, 2019).

[151] "UN: We are not bound by Saudi Arabia's 'terror list'," *Al Jazeera*, June 10, 2017, https://www.aljazeera.com/news/2017/06/bound-saudi-arabia-terror-list-170609184543168.html (accessed September 9, 2019).

[152] "List of Declarations and Orders of Terrorist Organizations and Unlawful Associations," Ministry of Defense, http://www.mod.gov.il/Defence-and-Security/Fighting_terrorism/Pages/default.aspx (accessed October 27, 2019).

[153] "Defense Minister signs order banning Hamas-affiliated charitable organizations," Israel Ministry of Foreign Affairs, July 7, 2008, https://bit.ly/2XanGTT (accessed July 1, 2019).

[154] Chaim Levinson, "Israel Blacklists 163 Foreign Charities Suspected of Supporting Terrorism," *Haaretz*, January 12, 2011, https://www.haaretz.com/1.5106718 (accessed August 6, 2019).

Odeh, though, told Human Rights Watch that Qatar Charity's money did not go to Hamas or the Hamas-led government in Gaza, but rather to administrative costs related to Qatar Charity's office there and to private companies to carry out development projects.[155]

Despite the government ban, Qatar Charity continues to operate in the West Bank and Gaza Strip, as it has since 1996. Israel not only did not shut down Qatar Charity's operations in the West Bank, as it has with other entities it banned, but allowed funding for it into the Gaza Strip as recently as May 2019 for development projects it maintains.[156]

For more than 13 hours after her September 7 arrest, Odeh, who worked for Qatar Charity as the head of administration overseeing human resources, procurement and public relations, said that Israeli forces kept her in a military van handcuffed, shackled and blindfolded.[157] She said she vomited several times and that female soldiers strip-searched her twice.

That night, she arrived at the Kishon detention center in northern Israel, where they strip-searched her again. During the more than two weeks she spent there, Israeli officers from the intelligence services and police repeatedly questioned her about Qatar Charity: its funding, staff members, how they transferred funds to Gaza, the banks they used, and their partner organizations. She said one male interrogator asked her, "You are beautiful, why are you not married yet?"

Eighteen days later, authorities transferred her to HaSharon prison, in Israel. Military prosecutors accused her of "membership and activism in" and "holding office in" an "unlawful association" under the Defense (Emergency) Regulations of 1945 for her involvement in Qatar Charity and with "transfer of enemy funds" under Military Order 973 for receiving and transferring money without a permit. Although Israeli military law requires a permit for funding to enter the Occupied Palestinian Territory, this provision is enforced unevenly, including when Israel permitted funding for Qatar Charity to enter Gaza in May 2019. The indictment, reviewed by Human Rights Watch, lists funds coming to and from the

---

[155] Human Rights Watch phone interview with Najwan Odeh, October 13, 2019.

[156] Tovah Lazaroff, "Qatar Will Allocate $480 Million to the West Bank, Gaza," *Jerusalem Post*, May 8, 2019, https://www.jpost.com/Arab-Israeli-Conflict/gaza-news/Qatar-will-allocate-480-million-for-Palestinians-589015 (accessed September 9, 2019).

[157] Human Rights Watch interview with Najwan Odeh, Ramallah, January 29, 2019.

charity without allegation of any link between the funding flow and violence, terrorism or Hamas, or any activity undertaken by Odeh outside of her work with Qatar Charity. Two and-a-half months later, authorities moved her to Damon prison in Haifa.

Odeh said she attended about 40 hearings between the Petah Tikva court and Ofer and Salem military courts. At the advice of her lawyer following an agreement with authorities, Odeh pled guilty to membership in an "unlawful association" in return for an 18-month prison sentence—essentially time already served—and a one-year probation conditioned on her not "commit[ing] the offense of which she was convicted," effectively a ban on returning to her job, and a 100,000 NIS ($28,000) fine. The Ofer military court accepted her plea on February 8, 2017, finding the punishment "reasonable and balanced," and released her the next day.[158]

By detaining Odeh for her work with an established charity without proving any link to violent or criminal activity, Israel violated Odeh's right to freedom of association. Odeh said that she is "still looking for answers" about why the Israeli army arrested her and just wants her "life to go back to normal."

---

[158] Sentencing decision on file with Human Rights Watch.

# VI. Right to Freedom of Expression

Israeli authorities have arrested scores of activists and ordinary Palestinians for exercising their right to peaceful expression. Military Order 1651 prohibits "attempts, orally or in another manner, to influence public opinion in the Area in a manner which may harm public peace or public order," classifying such speech as "incitement" that carries a 10-year prison sentence.[159]

In a letter to Human Rights Watch, the Israeli army said that it prosecuted 358 people for "incitement" between July 1, 2014 and June 30, 2019 and that military courts convicted 351 of them (98%).[160]

In recent years, Israeli authorities have increasingly focused on what they deem "incitement" on social media platforms, which they say contributed to a wave of stabbings and other violent acts that began in October 2015 and that were carried out by individuals unaffiliated to any known armed group. In July 2018, Public Security Minister Gilad Erdan told the Associated Press that Israeli authorities had foiled over 200 Palestinian attacks through social media monitoring.[161] He further noted that his ministry had assembled a team to comb through an "ocean of data" on social media and develop predictive algorithms to determine whom to target. The Palestinian prisoner rights group Addameer reported 650 arrests for social media posts in 2017 and 2018, on par with numbers reported in the Israeli press.[162]

Israeli authorities, though, have not disclosed how they program their systems to make determinations of who poses a future threat, or how they use these determinations to

---

[159] Military Order No. 1651, art. 251.

[160] Letter from Israeli army to Human Rights Watch, November 18, 2019.

[161] Josef Federman, "Israel: Social Media Monitoring Nabs Would-Be Attackers," *Associated Press,* June 12, 2018, https://www.apnews.com/c573e9c93d8544209a52baed19be7984 (accessed August 7, 2019).

[162] Human Rights Watch phone interview with Sahar Francis, Director of Addameer, July 3, 2019. Amos Harel, "Israel Arrested 400 Palestinians Suspected of Planning Attacks After Monitoring Social Networks," *Haaretz,* April 18, 2017, https://bit.ly/2J50i9P (accessed July 1, 2019): finding in the span of just over a year that predictive policing methods led Israeli authorities to arrest more than 400 Palestinians and to turn over a similar number to the Palestinian Authority for arrest; Orr Hirschauge and Hagar Shezaf, "Revealed: How Israel Jails Palestinians Because They Fit the 'Terrorist Profile'," *Haaretz,* May 31, 2017, https://bit.ly/2Xc1Lfe (accessed September 17, 2019): finding that between October 2015 and the end of 2016, Israeli military prosecutors brought 160-170 incitement cases concerning social media before military courts.

detain Palestinians. It is also unclear whether or how Israel restricts monitoring to ensure it is strictly necessary and proportionate to achieving a legitimate aim, as required under international human rights law.

The three cases below illustrate how the Israeli army has prosecuted Palestinians for social media activity and other expression. All three involve efforts to characterize as "incitement" or support for terrorism, both of which can connote cognizable offenses, speech that opposes, and may incite opposition to, Israeli policies, but does not do so in a way that poses any imminent threat of violence, as international law requires. These cases involve Facebook posts and a livestream of an encounter with Israeli soldiers. Two cases involve Palestinian journalists accused of incitement and support for terrorism over their reporting. The Palestinian Center for Development and Media Freedoms (MADA) documented 41 arrests of journalists and two media institutions shuttered by Israeli forces in 2018,[163] and 33 arrests of journalists and 17 media institutions closed in 2017.[164]

In addition to those charged based on specific posts, a military prosecutor interviewed by *Haaretz* said that social media posts resulted in the administrative detention of scores of Palestinians without trial or charge,[165] which four lawyers who have represented Palestinians in military court system and a legal researcher who has worked on administrative detention affirmed to Human Rights Watch.[166]

As part of its efforts to regulate speech online, Israeli authorities also encouraged Facebook and other social media providers to delete content on their platform. The Israeli police said in a letter to Human Rights Watch that it directly notifies social media companies about posts "only in exceptional circumstances and with respect to serious criminal offenses, but not in cases in which posts do not amount to offenses." The police

---

[163] Palestinian Center for Development and Media Freedoms (MADA), 2018 Annual Report, https://bit.ly/2RPH6MP (accessed July 1, 2019).

[164] MADA, 2017 Annual Report, https://www.madacenter.org/files/image/editor/annualrepE2017(1).pdf (accessed July 1, 2019).

[165] Orr Hirschauge and Hagar Shezaf, "Revealed: How Israel Jails Palestinians Because They Fit the 'Terrorist Profile'," *Haaretz,* May 31, 2017, https://bit.ly/37Z2OFG (accessed December 2, 2019).

[166] Human Rights Watch phone interview with legal researcher in Ramallah (name withheld), April 24, 2019; Human Rights Watch phone interview with Gaby Lasky, lawyer, April 29, 2019; Human Rights Watch phone interview with Lea Tsemel, lawyer, May 15, 2019; Human Rights Watch phone interview with Eitay Mack, lawyer, May 16, 2019; Human Rights Watch phone interview with Aram Mahameed, lawyer at Adalah, May 23, 2019.

noted that it "does not instruct companies to remove posts, but brings posts to their attention and consideration."[167]

Israel's Justice Minister said, meanwhile, that the Israeli State Attorney's Office submitted 12,351 requests to various social media companies in 2017 to "remove content, restrict access and filter search results in respect of forbidden contents." She noted that 99% of content related to "terrorist activity and support of terrorism" or "incitement to terrorism, racism and violence and also the threat to commit terrorism," and that social media companies "fully complied" with 85% of its requests and "partially complied" with 3.5%.[168] According to the Ministry of Justice, of the total 12,531 requests, about 11,754 were submitted to Facebook, 517 to YouTube and the remainder to Google, Twitter and others.[169] The State Attorney's Office reported making 14,283 requests related to social media content in 2018.[170]

In a letter to Human Rights Watch, Facebook explained that it first assesses whether content reported by governments complies with its own Community Standards, which apply globally. When it determines that the content complies with these Standards, it reviews whether the request for removal is legally valid. If the request is "overly broad," "inconsistent with international norms," or not valid under local law, it will "request clarification or take no action."

When it comes to enforcement of Community Standards, Facebook does not provide a geographic breakdown of content it has removed under these Standards, or the proportion of removals that it knows to be linked to a government request. These Standards dictate that Facebook "remove content that glorifies violence or celebrates the suffering or

---

[167] Letter from National Public Complaint Officer and Freedom of Information Officer Assistant, Israel Police, to Human Rights Watch, August 28, 2019.

[168] "Minister of Justice Ayelet Shaked," Israel Ministry of Foreign Affairs, March 20, 2018, https://bit.ly/2FNr7u0 (accessed July 3, 2019). See also "Social media giants continue to collaborate with Israel's illegal 'Cyber Unit'," Adalah press release, December 19, 2018, https://www.adalah.org/en/content/view/9652 (accessed July 1, 2019); "Israel's 'Cyber Unit' operating illegally to censor social media content," Adalah press release, September 14, 2017, https://www.adalah.org/en/content/view/9228 (accessed July 1, 2019).

[169] Ministry of Justice, Commissioner of Public Information (Freedom of Information), May 31, 2018, https://foi.gov.il/sites/default/files/130-18%20פרסום%20לפרסום%20הבושת.pdf (Hebrew) (accessed August 6, 2019).

[170] Ministry of Justice, Office of the State Attorney, 2018 Annual Report, September 11, 2019, https://bit.ly/384H1Nb (accessed December 5, 2019).

humiliation of others,"[171] as well as "content that expresses support or praise for groups, leaders or individuals involved in [terrorist activity]."[172] It further notes that it does not allow "terrorist organizations and terrorists" to "maintain a presence" on its platform. Facebook also said in its letter that it abides by the US Foreign Terrorist Organization list,[173] which includes political movements that also have armed wings like the Popular Front for the Liberation of Palestine (PFLP) and Hamas.[174]

In its public reporting on content restrictions in Israel based on local law, Facebook said it restricted access in Israel to 4,451 pieces of content, mostly related to "Holocaust denial," in response to requests from the Israeli government based on Israeli law for the five-year period between July 1, 2014 and June 30, 2019.[175]

## Nariman Tamimi, Nabi Saleh

On December 19, 2017, Israeli border police arrested Nariman Tamimi, 43, at the Binyamin police station, in a settlement near Ramallah, where she had gone after Israeli forces arrested her then-16-year-old daughter Ahed during a night raid at their home in Nabi Saleh village, northwest of Ramallah.

---

[171] "Violence and graphic content," Facebook Community Standards, https://www.facebook.com/communitystandards/graphic_violence (accessed November 27, 2019).

[172] "Dangerous individuals and organisations," Facebook Community Standards, https://www.facebook.com/communitystandards/dangerous_individuals_organizations (accessed November 27, 2019)

[173] Letter from Facebook to Human Rights Watch, November 6, 2019.

[174] "Foreign Terrorist Organizations – Bureau of Counterterrorism," U.S. Department of State, https://www.state.gov/foreign-terrorist-organizations/ (accessed November 27, 2019).

[175] "Israel," Content Restrictions, Facebook Transparency Report, July 2013 – June 2019, https://transparency.facebook.com/content-restrictions/country/IL (accessed November 27, 2019).



Nariman Tamimi, right, with her husband Bassem and her daughter Ahed, at an Israeli checkpoint near the village of Nabi Saleh in the central West Bank, on July 29, 2018 following her and Ahed's release from seven months in prison after they pled guilty to charges following a confrontation between Ahed and a soldier that Nariman livestreamed on Facebook in July 2018. © 2018 Anadolu Agency/Getty Images

Four days earlier, on December 15, an Israeli soldier had fired a rubber-coated bullet that hit the face of, and severely wounded, Nariman's 15-year-old relative, Muhammad Tamimi, in Nabi Saleh during a protest in the village against US President Trump's recognition of Jerusalem as Israel's capital.[176] Later that day, a confrontation broke out between Israeli soldiers stationed in Nariman's front yard and Ahed and Nariman's 21-year-old relative Nour, which Nariman livestreamed on Facebook. The video, showing Ahed pushing and slapping the soldiers, went viral and attracted media attention.

Nariman, formerly a field researcher with the Palestinian rights group Women's Centre for Legal Aid and Counselling and a member of the coordinating committee from the Popular Committee Against the Wall and Settlements in Nabi Saleh, told Human Rights Watch that

---

[176] Bill Van Esveld, "Israeli Prosecutors Throw Book at Palestinian Child Protestor," commentary, Human Rights Dispatch, January 14, 2018, https://www.hrw.org/news/2018/01/14/israeli-prosecutors-throw-book-palestinian-child-protestor. Mohammad was in a coma for four days and underwent two operations to remove bullet fragments lodged in the back of his brain after he was shot at close range by Israeli forces. Tessa Fox, "Shot in the head and arrested, Mohammed Tamimi still in high spirits," *Middle East Eye,* February 26, 2018, https://bit.ly/2GMAuKH (accessed August 6, 2019).

she had hoped at the police station to attend the interrogation that she anticipated Ahed would face. Instead, officers took her to a separate room and interrogated her about the video she had livestreamed. She said that because they refused to allow her to speak to her lawyer, she opted not to answer any questions. She said that officers told her that her live filming constituted incitement, since it amounted to "telling people to come and resist the Israeli army in that exact moment," and that she, too, was under arrest. Interrogators also pressed her regarding her Facebook profile picture, a picture of her brother whom Israeli forces had killed in 2012, telling her that they considered posting pictures of Palestinians killed by Israeli forces as "incitement."[177]

After interrogating her for more than three and-a-half hours, officers took Nariman to a room with Ahed, but forbade them to speak with each other, she said. Later that night, soldiers transferred them to HaSharon Prison, inside Israel, where they arrived around midnight, and separated them in the prison.[178]

On December 20, the Israeli army also arrested Nour Tamimi. Following the arrests, Israel's then-Education Minister Naftali Bennett said that the Tamimis "should finish their lives in prison,"[179] and then-Defense Minister Avigdor Lieberman called for "severe" punishment "to serve as a deterrent" for others.[180]

Officers interrogated Nariman three other times, each time returning to her "incitement." She said they also asked her about her Facebook posts, some dating as far back as seven years, of Palestinians who carried out attacks against Israelis or were killed by Israeli forces. She recalled one instance where they asked about a 2017 post in which she shared a screenshot of a post by a girl killed by Israeli forces as she tried to carry out a stabbing attack.[181] The girl had written, "Rise up and martyr yourself, oh God, rise up and carry out operations," to which Nariman posted the comment, "These are the words of the martyr

---

[177] Human Rights Watch Interview with Nariman Tamimi, Nabi Saleh, November 7, 2018.

[178] Ahed was detained in the children's section of the prison, her lawyer told media. Jaclynn Ashly, "Ahed and Nariman Tamimi's detentions extended," *Al Jazeera*, December 26, 2017, https://bit.ly/31PMMKa (accessed October 26, 2019).

[179] Jack Khoury and Yaniv Kubovich, "Israeli Army Arrests Palestinian Teenage Girl Who Slapped Soldiers; 'She Should Finish Her Life in Prison'," *Haaretz,* December 20, 2017, https://www.haaretz.com/israel-news/idf-arrests-palestinian-teen-girl-who-slapped-soldiers-1.5629071 (accessed July 1, 2019).

[180] Lilach Shoval, "Punishment for Assaulting Soldiers: Restrictions on the Family of Ahed Tamimi," *Israel Hayom,* January 10, 2018, https://www.israelhayom.co.il/article/527343 (Hebrew) (accessed August 29, 2019).

[181] Human Rights Watch phone interview with Nariman Tamimi, June 24, 2019.

Fatima [Hajaj]. She couldn't betray those in the resistance, so she responded in her own way."[182]

On January 1, 2018, Ofer military court charged Nariman with "aggravated assault of a soldier," "interference with a soldier," and multiple counts of "incitement" under Military Order 1651, based on the December 15 events, according to the original indictment reviewed by Human Rights Watch. The first two counts allege that Nariman "shout[ed at] and push[ed] the two soldiers." Nariman denies this accusation, stating that she filmed the entire encounter on her phone. To substantiate one of the incitement counts, the original indictment highlights her livestreaming the event on her Facebook page, claiming Nariman "attempted to influence public opinion in the Area in a manner that may harm public order and safety and made a direct call to commit terrorist attacks." The video footage, reviewed by Human Rights Watch, involves no such call or use of violence by Nariman.[183] The indictment also does not quote anything that Nariman herself said during the livestream, but notes that it was "viewed by thousands of users, shared by dozens of users, received dozens of responses and many dozens of likes."[184]

The indictment also includes a charge of "offenses against public order" for Nariman's actions during an army raid near her house on December 8, stating that in her livestream event, she called on Ahed during an encounter with soldiers at their house to "not let them in," "kick them out," and "call the boys and tell them they came up through here," and remarked after the soldiers left that "the boys saw them" and "the stones are coming at them." The livestream, reviewed by Human Rights Watch, does show Nariman making these statements. The indictment also alleges that, on the same day, Nariman spat on a soldier, which the video appears to also show. It also charges her with "incitement" over three Facebook posts from between May 7 and June 17, 2017, including the post about Fatima Hajaj, a picture of a man holding stones with her comment calling him a martyr and saying "Rejoice, for you have sacrificed your soul for them," and a post about an attack that killed a soldier and three Palestinian assailants, proclaiming "[t]he three died as lions."

---

[182] Nariman Tamimi's Facebook page, https://bit.ly/2Xl39dG (accessed July 1, 2019).

[183] Ibid., https://bit.ly/2pXYoxC (accessed October 26, 2019).

[184] Charge sheet on file with Human Rights Watch.

Prosecutors also charged Ahed with 12 accounts of "threatening a soldier," "aggravated assault of a soldier," "interference with a soldier," "offences against public order," "throwing objects at a person or property," and "incitement." The court refused to release her on bail.[185] The prosecutors charged Nour Tamimi with "aggravated assault of a soldier" and "interference with a soldier." The court ordered her released on 5,000 NIS (US $1,450) bail on January 5, 2018.

On March 21, 2018, Nariman agreed to plead guilty to a subset of charges under a revised indictment, one that included incitement based solely on the December 15 Facebook livestream, "aiding in the assault of a soldier" over the December 15 events and "interference with a soldier" based on the December 8 livestream. The court sentenced her to nine months in prison, including the four months she had already served, and to pay a 5,000 NIS (US $1,450) fine.

Ahed, meanwhile, agreed to a guilty plea, whereby she would serve eight months in prison, including the four months she had already served, and to pay the same fine. Nariman told Human Rights Watch that she agreed to this plea deal because she faced multiple years in prison "when all I did was take a video."[186]

The court agreed for Nariman to pay another 1,000 NIS (US$280) in lieu of serving an extra month's sentence so she and Ahed could be released on the same day. On July 29, 2018, Israeli forces released both.

Some of Nariman's Facebook posts comment favorably on Palestinians who have violently attacked Israelis. However, this commentary does not constitute incitement to imminent violence. In any event, in the revised indictment, military prosecutors dropped the incitement charges based on Facebook posts and retained only those stemming from the livestream. The context and form of the livestream make clear that it does not come close to constituting incitement to violence and, in any event, the charges did not specify which words in particular amounted to incitement.

---

[185] For more information on Ahed Tamimi's detention: Bill Van Esveld, "Palestinian Girl's Detention Raises Rights Concerns," commentary, Human Rights Dispatch, February 12, 2018, https://www.hrw.org/news/2018/02/12/palestinian-girls-detention-raises-rights-concerns; Bill Van Esveld, "Israeli Prosecutors Throw Book at Palestinian Child Protestor," commentary, Human Rights Dispatch, January 14, 2018, https://www.hrw.org/news/2018/01/14/israeli-prosecutors-throw-book-palestinian-child-protestor.

[186] Human Rights Watch phone interview with Nariman Tamimi, June 24, 2019.

## Alaa al-Rimawi, Ramallah

In the early morning of July 30, 2018, Israeli soldiers arrested from his home Alaa al-Rimawi, the 40-year-old director in the West Bank of al-Quds TV Channel, which is considered pro-Hamas. The same night, Israeli forces arrested three other Al Quds TV journalists, Muhammad Alwan and Qutaiba Hamdan from their homes in Ramallah, and photographer Housni Injas in his village Kharbatha al-Misbah, west of Ramallah.[187] They also arrested two other journalists: Mohammad Anwar Mouna, who works with a different outlet considered sympathetic to Hamas, and also manages a local radio station, and Lama Khater, a freelancer.[188]

Earlier that month, on July 8, Israeli Defense Minister Avigdor Lieberman had announced a ban on Al Quds Channel, which is licensed in London and headquartered in Beirut, with offices in Turkey, Jordan and France, from operating in Israel, although he never announced a ban on its operations in the West Bank. He declared that "the al-Quds station is a propaganda wing of Hamas, representing a central platform for distributing the terrorist organization's messages," according to a Defense Ministry statement.[189]

The channel works with local production companies, sometimes relying on them for content, facilities, studios and camera crews. Less than a year earlier, in October 2017, the Israeli army had raided the offices of one such company, PalMedia, and issued a closure order, claiming it engaged in "incitement to terror," which the army said "leads directly to terror attacks."[190] On July 8, 2018, the Palestinian Center for Development and Media Freedom (MADA) reported that Israeli authorities summoned several members of another production company inside Israel for questioning and instructed them to end collaboration with Al Quds.[191] The lawyer for the production company told the Israeli newspaper *Haaretz* that the ban announced by the Defense Ministry applied only inside Israel and would not

---

[187] Human Rights Watch interview with Alaa al-Rimawi, Ramallah, September 23, 2018.

[188] Oren Persico, "Israel arrests six Palestinian journalists for 'incitement'," *+972 Magazine*, August 6, 2018, https://972mag.com/israel-arrests-six-palestinian-journalists-for-incitement/137093/ (accessed July 1, 2019).

[189] Judah Ari Gross and Alexander Fulbright, "Israel puts Palestinian TV station on terror blacklist," *The Times of Israel*, July 9, 2018, https://www.timesofisrael.com/israel-puts-palestinian-tv-station-on-terror-blacklist-for-hamas-link/ (accessed July 1, 2019).

[190] Gili Cohen and Jack Khoury, "Israeli Army Raids Multiple Palestinian Media Outlets Across West Bank," *Haaretz,* October 18, 2017, https://bit.ly/325WcSW (accessed July 1, 2019).

[191] "MADA" denounces the banning of "Al-Quds" TV and the persecution of its Staff by Israel," MADA press release, July 10, 2018, https://www.madacenter.org/en/article/1141/ (accessed July 1, 2019).

stop them from broadcasting in the West Bank and Gaza Strip.[192] Al-Rimawi's lawyer, Nasser al-Nubani, told Human Rights Watch that the army never publicly announced or posted notice on its website of a ban on the channel operating in the West Bank.[193]

On July 30, 2018 ,more than 20 soldiers raided al-Rimawi's home at around 3:00 am, while another 30 to 40 soldiers surrounded the building, he told Human Rights Watch. The soldiers searched his home, confiscating his work car, cameras, laptops, and press card. The soldiers caused a commotion that frightened his five children, he said. The soldiers blindfolded and handcuffed him and took him into custody.

Israeli soldiers transferred al-Rimawi to the Ofer Interrogation Center near Ramallah and, after leaving him for about six hours without questioning him, an officer who introduced himself as being from the Shabak, the Israeli Security Agency (or Shin Bet), told al-Rimawi that they had arrested him for his work with "a channel that incites." The officer brought hundreds of photos, some aerial, of al-Rimawi working in the field and said that he worked with a "banned" outlet.[194]

Al-Rimawi said that Israeli officers interrogated him over seven sessions, some lasting up to six hours. In addition to questions about Al Quds' legal status, officers probed possible links to Hamas, Islamic Jihad and Iran. They also asked him about his Facebook posts, in particular fixating on his use of the word "martyrs" when referring to Palestinians killed by Israel and of the word "raids" when referring to incidents where the Israeli army entered the Al-Aqsa mosque compound. The interrogator then showed him an Al Quds TV news segment on Ahmed Jarrar, who was accused of shooting an Israeli settler and was himself killed by Israeli forces in February 2018. [195] Interrogators accused the channel of "glorifying" and "praising" Jarrar. Al-Rimawi said he objected, pointing out that the report included the Israeli official point of view that Jarrar was a "terrorist." His last two

---

[192] Jack Khoury, "Israel Bans Hamas-affiliated Palestinian TV Channel," *Haaretz*, July 9, 2018, https://www.haaretz.com/israel-news/.premium-israel-bans-hamas-affiliated-palestinian-tv-channel-1.6249941 (accessed July 17, 2019).

[193] Human Rights Watch phone interview with Nasser al-Nubani, January 24, 2019.

[194] Human Rights Watch interview with Alaa al-Rimawi, Ramallah, September 23, 2018.

[195] Linah al-Saafin, "Israel kills Palestinian after month-long manhunt," *Al Jazeera*, February 6, 2018, https://www.aljazeera.com/news/2018/02/israel-kills-palestinian-month-long-manhunt-180206091847290.html (accessed July 1, 2019).

interrogation sessions focused on the Fatah-Hamas split and the political situation in the West Bank and Gaza, al-Rimawi said.

Al-Rimawi, who declared a hunger strike upon his arrest and maintained it for nine days, said he appeared on August 2 along with his colleagues before the Ofer military court, which extended their detention for a week.[196] Court documents reviewed by Human Rights Watch indicate that prosecutors were investigating a possible charge of involvement in an "unlawful association" under the Defense (Emergency) Regulations of 1945.[197] On August 9, the court ordered al-Rimawi and his colleagues released, but the prosecution appealed and an appellate military court permitted a seven-day extension of al-Rimawi's detention while upholding the release of his colleagues.[198]

On August 15, a judge ordered al-Rimawi's release on bail on grounds that "it was doubtful whether the al-Quds channel, managed by the Respondent, could be connected, as alleged, to the Hamas organization" and that al-Rimawi "did not know, on the relevant date, that the channel had been declared an unlawful association."[199] The military prosecution appealed the decision, according to al-Rimawi and court documents reviewed by Human Rights Watch.

On August 20, an appellate military court ordered al-Rimawi's release on 10,000 NIS(US$2,800) bail, saying that "the declaration of the channel as an unlawful association was not properly published," while encouraging further "examination" into the unlawful association charge. The judge further conditioned his release on a two-month ban on "publication of content on social or any other communication network, including broadcasting, publishing, editing and creating content aforesaid," a prohibition on leaving Ramallah without the court's approval, and attendance at court hearings, according to court documents reviewed by Human Rights Watch. Al-Rimawi said the prohibition on leaving Ramallah lasted one year. An officer further warned al-Rimawi not to speak about

---

[196] "Prisoner's Club: Israeli court extends detention of four journalists for investigation," (Arabic), *Palestinian News and Information Agency (Wafa)*, August 2, 2018, http://www.wafa.ps/ar_page.aspx?id=w388Fza826929642297aw388Fz (accessed July 1, 2019).

[197] Military Court of Appeals verdict on file with Human Rights Watch.

[198] "[Israeli] Occupation court extends journalist al-Rimawi's detention and releases four others on conditions," (Arabic), *Wafa*, August 9, 2018, http://www.wafa.ps/ar_page.aspx?id=VeV5nta827290356684aVeV5nt (accessed July 1, 2019)

[199] Military Court of Appeals verdict on file with Human Rights Watch.

his arrest or to give any media interviews or statements about it," al-Rimawi said. The Israeli army released al-Rimawi that night.[200]

On December 31, 2018, Israeli soldiers raided al-Rimawi's home again, confiscated his laptop, three phones and 7,000 NIS (US$1,960) in cash, he told Human Rights Watch.[201] In mid-January 2019, prosecutors closed the case against al-Rimawi without bringing formal charges. The Israeli army returned some of al-Rimawi's equipment badly damaged, he said. He said they have yet to return his 10,000 NIS (US$2,800) bail.[202]

Al-Rimawi's arrest and the confiscation of his equipment on the grounds of his affiliation with a pro-Hamas media outlet, without providing evidence that his speech constituted incitement to imminent violence, violates his right to freedom of association and expression, even if, in the end, a military court exonerated him.

## Manbar al-Huriyya Radio, Hebron

On August 30, 2017, the Israeli army raided Manbar al-Huriyya Radio, affiliated with the Fatah political party, in Hebron and issued a six-month closure order. Citing Military Order 1651 and the Defense (Emergency) Regulations of 1945, the order, reviewed by Human Rights Watch, claims that the station "carried out operations and contributed to the incitement of terror attacks that affect security." A notice attached to the order and dated August 21 states that businesses must refrain from "extend[ing] a hand in support of terrorism," but neither the order nor the notice includes any details about the materials or acts that constitutes incitement.[203]

The radio station's chairman, Ayman al-Qawasme, told Human Rights Watch that authorities never provided station staff with further details. He said that Israeli forces had raided the station four prior times, often causing damage and confiscating equipment or money.[204] The army's closure of the station on multiple occasions on the basis of sweeping

---

[200] Human Rights Watch phone interview with Alaa al-Rimawi, June 24, 2019.

[201] Ibid.

[202] Ibid.

[203] Closure order on file with Human Rights Watch; Military Order No. 1651; Order regarding Closure of Place, August 21, 2017.

[204] Human Rights Watch phone interview with Ayman al-Qawasme, January 23, 2019.

allegations -- without any judicial process or producing evidence to substantiate the claims violates the rights of the staff to freedom of expression and association.

During the August 30 raid, al-Qawasme said, soldiers damaged furniture and other items, and confiscated equipment, including transmitters, cameras, computers and telephones. Al-Qawasme estimated the monetary damage at between US$400,000 and $500,000. As they left, soldiers sealed the door of the station to prevent staff from entering.[205]

The next day, al-Qawasme appeared in a video, reviewed by Human Rights Watch, in which he rejected the charges and "challenge[d] the Israeli occupation to come and prove where this terrorism, where this incitement is."[206] He further criticized Palestinian President Mahmoud Abbas and then-Prime Minister Rami Hamdallah for failing to protect Palestinians in areas they control and calling for their resignation. Several days later, the PA Preventive Security agency in Hebron arrested him, holding him for four days and charging him with causing "sectarian strife."[207]

On February 14, 2018, the station resumed operations after the closure order expired. However, as of October 2019, the Israeli army had not returned the confiscated equipment.[208]

---

[205] Human Rights Watch interview with Ayman al-Qawasme, Hebron, October 21, 2017.

[206] "Watch: The reaction of Mr Ayman al-Qawasme to the closure of Manbar al-Huriyya in Hebron," (Arabic), video clip, YouTube, August 31, 2017, https://www.youtube.com/watch?v=mvv5iROIF2U (accessed July 17, 2018).

[207] Human Rights Watch interview with Ayman al-Qawasme, Hebron, October 21, 2017.

[208] Human Rights Watch phone interview with Ayman al-Qawasme, October 21, 2018.

# Recommendations

## To the State of Israel

- Grant Palestinians living in the occupied West Bank full protection of the rights guaranteed to all people under international human rights law, using as a benchmark the rights it grants Israeli citizens, as well as the protections they are owed under international humanitarian law.
- Accept the applicability of international human rights treaties and law to the Occupied Palestinian Territory in subsequent reviews before United Nations treaty bodies.
- Deposit a note with the International Covenant on Civil and Political Rights clarifying that it considers that the Convention applies to its actions in the Occupied Palestinian Territory.

## To states and international organizations

- Demand that Israel grant Palestinians full protection of all their human rights, using as a benchmark the rights it grants Israeli citizens, and use international human rights law and standards, in addition to the protections afforded by international humanitarian law, as a primary basis to evaluate Israel's policies towards Palestinians in the Occupied Palestinian Territory.
- Highlight the impact of restrictive Israeli military orders on Palestinians in the West Bank through a civil rights framework.
- Consider including calls for Israel to grant Palestinians civil rights at least equal to those it grants its own citizens in publications, reports and policy positions and to assess Israel's conduct on this basis.

## To the Israeli army

- Cease arresting and detaining people for their nonviolent exercise of their rights to free assembly, association and expression.
- Repeal Military Orders 101 and 1651 and refrain from imposing any new criminal regulations unless the offenses are defined in a clear, narrow, and specific manner and are consistent with international human rights law.

- Monitor, aggregate, store, or search online speech only when a clear, specific, publicly available legal basis for such activities exists, and ensure that individuals have sufficient information about these activities to seek redress for abuses. Restrict such activities to what is strictly necessary and proportionate for achieving a legitimate aim.
- Provide information about any criteria used to analyze individuals' social media posts and other online activities.

## To Israeli military prosecutors

- Stop charging persons under the Defense (Emergency) Regulations of 1945; if there are grounds to suspect them of committing a recognizable offense, charge them under regulations that are clear, narrow and specific and consistent with international human rights law.

## To the Israeli Knesset

- Enact legislation compelling law enforcement and intelligence bodies to disclose information about their use of social media monitoring, including the types of information collected by these methods, how such information is analyzed to make determinations about an individual's likelihood of committing violence, and the safeguards in place (if any) to prevent or mitigate inaccurate determinations (for example, information about how the authorities corroborate these determinations).
- Enact legislation restricting the ability of law enforcement and intelligence bodies to gather, store, and data-mine social media accounts without a warrant or in an insecure or discriminatory manner.

## To social media companies and internet service providers

- Scrutinize and disclose the susceptibility of platforms and users' online speech to indiscriminate or otherwise potentially rights-violating monitoring or aggregation by governments, and create rights protections accordingly.
- Review government requests to restrict user content, including from Israeli and Palestinian authorities, for compliance with domestic law and international human

rights law, and take steps to prevent or mitigate the impact of these requests on the exercise of freedom of expression and the right to privacy.

- Allow individuals who face risk of reprisal for their peaceful expression on social media to use pseudonyms on your platforms.

# Acknowledgements

Omar Shakir, Israel and Palestine Director at Human Rights Watch, was the lead researcher and author of this report. Zena Al Tahhan, research assistant for the West Bank and East Jerusalem, Anan AbuShanab, former research assistant for the West Bank, Emilie Max, consultant for Human Rights Watch, and Khulood Badawi, Israel and Palestine consultant at Human Rights Watch, contributed research and writing.

Sari Bashi, former Israel and Palestine Advocacy Director at Human Rights Watch, and Sarah Leah Whitson, Executive Director of Human Rights Watch's Middle East and North Africa division, led the development of the legal analysis underpinning the report. Eric Goldstein, Deputy Director of Human Rights Watch's Middle East and North Africa division, served as the report's primary editor and Clive Baldwin, senior legal advisor at Human Rights Watch, provided legal review.

Tom Porteous, Deputy Program Director at Human Rights Watch, Bill Van Esveld, Associate Director in Human Rights Watch's Children's Rights Division, Amos Toh, senior researcher on artificial intelligence and human rights at Human Rights Watch, and Sarah St. Vincent, former researcher and advocate on national security, surveillance, and domestic law enforcement for the US program at Human Rights Watch, also edited the report.

Remy Arthur, photo and publications associate at Human Rights Watch, helped prepare the report for publication. Maya Johnston assisted with translating military courts documents into English, and Maya Johnston and Shirly Eran translated the report into Hebrew. Abeer al-Masri, research assistant for the Gaza Strip, reviewed the Arabic translation of the report.

Amanda Bailly developed the script for the accompanying multimedia piece and Raed Khoury of Top Shot Production conducted the filming. Omar al-Fotihi and Sakae Ishikawa, multimedia producers at Human Rights Watch, oversaw multimedia production.

We would also like to thank Sahar Francis, Gaby Lasky, Amnon Brownfield Stein, Jonathan Pollak, Michael Sfard and Karin Hibler for their legal insights and time.

Most importantly, we wish to thank the men and women who were detained and courageously shared their stories with us.

# Appendix I: Letter from Human Rights Watch to Israeli Police

Human Rights Watch sent a similar letter to the Israel Security Agency (Shin Bet). All letters were sent in Hebrew.

---

August 1, 2019

Dear ███████████
Public Complaints Section Officer and Freedom of Information
Israel Police
Via Email: ███████████

Greetings,

I write to request your assistance in obtaining information pertaining to the monitoring of social media accounts and posts by the Israeli state and the impact on the rights of social media users. We would greatly appreciate the opportunity to understand your perspective on these issues, so it can be reflected in our forthcoming report on these issues. For this to happen, we would need to receive your responses by Wednesday, August 21.

Human Rights Watch (HRW) is an international human rights organization, whose head office is located in New York City. The organization publishes reports on the state of human rights in nearly 100 countries worldwide, with the objective of defending human rights and promoting respect for international humanitarian law. Human Rights Watch has covered human rights issues in Israel and Palestine for nearly three decades and, in that time, has regularly met and corresponded with Israeli officials.

We would greatly appreciate answers to the following questions:
1. Do police forces monitor social media accounts and posts in Israel? Do they also monitor social media accounts and posts in the West Bank and the Gaza Strip?
    a. What laws and policies authorize this monitoring, and are they publicly available?

b.  Do the laws and policies contain provisions limiting the monitoring and collection of these posts to what is necessary to achieving a legitimate aim?

c.  What is considered a security risk justifying monitoring and review of social networks?

d.  Do the laws and policies specify in detail the circumstances in which monitoring may be conducted?

e.  What are the different grounds, including key words, for flagging particular content or people for additional scrutiny? Could you please provide the full list of key words?

f.  How does the police evaluate whether a social media post or account violates relevant laws, including those related to incitement or terrorism? Are there specific criteria or guidance that the police rely on beyond those identified in relevant laws and policies?

g.  Do the laws and policies place limits on the duration of the monitoring, as well as access to, use of, and storage of resulting information?

h.  What techniques are used to monitor these posts? Does the police have accounts on social media websites or apps that participate in or facilitate this monitoring?

i.  Does the police monitor the personal correspondence of social media users or have access to their private information?

j.  What approvals are needed to authorize online surveillance? Are the approvals different for the monitoring of social media posts, and if so, in what ways are they different?

k.  Does the police keep or maintain a database of social media accounts and posts?

l.  What is the annual budget for monitoring social media accounts of individuals seen as a security risk?

m.  Does the police maintain contracts with private companies to assist with monitoring social networks? If so, please provide the names of the companies; their practices for collecting, monitoring, accessing, storing, searching, or sharing data obtained from the monitoring of social media; and the safeguards they impose to prevent undue or discriminatory interference with free expression, privacy, or other rights,

2.  Has the police submitted requests to social media companies to remove posts or accounts hosted on their platform based on violations of law? If so, how many between July 1, 2014 and June 30, 2019?

3.  Does the police report social media posts to social media companies for removal, or accounts for suspension or deletion, based on the company's community standards or terms of service, even if these posts or accounts do not violate the law? How does it flag these posts or accounts for reporting?

4.  At what point is an individual flagged as a threat based on social media posts brought in for questioning? What is the process for determining whether to question or arrest someone on this basis?

5.  How many of the arrests carried by Israeli police between July 1, 2014 and June 30, 2019 were triggered by social media posts?

    a.  How many arrests took place in Israel? How many in the West Bank?

    b.  How many of those arrested were Israeli citizens? How many were Palestinian East Jerusalem or West Bank ID holders?

    c.  What techniques and criteria were used to identify and evaluate these posts?

    d.  How many individuals were charged based on these posts? What charges did they face?

    e.  How many charges resulted in convictions?

6.  In July 2018, Public Security Minister Gilad Erdan told the Associated Press that Israeli authorities had foiled over 200 Palestinian attacks through social media monitoring. How do Israeli authorities determine that they successfully foiled an attack based on a social media post?

    a.  What is threshold by which an individual is classified as a would-be attacker?

    b.  In how many cases did the determination turn on a confession?

We will reflect any pertinent information you provide us by Wednesday, August 21 in our report on these issues and take that information into account in finalizing our conclusions and recommendations.

For any query, please contact my colleague Khulood Badawi at ██████████████
██████████████

**BORN WITHOUT CIVIL RIGHTS**                    68

Thank you in advance for your attention to this request.

Regards,
Eric Goldstein
Deputy Director
Middle East and North Africa
Human Rights Watch

# Appendix II: Letter from Human Rights Watch to the Israeli Army Spokesperson

Human Rights Watch sent a similar letter to the Coordination of Government Activities in the Territories (COGAT) Office of Public Inquiries on August 1. All letters were sent in Hebrew.

---

August 29, 2019

Dear:

IDF Spokesman Brig.-Gen. Ronen Manlis

Via email: █████████

Greetings,

Subject: Request to Receive Information in Relation to the Use of Military Orders

I write to request your assistance in obtaining information pertaining to the use of military orders to restrict the rights of Palestinians in the West Bank to free assembly, association and expression. We would greatly appreciate the opportunity to understand your perspective on these issues, so it can be reflected in our forthcoming report on these issues. For this to happen, we would need to receive your responses by Thursday, September 12.

Human Rights Watch (HRW) is an international human rights organization, whose head office is located in New York City. The organization publishes reports on the state of human rights in nearly 100 countries worldwide, with the objective of defending human rights and promoting respect for international humanitarian law. Human Rights Watch has covered human rights issues in Israel and Palestine for nearly three decades and, in that time, has regularly met and corresponded with Israeli officials.

Human Rights Watch research seeks to understand how the Israeli army's use of Military Orders 101 and 1651 and the Defense (Emergency) Regulations of 1945 affect the ordinary life of Palestinians in the West Bank and in particular their right to free expression, assembly and association.

Our preliminary findings show that the Israeli army has expansively used these orders to outlaw political parties, civil society organizations and media outlets, suppress peaceful assembly, and detain Palestinians over their peaceful expression, violating its duty as an occupying power to facilitate normal life for the occupied Palestinian population. While the law of occupation grants the occupying power broad authority to restrict the rights of the occupied population, they prohibit disproportionate restrictions on civil life.

We are writing to you to better understand the perspective of the Israeli army on these issues. We would greatly appreciate answers to the following questions:

1. What is the process by which West Bank Palestinians can apply for a permit from the Israeli army for a protest or any other peaceful gathering for a political purpose in the West Bank?
   a. Has this process been made public? If so, where?
2. How many requests for permits for protests or gathering were by filed by West Bank Palestinians since July 1, 2014?
   a. How many requests were granted?
   b. Can you provide an example of a protest or gathering authorized by the Israeli army during this five-year period?
3. What are the different criteria the Israeli army uses to declare an area to be a "closed military zone"?
4. Do you maintain a record of every detention, from the moment of arrest, including the legal basis for detention, to the date of release?
5. How many arrests did the Israeli army carry out in the West Bank between July 1, 2014 and June 30, 2019?
   a. How many of these arrests were triggered by social media posts?
      i. What techniques and criteria were used to identify and evaluate these posts?
      ii. How many individuals were charged based on these posts?
      iii. How many charges resulted in convictions?
      iv. How many individuals were placed in administrative detention?
   b. How many arrests took place during protests or other gatherings?
6. Between July 1, 2014 and June 30, 2019, how many West Bank Palestinians were charged with:
   a. "Demonstrating without a permit" under Military Order 101?

    b. "Membership in an unlawful association" under the Defense (Emergency) Regulations of 1945?

    c. Entering "a closed military zone" under Military Order 1651?

    d. "Incitement and support for a hostile organization" or attempting to "influence public opinion in the Area" under Military Order 1651?

7. Between July 1, 2014 and June 30, 2019, how many West Bank Palestinians were convicted for:

    a. Holding a "procession, assembly or vigil" without a permit under Military Order 101?

    b. "Membership in an unlawful association" under the Defense (Emergency) Regulations of 1945?

    c. Entering "a closed military zone" under Military Order 1651?

    d. "Incitement and support for a hostile organization" or attempting to "influence public opinion in the Area" under Military Order 1651?

8. Does the Israeli army itself monitor social media posts of West Bank Palestinians?

    a. What laws and policies authorize this monitoring, and are they publicly available?

    b. Do the laws and policies contain provisions limiting the monitoring and collection of these posts to what is necessary to achieving a legitimate aim?

    c. What is considered a security risk justifying monitoring and review of social networks?

    d. Do the laws and policies specify in detail the circumstances in which monitoring may be conducted?

    e. What are the different grounds, including key words, for flagging particular content or people for additional scrutiny? Could you please provide the full list of key words?

    f. How does the army evaluate whether a social media post or account violates Military Order 1651 or other relevant military orders? Are there specific criteria or guidance that the army relies on beyond those set out in military law?

    g. Do the laws and policies place limits on the duration of the monitoring, as well as access to, use of, and storage of resulting information?

    h. What techniques are used to monitor these posts? Does the army have accounts on social media websites or apps that participate in or facilitate this monitoring?

    i.   Does the army monitor the personal correspondence of social media users or have access to their private information?

    j.   What approvals are needed to authorize online surveillance? Are the approvals different for the monitoring of social media posts, and if so, in what ways are they different?

    k.   Does the army keep or maintain a database of social media accounts and posts?

    l.   What is the annual budget for monitoring social media accounts of individuals seen as a security risk?

    m.   Does the army maintain contracts with private companies to assist with monitoring social networks? If so, please provide the names of the companies; their practices for collecting, monitoring, accessing, storing, searching, or sharing data obtained from the monitoring of social media; and the safeguards they impose to prevent undue or discriminatory interference with free expression, privacy, or other rights,

9.  Does the Israeli army receive names from the Palestinian Authority of individuals who they suspect may carry out attacks against Israelis or engage in other unlawful acts?

10.  Does the Israeli army provide the Palestinian Authority with names of Palestinians who they suspect may carry out attacks against Israelis or engage in other unlawful acts?

We will reflect any pertinent information you provide us by Thursday, September 12 in our report on these issues and take that information into account in finalizing our conclusions and recommendations.

For any query, please contact my colleague Khulood Badawi at ██████████████

Thank you in advance for your attention to this request.

Regards,

Eric Goldstein
Deputy Director
Middle East and North Africa
Human Rights Watch

# Appendix III: Unofficial Translation of Letter from Israeli Army Spokesperson to Human Rights Watch

November 18, 2019

To:
Eric Goldstein, Deputy Director
Middle East and North Africa Division
Human Rights Watch

Re: <u>Your Freedom of Information Application regarding use of military orders</u>

1. Your letter in reference has been received and forwarded to the professional staff for a response. Below is the response of the IDF to your application:

2. We begin by noting that the provisions of the Freedom of Information Act - 1998 (hereinafter: the Act) do not apply to authorities in the Judea and Samaria Area (see HCJ 6870/14 **Regavim v. Head of the Civil Administration**). However, and as stated by the State in the proceedings, the aforesaid does not detract from the application of Israeli law to the work of the authorities in the Area, including the principles of freedom of information in their general sense. This response serves as no indication of the application of the Act.

3. **Sections 1 and 2:** The information requested in these sections relates to the conduct of the IDF vis-a-vis residents of the Judea and Samaria Area in matters relating to their civil rights. This issue is the purview of the Civil Administration. Therefore, we refer you to the Civil Administration for this information, in the spirit of Section 8(5) of the law.

4. **Section 3:** According to security legislation in the Judea and Samaria Area, the military commander has the power to declare a certain area a 'closed military zone', where a **concrete security need**, or a **concrete need to maintain public order** necessitate closing the area. When making such a decision, the military commander must balance the need for security or for maintaining public order against the harm caused to Area residents by the restrictions on freedom of movement, including the effect on the residents' daily lives

and occupations.   The military commander must consider the size of the area that needs to b closed and the duration for which it will be closed.

5. **Section 4:** Every arrest made by IDF forces in the Judea and Samaria Area is recorded along with the reason for the arrest and the name of the party to which the detainee had been transferred.

6. **Section 5:** To avoid delaying the response to the application, the response to this section will be provided separately.

6.1. **Section 5 (a):** To avoid delaying the response to the application, the response to this section will be provided separately.

6.1.1. **Section 5 (a)(1):** The requested information cannot be provided, in the spirit of Section 9(b)(8) of the Freedom of Information Act - 1998 (hereinafter: the Act).

6.1.2. **Section 5 (a)(2):** According to the records kept by the military courts in the Judea and Samaria Area, in the timeframe cited in your application, 358 indictments in which the main offense was classified as incitement were filed. We do not have information regarding the number of indictments filed based on social media posts.

6.1.3. **Section 5 (a)(3):** Seven of the 358 defendants in whose indictments the main offense was classified as incitement, as stated above, were not convicted.

6.1.4. **Section 5 (a)(4):** The administrative evidence that forms the basis for an individual's administrative arrest is classified. As such, we are unable to provide these figures, in the spirit of Section 9(a)(4) of the Act.

**Section 5 (b):** To avoid delaying the response to the application, the response to this section will be provided separately.

7. **Section 6:**

7.1. **Section 6 (a):** The information requested in this section is not available according to the requested breakdown on the computer database. As such, we are unable to grant your application on this matter, in the spirit of Section 8(3) of the Act.

7.2.    **Section 6 (b):** According to the records available on the computer database, in the timeframe cited in your application, 1704 defendants were prosecuted for the main offense of membership and activity in an unlawful association.

7.3.    **Section 6 (c):** According to the records available on the computer database, in the timeframe cited in your application, 4,590 defendants were prosecuted for the main offense of failure to obey an order regarding a closed zone.

7.4.    **Section 6 (d):** See response in section 6.1.3 above.

8.  **Section 7:**

8.1.    **Section 7 (a):** The information requested in this section is not available according to the requested breakdown on the computer database. As such, we are unable to grant your application on this matter, in the spirit of Section 8(3) of the Act.

8.2.    **Section 7 (b):** According to the records available on the computer database, in the timeframe cited in your application, 1823 defendants were convicted of a main offense of membership and activity in an unlawful association. Note that this figure includes defendants indicted prior to the timeframe cited in your application.

8.3.    **Section 7 (c):** According to the records available on the computer database, in the timeframe cited in your application, 4,519 defendants were convicted of a main offense of failure to obey an order regarding a closed zone. Note that this figure includes defendants indicted prior to the timeframe cited in your application.

8.4.    **Section 7 (d):** According to the records available on the computer database, in the timeframe cited in your application, 329 defendants were convicted of a main offense of incitement. Note that this figure includes defendants indicted prior to the timeframe cited in your application.

9.  **Sections 8-10:** The requested information cannot be provided in the spirit of Section 14(a) of the Act.

Sincerely,

Lieut. Col. ███████████

████████████████████████████

on behalf of IDF Spokesperson and Freedom of Information Officer

# Appendix IV: Unofficial Translation of Letter from Israel Police to Human Rights Watch

August 27,2019

To: Mr. Eric Goldstein
Via email: █████████

Dear Sir,
**Re: <u>Freedom of Information Application ████████ for information regarding the monitoring of social media accounts and posts</u>**

In reference to your letter date August 1, 2019
                    Fee payment on August 15, 2019

1. In your letter in reference you requested to receive information regarding the monitoring of social media accounts and posts by the State of Israel and the effect of such monitoring on the rights of social media users – as detailed in your application dated August 1, 2019.

2. Having reviewed your application and weighed the relevant considerations, we have decided to accept your application in part.

3. Most of your application is not drafted as an application for information in accordance with Section 2 of the Freedom of Information Act 1998 (hereinafter: the Act), but as a request to obtain knowledge by way of responding to a questionnaire.
   The provisions of the Act do not impose a duty on authorities to provide knowledge by way of responding to a questionnaire. On this issue, see AAA 6930/12 Zvi Tiram v. Ministry of Defense, where the Supreme Court sitting as the Administrative Court of Appeals held:

**In Section 2, the Freedom of Information Act clarifies what constitutes information kept by the authorities which private individuals are entitled to receive: "Any information in the possession of a public authority in written, recorded, filmed, photographed or digitized form". The Section refers to information the authority is able to provide in any**

format in which it is kept. The additional information requested by the Appellant, as detailed in his appeal and in his arguments before the Court, does not come under the terms of the Freedom of Information Act. We have been convinced that the Respondents have provided the Appellant with all the information in their possession. <u>Indeed, there was no room for the Respondents to answer a "questionnaire" of sorts for the Appellant, nor provide him with responses that amount to legal advice that does not come under the term "information" as defined in the law. Additionally, there is no room to demand public authority officials to produce documents that do not exist.</u> (Emphasis added).

4.   We first note that the Israel Police Investigation Department is charged with the area of freedom of speech offenses, including offenses of incitement to violence, incitement to racism, libel, insulting a senior public servant (or elected official). Such offenses are committed, inter alia, using social media posts.

5.   You have further requested figures related to requests to have posts removed and arrests made following such posts. We note at this early stage that it is impossible to break down offenses related to posts on social media specifically given the complexity of data extrication. We, therefore, reject this part of your application in accordance with the provisions of Section 8 (3) of the Freedom of Information Act 1998 (hereinafter: the Act).

6.   In response to paragraph 2 of your application – whether the police has contacted social media companies with requests to remove posts or accounts based on offenses under the Act – First, it is noted, that the police **does not instruct social media companies on the removal of posts or accounts**. As a rule, the issue of removing content in speech offenses is under the purview and authority of the State Attorney's Office Cyber Department. In other words, the police reports posts the content of which raises suspicion that a criminal offense has been committed to the State Attorney's Office. The aforesaid notwithstanding, in exceptional cases and where serious crimes are concerned, the police does notify enforcement officials within social media companies of the existence of such content for the purpose of an internal review of the possible removal of said content.

With respect to the second part of the paragraph, wherein you sought a numeric response to the question how many requests have been made to social media companies during specific time periods, as stated, the police does not have

numeric records of such applications and we, therefore, reject this part of your application in accordance to the provisions of Section 8(3) of the Act.

7. In response to paragraph 3 of your application, we repeat the statements made in section 6 above. The police reports to social media only in exceptional circumstances and with respect to serious criminal offenses, but not in cases in which posts do not amount to offenses. As clarified, the police does not instruct companies to remove posts, but brings such posts to their attention and consideration, inasmuch as they see fit to do so.
With respect to the second part of the paragraph, wherein we were asked how the police uncovers the posts to be reported, the police uncovers the posts according to information received, or during investigations.

8. In response to paragraph 4 of your application regarding the process and decision to summon a civilian for interrogation over social media posts – State Attorney Directive 14.12, "Launching investigations into matters of high public sensitivity" stipulates that approval to launch an investigation into freedom of speech offenses will be given by the State Attorney's Office (Special Functions). Therefore, in cases in which freedom of speech offenses are suspected, a review of social media posts is carried out, the recommendation of the police is forwarded to the State Attorney's Office for a decision, and, based on this decision, an investigation is launched.

9. In response to paragraph 5 of your request – information relating to arrests due to social media posts, with a breakdown by group and figures on indictments and convictions over such posts – it is not possible to assess or extricate the requested figures. We, therefore, reject this part of your application in accordance with the provisions of Section 8 (3) of the Freedom Act.

10. For your information, you may appeal this decision before the Jerusalem District Court sitting as the  Court of Administrative Affairs within 45 days of receipt of this notice.

Sincerely,
Superintendent ██████████
National Public Complaint Officer
Freedom of Information Officer Assistant

# Appendix V: Unofficial Translation of Letter from Israel Prime Minister's Office to Human Rights Watch

August 8, 2019

**To**
**Mr. Eric Goldstein**
**Deputy Director, Middle East and North Africa Division**
**Human Rights Watch**

**By e-mail:** ███████████

Dear Sir,

Re: **Provision of information regarding monitoring of social media accounts and posts by the State of Israel and the effect such monitoring has on the rights of social media users**

**Your letter dated August 1, 2019**

Following your letter in reference, we hereby respond that the Israel Security Agency operates pursuant to its powers and duties as established by law and is unable to provide information the disclosure of which might reveal work methods.

Sincerely,

████████████

Public Affairs Department

# Appendix VI: Letter from Human Rights Watch to Facebook

October 29, 2019



Product Policy & Engagement
Facebook

Dear ,

Thank you for taking the time to speak with us on Thursday, October 24.
As a follow-up to our conversation, we're writing at your invitation to request information regarding efforts by Israeli authorities to regulate content on your platform as part of a report we will be publishing next month concerning Israeli restrictions on the rights of Palestinians in the West Bank to free expression, association and assembly. In order to ensure thorough and objective reporting, we hope to receive information from you by Tuesday, November 5 so that we can incorporate Facebook's response and perspectives.

Israel's Justice Minister Ayelet Shaked said in March 2018 that the State Attorney's Office submitted 12,351 requests to various social media companies, in 2017 to "remove content, restrict access and filter search results in respect of forbidden contents." She said 99% of contents related to "terrorist activity and support of terrorism" or "incitement to terrorism, racism and violence and also the threat to commit terrorism." She noted that social media companies "fully complied" with 85% of its requests and partially compiled with 3.5%. The State Attorney's office separately noted that 11,754 of these requests were directed to Facebook.

Our research indicates that Israeli authorities often deem expression that calls for opposing Israel's occupation as constituting "incitement" or "support for terrorism," even when such speech does not constitute incitement to imminent violence. We have documented many instances where the Israeli army has detained Palestinian journalists, activists and other people for such speech and charged them with "incitement" and

similar criminal offenses. International human rights law safeguards the right to free expression, including speech of this sort.

We would appreciate answers to the following questions:

- How many requests has the Israeli government submitted to Facebook requesting the removal or restriction of content since July 1, 2014? If you are unable to provide an exact number, can you provide annual figures, including 2019 to date?
- Of these requests, can you determine how many of these requests concern content that originates from accounts established in Israel and the Occupied Palestinian Territory? If you are unable to provide an exact number, can you provide a percentage or number range by year, including 2019 to date?
- How many of these requests cite content that, in Facebook's determination, violated its Community Standards? Please include a breakdown by year, including 2019 to date. Please also provide information about the most common Community Standard(s) that were cited as the basis for removing or restricting the content at issue.
- We understand that government requests to remove content that Facebook deems consistent with its Community Standards are subsequently routed to your legal department for review for consistency with local law. Of the total number of Israeli government requests you received, how many were routed to legal review for conformity with local law? If you are unable to provide an exact number, can you provide a percentage or number range by year, including 2019 to date?
- Of the total number of requests described in paragraph 4, how many of them did you comply with?
- Does Facebook ever challenge the requests described in paragraph 4 in court? If so, can you provide examples of those instances?
- Has the Israeli government ever challenged Facebook's refusal to comply or non-compliance with the requests described in paragraph 4 in court? If so, can you provide examples of those instances?
- From which government agencies have you received requests for the removal or restriction of content in Israel and the Occupied Palestinian Territory?
- What local laws have the Israeli government cited as the bases for their requests? If you are unable to provide an exhaustive list of the local laws, can you provide the list of those most commonly cited?

- During your evaluation of government requests described in paragraph 3 for consistency with Israeli law, do you rely on the standards for "incitement" under Israeli military law, which govern Palestinians in the West Bank?
- Under your Community Standards policy, how do you determine whether a group is a "terrorist organization" for whom praise, endorsement or mere representation may constitute grounds for content removal?
- Does Facebook maintain a list of keywords or phrases specific to the Israeli-Palestinian context for the purposes of flagging or filtering content for review under its Community Standards? If so, please provide a list of all keywords used.
- Does Facebook maintain a list of keywords or phrases for the purposes of flagging or filtering content for review under its policies on terrorist propaganda or violence and graphic content? If so, please provide a list of all keywords used.
- How does Facebook rely on the keywords described above to guide its automated systems in the filtering or flagging of content on its platforms?
- What human rights due diligence procedures are in place to ensure respect of free expression during your Community Standards review?
- What human rights due diligence procedures are in place to ensure respect of free expression during the legal review described in paragraph 4?

Thanks in advance for your attention to our questions and feel free to provide any other information you wish.

For any comments or questions, please feel free to contact me or my colleague, Omar Shakir, our current Israel and Palestine director ██████████ or Eric Goldstein, our Deputy Middle East and North Africa director ██████████

Sincerely,

Arvind Ganesan
Director, Business & Human Rights
Human Rights Watch

# Appendix VII: Letter from Facebook to Human Rights Watch

6 November 2019

Dear Arvind,

Thank you for your letter on Facebook's approach to legal requests from Israel. We applaud Human Rights Watch's efforts to protect and promote human rights worldwide, and appreciated the opportunity to discuss this issue with you and your team last month.

As you know, Facebook is a member of the Global Network Initiative (GNI), a multi-stakeholder human rights organization for the information and communications technology (ICT) sector. We are committed to upholding the robust human rights standards set out in the GNI Principles and Implementation Guidelines—a sector-specific set of guidelines for freedom of expression and privacy that are grounded in the UN Guiding Principles for Business and Human Rights (UNGP), the Universal Declaration of Human Rights (UDHR), and the International Covenant on Civil and Political Rights (ICCPR). We are independently assessed on our implementation of these commitments on a biennial basis, and were found by the GNI Board to be making good faith efforts to implement the GNI Principles with improvement over time in our most recent assessment earlier this year.

In line with our GNI commitments, we publish a Transparency Report twice a year containing details on the actions we take based on legal requests from governments, including Israel. Our Transparency Report includes data on content we have restricted based on Israeli law and covers the period from H2 2013 through H2 2018. Since May 2018, we have also published data on global enforcement of our Community Standards. We look forward to sharing an updated Transparency Report later this month.

In addition to our formal commitments, and our regular transparency reporting, Facebook believes in giving as much voice to as many people as possible. That is why we have recently updated the values that inform our Community Standards—and included explicit references to internationally accepted human rights

principles. And it is why we also push back on government requests wherever we can, invoking human rights principles; challenge requests that are overly broad; and are transparent about the content we restrict by publishing data and qualitative details in our Transparency Report.

I hope that our answers to your detailed questions, which accompany this letter, will shed some light on our policies, our commitments, and our very hard work in maintaining the broadest possible environment for freedom of expression.

Yours sincerely,

██████████

## Detailed Answers

1. How many requests has the Israeli government submitted to Facebook requesting the removal or restriction of content since July 1, 2014? If you are unable to provide an exact number, can you provide annual figures, including 2019 to date?

    *Information on content restricted based on Israeli law is provided in our Content Restrictions Transparency Report for Israel. Data is available for each half between H2 2013 and H2 2018. Data covering H1 2019 will be published later in November.*

2. Of these requests, can you determine how many of these requests concern content that originates from accounts established in Israel and the Occupied Palestinian Territory? If you are unable to provide an exact number, can you provide a percentage or number range by year, including 2019 to date?

    *Information on content restricted based on Israeli law is provided in our Content Restrictions Transparency Report for Israel. Data is available for each half between H2 2013 and H2 2018. Information on*

*content restricted based on legal requests from Palestine is similarly available. Data covering H1 2019 will be published later in November.*

3. How many of these requests cite content that, in Facebook's determination, violated its Community Standards? Please include a breakdown by year, including 2019 to date. Please also provide information about the most common Community Standard(s) that were cited as the basis for removing or restricting the content at issue.

   *Information on actions taken under our Community Standards is available in our global Community Standards Enforcement Report.*

4. We understand that government requests to remove content that Facebook deems consistent with its Community Standards are subsequently routed to your legal department for review for consistency with local law. Of the total number of Israeli government requests you received, how many were routed to legal review for conformity with local law? If you are unable to provide an exact number, can you provide a percentage or number range by year, including 2019 to date?

   *Information on content restricted based on Israeli law is provided in our Content Restrictions Transparency Report for Israel. Data is available for each half between H2 2013 and H2 2018. Data covering H1 2019 will be published later in November.*

5. Of the total number of requests described in paragraph 4, how many of them did you comply with?

   *Information on content restricted based on Israeli law is provided in our Content Restrictions Transparency Report for Israel. Data is available for each half between H2 2013 and H2 2018. Data covering H1 2019 will be published later in November.*

6. Does Facebook ever challenge the requests described in paragraph 4 in court? If so, can you provide examples of those instances?

*If content reported by Israeli authorities does not violate our Community Standards, we conduct a careful legal review to confirm whether the report is valid and carry out human rights due diligence on the request. In cases where reports are not legally valid, are overly broad, or are inconsistent with international norms, **we will request clarification or take no action.***

7.  Has the Israeli government ever challenged Facebook's refusal to comply or non- compliance with the requests described in paragraph 4 in court? If so, can you provide examples of those instances?

    *We regret that we have not had sufficient time, within the tight deadline you set for a response, to confirm this information for you.*

8.  From which government agencies have you received requests for the removal or restriction of content in Israel and the Occupied Palestinian Territory?

    *Information on content restricted based on Israeli law is provided in our [Content](#) [Restrictions Transparency Report for Israel](#). Data is available for each half between H2 2013 and H2 2018. Information on content restricted based on legal requests from Palestine is [similarly available](#). Data covering H1 2019 will be published later in November.*

9.  What local laws have the Israeli government cited as the bases for their requests? If you are unable to provide an exhaustive list of the local laws, can you provide the list of those most commonly cited?

    *Detailed information on content restricted based on Israeli law is provided in our [Content Restrictions Transparency Report for Israel](#). Data is available for each half between H2 2013 and H2 2018. Data covering H1 2019 will be published later in November.*

10. During your evaluation of government requests described in paragraph

3 for consistency with Israeli law, do you rely on the standards for "incitement" under Israeli military law, which governs Palestinians in the West Bank?

*Let us be clear: our policies are global. That includes our [violence and incitement](#) policy. As described in our [Transparency Report](#), we first review all government requests to restrict content against the Facebook Community Standards or Instagram Community Guidelines. If we determine that the reported content violates our policies, we remove it. If content does not violate our policies, we conduct a careful legal review to confirm whether the report is valid and carry out human rights due diligence on the request. In cases where reports are not legally valid, are overly broad, or are inconsistent with international norms, we will request clarification or take no action.*

11.   Under your Community Standards policy, how do you determine whether a group is a "terrorist organization" for whom praise, endorsement or mere representation may constitute grounds for content removal?

*We define "terrorist organizations" based on the definition in our Community Standards on [Dangerous Organizations and Individuals](#):*

*"Any non-state actor that:*

*\* Engages in, advocates, or lends substantial support to purposive and planned acts of violence,*

*\* Which causes or attempts to cause death, injury or serious harm to civilians, or any other person not taking direct part in the hostilities in a situation of armed conflict, and/ or significant damage to property linked to death, serious injury or serious harm to civilians*

*\* With the intent to coerce, intimidate and/or influence a civilian population, government, or international organization*

*\* In order to achieve a political, religious, or ideological aim."*

*As a US company, we also abide by applicable US law, including the [Foreign Terrorist Organization list,](#) You can learn more about our approach to extremism here: [https://newsroom.fb.com/news/2019/09/combating-hate-and-extremism/.](https://newsroom.fb.com/news/2019/09/combating-hate-and-extremism/)*

12.  Does Facebook maintain a list of keywords or phrases specific to the Israeli-Palestinian context for the purposes of flagging or filtering content for review under its Community Standards? If so, please provide a list of all keywords used.

> *Our policies are global. We believe that context matters in enforcing our policies— accordingly, we do not maintain a list of universally banned keywords or phrases.*
>
> *Content reported or identified by automation is reviewed by our Community Operations team, who take into account the context and intent of the content in making a decision as to whether it violates our policies.*

13.  Does Facebook maintain a list of keywords or phrases for the purposes of flagging or filtering content for review under its policies on terrorist propaganda or violence and graphic content? If so, please provide a list of all keywords used.

> *We believe that context matters in enforcing our policies—accordingly, we do not maintain a list of universally banned keywords or phrases. Content reported or identified by automation is reviewed by our Community Operations team, who take into account the context and intent of the content in making a decision as to whether it violates our policies.*

14.  How does Facebook rely on the keywords described above to guide its automated systems in the filtering or flagging of content on its platform?

> *Content identified by automation is reviewed by our Community Operations team, who take into account the context and intent of the content in making a decision as to whether it violates our policies.*

15.  What human rights due diligence procedures are in place to ensure respect of free expression during your Community Standards review?

   *As a member of the Global Network Initiative, we have formally committed to conducting human rights due diligence on government requests to restrict the freedom of expression. In line with these commitments, we routinely conduct human rights due diligence on product, policy, enforcement, and business decisions.*

   *Thus, our Community Standards are developed with input from our internal human rights team and from an extensive stakeholder engagement process which includes consultation with the human rights community. We also routinely audit the actions of our Community Operations team to ensure they are accurately enforcing our policies.*

16.  What human rights due diligence procedures are in place to ensure respect of free expression during the legal review described in paragraph 4?

   *As a member of the Global Network Initiative, we have formally committed to conducting human rights due diligence on government requests to restrict the freedom of expression. This process is conducted with input from our legal, public policy, organic content policy, and human rights teams, as appropriate.*



Activestills.org

# BORN WITHOUT CIVIL RIGHTS

## Israel's Use of Draconian Military Orders to Repress Palestinians in the West Bank

This report documents how Israeli authorities strip Palestinians in the West Bank of basic civil rights protections. Military orders issued as far back as the beginning of the occupation in 1967 criminalize nonviolent political activities, including protesting or waving flags or political symbols without a permit, publishing material "having a political significance," and joining groups "hostile" to Israel.

Fifty-two years later and with no end in sight, the Israeli army still relies on these sweeping military orders to jail Palestinian activists, journalists and others who speak out or organize against the occupation. It has outlawed hundreds of political and civil society organizations and shut down dozens of media outlets.

International law allows an occupying power to restrict some civil rights in the early days of an occupation, but also requires it to facilitate public life for the occupied population. This responsibility increases with the duration of the occupation, as the occupier has more time and opportunity to develop less restrictive measures. The suspension of core rights for more than a half century violates Israel's obligations as an occupying power.

This report examines eight illustrative cases of Palestinians jailed for their political affiliations or anti-occupation speech or activism, drawing on a rich variety of sources, including military court documents. Human Rights Watch urges Israel – regardless of the nature of any eventual political resolution to the conflict – to grant Palestinians rights protections on par with those afforded to Israeli citizens.

*(above) Palestinian activists wait to board an Israeli bus that connects an Israeli settlement in the West Bank to occupied East Jerusalem, to protest discriminatory movement restrictions, on November 15, 2011. The Israeli army arrested the activists, who called themselves the "Freedom Riders" after American civil rights activists of the 1960s, for seeking to enter Jerusalem without the permit that is required of West Bank Palestinians but not Jews.*
*© 2011 Activestills*

*(front cover) Israeli security forces block Palestinian protesters marching to demand the re-opening of Al-Shuhada Street, a central artery in Hebron that the Israeli army has prohibited Palestinians from using for the past 19 years, on February 23, 2018.*
*© 2018 Anadolu Agency/Getty Images*

**hrw.org**