UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

CHAIM DOV PRZEWOZMAN, HADASSAH
PRZEWOZMAN, individually, as personal
representative of Estate of Pinches Menachem
Przewozman, and as parent and natural
guardian of Y.P., a minor, and P.P., a minor,
CHAYA RACHEL PRZEWOZMAN, individually
and as parent and natural guardian of A.M.P., a
minor, and F.P., a minor, SARA
PRZEWOZMAN-ROZENBAUM, YAFA
PRZEWOZMAN, and TZVI YOSEF
PRZEWOZMAN,

                         Plaintiffs,

         -against-

QATAR CHARITY, QATAR NATIONAL BANK,
and MASRAF AL RAYAN,

                         Defendants.

**MEMORANDUM & ORDER
20-CV-6088 (NGG) (TAM)**

NICHOLAS G. GARAUFIS, United States District Judge.

Pending before the court are Defendants Masraf al Rayan, Qatar
National Bank, and Qatar Charity's ("Defendants") motions to
dismiss for lack of personal jurisdiction, improper service of pro-
cess, and failure to state a claim. (*See* Masraf al Rayan Mot. (Dkt.
48); Qatar National Bank Mot. (Dkt. 50); Qatar Charity Mot.
(Dkt. 52).) Each Defendant also filed a request for oral argument
on these motions. (*See* Dkt. 49; Dkt. 51; Dkt. 53.) Plaintiffs filed
an omnibus opposition brief responding to all three motions. (*See*
Dkt. 48-3 ("Opp.").) For the following reasons, Defendants' mo-
tions to dismiss are GRANTED WITHOUT PREJUDICE.

1

## I.   BACKGROUND[1]

This case arises out of a rocket attack launched by Hamas and the Palestinian Islamic Jihad ("PIJ") that struck Ashdod, Israel, on May 5, 2019 and killed Pinches Menachem Przewozman, a United States citizen. (Compl. (Dkt. 1) ¶¶ 26-27, 334.) Plaintiffs are members of Mr. Przewozman's family. (*Id.* ¶¶ 26, 32, 33, 36-38.) Each brings claims individually; two Plaintiffs also bring claims as guardians of minor members of the family; and one additionally brings a claim as the personal representative of Mr. Przewozman's estate. (*Id.* ¶¶ 26, 28-38.) Each Plaintiff, as well as each minor represented by guardians, brings claims for loss of consortium and intentional infliction of emotional distress; Mr. Przewozman's estate also brings claims for wrongful death, pain and suffering, and intentional infliction of emotional distress. (*Id.* ¶¶ 28-29.)

### A.   The Rocket Attacks

On May 4 and 5, 2019, "Hamas and PIJ terrorists launched over 600 rockets and mortars" from the Gaza Strip. (*Id.* ¶¶ 327-28.) At this time, Mr. Przewozman lived in the Israeli city of Ashdod, close to the Gaza Strip. (*Id.* ¶ 332.) On May 5, Mr. Przewozman was walking in Ashdod when sirens, warning of an incoming rocket attack, were sounded; he took shelter in a nearby building, which was hit by a rocket, and Mr. Przewozman was hit with shrapnel. (*Id.* ¶¶ 334-36.) Although Mr. Przewozman was rushed

---

[1] The following facts are taken from the Complaint and, for the purposes of this motion to dismiss, are assumed to be true. *See Ark. Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*, 28 F.4th 343, 349 (2d Cir. 2022). Defendants also submitted a variety of exhibits, affidavits, and declarations attached to the motion to dismiss. These extrinsic documents have been excluded by the court as required by Federal Rule of Civil Procedure ("Rule") 12(b) and were not considered in resolving this motion. *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 154 (2d Cir. 2002).

to the hospital and treated by emergency personnel, he suc-
cumbed to his injuries. (*Id.* ¶¶ 337-38.)

## B.   Role of the Defendants

The various claims in this case are brought against three Defend-
ants: Qatar Charity, Qatar National Bank, and Masraf al Rayan.
(*Id.* ¶¶ 39, 66, 77, 340, 354, 368, 385.) Plaintiffs allege that each
of these defendants facilitated the attacks in some way by provid-
ing resources to Hamas and PIJ.

### 1.   Qatar Charity

Qatar Charity was originally founded under the name "Qatar
Charitable Society." (*Id.* ¶ 39.)[2] According to Plaintiffs, Qatar
Charity ostensibly engages in philanthropic endeavors which pro-
vide cover for its secret funding of terrorist activity. (*Id.* ¶¶ 127-
29.)

Plaintiffs allege that a variety of countries designated Qatar Char-
ity as a "financial supporter of terrorism." (*Id.* ¶ 64.) In July 2008,
Israel banned Qatar Charity from operating branches in the Pal-
estinian territories. (*Id.* ¶ 54.) The only allegation regarding the
United States' treatment of Qatar Charity, however, is that the
United States Interagency Intelligence Committee on Terrorism
of the United States National Counterterrorism Center designate
Qatar Charity "as a 'priority III terrorism support entity'" in March

---

[2] The Complaint states that Qatar Charity was founded in 2002, (Compl. ¶
39) but alleges a variety of activities that occurred earlier. (*See, e.g., id.* ¶¶
43 (1993), 44 (1998), 50 ("the 1990s").) The court takes judicial notice of
the fact that public sources, including Qatar Charity's website, state the
organization was founded in 1992, and assume the Complaint's discrep-
ancy is attributable to a typo. *See, e.g., What We Do*, Qatar Charity,
https://www.qcharity.org/en/qa/home/whatwedo (last visited Mar. 6,
2023).

2008. (*Id.* ¶ 41.)[3] The Complaint includes no allegation that the United States designated Qatar Charity as a Foreign Terrorist Organization ("FTO") or Specially Designated Global Terrorist ("SGDT"). (*See generally id.*)

The Complaint also alleges that Qatar Charity is a member of the Union of Good, "a notorious funder of Hamas and international terrorism" and an organization that the United States designated an SGDT in 2008. (*Id.* ¶¶ 7, 54.) The designation declared that "the Union of Good was 'an organization created by Hamas leaders to transfer funds to the terrorist organization" and intended to "(i) divert[] charitable donations to support Hamas members and the families of terrorist operatives; and (ii) dispensing social welfare and other charitable services on behalf of Hamas." (*Id.* ¶ 57.) Such use of donations included "martyr" payments made to the families of suicide bombers and direct payments to the families of individuals serving time in Israeli jails. (*Id.* ¶ 58.)

Although the Complaint references direct connections between Qatar Charity and a variety of terrorist organizations around the world, (*see, e.g., id.* ¶¶ 43-51), the only two organizations alleged to be implicated in Mr. Przewozman's death are relevant for the purposes of Plaintiffs' claims: Hamas and PIJ. Regarding those organizations, the Complaint alleges that Qatar Charity provided funding to Islamic Relief Worldwide, "which Israel banned in 2014 for funding Hamas," (*id.* ¶ 53), and indirectly provided support as a member of the Union of Good. (*Id.* ¶ 54). From March 1, 2015, until September 7, 2015, Qatar Charity transferred over $28 million to its two branches in the Palestinian Territories, and

---

[3] Qatar Charity disputes this characterization as unsupported, and potentially sourced from "a webpage found at wikileaks.org." (Qatar Charity Mot. at 5.) Plaintiffs are not tasked with proving their factual allegations, though, and—as noted above—the court disregards the extrinsic evidence submitted by Defendants on these motions to dismiss.

ultimately "transferred a substantial portion of those funds to Hamas, PIJ, and supposed charities controlled by those terrorist organizations." (*Id.* ¶ 128-29.) Qatar Charity transferred at least $150,000 between March 2011 and September 2015 to one such organization, the Hebron Islamic Charity Society, which Israel allegedly "outlawed . . . because it operated as an arm of Hamas." (*Id.* ¶¶ 130-31.)

According to the Complaint, these transfers were identified from two sources. *First*, the Director and other employees of Qatar Charity's Ramallah Branch were convicted in Israeli courts of operating an illegal organization and transferring funds to Hamas. (*Id.* ¶¶ 132, 143-45.) They confessed to a scheme by which Qatar Charity transferred more than $3.5 million of donations between 2009 and 2015 from the organization to the branches in the Palestinian Territories, and then "distributed a portion of those funds" to Hamas and PIJ. (*Id.* ¶ 132.) *Second*, Qatar Charity's annual reports for the years 2013, 2014, and 2015 reflected fund transfers and joint programs with "various Hamas and PIJ fronts," including an organization called the "Elehssan Society." (*Id.* ¶¶ 133-34.)

Additionally, Qatar Charity (at an unspecified time) purchased "thousands of anonymous debit cards known as 'Sanabel Cards' from the Bank of Palestine," which were distributed to PIJ and Hamas operatives for personal use and to purchase supplies for attacks, and to individual terrorists and family members, particularly after those terrorists' deaths. (*Id.* ¶¶ 150-56.)

### 2. Qatar National Bank

Qatar National Bank is a commercial bank in Qatar. (Opp. at 5; *see also* Compl. ¶¶ 77-78.) Plaintiffs allege that Qatar National Bank maintained bank accounts and provided banking services for Qatar Charity and a variety of individuals with ties to Hamas. (*Id.* ¶¶ 14-15.) Six of the accounts for Qatar Charity were opened

in 2012, and another was opened in 2006. (*Id.* ¶ 172.) The different individuals opened bank accounts at a variety of times over the period discussed in the Complaint, including shortly after they were released from Israeli custody in prisoner exchanges. (*See, e.g., id.* ¶¶ 174-78.)

By virtue of providing banking services to Qatar Charity and these individuals, the Complaint alleges that Qatar National Bank violated internal policies and international banking requirements, including know-your-customer and due diligence obligations. (*Id.* ¶¶ 170, 229, 317.) The Complaint further alleges that "[t]he accounts that [Qatar National Bank] maintained for the above-mentioned terrorists were used to finance Hamas and PIJ terrorist activities in Israel." (*Id.* ¶ 226.) Finally, Qatar National Bank also allegedly contributed funding to Qatar Charity, including a donation of approximately $275,000, in November 2013, and an additional $550,000 in February 2020, "to assist Syrian refugees." (*Id.* ¶ 227-28.)

### 3. Masraf al Rayan

Masraf al Rayan is a bank headquartered in Qatar. (*Id.* ¶ 66.) It provides "banking, financing and investing" services. (*Id.* ¶ 67.) Like Qatar National Bank, Masraf al Rayan provided financial services to Qatar Charity. (*Id.* ¶ 70.) These services included the use of a correspondent banking account at Bank of New York Mellon, which allowed Masraf al Rayan to transact in U.S. dollars on behalf of clients including Qatar Charity. (*Id.* ¶¶ 158, 163-64.) Masraf al Rayan facilitated the transfer of $28 million between March to September, 2015, from Qatar Charity to its Palestinian branches, (*id.* ¶ 128), and the conversion of $3.5 million worth of dollars and Euros into Israeli shekels and transfer of the same to the Palestinian territories between 2009 and 2015. (*Id.* ¶ 132.) Some portion of this latter transfer is explicitly alleged to have utilized the New York-based correspondent account. (*Id.*) Some

portion of each amount was ultimately transferred to Hamas, PIJ, or affiliated organizations. (*Id.* ¶¶ 129, 132.)

### C. Plaintiffs' Claims

On December 15, 2020, Plaintiffs filed the Complaint. (*See generally* Compl.) The four counts alleged therein are: (1) aiding and abetting foreign terrorist organizations, specifically Hamas and PIJ, in violation of the Anti-Terrorism Act ("ATA") and Justice Against Sponsors of Terrorism Act ("JASTA"), (*id.* ¶¶ 339-52); (2) conspiracy to violate the ATA and JASTA by facilitating acts of terrorism conducted by Hamas and PIJ, (*id.* ¶¶ 353-66); (3) primary violations of the ATA by providing material support to Hamas and PIJ with the intent or knowledge that support will facilitate terrorism, (*id.* ¶¶ 367-83); and (4) primary violations of the ATA by providing material support to Hamas and PIJ with the knowledge those organizations were designated Foreign Terrorist Organizations, (*id.* ¶¶ 384-95.) Plaintiffs allege that they were injured by Defendants' support of Hamas and PIJ when Mr. Przewozman died in the rocket attack, causing loss of consortium and intentional infliction of emotional distress to his relatives, and, with respect to claims brought by Mr. Przewozman's estate, wrongful death, pain and suffering, and intentional infliction of emotional distress. (*Id.* ¶¶ 28-38.)

Each Defendant individually moved to dismiss under Rules 12(b)(2), for lack of personal jurisdiction; 12(b)(5), for improper or insufficient service of process;[4] and 12(b)(6), for failure to state a claim.

---

[4] Only Masraf al Rayan brings a motion to dismiss on the basis of improper service, but Qatar National Bank asserts improper service as part of their Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction. (*See* Qatar Nat'l Bank Mot. (Dkt. 50-1) at 5-6.). Qatar Charity's brief adopts the arguments made by the other Defendants. (Qatar Charity Mot. at 35.)

## II.  LEGAL STANDARD

"In order to survive a motion to dismiss for lack of personal juris-
diction, the plaintiffs must make a *prima facie* showing that
jurisdiction exists." *Licci ex rel. Licci v. Lebanese Canadian Bank,
SAL*, 732 F.3d 161, 167 (2d Cir. 2013).[5] To satisfy this require-
ment, plaintiffs must provide "an averment of facts that, if
credited by the ultimate trier of fact, would suffice to establish
jurisdiction over the defendant." *Chloé v. Queen Bee of Beverly
Hills, LLC,* 616 F.3d 158, 163 (2d Cir. 2010). The court neither
"draw[s] argumentative inferences in the plaintiff's favor," *Rob-
inson v. Overseas Mil. Sales Corp.,* 21 F.3d 502, 507 (2d Cir.
1994), nor does it "accept as true a legal conclusion couched as
a factual allegation," *Jazini v. Nissan Motor Co.,* 148 F.3d 181,
185 (2d Cir. 1998).

Similarly, on a Rule 12(b)(5) motion to dismiss for insufficient
service of process, "the plaintiff bears the burden of establishing
that service was sufficient." *Khan v. Khan*, 360 F. App'x 202, 203
(2d Cir. 2010) (Summary Order) (citing *Burda Media, Inc. v.
Viertel,* 417 F.3d 292, 298 (2d Cir. 2005)). Service on a corpora-
tion in a foreign country is governed by Federal Rules of Civil
Procedure 4(f) and (h).

A motion to dismiss for failure to state a claim pursuant to Rule
12(b)(6) asks whether the complaint pleads "enough facts to
state a claim to relief that is plausible on its face." *Bell Atl. Corp.
v. Twombly*, 550 U.S. 544, 570 (2007). The court "must accept
as true all of the allegations contained in a complaint," but may
discard "legal conclusions" and "[t]hreadbare recitals of the ele-
ments of a cause of action, supported by mere conclusory
statements[.]" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A

---

[5] When quoting cases, unless otherwise noted, all citations and internal
quotation marks are omitted, and all alterations are adopted.

claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*; *see also In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 118, 122 (2d Cir. 2013).

"Where a Court is asked to rule on a combination of Rule 12 defenses, it will pass on the jurisdictional issues before considering whether a claim is stated in the complaint." *Koulkina v. City of New York*, 559 F. Supp. 2d 300, 310 (S.D.N.Y. 2008) (collecting cases); *see also Arrowsmith v. United Press Int'l*, 320 F.2d 219, 221 (2d Cir. 1963) (en banc) ("[L]ogic compel[s] initial consideration of the issue of jurisdiction over the defendant—a court without such jurisdiction lacks power to dismiss a complaint for failure to state a claim[.]").

## III. DISCUSSION

### A.  Improper Service of Process

Service of corporations generally is governed by Rule 4(h). Where service is effected outside of the United States, Rule 4(h) incorporates by reference most methods prescribed by Rule 4(f)—"Serving an Individual in a Foreign Country"—excluding personal delivery to an individual under Rule 4(f)(2)(C)(i). *See* Fed. R. Civ. P. 4(h); Fed. R. Civ. P. 4(f). Excluding individual service, Rule 4(f) provides the following options:

> (1) by any internationally agreed means of service that is reasonably calculated to give notice, such as those authorized by the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents;

> (2) if there is no internationally agreed means, or if an international agreement allows but does not specify other means, by a method that is reasonably calculated to give notice:

(A) as prescribed by the foreign country's law for service in that country in an action in its courts of general jurisdiction;

(B) as the foreign authority directs in response to a letter rogatory or letter of request; or

(C) unless prohibited by the foreign country's law, by . . . (ii) using any form of mail that the clerk addresses and sends to the individual and that requires a signed receipt; or

(3) by other means not prohibited by international agreement, as the court orders.

Fed. R. Civ. P. 4(f). Plaintiffs do not assert that Qatar is subject to an "internationally agreed means of service" under Rule 4(f)(1). Instead, Plaintiffs moved for issuance of letters rogatory on January 4, 2021, (Dkt. 7), and the court granted this request on January 5, 2021. (Dkt. 10). On September 2, 2022, the Department of State confirmed that the American Embassy had executed the letters rogatory and transmitted them to the foreign authorities as of June 2, 2022, but it appears Plaintiffs have not yet received a response from Qatari authorities or confirmation that service was executed. (Dkt. 58.)

In their opposition, Plaintiffs now rely on Rule 4(f)(2)(C)(ii) for their apparent use of Federal Express to deliver service. (*See* Masraf al Rayan Mot. at 12.) This Rule only allows such service by mail if not "prohibited by the foreign country's law." Fed. R. Civ. P. 4(f)(2)(C). Plaintiffs do not put forward evidence that Qatari law specifically allows such service.[6] As a result, the parties

---

[6] Plaintiffs' statement that "the Qatari Civil and Commercial Procedures Law (Law No. 13 of 1990) expressly authorizes . . . Qatari courts . . . to deliver process to any person inside or outside of Qatar by registered mail or

argue over whether "prohibited" means explicitly barred (Defendants' position) or not affirmatively permitted (Plaintiffs'). (*See, e.g.*, Masraf al Rayan Mot. at 12; Opp. at 53.)

Plaintiffs' position is correct. To carry the burden generally to show the legal sufficiency of service, Plaintiffs state that they have not identified any decisions in the United States concluding that Qatari law prohibits service by mail; point out that Qatari law does allow for service by mail in other contexts (specifically, service of individuals); and most importantly, state that Qatari law does not include any prohibition of service by mail. (*See* Opp. at 52-54.) This is all that the law requires. *See Soc. Enter. LLC v. Sociedad Agricola Cato S.A.*, 15-CV-4158 (RJD), 2015 WL 13743436, at *3 (E.D.N.Y. Oct. 6, 2015) (holding that service by signed receipt Federal Express in Chile is permitted under Rule 4(f) because "'prohibited' in this context means that the foreign country's law expressly prohibits the method, not merely that it does not recognize or provide for it"). This interpretation best aligns with another provision of Rule 4(f), which allow for service by any method "prescribed by the foreign country's law." Fed. R. Civ. P. 4(f)(2)(A). If Rule 4(f)(2)(C) required an affirmative showing that the method of service used was permitted by foreign law, as the Defendants urge, it would be entirely duplicative of Rule 4(f)(2)(A). *See SEC v. Alexander*, 248 F.R.D. 108, 111 (E.D.N.Y. 2007) (noting that most courts to read the two provisions alongside each other have held that "Rule 4(f)(2)(C)(i) permits personal service so long as the law of the foreign jurisdiction does not specifically forbid personal service"); *see also* Wright & Miller, 4B Fed. Prac. & Proc. Civ. § 1134 (4th ed. 2022) ("[T]his reading of the rule seems inconsistent

---

any other appropriate means," (Opp. at 54), appears to argue by implication that such service would similarly be proper on a corporation. Plaintiffs do not dispute that Qatari law addresses service on corporations in another section lacking the quoted language. (*See* Masraf al Rayan Mot. at 13.)

with the text on its face, which indicates that personal service and service by mail are permissible so long as they are not forbidden by the foreign country's laws."). While the court would prefer the certainty of the letters rogatory process, Plaintiffs' approach here comports with the Federal Rules.

Masraf al Rayan[7] next argues that service was improper because Plaintiffs have failed to demonstrate the individual who received service was "authorized to accept service" on Masraf al Rayan's behalf. (Masraf al Rayan Mot. at 12; *see also* Dkt. 24-2 (email from Federal Express stating package was received by "M.Mohamed" at address in Qatar).) Service made under subsection (f)(2), as here, must be proved "by a receipt signed by the addressee, or by other evidence satisfying the court that the summons and complaint were delivered to the addressee." Fed. R. Civ. P. 4(l)(2)(B). But this language includes no clarification for contexts where the service is effected on a foreign corporation, who can only "sign[]" a "receipt" through an agent. As a result, at least one court in this district has required, where the addressee is a corporation, that the plaintiff further show why the recipient was "authorized to accept service on behalf of" the defendant. *Rosenberg v. Lashkar-e-Taiba*, No. 10-CV-5381 (DLI) (CLP), 2017 WL 11647006, at *4 (E.D.N.Y. Mar. 31, 2017), *adopting* R&R, No. 10-CV-5381 (Dkt. 61).

Plaintiffs have not attempted to prove "the accuracy of the address where" Masraf al Rayan was served, *NYKCool A.B. v. Pacific Int'l Servs., Inc.*, 2013 WL 6799973, at *8 (S.D.N.Y. Dec. 20, 2013), nor have they offered any evidence that the individual who accepted delivery at that address was authorized to accept

---

[7] Qatar National Bank does not raise an argument in its motion regarding insufficient proof of proper service. Although Qatar Charity adopts the arguments of the other Defendants, Masraf al Rayan's argument on this point is specific to the proof regarding its service; without its own argument regarding the evidence presented, Qatar Charity cannot adopt this point.

service on behalf of Masraf al Rayan. Since service by registered mail (with receipt) is not explicitly authorized for service of corporations by Qatari law, it is unclear how Masraf al Rayan would designate the individual who received the Federal Express package to accept service.[8] Accordingly, Plaintiffs' failure to provide evidence beyond the receipt by an identified, but unknown, individual at the address designated leaves the court unable to determine whether service was effected. Nonetheless, "[f]ailure to prove service does not affect the validity of service" and "[t]he court may permit proof of service to be amended." Fed. R. Civ. P. 4(l)(3). If Plaintiffs seek to amend the Complaint in compliance with this Memorandum and Order, the court will permit them to cure these deficiencies regarding proof of service (or, alternately, to effect service via the conclusion of the letters rogatory process). Therefore, Masraf al Rayan's motion to dismiss for improper service is GRANTED with leave to amend.

Because the court has concluded that two avenues remain available for Plaintiffs to effect service pursuant to Rule 4(f)(2)(B) and (C)(ii), the court declines to exercise its discretion to issue an order under Rule 4(f)(3) directing service of Defendants by email. Fed. R. Civ. P. 4(f)(3) (allowing service "by other means not prohibited by international agreement, as the court orders"); (*see* Opp. at 54-55). "[T]here is no hierarchy among the subsections in Rule 4(f)"—that is, there is no preference in the Rule for

---

[8] Plaintiffs argue that Defendants' appearance in this case is sufficient to prove service. (Opp. at 53.) But the case they cite in support of this argument, *NYKCool,* addressed an entirely different case: the defaulting defendant had not appeared, and repeatedly refused to accept delivery of mailed service in a transparent attempt to evade jurisdiction. 2013 WL 6799973, at *8. "Nor can defective service be ignored on the mere assertion that defendant had actual notice." *Weston Funding, LLC v. Consorcio G Group Dina, S.A. de C.V.,* 451 F. Supp. 2d 585, 589 (S.D.N.Y. 2006). The court will not adopt a legal conclusion that implies defendants always waive an ineffective service argument merely by appearing in the case to assert such an argument.

service under subsection (f)(2) instead of (f)(3). *Group One Ltd. v. GTE GmbH*, 523 F. Supp. 3d 323, 341 (E.D.N.Y. 2021). Nonetheless, some courts have adopted additional requirements before granting leave to effect service by other means, such as: "(1) a showing that the plaintiff has reasonably attempted to effectuate service on the defendant, and (2) a showing that the circumstances are such that the court's intervention is necessary." *Equipav S.A. Pavimentacão, Engenharia e Comercia Ltda. v. Bertin*, No. 22-CV-4594 (PGG), 2022 WL 2758417, at *4 (S.D.N.Y. July 14, 2022). Plaintiffs have failed to show the necessity of the court's intervention, so their motion for a court order pursuant to Rule 4(f)(3) is DENIED without prejudice.

## B. Personal Jurisdiction

It is undisputed that all three Defendants are domiciled outside of the United States. The Complaint alleges that Qatar Charity and Masraf al Rayan are based in Qatar, (*see* Compl. ¶¶ 7, 66), and although no domicile is alleged for Qatar National Bank, Plaintiffs concede in their opposition brief that it is a "Qatari bank headquartered in Doha." (Opp. at 5; *see also* Compl. ¶ 77.)

Because these are non-domiciliary defendants, the court must engage in two steps of analysis to determine whether a plaintiff has sufficiently established personal jurisdiction to survive a motion to dismiss under Rule 12(b)(2). *Eades v. Kennedy, PC Law Offices*, 799 F.3d 161, 167-68 (2d Cir. 2015). *First*, the court applies the long-arm statute used by the forum state. *Id.* (quoting *Chloé*, 616 F.3d at 163). If, as Plaintiffs argue, "the defendant is not subject to jurisdiction in any state's courts of general jurisdiction," this first step may rely instead on the plaintiff's proper service of federal claims rather than the state long-arm statute. Fed. R. Civ. P. 4(k)(2). *Second,* whether relying on the state long-arm statute or

Rule 4(k)(2), the court must analyze "whether personal jurisdiction comports with due process protections established under the Constitution." *Eades*, 799 F.3d at 168; Fed. R. Civ. P. 4(k)(2)(B).[9]

Plaintiffs' asserted statutory basis of personal jurisdiction has shifted over the course of this litigation. In the Complaint, they assert that "Defendants are subject to personal jurisdiction in the United States pursuant to 18 U.S.C. § 2334(a), N.Y. C.P.L.R. § 302, and Fed. R. Civ. P. 4(k)(1)-(2) because, pursuant to a conspiracy, they: transacted business and committed tortious acts within the United States (and New York)[.]" (Compl. ¶ 23.) In their pre-motion letter opposing the Defendants' request to file this motion to dismiss, Plaintiffs relied solely on defendants' use of a correspondent banking account in New York pursuant to a conspiracy, a legal theory founded in C.P.L.R. § 302(a)(1), *see Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 20 N.Y.3d 327, 339 (2012); *Licci*, 732 F.3d at 165; they made no mention of personal jurisdiction under section 2334(a) or Rule 4(k), or on the basis of any tortious acts. (*See* Pls.' Pre-Mot. Letter (Dkt. 44) at 2-4.) In their Opposition, Plaintiffs relied primarily on Rule 4(k)(2), but also raised arguments that they satisfied the requirements of C.P.L.R. sections 302(a)(1) and (2), and requested the opportunity to perform jurisdictional discovery. (*See* Opp. at 55-

---

[9] The court discusses the due process requirements at length *infra*, but includes a brief summary here to aid the reader. The constitutional analysis proceeds in two steps: *first*, the court "evaluate[s] the quality and nature of the defendant's contacts with the forum state under a totality of the circumstances test. Where the claim arises out of, or relates to, the defendant's contacts with the forum—*i.e.*, specific jurisdiction is asserted—minimum contacts necessary to support such jurisdiction exist *where the defendant purposefully availed itself of the privilege of doing business in the forum and could foresee being haled into court there*." *Licci*, 732 F.3d at 170. *Second*, if minimum contacts are established, the court must determine "whether the assertion of personal jurisdiction would comport with fair play and substantial justice." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985).

80.) Despite the mutable nature of Plaintiffs' theories of jurisdiction, the court will analyze each of the asserted New York and federal bases in turn.[10]

### 1. Masraf al Rayan and Qatar Charity

#### a. *New York's Long-Arm Statute*

New York's long-arm statute is codified at C.P.L.R. § 302(a). That statute provides four situations where personal jurisdiction may be established over a non-domiciliary defendant who, acting in person or through an agent:

> 1. transacts any business within the state or contracts anywhere to supply goods or services in the state; or
>
> 2. commits a tortious act within the state . . .; or
>
> 3. commits a tortious act without the state causing injury to person or property within the state . . . , if he
>
> (i) regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state, or
>
> (ii) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce; or

---

[10] Unlike the other presented bases for personal jurisdiction, the Complaint's citation to 18 U.S.C. § 2334(a) as a basis for jurisdiction has not been reiterated in any of Plaintiffs' filings since. In any event, that provision allows for venue and service "in the district court of the United States for any district where any plaintiff resides or where any defendant resides or is served, or has an agent." 18 U.S.C. § 2334(a). Even if this provision could be read to apply to personal jurisdiction, there are no allegations to support a claim that any Plaintiff resides, or that any Defendant resides or has an agent, in New York.

    4. owns, uses or possesses any real personal property situated within the state.

C.P.L.R. § 302(a). As discussed above, Plaintiffs only assert jurisdiction under section 302(a)(1) or (2).

Section 302(a)(2) is more easily assessed, so the court begins there. That provision extends jurisdiction to parties who "commit[] a tortious act within the state." *Id.* Under longstanding New York law, this section extends only to acts committed within the state—that is, the defendant must have been physically present in New York when committing the tort. *Longines-Wittnauer Watch Co. v. Barnes & Reinecke, Inc.*, 15 N.Y.2d 443, 461-62 (1965) ("[T]he Legislature chose to adopt language which, in so many words, demands that the tortious act be one committed by the defendant, in person or through an agent, within this State."); *see also Harvey v. Chemie Grunenthal, G.m.b.H.*, 354 F.2d 428, 431 (2d Cir. 1965) (following *Longines-Wittnauer* and concluding that the location of the consequence of the tort is irrelevant under section 302(a)(2)). The question is the location of the act, not the location of any consequences thereto. *Platt Corp. v. Platt*, 17 N.Y.2d 234, 237 (1966).[11] The only act allegedly committed in New York was the use of a correspondent banking account—a normal commercial activity which is plainly

---

[11] The resulting gap in New York's personal jurisdiction law, for torts committed without the state which caused injury within, was closed by section 302(a)(3), upon which Plaintiffs do not rely. *See Bensusan Rest. Corp. v. King*, 126 F.3d 25, 29 (2d Cir. 1997). Even if Plaintiffs did assert that basis for jurisdiction, though, that provision includes additional requirements not satisfied by the Complaint. *Id.* (noting section 302(a)(3)'s requirements that the party "expect or should reasonably expect the tortious act to have consequences in the state and in addition derive substantial revenue from interstate commerce"); *see also* C.P.L.R. § 302(a)(3) (adding that jurisdiction may extend where the alleged tortfeasor "regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state").

not a tort—and there is no allegation that Masraf al Rayan or Qatar Charity was ever physically present in the state. Accordingly, section 302(a)(2) cannot provide jurisdiction over either.

Section 302(a)(1) raises a more complex question. That provision provides specific jurisdiction when a party "transacts business within the state and the cause of action arises from that transaction." *Reed Int'l, Inc. v. Afghanistan Int'l Bank*, __ F. Supp. 3d __, 2023 WL 2138600, at *5 (S.D.N.Y. Feb. 21, 2023) (citing C.P.L.R. § 302(a)(2)). "Proof of one transaction in New York is sufficient to invoke jurisdiction, even though the defendant never enters New York, so long as the defendant's activities here were purposeful and there is a substantial relationship between the transaction and the claim asserted." *Eades*, 799 F.3d at 168. "Purposeful activities are those with which a defendant, through volitional acts, avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Fischbarg v. Doucet*, 9 N.Y.3d 375, 380 (2007).

Plaintiffs allege that Masraf al Rayan transacted business in New York, as an agent of Qatar Charity,[12] when Masraf al Rayan utilized its correspondent banking account at Bank of New York

---

[12] Plaintiffs do not allege any direct ties between Qatar Charity and New York. However, Plaintiffs do allege in a few instances that Qatar Charity intentionally used Masraf al Rayan's correspondent banking account. (*See* Compl. ¶¶ 24 ("Qatar Charity and Masraf [a]l Rayan . . . knowingly effectuated U.S. dollar-denominated funds transfers on behalf of Qatar Charity through the Bank of New York Mellon in New York."), 132 (alleging that Qatar Charity intentionally passed U.S. dollars through the American banking system via Bank of New York Mellon).) While these statements appear to insufficiently allege factual contacts between Qatar Charity and New York or the United States, the court could charitably read the allegations to imply that Masraf al Rayan was acting as Qatar Charity's agent. Because the court holds that Plaintiffs have failed to demonstrate the contacts with New York have a sufficient nexus to the claims to exercise jurisdiction, the court does not reach whether Plaintiffs have sufficiently alleged an agency relationship between Qatar Charity and Masraf al Rayan.

Mellon, in New York, on behalf of Qatar Charity. (Compl. ¶¶ 163, 166.) Correspondent banking is a system through which banks are able to effect transactions in areas where they do not have a branch or office. (*See* Compl. ¶¶ 158-60); *see also Berdeaux v. OneCoin, Ltd.*, 561 F. Supp. 3d 379, 403 n.25 (S.D.N.Y. 2021) ("Correspondent banking is a system of interbank relationships in which a bank sells services to other financial institutions and involves banks establishing relationships with one another to facilitate transactions involving remote customers of certain banks."). Typically, the foreign bank (here, Masraf al Rayan) will utilize a "correspondent account" at a local bank (Bank of New York Mellon), which is used to send and receive financial transfers in the area; the local bank will provide services in the region on behalf of customers of the foreign bank, including (for example) transfers or currency exchange transactions. (*See, e.g., id.* ¶ 165.)

The New York Court of Appeals has addressed the use of a correspondent account in a very similar context. *See Licci,* 20 N.Y.3d 327. In *Licci,* individuals brought ATA claims against a foreign financial institution, Lebanese Canadian Bank ("LCB"), among other defendants, for injuries and deaths of their family members who were victims in rocket attacks allegedly carried out by Hizballah in Israel. *Id.* at 330-31. The district court initially dismissed the claims for lack of personal jurisdiction under section 302(a)(1), holding that the plaintiffs had failed to allege a nexus between LCB's use of its correspondent account for wire transfers and the specific terrorist activity underlying the claim. *Licci v. Am. Express Bank Ltd.,* 704 F. Supp. 2d 403, 407-08 (S.D.N.Y. 2010). On appeal, the Second Circuit certified two questions to the New York Court of Appeals:

> (1) Does a foreign bank's maintenance of a correspondent bank account at a financial institution in New York,

and use of that account to effect "dozens" of wire transfers on behalf of a foreign client, constitute a "transaction" of business in New York within the meaning of N.Y. C.P.L.R. § 302(a)(1)?

(2) If so, do the plaintiffs' claims under the Anti-Terrorism Act, the ATS, or for negligence or breach of statutory duty in violation of Israeli law, "arise from" LCB's transaction of business in New York within the meaning of N.Y. C.P.L.R. § 302(a)(1)?

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50, 74-75 (2d Cir. 2012). The Court of Appeals' response is highly instructive.

In answering the first question, the Court of Appeals agreed that a defendant may "transact business" within New York under section 302(a)(1) by "use of a correspondent bank account in New York, even if no other contacts between the defendant and New York can be established, *if* the defendant's use of that account was purposeful." 20 N.Y.3d at 338 (quoting *Licci*, 673 F.3d at 66) (emphasis in original). The court emphasized the importance of the intent inquiry and distinguished *Amigo Foods Corp. v. Marine Midland Bank-N.Y.*, 39 N.Y.2d 391 (1976), in which the only relevant interaction between the defendant bank and New York—the "adventitious" maintenance of a correspondent account in the jurisdiction—was insufficient to show purposeful transaction of business.[13] *Id.*

---

[13] The facts of *Amigo Foods* are complicated, but provide useful context for developing the spectrum of purposeful to unintentional contact with the forum via banking activity. The plaintiff, Amigo Foods Corporation, purchased goods from a distributor; the contract called for payment to be made at or through a Maine bank, Aroostook Trust Company. *Licci*, 20 N.Y.3d at 335. Amigo obtained a letter of credit from a New York bank, who delivered payment on Amigo's behalf to Aroostook's correspondent

The Court of Appeals concluded that the intentional use of a correspondent account "to effect 'dozens' of wire transfers on behalf of a foreign client" constitutes a "transaction of business" pursuant to section 302(a)(1). 20 N.Y.3d at 334, 341. However, the court noted that "[i]n the banking context, the requisite inquiry . . . may be complicated by the nature of inter-bank activity, especially given the widespread use of correspondent accounts nominally in New York to facilitate the flow of money worldwide, often for transactions that otherwise have no other connection to New York, or indeed the United States." *Id.* at 338. In a later decision, the Court of Appeals explained that the relevant distinction is between a "non-domiciliary bank [that] is a passive and unilateral recipient of funds later rejected" and the "[r]epeated, deliberate use that is approved by the foreign bank on behalf and for the benefit of a customer." *Al Rushaid v. Pictet & Cie*, 28 N.Y.3d 316, 326-27 (2016).

The facts alleged here fall somewhere in between *Amigo Foods* and *Licci*. The Complaint alleges that Masraf al Rayan "passed" funds "through" its New York-based correspondent account at Bank of New York Mellon while facilitating currency exchanges and transfers of money from Qatar Charity to its branches in the Palestinian territories. (Compl. ¶ 132.) The money was initially obtained by Qatar Charity from donations "in Qatar and around the world," although not specifically in the United States; transferred into Qatar Charity's Doha-based account at Masraf al

---

account at a New York bank; but subsequently, the distributor rejected payment and refused to deliver products in accordance with the contract. *Id.* at 335, 337. Aroostook's only relevant, intentional contact with New York was therefore the maintenance of a correspondent account there; the choice of the New York bank to attempt to deposit payment with Aroostook's New York correspondent account, rather than sending it directly to Aroostook, was not at Aroostook's direction, and could not be considered Aroostrook "transacting business" pursuant to section 302(a)(1). *Id.* at 337-38.

Rayan; converted from U.S. dollars or Euros into Israeli shekels, in Doha; then transferred to Qatar Charity's Palestinian accounts ("pass[ing] through" New York) before being distributed to Hamas, PIJ, or their affiliates. (*Id.*) Plaintiffs specifically allege that, between 2009 and 2015, Masraf al Rayan moved approximately $3.5 million in U.S. dollars and Euros through this process, and transferred $25 million from Doha (through Masraf al Rayan, and possibly the correspondent account) to a Qatar Charity branch in the Gaza Strip between 2011 and 2013. (*Id.* ¶ 128.) Plaintiffs additionally allege the planned transfer through Masraf Al Rayan of $28 million from Qatar Charity to its branches in Palestine between March and September of 2015, although the Complaint does not mention whether this sum was routed through the correspondent account. (*Id.* ¶ 128.) Some unspecified portions of these amounts ultimately reached Hamas, PIJ, and their affiliates, potentially including $150,000 provided to the Hebron Islamic Charity Society between March 2011 and September 2015 and unspecified amounts to "the Elehssan Society." (*Id.* ¶¶ 130-33.)

The Complaint's lack of clarity and specificity on *how* Masraf al Rayan used the Bank of New York Mellon account causes significant difficulties in applying *Licci*'s guidance. Plaintiffs do not allege that the transactions using the correspondent account transferred money to and from New York or the United States, a context which would clearly illustrate that the bank transacted business in New York, because the correspondent account was the mechanism that made New York banking activity possible. *See, e.g., Peterson v. Islamic Republic of Iran*, No. 10-CV-4518 (KBF), 2013 WL 1155576, at *16 (S.D.N.Y. Mar. 13, 2013) (describing how bank used correspondent account in New York to distribute sales proceeds and interest payments from bonds held in New York). Nor does the Complaint allege that the correspondent account was used for currency exchanges—to the contrary, it states that those too occurred in Doha. (Compl. ¶

132.) It merely alleges that some portion of the money trans-
ferred by Masraf al Rayan on behalf of Qatar Charity "passed
through" the correspondent account as part of "currency ex-
change transactions" converting dollars into Israeli shekels. (*Id.*)

Nor do Plaintiffs allege facts giving rise to the inference that
Masraf al Rayan specifically chose a New York-based account to
take advantage of "New York's dependable and transparent
banking system, the dollar as a stable and fungible currency, and
the predictable jurisdictional and commercial law of New York
and the United States." *Licci*, 20 N.Y.3d at 339. The allegations
here regarding the volume of the transactions fall somewhere be-
tween *Amigo Foods* and *Licci*, as the Complaint plainly states
more than mere maintenance of a correspondent account, (*see,
e.g.*, Compl. ¶ 132), and the allegations could arguably be read
to indicate that the transactions using the correspondent account
"totaled several million dollars."[14] *Licci*, 673 F.3d at 56. But un-
like in *Licci*, there is no indication that "dozens" of transactions
occurred, *id.*; indeed, the Complaint is entirely devoid of state-
ments regarding the volume and frequency of transfers.

Underlining this concern, none of the typical markers of deliber-
ate use of the New York correspondent account are alleged in the
Complaint. Courts in this circuit have pointed to four such indi-
cators:

> (1) the defendant bank's level of control over the trans-
> fers, (2) the defendant bank's marketing of the

---

[14] Masraf al Rayan argues that Plaintiffs "fail to identify what amount or
frequency of [the alleged] funds were actually U.S. dollars versus Euros,
meaning their allegation may amount to only a *de minimis* amount of dol-
lars passing through New York." (Masraf al Rayan Mot. at 6.) The court
declines to conclude that it lacks jurisdiction solely on this basis, but
acknowledges that the Complaint's failure to specify the amounts actually
transferred through the correspondent account makes it virtually impossi-
ble to undertake the "examination of the particular facts in each case"
required by *Licci*. 20 N.Y.3d at 338.

> correspondent account or encouragement of others to
> use it, (3) the necessity of the correspondent account to
> the alleged scheme, and (4) other conduct by which the
> bank projected itself into the New York market.

*Vasquez v. Hong Kong & Shanghai Banking Corp.*, 477 F. Supp.
3d 241, 258 (S.D.N.Y. 2020). Other than the number of transfers
to the correspondent account and amount of money involved—
which, as discussed, are both undefined—there is no indication
in the Complaint that Masraf al Rayan made any specific choices
regarding the use of the correspondent account.[15] *Cf. Off. Comm.
of Unsecured Creditors of Arcapita v. Bahrain Islamic Bank*, 549
B.R. 56, 68-69 (S.D.N.Y. 2016) ("The Banks . . . set the terms of
each placement transaction. . . . The Banks selected U.S. dollars
as the currency in which to execute the transaction. The Banks
designated New York correspondent bank accounts to receive the
funds[.]"). The Complaint is entirely devoid of allegations that
Masraf al Rayan encouraged or marketed use of its correspond-
ent account in New York, or that use of the correspondent
account was necessary to exchange dollars for other currencies
(or even "cheaper or easier" than other options). *See Vasquez v.
Hong Kong & Shanghai Banking Corp.*, No. 18-CV-1876 (PAE),
2019 WL 2327810, at *12 (S.D.N.Y. May 30, 2019); *Vasquez,*

---

[15] Indeed, there is no allegation anywhere in the Complaint that Qatar
Charity—who appears to have directed monetary transfers, (*see, e.g.,*
Compl. ¶ 132)—intended to use or was even aware of the existence of a
correspondent account in New York used by Masraf al Rayan. "Absent un-
usual circumstances, an individual bank customer would have no reason
to direct its foreign bank to use a New York-based correspondent account
for a transaction that, such as those at issue here, has no other connection
to New York." *Berdeaux*, 561 F. Supp. 3d at 403 n.25. While allegations
illustrating Masraf al Rayan's repeated, purposeful use of the New York
banking system may be sufficient to establish jurisdiction, it is unclear how
it would be sufficient to allege Qatar Charity requested currency exchange
transactions that, without their knowledge, were effected in a New York-
based account. (*See* Qatar Charity Mot. at 9-10.)

24

477 F. Supp. 3d at 259. And the Complaint affirmatively states that "Masraf al Rayan had no U.S. branch or office." (Compl. ¶ 158.)

Therefore, although Plaintiffs' allegations are not wholly devoid of details, they are too insubstantial to clearly establish purposeful availment of the New York banking system. *See, e.g., Singer v. Bank of Palestine*, No. 19-CV-6 (ENV) (RML), 2021 WL 4205176, at *5-6 (E.D.N.Y. Apr. 30, 2021) (concluding there was a lack of jurisdiction where the jurisdictional allegations were a "conclusory web" lacking "information as to dates, dollar amounts, number of transactions, senders or recipients of these transfers," but allowing limited jurisdictional discovery). Absent any specificity regarding the scope and extent of the use of the account, and without any indication of *why* the transfers were made "through" New York, the Complaint alleges an example of "the widespread use of correspondent accounts nominally in New York to facilitate the flow of money worldwide . . . for transactions that otherwise have no other connection to New York," *Licci*, 20 N.Y.3d at 338, and comes dangerously close to asserting New York jurisdiction over any financial transaction conducted in U.S. dollars.[16] *See Cmty. Fin. Grp., Inc. v. Stanbic Bank Ltd.*, No.

---

[16] The Declaration submitted by Patrick J. McArdle on behalf of Plaintiffs, (Dkt. 48-4), implicitly makes the same argument. It makes no factual assertions regarding Masraf al Rayan's actions, (*see id.* ¶ 18 (stating that Masraf al Rayan's transfers on behalf of Qatar Charity "*almost certainly* settled and cleared in the U.S. (New York) by U.S. banks")), but merely describes how money likely flowed through the financial system based on the Complaint's description of the transactions. (*See generally id.*) McArdle opines that, due to various regulatory requirements, "foreign banks with no physical U.S. presence" cannot participate in the infrastructure which facilitates transfers of U.S. dollars, and instead must use a correspondent account at a bank with such a physical presence. (*Id.* ¶ 11.) If the court were to exercise jurisdiction without indicia of purposeful availment beyond a single use of a correspondent account to facilitate such transactions, McArdle's assertions would subject any bank transacting in U.S. dollars to New York (or United States) jurisdiction.

14-CV-5216 (DLC), 2015 WL 4164763, at *4 (S.D.N.Y. July 10, 2015) (routing of U.S. dollar wire payment through New York correspondent account was adventitious, not purposeful use of forum); *Hau Yin To v. HSBC Holdings PLC*, No. 15-CV-3590 (LTS) (SN), 2017 WL 816136, at *7 n.6 (S.D.N.Y. Mar. 1, 2017), *aff'd* 700 F. App'x 66 (2d Cir. 2017) (Summary Order) (dismissing for lack of personal jurisdiction where wiring of U.S. dollars through correspondent account was "passive, rather than 'integral' to the alleged" fraud).

Because of these deficiencies, the court harbors serious doubts that Plaintiffs have alleged purposeful actions in New York. Nonetheless, section 302(a)(1) is a "single act statute," meaning "one transaction in New York is sufficient" if it bears the markers of a purposeful transaction. *Deutsche Bank Secs., Inc. v. Montana Bd. of Invs.*, 7 N.Y.3d 65, 71 (2006); *see also Chloé*, 616 F.3d at 170. Plaintiffs must—and possibly could, if given the opportunity in jurisdictional discovery, addressed further *infra*—fill in the many gaps in their allegations regarding how, why, when, and how much money was transferred into and from the New York correspondent account. *See Vasquez*, 2019 WL 2327810, at *12. Accordingly, the court declines to grant Masraf al Rayan and Qatar Charity's motions to dismiss for lack of personal jurisdiction on this basis.

The same cannot be said, however, with respect to the second prong of section 302(a)(1), which requires that the claims at issue "arise from the transactions." *Al Rushaid*, 28 N.Y.3d at 323. In *Licci*, the Court of Appeals explained that this required an "articulable nexus" or "substantial relationship," but clarified that this was a liberal standard: "these standards connote, at a minimum, a relatedness between the transaction and the legal claim such that the latter is not completely unmoored from the former, regardless of the ultimate merits of the claim." 20 N.Y.3d at 339.

Even by this low standard, Plaintiffs have failed to allege facts giving rise to a *prima facie* case of personal jurisdiction. The transactions allegedly routed through the correspondent account, occurred, at latest, in 2015, while the rocket attacks did not happen until 2019. (Compl. ¶¶ 17, 128, 132-33; *see also id.* ¶ 106 ("From at least 2011 through *2015*, Hamas and PIJ knowingly, willfully, and unlawfully combined, conspired, confederated and agreed with Defendants to commit numerous acts of international terrorism[.]") (emphasis added).) This temporal gap leaves the nexus between the Defendants' New York-related acts and Plaintiffs' injuries far too attenuated. *See Strauss v. Crédit Lyonnais, S.A.*, 175 F. Supp. 3d 3, 20 (E.D.N.Y. 2016) ("That nexus would be too attenuated if, contrary to the facts alleged here, Defendant . . . executed the New York transfers at a time far removed from the attacks that caused Plaintiffs' injuries."); *Universal Trading & Inv. Co. v. Credit Suisse (Guernsey) Ltd.*, No. 12-CV-198 (PAC), 2012 WL 6186598, at *4 (S.D.N.Y. Dec. 12, 2012), *aff'd*, 560 F. App'x 52 (2d Cir. 2014) (Summary Order) (holding no articulable nexus or substantial relationship where there was a gap of nearly a decade between wire transfers and injury to plaintiffs). It is the Plaintiffs' burden to factually allege that the Defendants "used an actual, specific transaction through a New York correspondent account in the course of bringing about the injuries on which the claims are predicated." *Daou v. BLC Bank, S.A.L.*, 42 F.4th 120, 132 (2d Cir. 2022). The Plaintiffs' general allegations of how Hamas and PIJ used money entirely fails to show 2015 (or earlier) transfers were used "in the course of" the 2019 rocket attacks.

Accordingly, Plaintiffs have failed to establish a *prima facie* case for personal jurisdiction over Masraf al Rayan and Qatar Charity pursuant to section 302(a)(1).

b.   *Rule 4(k)(2)*

Plaintiffs argue that, if Masraf al Rayan and Qatar Charity's con-
tacts with New York are insufficient under New York's long-arm
statute, the court may still exercise personal jurisdiction over
them pursuant to Rule 4(k)(2). (Opp. at 56.) That Rule states
that proper service establishes personal jurisdiction in federal
courts over a defendant for claims arising under federal law if
"(A) the defendant is not subject to jurisdiction in any state's
courts of general jurisdiction; and (B) exercising jurisdiction is
consistent with the United States Constitution and laws." Fed. R.
Civ. P. 4(k)(2); *see also Porina v. Marward Shipping Co.*, 521 F.3d
122, 127 (2d Cir. 2008).

It is undisputed that Plaintiffs' claims arise under federal law. *See
Kaplan v. Cent. Bank of Islamic Republic of Iran*, No. 19-CV-3142
(ILG) (RLM), 2022 WL 1120455, at *5 (E.D.N.Y. Apr. 14, 2022)
(holding that claims pursuant to the ATA satisfy this require-
ment). Whether Masraf al Rayan or Qatar Charity are subject to
jurisdiction under any state's long-arm statute, though, impli-
cates an ongoing procedural debate in the federal courts: who
bears the burden to show whether jurisdiction could be exercised
somewhere? Typically, a plaintiff bears the burden of alleging
facts sufficient to state a *prima facie* case of jurisdiction, *Licci*, 732
F.3d at 167, but in the context of Rule 4(k)(2) that obligation "in
effect requires a plaintiff to prove a negative fifty times over."
*United States v. Swiss Am. Bank, Ltd.*, 191 F.3d 30, 40 (1st Cir.
1999). Assigning the burden of proof to defendants, though,
would require them to either concede amenability to suit in fed-
eral court or identify a forum where jurisdiction exists. *Id.* at 41.
The First Circuit addressed this issue by developing a burden-
shifting framework, under which the plaintiff must first certify
that "based on the information that is readily available to the
plaintiff and his counsel, the defendant is not subject to suit in
the courts of general jurisdiction of any state." *Id.* Only after this
certification is made does the burden shift to the defendant to

show "that one or more specific states exist in which it would be subject to suit[.]" *Id.* at 41. In the absence of guidance from the Second Circuit, some district courts within the circuit have relied on this burden-shifting framework. *See Abbott Laboratories v. Adelphia Supply USA*, No. 15-CV-5826 (CBA) (LB), 2017 WL 11665423, at *5 (E.D.N.Y. Mar. 30, 2017) (collecting cases). But other circuits have concluded that this element of Rule 4(k)(2) is met so long as "the defendant contends that he cannot be sued in the forum state and refuses to identify any other where suit is possible." *ISI Int'l, Inc. v. Borden Ladner Gaervais LLP*, 256 F.3d 548, 552 (7th Cir. 2001); *see also Mwani v. bin Laden*, 417 F.3d 1, 11 (D.C. Cir. 2005); *Adams v. Unione Mediterranea Di Scurta*, 364 F.3d 646, 651 (5th Cir. 2004).

Plaintiffs have failed to certify that the Defendants are not subject to jurisdiction in any state, but Defendants have declined to identify any state forum where suit is possible. The court is sympathetic to the "Catch-22" situation Defendants would face if forced to bear the burden of providing an alternate location for jurisdiction, *Swiss Am.*, 191 F.3d at 41, but in light of the due process analysis below and absent guidance from the Second Circuit, it declines to dismiss Plaintiffs' claims at this time solely on the basis of their failure to certify. If Plaintiffs ultimately file an amended complaint, they are encouraged to submit a certification, as would be required in the First Circuit, to assist the court's analysis of jurisdiction pursuant to Rule 4(k)(2).

Further complicating the issue, Plaintiffs allege no further contacts between the Defendants and the United States beyond those with New York. But Rule 4(k)(2) was added to the Federal Rules to address the "significant lacuna when the defendant was a non-resident of the United States having contacts with the United States sufficient to justify the application of United States law . . . but having insufficient contact with any single state to support jurisdiction under state long-arm legislation[.]" *Porina,*

521 F.3d at 127. This case does not fall into that gap, because the Defendants appear not to have *any* general contacts with the United States. By raising solely New York contacts, Plaintiffs attempt to use Rule 4(k)(2) to evade the limited extent to which section 302(a)(1) may require more than constitutional due process. *Licci*, 732 F.3d at 170 ("[S]ection 302(a)(1) of New York's long-arm statute and constitutional due process are not coextensive[.]"). Nonetheless, nothing in the text of the Rule requires Plaintiffs to allege contacts with the United States generally, so the court will analyze the alleged contacts with New York to determine whether they comport with due process.[17] *Dardana Ltd. v. Yuganskneftegaz*, 317 F.3d 202, 207 (2d Cir. 2003) ("Rule 4(k)(2) confers personal jurisdiction over a defendant so long as the exercise of jurisdiction comports with the Due Process Clause of the Fifth Amendment.").

    *c.   Due Process*

In determining whether exercising personal jurisdiction over a defendant would comport with due process, the court once again proceeds in two steps. *First*, "due process requires . . . [the defendant] have certain minimum contacts with [the forum] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. State of Wash., Office of Unemployment Comp. & Placement*, 326 U.S. 310, 316 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)). Where, as here, a plaintiff asserts specific jurisdiction, amenability to suit depends on an "affiliation between the forum and the underlying controversy"—in other words, a connection between the defendant's minimum contacts with the forum and

---

[17] Because the court concluded that the New York long-arm statute was not satisfied, there is no need to reach the constitutional analysis for that asserted basis of jurisdiction. In this context, however, where Defendant's only alleged ties to the United States are in New York, the due process inquiry would be the same for both Rule 4(k)(2) and section 302(a)(1).

the claim brought. *Goodyear Dunlop Tires Operations S.A. v. Brown,* 564 U.S. 915, 919 (2011); *see also Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez,* 305 F.3d 120, 127 (2d Cir. 2002) (citing *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 472-76 (1985)). *Second,* if minimum contacts and a nexus to the claims asserted are found, the court is then asked to consider several factors to determine "whether the assertion of personal jurisdiction would comport with fair play and substantial justice." *Burger King,* 471 U.S. at 476. Such factors include "(1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case; [and] (3) the plaintiff's interest in obtaining convenient and effective relief." *Metro. Life Ins. Co. v. Robertson-Ceco Corp.,* 84 F.3d 560, 568 (2d Cir. 1996).

After the Court of Appeals ruled on the certified questions in *Licci,* the Second Circuit held that an exercise of personal jurisdiction over the defendant bank was consistent with due process. *Licci,* 732 F.3d at 165. The circuit analyzed due process separately from the long-arm statute because, in some cases, "personal jurisdiction permitted under the long-arm statute may theoretically be prohibited under due process analysis," but noted that such cases would be "rare." *Id.* at 170. Ultimately, the court concluded that "the selection and repeated use of New York's banking system" was sufficient contact with New York to justify jurisdiction under the Constitution, and because "the correspondent account at issue is alleged to have been used as an instrument to achieve the very wrong alleged," the first step of the due process analysis was met. *Id.* at 171.

As above, it is fatal to jurisdiction over Masraf al Rayan and Qatar Charity that Plaintiffs have failed to allege a causal link between the use of the correspondent account, which ended in 2015, and the rocket attacks that caused their injury in 2019. There is no basis from which the court can conclude that "the correspondent

account at issue" was "used as an instrument to achieve the very wrong alleged." *Id.* Without such a nexus between the only contacts alleged with the United States and the claims at issue, the court cannot exercise personal jurisdiction consistent with due process.

In sum, Plaintiffs have failed to make out a *prima facie* case for jurisdiction over Masraf al Rayan and Qatar Charity under New York's long-arm statute or Rule 4(k)(2). They have also not successfully shown that the exercise of personal jurisdiction would be consistent with due process, as is required under both approaches. Accordingly, Masraf al Rayan and Qatar Charity's motions to dismiss for lack of personal jurisdiction are GRANTED. If Plaintiffs seek to amend their Complaint in accordance with this Memorandum & Order, the court would welcome allegations curing the deficiencies detailed with respect to purposeful availment and nexus between the forum contacts and the injuries asserted.

### 2. Qatar National Bank

Unlike Masraf al Rayan and Qatar Charity, Plaintiffs allege no contacts whatsoever between Qatar National Bank and New York or the United States generally. Instead, Plaintiffs claim that personal jurisdiction over Qatar National Bank may be established based on their participation in a conspiracy with the other Defendants, who used a correspondent banking account in New York to transact in United States Dollars. (Compl. ¶¶ 23, 158-66.)

As with any theory of personal jurisdiction, Plaintiffs' argument that jurisdiction over Qatar National Bank is established by the actions of its alleged co-conspirators must both have a statutory basis and comport with the Constitution. *Suber v. VVP Servs., LLC,* No. 21-2649, 2023 WL 115631, at *2 (2d Cir. Jan. 10, 2023) (Summary Order) ("[A] plaintiff must demonstrate a statutory basis for jurisdiction and show that exercising personal jurisdiction comports with due process.") (citing *Licci,* 732 F.3d at 168)).

The Second Circuit has held that conspiracy jurisdiction satisfies the requirements of due process where a plaintiff alleges "(1) a conspiracy existed; (2) the defendant participated in the conspiracy; and (3) a co-conspirator's overt acts in furtherance of the conspiracy had sufficient contacts with a state to subject that co-conspirator to jurisdiction in that state." *Berkshire Bank v. Lloyds Banking Grp. Plc*, No. 20-CV-1987, 2022 WL 569819, at *2 (2d Cir. Feb. 25, 2022) (Summary Order) (quoting *Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 87 (2d Cir. 2018) ("*Schwab I*")). "[T]here is no requirement that a plaintiff demonstrate that a defendant 'directed, controlled, and/or supervised the co-conspirator who carried out the overt acts in the forum." *Id.* (quoting *Schwab Short-Term Bond Mkt. Fund v. Lloyds Banking Grp. Plc*, 22 F.4th 103, 124 (2d Cir. 2021) ("*Schwab II*")).

However, numerous district courts sitting in New York have held that Section 302(a)(1) of New York's long-arm statute, the only section that potentially applies here, *see supra* Part III.A.1.a., does not provide for co-conspirator jurisdiction.[18] *See, e.g., Suber v. VVP Servs., LLC*, No. 20-CV-8177 (AJN), 2021 WL 4429237, at *6 (S.D.N.Y. Sept. 27, 2021), *aff'd in relevant part by* 2023 WL 115631 (2d Cir. Jan. 10, 2023) (collecting cases); *Berdeaux*, 561 F. Supp. 3d at 400 (rejecting theory of personal jurisdiction where "the only adequately pled allegation tying [defendant] to New York is that" a co-conspirator misrepresented material facts within New York);[19] *United States v. Besneli*, No. 14-CV-7339

---

[18] The statute allows for consideration of acts taken by a party's agent, *see* C.P.L.R. § 302(a), but there is no allegation that Masraf al Rayan's use of a correspondent account was done as Qatar National Bank's agent or in any way at the direction or under the control of Qatar National Bank.

[19] Plaintiffs claim that *Berdeaux* did not address conspiracy jurisdiction because, in that case, the "plaintiffs expressly disclaimed reliance on conspiracy jurisdiction." (Opp. at 75 (quoting *Berdeaux*, 561 F. Supp. 3d at 399).) That decision, like this one, nonetheless reached all of the plaintiffs'

(JFK), 2018 WL 443747, at *5 (S.D.N.Y. Jan. 16, 2018) (collect-ing cases and stating that "in cases where courts have considered conspiracy-based jurisdiction over a non-domiciliary defendant, jurisdiction over the alleged co-conspirator has usually been premised on § 302(a)(2)"). It appears that New York state courts have not weighed in on the precise question, but the court is un-able to find any New York case relying on a co-conspirator theory to establish personal jurisdiction under section 302(a)(1). *Cf. New Media Holding Co. v. Kagalovsky*, 949 N.Y.S.2d 22, 24 (1st Dep't 2012) (holding that personal jurisdiction could be estab-lished over defendant pursuant to 302(a)(1) based on the acts of companies that were also *alter egos* of defendant).[20] In the closest case, the First Department rejected a conspiracy theory of juris-diction because the alleged business activity in New York was not a tort, and therefore section 302(a)(2) (under which conspiracy jurisdiction is available) could not apply; the decision implicitly assumed that co-conspirator jurisdiction could not extend under

---

arguments, including under section 302(a)(1), "to avoid resting its deci-sion on Plaintiffs' abandonment." *Berdeaux*, 561 F. Supp. 3d at 399.

[20] *Freeman v. HSBC Holdings PLC*, 413 F. Supp. 3d 67 (E.D.N.Y. 2019) pre-sents a single outlier. In that case, a court in this district held that personal jurisdiction existed over a defendant on a co-conspirator theory pursuant to section 302(a)(1). *Id.* at 79-80. The defendant in question argued that such a theory was incompatible with due process pursuant to the Supreme Court's decision in *Walden v. Fiore*, 571 U.S. 277 (2014), and *Freeman's* analysis focused on the various facts that distinguished the case from *Wal-den* and illustrated that the defendant, by virtue of the alleged conspiracy, had the requisite intent to avail itself of the forum. *Id.* As a result, it appears the court did not have the occasion to examine the case law discussed above. In any event, the court is more persuaded by the case law discussed above than by *Freeman's* brief statement that, under section 302(a)(1), "activities of a co-conspirator may be imputed to an out-of-state tortfeasor for jurisdictional purposes under an agency rationale." *Id.* at 79 (quoting *In re N. Sea Brent Crude Oil Futures Litig.*, No. 13-MD-2475 (ALC), 2017 WL 2535731, at *9 (S.D.N.Y. June 8, 2017), which concluded to the con-trary that "an agency relationship is required to uphold jurisdiction based on a conspiracy theory")).

section 302(a)(1). *See Bluewaters Comms. Holdings, LLC v. Ecclestone*, 966 N.Y.S.2d 232, 233-34 (1st Dep't 2014) (rejecting the use of co-conspirator jurisdiction because "[a co-conspirator's] purchase of . . . shares was not a tort, and the complaint does not allege that [co-conspirator] bought those shares at the direction, under the control, at the request, or on behalf of the personal jurisdiction defendants."). With tacit approval (and no contrary statements) from the state courts, the court agrees with the many federal decisions concluding New York law does not support co-conspirator jurisdiction under section 302(a)(1). Accordingly, the New York long-arm statute does not establish personal jurisdiction over Qatar National Bank.

Plaintiffs' arguments in response do not change this analysis. They primarily rely on *Berkshire Bank* and the two *Schwab* decisions to assert that conspiracy jurisdiction is appropriate under New York law. (Opp. at 73-76.) But these decisions had no opportunity to address section 302(a)(1); instead, they focused on the requisite *constitutional* considerations for a co-conspirator theory of jurisdiction. *See Berkshire Bank*, 2022 WL 569819, at *3-4 (Summary Order) (applying section 302(a)(2) and determining that co-conspirator jurisdiction comports with the standards of constitutional due process); *Schwab I*, 883 F.3d at 86-87 (discussing whether a co-conspirator's minimum contacts were in furtherance of the conspiracy and therefore indicated purposeful availment). The *Schwab* decisions, which arose in subsequent appeals from the LIBOR multi-district litigation, had no occasion to engage with the line of decisions discussed above because personal jurisdiction there rested on the California long-arm statute, rather than New York's. *See* 883 F.3d at 82. Further, the specific subset of defendants at issue did not contest the statutory basis for personal jurisdiction, *id.*; the only question before the court was whether members of the conspiracy with no connection to California beyond the acts of co-conspirators had

sufficient minimum contacts to satisfy constitutional standards. *Id.* at 86-87.[21]

But the analysis does not end there, because Plaintiffs' reliance on Rule 4(k)(2) could have, allowed for personal jurisdiction over Qatar National Bank notwithstanding the state forum long-arm statute. If a theory of jurisdiction based on Rule 4(k)(2) provided an independent basis for jurisdiction over Qatar National Bank, the court would need to determine whether the acts of Qatar National Bank's alleged co-conspirators create sufficient contact with the United States to comport with the requirements of due process. *See Dardana Ltd. v. Yuganskneftegaz,* 317 F.3d 202, 207 (2d Cir. 2003) ("Rule 4(k)(2) confers personal jurisdiction over a defendant so long as the exercise of jurisdiction comports with the Due Process Clause of the Fifth Amendment."). For this purpose, the *Schwab* cases provide the relevant analysis. In *Schwab I,* the Second Circuit laid out a three-prong test for determining whether allegations established minimal contacts with the forum jurisdiction under a conspiracy theory of jurisdiction. *Schwab I,* 883 F.3d at 87. Plaintiffs must allege "that (1) a conspiracy existed; (2) the defendant participated in the conspiracy; and (3) a co-conspirator's overt acts in furtherance of the conspiracy had sufficient contacts with a state to subject that

---

[21] In a separate section addressing jurisdiction over a different subset of defendants, *Schwab I* did reference section 302(a) even though New York law was inapplicable to the case at issue. 883 F.3d at 85. In that section, the Second Circuit addressed whether jurisdiction could constitutionally be asserted over a party solely on the basis of its agent's contacts with the forum—a situation explicitly contemplated by every provision of section 302(a), including 302(a)(1). *Id.* In concluding that it could, the Second Circuit stated it was "instructive" that its extensive case law "never suggested that due process require[d] something more than New York law." *Id.* Here, there is no assertion, conclusory or otherwise, that Masraf al Rayan acted as Qatar National Bank's agent in using its correspondent account, so this section of *Schwab I* is irrelevant to the analysis herein.

co-conspirator to jurisdiction in that state." *Id.* The court determined that the *Schwab I* plaintiffs had failed to adequately allege overt acts in furtherance of the conspiracy that occurred in the forum, and therefore affirmed the district court's dismissal of certain defendants for lack of personal jurisdiction. *Id.*

Only in *Schwab II*, after the plaintiffs amended the complaint to include "several overt, conspiratorial acts" by co-conspirators within the United States, did the Second Circuit allow suit against these defendants to proceed. *Schwab II*, 22 F.4th at 123. The decision emphasized, however, that the *Schwab I* test "*serves* the purposeful availment requirement, rather than supplants it." *Id.* at 125 (emphasis in original). Although the constitutional analysis "does not require a relationship of control, direction, or supervision" between the defendant and their co-conspirator, the overt acts and connection to the jurisdiction must be foreseeable. *Id.*

Although the Complaint repeatedly asserts a conspiracy existed, (*see, e.g.*, Compl. ¶¶ 1, 20, 359), it fails to allege in a non-conclusory manner any facts from which an inference of agreement between Qatar National Bank and the other defendants can be drawn. *See Halberstam v. Welch*, 705 F.2d 472, 477 (D.C. Cir. 1983) ("[T]he separate elements of civil conspiracy [are]: (1) an agreement between two or more persons; (2) to participate in an unlawful act, or a lawful act in an unlawful manner; (3) an injury caused by an unlawful overt act performed by one of the parties to the agreement; [and] (4) which overt act was done pursuant to and in furtherance of the common scheme."). The factual allegations regarding Qatar National Bank are limited to maintaining bank accounts and providing banking services for Qatar Charity and various Hamas-affiliated individuals, (Compl. ¶¶ 14-15, 171-172, 174-225), contributing to Qatar Charity, (*id.* at ¶¶ 227-28), and it being controlled by members of the Qatari

government and royal family, who themselves have ties to Hamas. (*Id.* ¶¶ 79-82, 111-124.) The Complaint makes no attempt to factually tie the Qatari government or royal family to the rocket attacks at issue (it lacks even a connection between Qatar National Bank and the transfers effected by Masraf al Rayan), and the only connection with the accounts maintained at Qatar National Bank is the conclusory statement that they "were used to finance Hamas and PIJ terrorist activities in Israel" because they "allowed the released terrorists to finance their personal expenditures, thereby freeing them to continue to conduct activities on behalf of Hamas and PIJ" and were "directly used . . . to further the efforts of Hamas and PIJ to carry out terrorist attacks." (*Id.* ¶ 226.) How or when these accounts were used is left to the imagination.

Putting aside the court's doubts that the Complaint has sufficiently alleged Qatar National Bank's agreement to conspire to finance rocket attacks or other specific terrorist activity, the *Schwab I* test also relies on the sufficiency of a co-conspirator's contacts with the jurisdiction. *Schwab I*, 883 F.3d at 87 (including requirement that the "co-conspirator's overt acts in furtherance of the conspiracy had sufficient contacts with a state to subject that co-conspirator to jurisdiction in that state"). For the reasons discussed above with respect to Masraf al Rayan and Qatar Charity, the allegations regarding any Defendant's contacts with the United States are insufficient to support personal jurisdiction, and therefore the conspiracy theory of jurisdiction under Rule 4(k)(2) set forth with respect to Qatar National Bank also fails.

Accordingly, Qatar National Bank's motion to dismiss for lack of personal jurisdiction pursuant to Rule 12(b)(2) is GRANTED.

### C.  Jurisdictional Discovery

Having found that Plaintiffs failed to state a *prima facie* case for personal jurisdiction over any of the three defendants, the court turns to Plaintiffs' request to conduct jurisdictional discovery. The

court has "broad discretion" in deciding whether to allow jurisdictional discovery. *Lehigh Valley Indus., Inc. v. Birenbaum*, 527 F.2d 87, 93 (2d Cir. 1975). "Courts frequently permit jurisdictional discovery where the plaintiff has made a sufficient start toward establishing jurisdiction, but will not permit jurisdictional discovery on the basis of a generalized request more akin to a fishing expedition." *Alexander v. Porter*, No. 13-CV-6834 (SLT) (JO), 2014 WL 7391683, at *6 (E.D.N.Y. Dec. 29, 2014).

As mentioned above, Plaintiffs could benefit from jurisdictional discovery into the specifics of the correspondent account utilizing transfers described in the Complaint. But none of these transfers could establish jurisdiction even if more detail were provided because, absent some factual allegation to the contrary, there is no causal connection between the transfers and the injuries suffered by Plaintiffs, which are not proximate in time. Any jurisdictional discovery at this stage would therefore amount to a fishing expedition into the existence of *later* transfers touching New York—transfers regarding which the Complaint is wholly silent.

Accordingly, Plaintiffs' request for jurisdictional discovery is DENIED.

39

## IV. CONCLUSION

For the aforementioned reasons, Masraf al Rayan, Qatar National Bank, and Qatar Charity's motions to dismiss are GRANTED WITHOUT PREJUDICE. Defendants' request for oral argument is DENIED as moot. Plaintiffs will be given leave to amend their Complaint within thirty days of the date of this Memorandum and Order. If Plaintiffs fail to amend their Complaint by this time, the Complaint will be dismissed with prejudice.

SO ORDERED.


Dated:     Brooklyn, New York
           March /ᒪ, 2023

                            s/Nicholas G. Garaufis

                            NICHOLAS G. GARAUFIS
                            United States District Judge